Michael P. Lehmann (Cal. Bar No. 77152)
Christopher L. Lebsock (Cal. Bar No. 184546)
Bonny E. Sweeney (Cal. Bar No. 176174)
HAUSFELD
600 Montgomery St., Suite 3200
San Francisco, California 94111
Tel: 415-633-1908
Fax: 415-358-4980
mlehmann@hausfeld.com
clebsock@hausfeld.com
bsweeney@hausfeld.com

Richard Lewis
(*pro hac vice* application forthcoming)
Kristen Ward Broz
(*pro hac vice* application forthcoming)
HAUSFELD
1700 K St. NW, Suite 650
Washington, D.C. 20006
Tel: 202-540-7200
Fax: 202-540-7201
rlewis@hausfeld.com
kward@hausfeld.com

*Attorneys for Plaintiffs*

Pat A. Cipollone, P.C.
(*pro hac vice* application forthcoming)
Rebecca R. Anzidei
(*pro hac vice* application forthcoming)
Robert B. Gilmore
(*pro hac vice* application forthcoming)
STEIN MITCHELL MUSE
CIPOLLONE & BEATO LLP
1100 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 737-7777
pcipollone@steinmitchell.com
ranzidei@steinmitchell.com
rgilmore@steinmitchell.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christopher Corcoran, Robert Garber, Toni Odorisio, Robert Guarnieri, Onnolee Samuelson, Ron W. Coder, and Irma Pacheco, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CVS Health Corporation, <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

## I.      INTRODUCTION

1.      Plaintiffs Christopher Corcoran, Robert Garber, Toni Odorisio, Robert Guarnieri, Onnolee Samuelson, Ron W. Coder, and Irma Pacheco (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against CVS Health Corporation ("CVS"), to recover monetary damages, injunctive relief, and other remedies for violations of state laws.

## II.     NATURE OF THE ACTION

2.      Plaintiffs allege that CVS knowingly and intentionally overcharged pharmacy customers for generic prescription drugs by submitting claims for payment to third-party payors at fraudulently inflated prices.  CVS's false and deceptive pricing scheme caused CVS pharmacy customers who purchased generic prescription drugs through third-party plans to pay significantly more in copayments than CVS charges cash-paying customers to purchase the same drugs.

3.      All class members are CVS customers who participate in third-party health care plans (either private insurance or a federal or state funded health care program) and have filled prescriptions for generic drugs at CVS pharmacies using coverage provided by their third-party health care plans. When a plan participant fills a prescription under a third-party health care plan, a third-party payor (generally a private, public or governmental entity) pays a portion of the participant's prescription drug costs.  The remaining portion is paid directly by the plan participant in the form of a copayment or "copay", which may include, for example, co-insurance, flat fees, or deductibles.  CVS collects the copay from the plan participant at the time a covered prescription drug is dispensed.  The amount of the copay collected by CVS from the plan participant may not exceed CVS's usual and customary price, which is generally defined as the cash price to the general public for the same drug.

4.      Defendant CVS is a nationwide retail pharmacy chain with over 7,866 stores throughout the United States, the District of Columbia, and Puerto Rico.  It is the nation's largest purchaser of drugs, counts one of every two Americans as a customer, and fills or manages more than one billion prescriptions per year—nearly one in every three prescriptions in the nation.  In 2014, CVS's net revenue was $139.37 billion, and it generated approximately $67 billion from its retail pharmacy business.

5.      CVS commonly submits electronic claims for payment to third-party payors when it fills prescriptions.  In submitting electronic claims for payment, CVS is required to state accurately its usual and customary price for every dispensing event, in accordance with the National Council for Prescription Drug Program ("NCPDP") requirements.  But for years, CVS has knowingly and intentionally submitted false and artificially inflated usual and customary prices for generic drugs to third-party payors.  Beginning in 2008, CVS orchestrated and carried out a massive fraud that resulted in substantial ill-gotten gains, and substantial harm to Plaintiffs and the members of the Classes they represent.  CVS created the "Health Savings Pass" ("HSP") program—the centerpiece of its fraud—as an integral vehicle for overcharging third-party payors and plan participants for covered drugs.  The HSP formulary includes long-term maintenance medications, which, in many instances, are prescribed to elderly and disabled patients on a regular basis.

6.      The HSP program served a twofold purpose for CVS.  Not only was the HSP program a means by which CVS could maintain and increase its market share by fending off discounted prices from its competitors, but importantly, CVS also intended that the HSP program would serve as a mechanism to hide CVS's true usual and customary prices from third-party payors.  By submitting false and inflated usual and customary prices to third-party payors, CVS knowingly and wrongfully overcharged plan participants copay amounts that often exceeded the HSP drug prices available to the general public for the same drugs.  In essence, the unlawful scheme that CVS designed allowed CVS to have its cake and eat it too:  CVS could maintain and increase its cash-paying customer base while also maintaining higher reimbursement payments from third-party payors and higher copays from plan participants who filled their prescriptions at CVS pharmacies.

7.      As a result of CVS's unlawful scheme, CVS overcharged Plaintiffs and the other class members for generic prescription drugs (in many cases by more than three or four times the usual and customary price) from November 2008 to the present.  CVS's misconduct has caused Plaintiffs and the other class members to suffer significant damages.

## III.    PARTIES

### A.    Plaintiffs.

8.      Plaintiff Christopher Corcoran is domiciled in the State of California.  Mr. Corcoran

has purchased generic versions of four monthly maintenance medications from CVS between November 2008 and the present. Mr. Corcoran carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS. All four medications prescribed to Mr. Corcoran are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Mr. Corcoran purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS' fraudulent scheme, Mr. Corcoran has, during the class period, paid copays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured.

9.   Plaintiff Robert Garber is domiciled in the Commonwealth of Massachusetts. Dr. Garber has purchased generic versions of five monthly maintenance medications from CVS between November 2008 and the present. Dr. Garber carries private health insurance through his employer and carried private health insurance during the time that he purchased generic medications from CVS. All five medications prescribed to Dr. Garber are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Dr. Garber purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS's fraudulent scheme, Dr. Garber has, during the class period, paid copays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured.

10.   Plaintiff Toni Odorisio is domiciled in the State of New York. Ms. Odorisio has purchased generic versions of two monthly maintenance medications from CVS between November 2008 and the present. Additionally, Ms. Odorisio carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS. Both medications prescribed to Ms. Odorisio are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Ms. Odorisio purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS's fraudulent scheme, Ms. Odorisio has, during the class period, paid copays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time she purchased her

generic prescriptions from CVS and has, thereby, been injured.

11.    Plaintiff Robert Guarnieri is domiciled in the State of New York. Mr. Guarnieri has purchased generic versions of three monthly maintenance medications from CVS between November 2008 and the present. Mr. Guarnieri carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS. All three medications prescribed to Mr. Guarnieri are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Mr. Guarnieri purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS's fraudulent scheme, Mr. Guarnieri has, during the class period, paid copays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured.

12.    Plaintiff Onnolee Samuelson is domiciled in the State of New York. Ms. Samuelson has purchased generic versions of two monthly maintenance medications from CVS between November 2008 and the present. Ms. Samuelson carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS. Both medications prescribed to Ms. Samuelson are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Ms. Samuelson purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS's fraudulent scheme, Ms. Samuelson has, during the class period, paid co-pays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time she purchased her generic prescriptions from CVS and has, thereby, been injured.

13.    Plaintiff Ron W. Coder is domiciled in the Commonwealth of Pennsylvania. Mr. Coder has purchased generic versions of three monthly maintenance medications from CVS between November 2008 and the present. Mr. Coder carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS. Numerous medications prescribed to Mr. Coder are on the CVS HSP generic medication list (attached hereto as Exhibit A). Cash-paying customers paid $9.99 for a 90-day supply of the same prescriptions that Mr. Coder purchased from 2008 to 2010, and $11.99 from 2011 to the present. As a result of CVS's fraudulent

scheme, Mr. Coder has, during the class period, paid co-pays substantially higher than $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured.

14.    Plaintiff Irma Pacheco is domiciled in the State of Texas.  Ms. Pacheco has purchased generic versions of at least one monthly maintenance medication from CVS between October 2014 and the present.  Ms. Pacheco carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.  Cash-paying customers paid $11.99 for a 90-day supply of the same prescription that Ms. Pacheco purchased from 2014 to the present.  As a result of CVS's fraudulent scheme, Ms. Pacheco has, during the class period, paid co-pays substantially higher than $11.99 from 2014 to the present per 90-day supply when she purchased her generic prescriptions from CVS and has, thereby, been injured.

### B.    Defendant.

15.    Defendant CVS Health Corporation, a/d/a CVS/Caremark, CVS/Pharmacy, CVS/Minute Clinic and CVS/Specialty (hereinafter, "CVS") is a corporation organized under the laws of Delaware.  CVS is headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895.

16.    CVS is a nationwide retail pharmacy chain with more than 7,866 pharmacies operating under the trade names CVS Pharmacy and Longs Drugs throughout the United States, the District of Columbia, and Puerto Rico, including numerous locations in this District.  As one of the nation's leading pharmacy businesses, CVS "has relationships with over 150 million consumers, one of every two Americans, and has access to data on 30 percent of all prescriptions in the United States."  CVS fills or manages more than 1 billion prescriptions per year, and, in 2014, earned net revenue of $139.37 billion.  Significantly, CVS's retail prescription drug sales accounted for approximately $67 billion in revenue in 2014.

### IV.    JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds of thousands, and likely millions, of proposed Class members; the aggregate amount in controversy

exceeds the jurisdictional amount or $5,000,000.00; and CVS is a citizen of a State different from that of Plaintiffs and members of the Class. This Court also has subject matter jurisdiction over Plaintiffs' and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

18.     This Court has jurisdiction over CVS because CVS intentionally avails itself of the California consumer market through the promotion, sale, marketing, and distribution of their products to California residents. As a result, jurisdiction in this Court is proper and necessary. Moreover, CVS's wrongful conduct, as described herein, foreseeably affects consumers in California and nationwide.

19.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## V.     FACTS

### A.     Third-party Plan Coverage and Claims Submission.

20.     The majority of patients in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses. Few plans cover all expenses, but, instead, require plan participants to pay a portion of their drug costs out-of-pocket. These out-of-pocket expenses include copayments, co-insurance, and/or deductibles.

21.     Even though plan participants cannot and do not negotiate the price charged by CVS for prescription drugs and do not negotiate the copayment price for the drug in a given transaction, they are required to pay to CVS a copayment amount in order to receive the prescription.

22.     Plan participants pay premiums, either on their own or through their employer, to a third-party payor for the purpose of insuring against healthcare costs, including prescriptions.

