Bonny E. Sweeney (Cal. Bar No. 176174)
Michael P. Lehmann (Cal. Bar No. 77152)
Christopher L. Lebsock (Cal. Bar No. 184546)
HAUSFELD
600 Montgomery St., Suite 3200
San Francisco, California 94111
Tel: 415-633-1908
Fax: 415-358-4980
bsweeney@hausfeld.com
mlehmann@hausfeld.com
clebsock@hausfeld.com

Richard Lewis (admitted *pro hac vice*)
Kristen Ward Broz (admitted *pro hac vice*)
HAUSFELD
1700 K St. NW, Suite 650
Washington, D.C. 20006
Tel: 202-540-7200
Fax: 202-540-7201
rlewis@hausfeld.com
kward@hausfeld.com

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar. No. 220289)
Shiho Yamamoto (Cal. Bar. No. 264741)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, California 94612
Tel.  415-692-0772
Fax. 415-366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
sy@pritzkerlevine.com

Pat A. Cipollone, P.C. (admitted *pro hac vice*)
Rebecca R. Anzidei (admitted *pro hac vice*)
Robert B. Gilmore (admitted *pro hac vice*)
STEIN MITCHELL CIPOLLONE BEATO &
  MISSNER LLP
1100 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: 202-737-7777
Fax: 202-296-8312
pcipollone@steinmitchell.com
ranzidei@steinmitchell.com
rgilmore@steinmitchell.com

*Attorneys for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christopher Corcoran, Elizabeth Gardner, Tyler Clark, Michael Norkus, Zulema Avis, Robert Garber, Toni Odorisio, Robert Guarnieri, Onnolee Samuelson, Irma Pacheco, Robert Jenks, Debbie Barrett, Carl Washington, Robert Podgorny, Vincent Gargiulo, Zachary Hagert, Kevin Cauley, Linda Krone, Carolyn Caine, Ken Bolin, and Walter Wulff on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>CVS Health Corporation and CVS Pharmacy, Inc.<br><br>                Defendants. | Case No.<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

## I.    INTRODUCTION

1.      Plaintiffs Christopher Corcoran, Elizabeth Gardner, Tyler Clark, Michael Norkus, Zulema Avis, Robert Garber, Toni Odorisio, Robert Guarnieri, Onnolee Samuelson, Irma Pacheco, Robert Jenks, Debbie Barrett, Carl Washington, Robert Podgorny, Vincent Gargiulo, Zachary Hagert, Kevin Cauley, Linda Krone, Carolyn Caine, Ken Bolin, and Walter Wulff (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against CVS Health Corporation and CVS Pharmacy, Inc. (together "CVS"), to recover monetary damages, injunctive relief, and other remedies for violations of state laws.

## II.    NATURE OF THE ACTION

2.      This action alleges a common fraudulent and deceptive pricing scheme by CVS to overcharge customers with third-party health care plans on purchases of generic prescription drugs at CVS pharmacies.

3.      CVS calls itself an "integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions."   CVS Health Corporation's United States Securities and Exchange Commission Form 10-Q for the Quarterly Period Ended June 30, 2015.

4.      CVS currently operates more than 7,800 retail pharmacies in the United States and Puerto Rico, nearly 1,000 walk-in medical clinics, and a pharmacy benefits manager with more than 70 million plan members.  CVS fills more than 1.7 billion prescriptions a year, has more than five million pharmacy customers a day, and has captured a third of total prescription growth in the United States since 2008.

5.      In June CVS announced that it will be acquiring and operating all of Target Corporation's in-store pharmacies, which will add more than 1,650 additional pharmacies to CVS's pharmacy business.   When the Target acquisition is completed later this year, CVS will have more retail pharmacies in the United States than any other company.

6.      In 2014, CVS's retail pharmacy business generated more than $67 billion in revenues, 70% of which came from prescription drugs.

7.      This action concerns CVS's pricing of generic prescription drugs.  A generic drug is a copy of a brand-name drug.  By law, generic drugs must have the same active ingredients as the brands

---

SECOND AMENDED CLASS ACTION
COMPLAINT

1

they copy. Generics must be the same strength and work the same way as the brand-name drug.  Generics typically cost less than brand-name drugs and, because of this cost savings, many third-party payors give members a lower copay if they agree to use available generic drugs as a cost-savings incentive. According to the IMS Institute for Healthcare Informatics, approximately 86% of all prescriptions filled in the United States are for generic drugs.

8.     About 90% of all United States citizens are now enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses.  A feature of most of these plans is the shared cost of prescription drugs.  When a plan participant fills a prescription under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or copay.  CVS pharmacies collect the copay from the plan participant at the time the prescription is filled.  The amount of the copay cannot exceed CVS's usual and customary price, which is generally defined as the cash price to the general public for the same drug.

9.     Plaintiffs allege that CVS knowingly and intentionally overcharged pharmacy customers for generic prescription drugs by submitting to third-party payors claims for payment at prices that CVS has fraudulently inflated far above its usual and customary prices.  CVS's false and deceptive pricing scheme caused CVS pharmacy customers who purchased generic prescription drugs through third-party plans to pay significantly more in copayments than CVS charges cash-paying customers to purchase the same drugs.

10.     All class members are CVS customers who participate in third-party health care plans (either private insurance or a federal or state funded health care program) and have filled prescriptions for generic drugs at CVS pharmacies using coverage provided by their third-party health care plans. When a plan participant fills a prescription under a third-party health care plan, a third-party payor (generally a private, public or governmental entity) pays a portion of the participant's prescription drug costs.  The remaining portion is paid directly by the plan participant in the form of a copayment or "copay", which may include, for example, co-insurance, flat fees, or deductibles.  CVS collects the copay from the plan participant at the time a covered prescription drug is dispensed.  The amount of the copay collected by CVS from the plan participant may not exceed CVS's usual and customary price.

11.     CVS commonly submits electronic claims for payment to third-party payors when it fills prescriptions.  In submitting electronic claims for payment, CVS is required to state accurately its usual and customary price for every dispensing event, in accordance with the National Council for Prescription Drug Program ("NCPDP") requirements.  But for years, CVS has knowingly and intentionally submitted false and artificially inflated usual and customary prices for generic drugs to third-party payors.  Beginning in 2008, CVS orchestrated and carried out a massive fraud that resulted in substantial ill-gotten gains, and substantial harm to Plaintiffs and the members of the Classes they represent.  CVS created the "Health Savings Pass" ("HSP") program—the centerpiece of its fraud—as an integral vehicle for overcharging third-party payors and plan participants for covered drugs.  The HSP formulary includes long-term maintenance medications, which, in many instances, are prescribed to elderly and disabled patients on a regular basis.

12.     For the 400 or so generic prescription drugs listed on the HSP formulary, CVS should have reported to third-party payors the HSP prices for those drugs as CVS's usual and customary price, because the HSP price  was (and is) the price CVS charged for cash customers not paying with insurance.

13.     But, CVS purposefully disregards prices charged in the HSP program in setting its usual and customary prices for these generic prescription drugs when they are sold to customers covered in whole or in part by a third-party payor.  Instead, CVS knowingly and intentionally submits falsely inflated "usual and customary prices" to third-party health payors, and overcharges customers paying for generic prescription drugs with insurance by collecting falsely inflated copays.

14.     The HSP program has served a twofold purpose for CVS.  Not only was the HSP program a means by which CVS could maintain and increase its market share by fending off discounted prices from its competitors, but importantly, CVS also intended that the HSP program would serve as a mechanism to hide CVS's true usual and customary prices from third-party payors.  By submitting false and inflated usual and customary prices to third-party payors, CVS knowingly and wrongfully overcharged plan participants copayment amounts that often exceeded the HSP drug prices available to the general public for the same drugs.  In essence, the unlawful scheme that CVS designed allowed CVS to have its cake and eat it too: CVS could maintain and increase its cash-paying customer base while also maintaining higher reimbursement payments from third-party payors and higher copayments from

plan participants who filled their prescriptions at CVS pharmacies.

15.     As a result of CVS's unlawful scheme, CVS overcharged Plaintiffs and the other class members for generic prescription drugs (in many cases by more than three or four times the usual and customary price) from November 2008 to the present.  CVS's misconduct has caused Plaintiffs and the other class members to suffer significant damages.

III.     PARTIES

    A.     **Plaintiffs.**

16.     Plaintiff Christopher Corcoran is domiciled in the State of California.  Mr. Corcoran has purchased generic versions of four monthly maintenance medications from CVS in California between February 2009 and the present.  Mr. Corcoran carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS. All four medications prescribed to Mr. Corcoran are on the CVS HSP generic medication list (attached hereto as Exhibit A). CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply of the same prescription that Mr. Corcoran purchased from 2008 to 2010, and $3.99 from 2011 to the present. CVS is required to charge Mr. Corcoran a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Corcoran's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Corcoran has paid copays substantially higher than $3.33 from 2008 to 2010 and $3.99 from 2011 to the present per 30-day supply when he purchased his generic prescriptions from CVS and has, thereby, been injured. CVS has overcharged Mr. Corcoran at least $284.79 in inflated copays.  Mr. Corcoran anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

17.     Plaintiff Elizabeth Gardner is domiciled in the State of California.  Ms. Gardner has purchased generic versions of at least one monthly maintenance medication from CVS in California between May 2015 and the present.  Ms. Gardner carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.  The medication

prescribed to Ms. Gardner appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply of the same prescription that Ms. Gardner purchased from 2015 to the present.  CVS is required to charge Ms. Gardner a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Gardner's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Gardner has paid copays substantially higher than $3.99 from 2015 to the present per 30-day supply when she purchased her generic prescription from CVS and has, thereby, been injured.  CVS has overcharged Ms. Gardner at least $12.62 in inflated copays.  Ms. Gardner anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

18.     Plaintiff Tyler Clark is domiciled in the State of California.  Mr. Clark has purchased generic versions of at least one monthly maintenance medication from CVS in California between March 2015 and the present.  The medication prescribed to Mr. Clark appears on the CVS HSP generic medication list (Exhibit A hereto).  Mr. Clark carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply and $11.99 for a 90-day supply of the same prescription that Mr. Clark purchased from March 2015 to the present.  CVS is required to charge Mr. Clark a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Clark's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Clark has, during the class period, paid copays substantially higher than $3.99 per 30-day supply and $11.99 per 90-day supply from 2015 to the present when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Mr. Clark at least $44.41 in inflated copays.  Mr. Clark anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

