1

2

3    **UNITED STATES DISTRICT COURT**

4    **NORTHERN DISTRICT OF CALIFORNIA**

5

6    **CHRISTOPHER CORCORAN, ET AL.,**            Case No.  15-cv-03504-YGR

7                    Plaintiffs,

8              v.                                  **ORDER DENYING MOTION FOR CLASS
                                                   CERTIFICATION; DENYING MOTIONS TO
9    **CVS HEALTH, ET AL.,**                       STRIKE AS MOOT**

10                   Defendants.                   Dkt. Nos. 172, 185, 186

11          Plaintiffs bring this putative class action against defendants alleging that they knowingly

12   overcharged millions of insured patients by submitting falsely inflated drug prices to pharmacy

13   benefit managers ("PBMs") and third-party payor insurance providers ("TPPs"), which resulted in

14   higher copayment obligations for plaintiffs.  Specifically, plaintiffs raise claims under the laws of

15   eleven states: (i) each state's statutory laws proscribing unfair and deceptive acts and practices

16   ("UDAP");[1] and common law claims for (ii) fraud, (iii) negligent misrepresentation, and (iv)

17   unjust enrichment.

18          Plaintiffs now seek to certify eleven classes either as damages classes pursuant to Rule

19   23(b)(3) or injunctive relief classes pursuant to Rule 23(b)(2).[2]  Specifically, plaintiffs define the

20   class as follows:

21          All CVS customers in [the eleven states] who, between November 2008 and the
            present (the "Class Period"), (1) purchased one or more generic prescription drugs
22          that were offered through CVS's Health Savings Pass ("HSP") program at the
            time of the purchase; (2) were insured for the purchase(s) through a third-party
23

24          _____

25          [1]  Plaintiffs do not seek to certify any statutory claims as to the Ohio and Georgia classes.

26          [2]  The following is a list of the state classes plaintiffs seek to certify, and the specific
     plaintiffs that are offered as representatives for each:  Arizona (Avis); California (Clark,
27   Corcoran); Florida (Barrett, Jenks); Georgia (Caine); Illinois (Washington, Jenks); Massachusetts
     (Garber); New Jersey (Gargiulo); New York (Odorisio, Samuelson); Ohio (Wulff); Pennsylvania
28   (Hagert); and Texas (Brown, Gilbert).

United States District Court
Northern District of California

payor plan (except those that did not use usual and customary pricing or expressly excluded discount programs from usual and customary pricing); and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the 90-day supply of the prescription (or, greater than a price proportionate to the HSP price but for a prescription less than or greater than a 90-day supply).

Defendants oppose plaintiffs' motion for class certification. Additionally, defendants have filed motions to strike the expert declarations of plaintiffs' experts, namely, Drs. Hay and Navarro.[3]

Having carefully considered the pleadings and the papers submitted on the motions, and oral arguments held on March 7, 2017, and for the reasons set forth below, the Court **ORDERS** as follows: The Court **DENIES** plaintiffs' motion for class certification. The Court **GRANTS IN PART** defendants' motion to strike the declaration of Dr. Navarro. The Court **DENIES** as moot defendants' motion to strike the declaration of Dr. Hay.[4]

## I.   BACKGROUND

Plaintiffs seek to certify eleven state classes composed of individuals who "have filed prescriptions for generic drugs at CVS pharmacies using coverage provided by their [TPP] plans." (Dkt. No. 101, Third Amended Complaint ("TAC") ¶ 10.) The following facts and allegations relate to the instant motion for class certification:

CVS is a national retail pharmacy chain with over seven thousand pharmacies operating under its trade name in the United States and Puerto Rico, managing more than one billion prescriptions annually. (*Id.* ¶ 4.) In 2014, CVS' retail pharmacy business generated more than $67 billion in revenues, 70% of which came from prescription drugs. Since 2008, CVS has captured more than one third of total prescription growth in the United States. (*Id.*)

---

[3] In connection with their filings on the motion for class certification and the motions to strike the expert declarations of plaintiffs' experts, the parties filed administration motions to seal certain documents. (Dkt. Nos. 170, 182, 205, 208, 211, 214, and 221.) The Court addresses each in separate orders. To the extent that the Court has granted these administrative motions, the Court notes that it may not do so in the context of trial or any summary judgment motions, as those are dispositive motions.

[4] Defendants' motion to strike certain parts of Dr. Hay's declaration is based on an argument that plaintiffs violated certain discovery obligations. Because the Court is denying plaintiffs' motion for class certification and any such violation could be cured in any event, such motion is **DENIED** as moot. The Court does not further address such motion below.

2

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Approximately ninety percent of Americans—including plaintiffs— are enrolled in a private or

2    public health care plan that shares prescription drug costs.  (*Id.* ¶ 8.)  Generally, when plan

3    participants fill a prescription under one of these TPP health care plans, the plan "pays a portion of

4    the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy in

5    the form of a copayment or copay."  (*Id.*)  Many TPPs typically contracted with a PBM to

6    administer their prescription benefits with a pharmacy.  (Dkt. No. 184-28, Jones Decl. ¶¶ 11–13.)

7        When a plan participant fills a prescription at CVS, the pharmacist generates a claim by

8    transmitting patient, prescription, and insurance information electronically to the customer's

9    insurer directly or the PBM.  (TAC ¶¶ 47–48.)  The electronic CVS claims process utilizes

10   standardized data fields developed by the National Council for Prescription Drug Programs

11   ("NCPDP"), a standard-setting organization in the healthcare industry.  (*Id.* ¶¶ 50–51.)  One data

12   field on NCPDP's standard layout is Field No. 426-DQ, the usual and customary ("U&C") price.

13   (*Id.* ¶ 53.)  The U&C price is "generally defined as the cash price to the general public, which is

14   the amount charged [to] cash customers for the prescription, exclusive of sales tax or other

15   amounts claimed."  (*Id.*)  Under most of CVS's contracts with TPPs and PBMs, the copayment

16   must generally be the lower of the following:  (a) the drug's average wholesale price established

17   by the industry; (b) a maximum allowable cost determined by the pharmacy's contract with the

18   PBM or TPP; or (c) the U&C price.  Relevant to the instant motion, many of these contracts

19   specifically define U&C, some expressly excluding or including discounts, and others facially

20   silent on that issue.  (*See infra*.)

