Bonny E. Sweeney (Cal. Bar No. 176174)
HAUSFELD
600 Montgomery St., Suite 3200
San Francisco, California 94111
Tel: 415-633-1908
Fax: 415-358-4980
bsweeney@hausfeld.com

Richard Lewis (admitted *pro hac vice*)
HAUSFELD
1700 K St. NW, Suite 650
Washington, D.C. 20006
Tel: 202-540-7200
Fax: 202-540-7201
rlewis@hausfeld.com

Pat A. Cipollone, P.C. (admitted *pro hac vice*)
Rebecca R. Anzidei (admitted *pro hac vice*)
Robert B. Gilmore (admitted *pro hac vice*)
STEIN MITCHELL CIPOLLONE BEATO &
  MISSNER LLP
1100 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 737-7777
pcipollone@steinmitchell.com
ranzidei@steinmitchell.com
rgilmore@steinmitchell.com

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany L. Caracuzzo (Cal. Bar No. 190687)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, California 94612
Tel.  415-692-0772
Fax. 415-366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com

*Interim Class Counsel*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| Christopher Corcoran, et al., | Case No. 4:15-cv-03504-YGR |
| Plaintiffs, | <u>CLASS ACTION</u> |
| v. | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| CVS Pharmacy, Inc. | Date: January 31, 2017 |
| Defendant. | Time: 2:00 p.m. |
| | Courtroom: 1 |
| | Judge: Honorable Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ......................................................................................................1

I.  CVS FAILS TO REBUT THAT CVS'S UNIFORM CLAIMS ADJUDICATION PROCESS INVOLVES COMMON ISSUES THAT PREDOMINATE OVER INDIVIDUALIZED INQUIRIES. ...............................4

    A.  The Uniform Claim Adjudication Process Overwhelmingly Involves "Lower Of U&C" Pricing Logic. .............................................................................4

    B.  The U&C Definitions In The Contracts Within The Class Have No Material Differences.   .............................................................................5

    C.  CVS Offers Nothing But Speculative Conjecture That Plaintiffs' And Class Members' Health Insurance Plans Alter Or Limit The Applicability Of "Lower Of U&C" Pricing, Or Otherwise Impact Plaintiffs' Or Class Members' Damages..........................7

II.  CVS FAILS TO REBUT THAT IT MADE IDENTICAL MISREPRESENTATIONS AND OMISSIONS REGARDING ITS U&C PRICES, WHICH PREDOMINATE OVER INDIVIDUALIZED ISSUES. .............8

    A.  CVS Made Direct Misrepresentations And Omissions To Plaintiffs And Class Members Each Time CVS Communicated And Charged An Inflated Copayment...........................8

    B.  CVS Fails to Rebut That, Class-Wide, The HSP Prices Properly Are Considered CVS's U&C Prices, And Thus CVS Submitted False And Inflated U&C Prices.........................9

    C.  Even CVS's Hand-Picked PBM Witnesses Admitted That CVS Should Have Submitted Its HSP Prices As U&C Prices Under The Facts Of This Case.....................................10

    D.  Even Disregarding CVS's HSP Prices, CVS Submitted Inflated U&C Prices And Overcharged Plaintiffs And Class Members.....................................12

III. CVS'S ATTACKS ON PLAINTIFFS' STANDING, TYPICALITY AND ADEQUACY ARE MERITLESS.12

    A.  Each Named Plaintiff Has One Or More Qualifying Purchases........................................12

    B.  CVS's Claim That Certain Plaintiffs Lack "Standing" Because Their Overcharge Claims Are Based On Prorated HSP Prices Is An Incorrect Argument Over The Merits, Not Standing Or Class Certification. ..................................................13

    C.  CVS's Continued Patronage Argument Does Not Apply To Non-Discretionary Purchases of Medically Necessary Prescription Drugs. ...................................................14

    D.  CVS's ERISA Preemption Argument Is Unsupported By The Facts Or The Law. ..........16

    E.  CVS's Misleading Excerpts Of Plaintiffs' Deposition Testimony Fail To Rebut Plaintiffs' Showing That They Are Properly Informed Of And Participating In The Litigation, And Thus Are Adequate Representatives. .......................................................17

IV. CVS FAILS TO REBUT PLAINTIFFS' SHOWING THAT CLASS TREATMENT IS THE SUPERIOR METHOD OF ADJUDICATION. ..................................................................................18

A. "Ascertainability" Is Not A Rule 23 Requirement, But Regardless, Absent Class Members Can Be Identified. ...........................................18

B. Certifying 11 State Classes Is Manageable...................................19

V. INJUNCTIVE RELIEF IS APPROPRIATE. ............................................20

CONCLUSION...........................................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Aetna Health v. Davila,*
542 U.S. 200 (2004) ............................................................................................................. 17

*Bias v. Wells Fargo & Co.,*
312 F.R.D. 528 (N.D. Cal. 2015) ............................................................................ 7, 14, 17, 18

*Bodner v. Oreck Direct, LLC,*
2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ................................................................... 18

*Brazil v. Dell, Inc.,*
No. C 07 01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) ............................ 14

*Briseno v. ConAgra Foods, Inc.,*
-- F.3d --, No. 15-55727, 2017 WL 24618 (9th Cir. Jan 3, 2017) ("*Briseno I*") ........................ 18, 19

*Briseno v. ConAgra Foods, Inc.,*
No. 15-55727, 2017 WL 53421 (9th Cir. Jan. 3, 2017) ("*Briseno II*")............................. 19

*Californians for Disability Rights, Inc. v. California Dep't of Transp.,*
249 F.R.D. 334 (N.D. Cal. 2008)........................................................................................ 17

*Corcoran v. CVS Health Corp.,*
169 F. Supp. 3d 970 (N.D. Cal. 2016) ........................................................................... 4, 8

*Cummings v. Connell,*
316 F.3d 886 (9th Cir. 2003) ............................................................................................... 7

*Daniel v. Ford Motor Co.,*
806 F.3d 1217 (9th Cir. 2015) ............................................................................................. 8

*District Council 16 Northern California Health and Welfare Trust Fund v. Sutter Health,*
No. 15-cv-00735-THE, 2015 WL 2398543 (N.D. Cal. May 19, 2015)............................. 17

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) .............................................................................................. 13

*Faulk v. Sears Roebuck & Co.*,
   No. 11-CV-02159 YGR, 2013 WL 1703378 (N.D. Cal. Apr. 19, 2013)...........................................15

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
   317 F.R.D. 374 (S.D.N.Y. 2016) ...........................................................................................19

*Gutierrez v. Wells Fargo Bank, NA*,
   704 F.3d 712 (9th Cir. 2012) ...............................................................................................15

*In re ConAgra Foods Inc.*,
   90 F Supp. 3d 919 (C.D. Cal 2015) ......................................................................................19

*In re Lenovo Adware Litig.*,
   No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016).................................13

*In re Pharmaceutical Industry Average Wholesale Price Litig.*,
   252 F.R.D. 83 (D. Mass. 2008) ............................................................................... 11, 16, 20

*In re Terazosin Hydrochloride*,
   220 F.R.D. 672 (S.D. Fla. 2004) ...........................................................................................20

*In re U.S. Foodserv. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)..................................................................................................14

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litigation*,
   No. MDL-09-2074 PSG, 2014 WL 6888549 (C.D. Cal. Sept. 3, 2014)..................................6

*In re Worlds of Wonder Securities Litigation*,
   1990 WL 61951 (N.D. Cal. 1990) .........................................................................................17

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015)........................................................................................7, 13

*Kanawi v. Bechtel Corp.*,
   254 F.R.D. 102 (N.D. Cal. 2008)...........................................................................................18

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................................................13

*Moeller v. Taco Bell Corp.*,
   220 F.R.D. 604 (N.D. Cal. 2004)...........................................................................................17

*Moore v. Apple*,
   309 F.R.D. 532 (N.D. Cal. 2015)..........................................................................................13

*Parksons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...............................................................................................20

