Enu Mainigi (*Pro Hac Vice*)
F. Lane Heard III (*Pro Hac Vice*)
Grant A. Geyerman (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

Edward W. Swanson (State Bar No. 159859)
August Gugelmann (State Bar No. 240544)
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
Telephone:  (415) 477-3800
Facsimile:  (415) 477-9010

*Attorneys for CVS Pharmacy, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CHRISTOPHER CORCORAN, et al., | No. 15–CV–03504–YGR |
| Plaintiffs, | |
| v. | **CVS PHARMACY, INC.'S NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| CVS PHARMACY, INC., | |
| Defendant. | Date:  July 18, 2017<br>Time:  2 p.m. PST<br>Courtroom:  1<br>Judge:  Honorable Yvonne Gonzalez Rogers |

# NOTICE OF MOTION AND MOTION

**TO:  THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 18, 2017, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 1, 4th Floor, of this Court, located at 1301 Clay Street, Oakland, California 94612, Defendant CVS Pharmacy, Inc. ("CVS") will and hereby does move the Court for summary judgment on each remaining cause of action in Plaintiffs' Third Amended Complaint ("TAC") [Dkt. No. 101].

This Motion is made pursuant to Federal Rule of Evidence 56 on the grounds that there is no genuine dispute as to any material fact and that CVS is therefore entitled to judgment as a matter of law.

CVS's Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Supporting Separate Statement of Facts, the declaration and exhibits attached hereto, any reply memorandum, the orders, pleadings, and files in this action, and such other matters as may be presented at or before the hearing.

Dated:  June 6, 2017

Respectfully submitted,

By: /s/ Grant A. Geyerman
Enu Mainigi (*Pro Hac Vice*)
F. Lane Heard III (*Pro Hac Vice*)
Grant A. Geyerman (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP

Edward W. Swanson (State Bar No. 159859)
August Gugelmann (State Bar No. 240544)
SWANSON & McNAMARA LLP

Attorneys for CVS Pharmacy, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

STATEMENT OF ISSUES TO BE DECIDED .......................................................................... v

INTRODUCTION ........................................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................................... 3

    A.    The HSP Program. ........................................................................................... 3

    B.    PBMs and TPPs Agreed that the HSP Price Was Not the U&C Price. .......... 5

        1.    Express Scripts. ................................................................................. 5

        2.    Caremark. ......................................................................................... 6

        3.    Medco. ............................................................................................. 7

        4.    Optum. ............................................................................................. 8

        5.    MedImpact. ...................................................................................... 8

        6.    Aetna .............................................................................................. 9

    C.    The Six Intermediaries Adjudicated Plaintiffs' At-Issue Transactions. .................. 9

ARGUMENT ............................................................................................................................. 11

I.    THE UNDISPUTED EVIDENCE IS THAT CVS MADE NO MISREPRESENTATION ...................................................................................... 11

    A.    CVS Did Not Misrepresent the U&C Price. ................................................ 12

        1.    The HSP price fell outside the contract definition of U&C price. ............. 12

        2.    PBMs decided membership program prices were not U&C before CVS launched HSP. ........................................................................ 13

        3.    CVS openly communicated its view that the HSP price was not the U&C price. ..................................................................................... 14

        4.    PBMs did not contest CVS's U&C submissions. ..................................... 14

    B.    CVS Did Not Misrepresent the Nature or Availability of the HSP Program. ....................................................................................................... 15

        1.    No Affirmative Misrepresentations about HSP. ........................................ 15

        2.    No Fraudulent Omissions About HSP. ..................................................... 15

    C.    All Plaintiffs' Claims Fail Absent a Misrepresentation. ............................... 16

        1.    Fraud and Negligent Misrepresentation. ................................................... 16

        2.    Unjust Enrichment. ........................................................................ 16

        3.    Consumer Protection Claims. ........................................................... 17

II.    THE UNDISPUTED EVIDENCE IS THAT THE PBMs AND PLAINTIFFS DID NOT RELY ON ANY MISREPRESENTATION. ............................................... 19

    A.    The PBMs Did Not Reasonably Rely On Any Misrepresentation About the U&C Price. ......................................................................................... 20

        1.    Actual knowledge. ........................................................................ 20

        2.    Constructive knowledge. ................................................................ 21

    B.    Plaintiffs Did Not Rely on Any Misrepresentation About the U&C Price. ........... 23

        1.    Plaintiffs had constructive knowledge. ..................................................... 23

        2.    Plaintiffs continued to patronize CVS pharmacies. .................................. 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bowring v. Sapporo U.S.A., Inc.*, --- F.Supp. 3d ---, 2017 WL 902151
(E.D.N.Y. Feb. 10, 2017) ............................................................................19

*Campmor, Inc. v. Brulant, LLC*, 2011 WL 2745922 (D.N.J. July 12, 2011) ..............................19

*Carranza v. Lewis*, 2017 WL 1050538 (N.D. Cal. Mar. 17, 2017) ................................................11

*Cooper v. Sirota*, 37 F. App'x 46 (3d Cir. 2002).........................................................................19

*Corcoran v. CVS Health Corp.*, 2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) .................. passim

*Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 989 (N.D. Cal. 2016)..........................15, 16

*Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505 (D.N.J. 2008).....................................................19

*English v. Apple Inc.*, 2017 WL 106299 (N.D. Cal. Jan. 11, 2017)...............................................18

*In re Kirsh*, 973 F.2d 1454 (9th Cir. 1992).....................................................................................20

*In re Pharm. Indus Average Wholesale Price Litig.*, 252 F.R.D. 83
(D. Mass. 2008)......................................................................................... passim

*Intl. Ins. Co. of Hannover v. ACW Constr., Inc.*, 2015 WL 6954962
(N.D. Cal. Nov. 10, 2015)..........................................................................15

*Maricopa Cty. v. Office Depot, Inc.*, 2014 WL 6611562
(D. Ariz. Nov. 21, 2014) ...........................................................................17, 18

*Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579 (S.D.N.Y. 2008)...........................................20

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713
(11th Cir. 2014).........................................................................................16

*Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32 (D. Mass. 2006)..................................19

*Red v. Kraft Foods, Inc.*, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011)......................................25

*Reznik v. IBM*, 2016 WL 3162229 (N.D. Cal. June 7, 2016) .......................................................11

*Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330 (S.D. Fla. 2011),
*aff'd per curiam*, 438 F.App'x 568 (11th Cir. 2012)...............................................18

*Soriano v. Countrywide Home Loans, Inc.*, 2011 WL 2175603
(N.D. Cal. June 2, 2011) ............................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 118 F. Supp. 3d 412
 (D. Mass. 2015).............................................................................................................22

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016).......................2, 22

## STATE CASES

*Feagins v. Tyler Lincoln-Mercury, Inc.*, 277 S.W.3d 450 (Tex. App. 2009) ...............................19

*Fla. Bar v. Frederick*, 756 So. 2d 79 (Fla. 2000) ...........................................................................15

*Haisch v. Allstate Ins.*, 5 P.3d 940 (Ariz. Ct. App. 2000)..............................................................18

*Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466 (Ct. App. 2008)................................................................24

*Levine v. Blue Shield of Cal.*, 117 Cal. Rptr. 262 (Ct. App. 2010)................................................17

*Peabody v. Northgate Ford, Inc.*, 794 N.Y.S.2d 452 (App. Div. 2005)........................................19

*Peterson v. First Nat'l Bank of Ariz.*, 417 P.2d 728 (Ariz. Ct. App. 1966)...................................15

*Princess Cruise Lines, Ltd. v. Super. Ct.*, 101 Cal. Rptr. 3d 323, 329
 (Ct. App. 2009)………..................................................................................................25

*Riddick v. Quail Harbor Condo. Ass'n*, 7 S.W.3d 663 (Tex. App. 1999) ....................................19

*Ruane v. Amore*, 677 N.E.2d 1369 (Ill. App. Ct. 1997)................................................................18

*Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213 (Ill. 2004) ....................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 56..............................................................................................................................10

Restatement (Second) of Contracts § 201(1) ...................................................................................15

Restatement (Second) of Torts § 541................................................................................................20

Restatement (Third) of Agency § 5.03 .............................................................................................24

CVS PHARMACY, INC.'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT
15-CV-03504-YGR

## STATEMENT OF ISSUES TO BE DECIDED

Whether there is any genuine dispute of material fact that:

1.      CVS Pharmacy, Inc. ("CVS") made *no misrepresentation* by its non-submission of the Health Savings Pass ("HSP") program price as its usual and customary ("U&C") price, in light of the fact that:

    a.   U&C price is a defined term in CVS's contracts with pharmacy benefits managers ("PBMs") or third-party payors ("TPPs");

    b.   The PBMs and TPPs, as the counterparties to CVS's contracts, agree that HSP pricing was not U&C pricing under their contracts;

    c.   The PBMs were aware from the HSP program's inception that CVS was not submitting the HSP price as its U&C price and have never objected to CVS's practice, including through today;

    d.   The PBMs took the same position regarding the HSP program as they had previously to membership programs offered by other pharmacies—a position formulated after internal deliberation that concluded the pricing charged to enrollees in a membership program differs from U&C pricing; and

    e.   There is no record evidence that any PBM or health insurer viewed things differently.

