Enu Mainigi (*Pro Hac Vice*)
F. Lane Heard III (*Pro Hac Vice*)
Grant A. Geyerman (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

Edward W. Swanson (State Bar No. 159859)
August Gugelmann (State Bar No. 240544)
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

*Attorneys for CVS Pharmacy, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

CHRISTOPHER CORCORAN, et al.,

Plaintiffs,

v.

CVS PHARMACY, INC.,

Defendant.

No. 15–CV–03504–YGR

**CVS PHARMACY, INC.'S SUPPORTING SEPARATE STATEMENT OF FACTS**

| Issue No.[1] | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| **I.** | **THE HSP PROGRAM** | |
| 1&2 | Fact 1. CVS Pharmacy, Inc. ("CVS") is a chain pharmacy that dispenses prescription drugs.<br><br>Third Amended Complaint ("TAC") ¶¶ 4, 40 | |
| 1&2 | Fact 2. CVS operated the Health Savings Pass ("HSP") program from 11/9/08 through 2/1/16.<br><br>DX-423 at 193:14–194:20 (CVS 30(b)(6) Dep.) | |
| 1&2 | Fact 3. CVS intended HSP primarily as a program to retain existing customers, not as a program to attract new customers to CVS.<br><br>PX-40 (CVS Email); DX-428 at 175:3–181:15 (Morrison Dep. (July 20, 2016)) | |
| 1&2 | Fact 4. HSP was a membership program.<br><br>DX-428 at 134:17–135:18; DX-80 (HSP enrollment form); DX-441 (HSP enrollment form) | |
| 1&2 | Fact 5. CVS required enrollees to complete an enrollment form; agree to the program's terms and conditions, including a waiver or authorization under HIPAA; and pay an annual membership fee ($10 through December 31, 2010, and $15 thereafter).<br><br>DX-428 at 134:17–135:18; DX-423 at 193:14–194:3; DX-80; DX-441 | |
| 1&2 | Fact 6. HSP provided members a set price—$9.99 through December 31, 2010 and $11.99 thereafter—for a standard 90-day supply of approximately 400 common generic drugs. (A limited number of drugs had a different price.) The set $9.99/$11.99 price applied to supplies of less than 90 days. HSP also offered members a discount at MinuteClinics in CVS pharmacies. | |

[1] Issue No. 1 corresponds with Argument I in CVS's summary judgment motion ("THE UNDISPUTED EVIDENCE IS THAT CVS MADE NO MISREPRESENTATION."). Issue No. 2 corresponds with Argument II ("THE UNDISPUTED EVIDENCE IS THAT THE PBMs AND PLAINTIFFS DID NOT RELY ON ANY MISREPRESENTATION.").

| | | |
|---|---|---|
| | DX-432 at 3 (Pharmacy Team Huddle Guide); DX-437 (Nov. 2013 HSP Medication List) | |
| 1&2 | Fact 7. CVS designed HSP as a membership program and offered the lower HSP price only to HSP members.<br><br>DX-428 at 134:17–135:18; DX-432 at 3–6; DX-408 ¶¶ 79–81 (Barlag Rep.) | |
| 1&2 | Fact 8. Per HSP's policies and procedures, CVS did not prorate downward the price charged in an HSP transaction, even when the enrollee purchased less than a 90-day supply. The price was increased, however, if the enrollee required a quantity greater than that dispensed in a standard 90-day supply.<br><br>DX-431 at 1–3 (HSP P&P); DX-432 at 4; DX-408 ¶¶ 63, 92–96 | |
| 1&2 | Fact 9. HSP program purchases never accounted for more than 1.12% of total prescriptions purchased at CVS in any year from 2009-2015 in the Plaintiffs' 11 states.<br><br>DX-408 ¶ 30 fig.2 | |
| 1&2 | Fact 10. Cash customers who purchased HSP-eligible drugs outnumbered HSP members by more than 25 to 1 in the Plaintiffs' 11 states.<br><br>DX-408 ¶ 48 & fig.9; DX-411 at 209:25–210:11 (Hay Dep.) | |
| 1&2 | Fact 11. Cash purchases outnumbered HSP purchases in every year of the program, and in each one of the Plaintiffs' 11 states.<br><br>DX-408 ¶¶ 30 fig.2, 46 & fig.7, 77 | |
| 1&2 | Fact 12. In the Plaintiffs' 11 states, there were 27.19 million cash transactions and only 5.82 million HSP transactions for HSP-eligible drugs between November 9, 2008 and December 7, 2015—a ratio of over 4.5 to 1.<br><br>DX-408 ¶¶ 46, 48 & figs.7, 9; DX-411 at 208:11–209:24 | |