23.     Plan participants (including Plaintiffs and the Class), at a minimum, expect to pay the same prices as uninsured or cash-paying individuals for a prescription. Otherwise, they would not only receive no benefit from their insurance, but would, in fact, be punished for having insurance. Therefore, given the network of entities negotiating the prices of prescription drugs on their behalf and the premiums paid for coverage, they reasonably expect to pay less than cash-paying customers who do not have insurance coverage.

24.     CVS uses a uniform process at its locations for each prescription drug transaction. When a patient fills a prescription at a CVS pharmacy, the pharmacist or pharmacy tech enters the prescription information and any applicable insurance or benefit information into CVS's computerized claims processing system. Once this information is entered, CVS submits the claim for dispensing and adjudication.

25.     Adjudication is the automated process by which CVS submits prescription claims electronically in real time to the third-party payor (or the third-party payor's agent). During adjudication, the claim is verified and/or confirmed for patient eligibility for insurance or another prescription drug benefit. Through this process, using the drug price information from CVS, the third-party payor sets the reimbursement amount and any applicable copayment or coinsurance.

26.     For all times relevant to the allegations in this Complaint, CVS used the industry standard NCPDP reporting for the electronic transmission and adjudication of its pharmacy claims.

27.     As a required component of the adjudication process, CVS reports to third-party payors CVS's usual and customary ("U&C") price for the drug being dispensed. The U&C price is generally defined as the cash price to the general public, which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed. Pursuant to the NCPDP reporting standard, pharmacies are required to report the amount of its U&C price for each prescription transaction using NCPDP's mandatory pricing segment code 426–DQ.

28.     Based on the data reported by CVS, third-party payors identify the copayment amount that the patient must pay to CVS in a specific transaction. The copayment amount is a portion of the total drug price and cannot exceed the drug price. The remainder of the drug price is reimbursed to the pharmacy by the third-party payor.

29.     The out-of-pocket copayment that a plan participant is required to pay in order to receive the prescription is calculated based on the U&C price reported by CVS. Not only must the copayment be equal to or less than the drug price, the drug price cannot exceed the U&C price. As a result, the copayment cannot exceed the U&C price.

30.     In some situations, the copayment may only be charged as a percentage of the U&C price. For instance, suppose a third-party payor's negotiated price for a specific drug is $36 with a

beneficiary copayment of 25% for a 90-day supply of a generic prescription drug.  If, however, CVS reports to the third-party payor that the U&C price for the same 90-day supply of the same drug is $20, the third-party payor would consider the $20 price to take the place of the $36 negotiated price.  In such a scenario, the third-party payor would adjudicate CVS's claim for $20, and the plan participant would pay only a $5 copay, rather than a $9 copay.

**B.    The HSP Program.**

31.    In 2006, large "big-box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.

32.    For example, in September 2006, Wal-Mart began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  In November of that same year, Target began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  Other retailers with pharmacy departments, which were able to absorb lower margins on generic drug sales because pharmacy sales represented such a low percentage of their total sales, followed suit.  Wal-Mart and Target report to third-party payors, as their U&C prices, the lower $4 per 30-day prices for generic prescription drugs.

33.    CVS was unwilling to match the deep discounts on generic drugs provided to customers by big-box retailers.  So, in response to lower prices and increased competition for cash customers, CVS created a custom-branded loyalty program targeted at cash customers and other price-sensitive customers.

34.    In November 2008, CVS launched its custom branded generic prescription drug program—the HSP program.

35.    The HSP program is intended to offer competitive prices to cash customers while maximizing third-party reimbursements and copayments through reporting artificially inflated U&C prices to third-party payors.

36.    Specifically, as designed, the HSP program is a non-networked discount prescription drug program that offers savings on hundreds of generic medications.  The HSP program is not a third-party plan; it is not insurance or a substitute for insurance.  Enrollment in the HSP program was and continues to be open to cash-paying customers.  From November 9, 2008 through 2010, such

CLASS ACTION COMPLAINT

customers could join the HSP for a $10 fee.  During this time, CVS charged HSP members $9.99 for a 90-day supply of the most commonly prescribed generic drugs ("HSP Generics").  Moreover, CVS pharmacists routinely prorated prescriptions written for less than 90-days.  For example, CVS would charge a HSP member roughly $3.33 for a 30-day supply.  In 2011, CVS raised its enrollment fee to $15 a year and the price of the over 400 HSP generics to $11.99 for a 90-day supply (or a prorated amount of approximately $3.99 for a 30-day supply).

37.   The 400 drugs included under the HSP program are among some of the most commonly prescribed generic drugs for cardiovascular, allergy, diabetes, pain, and arthritis, cholesterol, skin conditions, mental health, women's health, viruses, thyroid conditions, glaucoma and eye care, gastrointestinal disorders, and other common ailments.

38.   CVS designed the HSP program to appeal to price sensitive customers, which, for the most part, are customers who take long-term maintenance medications.  Customers who take maintenance medications, many of whom are elderly or disabled, are the most valuable to CVS.

### C.   CVS's Unlawful Conduct.

39.   Although CVS sought to retain and attract cash customers by implementing the HSP program, it was unwilling to lower the price charged to third-party payors.  The HSP program enabled CVS to unlawfully report artificially inflated U&C prices to third-party payors, thereby allowing CVS to collect from consumers artificially inflated copays.

40.   CVS is on notice that third-party payors calculate the drug price to be paid to the pharmacy based on whether the U&C submitted to the third-party payor is less than or greater than the negotiated price.  Where the U&C is less than the negotiated price, CVS may not charge a drug price greater than the U&C.  This is clear in contracts, network pharmacy manuals, payor sheets, and CVS's own transaction data, which contain reimbursements adjudicated under this formula.

41.   Third-party payors state, in detail, how a beneficiary's copay is determined in their pharmacy agreements and manuals.  CVS is in possession of these documents and is aware of their contents.  Many third-party payors specifically contemplate a situation where the U&C is less than the copay.  In these cases, the third-party payors forbid CVS from charging plan participants a copay in excess of the U&C.

CLASS ACTION COMPLAINT

9

42.     Through the HSP program, CVS implemented a scheme to create a new category of cash customers, in order to avoid lowering prices charged to third-party payors and their plan participants.  CVS designed the HSP to split CVS's cash business, formerly consisting solely of people who pay the cash price (the usual and customary price), into two segments: customers who pay the retail price, and customers who pay the HSP price.

43.     The customers who purchase prescriptions outside of the HSP program and pay the retail make up less than 50 percent of CVS's cash business and less than three percent of CVS's total prescription business.  In other words, most of CVS's cash-paying customers pay the HSP price.

44.     As previously stated, the U&C price is the cash price offered to the general public for specific drugs.  CVS offers the HSP price as the cash price to the general public and the HSP price is the most common price paid by CVS's cash-paying customers.  The HSP price is CVS's U&C price.

45.     Nonetheless, CVS continues deceptively to submit the retail price as its purported U&C price to third-party payors.  CVS can accomplish this because third-party payors are not privy to what prices CVS charges its cash customers, including its HSP customers, and what percentage of CVS's cash customers pay each price.  Therefore, third-party payors and plan participants have no way of determining on their own whether the price CVS submits as its U&C is, in fact, the most common price offered to cash paying members of the general public.

46.     In essence, the HSP program serves as a camouflage or ruse to avoid reporting the HSP prices to third-party payors as CVS's U&C price.

47.     Instead of reporting the more common HSP price as the U&C price, CVS reports a significantly inflated price.

48.     CVS falsely reports, and continues to report, to third-party payors U&C prices for HSP Generics that are substantially higher than the HSP price it offers to the general public.

49.     The inflated U&C reported by CVS to third-party payors does not take into account the specifics of any particular third-party plan.  In fact, for a given drug, strength, and quantity, CVS may report the same U&C to all third-party payors despite any variations in their respective plans.

50.     Beginning in November 2008 and continuing through the present, CVS has reported to third-party payors artificially inflated U&C prices for the same prescription drugs that CVS offers for

CLASS ACTION COMPLAINT

10

lower prices under the HSP program.  CVS has thereby caused (and continues to cause) plan participants (including Plaintiffs and other class members) to pay inflated copays to CVS, because the copays are calculated based on, and are not supposed to exceed, the U&C prices.

51.   CVS directly competes for customers with other national retail pharmacies, such as Wal-Mart, Target, Costco, and ShopRite.  In contrast to other national retail pharmacies who report the discounted price as the U&C price, CVS unlawfully reports a marked-up and baseless U&C price that deceives and gouges plan participants who are forced to pay inflated copayments.

52.   As part of its scheme, CVS has reported U&C prices for generic prescription drugs that are up to eleven (11) times the U&C prices reported by some of its most significant competitors and its own HSP prices.  The chart below shows U&C prices submitted to Pennsylvania's Medicaid program for the purposes of claims adjudication.  The U&Cs submitted by CVS are unequivocally inflated.

| Drug - 90-Day Supply | Shoprite Reported U&C | WalMart Reported U&C | Target Reported U&C | Costco Reported U&C | CVS Reported U&C | CVS HSP Price |
|---|---|---|---|---|---|---|
| Carvedilol 12.5 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $120.99 | $11.99 |
| Lisinopril 20 mg tab | $9.99 | $10.00 | $10.00 | n/a | $42.19 | $11.99 |
| Lisinopril-HTCZ 20–12.5 mg tab | $9.99 | $24.00 | $24.00 | n/a | $58.59 | $11.99 |
| Metformin HCL 1000 mg tab | $9.99 | $24.00 | $24.00 | $9.99 | $86.59 | $11.99 |
| Metoprolol Tartrate 50 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $48.99 | $11.99 |
| Warfarin Sodium 5 mg tab | $9.99 | $10.00 | $24.00 | $28.00 | $48.39 | $11.99 |
| Meloxicam 15 mg tab | $9.99 | $10.00 | n/a | $9.23 | $79.59 | $11.99 |
| Alendronate Sodium 70 mg tab | $29.99 | $24.00 | n/a | $17.61 | $134.99 | $11.99 |

53.   For years, this pricing scheme has been a financial boon for CVS.  Since 2008, CVS

has collected more than $46 billion in copays from plan participants including Plaintiffs and other class members.  On information and belief, CVS's wrongful overcharges to Plaintiffs and the other members of the Classes comprise a meaningful portion of CVS's generic prescription drug copay revenue.

54.     By reporting false U&C prices to third-party payors, CVS has caused Plaintiffs and members of the Classes to pay, and continue to pay, to CVS, artificially high copayments for generic prescription drugs.  On information and belief, there have been millions of instances where CVS intentionally submitted fraudulently-inflated U&C pricing information to third-party payors, relating to Plaintiffs' and members of the Classes' purchases of the relevant generic prescription drugs from CVS pharmacies during the class period, including the specific transactions by Plaintiffs described herein.