19.     Plaintiff Michael Norkus is domiciled in the State of California.   Mr. Norkus has purchased generic versions of at least one monthly maintenance medication from CVS in California between December 2013 and the present.  Mr. Norkus carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  The medication prescribed to Mr. Norkus appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply and $11.99 for a 90-day supply of the same prescription that Mr. Norkus purchased from 2013 to the present.  CVS is required to charge Mr. Norkus a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Norkus's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Norkus has, during the class period, paid copays substantially higher than $3.99 per 30-day supply and $11.99 per 90-day supply from 2013 to the present when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Mr. Norkus at least $24.72 in inflated copays.  Mr. Norkus anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

20.     Plaintiff Zulema Avis is domiciled in the State of Arizona.  Ms. Avis has purchased generic versions of at least three monthly maintenance medications from CVS in Arizona between February 2014 and the present.  Ms. Avis carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.   The medications prescribed to Ms. Avis appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply of the same prescription that Ms. Avis purchased from 2014 to the present.  CVS is required to charge Ms. Avis a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Avis's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Avis has paid copays substantially higher

than $3.99 from 2014 to the present per 30-day supply when she purchased her generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Ms. Avis at least $109.44 in inflated copays.  Ms. Avis anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

21.     Plaintiff Robert Garber is domiciled in the Commonwealth of Massachusetts.  Dr. Garber has purchased generic versions of five monthly maintenance medications from CVS in Massachusetts between February 2009 and the present.  Dr. Garber carries private health insurance through his employer and carried private health insurance during the time that he purchased generic medications from CVS.  All five medications prescribed to Dr. Garber are on the CVS HSP generic medication list (attached hereto as Exhibit A).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply of the same prescriptions that Dr. Garber purchased from 2008 to 2010, and $3.99 from 2011 to the present.  CVS is required to charge Dr. Garber a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Dr. Garber's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Dr. Garber has paid copays substantially higher than $3.33 from 2008 to 2010 and $3.99 from 2011 to the present per 30-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Dr. Garber at least $375.18 in inflated copays.  Dr. Garber anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS's wrongful conduct is not stopped.

22.     Plaintiff Toni Odorisio is domiciled in the State of New York.  Ms. Odorisio has purchased generic versions of two monthly maintenance medications from CVS in New York between November 2008 and the present.  Additionally, Ms. Odorisio carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.  Both medications prescribed to Ms. Odorisio are on the CVS HSP generic medication list (attached hereto as Exhibit A).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day

supply of the same prescriptions that Ms. Odorisio purchased from 2008 to 2010, and $3.99 from 2011 to the present. CVS is required to charge Ms. Odorisio a copay that does not exceed the usual and customary price CVS charges for the prescription drug. For these sales, CVS knowingly submitted to Ms. Odorisio's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program. As a result of CVS's fraudulent scheme, Ms. Odorisio has paid copays substantially higher than $3.33 from 2008 to 2010 and $3.99 from 2011 to the present per 30-day supply each time she purchased her generic prescriptions from CVS and has, thereby, been injured. CVS has overcharged Ms. Odorisio at least $76.20 in inflated copays. Ms. Odorisio anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

23.    Plaintiff Robert Guarnieri is domiciled in the State of New York. Mr. Guarnieri has purchased generic versions of three monthly maintenance medications from CVS between March 2009 and the present. Mr. Guarnieri carries health insurance and carried health insurance during the time that he purchased generic medications from CVS. All three medications prescribed to Mr. Guarnieri are on the CVS HSP generic medication list (attached hereto as Exhibit A). CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply and 9.99 for a 90-day supply of the same prescriptions that Mr. Guarnieri purchased from 2008 to 2010, and $3.99 for a 30-day supply and $11.99 for a 90-day supply from 2011 to the present. CVS is required to charge Mr. Guarnieri a copay that does not exceed the usual and customary price CVS charges for the prescription drug. For these sales, CVS knowingly submitted to Mr. Guarnieri's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program. As a result of CVS's fraudulent scheme, Mr. Guarnieri has paid copays substantially higher than $3.33 from 2008 to 2010 and $3.99 from 2008 to 2010 per 30-day supply, and $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-day supply each time he purchased his generic prescriptions from CVS and has, thereby, been injured. CVS has overcharged Mr. Guarnieri at least $46.45 in inflated copays. Mr. Guarnieri anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS

1    continues its wrongful conduct.

2        24.    Plaintiff Onnolee Samuelson is domiciled in the State of New York.  Ms. Samuelson has

3    purchased generic versions of two monthly maintenance medications from CVS between November

4    2008 and the present in New York.  Ms. Samuelson carries private health insurance and carried private

5    health insurance during the time that she purchased generic medications from CVS.  Both medications

6    prescribed to Ms. Samuelson are on the CVS HSP generic medication list (attached hereto as Exhibit

7    A).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply

8    and 9.99 for a 90-day supply of the same prescriptions that Ms. Samuelson purchased from 2008 to

9    2010, and $3.99 for a 30-day supply and $11.99 for a 90-day supply from 2011 to the present.  CVS is

10   required to charge Ms. Samuelson a copay that does not exceed the usual and customary price CVS

11   charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Samuelson's third-

12   party payor a purported usual and customary price fraudulently inflated above CVS's true usual and

13   customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme,

14   Ms. Samuelson has paid copays substantially higher than $3.33 from 2008 to 2010 and $3.99 from 2008

15   to 2010 per 30-day supply, and $9.99 from 2008 to 2010 and $11.99 from 2011 to the present per 90-

16   day supply each time she purchased her generic prescriptions from CVS and has, thereby, been injured.

17   CVS has overcharged Ms. Samuelson at least $259.38 in inflated copays.  Ms. Samuelson anticipates

18   filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of

19   paying additional inflated copays in the future if CVS continues its wrongful conduct.

20       25.    Plaintiff Irma Pacheco is domiciled in the State of Texas.  Ms. Pacheco has purchased

21   generic versions of at least one monthly maintenance medication from CVS between October 2014 and

22   the present in Texas.  Ms. Pacheco carries private health insurance and carried private health insurance

23   during the time that she purchased generic medications from CVS.  The medication prescribed to Ms.

24   Pacheco appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-

25   paying customers a usual and customary price of $15.98 for a 120-day supply of the same prescription

26   that Ms. Pacheco purchased from 2014 to the present.  CVS is required to charge Ms. Pacheco a copay

27   that does not exceed the usual and customary price CVS charges for the prescription drug.  For these

28   sales, CVS knowingly submitted to Ms. Pacheco's third-party payor a purported usual and customary

SECOND AMENDED CLASS ACTION
COMPLAINT

price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Pacheco has paid copays substantially higher than $15.98 from 2014 to the present per 120-day supply when she purchased her generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Ms. Pacheco at least $39.57 in inflated copays.  Ms. Pacheco anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

26.     Plaintiff Robert Jenks is domiciled in the State of Florida.  Mr. Jenks has purchased generic versions of at least two monthly maintenance medications from CVS in Florida and Illinois between March 2015 and the present.  Mr. Jenks carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  The medications prescribed to Mr. Jenks appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply and $11.99 for a 90-day supply of the same prescriptions that Mr. Jenks purchased from 2015 to the present.  CVS is required to charge Mr. Jenks a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Jenks's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Jenks has paid copays substantially higher than $3.99 for a 30-day supply and $11.99 for a 90-day supply from 2015 to present when he purchased his generic prescriptions from CVS and has, thereby, been injured. CVS has overcharged Mr. Jenks at least $40.06 in inflated copays.  Mr. Jenks anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

27.     Plaintiff Debbie Barrett is domiciled in the State of Florida.  Ms. Barrett has purchased generic versions of at least four monthly maintenance medications from CVS in Florida between November 2013 and the present. Ms. Barrett carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.  The medications prescribed to Ms. Barrett appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS

charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply, $7.98 for a 60-day supply, and $11.99 for a 90-day supply of the same prescriptions that Ms. Barrett purchased from 2013 to the present.  CVS is required to charge Ms. Barrett a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Barrett's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Barrett has, during the class period, paid copays substantially higher than $3.99 per 30-day supply, $7.98 per 60-day supply, and $11.99 per 90-day supply from 2013 to the present when she purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Ms. Barrett at least $38.81 in inflated copays.  Ms. Barrett anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

28.     Plaintiff Carl Washington is domiciled in the State of Illinois.  Mr. Washington purchased generic versions of at least one monthly maintenance medication from CVS in Illinois between November 2008 and May 2009.  Mr. Washington carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  The medication prescribed to Mr. Washington appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply of the same prescription that Mr. Washington purchased from 2008 to 2009.  CVS is required to charge Mr. Washington a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Washington's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Washington has paid copays substantially higher than $3.33 from 2008 to 2009 per 30-day supply when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS overcharged Mr. Washington at least $70.94 in inflated copays.  Mr. Washington anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

29.     Plaintiff Robert Podgorny is domiciled in the State of Illinois.  Mr. Podgorny has purchased generic versions of two prescribed maintenance medications from CVS in Illinois between November 2008 and the present.  Mr. Podgorny carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  The two medications prescribed to Mr. Podgorny appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $9.99 for a 90-day supply of the same medications prescribed to and purchased by Mr. Podgorny from 2008 to 2010, and $11.99 for a 90-day supply of the same medications starting in 2011.  CVS is required to charge Mr. Podgorny a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Podgorny's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's unlawful scheme, Mr. Podgorny has throughout the class period paid copays substantially higher than the usual and customary price of $9.99 or $11.99 per 90-day supply of these medications.  CVS has overcharged Mr. Podgorny at least $686.40 in inflated copays.  Mr. Podgorny anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

30.     Plaintiff Vincent Gargiulo is domiciled in the State of New Jersey.  Mr. Gargiulo has purchased generic versions of at least two monthly maintenance medications from CVS in New Jersey between May 2014 and the present.  The medications prescribed to Mr. Garguilo appear on the CVS HSP generic medication list (Exhibit A hereto).  Mr. Gargiulo carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS.  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply and $11.99 for a 90-day supply of the same prescriptions that Mr. Gargiulo purchased from 2015 to the present.  CVS is required to charge Mr. Gargiulo a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Gargiulo's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent

scheme, Mr. Gargiulo has paid copays substantially higher than $3.99 for a 30-day supply and $11.99 for a 90-day supply from 2015 to present when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Mr. Gargiulo at least $4.97 in inflated copays.  Mr. Gargiulo anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