21       In 2008, CVS introduced a Health Savings Pass ("HSP") program.  (*Id.* ¶ 60.)  The HSP

22   program provides discounted pricing on hundreds of generic prescription medications, including

23   some of the most commonly prescribed drugs for cardiovascular, allergy, and diabetes conditions,

24   among others.  (*Id.* ¶ 62.)[5]  Plaintiffs allege that the price charged by CVS under the HSP program

25   for the HSP generics was the true U&C price for those drugs.  (*Id.* ¶ 70.)  However, CVS

26

27       [5]  From November 9, 2008 through 2010, cash paying customers could join the HSP
     program for a $10 fee, and be entitled to $9.99 prices for a ninety-day supply of an HSP generic.
28   (*Id.* ¶ 62.)  Beginning in 2011, CVS raised the HSP enrollment fee to $15 a year and the cost of a
     ninety-day supply of an HSP generic rose to $11.00.  (*Id.*)

1   continued to submit amounts higher than the HSP price for all HSP generics (rather than the HSP

2   program price) as the U&C price to TPPs and PBMs.  (*Id.* ¶ 71.)  As a result, in some instances,

3   plaintiffs allege they paid copayments that exceeded the HSP price or the "true U&C price."  (*Id.*

4   ¶¶ 76, 80.)  Defendants discontinued the HSP program on February 1, 2016.  (Dkt. No. 187-23,

5   Gibbons Decl. ¶ 9.)

6       Plaintiffs have offered the expert declarations of Drs. Hay and Navarro in support of their

7   positions.  Dr. Hay opines thus:  (i) CVS's claim adjudication process has multiple common,

8   standard features that apply across the transactions of class members; (ii) CVS's HSP prices

9   properly should be considered CVS's true U&C prices; (iii) transaction data for named plaintiffs'

10  relevant purchases indicate that plaintiffs meet the class definition; (iv) plaintiffs exceed 37

11  million class members whom CVS charged copayments above CVS's true U&C prices; and (v)

12  calculation of damages is common and uniform and totals at least $1.23 billion.

13      Dr. Navarro opines thus:  (i) the requirement that pharmacies cannot charge insured

14  patients more than its U&C price is a standard feature throughout the industry and CVS in

15  particular; (ii) U&C should be the lowest cash price and should include discounts offered to the

16  general public, as indicated by contracts, regulations, and policies; and (iii) by excluding HSP

17  prices, CVS submitted an inflated U&C; which (iv) as a result, injured patients.

18  **II.   LEGAL STANDARD**

19      **A.   Class Certification**

20      Under Federal Rule of Civil Procedure 23(a), the Court may certify a class only where "(1)

21  the class is so numerous that joinder of all members is impracticable; (2) there are questions of law

22  or fact common to the class; (3) the claims or defenses of the representative parties are typical of

23  the claims or defenses of the class; and (4) the representative parties will fairly and adequately

24  protect the interests of the class."  Fed. R. Civ. P. 23(a).  Courts refer to these four requirements as

25  "numerosity, commonality, typicality[,] and adequacy of representation."  *Mazza v. Am. Honda*

26  *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

27      Once the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through

28  evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1  23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Here, plaintiffs seek

2  certification under Rule 23(b)(2) and Rule 23(b)(3).

3  　　　　Rule 23(b)(2) requires plaintiffs to establish that the "party opposing the class has acted or

4  refused to act on grounds that apply generally to the class, so that final injunctive relief or

5  corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

6  23(b)(2).  "Class certification under Rule 23(b)(2) is appropriate only where the primary relief is

7  declaratory or injunctive."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011)

8  (citation omitted).  In a class action "predominately for money damages . . . th[e] absence of notice

9  and opt-out violates due process" and renders certification of a Rule 23(b)(2) class inappropriate.

10  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

11  　　　　Rule 23(b)(3) requires plaintiffs to establish "that the questions of law or fact common to

12  class members predominate over any questions affecting only individual members, and that a class

13  action is superior to other available methods for fairly and efficiently adjudicating the

14  controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry focuses on "whether proposed

15  classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon v. Chrysler*

16  *Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

17  591, 623 (1997)).

18  　　　　"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap

19  with the merits of the plaintiff's underlying claim.'"  *Amgen, Inc. v. Conn. Ret. Plans & Trust*

20  *Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal-Mart*, 564 U.S. at 351); *see also Mazza*, 666

21  F.3d at 588.  The Court considers the merits to the extent they overlap with the Rule 23

22  requirements.  *Ellis*, 657 F.3d at 983.  The Court must resolve factual disputes as "necessary to

23  determine whether there was a common pattern and practice that could affect the class *as a*

24  *whole*."  *Id.* (emphasis in original).  "When resolving such factual disputes in the context of a

25  motion for class certification, district courts must consider 'the persuasiveness of the evidence

26  presented.'"  *Aburto v. Verizon Cal., Inc.*, No. 11-CV-03683, 2012 WL 10381, at *2 (C.D. Cal.

27  Jan. 3, 2012) (quoting *Ellis*, 657 F.3d at 982), *abrogated on other grounds as recognized by*

28  *Shiferaw v. Sunrise Sen. Living Mgmt., Inc.*, No. 13-CV-2171, 2014 WL 12585796, at * 24n. 16

United States District Court
Northern District of California

(C.D. Cal. June 11, 2014). "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart*, 564 U.S. at 350. Ultimately, the Court exercises its discretion to determine whether a class should be certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

### B.  *Daubert* Standard for Expert Declarations

Rule 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable." Fed. R. Evid. 702. An expert witness may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

At the class certification stage, courts analyze challenges to expert testimony under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ellis*, 657 F.3d at 982. "[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Culley v. Lincare, Inc.*, No. 2:15-CV-00081-MCE-CMK, 2016 WL 4208567, at *1 (E.D. Cal. Aug. 10, 2016) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 492–93 (C.D. Cal. 2012). The trial judge has discretion to determine reasonable measures of reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).