*Parrish v. Nat'l Football League Players Ass'n*,
   No. C-07-00943-WHA, 2008 WL 1925208 (N.D. Cal. Apr. 29, 2008) ...............................18

*Paulsen v. CNF Inc.*,
   559 F.3d 1061 (9th Cir. 2009) .............................................................................................17

*Petersen v. Costco*,
   312 F.R.D. 565 (C.D. Cal. 2012) .........................................................................................19

*Red v. Kraft Foods, Inc.*,
   No. CV 10-1028-GW AGRX, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011) ...................15

*Rikos v. Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015) ...............................................................................................19

*Senne v. Kansas City Royals Baseball Corp.*,
   315 F.R.D. 523 (N.D. Cal. 2016)..........................................................................................18

*Stitt v. Citibank, N.A.*,
   No. 12-cv-03892-YGR, 2015 WL 9177662 (N.D. Cal. Dec. 17, 2015)..................................6

*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. Aug. 31, 2016) ...............................................................................13

*Trosper v. Styker Corp.*,
   No. 13-CV-0607-LHK, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014)................................18

*United States ex rel. Garbe, v. Kmart Corp.*,
   73 F. Supp. 3d 1002 (S.D. Ill. 2015) ("*Garbe I*") .......................................................3, 6, 9

*United States ex rel. Garbe, v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016),
   *cert. denied*, 580 U.S. -- (Jan. 9, 2016) ("*Garbe II*")........................................................3, 9

*Wit v. United Behavioral Health*,

No. 14-CV-02346 JCS, 2016 WL 4990514 (N.D. Cal. Sept. 19, 2016).............................................. 7

*Zeisel v. Diamond Foods, Inc.*,

No. C 10-01192 JSW, 2011 WL 2221113, (N.D. Cal. June 7, 2011)................................................. 14


**Other Authorities**

1 DAN B. DOBBS, LAW OF REMEDIES § 3.8(1) at 372–73 (2d ed.1993) .................................... 7

JUR. 2D REST. AND IMPLIED CONTRACTS § 92 (West 2016)................................................. 15

**INTRODUCTION**

CVS's Opposition fails to rebut that Plaintiffs' case – CVS "submits falsely inflated 'usual and customary prices' to third-party health payors, and overcharges customers paying for generic prescription drugs with insurance by collecting falsely inflated copays"[1] – is amenable to class-wide common evidence, predominating over individual issues. As explained below, the following basic points are born out class-wide:

- **CVS's contracts are uniform with regard to the definition and operation of U&C pricing**, as CVS's witnesses have testified and its brief confirms;

- **CVS's calculation and reporting of U&C prices does not vary under these contracts.** CVS's witnesses and data confirm its conduct is the same across its business; and

- **CVS uniformly submitted inflated U&C prices across the class**. CVS admits that it uniformly did not include its Health Savings Pass "HSP" prices in calculating and reporting its U&C prices. To counter CVS's view, Professor Hay's analysis of CVS's transaction data shows that CVS submitted inflated U&C prices as compared to CVS's cash transactions even excluding HSP purchases; this is uniformly true across the class as well.

In short, the class-wide, common evidence shows that CVS's supposed U&C prices are *neither usual nor customary* – they bear no relation to the company's actual cash transactions under any measure. Rather, as CVS's witnesses have testified, CVS *simply makes up the prices it reports as "usual and customary," to maximize what it is paid by payors and patients*.[2] Class certification is the only way that millions of class members – patients, many of them elderly and ill, who must purchase health-maintaining, even life-saving, drugs – can recover for CVS's unfair and deceptive copay overcharges. The facts and the law overwhelmingly support certification.

***First***, **CVS fails to rebut that CVS's uniform claims adjudication process involves common issues that predominate over any individualized inquiries**. CVS does not meaningfully dispute that "lower of U&C" pricing logic – where the amount CVS charges insurers and individuals is not to exceed CVS's submitted U&C price – is essentially uniform throughout its business. And CVS admits that the contracts' U&C "definitions share a common element, which is that the U&C price is the price paid by

---

[1] 3d Am. Compl. ¶ 11 [ECF 101].
[2] Ex. 41, Wingate [TX] 128:25-129:7; Ex. 42, Gibbons 71:3-15. Unless otherwise noted, references to Exhibits 1-40 are to those attached to the Declaration of Robert B. Gilmore in Support of Plaintiffs' Motion for Class Certification [ECF 172-2]. References to Exhibits 41-67 are to those attached to the Declaration of Elizabeth C. Pritzker in Support of Plaintiffs' Reply.

the 'cash customer.'"  Opp. at 10.  The uniformity of the process and the contracts is powerfully evidenced by the fact that CVS *administers* these contracts uniformly.  CVS's witnesses testified that (1) CVS submits the same U&C prices for each drug to all pharmacy benefit managers ("PBMs") and third-party payors ("TPPs"), and (2) CVS believes it can comply with all of its contracts by submitting the same U&C price.  CVS's conduct and testimony belie its litigation stance that the contracts differ.

**Second**, **CVS fails to rebut that it made identical misrepresentations and omissions regarding its U&C Prices, which predominate over any individualized issues.**  CVS itself asserts that the "most important common question" is whether CVS should have considered its HSP prices in calculating and reporting its U&C prices.  Opp. at 1.  This common question supports class certification.  Implicitly recognizing this, CVS instead focuses on *the merits*, rather than class certification, claiming that certain PBMs – the industry middlemen, not the people and entities that actually pay for the prescriptions – endorsed CVS's refusal to include its HSP pricing in reporting its U&C prices.

CVS's merits argument, however, is equally unavailing.  CVS and its hand-picked PBM witnesses do not point to a single piece of contemporaneous evidence from 2008 to 2015 – no memo, no letter, no policy, no document of any kind – memorializing their supposed shared "understanding" that notwithstanding the definition of a U&C price found in their contracts, the parties agreed to deviate from or disregard such definitions.  And these witnesses testified that they did not tell their clients – individual patients and TPPs – about this supposed shared understanding.

In reality, the PBM witnesses' deposition testimony actually supports Plaintiffs' case and class certification.  The PBMs' supposed alignment with CVS relies entirely on CVS's misrepresentations and the PBMs' belief that the HSP prices were only offered through a "bona fide" membership program, as described by PBM Express Scripts' declarant, Amber Compton.  But that is not what happened.  CVS's transaction data show that cash-paying customers who were not HSP members were able to, *and in fact did*, pay the same prices that supposedly were only available to HSP members.  In nearly 7 million non-HSP program cash sales, CVS charged the cash customer the HSP price or lower – one out of every three such sales.  The PBM witnesses testified that *CVS had not informed them that it frequently charged non-HSP customers the HSP prices, and that if CVS charged the HSP prices to members and non-members, then the PBM would expect CVS to submit the HSP price as its U&C.*

CVS has admitted that it uniformly did not submit its HSP price as its U&C price.  CVS thus has misrepresented, uniformly, its U&C prices, even to the PBMs it claims have endorsed CVS's position.

Further undercutting CVS's merits arguments, Plaintiffs are not alone in challenging CVS's unlawful pricing.  In addition to the third-party payor class actions against CVS,[3] on January 5, 2017, the State of Texas filed suit against CVS for defrauding Texas Medicaid, asserting that "CVS has fraudulently and systematically reaped unlawful overpayments from Texas Medicaid" by reporting "falsely inflated usual and customary ("U&C') prices that – contrary to the name – were not and are not designed to reflect the actual prices that CVS usually and customarily charges cash-paying customers."[4] Texas's suit is the latest in a series of investigations and cases against CVS for its false U&C pricing.