2.      Plaintiffs cannot demonstrate *the reliance* required for their common law and consumer protection claims, particularly given that:

    a.   PBMs and TPPs had actual or constructive knowledge that CVS was not submitting its HSP program prices as the U&C price;

    b.   The knowledge of the TPP is chargeable to Plaintiffs, who contend their insurers acted as their agents; and

    c.   Plaintiffs continued to purchase the same medications at CVS at the same prices after learning about the basis for their claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

In this consumer-fraud case, the dispositive question is whether CVS Pharmacy, Inc.'s ("CVS") non-submission of its Health Savings Pass ("HSP") program price as its "usual and customary" price was a misrepresentation to pharmacy benefits managers ("PBMs") or third-party payors ("TPPs"). The uniform answer, provided directly by the PBMs and TPPs, is "No."

CVS contracts with PBMs (primarily) or TPPs (less frequently) to participate in their pharmacy networks, and those contracts typically define the term "usual and customary" ("U&C"). The gravamen of Plaintiffs' claims is that CVS misrepresented its U&C price to PBMs (and TPPs) by submitting on electronic prescription claim records a U&C price other than the HSP price. Plaintiffs then allegedly overpaid because the PBMs did not use the lower HSP price in determining their copayments. Yet the undisputed evidence is that the PBMs—CVS's counterparties and the actual recipients of the U&C price—agreed then, and still agree, that the HSP price does not constitute the U&C price under their contracts, and that CVS made no misrepresentation. The record evidence, including testimony from *eight executives* at *six PBMs and TPPs* representing more than *80% of the market*, is undisputed on this point. There is no contrary record evidence from any PBM or TPP.

CVS launched HSP in November 2008. Well before that time, most PBMs had determined that pricing charged under a pharmacy's membership program did not constitute the pharmacy's U&C price. In a membership program, a customer takes some affirmative action like completing an application, paying a fee, or signing a waiver in exchange for preferential pricing. A membership program stands in contrast to the situation where a pharmacy simply lowers its list price charged to all customers for the drug.

In 2006, Walmart lowered its list price for all customers to $4 for popular generics. Walmart's announcement was seismic, causing competitors to respond and catching the attention of PBMs and TPPs, who debated internally whether the new discount prices constituted the U&C price for those drugs. In 2007, Walgreens took a different approach, introducing a membership program that offered only program members discounted prices on certain generic drugs. Rite

1    Aid introduced a membership program shortly thereafter.  Of the three national pharmacy chains,

2    CVS was last to the party.  By the time CVS launched the HSP program in late 2008, most

3    PBMs had considered the interaction between membership programs and their contract

4    definitions of U&C.  And they had already concluded membership prices were ***not*** U&C prices.

5            From the program's inception, CVS did not submit the HSP price as its U&C price.  The

6    undisputed evidence demonstrates that CVS's counterparties knew this was CVS's practice, they

7    agreed with CVS, and they raised no objection despite having a financial incentive to do so.  In

8    this case, the counterparties have each testified that CVS's conduct was appropriate and its U&C

9    submissions were not misrepresentations.  Because Plaintiffs' causes of action are all predicated

10   on a misrepresentation of the U&C price, CVS is entitled to summary judgment on all claims.

11           Even assuming that CVS had misrepresented the U&C price, summary judgment would

12   be appropriate because the undisputed facts foreclose reliance.  The PBMs (and TPPs) knew that

13   CVS was not submitting the HSP price as its U&C price, and that fact demonstrates that they did

14   not rely on any alleged misrepresentation, let alone reasonably relied.  Given the "outpouring of

15   publicity" covering HSP over the years, no PBM could have reasonably been misled by CVS's

16   U&C prices.  *See U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 205, 212 (1st

17   Cir. 2016) (observing publicity on HSP made "crystal clear that CVS was not providing its HSP

18   prices to Medicaid" and "left no doubt about CVS's insistence that its HSP prices should not be

19   considered when calculating U&C").

20           Further, Plaintiffs had constructive knowledge of the information known to their TPPs,

21   defeating the reliance requirement of their claims.  Even setting the insurer's knowledge aside,

22   the Plaintiffs themselves continued to purchase drugs at CVS at the same prices even after

23   learning about the basis for this case.  Their doing so reflects that they would have made the

24   same purchases even in the absence of CVS's alleged misrepresentations.  Plaintiffs' continued

25   purchases at CVS, standing alone, foreclose reliance and entitle CVS to summary judgment.

26

27

28

1

**FACTUAL BACKGROUND**

2

    **A.     The HSP Program.**

3

      In September 2006, Walmart announced a "market changing" event in the pharmacy and

4 prescription-drug-insurance industries: For all customers, the company lowered the price for a

5 30-day supply of many popular generic drugs to \$4.  UF 35.[1]  A year later, Walgreens responded

6 with a program that allowed customers to enroll in a membership program in order to obtain

7 reduced pricing on generic medicines.  Rite Aid soon followed with its own membership

8 program.  UF 39.  By November 2008, more than a half-dozen companies—including

9 Albertsons, Kmart, Kroger, Safeway, and Target—had either lowered their list prices (like

10 Walmart) or adopted membership program (like Walgreens) for generic drugs.  UF 36, 39.

11

      Not until November 9, 2008 did CVS launch its own membership program, called Health

12 Savings Pass ("HSP").  UF 2.  The HSP program required members to complete an enrollment

13 form, agree to terms and conditions (including a waiver or authorization under HIPAA), and pay

14 an annual membership fee (\$10 through December 31, 2010, and \$15 thereafter).  UF 5.  HSP

15 provided members a 90-day supply of approximately 400 generic drugs for a fixed price (\$9.99

16 through December 31, 2010, and \$11.99 thereafter).  UF 6.  The membership price was a

17 minimum price:  HSP enrollees paid \$9.99/\$11.99 per prescription, even if they purchased less

18 than a 90-day supply.  UF 8.  HSP members received discounts on services at Minute Clinics in

19 CVS pharmacies.  UF 6.

20

      CVS discontinued the HSP program on February 1, 2016.  UF 2.

21

      The HSP program was always small.  Based on CVS's transactions in Plaintiffs' 11

22 states, HSP never accounted for more than 1.12% of CVS's total prescription sales in a given

23 year.  UF 9.  The program was small even relative to CVS's "cash" business (i.e., prescriptions

24 purchased without insurance or another form of benefit, such as discount cards or membership

25 programs).  Cash customers purchasing HSP-eligible drugs outnumbered HSP members by more

26 than 25 to 1 in Plaintiffs' states.  UF 10.  In the Plaintiffs' states, there were 27.2 million cash

27

----

[1] Undisputed fact ("UF") citations appear in CVS's Supporting Separate Statement of Facts.

28

transactions of HSP-eligible drugs from 2009 through 2015 compared to 5.8 million HSP transactions.  UF 12.  Cash transactions far outnumbered HSP transactions in every year of the program, in each of the Plaintiffs' states.  UF 11.

CVS created the HSP program, not to attract new customers, but to retain current customers who might be wooed by competitors' lower prices, as the program's implementation "Pharmacy Team Huddle Guide" reflects.  UF 3.  The program was a better value to only a narrow type of customer—the frequent purchaser of prescriptions who had no insurance or other form of prescription benefit.  The typical CVS cash customer purchases only one or two prescriptions per year, and 78% of such customers would have paid *more* by buying their drugs through the HSP program.  UF 13–14.  The enrollment fee limited interest in the program to a statistically significant degree, according to a consumer survey.  UF 16.

Despite its expected limited appeal, CVS heavily publicized HSP at launch.  The company posted details about the program on its website, issued a press release, secured coverage on NBC's *Today* show, and placed an "op-ed" piece by the CEO in *The Boston Globe*.  UF 18.  Publications across the country covered the story and national and local news featured HSP on programs broadcast to an estimated 7 million viewers.  UF 19–20.  CVS also announced HSP during its 2008 Third Quarter earnings call, which was attended by investors and a number of PBMs and TPPs, including Express Scripts, Caremark, Medco, Prime Therapeutics, RxAmerica, Aetna and UnitedHeathcare.  UF 18.