| | | |
|---|---|---|
| 1&2 | <u>Fact 13.</u> Approximately 78% of cash customers would have paid more by enrolling in HSP and making those purchases under the HSP program.<br><br>DX-418 ¶ 13 (Salve Rep.) | |
| 1&2 | <u>Fact 14.</u> The typical CVS cash customer purchases only 1 or 2 prescriptions per year.<br><br>DX-408 ¶ 49; DX-411 at 210:12–213:19 | |
| 1&2 | <u>Fact 15.</u> A "cash customer" is an industry term that refers to a customer who purchases a prescription without any form of prescription benefit, including insurance, discount card, or membership program. The "cash price" price is the amount charged to the "cash customer."<br><br>PX-618 ¶ 18 (Compton Decl.); PX-701 ¶ 12 (Lavin Decl.); PX-691 ¶ 11 (Reichardt Decl.); PX-662 ¶ 9 (Strein Decl.); PX-663 ¶ 10 (Spadaccino Decl.); DX-321 ¶ 13 (Zavalishin Decl.); DX-400 at 23:24–24:19 (Barre Dep.); DX-415 at 3, 6 (McGinley Rep.) | |
| 1&2 | <u>Fact 16.</u> The HSP enrollment fee reduced customer interest in joining the HSP program to a statistically significant degree.<br><br>DX-419 ¶¶ 9–12, 35–44, 47 (Simonson Rep.) | |
| 1&2 | <u>Fact 17.</u> Plaintiffs described the amount of the HSP enrollment fee ($10-$15) as a significant or meaningful amount of money.<br><br>DX-454 (Pl. Testimony Chart) | |
| 1&2 | <u>Fact 18.</u> At launch, CVS posted details about HSP on its website, in stores, and in weekly circulars; issued a press release; secured coverage on NBC's *Today* show; published an op-ed by the CEO in *The Boston Globe*; and discussed HSP during its 2008 Q3 earnings call (attended by multiple PBMs and TPPs).<br><br>DX-499 at A15 (*Boston Globe*); DX-489 (CVS.com screenshots (Nov., 2008)); DX-492 (CVS press release); DX-442 (Email summarizing HSP publicity); DX-438 (CVS 2008 Q3 Earnings Call Event Report); DX-439 at 6 (Earnings Call Transcript); DX-440 (HSP | |