55.     On or about February 5, 2009, March 16, 2009, and April 17, 2009, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.  Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  For each of these sales, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $28.10 for the 30-day supply.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

56.     On or about February 5, 2009, March 16, 2009, and April 17, 2009, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.  Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  For each of these sales, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $10.42 for the 30-day supply.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a

90-day supply.

57.     On or about November 8, 2010, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.   Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $10.27 for the 30-day supply.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

58.     On or about February 5, 2011 and March 6, 2011, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California. Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.   For each of these sales CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $10.27 for the 30-day supply.   CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

59.     On or about November 4, 2011, December 9, 2011, and January 6, 2012, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.   Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.   For each of these sales CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $8.45 for the 30-day supply.   On or about February 10, 2012, March 10, 2012, April 9, 2012, May 10, 2012, June 2, 2012, and June 28, 2012, Mr. Corcoran again filled prescriptions for a 30-day supply of the same drug at the same strength at the same pharmacy.   For each of these sales, CVS also submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $8.09 for the 30-day supply at the same pharmacy using the same insurance.   CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.   At the time of the purchase, CVS's true U&C price for this drug and this

strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

60.    On or about May 25, 2012 and June 20, 2012, Plaintiff Christopher Corcoran filled a prescription for a 60-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.  Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  For each of these sales, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $8.14 for the 60-day supply.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price. At the time of the purchase, CVS's true U&C price for this drug and this strength was $7.98 for a 60-day supply and $11.99 for a 90-day supply.

61.    On or about August 9, 2012, September 4, 2012, October 26, 2012, November 26, 2012, December 27, 2012, January 22, 2013, February 19, 2013, March 28, 2013, April 23, 2013, and May 29, 2013, Plaintiff Christopher Corcoran filled a prescription for a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.  Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  For each of these sales, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $10 for the 60-day supply.  On or about January 8, 2015 and February 11, 2015, Mr. Corcoran again filled a prescription for a 60-day supply of the same drug at the same strength, at the same pharmacy.  For each of these sales, CVS also submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $8.99 for the 60-day supply at the same pharmacy using the same insurance.  On or about April 2, 2015, CVS charged Mr. Corcoran a copay of $9.15.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $7.98 for a 60-day supply and $11.99 for a 90-day supply.

62.    On or about December 16, 2014, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.   Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of

$5.25 for the 30-day supply.  On or about January 13, 2015 and February 10, 2015, Mr. Corcoran paid a copay of $5 for the 30-day supply of the same drug at the same strength, at the same pharmacy using the same insurance.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

63.   On or about July 29, 2012, September 1, 2012, September 29, 2012, October 31, 2012, December 6, 2012, December 29, 2012, January 21, 2013, February 19, 2013, April 5, 2013, May 3, 2013, and May 29, 2013, Plaintiff Christopher Corcoran filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 738 Bancroft Road, Walnut Creek, California.  Mr. Corcoran purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $10 for the 30-day supply.  On or about June 27, 2013, July 28, 2013, August 27, 2013, October 1, 2013, November 3, 2013, and December 8, 2013, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $5.65 for the 30-day supply at the same pharmacy using the same insurance. On or about January 9, 2014, March 3, 2014, March 31, 2014, May 6, 2014, July 10, 2014, August 6, 2014, September 10, 2014, October 7, 2014, November 7, 2014, and April 9, 2015, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $5.40 for the 30-day supply, and on or about February 11, 2015, March 14, 2015, and May 9, 2015, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Corcoran a copay of $5.25 for the 30-day supply.  CVS is not permitted to charge Mr. Corcoran a copay that exceeds the U&C price. At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

64.   CVS overcharged Mr. Corcoran at least $275.93 between February 5, 2009 and May 9, 2015.  Mr. Corcoran anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

65.   On or about February 5, 2009, Plaintiff Robert Garber filled a prescription for a 30-day

supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.  Dr. Garber purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $8.18 for the 30-day supply.  On or about March 6, 2009 and March 28, 2009, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $10 for the 30-day supply at the same pharmacy using the same insurance.  On or about May 1, 2009 and July 23, 2009, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $9.16 for the 30-day supply, and on or about May 31, 2009, August 26, 2009, September 28, 2009, October 27, 2009, November 25, 2009, and December 26, 2009, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $10.55.  On or about June 28, 2009 January 28, 2010, February 22, 2010, March 25, 2010, May 2, 2010, and May 31, 2010, CVS charged Dr. Garber a copay of $8.16 for the 30-day supply, and on or about June 29, 2010, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $8.15.  Finally, on or about July 22, 2010, August 31, 2010, September 22, 2010, October 23, 2010, November 25, 2010 and December 21, 2010, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $7.50 for the 30-day supply.  CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

66.     On or about February 9, 2009 and March 28, 2009, Plaintiff Robert Garber filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.  Dr. Garber purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $10 for the 30-day supply.  CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

67.     On or about November 9, 2010, Plaintiff Robert Garber filled a prescription for a 30-

day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.   Dr. Garber purchased this prescription using his insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $16.49 for the 30-day supply.   CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

68.   On or about January 20, 2011, Plaintiff Robert Garber filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.   Dr. Garber purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $7.51 for the 30-day supply.   On or about February 20, 2011, March 22, 2011, and April 26, 2011, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $7.36 for the 30-day supply at the same pharmacy using the same insurance.   On or about May 28, 2011 and June 26, 2011, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $7.30 for the 30-day supply.   CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

69.   On or about March 23, 2012, May 21, 2012, July 22, 2012, and September 19, 2012, Plaintiff Robert Garber filled a prescription for a 60-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts. Dr. Garber purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $11.27 for the 60-day supply.   CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply, $6.66 for a 60-day supply, and $11.99 for a 90-day supply.

CLASS ACTION COMPLAINT

17

70.     On or about May 15, 2013, June 14, 2013, July 15, 2013, August 12, 2013, September 9, 2013, October 16, 2013, November 15, 2013, December 23, 2013, January 10, 2014, February 10, 2014, March 6, 2014, April 9, 2014, May 8, 2014, June 4, 2014, July 3, 2014, August 3, 2014, August 30, 2014, September 28, 2014, October 25, 2014, November 24, 2014, December 24, 2014, January 23, 2015, February 20, 2015, and March 24, 2015, Plaintiff Robert Garber filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.  Dr. Garber purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $5 for the 30-day supply.  CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

71.     On or about June 10, 2013, Plaintiff Robert Garber filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts. Dr. Garber purchased this prescription using insurance provided through a third-party payor.  Dr. Garber's insurance plan mandates that his copay cannot exceed the U&C.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $5 for the 30-day supply.  CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

72.     On or about November 20, 2013, December 13, 2013, January 3, 2014, January 31, 2014, and March 3, 2014, Plaintiff Robert Garber filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 95 Washington Street, Canton, Massachusetts.   Dr. Garber purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $13.39 for the 30-day supply.  On or about April 10, 2014, May 8, 2014, June 3, 2014, July 2, 2014, August 2, 2014, August 29, 2014,

September 27, 2014, October 24, 2014, and December 28, 2014, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $15.99 for the 30-day supply at the same pharmacy using the same insurance.  On or about January 23, 2015, February 19, 2015, and March 23, 2015, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Dr. Garber a copay of $5 for the 30-day supply.  CVS is not permitted to charge Dr. Garber a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

73.     CVS overcharged Dr. Garber at least $358.45 between February 5, 2009 and March 24, 2015.  Dr. Garber anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS's wrongful conduct is not stopped.

74.     On or about November 10, 2008, January 11, 2009, February 8, 2009, May 7, 2009, June 25, 2009, July 18, 2009, September 8, 2009, October 7, 2009, November 3, 2009, December 3, 2009, January 1, 2010, January 31, 2010, March 4, 2010, April 1, 2010, and August 18, 2010, Plaintiff Toni Odorisio filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Odorisio purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Odorisio a copay of $5 for the 30-day supply.  CVS is not permitted to charge Ms. Odorisio a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

75.     On or about March 13, 2009, Plaintiff Toni Odorisio filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Odorisio purchased this prescription using insurance provided through a third-party payor. CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Odorisio a copay of $5 for the 30-day supply.  CVS is not permitted to charge Ms. Odorisio a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and

$9.99 for a 90-day supply.

76.     On or about March 7, 2011, Plaintiff Toni Odorisio filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Odorisio purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Odorisio a copay of $5 for the 30-day supply.  CVS is not permitted to charge Ms. Odorisio a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

77.     CVS overcharged Ms. Odorisio at least $27.03 between November 10, 2008 and March 7, 2011.  Ms. Odorisio anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

78.     On or about March 6, 2009, Plaintiff Robert Guarnieri filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Mr. Guarnieri purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Guarnieri a copay of $5 for the 30-day supply.  CVS is not permitted to charge Mr. Guarnieri a copay that exceeds the U&C price.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

79.     On or about April 2, 2009, June 24, 2009, September 20, 2009, December 21, 2009, June 14, 2010, and November 3, 2010, Plaintiff Robert Guarnieri filled a prescription for a 90-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Mr. Guarnieri purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Guarnieri a copay of $12.50 for the 90-day supply.  CVS is not permitted to charge Mr. Guarnieri a copay that exceeds the U&C price.  At the time of the

CLASS ACTION COMPLAINT

1   purchase, CVS's true U&C price for this drug and this strength was $9.99 for a 90-day supply.

2   80.    On or about September 14, 2009, Plaintiff Robert Guarnieri filed a prescription for a

3   30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as

4   Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Mr. Guarnieri

5   purchased this prescription using insurance provided through a third-party payor. CVS submitted an

6   inflated U&C to the third-party payor and proceeded to charge Mr. Guarnieri a copay of $5 for the 30-

7   day supply. CVS is not permitted to charge Mr. Guarnieri a copay that exceeds the U&C price. At the

8   time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day

9   supply and $9.99 for a 90-day supply.

10   81.    On or about March 18, 2010, Plaintiff Robert Guarnieri filed a prescription for a 90-

11   day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit

12   A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Mr. Guarnieri

13   purchased this prescription using insurance provided through a third-party payor. CVS submitted an

14   inflated U&C to the third-party payor and proceeded to charge Mr. Guarnieri a copay of $12.50 for the

15   90-day supply. CVS is not permitted to charge Mr. Guarnieri a copay that exceeds the U&C. At the

16   time of the purchase, CVS's true U&C price for this drug and this strength was $9.99 for a 90-day

17   supply.