31.   Plaintiff Zachary Hagert is domiciled in the State of Pennsylvania.  Mr. Hagert has purchased generic versions of at least one monthly maintenance medication from CVS in Pennsylvania between October 2014 and the present.  Mr. Hagert carries private health insurance and carried private health insurance during the time that he purchased the generic medication from CVS.  The medication prescribed to Mr. Hagert appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.99 for a 30-day supply of the same prescription that Mr. Hagert purchased from 2014 to the present.  CVS is required to charge Mr. Hagert a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Hagert's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Hagert has paid copays substantially higher than $3.99 from 2014 to the present per 30-day supply when he purchased his generic prescription from CVS and has, thereby, been injured.  CVS has overcharged Mr. Hagert at least $3.01 in inflated copays.  Mr. Hagert anticipates filling future prescriptions for this generic drug at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

32.   Plaintiff Kevin Cauley is domiciled in the Commonwealth of Pennsylvania. Mr. Cauley has purchased generic versions of a prescribed monthly maintenance medication at CVS pharmacies located in Philadelphia, Pennsylvania between November 2008 and the present.  Mr. Cauley carries private health insurance and carried private health insurance during the time that he purchased this prescribed generic medication from CVS.  The medication prescribed to Mr. Cauley appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and

customary price of $9.99 for a 90-day supply of the same medication prescribed to and purchased by Mr. Cauley from 2008 to 2010, and $11.99 for a 90-day supply of the same medication starting in 2011. CVS is required to charge Mr. Cauley a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Cauley's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's unlawful scheme, Mr. Cauley has throughout the class period paid copays substantially higher than the usual and customary price of $9.99 or $11.99 per 90-day supply of his prescribed generic medication.  CVS has overcharged Mr. Cauley at least $222.32 in inflated copays.  Mr. Cauley anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

33.    Plaintiff Linda Krone is domiciled in the State of Maryland.  Ms. Krone purchased generic versions of at least one monthly maintenance medication from CVS in Washington, D.C. and Maryland between January 2015 and the present.  Ms. Krone carries private health insurance and carried private health insurance during the time that she purchased generic medications from CVS.  The medication prescribed to Ms. Krone appears on the CVS HSP generic medication list (Exhibit A hereto). CVS charged its cash-paying customers a usual and customary price of $11.99 for a 90-day supply of the same prescription that Ms. Krone purchased in 2015.  CVS is required to charge Ms. Krone a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Krone's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Krone has paid copays substantially higher than $11.99 in 2015 per 90-day supply when she purchased her generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Ms. Krone at least $24.03 in inflated copays.  Ms. Krone anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

34.    Plaintiff Carolyn Caine is domiciled in the State of Georgia.  Ms. Caine has purchased generic versions of at least one monthly maintenance medication from CVS in Georgia between August

2015 and the present.  Ms. Caine carries private health insurance and carried private health insurance during the time that she purchased the generic medication from CVS.  The medication prescribed to Ms. Caine appears on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $7.98 for a 60-day supply of the same prescription that Ms. Caine purchased from 2015 to the present.  CVS is required to charge Ms. Caine a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Ms. Caine's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Ms. Caine has paid copays substantially higher than $7.98 from 2015 to the present per 60-day supply when she purchased her generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Ms. Caine at least $22.67 in inflated copays.  Ms. Caine anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

35.     Plaintiff Ken Bolin is domiciled in the State of Ohio.  Mr. Bolin has purchased generic versions of at least two monthly maintenance medications from CVS in Ohio between January 2010 and December 2010.  Mr. Bolin carries health insurance and carried health insurance during the time that he purchased generic medications from CVS.  The medications prescribed to Mr. Bolin appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply and $9.99 for a 90-day supply of the same prescription that Mr. Bolin purchased from January to December 2010.  CVS is required to charge Mr. Bolin a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Bolin's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Bolin has, during the class period, paid copays substantially higher than $3.33 per 30-day supply and $9.99 per 90-day supply from January to December 2010 when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Mr. Bolin at least $12.06 in inflated copays.  Mr. Bolin anticipates filling future

prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

36.     Plaintiff Walter Wulff is domiciled in the State of Ohio.  Mr. Wulff purchased generic versions of at least two monthly maintenance medications from CVS in Ohio between November 2008 and December 2010.  Mr. Wulff carries health insurance and carried health insurance during the time that he purchased generic medications from CVS.  The medications prescribed to Mr. Wulff appear on the CVS HSP generic medication list (Exhibit A hereto).  CVS charged its cash-paying customers a usual and customary price of $3.33 for a 30-day supply and $9.99 for a 90-day supply of the same prescription that Mr. Wulff purchased from November 2008 to December 2010.  CVS is required to charge Mr. Wulff a copay that does not exceed the usual and customary price CVS charges for the prescription drug.  For these sales, CVS knowingly submitted to Mr. Wulff's third-party payor a purported usual and customary price fraudulently inflated above CVS's true usual and customary price – the price CVS offers under its HSP program.  As a result of CVS's fraudulent scheme, Mr. Wulff has, during the class period, paid copays substantially higher than $3.33 per 30-day supply and $9.99 per 90-day supply from November 18, 2008 to December 13, 2010 when he purchased his generic prescriptions from CVS and has, thereby, been injured.  CVS has overcharged Mr. Wulff at least $42.06 in inflated copays.  Mr. Wulff anticipates filling future prescriptions for these generic drugs at a CVS pharmacy, and thus faces the prospect of paying additional inflated copays in the future if CVS continues its wrongful conduct.

**B.     Defendants.**

37.     Defendant CVS Health Corporation, a/d/a CVS/Caremark, CVS/Pharmacy, CVS/Minute Clinic and CVS/Specialty (together with CVS Pharmacy, Inc., hereinafter, "CVS") is a corporation organized under the laws of Delaware.  CVS is headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895.  CVS describes itself as a "pharmacy innovation company" with "an unmatched suite of capabilities and…expertise," and "the only integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions." *See* CVS Health Corporation 2014 Annual Report at p.22, available at   http://investors.cvshealth.com/~/media/Files/C/CVS-IR-v3/reports/cvs-ar-2014.pdf (last accessed on November 2, 2015).

38.     Defendant CVS Pharmacy, Inc., a reporting division and wholly-owned subsidiary of CVS Health Corporation, is a corporation organized under the laws of Rhode Island that maintains its principle place of business at CVS headquarters at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS Health Corporation, through its integrated corporate structure, has throughout the class period overseen the day-to-day operations of CVS Pharmacy, Inc., with respect to the implementation of the fraudulent and deceptive prescription generic drug pricing policies and wrongful conduct described herein, such that CVS Pharmacy, Inc. may be deemed the agent of CVS Health Corporation and, as such, both CVS Health Corporation and CVS Pharmacy, Inc., may be held liable for the wrongful conduct alleged herein.  Additionally, through CVS's integrated corporate structure, CVS Pharmacy, Inc., performs and has throughout the class period performed business functions, including the prescription generic drug pricing policies and wrongful conducted described herein, that are compatible with, and that assist CVS Health Corporation's business, such that both CVS Health Corporation and CVS Pharmacy, Inc., may be held liable for the wrongful conduct alleged herein.

39.     CVS is a nationwide retail pharmacy chain with more than 7,866 pharmacies operating under the trade names CVS Pharmacy and Longs Drugs throughout the United States, the District of Columbia, and Puerto Rico, including numerous locations in this District.  As one of the nation's leading pharmacy businesses, CVS "has relationships with over 150 million consumers, one of every two Americans, and has access to data on 30 percent of all prescriptions in the United States."  CVS fills or manages more than 1 billion prescriptions per year, and, in 2014, earned net revenue of $139.37 billion. Significantly, CVS's retail pharmacy segment accounted for approximately $67 billion in revenue in 2014.

## IV.     JURISDICTION AND VENUE

40.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds of thousands, and likely millions, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and CVS is a citizen of a State different from that of Plaintiffs and members of the Class.  This Court also has subject matter jurisdiction over Plaintiffs'

and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

41.     This Court has jurisdiction over CVS because CVS intentionally avails itself of the California consumer market through the promotion, sale, marketing, and distribution of their products to California residents.  As a result, jurisdiction in this Court is proper and necessary.  Moreover, CVS's wrongful conduct, as described herein, foreseeably affects consumers in California and nationwide.

42.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## V.     FACTS

### A.     Third-Party Plan Coverage and Claims Submission.

43.     The majority of patients in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses.  Few plans cover all expenses, but, instead, require plan participants to pay a portion of their drug costs out-of-pocket.  These out-of-pocket expenses include copayments, co-insurance, and/or deductibles.

44.     Even though plan participants cannot and do not negotiate the price charged by CVS for prescription drugs and do not negotiate the copayment price for the drug in a given transaction, they are required to pay to CVS a copayment amount in order to receive the prescription.

45.     Plan participants pay premiums, either on their own or through their employer, to a third-party payor for the purpose of insuring against healthcare costs, including prescriptions.

46.     Plan participants (including Plaintiffs and the Class), at a minimum, expect to pay the same prices as uninsured or cash-paying individuals for a prescription.  Otherwise, they would not only receive no benefit from their insurance, but also would, in fact, be punished for having insurance.  Therefore, given the network of entities negotiating the prices of prescription drugs on their behalf and the premiums paid for coverage, they reasonably expect to pay less than cash-paying customers who do not have insurance coverage.

47.     CVS uses a uniform process at its locations for each prescription drug transaction.  When a patient fills a prescription at a CVS pharmacy, the pharmacist or pharmacy tech enters the prescription information and any applicable insurance or benefit information into CVS's computerized claims

processing system.   Once this information is entered, CVS submits the claim for dispensing and adjudication.

48.   Adjudication is the automated process by which CVS submits prescription claims electronically in real time to the third-party payor (or the third-party payor's agent).   During adjudication, the claim is verified and/or confirmed for patient eligibility for insurance or another prescription drug benefit.   Through this process, using the drug price information from CVS, the third-party payor sets the reimbursement amount and any applicable copayment or coinsurance.

49.   For all times relevant to the allegations in this Complaint, CVS used the industry standard NCPDP ("National Council for Prescription Drug Programs") reporting for the electronic transmission and adjudication of its pharmacy claims.

50.   NCPDP is a non-profit, multi-stakeholder organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services.   Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.   The NCPDP works through a consensus process to develop industry standards, any of which have been adopted into federal legislation, including HIPPA, MMA, HITECH and Meaningful USE (MU).