The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). An expert should be permitted to testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable. *See Thompson v. Whirlpool Corp.*, No. C06-1804-JCC, 2008 WL 2063549, at *3 (W.D. Wash. May 13, 2008) (citing *Daubert*, 509 U.S. at 589–90).

### III.  MOTION FOR CLASS CERTIFICATION

Defendants raise two categories of challenges to plaintiffs' motion for class certification: first, that certain plaintiffs lack standing; and, second, that plaintiffs have failed to meet the requirements of Federal Rule of Civil Procedure 23.

**A.     Standing**

Defendants claim the following plaintiffs lack standing:  (i) Caine because he did not use insurance but rather cash discount cards; and (ii) Brown, Hagert, Odorisio, and Wulff because they purchased only 30- and 60-day supplies, which are not part of the allegedly fraudulent HSP program at issue here.[6]

With regard to Caine, defendants argue that Caine's interrogatory responses reveal that he utilized a cash discount card, rather than insurance, in his prescription purchases from defendants.[7] This action, as explained in the class definition, involves purchases of certain prescription drugs using health insurance policies.  Thus, defendants argue, because Caine did not utilize such a policy, he lacks standing in this action.  Plaintiffs counter, relying on Dr. Hay's opinion, that each named representative engaged in at least one qualifying purchase using insurance.  Dr. Hay, in turn, relied on additional transactional data provided by plaintiffs that were apparently inconsistent with Caine's interrogatory responses.  Such opinion was the subject of defendants' motion to strike Dr. Hay's opinions due to certain discovery violations.  As discussed above, the Court has denied such motion as moot.  Defendants do not otherwise argue that the information upon which Dr. Hay relied somehow provides false data or information.  The Court therefore does not find that Caine lacks standing to represent a class of plaintiffs on this ground.

With regard to Brown, Hagert, Odorisio, and Wulff, defendants argue that none were actually overcharged.  Specifically, defendants argue that plaintiffs' claims are founded on the disparity between the U&C price reported by the pharmacies to the PBMs and TPPs and the HSP price for that drug.  Defendants note that the HSP program, however, was limited to the purchase of 90-day supplies for certain drugs, and that plaintiffs Brown, Hagert, Odorisio, and Wulff, only

---

[6]  Defendants also argue that Avis and Corcoran lack standing because some of their transactions involved the use of a cash discount card, and some of their transactions involved purchases of 30- or 60-day supplies.  Defendants do not, however, contend that Avis and Corcoran have no qualifying purchases whatsoever.  Thus, the Court does not find these standing arguments as to Avis and Corcoran persuasive.

[7]  Cash discount card programs were created by some companies to cover uninsured and underinsured consumers.  (*See* Dkt. No. 184-77.)  Essentially, discount card providers enter into purchasing agreements with pharmacies to provide discounts to consumers who are utilizing the card, and then charge a fee per transaction.  (*Id.* at 5–6.)

purchased 30- or 60-day supplies.  Thus, the drugs purchased by such plaintiffs do not fall within

the scope of plaintiffs' theories of damages.  Fundamentally, this argument is more aptly

addressed as one of typicality, not standing.  Plaintiffs assert an actual injury on the theory that

U&C price submitted by defendants to the PBMs and TPPs remained inflated with regard to the

30- and 60-day supplies for qualifying drugs.  For purposes of standing, that type of economic

injury is sufficient.  Typicality and the merits of the underlying damages and claims are separate

issues.

### B.      Rule 23 Requirements for Class Certification

Plaintiffs contend that they have established all requirements for certification of the eleven

state classes under both Rule 23(b)(2) (injunctive relief class) and Rule 23(b)(3) (damages class).

Defendants, on the other hand, argue that plaintiffs have failed to meet their burden with respect to

all class certification requirements save for numerosity.  For efficiency, the Court will first address

commonality under Rule 23(a) together with predominance under Rule 23(b)(3).  *See, e.g.*, *Collins*

*v. ITT Educ. Servs., Inc.*, No. 12-CV-1395, 2013 WL 6925827, at *3 (S.D. Cal. July 30, 2013)

(addressing commonality and predominance together) (citing *Amchem Prods.*, 521 U.S. at 609

("Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more

stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other

questions.")); *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, No. 13-CV-2468, 2014

WL 4627271, at *8 (C.D. Cal. Sept. 8, 2014).  The Court will then address the remaining factors

under Rules 23(a) and 23(b)(3)—Typicality, Adequacy, and Superiority—in turn.[8]

---

[8]  Plaintiffs have also moved to certify the classes as injunctive relief classes under Rule 23(b)(2), arguing that the injunctive relief they seek is wholly independent of the monetary relief plaintiffs seek.  However, it is undisputed the HSP program at issue in this litigation was discontinued as of February 1, 2016.  Plaintiffs' attempt to save their claims for injunctive relief by claiming that defendants have established a new, but identical, program does not persuade, given that the new program is not at issue here.  Thus, certification under Rule 23(b)(2) is inappropriate.  *See, e.g.*, *Knutson v. Schwan's Home Serv., Inc.*, No. 12-CV-0964, 2013 WL 4774763, at *9 (S.D. Cal. Sept. 5, 2013) (finding certification under Rule 23(b)(2) inappropriate where it was "undisputed that [d]efendants [had] ceased calling . . . customers" in a TCPA action); *cf. Wal-Mart*, 564 U.S. at 363.  Accordingly, the Court **DENIES** plaintiffs' motion to certify the classes under Rule 23(b)(2).

United States District Court
Northern District of California

### 1. *Predominance and Commonality*

Rule 23(a)(2) requires that the party seeking certification show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, a common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The existence of common questions itself will not satisfy the commonality requirement, and instead, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation omitted) (emphasis in original). The predominance inquiry under Rule 23(b)(3) is "far more demanding." *See Amchem Prods.*, 521 U.S. at 623–24.