CVS's Opposition thus gives this Court no basis to deviate from the holding of *United States ex rel. Garbe v. Kmart Corp.*  Those courts evaluated the negligible criteria that Kmart had for its discount price membership program, as well as the fact that such criteria often were disregarded, and concluded that Kmart's supposed program prices should have been reported as the pharmacy's U&C prices.  *United States ex rel. Garbe, v. Kmart Corp.*, 73 F. Supp. 3d 1002 (S.D. Ill. 2015) ("*Garbe I*"), *aff'd in part & rev'd in part* 824 F.3d 632 (7th Cir. 2016) ("*Garbe II*"), *cert. denied*, 580 U.S. -- (Jan. 9, 2016).  Nor does CVS refute the fact that this holding – and CVS's uniform deceptive pricing scheme – is susceptible to class-wide proof and warrants class certification.  In fact, the record shows that whether considering CVS's HSP pricing or not, CVS submitted inflated U&C prices across the class.

***Third*, CVS's hodgepodge of arguments targeting Plaintiffs' standing, typicality, and adequacy are unavailing.**  CVS misstates Plaintiffs' relevant transactions and other criteria, which confirm their standing and typicality.  That a few Plaintiffs purchased a small number of medically-necessary drugs from CVS post-suit does not defeat certification. And CVS mischaracterizes Plaintiffs' testimony; Plaintiffs are more than adequate class representatives.

---

[3] *Plumbers Welfare Fund v. CVS Health Corporation*, Civ. A. No. 16-CV-00447 (D.R.I. filed Aug. 10, 2016); *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund and Indiana Carpenters Welfare Fund v. CVS Health Corporation*, Civ. A. No. 16-CV-000-46-S-PAS (D.R.I. filed Feb. 1, 2016).

[4] Ex. 43, Corr. 1st Am. Pet., *Texas ex rel. Winkelman v. CVS Health Corp.*, Cause No. D-1-GV-14000388 (126th Jud. Dist., Travis Cty, Tx., Dist. Ct. filed Jan. 5, 2017).  In an obvious attempt to preempt Texas's case, CVS filed its own declaratory judgment action against the state a few days before.

---

*Fourth*, **CVS fails to rebut that class treatment is the superior method of adjudicating this case.**  As confirmed by the Ninth Circuit's recent endorsement of 11 single-state classes in *ConAgra*, Plaintiffs' proposed classes are not only manageable but represent the only feasible method for resolving class members' claims.  There is sufficient similarity among the claims' required elements in the 11 states that the classes' claims can be tried through grouping and common jury instructions, as even CVS's own legal claims charts demonstrate.

Plaintiffs therefore respectfully ask that the Court grant Plaintiffs' motion.

## ARGUMENT

I.  **CVS FAILS TO REBUT THAT CVS'S UNIFORM CLAIMS ADJUDICATION PROCESS INVOLVES COMMON ISSUES THAT PREDOMINATE OVER INDIVIDUALIZED INQUIRIES.**

Plaintiffs' allegations regarding CVS's misconduct are simple, as the Court has recognized: "CVS made a false representation every time it charged Plaintiffs copays that were calculated based on inflated U&C prices."  *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 988 (N.D. Cal. 2016).  CVS fails to refute that the claims adjudication process and its U&C pricing are uniform in nature.  Thus, common issues predominate over individualized considerations.

A.  **The Uniform Claim Adjudication Process Overwhelmingly Involves "Lower Of U&C" Pricing Logic.**

CVS tries to paint a picture of thousands of contracts that allegedly require individual analysis.  This is simply not true.  The evidence shows that, essentially uniformly across CVS's business, the amount CVS is paid, by either TPPs or individuals, cannot exceed CVS's submitted U&C prices.  Mr. Gibbons, the senior vice president in charge of CVS's payor relations, testified that "██████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 42, Gibbons 61:13-16.  Neither CVS's payor relations executives, nor its own PBM, Caremark, could identify a contract that lacked lower of U&C pricing.  Ex. 44, Zevzavadjian, 60:17-24; Ex. 45, Colbert 41:5-14; Ex. 46, Greenwood 48:18-49:1; Ex. 47 Lavin (Caremark) 74:10-22.  Nor has CVS done so in its brief.

Further, the lower of U&C requirement applies to the *copayments* that Plaintiffs and class members were to be charged.  As Mr. Zevzavadjian, CVS's vice president for payor relations, explained, "████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Ex. 44, Zevzavadjian 59:12-20.[5]  Mr. Gibbons, the senior vice president of payor relations, testifying as CVS's 30(b)(6) witness, did not dispute that the contracts applicable to Plaintiffs' purchases all contained lower of U&C pricing, and testified that when a contract indicates its total reimbursement cannot exceed CVS's U&C price, neither the insurer ***nor the individual*** can be charged more than the U&C price.  Ex. 42, Gibbons 247:1-248:24, 259:22-260:20.  PBM witnesses also admitted that copays could not exceed the pharmacy's reported U&C price.  Ex. 48, Compton (Express Scripts) 33:18-34:4; Ex. 49, Reichardt (Optum Rx) 269:1-21; Ex. 47, Lavin (Caremark) 63:23-64:10.

The essential uniformity of this pricing logic throughout CVS's business yields a core class-wide issue: where CVS submits an inflated U&C price to PBMs and TPPs, CVS is able to charge and collect an inflated copay from Plaintiffs and class members. Ex. 2, Navarro Decl. ¶¶ 7, 27, 53-58; Ex. 15, Hay Decl. ¶¶ 11, 32-33, 43.  Crucially, ***CVS and third-party witnesses acknowledged this as well***.  Ex. 42, Gibbons 101:5-11; Ex. 50, Barre (MedImpact) 62:1-63:18; Ex. 49, Reichardt (Optum Rx) 94:13-95:7; Ex. 47, Lavin (Caremark) 65:14-66:4.  Thus, a central issue for both class certification and the merits – where CVS overstates its submitted U&C prices, Plaintiffs and class members will be harmed – applies uniformly class-wide and is not subject to legitimate dispute.

## B.   The U&C Definitions In The Contracts Within The Class Have No Material Differences.

While CVS tries to argue that CVS's contracts with TPPs and PBMs within the class contain dissimilar definitions of U&C, the uniformity of the U&C concept is apparent from the definitions that CVS itself excerpts in its brief and attached contract language chart, Opp. at 5-6 & Opp. Ex. 74, and as CVS admits, "[d]espite different formulations of the definition, ***the definitions share a common element, which is that the U&C price is the price paid by the*** '***cash customer***.'" Opp. at 10.  It is for this reason that *Garbe* held the definitions of U&C throughout contracts and regulations could be boiled

---

[5] Emphasis added throughout unless otherwise noted.

down to a single, common meaning: the "'cash price to the general public.'" *Garbe I,* 73 F. Supp. 3d at 1015 (citation omitted).[6]

CVS relies heavily on *Stitt v. Citibank, N.A.*, No. 12-cv-03892-YGR, 2015 WL 9177662 (N.D. Cal. Dec. 17, 2015) and *In re Wellpoint, Inc. Out-of-Network UCR Rates Litigation*, No. MDL-09-2074 PSG, 2014 WL 6888549 (C.D. Cal. Sept. 3, 2014), to argue that variation in its contracts defeats commonality and predominance, Opp. at 24-25, but both are clearly distinguishable.  In *Stitt*, this Court observed that the common question, "as framed by the plaintiffs," involved whether the defendant charged unauthorized fees under the relevant contracts "by not taking ***individual circumstances of borrowers into account***."  2015 WL 9177662, at *3.  Plaintiffs here make no such self-defeating allegation: the contracts' definitions and operation of U&C pricing do not depend on the "individual circumstances" of class members. *Wellpoint* involved both patients and providers as plaintiffs, comprising those who were denied payment entirely as well as those whose claims were partially allowed, suing regarding a whole host of diverse medical services.  2014 WL 6888549, at *1-2.  The court was presented with a smorgasbord of provisions referencing "usual, customary, and reasonable" charges – a different concept than U&C prices for prescription drugs – with widely varying language: averages, percentiles, ranges, references to regional or national databases, variation depending on "complexity and severity of treatment," "level of skill," and "unusual medical circumstance," and so forth.  *Id.* at *5-6.  Here, in contrast, there are none of *Wellpoint*'s factual variations in plaintiffs or type of medical services, or in how U&C prices are defined in the contracts between CVS and PBMs or TPPs.  CVS's witnesses have testified to this uniformity themselves.