PBMs and TPPs knew about HSP when it launched.  UF 48.  Express Scripts "was aware of CVS having a membership program."  PX-618 ¶ 12 (Compton Decl.).  Caremark learned of HSP "[a]t or within several months of . . . launch."  PX-701 ¶ 22 (Lavin Decl.).  Optum knew "that, until early in 2016, CVS retail pharmacies offered a membership-based program."  PX-691 ¶ 3 (Reichardt Decl.).  Medco was "aware that CVS offered a program called Health Savings Pass."  PX-662 ¶ 10 (Strein Decl.).  And MedImpact recalled that CVS had an "enrollment program" that "began somewhere in the 2007 or '8 range."  DX-400 at 28:16–29:8 (Barre Dep.).  One of the nation's largest health plans, Aetna, was negotiating a new contract with CVS in late 2008 when it "learned that CVS was launching a generic drug membership program called

– 4 –

1  Health Savings Pass."  DX-321 ¶¶ 7–8 (Zavalishin Decl.).

2  CVS told PBMs and TPPs that it did not consider the HSP price to be the U&C price.  UF

3  48 –51.  It prepared a standard written description of HSP for use in answering questions about

4  the program, UF 50, and, in that description, explained that "CVS's [Health Savings Pass]

5  program is very different from the discount pricing Wal-Mart and other retailers have

6  introduced" and that HSP "does not constitute [CVS's] Usual and Customary pricing . . . ."  DX-

7  434 at 1–2.  CVS executives also advised their principal counterparties, the PBMs, that HSP was

8  not CVS's U&C price.  UF 49.  They told Caremark, for example, that "CVS would not be

9  submitting the HSP program price as its usual and customary price" PX-701 ¶ 22; Medco "that

10 the Health Savings Pass was not included in [the U&C] definition" DX-429 at 105:10–15,

11 114:6–11 (Wingate Dep.); Express Scripts that "Health Savings Pass . . . [is] not our usual and

12 customary" *id.* at 124:11–125:13; and MedImpact the same message, DX-430 at 122:19–124:4

13 (Wingate Dep.).

14       **B.    PBMs and TPPs Agreed that the HSP Price Was Not the U&C Price.**

15       The undisputed evidence—from eight executives at six of CVS's largest contract

16 counterparties—reflects that: (1) the PBMs (and TPPs) agreed that the HSP price did not meet

17 the contract definitions of the "usual and customary" price, UF 55, 57, 58, 62, 64, 69; (2) the

18 PBMs reached this conclusion after a considered, internal decision-making process, UF 43; and

19 (3) in most cases, the PBMs did so before CVS launched the HSP program in November 2008,

20 UF 45–47.  There is no contrary record evidence.

21       The six counterparties represent five PBMs (Express Scripts, Caremark, Medco,

22 MedImpact, Optum) and one TPP (Aetna) (collectively, "the Six Intermediaries").  Except for

23 Aetna, each counterparty is part of Plaintiffs' revised class definition.

24       **1.    Express Scripts**.  After Walmart's $4 announcement in 2006, Express Scripts

25 "had awareness that [generic drug] programs were in the market place . . . through NACDS

26 [National Association of Chain Drug Stores]" and industry publications such as "Drug Store

27 News."  Once membership programs began in 2007, Express Scripts "looked at the way the

28

CVS PHARMACY, INC.'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT
15-CV-03504-YGR

programs were structured"; there was "some discussion around [them]"; and the "consensus was . . . these programs were exempt from [Express Scripts'] contract."  The company made the "business decision" that when the "[p]atient had to choose to participate in the program . . . [Express Scripts'] position . . . was this was outside of the usual and customary retail pricing." DX-401 at 19:16–22:4 (Compton Dep.).

Regarding CVS's program specifically, Express Scripts considered HSP a "legitimate membership program" because "CVS did not make their membership prices available to all cash paying customers," but "required enrollment and payment of a fee."  HSP purchases thus were not "'cash transactions' for purposes of the U&C definition in the Contract, nor did Express Scripts interpret the terms 'discounts' and 'special promotions' in the Contract [U&C definition] as encompassing the membership price."  Express Scripts was "aware that CVS was not submitting . . . the membership program prices as [the] U&C price" and "did not object to CVS's approach because Express Scripts understood that the membership program price did not meet the definition of the U&C, as set forth in the Contract."  PX-618 ¶¶ 17–18 (Compl. Decl.).

Express Scripts' position is consistent.  It does not "have *any* . . . contractual agreement where a membership program would be included in the definition of usual and customary," according to its Vice President of Retail Pharmacy and Contracting.  DX-401 at 52:19–53:6.[2]

**2.    Caremark**.  The Sr. Vice President of Caremark's Pharmacy Network Administration testified that, "after the Walgreens . . . program came out [in 2007] . . . [Caremark] had to evaluate it because that was really the first club . . . plan . . . that came out.  So at that point, [Caremark] had to evaluate that and make a determination on how [it was] going to move forward."  In deciding whether membership pricing fell within its contracts, Caremark consulted with "client-facing management teams" and "worked with [its] legal team to evaluate [the program] based on [Caremark's] contract."  DX-403 at 105:22–106:25 (Lavin Dep.).  The company developed a policy distinguishing "Set Price Generic Programs" from "Club Plans." UF 47.  Under that policy, Caremark treated only the Set Price Generic Program prices as a

---

[2] All emphases in this Memorandum are added unless otherwise indicated.

pharmacy's U&C price. The rationale was that under a Set Price program (sometimes called a "*Standard* Set Price Generic Program") the "preferential price is charged to every customer without limitation," whereas in a Club Plan the price is "reserved for those customers who have taken steps to enroll in a program." PX-701 ¶¶ 14–17 (Lavin Decl). By at least October 2008, it had reduced its policy to writing, which explicitly said only the "[S]et [P]rice . . . passed through as U&C." PX-703 (Caremark policy). A Club Plan price had no similar requirement. UF 45, 47.

Caremark has "always considered[] HSP a 'Club Plan'" because CVS "required customers to opt into the program, fill out an enrollment form, agree to the program's terms and conditions, and pay an annual membership fee of $10-$15 in order to access the HSP program benefits." Thus, "CVS . . . was not required nor expected to submit its HSP program price as its usual and customary price on Caremark claims" under the parties' contract. PX-701 ¶¶ 19–20. Caremark did not consider the contract's reference to "applicable discounts offered to attract customers" to change the analysis. *Id.* ¶¶ 8, 21. Caremark's position on Club Plans and U&C "has been consistent. Across time, across pharmacies." DX-403 at 107:20–23.

**3.** **Medco**. By late 2008 Medco had adopted a "policy" that "membership plans are not considered U&C"—a policy the company subsequently maintained. Medco's policy "wasn't based on just CVS, it was [also based on] other membership programs that may have existed." DX-406 at 88:20–91:3 (Strein Dep.). In formulating its policy, Medco deliberated internally, including with in-house lawyers, as to whether membership program prices should generally be considered the U&C price. PX-662 ¶ 9 (Strein Decl.). Medco determined that member prices were not U&C because that price "wasn't available to all [people] . . . it was available to some, who chose to take additional actions." DX-406 at 91:7–94:22.

Consistent with this policy, Medco believed that "CVS was not required to submit the HSP price as its U&C price on Medco claims" and that "Medco did not consider membership program prices to be 'applicable discounts'" under its definition of U&C price. PX-662 ¶¶ 11, 13. The basis of Medco's position was "CVS required HSP members to affirmatively opt into the program." PX-662 ¶ 11. HSP prices were only charged "to customers who had paid a fee to join," and the "regular customer paying the retail price (i.e., the cash customer) who did not join

1   the program was not entitled to the same pricing structure." PX-663 ¶ 10 (Spadaccino Decl.).

2   Medco memorialized this understanding in an April 2009 letter that "communicate[d] to . . . CVS

3   that the . . . membership program[] . . . and the pricing therein did not constitute U&C pricing for

4   purposes of submitting claim[s] . . . to Medco." DX-406 at 151:15–20.

5          **4.**    **Optum**. Optum (f/k/a Prescription Solutions) did not interpret the definitions of

6   U&C in its contracts "to require CVS to submit its Health Savings Pass price as its U&C price."

7   Nor did Optum "consider HSP members . . . 'cash customers'" or "interpret the . . . phrase

8   'applicable discounts' [in the contracts] to encompass the Health Savings Pass." PX-691 ¶¶ 10–

9   11 (Reichardt Decl.). Optum came to this understanding after internal "strategic session[s]"

10  involving senior executives. DX-404 at 206:22–207:13 (Reichardt Dep.). For Optum, "it was

11  the action of the member or the customer enrolling" and "accepting the terms and conditions by

12  initialing or signature" that rendered the membership price something other than the U&C price.