| | | |
|---|---|---|
| | Marketing Materials) | |
| 1&2 | <u>Fact 19.</u> Industry publications and newspapers ran stories on HSP, noting its enrollment fee.<br><br>DX-497 at 4 (*Drug Store News*); DX-498 at 50 (*Drug Store News*); DX-493 (*Dallas Morning News*); DX-494 (*LA Times*); DX-495 (*Consumer Reports*) | |
| 1&2 | <u>Fact 20.</u> The national and local news that broadcast stories on HSP, as of November 4, 2008, reportedly reached an estimated audience of more than 7 million viewers.<br><br>DX-443 (Email summarizing HSP publicity) | |
| 1&2 | <u>Fact 21.</u> The specific issue of CVS's non-submission of the HSP price as its U&C price received press coverage in 2010, when CVS and Connecticut Medicaid disputed whether an amended state Medicaid regulation required submitting the HSP price as the U&C price.<br><br>DX-500 (*Wall Street Journal*); DX-501 (*Associated Press Online*); DX-502 (*Drug Benefit News*) | |
| 1&2 | <u>Fact 22.</u> CVS never submitted the HSP price as its U&C price on third-party (e.g., insured) prescription drug claims.<br><br>TAC ¶ 71; Defendant's Answer to the 2nd Am. Compl. [Dkt. No. 100] ¶ 13 | |
| 1&2 | <u>Fact 23.</u> The above fact notwithstanding, starting in August 2010, there were occasional cash transactions for which the regular retail or cash price was $11.99. In such instances, CVS submitted $11.99 to PBMs as its U&C price because it was the cash price.<br><br>DX-409 ¶¶ 23 & n.28, 26–29 & figs. 5–7 (Barlag Rebuttal Rep.) | |
| **II. THE PBM AND TPP EVIDENCE** | | |
| **A. Background principles** | | |
| 1 | <u>Fact 24.</u> Health insurers or employer groups providing prescription drug coverage to insureds are known as third-party payors ("TPPs").<br><br>TAC ¶¶ 44, 46; DX-412 at 4 (Jones Rep.) | |

| | | |
|---|---|---|
| 1 | <u>Fact 25.</u> Most TPPs contract with pharmacy benefit managers (“PBMs”) to, *inter alia*, administer their members’ pharmacy benefits. PBMs, in turn, contract with pharmacies to establish networks of pharmacies to service members of the PBM’s clients (i.e., TPPs).<br><br>DX-417 at 13:19–14:16, 22:15–23:2 (Navarro Dep.); DX-412 at 8–9 | |
| 1 | <u>Fact 26.</u> In the minority of cases, TPPs handle claims administration (e.g., adjudication) internally without contracting with a PBM.<br><br>DX-412 at 9 n.10 | |
| 1 | <u>Fact 27.</u> For example, prior to January 1, 2011, Aetna, an insurance company, administered its own claims in-house and, therefore, contracted directly with CVS. Since 2011, however, Aetna has contracted with an outside PBM—Caremark—to adjudicate its claims.<br><br>DX-407 at 14:7–15:14 (Zavalishin Dep.); PX-785 (CVS/Aetna contract); DX 425 ¶ 13 (Colbert Decl. (Nov. 21, 2016)) | |
| 1 | <u>Fact 28.</u> Claim “adjudication” is the process where the pharmacy submits patient, prescription and insurance information to the PBM (or TPP), and the PBM determines, *inter alia*, whether the claim is approved and if so, what amounts the customer and TPP will owe as payment. The PBM then sends the pharmacy a response transaction indicating what copay amount, if any, the pharmacy should collect.<br><br>Navarro Rep. ¶ 17; DX-412 at 12–14 | |
| 1 | <u>Fact 29.</u> For insured prescriptions, the cost can be shared between the TPP and the member. The member’s share (e.g., copayment) depends upon his or her particular benefit plan design.<br><br>TAC ¶ 10, 44; DX-412 at 5–6 | |
| 1 | <u>Fact 30.</u> PBMs (or TPPs) calculate copayments. Pharmacies do not calculate copayments.<br><br>DX-427 at 44:16–45:6, 46:4–47:8 (Gibbons Dep.); DX-424 at 87:18–88:3, 95:22–96:2 | |