18   82.    On or about August 24, 2011, Plaintiff Robert Guarnieri filed a prescription for a 90-

19   day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit

20   A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Mr. Guarnieri

21   purchased this prescription using insurance provided through a third-party payor. CVS submitted an

22   inflated U&C to the third-party payor and proceeded to charge Mr. Guarnieri a copay of $24.12 for the

23   90-day supply.  On or about November 9, 2011, CVS submitted an inflated U&C to the third-party

24   payor and proceeded to charge Mr. Guarnieri a copay of $23.73 for the 90-day supply at the same

25   pharmacy using the same insurance.  CVS is not permitted to charge Mr. Guarnieri a copay that

26   exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength

27   was $11.99 for a 90-day supply.

28   83.    CVS overcharged Mr. Guarnieri at least $44.78 between March 6, 2009 and November

CLASS ACTION COMPLAINT

9, 2011.   Mr. Guarnieri anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

84.     On or about November 14, 2008, December 22, 2008, January 29, 2009, March 5, 2009, April 16, 2009, May 19, 2009, and June 21, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.   Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $10 for the 30-day supply.   CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

85.     On or about December 7, 2008, January 16, 2009, February 20, 2009, April 3, 2009, May 19, 2009, and June 21, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.   Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $10 for the 30-day supply.   CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

86.     On or about July 28, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.   CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $5 for the 30-day supply.   CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.   At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day

supply and $9.99 for a 90-day supply.

87.     On or about July 28, 2009 and September 4, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor. CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $5 for the 30-day supply. CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C. At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

88.     On or about October 11, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor. CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $5 for the 30-day supply. CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C. At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

89.     On or about October 12, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor. CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $5 for the 30-day supply. CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C. At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

90.     On or about November 18, 2009 and December 18, 2009, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New

York.  Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $3.34 for the 30-day supply. On or about August 24, 2010, September 26, 2010, October 30, 2010, and December 1, 2010, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $9.82 for the 30-day supply at the same pharmacy using the same insurance.  On or about March 27, 2010, April 25, 2010, June 10, 2010, and July 16, 2010, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $12.18 for the 30-day supply, and on or about January 9, 2010 and February 22, 2010 CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $13.93.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

91.    On or about January 9, 2010 and February 22, 2010, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $13.93 for the 30-day supply.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

92.    On or about March 2, 2010, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $6.50 for the 30-day supply.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

CLASS ACTION COMPLAINT

93.     On or about March 27, 2010, April 25, 2010, June 10, 2010, and July 16, 2010, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $12.18 for the 30-day supply.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.33 for a 30-day supply and $9.99 for a 90-day supply.

94.     On or about March 27, 2010, July 16, 2010, and October 14, 2010, Plaintiff Onnolee Samuelson filled a prescription for a 90-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $14 for the 90-day supply.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $9.99 for a 90-day supply.

95.     On or about January 11, 2011 and February 16, 2011, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $9.82 for the 30-day supply.  On or about March 21, 2011 and April 23, 2011, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $7.49 for the 30-day supply at the same pharmacy using the same insurance.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

96.     On or about May 17, 2011, June 28, 2011, August 1, 2011, September 5, 2011, October

11, 2011, and November 14, 2011, Plaintiff Onnolee Samuelson filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York.  Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $7.50 for the 30-day supply.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $3.99 for a 30-day supply and $11.99 for a 90-day supply.

97.     On or about January 20, 2011, Plaintiff Onnolee Samuelson filled a prescription for a 90-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 19 S. Main Street, Jamestown, New York. Ms. Samuelson purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $14 for the 90-day supply.  On or about August 8, 2011 and November 14, 2011, CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Samuelson a copay of $21.90 for the 90-day supply at the same pharmacy using the same insurance.  CVS is not permitted to charge Ms. Samuelson a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $11.99 for a 90-day supply.

98.     CVS overcharged Ms. Samuelson at least $314.31 between November 14, 2008 and November 14, 2011.  Ms. Samuelson anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

99.     On or about January 17, 2011, Plaintiff Ronald Coder filled a prescription for a 30-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A) at the CVS pharmacy located at 355 Lincoln Avenue, Bellevue, Pennsylvania.  Mr. Coder purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Mr. Coder a copay of $5 for the 30-day supply.  CVS is not permitted to charge Mr. Coder a copay that exceeds the U&C.  At the time of the purchase, CVS's

true U&C price for this drug and this strength was $11.99 for a 90-day supply.

100.   CVS overcharged Mr. Coder at least $1.01 on January 17, 2011.  Mr. Coder anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

101.   On or about October 2, 2014 and December 30, 2014, Plaintiff Irma Pacheco filled a prescription for a 180-day supply of a prescription drug on the CVS HSP generic medication list (attached hereto as Exhibit A), at the CVS pharmacy located at 1800 Brown Boulevard, Arlington, Texas.  Ms. Pacheco purchased this prescription using insurance provided through a third-party payor.  CVS submitted an inflated U&C to the third-party payor and proceeded to charge Ms. Pacheco a copay of $30 for the 180-day supply.  CVS is not permitted to charge Ms. Pacheco a copay that exceeds the U&C.  At the time of the purchase, CVS's true U&C price for this drug and this strength was $11.99 for a 90-day supply and $23.98 for a 180-day supply.  CVS overcharged Ms. Pacheco by at least $12.04.

102.   CVS overcharged Ms. Pacheco at least $12.04 between October 2, 2014 and December 30, 2014.  Ms. Pacheco anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

103.   As a result of its fraudulent scheme, CVS has overcharged and continues to overcharge hundreds of thousands, and likely millions, of plan participants (including Plaintiffs and the Classes) who purchased some of the most commonly prescribed generic drugs from CVS Pharmacies around the country.  Class members were overcharged by at least the difference between their copays and the U&C.

## VI.   CLASS ALLEGATIONS

104.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and the following national class and state subclasses:

> All CVS customers in the United States who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an

insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

**STATE SUBCLASSES**

California Subclass:
CVS customers in the State of California who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Massachusetts Subclass:
CVS customers in the Commonwealth of Massachusetts who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount

such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

New York Subclass:

CVS customers in the State of New York who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Michigan Subclass:

CVS customers in the State of Michigan who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-

day supply from 2012 to the present.

Texas Subclass:

CVS customers in the State of Texas who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Florida Subclass:

CVS customers in the State of Florida who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Illinois Subclass:

CVS customers in the State of Illinois who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment,

including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Pennsylvania Subclass:

CVS customers in the Commonwealth of Pennsylvania who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional  pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

Virginia Subclass:

CVS customers in the Commonwealth of Virginia who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass prescription drug list attached as Exhibit A; (2) received prescription drug benefits from a third-party payor (i.e., an insurance company, Medicare, Medicaid, or another payor); (3) paid CVS an out-of-pocket copayment, including flat fee, coinsurance and deductible, when purchasing the generic prescription drug; and (4) whose copay for the prescription was: (a) more than $9.99 for a 90-day supply or more than any multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or whose copay for the prescription was more than $11.99 for a 90-day supply or any multiple or proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present; or (b) in excess of the scheduled percentage of the drug price, where the drug price is $9.99 for a 90-day supply or any

multiple or proportional pro-rated amount such as $3.33 for a 30-day supply or $19.98 for a 180-day supply from 2008 to 2011, or $11.99 for a 90-day supply or any multiple proportional pro-rated amount such as $3.99 for a 30-day supply or $23.98 for a 180-day supply from 2012 to the present.

105.     Excluded from the foregoing Class and Subclasses are CVS, their officers and directors.

106.     The Class and Subclasses consist of at least hundreds of thousands, and likely millions, of individual CVS customers, making joinder impractical, in satisfaction of FRCP 23(a)(1).  The exact size of the Class and Subclasses and the identities of the individual members thereof are ascertainable through CVS's records, including but not limited to their billing and collection records.

107.     The claims of Plaintiffs are typical of the Class and Subclasses.  The claims of the Plaintiffs and the respective classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiffs and their respective classes.

108.     The respective classes have a well-defined community of interest.  CVS has acted and failed to act on grounds generally applicable to the Plaintiffs and the Class and Subclasses, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the respective classes.

109.     There are many questions of law and fact common to the claims of Plaintiffs and the Class and Subclasses, and those questions predominate over any questions that may affect only individual class members within the meaning of FRCP 23(a)(2) and 23(b)(2).

110.     Common questions of fact and law affecting members of the Class and Subclasses include, but are not limited to, the following:

   a.   Whether CVS artificially inflated the U&C prices that it reported pursuant to the NCPDP reporting standard;

   b.   Whether CVS omitted and concealed material facts from its communications and disclosures regarding its pricing scheme;

   c.   Whether CVS has overcharged and continues to overcharge copays to hundreds of thousands, and likely millions, of plan participants (including Plaintiffs and the Class and Subclasses) who purchased some of the most commonly prescribed generic drugs from CVS Pharmacies around the country;

d.  Whether CVS has engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of generic prescription drugs;

e.  Whether, as a result of CVS's conduct, Plaintiffs and the Class and Subclasses have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

f.  Whether, as a result of CVS's misconduct, Plaintiffs and the Class and Subclasses are entitled to injunctive, equitable and/or other relief, and, if so, the nature of such relief.

111.  Absent a class action, most of the members of the Class and Subclasses would find the cost of litigating their claims to be prohibitive and will have no effective remedy.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

112.  Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses.  Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class and Subclasses.

**VII.    TOLLING OF THE STATUTE OF LIMITATIONS**

113.  Plaintiffs and the Class and Subclasses had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

114.  Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

115.  CVS engaged in a secret scheme that did not reveal facts that would have put Plaintiffs or the Class or Subclasses on inquiry notice that CVS was charging inflated prices for generic prescription drugs.

116.    Because CVS's scheme was kept secret, Plaintiffs and the Class Subclasses were unaware of CVS's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for generic prescription drugs in the United States during the class period.

117.    CVS actively misled the public about the HSP scheme by not disclosing to Plaintiffs and the Class and Subclasses (or to third-party payors) that the U&C prices reported to third-party payors for the generic drugs in the HSP program were far higher than the HSP prices.  CVS charged Plaintiffs and the Class and Subclasses copayments for the drugs they purchased that reflected CVS' artificially inflated U&C prices.  CVS also failed to post drug prices in a clear manner and in a way that would alert Plaintiffs and the Class and Subclasses to the artificially inflated prices charged by CVS.  By so doing, CVS misled Plaintiffs and the Class and Subclasses into paying to CVS inflated copays for these drugs.

118.    CVS's affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

119.    CVS's unlawful pricing activities were inherently self-concealing because they involved misrepresenting and falsely reporting the U&C price.  If CVS had been open and notorious about its fraudulent pricing scheme, it would never have succeeded.

120.    Plaintiffs and the Class and Subclasses could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because CVS employed deceptive practices and techniques of secrecy to avoid detection of their activities.  CVS fraudulently concealed their activities by various means and methods, including misrepresentations regarding the real U&C prices of generic prescription drugs.