51.   HIPPA requires uniform methods and codes for exchanging electronic information between health plans.   These standards were developed by the NCPDP and referred to as the NCPDP Telecommunications Standard.   HIPPA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D. 42 CFR 423.160.   The NCPDP also adjudicates claims between pharmacies and patients.

52.   As a required component of the adjudication process, CVS reports to third-party payors CVS's usual and customary ("U&C") price for the drug being dispensed.   The U&C price is generally defined as the cash price to the general public, which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed.   Pursuant to the NCPDP reporting standard, pharmacies are required to report their U&C prices for each prescription transaction using NCPDP's mandatory pricing segment code 426–DQ.

53.     Based on the data reported by CVS, third-party payors identify the copayment amount that the patient must pay to CVS in a specific transaction.  The copayment amount is a portion of the total drug price and cannot exceed the drug price.  The remainder of the drug price is reimbursed to the pharmacy by the third-party payor.

54.     The out-of-pocket copayment that a plan participant is required to pay in order to receive the prescription is calculated based on the U&C price reported by CVS.  Not only must the copayment be equal to or less than the drug price, but also the drug price cannot exceed the U&C price.  As a result, the copayment cannot exceed the U&C price.

55.     In some situations, the copayment may only be charged as a percentage of the U&C price.  For instance, suppose a third-party payor's negotiated price for a specific drug is $36 with a beneficiary copayment of 25% for a 90-day supply of a generic prescription drug.  If, however, CVS reports to the third-party payor that the U&C price for a 90-day supply of the same drug is $20, the third-party payor would consider the $20 price to take the place of the $36 negotiated price.  In such a scenario, the third-party payor would adjudicate CVS's claim for $20, and the plan participant would pay only a $5 copay, rather than a $9 copay.

**B.    The HSP Program.**

56.     In 2006, large "big-box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices.

57.     For example, in September 2006, Wal-Mart began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  In November of that same year, Target began charging $4 for a 30-day supply of the most commonly prescribed generic drugs and $10 for a 90-day supply.  Other retailers with pharmacy departments, which were able to absorb lower margins on generic drug sales because pharmacy sales represented such a low percentage of their total sales, followed suit.  Wal-Mart and Target report to third-party payors, as their U&C prices, their $4 per 30-day prices for generic prescription drugs.

58.     CVS was unwilling to match the deep discounts on generic drugs provided to customers by big-box retailers.  So, in response to lower prices and increased competition for cash customers, CVS created a custom-branded loyalty program targeted at cash customers and other price-sensitive

1  customers.

2       59.     In November 2008, CVS launched its custom branded generic prescription drug

3  program—the HSP program.

4       60.     The HSP program is intended to offer competitive prices to cash customers while

5  maximizing third-party reimbursements and copayments through reporting artificially inflated U&C

6  prices to third-party payors.

7       61.     Specifically, as designed, the HSP program is a non-networked discount prescription

8  drug program that offers savings on hundreds of generic medications.  The HSP program is not a third-

9  party plan; it is not insurance or a substitute for insurance.  Enrollment in the HSP program was and

10 continues to be open to cash-paying customers.  From November 9, 2008 through 2010, such customers

11 could join the HSP for a $10 fee.  During this time, CVS charged HSP members $9.99 for a 90-day

12 supply of the most commonly prescribed generic drugs ("HSP Generics").  Moreover, CVS pharmacists

13 routinely prorated prescriptions written for less than 90-days.  For example, CVS would charge a HSP

14 member roughly $3.33 for a 30-day supply.  In 2011, CVS raised its enrollment fee to $15 a year and

15 the price of the over 400 HSP generics to $11.99 for a 90-day supply (or a prorated amount of

16 approximately $3.99 for a 30-day supply).

17      62.     The 400 drugs included under the HSP program are among some of the most commonly

18 prescribed generic drugs for cardiovascular, allergy, diabetes, pain, and arthritis, cholesterol, skin

19 conditions, mental health, women's health, viruses, thyroid conditions, glaucoma and eye care,

20 gastrointestinal disorders, and other common ailments.

21      63.     CVS designed the HSP program to appeal to price sensitive customers, who, for the most

22 part, take long-term maintenance medications.  Customers who take maintenance medications, many of

23 whom are elderly or disabled, are the most valuable to CVS.

24      **C.     CVS's Unlawful Conduct.**

25      64.     Although CVS sought to retain and attract cash customers by implementing the HSP

26 program, it was unwilling to lower the price charged to third-party payors.  The HSP program enabled

27 CVS to unlawfully report artificially inflated U&C prices to third-party payors, thereby allowing CVS

28 to collect from consumers artificially inflated copays.

SECOND AMENDED CLASS ACTION
COMPLAINT                                                      21

65.     CVS is on notice that third-party payors calculate the drug price to be paid to the pharmacy based on whether the U&C submitted to the third-party payor is less than or greater than the negotiated price.  Where the U&C is less than the negotiated price, CVS may not charge a drug price greater than the U&C.  This is clear in contracts, network pharmacy manuals, payor sheets, and CVS's own transaction data, which contain reimbursements adjudicated under this formula.

66.     Third-party payors state, in detail, how a beneficiary's copay is determined in their pharmacy agreements and manuals.  CVS is in possession of these documents and is aware of their contents.  Many third-party payors specifically contemplate a situation where the U&C is less than the copay.  In these cases, the third-party payors forbid CVS from charging plan participants a copay in excess of the U&C.

67.     Through the HSP program, CVS implemented a scheme to create a new category of cash customers, in order to avoid lowering prices charged to third-party payors and their plan participants.  CVS designed the HSP to split CVS's cash business, formerly consisting solely of people who pay the cash price (the usual and customary price), into two segments: customers who pay the retail price, and customers who pay the HSP price.

68.     The customers who purchase prescriptions outside of the HSP program and pay the retail price make up less than 50 percent of CVS's cash business and less than three percent of CVS's total prescription business.  In other words, most of CVS's cash-paying customers pay the HSP price.

69.     As previously stated, the industry standards that CVS follows provide that the U&C price is the cash price offered to the general public for specific drugs.  CVS offers the HSP price as the cash price to the general public and the HSP price is, in fact, the most common price paid by CVS's cash-paying customers.  Thus, under industry standards and CVS's own definition, the HSP price is CVS's U&C price for each generic prescription drug that is identified in Exhibit A.

70.     Nonetheless, CVS continues to submit not the HSP price but the supposed retail price as its purported "usual and customary price" to third-party payors.  CVS can do so because the third-party payors are not privy to what prices CVS charges its uninsured cash customers, including its HSP customers, and what percentage of CVS's cash customers pay each price.  Thus, third-party payors and

insured CVS customers have no way of determining on their own whether the price CVS submits as its usual and customary price is, in fact, the most common price offered to cash paying members of the general public.

71.    In essence, the HSP program serves as a ruse to avoid reporting the HSP prices to third-party payors as CVS's U&C price.

72.    Instead of reporting the more common HSP price as the U&C price, CVS reports a significantly inflated price.

73.    CVS falsely reports, and continues to report, to third-party payors, U&C prices for HSP Generics that are substantially higher than the HSP prices it offers to the general public.

74.    The inflated U&C prices that CVS reports to third-party payors do not vary based on any particular third-party plan.  In fact, for a given drug, strength, and quantity, CVS may report the same U&C to all third-party payors, despite any variations in their respective plans.

75.    Beginning in November 2008 and continuing through the present, CVS has reported to third-party payors artificially inflated U&C prices for the same prescription drugs that CVS offers for lower prices under the HSP program.  CVS has thereby caused (and continues to cause) plan participants (including Plaintiffs and other class members) to pay inflated copays to CVS, because the copays are calculated based on, and are not supposed to exceed, the U&C prices.

76.    CVS directly competes for customers with other national retail pharmacies, such as Wal-Mart, Target, Costco, and ShopRite.  In contrast to other national retail pharmacies that report the discounted price as the U&C price, CVS unlawfully reported and continues to report a marked-up and baseless U&C price that deceives and gouges plan participants who are forced to pay inflated copayments.

77.    As part of its scheme, CVS has reported U&C prices for generic prescription drugs that are up to eleven (11) times the U&C prices reported by some of its most significant competitors and its own HSP prices.  The chart below shows U&C prices submitted to Pennsylvania's Medicaid program for the purposes of claims adjudication.  The U&Cs submitted by CVS are unequivocally inflated.

| Drug - 90-Day Supply | Shoprite Reported U&C | WalMart Reported U&C | Target Reported U&C | Costco Reported U&C | CVS Reported U&C | CVS HSP Price |
|---|---|---|---|---|---|---|
| Carvedilol 12.5 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $120.99 | $11.99 |
| Lisinopril 20 mg tab | $9.99 | $10.00 | $10.00 | n/a | $42.19 | $11.99 |
| Lisinopril-HTCZ 20–12.5 mg tab | $9.99 | $24.00 | $24.00 | n/a | $58.59 | $11.99 |
| Metformin HCL 1000 mg tab | $9.99 | $24.00 | $24.00 | $9.99 | $86.59 | $11.99 |
| Metoprolol Tartrate 50 mg tab | $9.99 | $10.00 | $10.00 | $9.99 | $48.99 | $11.99 |
| Warfarin Sodium 5 mg tab | $9.99 | $10.00 | $24.00 | $28.00 | $48.39 | $11.99 |
| Meloxicam 15 mg tab | $9.99 | $10.00 | n/a | $9.23 | $79.59 | $11.99 |
| Alendronate Sodium 70 mg tab | $29.99 | $24.00 | n/a | $17.61 | $134.99 | $11.99 |

78.    For years, this pricing scheme has been a financial boon for CVS.  Since 2008, CVS has collected more than $46 billion in copays from plan participants including Plaintiffs and other class members.  On information and belief, CVS's wrongful overcharges to Plaintiffs and the other members of the Classes comprise a meaningful portion of CVS's generic prescription drug copay revenue.

79.    By reporting false U&C prices to third-party payors, CVS has caused Plaintiffs and members of the Classes to pay, and continue to pay, to CVS, artificially high copayments for generic prescription drugs.

80.    CVS does not inform customers who use their insurance benefits to purchase generic prescription drugs (including Plaintiffs and members of the Classes) that, for the drugs in the HSP program, the HSP prices are lower than the copays CVS is charging the customers.  CVS either wrongly conceals or omits such information by failing to tell insured customers about the HSP program, or by misrepresenting to insured customers that the HSP program would not apply to their purchases.