The gravamen of plaintiffs' theory asserts: defendants misrepresented the true U&C price to the PBMs and TPPs, which in turn then charged plaintiffs and potential class members inflated copays.[9] Defendants contend that the determination of whether they submitted false U&C prices to the PBMs would necessarily involve an individualized analysis of the contracts between defendants and the PBMs. Defendants argue that each of these contracts contains its own definition of U&C, and each PBM had its own understanding of its agreement with CVS. Crucially, defendants have active contracts with more than fifty PBMs (Dkt. No. 214-6 at 42), which in turn have thousands of contracts with TPPs (Dkt. No. 170-21 (plaintiffs' list of relevant contracts)).[10] Thus, for these reasons, defendants argue that individualized issues of which contracts required submission of HSP prices as U&C and which did not would predominate.

---

[9] Plaintiffs also suggest that defendants made misrepresentations or omissions as to the price and the HSP program directly to plaintiffs. Such, however, ignores the evidence presented as to how the transactions operated. As discussed above, the evidence shows that the pharmacies would transmit the U&C price to the PBM or the TPP, and, based on individual health plans and the PBM's or TPP's contracts, the PBM or TPP would transmit to the pharmacy what copay it should charge the customer. *See supra*. Thus, plaintiffs cannot escape the fact that whatever injuries they may have suffered would have been a result of defendants' representations to the PBMs and TPPs rather than to plaintiffs directly.

[10] Defendants object to the accuracy of this list, but note that even the contracts listed by plaintiffs in this exhibit vary. Additionally, plaintiffs aver that these PBM contracts typically served as starting points for negotiations and are usually supplemented by each PBMs provider manuals. (*See* Jones Decl. ¶ 24; *see also* Dkt. No. 182-78.)

1   Plaintiffs' central argument on this issue is that the contracts between CVS and the many

2   PBMs in this litigation were all materially the same with regard to the definition of U&C.  Each

3   contract contains a provision that requires CVS pharmacies to submit the lower of the following:

4   (i) average wholesale price of the drug; (ii) a contractually agreed upon rate between CVS and the

5   PBM; or (iii) the U&C price for the drug.  Defendants did not submit a different U&C price to

6   each PBM depending on their contracts, which plaintiffs argue is evidence that all the definitions

7   of U&C price were the same.  And, furthermore, plaintiffs excluded from their class definition any

8   purchases under contracts that expressly provided that discount programs did not need to be

9   submitted as U&C.  Alternatively, plaintiffs also argue that, even if the PBMs did not require the

10  submission of drug prices that are part of a membership plan, the HSP program was not a bona

11  fide membership program, and, had the PBMs known the true nature of the HSP program, they

12  would have required HSP prices to be submitted as U&C.[11]

13  Plaintiffs do not persuade.  First, even ignoring contracts that expressly exclude

14  membership programs from their definition of U&C, the showing before the Court demonstrates

15  significant variation with how the different contracts define U&C.  (*See, e.g.*, Dkt. No. 182-68

16  ("The cash price less all applicable customer discounts which Pharmacy usually charges customers

17  for providing pharmaceutical services."); Dkt. No. 182-69 ("retail price of a Covered Medication

18  charged to the public by the Participating Pharmacy on the date that the prescription is dispensed,

19  including any special promotions or discounts available to the public on such date of

20  dispensing").)  Second, and more importantly, several executives from the largest PBMs in the

21  industry have submitted declarations expressing their understanding that the HSP prices at issue in

22  this litigation were not considered U&C prices.  (*See, e.g.*, Dkt. No. 182-11 ¶ 10–11 ("Prices

23  offered under legitimate membership programs . . . are generally not included in the pharmacy's

24  usual and customary price under the Express Scripts, Inc. Pharmacy Provider Agreement. . . . In

25  my experience, there was a general awareness in the marketplace that pharmacies with a

26  membership program were not reporting the membership program prices as usual and customary

27

28  [11]  Specifically, plaintiffs rely on Dr. Hay's analysis that defendants frequently charged non-HSP members the HSP prices.

United States District Court
Northern District of California

prices."); Dkt. No. 182-13 (same as to Caremark); 182-15 (same as to OptumRx).)  Plaintiffs fail

to explain how they can address, in a common manner, whether these PBMs were in some way

deceived given their knowledge and understanding of the HSP program.[12]  Moreover, some of

these highly sophisticated entities conducted their own independent audits to ensure compliance

with such agreements.[13]

Thus, the Court finds on this record that plaintiffs have failed to demonstrate how the class

action procedure can resolve common questions, which predominate all the identified transactions.

*See Stitt v. Citibank, N.A.*, No. 12-CV-03892-YGR, 2015 WL 9177662, at *4–5 (N.D. Cal. Dec.

17, 2015) (finding class certification was inappropriate because "class members' agreements had

'distinct terms'" and "common proof could not be used to determine the validity of property

inspection fees"); *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation*, No. 09-MDL-

---

[12]  That CVS submitted the same U&C price to each PBM would not itself answer the question of whether such U&C price would have violated each contract.  (*See* Dkt. No. 214-8, Colbert Dep. Tr. 247:20–248:17 ("So, again, CVS has many customers.  I don't know how many, but we have many customers, and if we excluded agreements where the U&C language specifically excluded discounts and agreements where usual and customary didn't have any additional definitions, we'd still need to look at every contract to look at that language because none of the language is exactly the same.").)

[13]  Plaintiffs additionally rely on the Seventh Circuit's decision in *Garbe v. Kmart Corp.*, 824 F.3d 632, 645 (7th Cir. 2016) in which the Seventh Circuit held the following:

> Allowing Kmart to insulate high "usual and customary" prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure.  The "usual and customary" price requirement should not be frustrated by so flimsy a device as Kmart's "discount programs."  Because Kmart offered the terms of its "discount programs" to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart "discount" prices at issue represented the "usual and customary" charges for the drugs.

However, the Seventh Circuit in *Garbe* specifically addressed the definition of U&C as it was "included in state regulations, plans, and contracts related to Medicare Part D . . . as required by the Medicare and Medicaid regulations."  *Id.* at 644 ("Its meaning in many state regulations, plans, and contracts is lifted from the federal regulations without significant modification.").  Such is not the case here where no identifiable regulations bind the contracts at issue.  In fact, the Seventh Circuit acknowledged individual state regulations could provide a different definition, and in such a case, that definition would apply to that state's contracts.  *Id.* at 643.  Here, even if the Court were to accept that some standard definition existed, defendants have presented sufficient evidence indicating that several PBMs did not understand HSP prices to be U&C prices under their individual agreements.