Putting aside that the definitions of U&C are virtually the same in the relevant contracts, for any difference even to be relevant, it would require CVS to determine and report a different U&C based on the terms of each specific contract.  ***Instead, CVS submits the same U&C price for a given drug to every PBM and TPP, regardless of CVS's contracts with those entities, while maintaining that what CVS submits in fact complies with each such contract.***  Ex. 42, Gibbons 63:4-64:2; *see also* Ex. 52, Melkonian 76:19-24, Ex. 53, Dudley 30(b)(6) 81:17-83:23; Ex. 44, Zevzavadjian 55:9-13, 131:6-24;

---

[6] Plaintiffs submit a revised contract chart that both adds and removes certain contracts based on further review to identify contracts that fit the proposed class definition.  Ex. 51, Revised Contract Chart.

Ex. 45, Colbert 248:18-249:6.  CVS cannot maintain that the contracts all operate differently when it does precisely the same thing in response to all of them.

The Court should not credit CVS's litigation stance that all of these contracts have different definitions of U&C, given its senior executive's testimony that a single definition of U&C applies to and conforms with all of these contracts.  CVS thus has "fail[ed] to explain how variations in contract language would negate the liability determination."  *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 536 (N.D. Cal. 2015).  In short, as in *Wit v. United Behavioral Health*, No. 14-CV-02346 JCS, 2016 WL 4990514, at *17 (N.D. Cal. Sept. 19, 2016), a case CVS ignores in its Opposition, "Plaintiffs here have demonstrated, as a factual matter, that the insurance plans for the putative class members are substantially the same in [several] key respect[s]…."  Certification thus is warranted.

C.   **CVS Offers Nothing But Speculative Conjecture That Plaintiffs' And Class Members' Health Insurance Plans Alter Or Limit The Applicability Of "Lower Of U&C" Pricing, Or Otherwise Impact Plaintiffs' Or Class Members' Damages.**

Trying to muddy the clear and uncontroverted evidence about the uniformity of the adjudication process and the consistent presence of the lower of U&C pricing logic, CVS hypothesizes without evidence that Plaintiffs' and class members' insurance plans might contain provisions that limit the applicability of the lower of U&C requirement to the determination of their copayments, or otherwise impact potential damages resulting from CVS's inflated U&C prices.  Asserting that one of the Plaintiffs, Mr. Clark, paid very little for his insurance prescriptions in the second half of 2014, CVS speculates that he ***might*** have had an "out of pocket" annual cap form of insurance.  Opp. at 29.[7]  But since CVS cannot even state that this is actually the case, the accusation amounts to nothing more than supposition.  CVS's unsupported conjecture should be disregarded, because a defendant's "[m]ere speculation … is insufficient to support denial of initial class certification."  *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 185 (N.D. Cal. 2015) (citing *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)).

---

[7] CVS also references former named plaintiff Linda Krone, asserting that Ms. Krone's insurer reimbursed her in part for her out of pocket expenditures.  But regardless, any such reimbursement would be irrelevant under the well-established collateral source rule, which provides that "benefits received by the plaintiff from a source collateral to the defendant may not be used to reduce that defendant's liability for damages." 1 DAN B. DOBBS, LAW OF REMEDIES § 3.8(1) at 372–73 (2d ed.1993).

1

2

## II. CVS FAILS TO REBUT THAT IT MADE IDENTICAL MISREPRESENTATIONS AND OMISSIONS REGARDING ITS U&C PRICES, WHICH PREDOMINATE OVER INDIVIDUALIZED ISSUES.

### A. CVS Made Direct Misrepresentations And Omissions To Plaintiffs And Class Members Each Time CVS Communicated And Charged An Inflated Copayment.

CVS begins its attack on Plaintiffs' commonality and predominance showing by mischaracterizing Plaintiffs' deception claims against CVS. Opp. at 19. CVS claims that Plaintiffs' only direct affirmative misrepresentation claim against CVS is that "Plaintiffs argued that CVS had made affirmative misrepresentations about HSP to them." *Id.* But this is false. As the Court has recognized, and as Plaintiffs explained in their opening brief, Mot. at 10:

> Plaintiffs contend that not only was the false U&C price directly communicated to them every time they paid inflated copayments, but it was also indirectly communicated to them through their insurers (third-party payors) every time their claims were adjudicated and copayments were calculated.

*Corcoran*, 169 F. Supp. 3d at 988. The Court went on to state that "***the Court agrees with Plaintiffs that the SAC alleges CVS made a false misrepresentation every time it charged Plaintiffs for copays that were calculated based on inflated U&C prices.***" *Id.* CVS nevertheless tries to say that the named Plaintiffs have disclaimed that CVS made any direct misrepresentations. But that assertion is false and based on selective quotations from the depositions and misleading questions by CVS's counsel, garbed in legal jargon in a purposeful effort to confuse the non-lawyer Plaintiffs. Plaintiffs uniformly testified that they believed that CVS overcharged them on copayments. Ex. 54, Plaintiff Testimony Chart.[8]

CVS does not even grapple with Plaintiffs' claim that because of CVS's misrepresentations at the point of sale, Plaintiffs and class members paid copayments higher than CVS's cash customers were charged. Indeed, CVS's own proffered expert, Edward McGinley, testified that pharmacy customers like Plaintiffs have "limited insight into the processes that occur 'behind the scenes' when they have a prescription filled at their local retail pharmacy," McGinley Decl. ¶ 10 (Opp. Ex. 27) [ECF 184-29], and

---

[8] CVS incorrectly argues that the Court has rejected Plaintiffs' omissions claims entirely. Opp. at 20-21. Plaintiffs understand the Court's ruling regarding a "Duty to Disclose" to have addressed Plaintiffs' constructive fraud counts. But omissions are actionable through claims other than constructive fraud. For example, "[f]raudulent omissions are actionable under both [the California CLRA and UCL consumer statutes." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Indeed, the Court observed and sustained Plaintiffs' allegation that CVS violated the CLRA when it made omissions by "'concealing from [Plaintiffs] the true U&C prices.'" *Corcoran*, 169 F. Supp. 3d at 992.

---

this lack of insight includes U&C pricing, Ex. 55, McGinley 42:21-24.  CVS's direct misrepresentations and omissions to the class are actionable and susceptible to class-wide proof.

**B.    CVS Fails to Rebut That, Class-Wide, The HSP Prices Properly Are Considered CVS's U&C Prices, And Thus CVS Submitted False And Inflated U&C Prices.**

The plain meaning of a U&C price in contracts and regulations includes the HSP program, as the courts in *Garbe* make clear.  CVS's position is, in effect, that it and others in the industry could decide to deviate from the plain language of contracts, manuals, and regulations, to form a non-documented "understanding" that supposed membership club prices were not U&C prices.  But this position simply cannot be squared with the rulings of the district court and the Seventh Circuit in *Garbe* – a case that, remarkably, CVS does not even address in its Opposition.  After considering an expert report from Dr. Susan Hayes (a consultant to PBMs)[9] as well as evidence from Kmart's pharmacy business that is similar to that adduced here regarding CVS, the district court conducted a survey of the industry, and found that the U&C price "is generally referred to within the industry as the 'cash price to the general public,' which is the amount charged cash customers for the prescription, exclusive of sales tax or other amounts claimed."  *Garbe I,* 73 F. Supp. 3d at 1015.  According to the court, "the members of Kmart's generic discount programs are part of the 'general public' (as opposed to a private group or club) because of the open eligibility of the programs, *i.e. anyone* is eligible to join the program."  *Id*.