13  *Id.* at 74:1–21, 208:6–17. Optum took a "consistent position" that if any pharmacy "required a

14  customer to enroll," then that pharmacy was not required "to submit the program's prices as

15  U&C." PX-691 ¶ 12. "[N]o one chain was treated differently and [a] consistent approach was

16  applied to the [Optum pharmacy] network." DX-404 at 205:24–206:10.

17         Because Optum knew that "to access the HSP program pricing, CVS required customers

18  to complete an enrollment form" and "agree to the program's terms and conditions," Optum did

19  not "require CVS to submit its Health Savings Pass price as its U&C price." PX-691 ¶¶ 4, 11.

20         **5.**    **MedImpact**. For MedImpact, the U&C price of any particular drug was "[the]

21  price of that product [] at that store at that given point in time" for "someone that has walked [in]

22  off the street" without any form of prescription benefit. MedImpact distinguished between

23  "active" and "passive" pricing. In a "passive model," the lower price is "obtained by a consumer

24  without taking any action" and, thus, the price is the pharmacy's U&C price. By contrast, in the

25  "active scenario . . . a person had . . . either registered or gave their name and information," and

26  anybody "not enrolled in that program would not be eligible to receive that pricing." DX-400 at

27  24:6–27:3 (Barre Dep.).

28

Applying these principles, MedImpact did not consider HSP members "cash customers," did not view HSP prices as "applicable discounts" under its U&C definition, and did not require CVS to submit the HSP program price as its U&C price. *Id.* at 30:16–33:7. It reasoned that because CVS had a "membership program . . . that a consumer actively enrolled in," the HSP price was active and thus "different than a usual and customary" price. *Id.* at 28:4–7.

**6.** **Aetna**. Aetna, one of the nation's largest insurers, believed "CVS did not need to submit the HSP program price as its U&C price" and that the HSP price "was not an 'applicable customer discount,' as [Aetna] understood that phrase [in its U&C definition]." Aetna took the same position regarding other membership programs: "By the time CVS had launched HSP, other pharmacies' membership programs, such as the Walgreens program, were available in the marketplace . . . . Aetna did not require those other pharmacies to submit their program prices as U&C on Aetna claims either." DX-321 ¶¶ 11–13 (Zavalishin Decl.).

Aetna learned about HSP directly, in late 2008, while negotiating a new contract with CVS. *Id.* ¶¶ 9–10. The week after HSP launched, CVS and five Aetna representatives, including two vice presidents and the COO, met to review the HSP program. UF 67. Several weeks later, CVS sent Aetna its standard description of the HSP program, which stated that the HSP price "does not constitute Usual and Customary pricing." UF 68. Aetna agreed, reasoning that "because HSP required enrollment and charged a fee, the HSP price was not CVS's 'cash price' [as used in the U&C definition]." DX-321 ¶ 13.

*     *     *

There is no record evidence that any PBM or TPP holds a contrary view.

**C.    The Six Intermediaries Adjudicated Plaintiffs' At-Issue Transactions.**

Fifteen Plaintiffs have pending claims. The Six Intermediaries adjudicated at least some prescriptions purchased by 12 of the 15 Plaintiffs and over half of the purchases that Plaintiffs' damages expert identified as at-issue purchases. UF 79–81. The table below identifies the

number of at-issue purchases that the Six Intermediaries adjudicated:[3]

| Adjudicator | Plaintiff |
|---|---|
| Aetna | Avis (4) |
| Caremark | Avis (11); Brown (7); Gilbert (4); Jenks (8); Clark (22); Samuelson (2); Washington (5) |
| Express Scripts | Caine (19); Garber (50) |
| Medco | Samuelson (4) |
| MedImpact | Garber (47) |
| Optum/Prescription Solutions | Barrett (30); Clark (50); Corcoran (11); Wulff (8) |

With the exception of Medco, CVS's master contract with each of the Six Intermediaries includes a definition of U&C.  Medco's U&C definition is in its Provider Manual.

Four of the six master contracts expressly state that CVS and the PBM are the sole intended beneficiaries of the contracts and that there are no third-party beneficiaries.  Medco's contract is illustrative:

> 10.5  Third Party Beneficiaries.  ***None of the provisions of this Agreement shall be for the benefit of or enforceable by any third party, including, without limitation***, any creditor or any other party hereto[,] ***any Covered Person***[,] or any Medco Plan Sponsor.  No such third party shall obtain any right under any provision of this Agreement or shall by reason of any such provision make any claim in respect of any debt, liability or obligation (or otherwise) against any party hereto.

PX-677 ¶ 10.5 (emphasis added).[4]

## LEGAL STANDARD

The Court knows well the requirements for summary judgment.  *See* Fed. R. Civ. P. 56;

---

[3] The declaration of CVS's Susan Colbert (DX-426) substantiates the table's information. Further, Plaintiffs Clark and Gilbert have an additional 38 and 33 at-issue purchases, respectively, not reflected in the table.  Their absence reflects CVS's inability to determine the contract governing certain lines-of-business after Express Scripts' 2012 merger with Medco.

[4] CVS's master contracts with the Six Intermediaries are Exhibits DX-300 and PX-532, -546, -674, -677, -695, and -785.  At DX-448, a table compares the contracts' U&C definitions and third-party-beneficiary provisions.  For Express Scripts and Aetna, the prohibition on third-party beneficiaries is implicit from the contract's structure, which contains an explicit provision identifying only certain intended third-party beneficiaries in specific circumstances.

1  *Carranza v. Lewis*, 2017 WL 1050538, at *10 (N.D. Cal. Mar. 17, 2017); *Reznik v. IBM*, 2016

2  WL 3162229, at *2 (N.D. Cal. June 7, 2016).

3                                    **ARGUMENT**

4        CVS is entitled to summary judgment on all of Plaintiffs' claims for two independent

5  reasons.  First, the undisputed evidence reflects that CVS did not misrepresent the U&C price.

6  The PBMs knew about the HSP program (and similar membership programs) and agreed that the

7  HSP price was not CVS's U&C price.  Because the allegation that CVS misled the PBMs by

8  failing to submit the HSP program price as the U&C price is the premise of each of Plaintiffs'

9  claims, each cause of action fails.

10       Second, even assuming that CVS misrepresented the U&C price (it did not), the

11 undisputed evidence reflects that Plaintiffs did not rely on the misrepresentation.  Given their

12 broad knowledge of the HSP program (and similar membership programs), the PBMs did not

13 ***reasonably*** rely on any misrepresentation, and TPPs' actual or constructive knowledge of the

14 alleged misrepresentation is chargeable to Plaintiffs.  In addition, these Plaintiffs continued to

15 purchase drugs at CVS after consulting with counsel and, in some cases, even after joining this

16 lawsuit.  That continued patronage of CVS pharmacies establishes a lack of reliance.

17

18 **I.     THE UNDISPUTED EVIDENCE IS THAT CVS MADE NO
        MISREPRESENTATION.**

19       Plaintiffs allege that "defendants misrepresented the true U&C price to the PBMs and

20 TPPs," and that allegation is "[t]he gravamen of plaintiffs' theory."  *Corcoran v. CVS Health*,

21 2017 WL 1065135, at *6 (N.D. Cal. Mar. 21, 2017).  It is that allegedly false statement—the

22 inaccurate U&C price—which underlies each cause in the Complaint.[5]  Plaintiffs do not argue

23 misrepresentation in any other way (e.g., a false statement to Plaintiffs, a fraudulent omission).

24

25 [5] *See, e.g.*, TAC ¶ 9 ("NATURE OF THE ACTION": "CVS . . . overcharged. . . by submitting to
   third-party payors claims for payment at prices that CVS has fraudulently inflated far above its
26 usual and customary prices."); *id.* ¶ 13 ("CVS knowingly and intentionally submits falsely
   inflated 'usual and customary prices'"); *see also id.* ¶¶ 104, 112, 119, 129, 140, 148, 156, 164,
27 172, 182, 191, 200, and 208 (identifying same misrepresentation for all causes).

28

CVS PHARMACY, INC.'S NOTICE OF MOTION
                                                                  AND MOTION FOR SUMMARY JUDGMENT
                                                                                    15-CV-03504-YGR

The undisputed facts establish that CVS did *not* misrepresent the U&C price. The PBMs knew about HSP, knew that the HSP price was $9.99 (and later $11.99), and knew that CVS was not submitting the program price as its U&C. By the time CVS launched the HSP program, most PBMs had already evaluated whether their contracts required pharmacies to submit membership-program prices as U&C prices, and they had concluded that such special prices were outside their contractual definitions of U&C. The PBMs (and TPPs) thus did not expect CVS to submit the HSP price as the U&C price, and they were not misled when CVS did not do so, which entitles CVS to summary judgment on each cause of action.