| | | |
|---|---|---|
| | (Colbert Dep.); DX-413 at 106:2–107:3 (Jones Dep.) | |
| 1 | Fact 31. As a pharmacy, CVS does not possess enough information about an insured's benefits to calculate the copay, nor is CVS privy to the formulas or algorithms the PBM (or TPP) uses to calculate the insured's copay.<br><br>DX-412 at 11; DX-415 at 7–8; DX-423 at 153:1–8, 154:7–16; Navarro Rep. ¶ 25 n.33 | |
| 1 | Fact 32. The phrase "usual and customary price" is a defined term in most PBM-pharmacy or TPP-pharmacy contracts.<br><br>DX-449 (Contract Compilation Chart); DX-412 at 17; DX-415 at 6 | |
| 1 | Fact 33. U&C definitions are worded differently in different contracts.<br><br>DX-449; DX-424 at 247:20–248:17 | |
| 1&2 | Fact 34. The record contains testimony from eight executives at six PBMs or TPPs (the "Six Intermediaries") whose job responsibilities involved negotiating contracts with pharmacies.<br><br>DX-321 ¶¶ 1, 4 (Aetna); PX-701 ¶¶ 1–2, 7 (Caremark); PX-618 ¶¶ 1–5 (Express Scripts); PX-662 ¶ 1–3 (Medco); PX-663 ¶ 1 (Medco); DX-400 at 10:12–11:21 (MedImpact); PX-691 ¶ 1 (OptumRx/Prescription Solutions) | |
| | **B. Before CVS had ever launched HSP, most PBMs had decided that membership program prices are not U&C prices.** | |
| 1 | Fact 35. In September 2006, Walmart announced that it would offer all customers 30-day supplies of certain generic drugs for $4. To purchase a $4 prescription, Walmart did not require customers to join a program or pay a fee.<br><br>DX-503 (Walmart press release); PX-701 ¶ 13; PX-618 ¶ 7 | |
| 1 | Fact 36. After Walmart's announcement, Kroger, Safeway, and other retailers announced similar price reductions—a lower price to all customers for select generic drugs, without any requirement to join a program or pay an enrollment fee. | |

| | | |
|---|---|---|
| | DX-504 (Safeway email); DX-506 (Kroger press release); PX-703; PX-704; PX-701 ¶ 15 | |
| 1&2 | Fact 37. PBMs were aware of Walmart's announcement and other companies' similar offerings when they were launched.<br><br>DX-400 at 24:25–25:24; PX-618 ¶ 7; PX-701 ¶¶ 13–14; PX-662 ¶¶ 7–8; DX-321 ¶ 11 | |
| 1 | Fact 38. PBMs considered Walmart's $4 price its U&C price under their PBM/Walmart contracts.<br><br>DX-400 at 24:25–25:19; PX-618 ¶ 10; PX-701 ¶ 15; PX-662 ¶ 7; PX-663 ¶ 7; DX-407 at 87:6–20 | |
| 1 | Fact 39. In November 2007, Walgreens launched its Prescriptions Savings Club ("PSC"). PSC required enrollment and payment of a fee. In September 2008, Rite Aid launched its own membership program, the "Rx Savings" program. Some other pharmacies, grocers, and retailers also launched membership programs.<br><br>DX-504 (Rite Aid press release); PX-704 (Caremark internal spreadsheet); DX-490 (*Drug Channel News*); DX-491 (*Chain Store Age*) | |
| 1 | Fact 40. Membership programs were different from Walmart's $4 offering in that the former offered the preferential pricing to program members, not to all customers. A membership program typically required customers to fill out an application, pay an enrollment fee, agree to terms and conditions, or some combination of those steps.<br><br>PX-618 ¶¶ 9–10; DX-400 at 26:17–27:3; PX-701 ¶¶ 13–17; PX-662 ¶¶ 6–9; DX-407 at 55:15–56:17; DX-412 at 15 | |
| 1&2 | Fact 41. PBMs were aware of Walgreens's and other companies' membership programs when they were launched.<br><br>DX-400 at 25:20–29:2; PX-618 ¶¶ 8–9; PX-701 ¶¶ 13, 16; PX-662 ¶ 8; DX-321 ¶ 8 | |