121.    Because CVS affirmatively concealed its scheme, Plaintiffs and the Class and Subclasses had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether CVS committed the actionable activities detailed herein.

122.    As a result of CVS's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class and Subclasses have as a result of the unlawful conduct alleged in this Complaint.

**COUNT I: FRAUD**

**Asserted by the National Class against CVS**

123. Plaintiffs repeat paragraphs 1 through 122 above.

124. CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

125. CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

126. CVS intended to induce Plaintiffs and Class Members to rely on its misrepresentations and/or omissions. CVS knew that Plaintiffs and Class Members would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

127. Plaintiffs and Class Members justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Class Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions. Plaintiffs' and Class Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

128. As a proximate result of CVS's conduct, Plaintiffs and Class Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

129. CVS is therefore liable to Plaintiffs and Class Members for the damages they sustained.

**COUNT II: CONSTRUCTIVE FRAUD**

**Asserted by the National Class against CVS**

130. Plaintiffs repeat paragraphs 1 through 122 above.

131. In the circumstances alleged above, Plaintiffs and the National Class Members had a special relationship with CVS.

CLASS ACTION COMPLAINT

132.    In particular, CVS had a duty to deal fairly with Plaintiffs and the Class Members because (a) CVS claimed to possess and did possess specialized knowledge, experience and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience and qualifications put CVS in a position of superiority over Plaintiffs and the Class Members; (c) CVS knew that Plaintiffs and the Class Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Plaintiffs and the Class Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Plaintiffs and the Class Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Plaintiffs and the Class Members' expense if CVS did not supply truthful and accurate information.

133.    CVS breached its duty to deal fairly with Plaintiffs and the Class Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

134.    CVS intended to induce Plaintiffs and Class Members to rely on its misrepresentations and/or omissions.  CVS knew that Plaintiffs and Class Members would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

135.    Plaintiffs and Class Members justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Class Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Plaintiffs' and Class Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

136.    CVS gained an advantage at Plaintiffs' and the Class Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Plaintiffs and the Class Members.

137.   As a proximate result of CVS's conduct, Plaintiffs and the Class Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

138.   CVS is therefore liable to Plaintiffs and Class Members for the damages they sustained.

## COUNT III: NEGLIGENT MISREPRESENTATION

### Asserted by the National Class against CVS

139.   Plaintiffs repeat paragraphs 1 through 122 above.

140.   Under the circumstances alleged, CVS owed a duty to Plaintiffs and members of the Class to provide them with accurate information regarding the prices of their generic prescription drugs.

141.   CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

142.   CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

143.   CVS intended to induce Plaintiffs and Class Members to rely on its misrepresentations and/or omissions.   CVS knew that Plaintiffs and Class Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

144.   Plaintiffs and Class Members justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Class Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Plaintiffs' and Class Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

145.   As a proximate result of CVS's negligent conduct, Plaintiffs and Class Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

CLASS ACTION COMPLAINT

146.    CVS is therefore liable to Plaintiffs and members of the National Class for the damages they sustained.

## COUNT IV:  UNJUST ENRICHMENT

### Asserted by the National Class against CVS

147.    Plaintiffs repeat paragraphs 1 through 122 above.

148.    By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

149.    CVS knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Class.  In so doing, CVS acted with conscious disregard for the rights of Plaintiffs and Class Members.

150.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Class.

151.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

152.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiffs and members of the National Class in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

153.    Plaintiffs and the other Class Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained proceeds.

154.    CVS is therefore liable to Plaintiffs and members of the National Class for restitution in the amount of CVS wrongfully obtained profits.

### COUNT V: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### Asserted by the National Class and, alternatively, the California Subclass against CVS

155.    Plaintiffs repeat paragraphs 1 through 122 above.

CLASS ACTION COMPLAINT

156.   Plaintiff Christopher Corcoran brings this claim individually and on behalf of the National Class and/or California Subclass.

157.   Mr. Corcoran and other members of the National Class and/or California Subclass are "persons" within the meaning of Cal. Bus. Prof. Code § 17204.

158.   CVS has unfairly obtained monies from Mr. Corcoran and the other members of the National Class and/or California Subclass through CVS's (i) unlawful business acts and/or practices; (ii) unfair business acts and/or practices; (iii) fraudulent business acts and/or practices; and (iv) unfair, deceptive, untrue and/or misleading advertising (including violations of Cal. Bus. & Prof. Code § 17500, *et seq.*), including, among other things:

(a) reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

(b) misrepresenting to insurance companies and state and federal health care entities, Mr. Corcoran, and the National Class and/or California Subclass that the U&C price was greater than their copayments;

(c) concealing from Mr. Corcoran and the National Class and/or California Subclass the true U&C prices of generic prescription drugs; and

(d) wrongfully obtaining monies from Mr. Corcoran and the National Class and/or California Subclass as a result of its deception.

159.   CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

160.   The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Corcoran's and the National Class and/or California Subclass' decisions about whether to purchase generic prescription drugs from CVS, in that Mr. Corcoran and the National Class and/or California Subclass would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

161.   As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Corcoran and the National Class and/or California Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

162.    CVS is therefore liable to Mr. Corcoran and the National Class and/or California Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT VI:  VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT

### Asserted by the National Class and, alternatively, the California Subclass against CVS

163.    Plaintiffs repeat paragraphs 1 through 122 above.

164.    Plaintiff Christopher Corcoran brings this claim individually and on behalf of the National Class and/or California Subclass.

165.    Mr. Corcoran and other members of the National Class and/or California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

166.    The generic prescription drugs that Mr. Corcoran and other members of the National Class and/or California Subclass purchased from CVS are "goods" within the meaning of Cal. Civ. Code § 1761(a).

167.    Mr. Corcoran's and other National Class and/or California Subclass members' purchases were "transactions" within the meaning of Cal. Civ. Code § 1761(e).

168.    CVS is a "person" within the meaning of Cal. Civ. Code § 1770(a).

169.    Mr. Corcoran and other members of the National Class and/or California Subclass have been damaged by CVS's unfair and/or deceptive practices in violation of Cal. Civ. Code § 1770(a), *et seq.*, which occurred in connection with transactions which resulted in Class members' purchase of goods.  These unfair and/or deceptive practices included, among other things:

(a) reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

(b) misrepresenting to insurance companies and state and federal health care entities, Mr. Corcoran and the National Class and/or California Subclass that the U&C price was greater than their copayments;

(c) concealing from Mr. Corcoran and the National Class and/or California Subclass the true U&C prices of generic prescription drugs; and

(d) wrongfully obtaining monies from Mr. Corcoran and the National Class and/or California

CLASS ACTION COMPLAINT

Subclass as a result of its deception.

170.     Pursuant to § 1782 of the California Consumer Legal Remedies Act, on the day that this Complaint is filed, Mr. Corcoran will notify CVS in writing by certified mail of the particular violations of § 1770 described above and request that that the CVS rectify its practices described above and give notice to all affected consumers of its intent to so act.

171.     CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

172.     The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Corcoran's and the National Class and/or California Subclass' decisions about whether to purchase generic prescription drugs from CVS, in that Mr. Corcoran and the National Class and/or California Subclass would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

173.     As a direct and proximate result of CVS's acts described above, Mr. Corcoran and the other Members of the National Class and/or California Subclass paid more for CVS's products than they would have and/or purchased products they would not have purchased but for CVS's deceptive conduct. However, Mr. Corcoran and the other Members of the National Class and/or California Subclass reserve any claim for restitution or damages under the California Legal Remedies Act and by this Complaint bring only an action for injunctive relief pursuant to § 1782(d) of the Act.

174.     If CVS fails to rectify or agree to rectify the problems associated with the actions described above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Mr. Corcoran and the National Class and/or California Subclass will amend this complaint to add claims for actual, punitive, and statutory damages, as well as restitution, as appropriate, pursuant to California Civil Code § 1782(d).

## COUNT VII: FRAUD

### Asserted by the California Subclass against CVS

175.     Plaintiffs repeat paragraphs 1 through 122 above.

176.     CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or

omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

177.   CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

178.   CVS intended to induce Mr. Corcoran and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Mr. Corcoran and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

179.   Mr. Corcoran and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Mr. Corcoran and Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Mr. Corcoran's and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

180.   As a proximate result of CVS's conduct, Mr. Corcoran and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

181.   CVS is therefore liable to Mr. Corcoran and Subclass Members for the damages they sustained.

## COUNT VIII: CONSTRUCTIVE FRAUD

### Asserted by the California Subclass against CVS

182.   Plaintiffs repeat paragraphs 1 through 122 above.

183.   In the circumstances alleged above, Plaintiff Christopher Corcoran and the California Subclass Members had a special relationship with CVS.

184.   In particular, CVS had a duty to deal fairly with Mr. Corcoran and the Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized

CLASS ACTION COMPLAINT

knowledge, experience and qualifications put CVS in a position of superiority over Mr. Corcoran and the Subclass Members; (c) CVS knew that Mr. Corcoran and the Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Mr. Corcoran and the Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Mr. Corcoran and the Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Mr. Corcoran and the Subclass Members' expense if CVS did not supply truthful and accurate information.

185. CVS breached its duty to deal fairly with Mr. Corcoran and the Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

186. CVS intended to induce Mr. Corcoran and Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Mr. Corcoran and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

187. Mr. Corcoran and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Mr. Corcoran and Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions. Mr. Corcoran's and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

188. CVS gained an advantage at Mr. Corcoran's and Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Mr. Corcoran and the Subclass Members.

189. As a proximate result of CVS's conduct, Mr. Corcoran and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

190. CVS is therefore liable to Mr. Corcoran and Subclass Members for the damages they

sustained.

## COUNT IX: NEGLIGENT MISREPRESENTATION

### Asserted by the California Subclass against CVS

191.   Plaintiffs repeat paragraphs 1 through 122 above.

192.   Under the circumstances alleged, CVS owed a duty to Plaintiff Christopher Corcoran and Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

193.   CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

194.   CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

195.   CVS intended to induce Mr. Corcoran and Subclass Members to rely on its misrepresentations.  CVS knew that Mr. Corcoran and Subclass Members would rely on CVS's misrepresentations regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

196.   Mr. Corcoran and Subclass Members justifiably relied upon CVS's misrepresentations in that Mr. Corcoran and Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations.  Mr. Corcoran's and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

197.   As a proximate result of CVS's negligent conduct, Mr. Corcoran and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

198.   CVS is therefore liable to Mr. Corcoran and Subclass Members for the damages they sustained.

**COUNT X: UNJUST ENRICHMENT**

**Asserted by the California Subclass against CVS**

199.    Plaintiffs repeat paragraphs 1 through 122 above.

200.    By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

201.    CVS knowingly received and retained wrongful benefits and funds from Plaintiff Christopher Corcoran and Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Mr. Corcoran and Subclass Members.