81.    On information and belief, there have been millions of instances where CVS intentionally

submitted fraudulently-inflated U&C pricing information to third-party payors, relating to Plaintiffs' and members of the Classes' purchases of the relevant generic prescription drugs from CVS pharmacies during the class period, including the specific transactions by Plaintiffs described herein.

## VI.    CLASS ALLEGATIONS

82.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and the following national class and state subclasses:

### NATIONAL CLASS

All CVS customers in the United States who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

### STATE SUBCLASSES

California Subclass:
CVS customers in the State of California who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Arizona Subclass:
CVS customers in the State of Arizona who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS

Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Massachusetts Subclass:
CVS customers in the Commonwealth of Massachusetts who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

New York Subclass:
CVS customers in the State of New York who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Ohio Subclass:
CVS customers in the State of Ohio who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were

insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Texas Subclass:
CVS customers in the State of Texas who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Florida Subclass:
CVS customers in the State of Florida who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Illinois Subclass:
CVS customers in the State of Illinois who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were

insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

New Jersey Subclass:
CVS customers in the State of New Jersey who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Pennsylvania Subclass:
CVS customers in the Commonwealth of Pennsylvania who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Maryland Subclass:
CVS customers in the State of Maryland who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were

insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

Georgia Subclass:

CVS customers in the State of Georgia who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drug that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

District of Columbia Subclass:

CVS customers in the District of Columbia who, between November 2008 and the present (the "Class Period"), (1) purchased generic prescription drugs that are listed on the CVS Health Savings Pass ("HSP") prescription drug list attached as Exhibit A; (2) were insured for the purchase through a third-party payor; and (3) paid CVS an out-of-pocket payment for the purchase either (a) greater than the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply); or (b) for customers whose out-of-pocket costs under their third-party payor plans are calculated as a percentage of the drug price to be paid to CVS, in excess of such percentage of the $9.99 HSP price for a 90-day supply from 2008 to 2011, or the $11.99 HSP price for a 90-day supply from 2012 to the present (or, for a price proportionate to these prices but for a prescription less than or greater than a 90-day supply).

83.     Excluded from the foregoing Class and Subclasses are CVS, their officers and directors.

84.     The Class and Subclasses consist of at least hundreds of thousands, and likely millions, of individual CVS customers, making joinder impractical, in satisfaction of FRCP 23(a)(1).  The exact

size of the Class and Subclasses and the identities of the individual members thereof are ascertainable through CVS's records, including but not limited to their billing and collection records.

85.    The claims of Plaintiffs are typical of the Class and Subclasses.  The claims of the Plaintiffs and the respective classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiffs and their respective classes.

86.    The respective classes have a well-defined community of interest.  CVS has acted and failed to act on grounds generally applicable to the Plaintiffs and the Class and Subclasses, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the respective classes.

87.    There are many questions of law and fact common to the claims of Plaintiffs and the Class and Subclasses, and those questions predominate over any questions that may affect only individual class members within the meaning of FRCP 23(a)(2) and 23(b)(2).

88.    Common questions of fact and law affecting members of the Class and Subclasses include, but are not limited to, the following:

a)   Whether CVS artificially inflated the U&C prices that it reported pursuant to the NCPDP reporting standard;

b)   Whether CVS omitted and concealed material facts from its communications and disclosures regarding its pricing scheme;

c)   Whether CVS has overcharged and continues to overcharge copays to hundreds of thousands, and likely millions, of plan participants (including Plaintiffs and the Class and Subclasses) who purchased some of the most commonly prescribed generic drugs from CVS Pharmacies around the country;

d)   Whether CVS has engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of generic prescription drugs;

e)   Whether, as a result of CVS's misconduct, Plaintiffs and the Class and Subclasses have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

SECOND AMENDED CLASS ACTION COMPLAINT

f)   Whether, as a result of CVS's misconduct, Plaintiffs and the Class and Subclasses are entitled to injunctive, equitable and/or other relief, and, if so, the nature of such relief.

89.   Absent a class action, most of the members of the Class and Subclasses would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

90.   Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class and Subclasses.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

91.   Plaintiffs and the Class and Subclasses had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

92.   Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

93.   CVS engaged in a secret scheme that did not reveal facts that would have put Plaintiffs or the Class or Subclasses on inquiry notice that CVS was charging inflated prices for generic prescription drugs.

94.   Because CVS's scheme was kept secret, Plaintiffs and the Class Subclasses were unaware of CVS's unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for generic prescription drugs in the United States during the class period.

95.   CVS actively misled the public about the HSP scheme by not disclosing to Plaintiffs and the Class and Subclasses (or to third-party payors) that the U&C prices reported to third-party payors

SECOND AMENDED CLASS ACTION
COMPLAINT

31

for the generic drugs in the HSP program were far higher than the HSP prices.  CVS charged Plaintiffs and the Class and Subclasses copayments for the drugs they purchased that reflected CVS's artificially inflated U&C prices.  CVS also failed to post drug prices in a clear manner and in a way that would alert Plaintiffs and the Class and Subclasses to the artificially inflated prices charged by CVS.  By so doing, CVS misled Plaintiffs and the Class and Subclasses into paying to CVS inflated copays for these drugs.

96.     CVS's affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

97.     CVS's unlawful pricing activities were inherently self-concealing because they involved misrepresenting and falsely reporting the U&C price.  If CVS had been open and notorious about its fraudulent pricing scheme, it would never have succeeded.

98.     Plaintiffs and the Class and Subclasses could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because CVS employed deceptive practices and techniques of secrecy to avoid detection of their activities.  CVS fraudulently concealed their activities by various means and methods, including misrepresentations regarding the real U&C prices of generic prescription drugs.

99.     Because CVS affirmatively concealed its scheme, Plaintiffs and the Class and Subclasses had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether CVS committed the actionable activities detailed herein.

100.    As a result of CVS's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class and Subclasses have as a result of the unlawful conduct alleged in this Complaint.

101.    As a result of CVS's fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class and Subclasses have as a result of the unlawful conduct alleged in this Complaint.

**COUNT 1: FRAUD**

**Asserted by Plaintiffs, the National Class and each Subclass against CVS**

102.    Plaintiffs repeat paragraphs 1 through 101 above.

103.    CVS materially misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

104.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

105.    CVS intended to induce Plaintiffs and Class Members, with respect to the National Class and each relevant State Subclass, to rely on its misrepresentations and/or omissions.  CVS knew that Plaintiffs and Members of the Classes, would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

106.    Plaintiffs and Members of the Classes justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Members of the Classes would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's misrepresentations and/or omissions.  Plaintiffs' and Members' of the Classes reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

107.    As a proximate result of CVS's conduct, Plaintiffs and Members of the Classes have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

108.    CVS is therefore liable to Plaintiffs and Members of the Classes for the damages they sustained.

**COUNT 2: CONSTRUCTIVE FRAUD**

**Asserted by Plaintiffs, the National Class and each State Subclass against CVS**

109.    Plaintiffs repeat paragraphs 1 through 101 above.

SECOND AMENDED CLASS ACTION
COMPLAINT

33

110.   In the circumstances alleged above, Plaintiffs and Members of the Classes had a special relationship with CVS.

111.   In particular, CVS had a duty to deal fairly with Plaintiffs and Members of the Classes because

a)   CVS claimed to possess and did possess specialized knowledge, experience and qualifications regarding the prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those prescription drugs;

b)   such specialized knowledge, experience and qualifications put CVS in a position of superiority over Plaintiffs and Members of the Classes;

c)   CVS knew that Plaintiffs and Members of the Classes needed to rely and did rely on CVS's specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing prescription drugs from CVS, because Plaintiffs and Members of the Classes were not able to detect the falsity and incompleteness of the information supplied by CVS;

d)   Plaintiffs and Members of the Classes were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and

e)   CVS stood to gain at Plaintiffs' and Members' of the Classes expense, if CVS did not supply truthful and accurate information.

112.   CVS breached its duty to deal fairly with Plaintiffs and Members of the Classes by making material misrepresentations and/or omissions regarding the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations and/or omissions by reporting artificially inflated U&C prices for such drugs to third-party payors.

113.   CVS intended to induce Plaintiffs and Members of the Classes to rely on its misrepresentations and/or omissions.  CVS knew that Plaintiffs and Members of the Classes would rely on CVS's representation and/or omissions regarding U&C prices, and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

114.   Plaintiffs and Members of the Classes justifiably relied upon CVS's misrepresentations and/or omissions in that Plaintiffs and Members of the Classes would not have purchased generic

prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Plaintiffs' and Members' of the Classes reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

115.    CVS gained an advantage at Plaintiffs' and Members' of the Classes expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Plaintiffs and Members of the Classes.

116.    As a proximate result of CVS's conduct, Plaintiffs and Members of the Classes have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

117.    CVS is therefore liable to Plaintiffs and Members of the Classes for the damages they sustained.

## COUNT 3: NEGLIGENT MISREPRESENTATION

### Asserted by Plaintiffs, the National Class and each State Subclass against CVS

118.    Plaintiffs repeat paragraphs 1 through 101 above.

119.    Under the circumstances alleged, CVS owed a duty to Plaintiffs and Members of the Classes to provide them with accurate information regarding the prices of their generic prescription drugs.

120.    CVS misrepresented and/or concealed the true U&C prices of generic prescription drugs that are included in the HSP program.  CVS made such misrepresentations by reporting artificially inflated U&C prices for such drugs to third-party payors.

121.    CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that CVS reported to third-party payors were substantially (and unjustifiably) higher than the prices CVS charged under its HSP program to cash-paying customers.

122.    CVS intended to induce Plaintiffs and Members of the Classes to rely on its misrepresentations and/or omissions.  CVS knew that Plaintiffs and Members of the Classes would rely on CVS's misrepresentations and/or omissions regarding U&C prices and, as a result, would pay copayments higher than the actual U&C prices for those generic prescription drugs.

123.    Plaintiffs and Members of the Classes justifiably relied upon CVS's misrepresentations

and/or omissions in that Plaintiffs and Members of the Classes would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's misrepresentations and/or omissions.  Plaintiffs' and Members' of the Classes reliance on CVS's misrepresentations and/or omissions was, thus, to their detriment.

124.   As a proximate result of CVS's negligent conduct, Plaintiffs and Members of the Classes have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS's misconduct.