United States District Court
Northern District of California

2074-PSG, 2014 WL 6888549, at *4 (C.D. Cal. Sept. 3, 2014) (finding certification not appropriate because "[usual, customary, and reasonable] obligations are governed by its contracts, and the relevant terms of those contracts vary across the proposed classes" even where a standard, industry definition existed); *Westways World Travel, Inc. v. AMR Corp.*, No. 99-CV-386, 2005 WL 6523266, at *9 (C.D. Cal. Feb. 24, 2005) (denying certification where the "sheer number of additional agreements, even though many are form contracts, suggests that individualized issued would predominate").[14]

Accordingly, the Court finds that the proposed classes fail to satisfy the requirements of Rule 23, and thus, certification would be inappropriate.[15]  The Court, however, proceeds with an analysis of the remaining factors to provide plaintiffs with further guidance, should they choose to file an amended motion for class certification.

### 2. *Typicality*

To satisfy typicality, plaintiffs must establish that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). With regard to this requirement, defendants argue that certain plaintiffs:  (a) did not purchase drugs at quantities part of the HSP program; (b) continued purchasing after learning of the alleged

---

[14]  Plaintiffs also contend that, even if CVS pharmacies had no obligation to submit the HSP price as U&C, defendants were still submitting inflated U&C prices to the PBMs and TPPs. This is, however, a wholly different theory than that presented in either the TAC or their class definition.  Furthermore, if plaintiffs were to proceed on such a theory, such would also present significant predominance issues as it would require an analysis of the actual U&C of each drug at issue for each transaction of that drug.  Such would not be appropriate for class certification.

[15]  Defendants raise two additional arguments against class certification:  First, defendants contend that issues of reliance and materiality on the part of plaintiffs and the PBMs would present predominance concerns.  Having found that plaintiffs face significant hurdles in showing misrepresentation on a class-wide basis, the Court need not now conclusively determine whether reliance and materiality may similarly bar class certification for the states and claims that require a showing of the same.  However the Court notes that evidence of the PBMs and plaintiffs' knowledge of the HSP program and its relation to U&C prices may have bearing on the presumption of reliance, to the extent such exists in the states at issue.  Second, defendants argue that whether each plaintiff actually suffered an injury would depend on the structure of their individual health insurance policy.  As to this argument, defendants have offered no actual evidence showing how differences in individual health insurance plans may bear on this question, and thus, at this stage, their arguments on this topic are without foundation.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  overcharges; or (c) have Employment Retirement Income Security Act of 1974 ("ERISA")

2  preemption issues that would bar their claims.[16]

3               *a.*     <u>No HSP Purchases</u>

4        Defendants challenge plaintiffs Brown, Odorisio, Hagert, and Wulff because they only

5  purchased drugs at quantities below the 90-day supply proscribed by the HSP program.  In short,

6  because plaintiffs' theory is based on the existence of a delta between the HSP prices, which only

7  exist for a 90-day supply, defendants argue that these plaintiffs, who did not purchase a 90-day

8  supply of a drug, would be atypical.

9        Plaintiffs concede that Brown, Odorisio, Hagert, and Wulff did not purchase any 90-day

10  supplies of drugs.  However, plaintiffs argue that the data reveals that defendants routinely

11  charged customers prices less than the HSP prices for quantities less than the HSP 90-day supply.

12  Thus, plaintiffs contend, defendants were in fact offering prorated HSP prices for 30- or 60-day

13  drug supplies.  In support of this claim, plaintiffs cite the declaration of Dr. Hay.  Dr. Hay opines

14  that defendants "commonly charged prorated HSP prices from cash paying customers—prices that

15  are less than the 'standard' HSP price for quantities below a 90-day supply."  (Dkt. No. 208-9 at

16  ¶¶ 42–43; *see also* Dkt. No. 214-5 at ¶¶ 27–11.)  Specifically, Dr. Hay opines that a large number

17  of transactions for 30-day supplies of certain generic drugs that would have otherwise fallen under

18  the HSP program were "sold at or below $4."  (Dkt. No. 208-9 at Table 4.)

19        Plaintiffs do not persuade.  Unlike plaintiffs' central theory that defendants submitted a

20  U&C rate above a fixed HSP price, plaintiffs offer no reference price with regard to supplies

21  below the 90-day supply specifically proscribed by the HSP program.  The argument of proration

22  is speculative.  That defendants are selling 30- or 60-day supplies for less than they would sell 90-

23  day supplies under the HSP program is not in and of itself probative of plaintiffs' theory.  Thus,

24  given the current state of the record, these claims would be subject to individualized analyses of,

25  for instance, the particular drugs they purchased on any given day, what U&C price was submitted

26  

27  _____

    [16]  Defendants repeat their standing arguments as to Caine, Avis, and Corcoran with regard
28  to cash discount cards, arguing that their use of the same not only negates their standing but
    renders them atypical plaintiffs.  The Court rejects such arguments here for the same reasons it
    rejected them in the context of standing.

for such drugs on those days, and what the "true" U&C price should have been.  Accordingly, the Court finds that Brown, Odorisio, Wulff, and Hagert are not typical of the classes which they seek to represent.

>    b.    _Continued Purchases_

Next, defendants argue that certain plaintiffs—Avis, Barrett, Brown, Caine, Clark, Corcoran, Garber, Gargiulo, Gilbert, Hagert, Jenks, and Washington—should be considered atypical because they continued to purchase prescriptions from CVS pharmacies even after learning of the alleged misrepresentations.[17]  As such, these plaintiffs' claims with regard to purchases made after obtaining knowledge of the alleged misrepresentations would be barred by the voluntary payment doctrine.  *See* 66 Am. Jur. 2d—Restitution and Implied Contracts § 92 (2017) (describing that a "person cannot use the courts to recover money voluntarily or consensually paid with full knowledge of all of the facts and without fraud, duress, or extortion in some form").