The Seventh Circuit affirmed these findings: "Even if the prices were offered only to members of its 'discount program'— and it is disputed whether this was the case— the programs themselves were offered to the general public.  Kmart's programs typically offered its 'discounts' in return for nothing more than assent, demographic data the pharmacy already needed to fill a prescription, and a nominal fee."  *Garbe II*, 824 F.3d at 643.  The court of appeals concluded that "[t]he 'usual and customary' requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.'"  *Id.* at 645.

There can be no reasonable dispute that under the *Garbe* analysis CVS's HSP program prices were the "cash price to the general public" and thus were U&C prices.[10]  ***First***, as Plaintiffs showed in

---

[9] Opp. To CVS's Mot. to Exclude Dr. Navarro Ex. 8, Expert Report of Susan Hayes [ECF 206-9].
[10] CVS submits declarations from purported industry experts.  But in their depositions, each disclaimed offering an opinion as to the definition of a U&C price, making their so-called "observations" regarding

their motion, CVS internally referred to the HSP program as a "cash card" or "cash offering," ███████

████████████████████████████████████████████████████████████████████

███████████████████████.[11]   ***Second***, the HSP program was offered to the general public. The

supposed membership criteria – signing a form and paying a small annual enrollment fee – were just as

flimsy as those of Kmart's that the *Garbe* courts dismissed as meaningless.[12] Ex. 60, Navarro Rebuttal

Decl. ¶¶ 10, 16, 18-22. And, like in *Garbe*, CVS did not enforce even these *de minimis* criteria. CVS

often did not collect the annual membership fee.  Ex. 61, Hay Rebuttal Decl.  ¶¶ 9, 19-20, 23, 32-34.

What is more, CVS commonly allowed non-HSP members to pay the HSP prices: in nearly 7 million

non-HSP cash sales, CVS charged the HSP price or lower (one out of every three such sales).  *Id.* ¶¶ 7,

19 & Tab. 2.  Under *Garbe*, CVS's HSP program prices constitute U&C prices, and CVS should have

reported them as such.

### C.   Even CVS's Hand-Picked PBM Witnesses Admitted That CVS Should Have Submitted Its HSP Prices As U&C Prices Under The Facts Of This Case.

CVS does not meaningfully contest the *Garbe* courts' holding that a pharmacy's discount

program price constitutes its U&C price.  Instead, CVS tries to sidestep the issue entirely, by asserting

that it and certain PBMs supposedly agreed in secret that this did not apply to CVS's HSP program.

CVS tries to prove this up by introducing after-the-fact testimony of a handful of present or former

employees of certain PBMs.   Tellingly, neither CVS nor the PBM witnesses point to any

contemporaneous documents memorializing their supposed understanding and agreement that CVS did

not need to submit its HSP prices as its U&C prices. Ex. 62, PBM Witness Testimony Chart.  ***But even***

***taking the PBM witnesses' testimony at face value, it is clear that CVS uniformly misrepresented the***

***HSP program to them as well, and thus class treatment is appropriate.***

The predicate for CVS's hand-picked PBM witnesses' testimony is that, because CVS

supposedly only offered HSP members the HSP prices, such prices were not usual and customary.  For

example, Ms. Compton of Express Scripts states in her declaration that ████████████████████

██████████████████████████████████.  Rather, as described above, it was a

---

supposed industry practice untethered and devoid of meaning. Ex. 56, Graeff 27:21-29:16; Ex. 57, Jones

73:19-24; Ex. 58, Barlag 67:18-21.

[11] Mot. at 8 & fn. 10 and exhibits; Ex. 59, Oct. 27, 2010 Retail Pricing Review [CVSC-0049949 at 50].

[12] Mot. at 8 and exhibits.

1   legitimate membership program that required enrollment and payment of a fee."  Declaration of Amber

2   D. Compton (Opp. Ex. 12 [ECF 184-15]), ¶¶ 10, 18, 17.

3   But CVS's representations about the HSP program were false.  CVS witnesses have admitted

4   that neither they nor anyone they know of told any TPPs or PBMs either that (1) the HSP prices were

5   the most common cash prices CVS charged, or (2) CVS allowed non-HSP cash customers to pay the

6   HSP prices as well.  Ex. 42, Gibbons 155:9-16; Ex. 44, Zevzavadjian 194:18-195:4, 209:24-211:12.

7   None of the PBMs knew then or now what CVS was *actually* charging cash customers, agreeing that

8   CVS never provided its proprietary cash transaction data, and they relied on CVS to report its U&C

9   prices accurately.  Ex. 62, PBM Witness Testimony Chart.  Moreover, the PBM witnesses testified that

10  *CVS had not informed the PBMs that CVS frequently charged non-HSP customers the HSP prices.*

11  *Had the PBMs known this, they testified, they would have expected CVS to submit the HSP prices as*

12  *its U&C prices*.  *Id.*

13  In short, the only thing that CVS's hand-picked PBM witnesses can confirm for the record is that

14  they (and PBMs) were unaware of what CVS was charging cash customers, and that if non-HSP

15  members were getting the HSP price without being members, which CVS's data emphatically

16  demonstrates, then the CVS HSP price should have been reported as the U&C.  Class-wide, CVS instead

17  reported false and inflated U&C prices that excluded its HSP prices.  Ex. 61, Hay Rebuttal Decl. ¶¶ 8,

18  22-31 & Tab. 6.

19  What is more, the PBM witnesses repeatedly admitted that they did not tell their client *payors* –

20  either private insurers or state or federal Medicare or Medicaid agencies – of this secret, undocumented,

21  understanding CVS and the PBMs supposedly shared.  Ex. 62, PBM Witness Testimony Chart.  And in

22  fact, CVS and its PBM Caremark actually gave contracts and provider manuals to Caremark's customers

23  that contain definitions of U&C that expressly include discounts, indicating the opposite of what CVS

24  and Caremark assert now, Ex. 47, Lavin 68:9-18, 71:15-21, yet never told these same entities that CVS

25  and Caremark were not including or requiring HSP prices to be submitted as U&C prices.  *Id.* at 133:13-

26  24, 136:8-15.  But even if some TPPs knew that CVS was not submitting its HSP prices as its U&C

27  prices, as CVS claims, that is not a barrier to class certification.  *See In re Pharm. Indus. Average*

28  *Wholesale Price Litig.*, 252 F.R.D. 83 (D. Mass. 2008) ("*AWP*") (certifying classes of consumers and

TPPs even where evidence showed that some TPPs and PBMs knew of the pharmaceutical industry's fraudulent average wholesale pricing).[13]

### D. Even Disregarding CVS's HSP Prices, CVS Submitted Inflated U&C Prices And Overcharged Plaintiffs And Class Members.

Finally, even if the Court were to disregard entirely CVS's HSP prices in evaluating the pharmacy's U&C prices, and look only at all other cash transactions, as CVS urges, the fundamental allegation of this case – that CVS charged class members inflated copays by submitting inflated U&C prices – is fully supported by CVS transaction data which is common to the class. Dr. Hay analyzed the lowest cash prices that CVS charged non-HSP cash customers, and compared those prices to what CVS submitted as its purported U&C prices. Ex. 61, Hay Rebuttal Decl. ¶¶ 22-31 & Tab. 6[14] This analysis shows that Plaintiffs and class members were overcharged – compared to the lowest routinely charged non-HSP cash price – at levels substantially similar to an approach using the HSP prices, or prorated HSP prices, as the U&C price. *Id.* Professor Hay's analysis demonstrates that CVS has been systematically inflating its U&C prices even if one disregards CVS's so-called "membership" prices.

### III. CVS's Attacks On Plaintiffs' Standing, Typicality And Adequacy Are Meritless.

CVS targets the Plaintiffs with a hodgepodge of meritless arguments against class certification.

### A. Each Named Plaintiff Has One Or More Qualifying Purchases.

CVS claims, incorrectly, that certain Plaintiffs have no qualifying transactions. Opp. at 13-14. CVS can only make this argument, however, by asking the Court to disregard the full set of Plaintiffs' transactions that fit the class definition. As explained in Plaintiffs' opposition to CVS's motion to strike

---

[13] Although much of CVS's brief attempts to address the merits, and thus is premature at the class certification stage, the evidence on the merits does not support CVS's position that it did not need to submit its HSP prices as its U&C prices. In addition to what is cited elsewhere in this Reply and in the Motion, *see generally* Ex. 2, Navarro Decl.; Ex. 60, Navarro Rebuttal Decl.