### A.      CVS Did Not Misrepresent the U&C Price.

#### 1.      The HSP price fell outside the contract definition of U&C price.

The undisputed facts—based on the testimony of executives from the Six Intermediaries, collectively representing more than 80 percent of the industry—demonstrate that CVS did *not* misrepresent the U&C price when it did not treat the HSP program price as U&C. That testimony is uniform and unequivocal:

- Express Scripts: "Q: I heard you say that you didn't expect CVS to submit the HSP prices as CVS's usual and customary prices. . . . I'm just trying to understand what you did to get that knowledge? . . . A: U&C is a defined term within [Express Scripts'] contract. [Express Scripts] had taken a position that these programs were outside of their usual and customary pricing and wouldn't be subject to the contract that we held with CVS." DX-401 at 56:12–57:1.

- Caremark: "[T]he HSP program was a club program. . . . [M]embers needed to enroll, and . . . the prices in that program are not usual and customary. Caremark did not consider them [U&C]. And that was consistent." DX-507 at 20:11–16.

- Medco: "Q: The reason . . . [Medco] decided that membership club prices like an HSP price should not be considered as part of U&C is because they had a fee that people had to pay to join? A: Well, actually, it was because this was a subset of the membership, [HSP] wasn't available to all . . . our beneficiaries, it was available to some, who chose to take additional actions." DX-406 at 91:7–19.

- MedImpact: "Q: [W]as CVS required to submit its membership program price as its usual and customary price? . . . A: No. We did not require them to." DX-400 at 30:18–31:2.

- Optum: "Q: Neither Prescription Solutions nor OptumRx interpreted any aspect of the definition of 'usual and customary price' in that [1999] contract as encompassing the

Health Savings Pass program price; correct?  A: Correct.  OptumRx did not interpret any aspect of the definition of 'usual and customary price' in the 2015 agreement that replaced the 1999 agreement as encompassing the Health Savings Pass program price; correct?  A: Correct."  DX-404 at 205:3–16.

- Aetna: "I agreed with CVS that under our Agreement, CVS did not need to submit the HSP program price as its U&C price."  DX-321 ¶ 12.

Plaintiffs have not presented contrary evidence from any PBM or TPP.  *See Soriano v. Countrywide Home Loans, Inc.*, 2011 WL 2175603, at *2 (N.D. Cal. June 2, 2011) ("[O]nce the moving party has satisfied its initial burden of production, the burden of proof shifts to the nonmovant to show that that there is a genuine issue of material fact." (quotes omitted)).

## 2. PBMs decided membership program prices were not U&C before CVS launched HSP.

The undisputed facts establish that the common understanding of CVS and the PBMs that membership program prices are not the U&C price was not the product of a "secret, undocumented, understanding."  Reply in Supp. of Pls.' Mot. for Class Cert. (Jan. 9, 2017) ("Class Reply") [Dkt. No. 215] at 11.  Rather, the evidence shows that most PBMs made this determination well before November 2008, when CVS launched HSP.  PBMs confronted membership program earlier because, after Walmart's $4 announcement, retailers, grocers, and pharmacy chains launched different types of programs that required careful consideration of what prices were and were not U&C.  A former Aetna vice president explained:

> [W]hat Walmart did was market disruptive, market changing. . . . And in the retail and pharmacy benefit management space, that was huge . . . This was transformative in the retail space.
> And on the payer side of the equation with pharmacy benefit managers, when you consider the billions of dollars of [sic] year – a year that transact, this had a level of awareness.  ***Everybody saw it.  Everybody knew about it.  Everybody discussed it.  And everybody had eyes wide open as to what these programs were, how they functioned, and what their long-term impact [was]***.

DX-407 at 87:4–88:7 (Zavalishin Dep.) (emphasis added).

When Walgreens and other pharmacies started membership programs in 2007, PBMs took note, discussed them internally, and concluded that membership-program prices were not U&C.  *See supra* pp. 5–9.  By the time CVS launched HSP in 2008, Drug Benefit News, a

widely read industry publication, noted that "CVS['s] . . . program *follows those of other large retail drugstore chains*," including "Rite Aid" and "Walgreens."  DX-496 at 6.  Because CVS was late to introduce a membership program, PBMs and TPPs "did not find CVS's position—that the HSP program price was not CVS's U&C price—surprising or remarkable."  DX-321 ¶ 11.

### 3. CVS openly communicated its view that the HSP price was not the U&C price.

PBMs were aware of the HSP program, not only because of the general industry "buzz" about membership programs, but also because CVS promoted the program and stated its position that the HSP price was not the U&C price.  CVS's standard written description of the program stated that "CVS's [Health Savings Pass] program is very different from the discount pricing Wal-Mart and others have introduced," and that HSP "does not constitute Usual and Customary pricing . . . ."  DX-433 at 2.  And CVS executives communicated this information in conversations:  CVS told Medco that "the Health [Savings] Pass was not included in [the U&C] definition," and had "the same conversation" with executives at Caremark, Express Scripts, MedImpact, and other PBMs.  DX-429 at 105:10–15, 125:1–9 (Wingate Dep.); UF 49.  These undisputed facts are at odds with any claim of misrepresentation.

### 4. PBMs did not contest CVS's U&C submissions.

It is to a PBM's financial benefit to pay CVS as little as possible.  Therefore, one "can be assured that if [the PBMs or TPPs] felt that [submitting the HSP price as U&C] was required [under the contract], they'd be in touch with us [CVS]," as CVS's former vice president of contracting testified.  DX-428 at 264:14–22 (Morrison Dep.).  The PBMs knew the HSP price, and knew also that the HSP price was not the U&C price being submitted to them by CVS.  Yet no PBM ever objected.  None ever asserted that CVS *should be* submitting the HSP price as the U&C price—not even after auditing CVS's claims data.  Like the dog that didn't bark, the PBMs' decision not to object is important undisputed evidence:  It is a recognition that CVS had no obligation to submit the HSP price as the U&C price.

\* \* \*

CVS PHARMACY, INC.'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT
15-CV-03504-YGR

1    Taken together, the undisputed evidence that CVS and its counterparties agreed that the

2    HSP price was not the U&C price forecloses any claim of misrepresentation.  It is axiomatic that

3    "[w]here the parties [to a contract] have attached the same meaning to a promise or agreement or

4    a term thereof, it is interpreted in accordance with that meaning."  Restatement (Second) of

5    Contracts § 201(1) (Am. Law Inst. 1981); *see also Intl. Ins. Co. of Hannover v. ACW Constr.,*

6    *Inc.*, 2015 WL 6954962, at *3 (N.D. Cal. Nov. 10, 2015) (Rogers, J.) ("The fundamental rules of

7    contract interpretation are based on the premise that the interpretation of a contract must give

8    effect to the 'mutual intention' of the parties.") (cite and quote omitted).[6]

9        **B.    CVS Did Not Misrepresent the Nature or Availability of the HSP Program.**

10           **1.    No Affirmative Misrepresentations about HSP.**

11    The undisputed evidence is that CVS did not make any misrepresentations to the

12    Plaintiffs about the HSP program (or any other matter).  *See, e.g.*, TAC ¶ 81 (CVS

13    "misrepresent[ed] to insured customers that the HSP program would not apply to their

14    purchases").  Plaintiffs' interrogatory answers and deposition testimony make clear that there

15    was never any basis for such an assertion.  Asked to identify a misrepresentation made to them,

16    Plaintiffs each gave the same answer in response to CVS's interrogatory—that the

17    misrepresentation was the communication of the U&C price *to PBMs*, and nothing else.  UF 84.

18    Plaintiffs have effectively disclaimed any contention that CVS said anything orally or in writing

19    that misrepresented the HSP program.

20           **2.    No Fraudulent Omissions About HSP.**

21    In dismissing Plaintiffs' constructive fraud claim, the Court held that CVS owed

22    Plaintiffs no legal duty to disclose "matters of drug pricing."  *Corcoran v. CVS Health Corp.*,

23    169 F. Supp. 3d 970, 989 (N.D. Cal. 2016).  Insofar as Plaintiffs would still contend that CVS

24    had a duty to tell them about the HSP program, and didn't, that contention fails.  As the Court

25

26    [6] The prohibition on parol evidence does not apply where, as here, a non-party to the contract
      challenges the contracting parties' understanding of the contract.  *See, e.g.*, *Peterson v. First*

27    *Nat'l Bank of Ariz.*, 417 P.2d 728, 731 (Ariz. Ct. App. 1966); *Fla. Bar v. Frederick*, 756 So. 2d
      79, 84–85 (Fla. 2000) (per curiam).