| | | |
|---|---|---|
| 1 | Fact 42. For U&C purposes, PBMs distinguish the pricing in membership programs from the simple lowering of a company's list price (e.g., Walmart).<br><br>DX-400 at 25:20–28:14; PX-618 ¶ 10; PX-701 ¶¶ 14–17; DX-403 at 104:23–106:17 (Lavin Dep.); PX-662 ¶ 7–9; PX-691 ¶ 12; DX-407 at 52:21–53:14; DX-707 (Caremark email) | |
| 1&2 | Fact 43. The Six Intermediaries, independently, deliberated internally regarding how to treat prices offered through pharmacy membership programs under their respective contracts with pharmacies.<br><br>DX-400 at 29:23–30:11; DX-403 at 105:7–107:6; DX-401 at 20:14–22:4 (Compton Dep.); PX-662 ¶ 9; DX-404 at 201:22–203:4, 206:22–207:16 (Reichardt Dep.); DX-321 ¶ 7 | |
| 1 | Fact 44. The Six Intermediaries, independently, each concluded that prices offered through membership programs were not U&C under their contracts with pharmacies.<br><br>DX-400 at 27:23–28:14; PX-618 ¶¶ 10–11; PX-701 ¶¶ 14–17; PX-662 ¶¶ 8–9; DX-406 at 88:15–89:21; 90:10–13 (Strein Dep.); PX-663 ¶¶ 6–7; DX-321 ¶¶ 11–12. | |
| 1 | Fact 45. By the time CVS launched HSP in November 2008, PBMs and TPPs had already formulated their position that membership programs should not be treated as U&C.<br><br>DX-403 at 100:5–102:3, 106:1–107:6; PX-703; DX-321 ¶ 11 | |
| 1&2 | Fact 46. By November 2008, there was a general awareness among PBMs that membership program prices were not considered U&C.<br><br>DX-321 ¶ 9; DX-407 at 85:6–86:2; 87:2–89:11; DX-403 at 100:5–102:3 | |
| 1 | Fact 47. By at least October 2008, internal documentation at Caremark memorialized the distinction between membership programs ("Club Plans," in Caremark terminology) and programs that charged the lower price to all | |

| | | |
|---|---|---|
| | customers (“Set Price Generic Programs” or “Standard Set Price Generic Programs”).<br><br>PX-703; DX-403 at 100:5–101:9 | |
| | **C. The Six Intermediaries knew CVS did not submit the HSP price as U&C.** | |
| 1&2 | Fact 48. PBMs were aware of HSP at or near its launch in November 2008.<br><br>DX-400 at 28:16–29:22; PX-701 ¶ 22; DX-406 at 74:24–75:13; DX-321 ¶¶ 7–8; DX-445 (Excellus Email); DX-444 (MedMetrics Email) | |
| 1 | Fact 49. CVS executives orally advised PBMs, their typical counterparties, that it did not consider the HSP price to be its U&C price.<br><br>PX-701 ¶ 22; DX-429 at 114:6–115:12, 124:11–128:3 (Wingate Dep.) | |
| 1 | Fact 50. CVS had a “template” or standard written description of HSP. Among other things, the template stated: “CVS’s program is very different from the discount pricing Wal-Mart and others have introduced and therefore it does not constitute Usual and Customary pricing for our   Medicaid clients.” (Extra spacing in original.) When it provided the template to PBMs or TPPs, CVS generally attached the HSP enrollment form and marketing materials.<br><br>DX-321 ¶ 9, Ex. A; DX-435 & DX-436 (TX Medicaid); DX-434 (CT Medicaid) | |
| 1 | Fact 51. CVS provided at least three examples of the template to PBMs or payers in 2008 and 2009—Aetna, Texas Medicaid, and Connecticut Medicaid.<br><br>DX-321 ¶ 9, Ex. A; DX-434; DX-436 | |
| 1&2 | Fact 52. The Six Intermediaries knew CVS did not consider the HSP price to be its U&C price.<br><br>DX-400 at 25:20–31:2; PX-618 ¶ 17; PX-701 ¶ 22; PX-662 ¶¶ 9–11; PX-691 ¶5; DX-321 ¶ 9 | |