202.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Mr. Corcoran and Subclass Members.

203.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

204.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Mr. Corcoran and Subclass Members in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

205.    Mr. Corcoran and Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

206.    CVS is therefore liable to Mr. Corcoran and Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

**COUNT XI: FRAUD**

**Asserted by the Massachusetts Subclass against CVS**

207.    Plaintiffs repeat paragraphs 1 through 122 above.

208.    CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or

omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

209.   CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

210.   CVS intended to induce Dr. Garber and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Dr. Garber and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

211.   Dr. Garber and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Dr. Garber and Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Dr. Garber and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

212.   As a proximate result of CVS's conduct, Dr. Garber and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

213.   CVS is therefore liable to Dr. Garber and Subclass Members for the damages they sustained.

### COUNT XII: CONSTRUCTIVE FRAUD

**Asserted by the Massachusetts Subclass against CVS**

214.   Plaintiffs repeat paragraphs 1 through 122 above.

215.   In the circumstances alleged above, Dr. Garber and the Subclass Members had a special relationship with CVS.

216.   In particular, CVS had a duty to deal fairly with Dr. Garber and the Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized

CLASS ACTION COMPLAINT

knowledge, experience, and qualifications put CVS in a position of superiority over Dr. Garber and the Subclass Members; (c) CVS knew that Dr. Garber and the Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Dr. Garber and the Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Dr. Garber and the Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Dr. Garber and the Subclass Members' expense if CVS did not supply truthful and accurate information.

217.   CVS breached its duty to deal fairly with Dr. Garber and the Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

218.   CVS intended to induce Dr. Garber and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Dr. Garber and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

219.   Dr. Garber and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Dr. Garber and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

220.   CVS gained an advantage at Dr. Garber and the Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Dr. Garber and the Subclass Members.

221.   As a proximate result of CVS's conduct, Dr. Garber and the Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

222.   CVS is therefore liable to Dr. Garber and Subclass Members for the damages they

1  sustained.

2  **COUNT XIII: NEGLIGENT MISREPRESENTATION**

3  **Asserted by the Massachusetts Subclass against CVS**

4      223.   Plaintiffs repeat paragraphs 1 through 122 above.

5      224.   Under the circumstances alleged, CVS owed a duty to Dr. Garber and Subclass

6  Members to provide them with accurate information regarding the prices of their generic prescription

7  drugs.

8      225.   CVS misrepresented and/or concealed the true U&C prices of generic prescription

9  drugs that are included in the HSP program.  CVS made such misrepresentations by reporting

10  artificially inflated U&C prices for such drugs to third-party payors.

11      226.   CVS had no reasonable grounds to believe that these misrepresentations and/or

12  omissions were true.  The prices that CVS reported to third-party payors were substantially (and

13  unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

14      227.   CVS intended to induce Dr. Garber and Subclass Members to rely on its

15  misrepresentations and/or omissions.  CVS knew that Dr. Garber and Subclass Members would rely

16  on CVS's misrepresentations and/or omissions regarding U&C prices, and, as a result, would pay

17  copayments higher than the actual U&C prices for those generic prescription drugs.

18      228.   Dr. Garber and Subclass Members justifiably relied upon CVS's misrepresentations

19  and/or omissions in that Dr. Garber and Subclass Members would not have purchased generic

20  prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or

21  omissions.   Dr. Garber and Subclass Members' reliance on CVS's misrepresentations and/or

22  omissions was, thus, to their detriment.

23      229.   As a proximate result of CVS's negligent conduct, Dr. Garber and Subclass Members

24  have been damaged because they paid copayments for generic prescription drugs that were far higher

25  than the prices they would have paid but for CVS's misconduct.

26      230.   CVS is therefore liable to Dr. Garber and Subclass Members for the damages they

27  sustained.

28

CLASS ACTION COMPLAINT

48

**COUNT XIV: UNJUST ENRICHMENT**

**Asserted by the Massachusetts Subclass against CVS**

231.    Plaintiffs repeat paragraphs 1 through 122 above.

232.    By means of CVS's conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

233.    CVS knowingly received and retained wrongful benefits and funds from Dr. Garber and Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Dr. Garber and Subclass Members.

234.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Dr. Garber and Subclass Members.

235.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

236.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Dr. Garber and Subclass Members in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

237.    Dr. Garber and the Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

238.    CVS is therefore liable to Dr. Garber and Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

**COUNT XV: VIOLATION OF NEW YORK CONSUMER PROTECTION LAW**

**Asserted by the New York Subclass against CVS**

239.    Plaintiffs repeat paragraphs 1 through 122 above.

240.    Plaintiffs Toni Odorisio, Robert Guarnieri, and Onnolee Samuelson bring this claim individually and on behalf of the other New York Subclass members against CVS.

241.    Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and other Subclass Members are "persons" within the meaning of N.Y. Code § 349(h).

242.    Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and other Subclass Members were injured by CVS's employment in business, trade and/or commerce of deceptive acts or practices in violation of N.Y. Code § 349 including, among other things among other things, (a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members that the U&C price was greater than Plaintiffs' copayments; (c) concealing from Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining monies from Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the other Subclass Members as a result of its deception.

243.    CVS willfully engaged in the deceptive acts and/or practices described above.

244.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass members were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

245.    CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT XVI: FRAUD

### Asserted by the New York Subclass against CVS

246.    Plaintiffs repeat paragraphs 1 through 122 above.

247.    CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

248.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to general public.

CLASS ACTION COMPLAINT

249.    CVS intended to induce Ms. Odorisio, Mr. Guarnieri, and Ms. Samuelson, and Subclass Members to rely on its misrepresentations and/or omissions.   CVS knew that Mr. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

250.    Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.   Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

251.    As a proximate result of CVS's conduct, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

252.    CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members for the damages they sustained.

## COUNT XVII: CONSTRUCTIVE FRAUD

### Asserted by the New York Subclass against CVS

253.    Plaintiffs repeat paragraphs 1 through 122 above.

254.    In the circumstances alleged above, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members had a special relationship with CVS.

255.    In particular, CVS had a duty to deal fairly with Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience and qualifications put CVS in a position of superiority over Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members; (c) CVS knew that Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information

CLASS ACTION COMPLAINT

supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members' expense if CVS did not supply truthful and accurate information.

256.    CVS breached its duty to deal fairly with Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

257.    CVS intended to induce Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

258.    Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

259.    CVS gained an advantage at Plaintiffs' and Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Mr. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members.

260.    As a proximate result of CVS's conduct, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

CLASS ACTION COMPLAINT

261.   CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Mr. Samuelson, and Subclass Members for the damages they sustained.

## COUNT XVIII: NEGLIGENT MISREPRESENTATION

### Asserted by the New York Subclass against CVS

262.   Plaintiffs repeat paragraphs 1 through 122 above.

263.   Under the circumstances alleged, CVS owed a duty to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

264.   CVS misrepresented and/or concealed that the U&C prices of generic prescription drugs were higher than Subclass Members' copayments.   CVS made such misrepresentations by reporting artificially inflated U&C prices to third-party payors.

265.   CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.   The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to general public.

266.   CVS intended to induce Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members to rely on its misrepresentations and/or omissions.   CVS knew that Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

267.   Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions. Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

268.   As a proximate result of CVS's negligent conduct, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

269.   CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass

Members for the damages they sustained.

## COUNT XIX: UNJUST ENRICHMENT

### Asserted by the New York Subclass against CVS

270.    Plaintiffs repeat paragraphs 1 through 122 above.

271.    By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

272.    CVS knowingly received and retained wrongful benefits and funds from Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members.

273.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members.

274.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

275.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members in an unfair and unconscionable manner.   CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

276.    Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the other Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

277.    CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

## COUNT XX: VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT

### Asserted by the Michigan Subclass against CVS

278.    Plaintiffs repeat paragraphs 1 through 122 above.

CLASS ACTION COMPLAINT

279.     Members of the Michigan Subclass are "persons" within the meaning of M.C.L. § 445.911(3).

280.     Members of the Michigan Subclass were injured by CVS's willful and knowing employment in trade and/or commerce of unfair, unconscionable and/or deceptive acts or practices in violation of M.C.L. § 445.903 including, among other things, (a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors and Subclass Members that the U&C price was greater than Subclass Members' copayments; (c) concealing from Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining monies from Plaintiffs and the other Members of the Michigan subclass as a result of its deception.

281.     As a direct and proximate result of CVS's unfair and deceptive acts and practices, Subclass members were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

282.     CVS is therefore liable to Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

### COUNT XXI: FRAUD

### Asserted by the Michigan Subclass against CVS

283.     Plaintiffs repeat paragraphs 1 through 122 above.

284.     CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

285.     CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

286.     CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for

those generic prescription drugs.

287.     Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

288.     As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

289.     CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXII: CONSTRUCTIVE FRAUD

### Asserted by the Michigan Subclass against CVS

290.     Plaintiffs repeat paragraphs 1 through 122 above.

291.     In the circumstances alleged above, Subclass Members had a special relationship with CVS.

292.     In particular, CVS had a duty to deal fairly with Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Subclass Members; (c) CVS knew that Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Subclass Members' expense if CVS did not supply truthful and accurate information.

293.     CVS breached its duty to deal fairly with Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting

CLASS ACTION COMPLAINT

artificially inflated U&C prices for such drugs to third-party payors.

294. CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

295. Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions. Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

296. CVS gained an advantage at Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Subclass Members.

297. As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

298. CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXIII: NEGLIGENT MISREPRESENTATION

### Asserted by the Michigan Subclass against CVS

299. Plaintiffs repeat paragraphs 1 through 122 above.

300. Under the circumstances alleged, CVS owed a duty to Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

301. CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

302. CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

303. CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Subclass Members would rely on CVS's misrepresentations and/or

omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

304.    Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

305.    As a proximate result of CVS's negligent conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

306.    CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXIV: UNJUST ENRICHMENT

### Asserted by the Michigan Subclass against CVS

307.    Plaintiffs repeat paragraphs 1 through 122 above.

308.    By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

309.    CVS knowingly received and retained wrongful benefits and funds from Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Subclass Members.

310.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Subclass Members.

311.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

312.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Subclass Members in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

313.    Subclass Members did not confer these benefits officiously or gratuitously, and it

1  would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

2  314. CVS is therefore liable to Subclass Members for restitution in the amount of CVS's

3  wrongfully obtained profits.

4  ### COUNT XXV: FRAUD

5  **Asserted by the Texas Subclass against CVS**

6  315. Plaintiffs repeat paragraphs 1 through 122 above.

7  316. CVS materially misrepresented and/or concealed the true U&C prices of generic

8  prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or

9  omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

10  317. CVS made these misrepresentations and omissions knowingly, or at least with reckless

11  disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were

12  substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-

13  paying customers.