125.   CVS is therefore liable to Plaintiffs and Members of the Classes for the damages they sustained.

## COUNT 4:  UNJUST ENRICHMENT

**Asserted by Plaintiffs, the National Class and each State Subclass against CVS**

126.   Plaintiffs repeat paragraphs 1 through 101 above.

127.   By means of CVS's wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and unconscionable.

128.   CVS knowingly received and retained wrongful benefits and funds from Plaintiffs and Members of the Classes.  In so doing, CVS acted with conscious disregard for the rights of Plaintiffs and Members of the Classes.

129.   As a result of CVS's wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Members of the Classes.

130.   CVS's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

131.   Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Plaintiffs and Members of the Classes in an unfair and unconscionable manner.  CVS's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

132.   Plaintiffs and Members of the Classes did not confer these benefits officiously or

gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained proceeds.

133.    CVS is therefore liable to Plaintiffs and Members of the Classes for restitution in the amount of CVS wrongfully obtained profits.

### COUNT 5:  VIOLATION OF RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT

#### Asserted by Plaintiffs and the National Class against CVS

134.    Plaintiffs repeat paragraphs 1 through 101 above.

135.    This count is brought against CVS, which is headquartered in and maintains its principle place of business in the State of Rhode Island, on behalf of Plaintiffs and the National Class pursuant to the Rhode Island Deceptive Trade Practices Act ("DPTA"), R.I. G.I., § 6-13.1-1 et seq.  *See Faherty v. CVS Pharmacy Inc.*, 2010 WL 1930573, *2 (D. Mass. May 12, 2012) (holding that class members residing outside of Rhode Island may pursue DPTA claims against Rhode Island-based CVS Pharmacy, Inc.); *Park v. Ford Motor Co.*, 844 A.2d 687, 690 (R.I. 2004) (allowing a nationwide class to maintain claims against a Rhode Island company under the DTPA, regardless of where a customer resided or suffered injury).

136.    R.I. G.I. § 6-13.1-2 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" and declares such practices unlawful.

137.    R.I. G.I. § 6-13.1-5 provides a private remedy and permits "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money, property, real or personal, as a result of the use or employment of another person of a method, act or practice declared unlawful by § 6-13.1-2" to bring an action, including a class action, for damages and injunctive relief.

138.    Plaintiffs and other members of the National Class are "persons" within the meaning of R.I. G.I. § 6-13.1-1(3), which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

139.    "Trade" and "commerce" is defined in R.I. G.I. § 6-13.1-1(5) as "advertising, offering for sale, sale, or distribution or any services and any property, tangible or intangible, real, personal, or

---

SECOND AMENDED CLASS ACTION
COMPLAINT

37

mixed, and any other article, commodity or thing of value, wherever situate, and include[s] any trade or commerce directly or indirectly affecting the people of" the State of Rhode Island.

140. CVS has unfairly obtained monies from Plaintiffs and other members of the National Class through CVS's unfair or deceptive acts or practices (including violations of R.I. G.I. § 6-3.1-1(6)(iii), (xi), (xii), (xiii)), including among other things:

a) reporting to third-party payors fraudulent usual and customary prices for the hundreds of generic prescription drugs set forth on Exhibit A;

b) misrepresenting to third-party payors, Plaintiffs and the National Class that the usual and customary price was greater than their copayments;

c) concealing from Plaintiffs and the National Class the true usual and customary prices of the generic prescription drugs set forth on Exhibit A; and

d) wrongfully obtaining monies from Plaintiffs and the National Class as a result of its deception.

141. CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

142. The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiffs' and the National Class' decisions about whether to purchase generic prescription drugs from CVS, in that Plaintiffs and National Class members would not have purchased generic prescription drugs from CVS for more than the usual and customary prices set forth on Exhibit A, but for CVS's unfair and/or deceptive acts and/or practices.

143. As a direct and proximate result of CVS's unfair and deceptive acts and practices, Plaintiffs and National Class members were deceived into paying falsely inflated prices for the generic prescription drugs set forth on Exhibit A and have been damaged thereby.

## COUNT 6: VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

### Asserted by the California Plaintiffs and California Subclass against CVS

144. Plaintiffs repeat paragraphs 1 through 101 above.

145. Plaintiffs Christopher Corcoran, Elizabeth Gardner, Tyler Clark, and Michael Norkus

bring this claim individually and on behalf of the National Class and/or California Subclass Members.

146.   Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and other members of the National Class and/or California Subclass are "persons" within the meaning of Cal. Bus. Prof. Code § 17204.

147.   CVS has unfairly obtained monies from Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the other members of the National Class and/or California Subclass through CVS's (i) unlawful business acts and/or practices; (ii) unfair business acts and/or practices; (iii) fraudulent business acts and/or practices; and (iv) unfair, deceptive, untrue and/or misleading advertising (including violations of Cal. Bus. & Prof. Code § 17500, *et seq.*), including, among other things:

> a)   reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

> b)   misrepresenting to insurance companies and state and federal health care entities, Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass that the U&C price was greater than their copayments;

> c)   concealing from Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass the true U&C prices of generic prescription drugs; and

> d)   wrongfully obtaining monies from Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass as a result of its deception.

148.   CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

149.   The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Corcoran's, Ms. Gardner's, Mr. Clark's, Mr. Norkus' and the National Class and/or California Subclass' decisions about whether to purchase generic prescription drugs from CVS, in that Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

150.   As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged

SECOND AMENDED CLASS ACTION
COMPLAINT

thereby.

151.    CVS is therefore liable to Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 7:  VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT

### Asserted by the California Plaintiffs and California Subclass against CVS

152.    Plaintiffs repeat paragraphs 1 through 101 above.

153.    Plaintiffs Christopher Corcoran, Elizabeth Gardner, Tyler Clark, and Michael Norkus bring this claim individually and on behalf of the National Class and/or California Subclass Members.

154.    Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and other members of the National Class and/or California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

155.    The generic prescription drugs that Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and other members of the National Class and/or California Subclass purchased from CVS are "goods" within the meaning of Cal. Civ. Code § 1761(a).

156.    Mr. Corcoran's, Ms. Gardner's, Mr. Clark's, Mr. Norkus' and other National Class and/or California Subclass members' purchases were "transactions" within the meaning of Cal. Civ. Code § 1761(e).

157.    CVS is a "person" within the meaning of Cal. Civ. Code § 1770(a).

158.    Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and other members of the National Class and/or California Subclass have been damaged by CVS's unfair methods of competition, and/or unfair and/or deceptive practices, in violation of Cal. Civ. Code § 1770(a), *et seq.*, which occurred in connection with transactions which resulted in Class members' purchase of goods.  These unfair methods of competition, and/or unfair and/or deceptive practices, included, among other things:

   a)    reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

   b)    misrepresenting to insurance companies and state and federal health care entities, Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass that the U&C price was greater than their copayments;

c)      concealing from Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass the true U&C prices of generic prescription drugs; and

d)      wrongfully obtaining monies from Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass as a result of its deception.

159.    Pursuant to § 1782 of the California Consumer Legal Remedies Act, on the day that this Complaint is filed, Mr. Corcoran notified CVS in writing by certified mail of the particular violations of § 1770 described above and requested that that the CVS rectify its practices described above and give notice to all affected consumers of its intent to so act.  CVS has failed to respond to this notice.

160.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

161.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Corcoran's, Ms. Gardner's, Mr. Clark's, Mr. Norkus' and the National Class and/or California Subclass' decisions about whether to purchase generic prescription drugs from CVS, in that Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

162.    As a direct and proximate result of CVS's acts described above, Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the other Members of the National Class and/or California Subclass paid more for CVS's products than they would have and/or purchased products they would not have purchased but for CVS's deceptive conduct. Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the other Members of the National Class and/or California Subclass therefore seek injunctive relief pursuant to § 1782(d) of the Act, to enjoining CVS's ongoing wrongful acts described herein.

163.    Because CVS failed to rectify or agree to rectify the problems associated with the actions described above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Mr. Corcoran, Ms. Gardner, Mr. Clark, Mr. Norkus and the National Class and/or California Subclass also seek to recover actual, punitive, and statutory damages, as well as restitution, as appropriate, pursuant to California Civil Code § 1782(d).

## COUNT 8: VIOLATION OF ARIZONA CONSUMER FRAUD ACT

### Asserted by the Arizona Plaintiff and the Arizona Subclass against CVS

164.   Plaintiffs repeat paragraphs 1 through 101 above.

165.   Plaintiff Avis Zulema brings this claim individually and on behalf of the other Arizona Subclass Members against CVS.

166.   Plaintiff Avis Zulema and Subclass Members of the Arizona Subclass have suffered losses because of CVS's acts, use and employment of deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission in connection with the sale or advertisement of CVS's merchandise, including, among other things,

a)     reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

b)     misrepresenting to third-party payors, Ms. Zulema and Subclass Members that the U&C price was greater than Ms. Zulema's and Subclass Members' copayments;

c)     concealing from Ms. Zulema and Subclass Members the true U&C prices of generic prescription drugs; and

d)     wrongfully obtaining monies from Ms. Zulema and Subclass Members as a result of its deception.

167.   CVS willfully and knowingly engaged in the deceptive, fraudulent, false and unfair acts and practices described above and knew or should have known that those acts and practices were unconscionable, fraudulent, false and unfair, and thus in violation of Arizona's Consumer Fraud Act, A.R.S. Ch. 10, Ar. 7, §§ 44-1521 *et seq.*

168.   As a direct and proximate result of CVS's unfair and deceptive acts and practices, Ms. Zulema and Subclass Members paid CVS artificially inflated prices for generic prescription drugs and have been damaged thereby.

169.   CVS is therefore liable to Ms. Zulema and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 9: VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT

**Asserted by the Massachusetts Plaintiff and the Massachusetts Subclass against CVS**

170.    Plaintiffs repeat paragraphs 1 through 101 above.

171.    Plaintiff Robert Garber brings this claim individually and on behalf of the other Massachusetts Subclass Members against CVS.

172.    Dr. Garber and the other Subclass Members are "persons" within the meaning of M.G.L. ch. 93A § 9(1).

173.    CVS is a "person" within the meaning of M.G.L. ch. 93A § 9(1).

174.    Dr. Garber and other Subclass Members were injured by CVS's employment in trade and commerce of unfair or deceptive acts or practices, including, among other things,

a)    reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

b)    misrepresenting to insurance companies and state and federal health care entities, Plaintiffs, and Class Members that the U&C price was greater than Plaintiffs' copayments;

c)    concealing from Plaintiffs and Class Members the true U&C prices of generic prescription drugs; and

d)    wrongfully obtaining monies from Plaintiffs and the other Subclass Members as a result of its deception.