However, defendants do not offer any reasons why such continued purchases would disqualify these plaintiffs and make them atypical of the class.  The Court could address these concerns administratively or by limiting the Class Period to end on an earlier date.  Accordingly, the Court finds that plaintiffs' continued purchases do not necessarily render them atypical of the classes sought to be certified in this action.[18]

---

[17]  Plaintiffs contend an analysis of the relevant transactions reveals that only five plaintiffs continued to purchase prescriptions from CVS while the HSP program was still active for a total of nineteen transactions.

[18]  Relatedly, defendants contend that the Texas representatives, Gilbert and Brown, are not proper representatives because under the Texas statutory laws at issue here, plaintiffs must allege that they would not have entered into the transaction on the same terms had the information been disclosed.  *See Corcoran v. CVS Health Corp., Inc.*, No. 15-CV-3504-YGR, 2016 WL 4080124, at *4 (N.D. Cal. July 29, 2016) (citing *Gill v. Boyd Distr. Ctr.*, 64 S.W.3d 601, 604 (Tex. App. 2001)).  By continuing to purchase their prescriptions from CVS, defendants argue, Gilbert and Brown negate the state of mind required by Texas statutory law.  Plaintiffs argue that by the time Brown and Gilbert joined the litigation, CVS's HSP program had ended, and therefore, they did not continue to purchase prescriptions under the deceptive practices alleged in the TAC.  The Court need not conclusively determine at this stage whether the Texas plaintiffs have no standing to raise Texas statutory claims because of their continued purchases, but note that should defendants prove correct on this point, Brown and Gilbert may only be proper representatives for the Texas common law claims, not the statutory claims.

United States District Court
Northern District of California

### c. *ERISA Preemption*[19]

Finally, defendants also argue that an "unknown number of [p]laintiffs and class members may be subject to a defense of preemption under [ERISA]." (Dkt. No. 183-1 at 38.) Defendants contend that because some plaintiffs' and class members' insurance would qualify as an "employee benefit plan" under ERISA, such plaintiffs' and class members' claims would be preempted by the same. *See Or. Teamster Emp'rs Tr. v. Hillsboro Garage Disposal, Inc.*, 800 F.3d 1151, 1155–56 (9th Cir. 2015). A claim "'relates to' an ERISA plan 'if it has a connection with or reference to such a plan.'" *Id.* (citation omitted). "In determining whether a common law claim has 'reference to' an ERISA plan, 'the focus is whether the claim is premised on the existence of an ERISA plan, and whether the existence of the plan is essential to the claim's survival.'" *Id.* (citation omitted).

Plaintiffs raise two counterarguments: First, plaintiffs contend that defendants' claims in this regard are speculative, as they have not identified a single plaintiff whose claims are arguably preempted. *Kamakahi v. Am. Soc. for Reproductive Medicine*, 305 F.R.D. 164, 185 (N.D. Cal. 2015) (finding that speculation as to whether plaintiffs may have conflicting interests is insufficient to support denial of class certification). Second, plaintiffs argue that ERISA preemption would not apply in any event because their claims are based on a "state-law based duty to engage in fair business practices, including refraining from the activity alleged." *Distr. Council 16 N. Cal. Health & Welfare Trust Fund v. Sutter Health*, No. 15-CV-735-TEH, 2015 WL 2398543, at *6 (N.D. Cal. May 19, 2015) (finding no ERISA preemption when plaintiff was "not seeking the recovery of unpaid benefits based on an obligation of [d]efendants that originated solely from an ERISA plan" but rather for "alleged overpayments that resulted from business practices prohibited by state law").

The Court need not now resolve whether ERISA preemption would bar the claims of some plaintiffs or potential class members. It is enough for the Court to find that defendants' showing in this regard is wholly insufficient. Defendants have failed to identify a single instance or

---

[19] Defendants raised this argument in the context of predominance and commonality. However, the Court views this more as a potential affirmative defense peculiar to each plaintiff's case and, thus, better analyzed as an issue of typicality.

1   example of a health insurance plan that would entitle defendants to an ERISA preemption defense

2   as to plaintiffs' claims in this action.  Accordingly, the Court finds that such arguments as

3   currently presented here would not present a bar to class certification.

### 3.   Adequacy

5        Rule 23(a)'s adequacy requirement considers "(1) [whether] the representative plaintiffs

6   and their counsel have any conflicts of interest with other class members, and (2) [if] the

7   representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the

8   class."  *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003).  Defendants do not contest that any

9   plaintiffs or counsel have conflicts of interests, nor do they contest that counsel will prosecute the

10  action vigorously on behalf of the class.  Rather, defendants argue that certain plaintiffs lack

11  fundamental threshold knowledge about the litigation, such that they should be deemed

12  inadequate.  Specifically, defendants cite deposition testimony suggesting that several plaintiffs

13  are unfamiliar with "HSP" and "U&C," central concepts in this litigation.  (*See* Dkt. No. 182-7

14  (deposition excerpts from named plaintiffs).)

15       Defendants do not persuade.  "The threshold of knowledge required to qualify a class

16  representative" is not high.  *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004).

17  Rule 23 requires only that the plaintiffs "be familiar with the basic elements of [the] claim, and

18  will be deemed inadequate only if [they are] 'startlingly unfamiliar' with the case."  *Id.* (citations

19  omitted).  A review of plaintiffs' depositions here reveals that each has demonstrated a sufficient

20  understanding of the basic facts and claims in this litigation.  Each understands the allegations that

21  CVS charged them inflated copays for generic prescription drugs, and each has participated in the

22  litigation by reviewing complaints, attending depositions, and producing documents.  (*See* Dkt.

23  No. 215-5 (deposition excerpts from named plaintiffs).)  Such are sufficient to satisfy the

24  adequacy requirements of Rule 23.

### 4.   Superiority

26       Lastly, the Court may certify a class under Rule 23(b)(3) only upon a finding that a class

27  action is superior to individual suits.  To make this determination, the Court considers the

28  following four non-exhaustive factors:  (1) the interests of members of the class in individually

16

United States District Court
Northern District of California

controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).  "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

Defendants argue that certification here would not be superior because (i) plaintiffs' method of determining class members is inaccurate and excessively labor-intensive; and (ii) the certification of eleven state classes, each with different standards and laws for the claims at issue, would be too complex and burdensome to adjudicate in one court.