[14] CVS and PBM witnesses state that U&C prices should be the lowest cash prices. John Lavin, an employee of Caremark (CVS's PBM subsidiary), references a definition of a U&C price as ███████████████████████████████████ Declaration of John Lavin (Opp. Ex. 14 [ECF 184-16]) ¶¶ 8-9. Two former employees of the PBM Medco, Franceen Spadaccino and William Strein, also reference definitions of U&C as the "lowest net price …." Declaration of Franceen Spadaccino (Opp. Ex. 16 [ECF 184-18]) ¶ 4; Declaration of William Strein (Opp. Ex. 17 [EC 184-19]) ¶ 4. And Dr. Navarro also has opined that the industry expectation is that pharmacies will submit their "lowest U&C price." Ex. 2, Navarro Decl. ¶ 29.

---

1   [ECF 209], each Plaintiff has at least one purchase of an HSP-eligible drug, using insurance, for which

2   Plaintiff was charged a copayment that exceeded the HSP program price or prorated price (fitting the

3   class definition, *see* Mot. at iii). Ex. 15, Hay Decl.; Ex. 61, Hay Rebuttal Decl. ¶¶ 39-42.

     **B.**     **CVS's Claim That Certain Plaintiffs Lack "Standing" Because Their Overcharge Claims Are Based On Prorated HSP Prices Is An Incorrect Argument Over The Merits, Not Standing Or Class Certification.**

6        CVS argues that it did not prorate prices downward under the HSP program, and therefore those

7   Plaintiffs who were only overcharged on prescription purchases for 30-day or 60-day supplies have no

8   standing.[15]   But this misconstrues the concept of standing in the class certification context.  CVS's real

9   argument is that if it prevails on its ***merits*** argument regarding proration, some Plaintiffs (and some class

10  members) did not suffer any damages.  This case is thus easily distinguished from *Moore v. Apple*, 309

11  F.R.D. 532, 542-43 (N.D. Cal. 2015), because it is "'possible that [the proration plaintiffs and] class

12  members have suffered injury.'"   *In re Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL

13  6277245, at *15 (N.D. Cal. Oct. 27, 2016 (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137-

14  38 & n. 6 (9th Cir. 2016)).   As the Ninth Circuit explained in *Ellis v. Costco Wholesale Corp.,* 657 F.3d

15  970, 983 (9th Cir. 2011), at class certification the court examines the merits only to determine "whether

16  common questions exist; not to determine whether class members could actually prevail."[16]

17       In any event, the data show that CVS routinely charged customers prices less than the HSP prices

18  for quantities less than the HSP "standard" 90-day supply. Ex. 15, Hay Decl. ¶¶ 42-43 & Table 4; Ex.

19  61, Hay Rebuttal Decl. ¶¶ 27-31.  CVS's effort to rebut Dr. Hay's analyses of the prevalence of prorated

20  cash prices is unavailing.  Barlag Decl. ¶¶ 18, 75-83 (Opp. Ex. 24 [ECF 184-26]; Ex. 58, Barlag 216:10-

21  219:25; Ex. 61, Hay Rebuttal Decl. ¶¶ 21, 27.  Plaintiffs have more than sufficient evidence to support

22  class certification on this issue.

---

24  [15] Contrary to CVS's assertions, all but Plaintiffs Hagert, Wulff, Gilbert, and Corcoran have non-prorated qualifying transactions. Ex. 61, Hay Rebuttal Decl. ¶ 42 & Ex. F.

25  [16] *See also Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 514 (9th Cir. 2013) (the "presence of individualized damages cannot, by itself, defeat class certification"); *In re Lenovo Advware Litig.*, 2016 WL 6277245 at *15 (possibility that defendant ultimately would prove that some class members could not prevail on their claims did not defeat certification); *Kamakahi*, 305 F.R.D. at 189 (rejecting argument that "injury-in-fact must be subject to classwide proof" and concluding that certification was required "to determine liability issues amenable to classwide adjudication, even where individual determinations of damages may ultimately show that some class members suffered none.").

C. **CVS's Continued Patronage Argument Does Not Apply To Non-Discretionary Purchases of Medically Necessary Prescription Drugs.**

CVS barely addresses Plaintiffs' authorities showing that a uniform financial misrepresentation at the point of sale gives rise to an inference of reliance. *See* Mot. at 21. As this Court held in *Bias*, "[i]n cases involving fraudulent overbilling, payment may cause circumstantial proof of reliance based on a reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." 312 F.R.D. at 541 (citing *In re U.S. Foodserv. Pricing Litig.*, 729 F.3d 108, 119-20 (2d Cir. 2013)). Nor does CVS rebut the evidence of a uniform CVS misrepresentation in every qualifying transaction. Recognizing that deceptive-pricing cases are amenable to a class-wide presumption of materiality and reliance, Opp. at 27, CVS instead claims that some class representatives' purchases of medically necessary prescription drugs from CVS after filing or joining this lawsuit gives rise to individualized issues as to reliance and materiality, *id.* at 27-28, 31.

The Court should reject this argument because certification is appropriate regardless of a few Plaintiffs' small number of post-suit purchases. [17] In *Zeisel v. Diamond Foods, Inc.*, the court rejected a standing and materiality challenge to the named plaintiff who "continued to purchase, and testified that he would continue to purchase" the mislabeled food after suit, certifying the class where there was common evidence of reliance based on "alleged misrepresentations [that] were made at point of sale as part of a standardized … purchasing process." 2011 WL 2221113, at *4, 10 (N.D. Cal. June 7, 2011) (citing *Brazil v. Dell, Inc.*, No. C 07 01700 RMW, 2010 WL 5387831 at *5 (N.D. Cal. Dec. 21, 2010)).

Certification is all the more warranted on the facts of this case. Not only did CVS engage in uniform overpricing, but Plaintiffs had to continue purchasing their medically-necessary prescriptions,

---

[17] CVS substantially overstates the extent to which such transactions occurred. A "continuing purchase" under CVS's theory must mean that the Plaintiff: (1) bought a HSP-eligible drug using their insurance; (2) after joining or becoming aware of this suit, but before February 2016, when HSP was discontinued, and (3) was overcharged – *i.e.* charged more than the true U &C. Under this criteria, only a few Plaintiffs actually made a very small number of such purchases. Indeed, the purchases by Amanda Gilbert that CVS cites, Opp. at 28, ***do not*** qualify, as she first learned of this suit in March 2016 and the "ongoing purchases" occurred since April 2016, two months ***after*** CVS discontinued the HSP program. Dr. Hay's analysis shows that only five Plaintiffs made a total of 19 qualifying transactions after joining or learning of the suit but before the HSP program ended, and they amount to less than 4 % of the transactions of the named plaintiffs as a whole and of their total overcharge damages. Ex. 61, Hay Rebuttal Decl. ¶ 43 & Exs. G-H.

and there is no evidence that Plaintiffs (or class members) had reasonably practical and economical alternatives while preserving important continuity of care healthcare objectives.  Plaintiffs and class members cannot simply forego buying the medicines at issue in this case, and CVS cannot avoid certification and liability by cynically asserting that they must.  Thus, the continuing purchase and voluntary payment cases CVS cites, such as the discretionary purchases of cookies and crackers in *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW AGRX, 2011 WL 4599833, at *1 (C.D. Cal. Sept. 29, 2011), are a far cry from ongoing purchases of medically-necessary drugs from an established pharmacist with whom the patient has a relationship and a prescription history.