28

CVS PHARMACY, INC.'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT
15-CV-03504-YGR

observed, "[t]he gravamen of [Plaintiffs' complaint] is ***not*** that CVS concealed the existence of the HSP program.  Rather, it is that CVS deceived Plaintiffs by reporting U&C prices significantly above the prices available to members of the HSP program . . . ."  *Id.* at 987.  The alleged "omission" is nothing more than Plaintiffs' misrepresentation claim re-packaged as a failure to disclose the "true" U&C price.  *Compare* TAC ¶ 11 ("CVS . . . submitted false and artificially inflated usual and customary prices"), *with* TAC ¶ 104 ("CVS made . . . omissions by reporting artificially inflated U&C prices").

When the alleged omission is merely the flip side of the misrepresentation coin, dismissal of the one requires dismissal of the other.  *See, e.g.*, *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014) (per curiam) ("[T]he district court properly rejected this claim because the alleged omissions relate to the same statements that the plaintiffs already raised as affirmative misrepresentations . . . .").  Were the law otherwise, every alleged false statement could be pled as an omission.  Thus, there is no surviving omission-based claim.

### C.      All Plaintiffs' Claims Fail Absent a Misrepresentation.

Because "[t]he gravamen of plaintiffs' theory asserts [that] defendants misrepresented the true U&C price to the PBMs and TPPs," *Corcoran*, 2017 WL 1065135, at *6, CVS is entitled to summary judgment on all causes of action.  As Plaintiffs themselves have said, "[p]roof that CVS reported false U&C prices is essential to proving Plaintiffs' fraud, negligent misrepresentation, and [consumer protection] claims, and will comprise much of Plaintiffs' [unjust enrichment claim]."  Pls' Trial Plan (Oct. 3, 2016) [Dkt. No. 172-1] ("Trial Plan") at 4.

### 1.      Fraud and Negligent Misrepresentation.

Every fraud and negligent misrepresentation claim requires a material misrepresentation or false statement.  *See* DX-451, 452.  Here, the undisputed evidence is that CVS did not misrepresent the U&C price.  *See supra* Part I.A.

### 2.      Unjust Enrichment.

Plaintiffs' unjust enrichment claim also fails in the absence of a misrepresentation.  The Complaint alleges that "CVS knowingly charges plan participants artificially high copayments for generic prescription drugs included in the HSP program in a manner that is unfair and

1    unconscionable." TAC ¶ 119.  But the argument why copayments were supposedly "artificially

2    high" rests on the premise that CVS failed to submit the lower HSP program price as the U&C

3    price.  Absent a misrepresented U&C price, there is nothing "artificially high" about the

4    Plaintiffs' copayments that rendered them unjust, unfair, or unconscionable.  *See*, *e.g.*, *Levine v.*

5    *Blue Shield of Cal.*, 117 Cal. Rptr. 262, 279 (Ct. App. 2010) ("[T]he trial court properly

6    [dismissed] . . . the [Plaintiffs'] claims for fraudulent concealment [and] negligent

7    misrepresentation . . . . The [Plaintiffs] thus have not demonstrated any basis on which they

8    would be entitled to restitution pursuant to a theory of unjust enrichment." (cites omitted)).

9                    **3.       Consumer Protection Claims.**

10          The Complaint alleges claims under ten consumer protection statutes from nine states,

11   asserting CVS's violation was misrepresenting the U&C price.  *See*, *e.g.*, TAC ¶¶ 129, 140, 148,

12   156, 164, 172, 182, 191, 200, 208 (repeating the "deceptive" conduct was "reporting . . .

13   fraudulent U&C prices," "misrepresenting . . . that the U&C price was greater than [Plaintiffs']

14   copayments").  In their briefing, Plaintiffs also say "for . . . [their consumer protection] claims,

15   Plaintiffs must generally prove that CVS made misrepresentations."  Trial Plan at 2; *see also* Ex.

16   67 to Pls.' Class Cert. Reply [Dkt. No. 215-14] ("Pls' Class Ex. 67") at 1–2 ("all nine consumer

17   protection statutes" require proof of "a misrepresentation;" deception actionable under each

18   statute is "the same as [the] misrepresentation based on the facts in this case").  Because the

19   undisputed evidence is that CVS did not misrepresent the U&C price, summary judgment is

20   appropriate on the statutory claims too.

21          Courts typically reject in one stroke consumer protection claims and any accompanying

22   fraud-based claims when both are premised on one misrepresentation, and that misrepresentation

23   is disproven.  For example, *Maricopa County v. Office Depot, Inc.* involved a set of related

24   contracts, not unlike the layers of contracts between CVS and PBMs, PBMs and TPPs, and TPPs

25   and insured consumers.  2014 WL 6611562 (D. Ariz. Nov. 21, 2014).  Los Angeles County's

26   contract with Office Depot obligated Office Depot to give the County the "best price" available

27   for office supplies.  Office Depot had a separate contract with a purchasing organization that

28   enabled cities and counties to enroll and obtain the County's lower prices.  Maricopa County was

1  one such county that enrolled.  Alleging that it did not get the same price as LA County,

2  Maricopa County sued Office Depot for common law fraud and violation of the Arizona

3  Consumer Fraud Act.  On a motion to dismiss, the Court found that the alleged

4  "misrepresentation . . . of the legal effect of [the] contract [did] not constitute actionable fraud,"

5  and dismissed both the fraud and consumer protection claims, finding they were "based on [the

6  same] allegation[]" that Office Depot "represented that its contracts guaranteed . . . the lowest []

7  pricing for office supplies."  *Id.* at *8 (internal quotation marks omitted).

8        The court reached a similar conclusion in *English v. Apple Inc.*, 2017 WL 106299, at *19

9  (N.D. Cal. Jan. 11, 2017), where common law and California consumer protection claims were

10  premised on Apple's alleged "misrepresent[ation] to consumers that replacement iPhones under

11  [its replacement plan] will be new when in fact many of the replacement devices . . . are . . . not

12  new," but refurbished phones.  *Id.* at *1.  ""All five of [plaintiff's] claims" stemmed from that

13  alleged misrepresentation.  *Id.* at *6.  Because "the undisputed evidence at class certification

14  established . . . that the replacement iPhones were new," *id.* at *7, Apple received summary

15  judgment on all claims,  *id.* at *19 (no "disputed issue whether [English] relied on an affirmative

16  misrepresentation . . . , doom[s] her CLRA, FAL, UCL, and common law fraud claims").

17        The same is true for the other states.  Cases applying the law of Plaintiffs' states supports

18  dismissing the consumer protection statutory claims when the predicate misrepresentation does

19  not exist or fails to state a claim:

20  - **Arizona**.  *See, e.g.*, *Haisch v. Allstate Ins.*, 5 P.3d 940, 943, 945 (Ariz. Ct. App. 2000)
      ("The complaint alleged that [Defendant's] conduct violated the Arizona Consumer
21     Fraud Act and constituted negligent misrepresentation, [and] common-law fraud . . .
      ." "[Defendant] commits neither actionable fraud, negligent misrepresentation,
22     consumer fraud, nor insurance fraud in failing to advise HMO members of their
      different status . . . .").
23

24  - **Florida**.  *See, e.g.*, *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330,
      1340–43 (S.D. Fla. 2011) (summary judgment on fraud and FDUTPA claims for
25     same reason), *aff'd per curiam*, 438 F.App'x 568 (11th Cir. 2012).

26  - **Illinois**.  *See, e.g.*, *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 219 (Ill. 2004)
      (summary judgment on consumer protection claim alleging "indirect[]"
27     misrepresentations "[i]n the absence of any evidence that the [intermediaries] were
      actually deceived"); *Ruane v. Amore*, 677 N.E.2d 1369, 1377–78 (Ill. App. Ct. 1997)

28

– 18 –

(summary judgment on omissions-based fraud and consumer-protection claims because "[t]here [was] no evidence that defendants concealed a material fact").

- **Massachusetts**. *See, e.g.*, *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("[Defendant's] duties . . . are defined by the terms of the loan contract . . . . Since . . . the Chapter 93A claim is based upon the [contract] claim[], there is no basis for . . . liab[ility] under Chapter 93A.").

- **New Jersey**. *Campmor, Inc. v. Brulant, LLC*, 2011 WL 2745922, at *12 (D.N.J. July 12, 2011) ("The factual base of [Plaintiff's] NJCFA claim is the same as that of its fraud claim under Ohio law. [Plaintiff] has insufficient evidence to sustain a claim for fraud under Ohio law; similarly, [Plaintiff] cannot sustain a [NJFA] claim . . ."); *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 527–28 (D.N.J. 2008).