| | | |
|---|---|---|
| 1&2 | Fact 53. MedImpact advised Harvard Pilgrim, which insured plaintiff Garber, that it did not consider the HSP price to be CVS's U&C price.<br><br>DX-400 at 34:1–35:8; DX-465 at 96:3–20 (Garber Dep.) | |
| | **D. The Six Intermediaries Concluded their Contracts Did Not Require CVS to Submit the HSP Price as the U&C Price.** | |
| 1 | Fact 54. CVS's master agreements with five of the Six Intermediaries include a U&C definition. Medco defines U&C in its Provider Manual, which is incorporated into its master agreement.<br><br>PX-546 at 20 (CVS/Caremark contract); PX-532 ¶ 1.17 (CVS/Express Scripts contract); PX-695 at 12 (CVS/Optum predecessor contract (1999-2015)); PX-674 § 1.41 (CVS/Optum current contract (2015-present)); DX-300 at Art. XVI-14 (CVS/MedImpact contract); PX-785 § 1.54 (CVS/Aetna contract); DX-266 at 86 (Medco 2009/2010 Provider Manual); PX-551 at 69 (Medco 2009 Provider Manual) | |
| 1 | Fact 55. Express Scripts did not interpret its contract with CVS to require CVS to submit the HSP price as the U&C price. It did not consider HSP transactions to be "cash transaction[s]" or as "discounts" or "special promotions" as those terms are used in the U&C definition.<br><br>PX-618 ¶¶ 16–18; PX-532 at ¶ 1.17 | |
| 1 | Fact 56. Express Scripts' rationale was that CVS did not charge its membership price to all cash customers, but instead required enrollment and payment of a fee to receive the lower price.<br><br>PX-618 ¶ 17 | |
| 1 | Fact 57. Caremark did not interpret its contract with CVS to require CVS to submit its HSP member price as its U&C price. Caremark did not consider HSP transactions to be "cash" transactions or "applicable discounts" as those terms are used in its U&C definition.<br><br>PX-701 ¶¶ 20–21; PX-546 at 20 | |

| | | |
|---|---|---|
| 1 | Fact 58. Caremark's rationale was that HSP qualified as a "Club Plan" and not a "Standard Set Price Generic Program" under Caremark's policy. HSP pricing was charged to HSP members, not to all CVS customers.<br><br>PX-701 ¶¶ 14–17, 19–20; DX-403 at 104:19–105:21; 164:11–165:4; DX-707 | |
| 1 | Fact 59. Medco did not interpret its contract with CVS to require CVS to submit its HSP member price as its U&C price. Medco did not consider membership program prices to be "applicable discounts" to "cash patient[s]" as those terms were used in its U&C definitions.<br><br>PX-662 ¶¶ 11, 13; PX-663 ¶ 5; DX-266 at 86; PX-551 at 69 | |
| 1 | Fact 60. Medco's rationale was based primarily on the existence of the enrollment fee.<br><br>PX-662 ¶ 11; PX-663 ¶ 7; DX-265 (Letter from Medco to CVS) | |
| 1 | Fact 61. In April 2009, Medco sent a letter to CVS stating: "Our current policy is that the Medco definition of U&C does not include discount cards that charge a more than nominal enrollment fee that is not routinely waived." The letter was responding to CVS's outreach to Medco about the fact that HSP was not U&C and memorialized Medco's understanding that CVS did not need to submit HSP as U&C.<br><br>DX-265; DX-264 (Email from CVS to Medco); DX-429 at 107:2–115:12 (Wingate Dep.) | |
| 1 | Fact 62. Optum and its predecessor Prescription Solutions did not interpret the definitions of U&C in their respective contracts with CVS to require CVS to submit the HSP price as the U&C price. Optum (and Prescription Solutions) did not consider HSP members to be "cash customers," or interpret the phrase "applicable discounts" to encompass the HSP price, as those phrases appear in the U&C definition.<br><br>PX-691 ¶¶ 10–11; PX-695 at 12; PX-674 § 1.41 | |
| 1 | Fact 63. Optum's rationale was that CVS | |