14  318. CVS intended to induce Ms. Pacheco and Subclass Members to rely on its

15  misrepresentations and/or omissions. CVS knew that Plaintiffs and Subclass Members would rely on

16  CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments

17  higher than the actual U&C prices for those generic prescription drugs.

18  319. Ms. Pacheco and Subclass Members justifiably relied upon CVS's misrepresentations

19  and/or omissions in that they and the Subclass Members would not have purchased generic

20  prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or

21  omissions. Their reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

22  320. As a proximate result of CVS's conduct, Ms. Pacheco and Subclass Members have

23  been damaged because they paid copayments for generic prescription drugs that were far higher than

24  the prices they would have paid but for CVS's misconduct.

25  321. CVS is therefore liable to Ms. Pacheco and Subclass Members for the damages they

26  sustained.

27

28

---

CLASS ACTION COMPLAINT

## COUNT XXVI: CONSTRUCTIVE FRAUD

### Asserted by the Texas Subclass against CVS

322.    Plaintiffs repeat paragraphs 1 through 122 above.

323.    In the circumstances alleged above, Ms. Pacheco and the Subclass Members had a special relationship with CVS.

324.    In particular, CVS had a duty to deal fairly with Ms. Pacheco and the Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Ms. Pacheco and the Subclass Members; (c) CVS knew that Ms. Pacheco and the Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Ms. Pacheco and the Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Ms. Pacheco and the Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Ms. Pacheco and the Subclass Members' expense if CVS did not supply truthful and accurate information.

325.    CVS breached its duty to deal fairly with Ms. Pacheco and the Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

326.    CVS intended to induce Ms. Pacheco and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Ms. Pacheco and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

327.    Ms. Pacheco and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they and other Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's

misrepresentations and/or omissions. Ms. Pacheco and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

328. CVS gained an advantage at Ms. Pacheco and the Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Ms. Pacheco and Subclass Members.

329. As a proximate result of CVS's conduct, Ms. Pacheco and the Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

330. CVS is therefore liable to Ms. Pacheco and Subclass Members for the damages they sustained.

### COUNT XXVII: NEGLIGENT MISREPRESENTATION

#### Asserted by the Texas Subclass against CVS

331. Plaintiffs repeat paragraphs 1 through 122 above.

332. Under the circumstances alleged, CVS owed a duty to Ms. Pacheco and Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

333. CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

334. CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

335. CVS intended to induce Ms. Pacheco and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Ms. Pacheco and Subclass Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

336. Ms. Pacheco and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more

than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions. Ms. Pacheco and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

337. As a proximate result of CVS's negligent conduct, Ms. Pacheco and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

338. CVS is therefore liable to Ms. Pacheco and Subclass Members for the damages they sustained.

## COUNT XXVIII: UNJUST ENRICHMENT

### Asserted by the Texas Subclass against CVS

339. Plaintiffs repeat paragraphs 1 through 122 above.

340. By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

341. CVS knowingly received and retained wrongful benefits and funds from Ms. Pacheco and Subclass Members. In so doing, CVS acted with conscious disregard for the rights of Ms. Pacheco and Subclass Members.

342. As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Ms. Pacheco and Subclass Members.

343. CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

344. Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Ms. Pacheco and Subclass Members in an unfair and unconscionable manner. CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

345. Ms. Pacheco and the other Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained

CLASS ACTION COMPLAINT

profits.

346.    CVS are therefore liable to Ms. Pacheco and Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

## COUNT XXIX: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### Asserted by the Florida Subclass against CVS

347.    Plaintiffs repeat paragraphs 1 through 122 above.

348.    Subclass Members of the Florida Subclass are "consumers' within the meaning of Fla. Stat. § 501.203(7).

349.    Subclass Members have suffered losses because of CVS's employment of unconscionable acts or practices and unfair and/or deceptive acts or practices in the conduct of trade and commerce, including, among other things, (a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors and Subclass Members that the U&C price was greater than Subclass Members' copayments; (c) concealing from Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining monies from Subclass Members as a result of its deception.

350.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive and in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

351.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Subclass Members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

352.    CVS is therefore liable to Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT XXX: FRAUD

### Asserted by the Florida Subclass against CVS

353.    Plaintiffs repeat paragraphs 1 through 122 above.

354.    CVS materially misrepresented and/or concealed the true U&C prices of generic

CLASS ACTION COMPLAINT

prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

355.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

356.    CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

357.    Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

358.    As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

359.    CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXI: CONSTRUCTIVE FRAUD

### Asserted by the Florida Subclass against CVS

360.    Plaintiffs repeat paragraphs 1 through 122 above.

361.    In the circumstances alleged above, Subclass Members had a special relationship with CVS.

362.    In particular, CVS had a duty to deal fairly with Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Subclass Members; (c) CVS knew that

Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Subclass Members' expense if CVS did not supply truthful and accurate information.

363. CVS breached its duty to deal fairly with Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

364. CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

365. Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions. Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

366. CVS gained an advantage at Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Subclass Members.

367. As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

368. CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXII: NEGLIGENT MISREPRESENTATION

### Asserted by the Florida Subclass against CVS

369. Plaintiffs repeat paragraphs 1 through 122 above.

370. Under the circumstances alleged, CVS owed a duty to Subclass Members to provide

them with accurate information regarding the prices of their generic prescription drugs.

371.   CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.   CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

372.   CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.   The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

373.   CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions.   CVS knew that Subclass Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

374.   Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.   Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

375.   As a proximate result of CVS's negligent conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

376.   CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXIII: UNJUST ENRICHMENT

### Asserted by the Florida Subclass against CVS

377.   Plaintiffs repeat paragraphs 1 through 122 above.

378.   By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

379.   CVS knowingly received and retained wrongful benefits and funds from Subclass Members.   In so doing, CVS acted with conscious disregard for the rights of Subclass Members.

380.   As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly

CLASS ACTION COMPLAINT

enriched at the expense of, and to the detriment of, Subclass Members.

381. CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

382. Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Subclass Members in an unfair and unconscionable manner. CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

383. Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

384. CVS is therefore liable to Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

## COUNT XXXIV: VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### Asserted by the Illinois Subclass against CVS

385. Plaintiffs repeat paragraphs 1 through 122 above.

386. At all relevant times, Subclass Members, CVS was a person within the meaning of 815 ILCS 505/1(c).

387. At all relevant times, Subclass Members were consumers within the meaning of 815 ILCS 505/1(e).

388. At all relevant and material times as described herein, CVS conducted trade and commerce within the meaning of 815 ILCS 505/1(f).

389. Subclass Members have suffered losses because of CVS's employment of unconscionable acts or practices and unfair and/or deceptive acts or practices in the conduct of trade and commerce, including, among other things, (a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors, Subclass Members that the U&C price was greater than Subclass Members' copayments; (c) concealing from Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining

CLASS ACTION COMPLAINT

monies from Subclass Members as a result of its deception.

390.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive and in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act.

391.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Subclass Members' decision about whether to purchase generic prescription drugs from CVS, in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

392.    This deception alleged herein occurred in connection with CVS's conduct of trade and commerce in Illinois.

393.    CVS intended for Subclass Members to purchase generic prescription drugs from CVS in reliance upon CVS's unfair and/or deceptive acts and/or practices.

394.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Subclass Members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

395.    CVS is therefore liable to Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT XXXV: FRAUD

### Asserted by the Illinois Subclass against CVS

396.    Plaintiffs repeat paragraphs 1 through 122 above.

397.    CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

398.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

399.    CVS intended to induce Subclass Members to rely on its misrepresentations and/or

omissions.  CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

400.   Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

401.   As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

402.   CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXVI: CONSTRUCTIVE FRAUD

### Asserted by the Illinois Subclass against CVS

403.   Plaintiffs repeat paragraphs 1 through 122 above.

404.   In the circumstances alleged above, Subclass Members had a special relationship with CVS.

405.   In particular, CVS had a duty to deal fairly with Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Subclass Members; (c) CVS knew that Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Subclass Members' expense if CVS did not supply truthful and accurate information.

406.   CVS breached its duty to deal fairly with Subclass Members by making material

misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

407. CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions. CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

408. Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions. Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

409. CVS gained an advantage at Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Subclass Members.

410. As a proximate result of CVS's conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

411. CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXVII: NEGLIGENT MISREPRESENTATION

### Asserted by the Illinois Subclass against CVS

412. Plaintiffs repeat paragraphs 1 through 122 above.

413. Under the circumstances alleged, CVS owed a duty to Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

414. CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program. CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

415. CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

CLASS ACTION COMPLAINT

416.   CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions.   CVS knew that Subclass Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

417.   Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.   Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

418.   As a proximate result of CVS's negligent conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

419.   CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XXXVIII: UNJUST ENRICHMENT

### Asserted by the Illinois Subclass against CVS

420.   Plaintiffs repeat paragraphs 1 through 122 above.

421.   By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

422.   CVS knowingly received and retained wrongful benefits and funds from Subclass Members.   In so doing, CVS acted with conscious disregard for the rights of Subclass Members.

423.   As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Subclass Members.

424.   CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

425.   Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Subclass Members in an unfair and unconscionable manner.   CVS's retention of such funds under circumstances making it inequitable to do so constitutes

CLASS ACTION COMPLAINT

71

unjust enrichment.

426.    Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

427.    CVS are therefore liable to Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

## COUNT XXXIX: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, § 201–1, *ET SEQ.*

### Asserted by the Pennsylvania Subclass against CVS

428.    Plaintiffs repeat paragraphs 1 through 122 above.

429.    Plaintiff Ron W. Coder brings this claim individually and on behalf of the Pennsylvania Subclass.

430.    CVS is a "person" within the meaning of § 201–2(2).

431.    CVS engaged in "trade" and "commerce" within the meaning of § 201–2(3).

432.    Mr. Coder and other members of the Pennsylvania Subclass have been injured by CVS's deceptive practices in violation of § 201–2(4), including, among other things, (a) reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors, Mr. Coder, and Subclass Members that the U&C price was greater than Mr. Coder's and Subclass Members' copayments; (c) concealing from Mr. Coder and Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining monies from Mr. Coder and the other Members of the Pennsylvania subclass as a result of its deception.

433.    These misrepresentations and concealments specifically violated § 201–2(4)(ii), § 201–2(4)(iii), § 201–2(4)(v), § 201–2(4)(vii), and § 201–2(4)(xxi).

434.    CVS willfully, knowingly, and fraudulently engaged in the deceptive acts and/or practices described above.

435.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Coder and the other Pennsylvania Subclass members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

CLASS ACTION COMPLAINT

436.    CVS is therefore liable to Mr. Coder and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs and reasonable attorneys' fees to the extent provided by law.