175.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were a violation of M.G.L. ch. 93A § 2.

176.    On August 3, 2015—more than thirty days prior to filing this Amended Complaint—Dr. Garber on behalf of himself and the Class mailed a written demand for relief to CVS, identifying himself and the Class and reasonably describing the unfair and/or deceptive acts and/or practices relied upon and injuries suffered.  CVS failed to make a written tender of settlement within thirty days.

177.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Dr. Garber and the other Massachusetts Subclass members were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

SECOND AMENDED CLASS ACTION COMPLAINT

178.   CVS is liable to Plaintiffs and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs and reasonable attorneys' fees to the extent provided by law.

### COUNT 10: VIOLATION OF NEW YORK CONSUMER PROTECTION LAW

**Asserted by the New York Plaintiffs and the New York Subclass against CVS**

179.   Plaintiffs repeat paragraphs 1 through 101 above.

180.   Plaintiffs Toni Odorisio, Robert Guarnieri, and Onnolee Samuelson bring this claim individually and on behalf of the other New York Subclass Members against CVS.

181.   Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and other Subclass Members are "persons" within the meaning of N.Y. Code § 349(h).

182.   Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and other Subclass Members were injured by CVS's employment in business, trade and/or commerce of deceptive acts or practices in violation of N.Y. Code § 349 including, among other things among other things,

      a)   reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

      b)   misrepresenting to third-party payors, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members that the U&C price was greater than Plaintiffs' copayments;

      c)   concealing from Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, third-party payors, and Subclass Members the true U&C prices of generic prescription drugs; and

      d)   wrongfully obtaining monies from Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the other Subclass Members as a result of its deception.

183.   CVS willfully engaged in the deceptive acts and/or practices described above.

184.   As a direct and proximate result of CVS's unfair and deceptive acts and practices, Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and the Subclass members were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

185.   CVS is therefore liable to Ms. Odorisio, Mr. Guarnieri, Ms. Samuelson, and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 11: VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT

### Asserted by the Ohio Plaintiff and the Ohio Subclass against CVS

186.  Plaintiffs repeat paragraphs 1 through 101 above.

187.  Plaintiffs Ken Bolin and Walter Wulff bring this claim individually and on behalf of the other Ohio Subclass Members against CVS.

188.  Mr. Bolin and Mr. Wulff, members of the Ohio Subclass, and CVS are "persons" within the meaning of the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. §§ 1345.01 through 1345.13.

189.  Mr. Bolin, Mr. Wulff, and the Subclass Members are "consumers" within the meaning of the Ohio Consumer Sales Practices Act.

190.  CVS is a "supplier" within the meaning of the Act.

191.  Mr. Bolin, Mr. Wulff, and the Subclass Members were injured by CVS's commission of unfair, unconscionable and/or deceptive acts or practices in connection with consumer transactions, including, among other things,

    a)  reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

    b)  misrepresenting to Mr. Bolin, Mr. Wulff, third-party payors, and Subclass Members that the U&C price was greater than Subclass Members' copayments;

    c)  concealing from Mr. Bolin, Mr. Wulff, third-party payors, and Subclass Members the true U&C prices of generic prescription drugs; and

    d)  wrongfully obtaining monies from Mr. Bolin, Mr. Wulff, and the other Sublcass Members as a result of its deception.

192.  As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Bolin, Mr. Wulff, and Subclass Members paid falsely inflated prices for generic prescription drugs and have been damaged thereby.

193.  CVS is therefore liable to Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

**COUNT 12: VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**

**Asserted by the Texas Plaintiff and the Texas Subclass against CVS**

194.    Plaintiffs repeat paragraphs 1 through 101 above.

195.    Plaintiff Irma Pacheco brings this claim individually and on behalf of the other Texas Subclass Members against CVS.

196.    Ms. Pacheco and other members of the Texas Subclass are "consumers" within the meaning of Tex. Bus. and Comm. Code § 17.50(a).

197.    CVS is a person within the meaning of Tex. Bus. and Comm. Code § 17.50(a).

198.    Ms. Pacheco and other members of the Texas Subclass suffered economic damages as a consequence of CVS's knowing and intentional use and/or employment of false, misleading, and/or deceptive acts or practices, and unconscionable actions and/or courses of action, including, among other things,

a)    reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

b)    misrepresenting to insurance companies and state and federal health care entities, Plaintiffs, and Subclass Members that the U&C price was greater than Plaintiffs' copayments;

c)    concealing from Plaintiffs and Subclass Members the true U&C prices of generic prescription drugs; and

d)    wrongfully obtaining monies from Plaintiffs and the other Members of the Texas subclass as a result of its deception.

199.    CVS knowingly and intentionally engaged in the acts and/or practices described above.

200.    On July 31, 2015, more than sixty days prior to filing this Amended Complaint, Ms. Pacheco on her own behalf and on behalf of the class mailed a letter to CVS giving the Defendant written notice in reasonable detail of the specific complaint and damages incurred. CVS did not tender a settlement or request mediation at any time.

201.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Ms. Pacheco and the other Texas Subclass members were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

202.    CVS therefore is liable to Plaintiffs and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs and reasonable attorneys' fees to the extent provided by law.

## COUNT 13: VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

**Asserted by the Florida Plaintiffs and the Florida Subclass against CVS**

203.    Plaintiffs repeat paragraphs 1 through 101 above.

204.    Plaintiffs Robert Jenks and Debbie Barrett bring this claim individually and on behalf of the other Florida Subclass Members against CVS.

205.    Plaintiffs Robert Jenks, Debbie Barrett. and Subclass Members of the Florida Subclass are "consumers' within the meaning of Fla. Stat. § 501.203(7).

206.    Mr. Jenks, Ms. Barrett, and Subclass Members have suffered losses because of CVS's employment of unconscionable acts or practices and unfair and/or deceptive acts or practices in the conduct of trade and commerce, including, among other things,

a)      reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

b)      misrepresenting to third-party payors, Mr. Jenks, Ms. Barrett, and Subclass Members that the U&C price was greater than Subclass Members' copayments;

c)      concealing from Mr. Jenks and Subclass Members the true U&C prices of generic prescription drugs; and

d)      wrongfully obtaining monies from Mr. Jenks and Subclass Members as a result of its deception.

207.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive and in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

208.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Jenks, Ms. Barrett, and Subclass Members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

209.    CVS is therefore liable to Mr. Jenks, Ms. Barrett, and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 14: VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### Asserted by the Illinois Plaintiffs and the Illinois Subclass against CVS

210.    Plaintiffs repeat paragraphs 1 through 101 above.

211.    Plaintiffs Carl Washington, Robert Podgorny and Robert Jenks bring this claim individually and on behalf of the other Illinois Subclass Members against CVS.

212.    At all relevant times, Plaintiffs Carl Washington, Robert Podgorny, Robert Jenks, Subclass Members, and CVS were persons within the meaning of 815 ILCS 505/1(c).

213.    At all relevant times, Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members were consumers within the meaning of 815 ILCS 505/1(e).

214.    At all relevant and material times as described herein, CVS conducted trade and commerce within the meaning of 815 ILCS 505/1(f).

215.    Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members have suffered losses because of CVS's employment of unconscionable acts or practices and unfair and/or deceptive acts or practices in the conduct of trade and commerce, including, among other things,

      a)    reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

      b)    misrepresenting to third-party payors, Mr. Washington, Mr. Jenks, and Subclass Members that the U&C price was greater than Mr. Washington, Mr. Jenks, and Subclass Members' copayments;

      c)    concealing from Mr. Washington, Mr. Jenks, and Subclass Members the true U&C prices of generic prescription drugs; and

      d)    wrongfully obtaining monies from Mr. Washington, Mr. Jenks, and Subclass Members as a result of its deception.

216.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described

above and knew or should have known that those acts and/or practices were unfair and/or deceptive and in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act.

217.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members' decision about whether to purchase generic prescription drugs from CVS, in that they would not have purchased generic prescription drugs from CVS for more than the HSP prices but for CVS's unfair and/or deceptive acts and/or practices.

218.    This deception alleged herein occurred in connection with CVS's conduct of trade and commerce in Illinois.

219.    CVS intended for Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members to purchase generic prescription drugs from CVS in reliance upon CVS's unfair and/or deceptive acts and/or practices.

220.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

221.    CVS is therefore liable to Mr. Washington, Mr. Podgorny, Mr. Jenks, and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

### COUNT 15: VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

**Asserted by the New Jersey Plaintiff and New Jersey Subclass against CVS**

222.    Plaintiffs repeat paragraphs 1 through 101 above.

223.    Plaintiff Vincent Gargiulo brings this claim individually and on behalf of the other New Jersey Subclass Members against CVS.

224.    Plaintiff Vincent Gargiulo and Subclass Members of the New Jersey Subclass have suffered losses because of CVS's acts, use and employment of unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of CVS's merchandise, including,

among other things,

a) reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

b) misrepresenting to third-party payors, Mr. Gargiulo and Subclass Members that the U&C price was greater than Mr. Gargiulo's and Subclass Members' copayments;

c) concealing from Mr. Gargiulo and Subclass Members the true U&C prices of generic prescription drugs; and

d) wrongfully obtaining monies from Mr. Gargiulo and Subclass Members as a result of its deception.

225.    CVS willfully and knowingly engaged in the unconscionable, fraudulent, false and unfair acts and practices described above and knew or should have known that those acts and practices were unconscionable, fraudulent, false and unfair, and thus in violation of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8 *et seq.*

226.    As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Gargiulo and Subclass Members paid CVS artificially inflated prices for generic prescription drugs and have been damaged thereby.

227.    CVS is therefore liable to Mr. Gargiulo and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 16: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, § 201–1, *ET SEQ.*

**Asserted by the Pennsylvania Plaintiffs and the Pennsylvania Subclass against CVS**

228.    Plaintiffs repeat paragraphs 1 through 101 above.

229.    Plaintiffs Kevin Cauley and Zachary Hagert bring this claim individually and on behalf of the Pennsylvania Subclass Members against CVS.