As to the first issue, defendants' arguments do not persuade in light of the Ninth Circuit's decision in *Briseno*.  There, the Ninth Circuit explained that there is no reason to require "an administratively feasible way to identify all class members at the certification stage."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017).  Such issues can be addressed during the claim administration process when defendants can "challenge the claims of absent class members if and when they file claims for damages."  *Id.* at 1131 (citation omitted).  Here, plaintiffs have presented a sufficiently feasible method for ascertaining the members of classes: Dr. Hay opines that one could review CVS's transactional data and use a numeric identifier known as a "condor code" to trace the transaction back to the applicable PBM or TPP contract.  (Hay Rebuttal Decl. ¶¶ 45–46; *see also* Dkt. No. 214-6, Dudley Dep. Tr. 71:4–12 ("Q:  What additional data would I need beyond the transaction data to link a specific transaction to a contract that CVS has with a PBM or payer?  A:  Off the top of my head, you would need to look at the database of contracts, look at the time frames and effective dates of the contracts, and the fee schedules, and link them up to the transaction through the condor code number and plan name.").  Defendants argue that such would not be completely accurate because certain codes may have been migrated to other contracts during the course of the Class Period.  However, that the method proposed would yield imperfect results is not sufficient to support denial of class certification.

17

With regard to the second issue, defendants argue that it would be exceedingly complicated to manage a trial involving the laws of eleven different states under each of those state's statutory laws, as well as common law causes of action for fraud, unjust enrichment, and negligent misrepresentation. *See In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995) ("The law of negligence, including subsidiary concepts such as duty of care, foreseeability , and proximate cause, may as the plaintiffs have argued forcefully to us differ among the states only in nuance . . . [but] nuance can be important and its significance is suggested by a comparison of different state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts."); *Mazza*, 666 F.3d at 596 ("The elements necessary to establish a claim for unjust enrichment also vary materially from state to state."). Plaintiffs counter arguing that the state law claims here raise common issues and certification is appropriate and superior where, as here, the "likely recovery [per plaintiff] is too small to incentivize individual lawsuits, and the realistic alternative to class litigation would be no adjudication at all." *Briseno v. ConAgra Foods, Inc.*, --- Fed. App'x ---, 2017 WL 53421, at *2 (9th Cir. Jan. 3, 2017) (affirming certification of eleven statewide classes involving various state-law claims).

The Court need not now decide whether the laws of all eleven states are so disparate as to make certifying eleven statewide classes unmanageable. However, the Court notes that should plaintiffs file an amended motion for class certification, the trial plan should include details on how jury instructions could be structured and formulated to account for eleven statewide classes involving statutory and common law state claims. While *Briseno v. ConAgra* provides some persuasive authority on this issue, it is not wholly analogous. There, all of the actions were consolidated in the Central District of California by an MDL panel, and the district court noted that it could sever the classes following certification for separate adjudication. *In re ConAgra*, 90 F. Supp. 3d 919, 1034 (C.D. Cal. 2015). No such MDL exists here, and such may impact the Court's analysis of the third factor of the superiority requirement, i.e. the desirability of concentrating the litigation of the claims in this particular forum.

### 5.    *Summary*

The Court finds that plaintiffs have failed to satisfy the predominance and commonality requirements for certification of Rule 23(b)(3) damages classes.  Additionally, the Court finds that Brown, Odorisio, Wulff, and Hagert are not typical of the classes which they seek to represent.  On such bases, the Court **DENIES** plaintiffs motion for class certification.

## IV.    MOTION TO STRIKE DECLARATION OF DR. NAVARRO

Plaintiffs offer Dr. Navarro to present the following opinions:  (i) the requirement that pharmacies cannot charge insured patients more than its U&C price is a standard feature throughout the industry and CVS in particular; (ii) U&C should be lowest cash price and should include discounts offered to the general public, as indicated by contracts, regulations, and policies; (iii) CVS submitted inflated U&C by excluding HSP prices; and (iv) as a result, CVS injured patients.  Defendants move to strike Dr. Navarro's expert declaration on two grounds:  First, he is not qualified to provide the opinions proffered.  Second, his methodology was insufficient resulting in unreliable opinions.  Defendants have not specified precisely which of Dr. Navarro's four opinions they are challenging.  However, based on the arguments presented, it appears to the Court that defendants challenge only Dr. Navarro's third and fourth opinions.  The Court, therefore, addresses Dr. Navarro's qualifications and methodology with regard to the same.

**Qualifications:**  The Court finds that Dr. Navarro's education and experience in the pharmaceutical industry are sufficient to qualify him to opine on the subjects identified in his expert declaration.  In his declaration, Dr. Navarro explains that he has three decades of experience "developing, managing, and consulting on pharmacy programs in Health Plans and pharmacy benefit management companies, developing drug formularies, contracting with pharmaceutical manufacturers, and consulting for pharmaceutical managers on access and reimbursement in prescription drug benefit programs."  (Dkt. No. 205-6 at ¶ 2.)  Currently, he is a professor in the Department of Pharmaceutical Outcomes & Policy at the University of Florida, College of Pharmacy and serves as the president of a managed care pharmacy consultancy.  (*Id.* at ¶ 1.)  Defendants do not contend that such experience is irrelevant or in some way untrue, but rather that he lacks specific experience concerning pharmacy membership programs and how that

1    pricing is treated by PBMs.  Such, however, requires a level of specificity not required by the law.