Indeed, this Court recognized the difference between discretionary and non-discretionary purchases in one of CVS's cited cases, *Faulk v. Sears Roebuck & Co.*, No. 11-CV-02159 YGR, 2013 WL 1703378, at *9 n.13 (N.D. Cal. Apr. 19, 2013), where the Court observed that a lack of reasonable alternatives could be a valid reason even for the plaintiff's continued purchases of tires that came with an allegedly deceptive warranty.  And the distinction between discretionary purchases, where a customer's preferences may inform decision-making, versus non-discretionary transactions, led to the Ninth Circuit's holding in *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012), which CVS tries in vain to distinguish.  There, the court of appeals stated:

> Unlike [a light cigarette consumer labeling case], where individual class members could have had different motives for choosing "light" cigarettes, ***we are hard pressed to agree that any class member would prefer to incur multiple overdraft fees***.

*Id.* at 729.  Just as no consumer would "prefer" to overpay for necessary banking activity, no consumer would "prefer" to overpay for necessary medicines – even if a few Plaintiffs had to overpay CVS on non-discretionary medicine purchases in a few instances post-suit.  This parallel to *Gutierrez*, and distinction from labeling cases like *Red* (or even *Zeisel*), shows that CVS's continued patronage argument is unavailing given the facts of this case.

There are also sound healthcare policy reasons not to apply CVS's cases to the facts here.  CVS's insistence that Plaintiffs were required to stop using the pharmacy services at CVS, or else surrender their overcharge claims, violates the important consensus healthcare goals of encouraging continuity of care in the purchase of prescription medicines (goals CVS itself has advocated), to ensure patients will not be prescribed medicines that are contraindicated and can lead to unanticipated adverse medical

1    interactions.[18]  Ex. 60, Navarro Rebuttal Decl. ¶¶ 28-32.  In sum, a patient who acts in a medically

2    prudent manner to preserve his or her continuity of care, while at the same time filing a lawsuit to seek

3    redress for the pharmacy's overpricing practice, should not be penalized.[19]

4         **D.   CVS's ERISA Preemption Argument Is Unsupported By The Facts Or The Law.**

5         Just as with its other "unique defense" arguments, CVS has not met its burden of showing that

6    the Employee Retirement Income Security Act of 1974 ("ERISA") preempts any of Plaintiffs' or class

7    members' claims.  CVS has not identified a single Plaintiff whose claims are arguably preempted, *see*

8    Opp. at 31 ("an **unknown** number of Plaintiffs and class members **may** be subject to a defense of

9    preemption").  The Court should not credit CVS's speculative argument.  *Kamakahi*, 305 F.R.D. at 185.

10        In any event, ERISA preemption will not apply to Plaintiffs' and class members' claims, because

11   Plaintiffs' claims are based on CVS's "state-law based duty to engage in fair business practices,

12   including refraining from the activity alleged."  *District Council 16 Northern California Health and*

13   *Welfare Trust Fund v. Sutter Health*, No. 15-cv-00735-THE, 2015 WL 2398543, at *6 (N.D. Cal. May

14   [18]  For example, the California Health Alliance Plan advises its members to "[h]ave all your prescriptions

15   filled at the same pharmacy every time….  Transferring prescriptions between pharmacies can be
     dangerous and is not recommended."  Ex. 63, Health Alliance Plan, "Medication Safety" at

16   https://www.hap.org/prescriptions/safety.php; *see also* Ex. 64, Cal. State Bd. of Pharmacy, "Prescription
     Drug   Discount   Program   for   Medicare   Recipients"   at

17   http://www.pharmacy.ca.gov/consumers/medicare_discount.shtml; Ex. 65, Pfizer, "Your Pharmacist: A
     Partner in Drug Safety" at www.pfizer.comfileshealthmedicine_safety4-4_Your_Pharmacist; Ex. 66,

18   Health is Primary, "Family Physicians Join with CVS Health to Improve Coordination Across Patients'
     'Medical Neighborhood'" at http://healthisprimary.org/campaign-news/family-physicians-join-with-

19   cvs-health-to-improve-coordination-across-patients-medical-neighborhood.

20   [19] CVS's reliance on the voluntary payment doctrine also fails, because the requirements of the doctrine
     cannot be established.  According to CVS's own cited authorities, for the voluntary payment doctrine to

21   apply, (1) the plaintiff must "have full knowledge of all of the facts," and (2) the facts must show that
     the plaintiff had an "intent …to waive rights."  Opp. at 31 (citing 66 AM. JUR. 2D REST. AND IMPLIED

22   CONTRACTS § 92 (West 2016)).  Neither of these elements are met here.  ***First***, Plaintiffs did not and
     could not have possessed full knowledge of all the relevant facts.  CVS itself has asserted that its method

23   for calculating and reporting U&C prices, which drive the determinations of the plaintiff's copay, is
     "proprietary," CVS Pharmacy MTD Reply Br. 15 [ECF 74], and CVS's own expert, Edward McGinley,

24   testified that patients do not have insight into the behind-the-scenes claims adjudication process.  *See*
     *supra* § II.A.  ***Second***, each of the Plaintiffs took the affirmative step of suing CVS to challenge its

25   deceptive conduct, so they could hardly have intended a waiver.  Because CVS has failed to establish

26   the necessary required elements of the voluntary payment doctrine, the court should reject the doctrine's

27   application here.  *See AWP*, 252 F.R.D. at 102 (D. Mass. 2008) ("so-called voluntary payment doctrine"

28   inapplicable to patient consumer pharmaceutical purchases).

19, 2015 (applying *Aetna Health v. Davila*, 542 U.S. 200 (2004) and rejecting preemption because "[t]he recovery of unpaid benefits is substantively distinguishable from the present case, which alleges fraudulently induced overpayments. While a claim for benefits guaranteed by the terms of an ERISA plan naturally relies on the application of the plan's provisions, a claim for overpayment does not.").[20] ERISA does not preempt Plaintiffs' claims.[21]

### E. CVS's Misleading Excerpts Of Plaintiffs' Deposition Testimony Fail To Rebut Plaintiffs' Showing That They Are Properly Informed Of And Participating In The Litigation, And Thus Are Adequate Representatives.

Lacking any evidence of actual conflicts, CVS relies on misleadingly excerpted deposition testimony to argue that Plaintiffs are unfamiliar with the facts and theories of the case, or have not participated adequately in the litigation. CVS's attacks are unavailing. Detailed knowledge of CVS's prescription drug pricing policies and each cause of action is not a prerequisite for adequacy. *See Californians for Disability Rights, Inc. v. California Dep't of Transp*., 249 F.R.D. 334, 349 (N.D. Cal. 2008). "The threshold of knowledge required to qualify a class representative" under Rule 23 is not high: "a party must be familiar with the basic elements of her claim, and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case." *Moeller v. Taco Bell Corp*., 220 F.R.D. 604, 611 (N.D. Cal. 2004), *amended in part*, No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) (internal citations omitted); *see also Bias*, 312 F.R.D. at 538 (same). A representative need not "be intimately familiar with every factual and legal issue in the case;" it is enough that the plaintiff understands the gravamen of the claim. *Moeller*, 220 F.R.D. at 611 *(citing In re Worlds of Wonder Secs. Litig.*, 1990 WL 61951 at *3 (N.D. Cal. 1990)).

Each Plaintiff has demonstrated a general understanding of the claims, as well as his or her role as class representative. Ex. 54, Plaintiff Testimony Chart. Each attested to his or her understanding regarding the class claims that CVS unlawfully, deceptively or fraudulently charged plaintiffs and class

---

[20] *See also Paulsen v. CNF Inc.*, 559 F.3d 1061, 1083 (9th Cir. 2009). (professional negligence claim against third-party service provider was not preempted because claim "d[id] not encroach on ERISA-regulated relationships" and there was "no indication" the claim "would result in a multiplicity of regulation….").