- **New York**. *See, e.g.*, *Peabody v. Northgate Ford, Inc.*, 794 N.Y.S.2d 452, 454 (App. Div. 2005) (summary judgment on fraud and consumer protection claims where no evidence supports the "gravamen of plaintiff's complaint [] that defendants misrepresented to her the purchase price of the vehicle"), *Bowring v. Sapporo U.S.A., Inc.*, --- F.Supp. 3d ---, 2017 WL 902151, at *4 & n.3 (E.D.N.Y. Feb. 10, 2017).

- **Pennsylvania**. *Cooper v. Sirota*, 37 F. App'x 46, 48 (3d Cir. 2002) ("[Plaintiff's] UTPCPL and negligent misrepresentation claims both require an actual misrepresentation . . . . but there is nothing in the record tying [Plaintiff's allegation] to any representations made by [Defendant].").

- **Texas**. *Feagins v. Tyler Lincoln-Mercury, Inc.*, 277 S.W.3d 450, 456–57 (Tex. App. 2009) (since "summary judgment was proper as to the affirmative misrepresentation causes . . . , it was also proper in denying injunctive relief under the DTPA"); *Riddick v. Quail Harbor Condo. Ass'n*, 7 S.W.3d 663, 671 (Tex. App. 1999).

This Court observed that "the only alleged misrepresentation that holds [Plaintiffs'] theory together is a representation to the PBM's and the TPP's," Class Cert. Hr'g Tr. (Mar. 7, 2017) ("Class Tr.") at 8:11–14, and the evidence is that those representations were accurate and not false. Summary judgment on the consumer protection claims is appropriate as well.

## II.   THE UNDISPUTED EVIDENCE IS THAT THE PBMs AND PLAINTIFFS DID NOT RELY ON ANY MISREPRESENTATION.

The undisputed facts demonstrate that CVS did not misrepresent the U&C price. But even had there been a misrepresentation, the record also shows that the PBMs did not rely on the misrepresentation, any reliance would not have been reasonable, and the Plaintiffs themselves have not relied—both because their TPPs' knowledge is imputed to Plaintiffs, and as evidenced by their continuing to purchase prescriptions at CVS even after learning of the alleged fraud.

Reliance is an element of almost all of Plaintiffs' claims.  First, fraud and negligent misrepresentation in each of Plaintiffs' 11 states requires reliance.  *See* Pls.' Class Ex. 67, at 4, 7; Def. Ex. 8–9.  Second, reliance is an explicit element of Plaintiffs' consumer protection claims in Arizona, California (CLRA & UCL), Pennsylvania, and Texas.  DX-450.  Finally, although not "reliance" *per se*, the remaining consumer protection statues, as well as unjust enrichment, require causation or some nexus between the defendant's conduct and the consumer's harm (or the defendant's enrichment), meaning the same undisputed facts foreclose those claims as well.[7] On the facts of this case, those causation elements serve the same purpose as does reliance.

## A.    The PBMs Did Not Reasonably Rely On Any Misrepresentation About the U&C Price.

The PBMs either knew or should have known CVS was not reporting HSP prices as U&C.  The Six Intermediaries had actual knowledge that CVS was not submitting the HSP price as the U&C price; other PBMs, also "highly sophisticated entities," *Corcoran*, 2017 WL 1065135, at *6, either knew the same thing, or should have.  The PBM's actual or constructive knowledge forecloses reliance.  *In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir. 1992) ("[The justifiable reliance standard] is a more subjective standard which takes into account the knowledge and relationship of the parties themselves.").

### 1.    Actual knowledge.

The Six Intermediaries, which collectively represent more than 80% of the industry, knew about the HSP program and knew also that CVS was not submitting the HSP price as the U&C price.  *See supra* Part I; UF 48–53.  Knowing that much, they cannot have **reasonably** or **justifiably** relied on CVS's alleged misrepresentation of the "true" U&C price.  *See* Restatement (Second) of Torts § 541 (Am. Law Inst. 1977) ("The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to

---

[7] *See, e.g.*, *In re Pharm. Indus Average Wholesale Price Litig.*, 252 F.R.D. 83, 98 n.15 (D. Mass. 2008) ("Defendants argue persuasively that the proximate cause standard is so strict as to be the functional equivalent of reliance when applied to deceptive acts or practices claims."); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 587 (S.D.N.Y. 2008) ("causation is an essential element, either directly or derivatively" in fraud, concealment, and consumer protection claims).

him."); *see also Corcoran*, 2017 WL 1065135, at *7 n.15 ("[T]he Court notes that evidence of the PBMs and plaintiffs' knowledge of the HSP program and its relation to U&C prices may have bearing on the presumption of reliance . . . .").

### 2.  Constructive knowledge.

Even if a PBM somehow did not know this information, it should have known.

First, CVS disclosed HSP publicly and in conspicuous ways—by website, press release, television appearance, and op-ed article.  UF 18.  And during an earnings call attended by numerous PBMs and TPPs, CVS's then-CEO announced "On November 9, we will launch a new . . . health savings pass which will allow customers to purchase [] 90-day supplies of over 400 generics for $9.99 . . . [with an] enrollment fee of $10."  DX-439 at 6–7.  Shortly thereafter, CVS.com linked to a page explaining HSP, where anyone could examine the list of generics, the terms and conditions of membership, and the price—including both the annual membership fee and the $9.99 (later $11.99) price for 90-day prescriptions.  UF 18.  At the same time, PBMs could see that the U&C price submitted by CVS for HSP-eligible drugs, because the U&C price is present on the face of the claim record.  If any PBM expected CVS to submit the HSP price as the U&C price, the fact that CVS was not would have been immediately obvious.

Second, the incentive to not overpay pharmacies spurred the monitoring of pharmacy programs.  Aetna's then-Vice President of Provider Relations explained these incentives, and why they resulted in full awareness of pharmacy membership programs:

> [O]n the payer side of the equation within pharmacy benefit managers, when you consider the billions of dollars of [sic] year – a year that transact, this [rise of membership programs] had a level of awareness.  Everybody saw it. . . . .
>
> So *it was my job, my responsibility, to know what's going on with retailers*, what are the programs they're doing and how do they work and how does that impact – at the time I was at Aetna – our organization as a payer of those services.

DX-407 at 87:25–89:4 (Zavalishin Dep.).

Third, even the popular press covered that CVS was not submitting the HSP price as U&C.  In 2010, sources such as the Wall Street Journal, Associated Press, and Drug Benefit News reported *the specific fact* that CVS was not submitting its HSP prices as U&C (in that

1  circumstance, to a state Medicaid program).  UF 21.  Citing that publicity, the District of

2  Massachusetts dismissed a *qui tam* False Claims Act lawsuit against CVS based on the statute's

3  public-disclosure bar—a doctrine barring a relator's claim where his factual allegations were

4  public before the lawsuit was filed.  *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 118 F.

5  Supp. 3d 412 (D. Mass. 2015).  In affirming the dismissal, the First Circuit observed the

6  "outpouring of publicity" by 2010 on CVS's position, and that such publicity made "crystal clear

7  that CVS was not providing its HSP prices to Medicaid" and "left no doubt about CVS's

8  insistence that its HSP prices should not be considered when calculating U&C."  *U.S. ex rel.*

9  *Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 205, 212 (1st Cir. 2016).

10       Fourth, PBMs conducted "independent audits to ensure compliance with [their]

11  agreements," including whether CVS and other pharmacies and retailers were submitting

12  accurate U&C prices.  *Corcoran*, 2017 WL 1065135, at *6.  Medco sent "'secret shoppers' to

13  some retail chains to confirm that a customer would not get the benefit of the membership

14  program pricing unless he or she signed up for the program and paid the fee."  PX-663 ¶ 8.

15  OptumRx's audit department also dispatched secret shoppers "that would go in with a

16  prescription requesting a cash price" in order to "look at the U&C, and then . . . compare against

17  prescriptions filled by that pharmacy" to ensure "compliance under the contract."  DX-413 at

18  95:19–96:10.  And, at Aetna, "[i]t was not uncommon . . . to do informal spot checks of what is

19  the cash price of a prescription."  DX-407 at 39:5–7.  When asked how many times Aetna

20  discovered that the price CVS quoted on the phone differed from CVS' reported U&C, Aetna's

21  witness responded "Never."  DX-407 at 41:3–9 (Zavalishin Dep.).

22       Given the public nature of the HSP program and CVS's position about HSP pricing, if a

23  PBM failed to inquire why CVS was not submitting the HSP price as the U&C price, its reliance

24  was neither reasonable nor justifiable.