| | | |
|---|---|---|
| | required HSP members to complete an enrollment form and agree to the programs terms and conditions to receive the HSP price.<br><br>DX-404 at 74:16–21; PX-691 ¶¶ 4, 11 | |
| 1 | Fact 64. MedImpact did not interpret its contract with CVS to require CVS to submit the HSP price as its U&C price. MedImpact did not consider HSP members to be "cash paying customers," or HSP-pricing "applicable discounts," as those terms are used in the U&C definition.<br><br>DX-400 at 30:16–33:19; DX-300 at Art. XVI-14 | |
| 1 | Fact 65. MedImpact's rationale turned on the distinction between "active" and "passive" pricing. "Active" pricing is not U&C because the customer had to take affirmative steps to receive the price. "Passive" discounts are U&C because they are automatically given to all customers without requiring any action. MedImpact considers HSP pricing "active" pricing.<br><br>DX-400 at 24:6–19, 26:13–28:14 | |
| 1 | Fact 66. Aetna learned about HSP in late 2008, while negotiating a new master agreement with CVS.<br><br>DX-321 ¶¶ 6–8 | |
| 1 | Fact 67. The week after HSP's launch in 2008, CVS reviewed the HSP program with five Aetna representatives, including at least three VP-or-above-level executives, at a meeting in Hartford, Connecticut.<br><br>DX-330 (Aetna-CVS Meeting Agenda); DX-407 at 140:14–144:16 | |
| 1 | Fact 68. In December 2008, CVS provided its template description of HSP to Aetna's Joseph Zavalishin, Vice President of Pharmacy Networks.<br><br>DX-321 at ¶ 10, Ex. A | |
| 1 | Fact 69. Aetna did not interpret its contract with CVS to require CVS to submit the HSP price as | |

| | | |
|---|---|---|
| | its U&C price. Aetna did not consider HSP pricing an "applicable customer discount[]" or CVS's "cash price" as those terms are used in its U&C definition.<br><br>DX-321 ¶¶ 11–13 | |
| 1 | Fact 70. Aetna's rationale was that the HSP program required enrollment and charged a fee.<br><br>DX-321 ¶ 13 | |
| **E. The Six Intermediaries monitored U&C prices and pharmacy programs.** | | |
| 1&2 | Fact 71. A PBM could see (visually) that CVS was not submitting the HSP price as its U&C price simply by examining the values submitted in the U&C data field on the prescription claim record.<br><br>DX-417 at 172:4–173:21 (Navarro Dep.); DX-412 at 21 | |
| 1&2 | Fact 72. PBMs have the right to audit information CVS submits on prescription claim records, including its submitted U&C prices.<br><br>DX-417 at 172:4–173:21 (Navarro Dep.); DX-401 at 91:6–19; DX-404 at 222:5–224:9; DX-405 at 73:10–74:8 (Spadaccino Dep.); DX-406 at 150:1–150:14; PX-679 at 33 (Caremark Provider Manual); PX-615 § 6 (Express Scripts Provider Manual); PX-551 at § 7.2 (2009 Medco Provider Manual) | |
| 1&2 | Fact 73. After Walmart's $4 announcement, some PBMs began auditing the U&C prices submitted by companies that lowered their list prices for all customers to ensure those lower prices were being submitted as U&C.<br><br>DX-403 at 119:1–120:1; DX-412 at 15 | |
| 1&2 | Fact 74. Caremark evaluated how a particular pharmacy's program was designed (i.e., club program vs. set pricing charged to all customers), and monitored and audited the U&C prices submitted by companies that offered set pricing to all customers.<br><br>DX-403 at 116:8–117:12; PX-703; PX-704 | |