## COUNT XL: FRAUD

### Asserted by the Pennsylvania Subclass against CVS

437.    Plaintiffs repeat paragraphs 1 through 122 above.

438.    CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

439.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

440.    CVS intended to induce Mr. Coder and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Mr. Coder and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

441.    Mr. Coder and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Mr. Coder and Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Mr. Coder's and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

442.    As a proximate result of CVS's conduct, Mr. Coder and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

443.    CVS is therefore liable to Mr. Coder and Subclass Members for the damages they sustained.

## COUNT XLI: CONSTRUCTIVE FRAUD

### Asserted by the Pennsylvania Subclass against CVS

444.    Plaintiffs repeat paragraphs 1 through 122 above.

445.    In the circumstances alleged above, Mr. Coder and the Subclass Members had a special relationship with CVS.

446.    In particular, CVS had a duty to deal fairly with Mr. Coder and the Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Mr. Coder and the Subclass Members; (c) CVS knew that Mr. Coder and the Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because they were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Mr. Coder and the Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Mr. Coder and the Subclass Members' expense if CVS did not supply truthful and accurate information.

447.    CVS breached its duty to deal fairly with Mr. Coder and the Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

448.    CVS intended to induce Mr. Coder and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Mr. Coder and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

449.    Mr. Coder and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Mr. Coder

and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

450.    CVS gained an advantage at Mr. Coder and the Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Mr. Coder and the Subclass Members.

451.    As a proximate result of CVS's conduct, Mr. Coder and the Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

452.    CVS is therefore liable to Mr. Coder and Subclass Members for the damages they sustained.

## COUNT XLII: NEGLIGENT MISREPRESENTATION

### Asserted by the Pennsylvania Subclass against CVS

453.    Plaintiffs repeat paragraphs 1 through 122 above.

454.    Under the circumstances alleged, CVS owed a duty to Mr. Coder and Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

455.    CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

456.    CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

457.    CVS intended to induce Mr. Coder and Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Mr. Coder and Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

458.    Mr. Coder and Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more

CLASS ACTION COMPLAINT

than the HSP prices but for CVS's misrepresentations and/or omissions.  Mr. Coder and Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

459.   As a proximate result of CVS's negligent conduct, Mr. Coder and Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

460.   CVS is therefore liable to Mr. Coder and Subclass Members for the damages they sustained.

## COUNT XLIII: UNJUST ENRICHMENT

### Asserted by the Pennsylvania Subclass against CVS

461.   Plaintiffs repeat paragraphs 1 through 122 above.

462.   By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants an artificially high copayment for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

463.   CVS knowingly received and retained wrongful benefits and funds from Mr. Coder and Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Mr. Coder and Subclass Members.

464.   As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Mr. Coder and Subclass Members.

465.   CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

466.   Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Mr. Coder and Subclass Members in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

467.   Mr. Coder and the other Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

CLASS ACTION COMPLAINT

468.    CVS is therefore liable to Mr. Coders and Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

## COUNT XLIV: VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

### Asserted by the Virginia Subclass against CVS

469.    Plaintiffs repeat paragraphs 1 through 122 above.

470.    CVS is a "supplier" within the meaning of the Virginia Consumer Protection Act (Va. Code. 59.1-198).

471.    CVS engaged in "consumer transactions" with Subclass Members within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1–198).

472.    Subclass Members purchased prescription drugs from CVS which constitutes "goods" within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1–198).

473.    CVS misrepresented and continues to engage in deception, fraud, false pretense, and/or misrepresentation in connection with consumer transactions, by, among other things, (a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party payors and Subclass Members that the U&C price was greater than Subclass Members' copayments; (c) concealing from Subclass Members the true U&C prices of generic prescription drugs; and (d) wrongfully obtaining monies from Subclass Members as a result of its deception.

474.    CVS willfully engaged in deceptive and unfair acts and practices in that it knew or should have known that the methods, acts or practices alleged herein were deceptive, unfair, unconscionable, or prohibited by law and failed to disclose material information to Subclass Members.

475.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Subclass Members' decisions about whether to purchase generic prescription drugs from CVS, in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's unfair and/or deceptive acts and/or practices.

476.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Subclass Members were deceived into paying artificially inflated prices for generic prescription drugs

1    and have been damaged thereby.

2        477.    CVS is therefore liable to Subclass Members for the damages they sustained, plus

3    statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

4                            **COUNT XLV: FRAUD**

5                    **Asserted by the Virginia Subclass against CVS**

6        478.    Plaintiffs repeat paragraphs 1 through 122 above.

7        479.    CVS materially misrepresented and/or concealed the true U&C prices of generic

8    prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or

9    omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

10       480.    CVS made these misrepresentations and omissions knowingly, or at least with reckless

11   disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were

12   substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-

13   paying customers.

14       481.    CVS intended to induce Subclass Members to rely on its misrepresentations and/or

15   omissions.  CVS knew that Subclass Members would rely on CVS's representation and/or omissions

16   regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for

17   those generic prescription drugs.

18       482.    Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions

19   in that Subclass Members would not have purchased generic prescription drugs from CVS for more

20   than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance

21   on CVS's misrepresentations and/or omissions was, thus, to their detriment.

22       483.    As a proximate result of CVS's conduct, Subclass Members have been damaged

23   because they paid copayments for generic prescription drugs that were far higher than the prices they

24   would have paid but for CVS's misconduct.

25       484.    CVS is therefore liable to Subclass Members for the damages they sustained.

26                    **COUNT XLVI: CONSTRUCTIVE FRAUD**

27                    **Asserted by the Virginia Subclass against CVS**

28       485.    Plaintiffs repeat paragraphs 1 through 122 above.

CLASS ACTION COMPLAINT

486.     In the circumstances alleged above, Subclass Members had a special relationship with CVS.

487.     In particular, CVS had a duty to deal fairly with Subclass Members because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Subclass Members; (c) CVS knew that Subclass Members needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Subclass Members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Subclass Members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Subclass Members' expense if CVS did not supply truthful and accurate information.

488.     CVS breached its duty to deal fairly with Subclass Members by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

489.     CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Subclass Members would rely on CVS's representation and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

490.     Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

491.     CVS gained an advantage at Subclass Members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Subclass Members.

492.     As a proximate result of CVS's conduct, Subclass Members have been damaged

CLASS ACTION COMPLAINT

because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

493.    CVS is therefore liable to Subclass Members for the damages they sustained.

## COUNT XLVII: NEGLIGENT MISREPRESENTATION

### Asserted by the Virginia Subclass against CVS

494.    Plaintiffs repeat paragraphs 1 through 122 above.

495.    Under the circumstances alleged, CVS owed a duty to Subclass Members to provide them with accurate information regarding the prices of their generic prescription drugs.

496.    CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

497.    CVS had no reasonable grounds to believe that these misrepresentations were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

498.    CVS intended to induce Subclass Members to rely on its misrepresentations and/or omissions.  CVS knew that Subclass Members would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

499.    Subclass Members justifiably relied upon CVS's misrepresentations and/or omissions in that Subclass Members would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Subclass Members' reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

500.    As a proximate result of CVS's negligent conduct, Subclass Members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

501.    CVS is therefore liable to Subclass Members for the damages they sustained.

CLASS ACTION COMPLAINT

## COUNT XLVIII: UNJUST ENRICHMENT

### Asserted by the Virginia Subclass against CVS

502.    Plaintiffs repeat paragraphs 1 through 122 above.

503.    By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

504.    CVS knowingly received and retained wrongful benefits and funds from Subclass Members.  In so doing, CVS acted with conscious disregard for the rights of Subclass Members.

505.    As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Subclass Members.

506.    CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

507.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Subclass Members in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

508.    Subclass Members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

509.    CVS are therefore liable to Subclass Members for restitution in the amount of CVS's wrongfully obtained profits.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against CVS, and request as follows:

A.    That all class members are owed at least the difference between their paid copay and the U&C offered to the general public for all prescriptions purchased during the life of the HSP program;

B.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiffs are properly Class

CLASS ACTION COMPLAINT

1  representatives;

2       C.     That the Court grant permanent injunctive relief to prohibit CVS from continuing to

3  engage in the unlawful acts, omissions, and practices described herein;

4       D.     That the Court award compensatory, consequential, and general damages in an amount

5  to be determined at trial;

6       E.     That the Court order disgorgement and restitution of all earnings, profits,

7  compensation, and benefits received by CVS as a result of its unlawful acts, omissions, and practices;

8       F.     That the Court award statutory treble damages, and punitive or exemplary damages, to

9  the extent permitted by law;

10       G.     That the unlawful acts alleged in this Complaint be adjudge and decreed to be a

11  violation of the unfair and deceptive business acts and practices in violation of the California Unfair

12  Competition Law, California Consumer Legal Remedies Act, New York Consumer Protection Law,

13  Michigan Consumer Protection Act, Florida Deceptive and Unfair Trade Practices Act, Illinois

14  Consumer Fraud and Deceptive Business Practices Act, Pennsylvania Unfair Trade Practices and

15  Consumer Protection Law and the Virginia Consumer Protection Act;

16       H.     That the Court award to Plaintiffs the costs and disbursements of the action, along with

17  reasonable attorneys' fees;

18       I.     That the Court award pre- and post-judgment interest at the maximum legal rate; and

19       J.     That the Court grant all such other relief as it deems just and proper.

20  <u>**DEMAND FOR JURY TRIAL**</u>

21      Plaintiffs and the Class and Subclasses demand a jury trial on all claims.

22

23  Dated: July 30, 2015              Respectfully submitted,

24                     By:    */s/ Christopher L. Lebsock*

25                          Michael P. Lehmann (Cal. Bar No. 77152)

                        Christopher L. Lebsock (Cal. Bar No. 184546)

26                          Bonny E. Sweeney (Cal. Bar No. 176174)

                        HAUSFELD

27                          600 Montgomery St. Suite 3200

                        San Francisco, California 94111

28                          Tel: 415-633-1908

---

CLASS ACTION COMPLAINT

clebsock@hausfeld.com
bsweeney@hausfeld.com

Richard Lewis (*pro hac vice* application forthcoming)
Kristen Ward Broz (*pro hac vice* application forthcoming)
HAUSFELD
1700 K St. NW, Suite 650
Washington, D.C. 20006
Tel: 202-540-7200
rlewis@hausfeld.com
kward@hausfeld.com

Pat A. Cipollone, P.C. (*pro hac vice* application forthcoming)
Rebecca R. Anzidei (*pro hac vice* application forthcoming)
Robert B. Gilmore (*pro hac vice* application forthcoming)
STEIN MITCHELL MUSE
CIPOLLONE & BEATO LLP
1100 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 737-7777
pcipollone@steinmitchell.com
ranzidei@steinmitchell.com
rgilmore@steinmitchell.com