230.    CVS is a "person" within the meaning of § 201–2(2).

231.    CVS engaged in "trade" and "commerce" within the meaning of § 201–2(3).

232.    Mr. Cauley, Mr. Hagert, and other members of the Pennsylvania Subclass have been

SECOND AMENDED CLASS ACTION
COMPLAINT

injured by CVS's deceptive practices in violation of § 201–2(4), including, among other things,

  a) reporting to insurance companies, and state and federal health care entities fraudulent U&C prices for hundreds of generic prescription drugs;

  b) misrepresenting to third-party payors, Mr. Cauley, Mr. Hagert, and Subclass Members that the U&C price was greater than Mr. Cauley's, Mr. Hagert's,  and Subclass Members' copayments;

  c) concealing from Mr. Cauley, Mr. Hagert, and Subclass Members the true U&C prices of generic prescription drugs; and

  d) wrongfully obtaining monies from Mr. Cauley, Mr. Hagert, and the other Members of the Pennsylvania subclass as a result of its deception.

233. These misrepresentations and concealments specifically violated § 201–2(4)(ii), § 201–2(4)(iii), § 201–2(4)(v), § 201–2(4)(vii), and § 201–2(4)(xxi).

234. CVS willfully, knowingly, and fraudulently engaged in the deceptive acts and/or practices described above.

235. As a direct and proximate result of CVS's unfair and deceptive acts and practices, Mr. Cauley, Mr. Hagert, and the other Pennsylvania Subclass members were deceived into paying artificially inflated prices for generic prescription drugs and have been damaged thereby.

236. CVS is therefore liable to Mr. Cauley, Mr. Hagert, and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs and reasonable attorneys' fees to the extent provided by law.

## COUNT 17: VIOLATION OF MARYLAND CONSUMER PROTECTION ACT

### Asserted by the Maryland Plaintiff and the Maryland Subclass against CVS

237. Plaintiffs repeat paragraphs 1 through 101 above.

238. Plaintiff Linda Krone brings this claim individually and on behalf of the other Maryland Subclass Members against CVS.

239. CVS is a "business" or "merchant" within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 through 13-501.

240. Plaintiff Linda Krone and Subclass Members purchased prescription drugs from CVS

which constitute "consumer goods" within the meaning of the Maryland Consumer Protection Act.

241.   CVS has engaged and continues to engage in unfair, false and misleading oral and written statements, deception, fraud, false pretense, false premise, misrepresentation, and knowing concealment, suppression, or omission of material facts in connection with the promotion and sale of consumer goods, including, among other things,

a)     reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

b)     misrepresenting to third-party payors, Ms. Krone and Subclass Members that the U&C price was greater than Ms. Krone and Subclass Members' copayments;

c)     concealing from Ms. Krone and Subclass Members the true U&C prices of generic prescription drugs; and

d) wrongfully obtaining monies from Ms. Krone and Subclass Members as a result of its deception.

242.   The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Ms. Krone, and Subclass Members' decisions about whether to purchase generic prescription drugs from CVS, in that Ms. Krone, and Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's unfair and/or deceptive trade practices.

243.   As a direct and proximate result of CVS's unfair and deceptive trade practices, Ms. Krone and Subclass Members paid CVS artificially inflated prices for generic prescription drugs and have been damaged thereby.

244.   CVS is therefore liable to Ms. Krone and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT 18: VIOLATION OF DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT

### Asserted by the D.C. Plaintiff and the D.C. Subclass against CVS

245.   Plaintiffs repeat paragraphs 1 through 101 above.

246.    Plaintiff Linda Krone brings this claim individually and on behalf of the other D.C. Subclass Members against CVS.

247.    CVS is a "merchant" within the meaning of the D.C. Consumer Protection Procedures Act, D.C. Official Code, §§ 28-3901-28-3913.

248.    Plaintiff Linda Krone and Subclass Members purchased prescription drugs from CVS which constitute "consumer goods" within the meaning of the D.C. Consumer Protection Procedures Act.

249.    CVS has engaged and continues to engage in unfair, false and misleading oral and written statements, deception, fraud, false pretense, false premise, misrepresentation, and knowing concealment, suppression, or omission of material facts in connection with the promotion and sale of consumer goods, including, among other things,

a)    reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

b)    misrepresenting to third-party payors, Ms. Krone and Subclass Members that the U&C price was greater than Ms. Krone and Subclass Members' copayments;

c)    concealing from Ms. Krone and Subclass Members the true U&C prices of generic prescription drugs; and

d)    wrongfully obtaining monies from Ms. Krone and Subclass Members as a result of its deception.

250.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Ms. Krone and Subclass Members' decisions about whether to purchase generic prescription drugs from CVS, in that Ms. Krone and Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's unfair and/or deceptive trade practices.

251.    As a direct and proximate result of CVS's unfair and deceptive trade practices, Ms. Krone and Subclass Members paid CVS artificially inflated prices for generic prescription drugs and have been damaged thereby.

252.    CVS is therefore liable to Ms. Krone and Subclass Members for the damages they

SECOND AMENDED CLASS ACTION COMPLAINT

53

sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

### COUNT 19: VIOLATION OF GEORGIA FAIR BUSINESS PRACTICES ACT

#### Asserted by the Georgia Plaintiffs and the Georgia Subclass against CVS

253.    Plaintiffs repeat paragraphs 1 through 101 above.

254.    Plaintiff Carolyn Caine brings this claim individually and on behalf of the other Georgia Subclass Members against CVS.

255.    CVS is a "business" or "merchant" within the meaning of the Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-390 through 10-1-407.

256.    Plaintiff Carolyn Caine and Subclass Members purchased prescription drugs from CVS which constitute "consumer goods" within the meaning of the Maryland Consumer Protection Act.

257.    CVS has engaged and continues to engage in unfair, false and misleading oral and written statements, deception, fraud, false pretense, false premise, misrepresentation, and knowing concealment, suppression, or omission of material facts in connection with the promotion and sale of consumer goods, including, among other things,

    a)    reporting to third-party payors fraudulent U&C prices for hundreds of generic prescription drugs;

    b)    misrepresenting to third-party payors, Ms. Caine, and Subclass Members that the U&C price was greater than Ms. Caine and Subclass Members' copayments;

    c)    concealing from Ms. Caine and Subclass Members the true U&C prices of generic prescription drugs; and

    d)    wrongfully obtaining monies from Ms. Caine and Subclass Members as a result of its deception.

258.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Ms. Caine and Subclass Members' decisions about whether to purchase generic prescription drugs from CVS, in that Ms. Caine and Subclass Members would not have purchased generic prescription drugs from CVS for more than the Health Savings Pass prices but for CVS's unfair and/or deceptive trade practices.

259.    As a direct and proximate result of CVS's unfair and deceptive trade practices, Ms. Caine and Subclass Members paid CVS artificially inflated prices for generic prescription drugs and have been damaged thereby.

260.    CVS is therefore liable to Ms. Caine and Subclass Members for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against CVS, and request as follows:

A.      That all class members are owed at least the difference between their paid copay and the U&C offered to the general public for all prescriptions purchased during the life of the HSP program;

B.      That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiffs are properly Class representatives;

C.      That the Court grant permanent injunctive relief to prohibit CVS from continuing to engage in the unlawful acts, omissions, and practices described herein;

D.      That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by CVS as a result of its unlawful acts, omissions, and practices;

F.      That the Court award statutory treble damages, and punitive or exemplary damages, to the extent permitted by law;

G.      That the unlawful acts alleged in this Complaint be adjudge and decreed to be a violation of the unfair and deceptive business acts and practices in violation of the Rhode Island Deceptive Trade Practices Act, California Unfair Competition Law, California Consumer Legal Remedies Act, Arizona Consumer Fraud Act, Massachusetts Consumer Protection Act, New York Consumer Protection Law, Ohio Consumer Protection Act, New Jersey Consumer Fraud Act, Texas Deceptive Trade Practices Act, Florida Deceptive and Unfair Trade Practices Act, Illinois Consumer Fraud and Deceptive Business Practices Act, Pennsylvania Unfair Trade Practices and Consumer Protection Law, the Maryland

1   Consumer Protection Act, the D.C. Consumer Protection Procedures Act, and the Georgia Fair Business

2   Practices Act;

3       H.      That the Court award to Plaintiffs the costs and disbursements of the action, along with

4   reasonable attorneys' fees;

5       I.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

6       J.      That the Court grant all such other relief as it deems just and proper.

7                               **<u>DEMAND FOR JURY TRIAL</u>**

8       Plaintiffs and the Class and Subclasses demand a jury trial on all claims.

9   Dated: November 3, 2015              Respectfully submitted,

10

11                          By: _____*/s/ Bonny E. Sweeney*_____
                                Bonny E. Sweeney (Cal. Bar No. 176174)
12                              Michael P. Lehmann (Cal. Bar No. 77152)
                                Christopher L. Lebsock (Cal. Bar No. 184546)
13                              HAUSFELD
                                600 Montgomery St., Suite 3200
14                              San Francisco, California 94111
                                Tel: (415) 633-1908
15                              bsweeney@hausfeld.com
16                              mlehmann@hausfeld.com
                                clebsock@hausfeld.com
17

18                              Richard Lewis (admitted *pro hac vice*)
                                Kristen Ward Broz (admitted *pro hac vice*)
19                              HAUSFELD
                                1700 K St. NW, Suite 650
20                              Washington, D.C. 20006
                                Tel: (202) 540-7200
21                              rlewis@hausfeld.com
22                              kward@hausfeld.com

23                              Pat A. Cipollone, P.C. (admitted *pro hac vice*)
24                              Rebecca R. Anzidei (admitted *pro hac vice*)
                                Robert B. Gilmore (admitted *pro hac vice*)
25                              STEIN MITCHELL CIPOLLONE
                                BEATO & MISSNER LLP
26                              1100 Connecticut Ave., N.W.
27                              Washington, D.C. 20036
                                Tel: (202) 737-7777
28                              pcipollone@steinmitchell.com

SECOND AMENDED CLASS ACTION
COMPLAINT                                    56

1   ranzidei@steinmitchell.com
    rgilmore@steinmitchell.com

2

3   Elizabeth C. Pritzker (Cal. Bar. No. 146267)
    Jonathan K. Levine (Cal. Bar. No. 220289)

4   Shiho Yamamoto (Cal. Bar. No. 264741)

5   PRITZKER LEVINE LLP
    180 Grand Avenue, Suite 1390

6   Oakland, California 94612
    Tel.  (415) 692-0772

7   ecp@pritzkerlevine.com

8   jkl@pritzkerlevine.com
    sy@pritzkerlevine.com

9

10  *Attorneys for Plaintiffs and the Proposed Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28