2           Defendants cite to cases which are not particularly apt, as they both involve opinions

3    requiring specific, technical expertise, the understanding of which would not have necessarily

4    flowed from the expert's general experience in the field.  *See Bunker v. Ford Motor Co.*, No. 11-

5    CV-1286-PMP-NJK, 2013 WL 4505798, *6–7 (D. Nev. Aug. 22, 2013) (excluding expert

6    testimony on "brake shift interlock systems" where his experience was in "automotive mechanical

7    failures generally"); *Zabriskie v. Fed. Nat'l Mortg. Assoc.*, No. 13-CV-2260-PHX-SRB, 2016 WL

8    3653512, at *1–2 (D. Az. Apr. 22, 2016) (excluding expert opinion on whether certain software

9    correctly applied underwriting standards where expert had no direct experience in the

10   "underwriting process of mortgage lending, and has no experience working with the [software at

11   issue]").  By contrast here, Dr. Navarro has experience in developing and managing pharmacy

12   programs in health plans and PBMs, as well as consulting on access and reimbursement in

13   prescription drug programs.  (*See also* Dkt. No. 205-6 at ¶ 3 (describing additionally that he

14   participated in the "negotiation and management of pharmaceutical discount and rebate contracts

15   between Health Plans, PBMs, and the pharmaceutical industry").  The Court finds that such

16   experience provides Dr. Navarro with, at a minimum, the foundational background upon which to

17   draw conclusions from relevant data and documents regarding contractual arrangements between

18   pharmacies and PBMs and industry understandings of health membership programs.  That Dr.

19   Navarro does not have specific experience applying health membership program prices to U&C

20   provisions relates to weight, not admissibility.  *See United States v. Garcia*, 7 F.3d 885, 889–90

21   (9th Cir. 1993) (holding that "lack of particularized expertise goes to the weight accorded

22   [expert's] testimony, not to the admissibility" where expert had experience working as a children's

23   mental health specialist but no particularized experience "on the subject of child testimony

24   through closed circuit television").

25          **Reliability and Methodology:**  Defendants contend that Dr. Navarro took "no steps to

26   discover the actual opinions of Caremark or other industry participants" on whether membership

27   program prices should be submitted as the U&C, nor could he identify any documents that

28   supported the existence of an industry standard as to the same.  (Dkt. No. 186 at 10.)  Given Dr.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Navarro lacks specific experience in the relationship between membership plan programs and

2    U&C pricing, defendants argue, the expert should provide, at a minimum, external sources and

3    references to support his opinions.  *See Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597,

4    608 (N.D. Cal. 2008) (finding experience insufficient "given [expert's] limited experience" in the

5    particular subject and noting that a "sufficient showing should include some minimum effort to

6    survey industry publications or consider the efforts of multiple persons in the field . . . at least

7    absent evidence of extensive experience in design or marketing in the [relevant] industry").

8        Plaintiffs counter that Dr. Navarro performed the exact same analysis that an expert

9    witness performed in *Garbe v. Kmart*, No. 12-CV-0081, 2014 WL 8278059 (S.D. Ill. July 29,

10   2014), which both the Southern District of Illinois and the Seventh Circuit adopted.  Plaintiffs

11   further argue that Dr. Navarro reviewed several hundred documents in this action, including

12   documents showing the different definitions of U&C within many of CVS's contracts with PBMs.

13       Having reviewed Dr. Navarro's report, the Court finds Dr. Navarro's methodology

14   insufficient with respect to his opinion that defendants should have submitted the HSP price as the

15   U&C price.[20]  While Dr. Navarro appears to have reviewed several documents and deposition

16   testimony in this case, Dr. Navarro has not articulated any particular methodology upon which his

17   opinion is based.  Specifically, Dr. Navarro testified thus:  "Ultimately, its [sic] CVS Caremark

18   that are signatories to the contract regarding pharmacy services for—for CVS pharmacies.  And,

19   so, while I offer my expert opinion in reading not only this, but other documents, and my

20   experience in the industry, that the—the signatories such as Caremark—CVS Caremark, their

21   opinion would be important."  (Dkt. No. 186-3, Navarro Dep. Tr. 104:7–14.)  Yet, in the same

22   deposition, he conceded that he conducted no specific investigation to determine what the PBMs

23   meant the contract provisions on U&C to mean.  (*Id.* at 104:20–24; 190:3–22.)  It is therefore not

24   clear to the Court on what basis Dr. Navarro is able to opine that the PBMs with whom CVS

25   contracted would have required CVS to submit HSP prices as its U&C price in all instances.  To

---

27   [20]   The Court notes that, as to Dr. Navarro's more general opinions about "lower of U&C
pricing" and the inclusion of some discounts as part of U&C calculations, Dr. Navarro's general
28   background in the pharmaceutical industry appears to provide sufficient bases upon which Dr.
Navarro can opine.

1   the contrary, the evidence submitted by defendants largely demonstrates that several of the PBMs

2   were aware of defendants' HSP program and did not expect the prices under such program to be

3   submitted as defendants' U&C.  (*See supra.*)  Thus, the Court finds that Dr. Navarro's opinion is

4   not supported by a reliable methodology.  By extension, the Court finds unreliable Dr. Navarro's

5   opinion that defendants' failure to submit HSP prices as U&C harmed patients in the putative

6   classes.

7      Accordingly, the Court **GRANTS IN PART** defendants' motion to exclude Dr. Navarro's

8   expert declaration, and excludes opinions three and four of Dr. Navarro's declaration based on the

9   record provided.

10  **V.**  **CONCLUSION**

11     For the foregoing reasons, plaintiffs' motion to certify eleven state classes under either

12  Rule 23(b)(2) or Rule 23(b)(3) is **DENIED WITHOUT PREJUDICE**.  Defendants' motion to strike

13  certain portions of Dr. Hay's declaration is **DENIED** as moot.  Defendants' motion to strike Dr.

14  Navarro's declaration is **GRANTED IN PART** as described above.

15     The Court previously scheduled a case management conference for Monday, May 1, 2017

16  at 2:00 p.m.  No later than **April 24, 2017**, the parties must file an updated joint case management

17  statement, but it shall focus on the next steps of the litigation, in particular, whether plaintiffs

18  intend to file an amended motion for class certification and the parties' plans for any dispositive

19  motions and the timing for the same.

20     This Order terminates Docket Numbers 172, 185, and 186.

21     **IT IS SO ORDERED.**

22

23  Dated: March 21, 2017

24            **YVONNE GONZALEZ ROGERS**
          **UNITED STATES DISTRICT COURT JUDGE**

*United States District Court*
*Northern District of California*