[21] Furthermore, CVS's Answer did not plead ERISA preemption, thus waiving this defense. *See* Answer to 3d Am. Compl. [ECF 144]; *Johns v. AutoNation USA Corp.*, 246 F.R.D. 608, 610 (D. Ariz. 2006).

members more for specified generic prescription drugs than CVS charged cash-paying customers without insurance. *Id*. And each has participated actively in the litigation by reviewing the complaints, producing documents, responding to interrogatories and correcting or amending such responses as necessary, and appearing for lengthy depositions where they answered questions truthfully and to the best of their abilities. *Id*. "It would be unfair to deny [Plaintiffs] access to our courts merely because [they] are unable to articulately respond to questions from attorneys." *Parrish v. Nat'l Football League Players Ass'n*, No. C-07-00943-WHA, 2008 WL 1925208, at *7 (N.D. Cal. Apr. 29, 2008).[22] "Indeed, the class mechanism is, at times, the only mechanism available to protect the rights of those who may be less sophisticated than seasoned defense counsel." *Bias*, 312 F.R.D. at 538. CVS has provided no evidence to contradict the record that Plaintiffs have acted adequately on behalf of class members' interests. Plaintiffs are adequate class representatives.

## IV. CVS Fails To Rebut Plaintiffs' Showing That Class Treatment Is The Superior Method Of Adjudication.

### A. "Ascertainability" Is Not A Rule 23 Requirement, But Regardless, Absent Class Members Can Be Identified.

On January 3, 2017, the Ninth Circuit held that Rule 23 does not require a showing of ascertainability. *Briseno v. ConAgra Foods, Inc.*, -- F.3d --, No. 15-55727, 2017 WL 24618, at *1 (9th Cir. Jan 3, 2017) ("*Briseno I*") ("A separate administrative feasibility prerequisite to class certification is not compatible with the language of Rule 23."). Regardless, Plaintiffs do in fact furnish the Court with a feasible approach for identifying absent class members, one validated by CVS's own corporate

---

[22] CVS's reliance on *Bodner v. Oreck Direct, LLC,* 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007), is misplaced. Multiple courts have distinguished *Bodner* by observing that there – unlike in this case – the proposed class counsel had previously been reprimanded and had prior related litigation dismissed, and that the plaintiff displayed a complete lack of knowledge about the suit. *See, e.g., Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *13 (N.D. Cal. Aug. 21, 2014) (class representative adequate even where he was first contacted by class counsel); *Kanawi v. Bechtel Corp.,* 254 F.R.D. 102, 111 (N.D. Cal. 2008) ("The circumstances here are not comparable [to *Bodner*]. There is no similar air of impropriety surrounding [counsel's] conduct, and the named plaintiffs have demonstrated that they are familiar with what this case is about."); *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 572 (N.D. Cal. 2016) (same).

1  representative.  Mot. at 16; Ex. 15, Hay Decl. ¶¶ 45-46; Ex. 53, Dudley 30(b)(6) 71:4-12; Ex. 61, Hay

2  Rebuttal Decl. ¶¶ 44-51.

   **B.     Certifying 11 State Classes Is Manageable.**

3

4          CVS tries to challenge Plaintiffs' showing that class treatment is not only superior but in fact is

5  the only feasible way to resolve the consumer claims in this case, asserting that *In re ConAgra Foods*

6  *Inc.*, 90 F Supp. 3d 919 (C.D. Cal 2015), one of Plaintiffs' primary authorities for certifying 11 single-

7  state classes, is an "outlier."  Opp. at 32-36.  But the Ninth Circuit just this month unanimously affirmed

8  the well-reasoned *ConAgra* opinion, which certified 11 state classes for UDAP claims, including

9  California and several other states for which certification is sought here.  *Briseno I*, 2017 WL 24618, at

10 *1; *see also Briseno v. ConAgra Foods, Inc.*, No. 15-55727, 2017 WL 53421, at *1 (9th Cir. Jan. 3,

11 2017) ("*Briseno II*").  The Ninth Circuit held that where, as here, state law claims "raise common

12 [predominating] issues," certification of 11 single-state classes is appropriate, particularly in a case

13 where "the likely recovery is too small to incentivize individual lawsuits, and the realistic alternative to

14 class litigation would be no adjudication at all."  *Briseno II*, 2017 WL 53421, at *2.

15         The Court should reach the same result here.  The "small recovery" potentially available to each

16 class member ensures that there is "no realistic alternative" to litigating these consumer claims on a

17 class-wide basis.  *Briseno II*, 2017 WL 53421, at *2; *see also Briseno I*, 2017 WL 24618, at *7.  CVS

18 argues that the Court cannot give common instructions because the law is not "uniform" across the

19 eleven states.  Opp. Exs. 7-10.  But the elements CVS alleges differ or are missing – such as the

20 requirement under several states' consumer protection statutes that the plaintiff be a consumer – either

21 do not differ at all, or are not at issue in this case.  *See* Ex. 67, Plaintiffs' Rebuttal Cause of Action Chart.

22 The Ninth Circuit in *Briseno I* stated that "courts should not refuse to certify a class merely on the basis

23 of manageability concerns," 2017 WL 24618, at *6 (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d

24 654, 663 (7th Cir. 2015)), but *ConAgra* and numerous other courts have found certification of single

25 state classes, involving similar selected state laws, to be manageable.[23]

26 ───────────────

27 [23] *See also Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015), *cert. denied,* 136 S. Ct. 1493
   (2016) (affirming the district court's decision certifying five single-state consumer classes); *Goldemberg*

28 *v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374 (S.D.N.Y. 2016) (certifying three
   single-state consumer classes); *Petersen v. Costco*, 312 F.R.D. 565, 582 (C.D. Cal. 2012) (certifying

1    In short, the 11 state classes here could be tried together in a readily manageable manner.[24]

2    **V.   INJUNCTIVE RELIEF IS APPROPRIATE.**

3    That CVS terminated the HSP program after Plaintiffs filed suit does not negate the propriety of

4    the injunctive relief Plaintiffs seek.  Such an injunction would stop CVS from reporting inflated U&C

5    prices, regardless of whether CVS is directly operating an HSP-type program; as Dr. Hay's analysis

6    shows, CVS's reported U&C prices are inflated even if one does not consider its HSP prices.  *See supra*

7    II.E.  Such a change in CVS's conduct would irrefutably avoid further injury for every class member, as

8    required by the Ninth Circuit.  *Parksons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014).  Further, contrary

9    to CVS's argument, the injunction is wholly independent of the monetary relief that Plaintiffs seek for

10   the retrospective harm caused by the inflated U&C prices CVS has already reported.  All that Plaintiffs

11   want, for themselves and all class members, is to be charged the correct amounts for the prescription

12   drugs that they need when using insurance.  Rule 23(b)(2) injunctive relief will achieve that result.

13   **CONCLUSION**

14   For all of the foregoing reasons as well as those set forth in Plaintiffs' motion and supporting

15   papers, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification.

16   Dated:  January 9, 2017                              Respectfully submitted,

17                                                        By: */s/ Bonny E. Sweeney*

18   Pat A. Cipollone, P.C. (admitted *pro hac vice*)
     Rebecca R. Anzidei (admitted *pro hac vice*)
19   Robert B. Gilmore (admitted *pro hac vice*)         Bonny E. Sweeney (Cal. Bar No. 176174)
     STEIN MITCHELL CIPOLLONE MISSNER               Richard Lewis (admitted *pro hac vice*)
20    & BEATO LLP                                         HAUSFELD

21   Elizabeth C. Pritzker (Cal. Bar No. 146267)
     Jonathan K. Levine (Cal. Bar No. 220289)
22   Bethany L. Caracuzzo (Cal. Bar No. 190687)
23   PRITZKER LEVINE LLP

24

25

26   _____
     nine single-state classes and finding manageability can be dealt with through careful trial planning—
27   particularly where some claims are "virtually identical"); *AWP*, 230 F.R.D. at 85 (certifying numerous
     single-state consumer classes); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 702 (S.D. Fla. 2004).
28   [24] Alternatively, the Court may try less than 11 state classes in one trial, utilizing the single state class
     bellwether trial model the *AWP* court employed.  252 F.R.D. at 96–97.