25       The reasoning from another drug-pricing case is instructive.  In *In re Pharmaceutical*

26  *Industry Average Wholesale Price Litigation*, 252 F.R.D. 83 (D. Mass. 2008), consumers and

27  TPPs sought to certify a class based on the allegation that manufacturers "grossly inflated the . . .

28  Average Wholesale Prices ('AWPs')" of certain drugs in industry publications.  *Id.* at 85–86.

The alleged inflation resulted in "mega-spreads" between the "inflated" AWP and the actual average cost of the drug. *Id.* at 89–90. The court, in considering reliance, found that "there was a perfect storm of information by 2001 about the AWP pricing" because of information published in the press. *Id.* at 97 (quotes and cites omitted)). "Various sophisticated TPP[s]," the court held, "may have acquired actual knowledge of the mega-spreads" because of the publicity. *Id.* "Moreover … TPPs that hired health care consultants or [PBMs] may have learned about the grossly inflated spreads before 2001." *Id.* Because of this, the court noted that "the misrepresentation claims of plaintiffs who continued to make payments based on AWP ***even after learning the truth about megaspreads*** could be undermined in jurisdictions requiring plaintiffs to prove the element of reliance." *Id.* (emphasis added).

Here, too, the PBMs and TPPs learned that CVS was not submitting the HSP price as the U&C price—the difference being that CVS's counterparties knew this from the beginning. *A fortiori*, Plaintiffs cannot establish that such companies relied on the alleged misrepresentation.

### B.  Plaintiffs Did Not Rely on Any Misrepresentation About the U&C Price.

The Court need not reach whether Plaintiffs themselves relied on the alleged misrepresentations at issue, because the PBMs' failure to rely, standing alone, defeats Plaintiffs' claims. *See, e.g.*, Class Tr. at 18:19 – 25 (commenting on "the reliance component with respect to the PBM's"). But even assuming the PBMs relied, the evidence shows that Plaintiffs themselves did not, which independently warrants summary judgment. Plaintiffs' reliance is lacking in two separate respects: (1) Plaintiffs are charged with the knowledge of their TPP; and (2) their continued purchases from CVS, even after learning of the nature of their claims, demonstrate that CVS's alleged misrepresentations were not material to their buying decisions.

### 1.  Plaintiffs had constructive knowledge.

Plaintiffs says that TPPs "negotiate[ed] the prices of prescription drugs ***on their behalf*.*" TAC ¶ 47. But TPPs—including Aetna, one of the largest health insurers—knew that CVS did not submit the HSP price as the U&C price. UF 49–51 (Aetna); *see also, e.g.*, UF 52 (TPP Harvard Pilgrim). And even if TPPs did not know, they should have known. *See supra* pp. 3–5, 13. The TPPs' actual or constructive knowledge is therefore imputed to Plaintiffs, foreclosing

1  reliance.  *See* Restatement (Third) of Agency § 5.03 (Am. Law. Inst. 2006) ("For purposes of

2  determining a principal's legal relations with a third party, notice of a fact that an agent **knows or**

3  **has reason to know** is imputed to the principal if knowledge of the fact is material to the agent's

4  duties to the principal. . . . ").

5         The *AWP* case is again instructive.  There, because the plaintiff-insured consumers "were

6  beneficiaries of the TPP plans, the knowledge of the TPP [was] imputed to [plaintiffs]."  *AWP*,

7  252 F.R.D. at 97.  The court thus found that "[claims] . . . requiring plaintiffs to prove the

8  element of reliance" were unlikely to succeed.  *Id.*  Just as the TPPs' knowledge was imputed to

9  the insureds in *AWP*, the TPPs' actual or constructive knowledge is imputed to Plaintiffs here,

10  entitling CVS to summary judgment against all 15 Plaintiffs.

11              **2.       Plaintiffs continued to patronize CVS pharmacies.**

12         Independent of having constructive knowledge, Plaintiffs' own purchases from CVS

13  foreclose reliance.  Twelve of fifteen Plaintiffs continued purchasing prescriptions at CVS even

14  after learning of the alleged overcharges.  UF 81.  Seven of those twelve even continued to

15  purchase HSP-eligible medications in particular.  UF 82.  Their continued patronage of CVS

16  defeats causation and reliance and entitles CVS to summary judgment.

17         The reasoning in *Princess Cruise Lines, Ltd. v. Superior Court* shows why.  101 Cal.

18  Rptr. 3d 323, 329 (Ct. App. 2009).  In that case, plaintiffs asserted fraud, negligent

19  misrepresentation, and consumer-protection claims stemming from the petitioner's alleged

20  "inflated charges" for certain "shore excursions" during a cruise.  *Id.* at 325 (quotes omitted).

21  The appeals court held that each claim was premised on the same misrepresentation, and that

22  plaintiffs did not rely.  "The problem," the court found, "is that it made no difference to

23  [plaintiffs] how much the excursions cost."  *Id.* at 329.  Plaintiffs "would have gone on the

24  excursions . . . without reference to anything petitioner said or did in connection with the

25  excursions."  *Id.*  Thus, "there was **no reliance**."  *Id.* (emphasis in original).[8]

26

27  [8] *See also Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466, 471 n.2 (Ct. App. 2008) ("Actual reliance
    occurs when a misrepresentation [exists] . . . and when, absent such representation, the plaintiff

28

                                          CVS PHARMACY, INC.'S NOTICE OF MOTION
                                          AND MOTION FOR SUMMARY JUDGMENT
                                          15-CV-03504-YGR

1   Plaintiffs have effectively admitted the same here—i.e. that they would have filled

2   prescriptions at CVS, including for HSP-eligible medications, regardless of whether CVS

3   submitted its HSP price as the U&C price, whether now or during the putative class period.  This

4   is apparent from their continued purchases, frequently of HSP-eligible drugs, after consulting

5   with counsel about the alleged overcharges, and even after *filing this lawsuit*.  As the Court has

6   observed, "Plaintiffs' continued patronage may later be evidence relevant to materiality."

7   *Corcoran*, 169 F. Supp. 3d at 987 ("[P]laintiffs' continued purchase of the product at issue would

8   have 'almost certainly destroyed . . . reliance.'" (quoting *Red v. Kraft Foods, Inc.*, 2011 WL

9   4599833, at *12 (C.D. Cal. Sept. 29, 2011)).  That evidence now stands as unrebutted proof that

10  CVS's U&C submissions were immaterial to Plaintiffs, and that they did not rely upon the U&C

11  price in choosing to shop at CVS.

12      Plaintiffs claim they "had to continue purchasing their medically-necessary prescriptions,

13  and there is no evidence that [they] . . . had reasonably practical and economical alternatives."

14  Class Reply at 15.  But the undisputed facts show otherwise.  Every Plaintiff admitted in written

15  discovery to purchasing drugs from CVS and at least one other pharmacy during the class

16  period—often in the same year.  UF 83.  Even if some medicines are not discretionary purchases,

17  "it is common knowledge . . . there's plenty of pharmacies and they are right across the street

18  from each other.  So whether or not you go to CVS or Rite Aid . . . [is] not mandatory in any way

19  even if your prescriptions . . . are."  Class Tr. at 22:9–14.

20      In short, the purchasing patterns of all but three of the 15 Plaintiffs demonstrates a lack of

21  reliance on CVS's U&C prices, entitling CVS to summary judgment on this separate basis for

22  everyone except Plaintiffs Odorisio, Samuelson, and Wulff.

23                          **CONCLUSION**

24      For the foregoing reasons, CVS respectfully requests that the Court grant Defendant's

25  Motion for Summary Judgment and dismiss with prejudice the Third Amended Complaint.

26

27  would not, in all reasonable probability, have entered into the contract or other transaction."
    (alternation and quote omitted)).

28

CVS PHARMACY, INC.'S NOTICE OF MOTION
AND MOTION FOR SUMMARY JUDGMENT
15-CV-03504-YGR

1    Dated:  June 6, 2017                      Respectfully submitted,

2

3                                              By: s/ Grant A.  Geyerman

4                                              Enu Mainigi (*Pro Hac Vice*)
                                               F.  Lane Heard III (*Pro Hac Vice*)
5                                              Grant A.  Geyerman (*Pro Hac Vice*)
                                               WILLIAMS & CONNOLLY LLP
6
                                               Edward W.  Swanson (State Bar No.  159859)
7                                              August Gugelmann (State Bar No.  240544)
                                               SWANSON & McNAMARA LLP
8

9                                              *Attorneys for CVS Pharmacy, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CVS PHARMACY, INC.'S NOTICE OF MOTION
                                               AND MOTION FOR SUMMARY JUDGMENT
                                               15-CV-03504-YGR