| | | |
|---|---|---|
| 1&2 | Fact 75. Aetna conducted spot checks of CVS's cash prices on prescription drugs by calling individual pharmacies and requesting price quotes. Aetna's former VP of Pharmacy Networks could not recall an instance when the spot checks found that CVS's quoted retail price differed from the U&C price submitted to Aetna.<br><br>DX-407 at 39:5–15, 40:8–14, 41:3–6 | |
| 1&2 | Fact 76. Optum's audit department sent secret shoppers to pharmacy chains to confirm that a cash price for a prescription was the same as the pharmacy's U&C submitted to Optum.<br><br>DX-413 at 95:16–96:10 | |
| 1&2 | Fact 77. Medco had a pharmacy audit team that audited prescription claims.<br><br>DX-405 at 70:18–74:8; PX-551 at Ch. 7 | |
| 1&2 | Fact 78. Medco sent secret shoppers to pharmacy chains with membership programs to confirm that a customer would receive membership pricing only if he or she enrolled in the program and paid the fee.<br><br>PX-663 ¶¶ 8, 11; DX-405 at 35:3–14, 37:21–38:7 | |
| **III. THE PLAINTIFFS' PRESCRIPTION PURCHASES AND COPAYMENTS** | | |
| 1&2 | Fact 79. The Six Intermediaries administered more than half of Plaintiffs' at-issue transactions.<br><br>DX-426 ¶ 10 (Colbert Decl. (June 2, 2017)) | |
| 1&2 | Fact 80. The Six Intermediaries administered at-issue purchases for Plaintiffs Avis, Barrett, Brown, Caine, Clark, Corcoran, Garber, Gilbert, Jenks, and Samuelson.<br><br>DX-426 ¶ 11 | |
| 2 | Fact 81. Plaintiffs Avis, Barrett, Brown, Caine, Clark, Corcoran, Garber, Gargiulo, Gilbert, Hagert, Jenks, and Washington continued purchasing prescriptions from CVS after they consulted with counsel about this lawsuit.<br><br>DX-458 (Pls.' Revised Privilege log); DX-456 | |

| | | |
|---|---|---|
| | (Pl. Testimony Chart & Transaction Records); DX-453 (Pl. testimony chart) | |
| 2 | Fact 82. Plaintiffs Avis, Barrett, Caine, Clark, Corcoran, Garber, and Jenks filled HSP-eligible prescriptions at CVS after they consulted with counsel about this lawsuit.<br><br>DX-456 | |
| 2 | Fact 83. Plaintiffs purchased medications from CVS and at least one other pharmacy during the class period.<br><br>DX-474–DX-488 (Pls.' Resps. & Objections to CVS's First RFAs) | |
| 1 | Fact 84. CVS did not make false or misleading statements about the availability or nature of the HSP program to Plaintiffs.<br><br>DX-6, DX-28, DX-83, DX-92, DX-102, DX-118, DX-165, DX-185, DX-193, DX-201, DX-217, DX-218, DX-239, DX-258, DX-270 (Pls.' Resps. Interrog. No. 12 (39–56)); DX-455 (Pl. Testimony Chart) | |
| 1&2 | Fact 85. Before the litigation, Plaintiffs did not know how their copayments are determined.<br><br>Ex. DX-457 (Pl. Testimony Chart) | |
| 1&2 | Fact 86. Before the litigation, Plaintiffs drew no association between a pharmacy's U&C price and the amount of their copayment.<br><br>DX-457 (Pl. Testimony Chart) | |
| 1&2 | Fact 87. Before the litigation, Plaintiffs were unfamiliar with the concept of U&C pricing.<br><br>DX-457 (Pl. Testimony Chart) | |

**ATTORNEY ATTESTATION**:

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

By: s/ Grant A. Geyerman

Grant A. Geyerman (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP

*Attorneys for CVS Pharmacy, Inc.*

.