Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

   CHRISTOPHER CORCORAN, et al.

5

            Plaintiff,

6

        vs.                        No. 15-CV-03504-YGR

7

   CVS PHARMACY, INC.,

8

            Defendant.

9   _____

10

11

12

13

14     VIDEOTAPED DEPOSITION OF WILLIAM JOHN BARRE

15

16            Thursday, November 17, 2016

17                 12:59 P.M.

18

19            12670 High Bluff Drive

20             San Diego, California

21

22

23   Reported by:

24   Harry Alan Palter

25   CSR No. 7708, Certified LiveNote Reporter

## Page 2

```
 1  APPEARANCES:
 2
 3  For Plaintiffs:
 4        STEIN MITCHELL CIPOLLONE BEATO & MISSNER
          BY:  ROBERT B. GILMORE
 5        Attorney at Law
          1100 Connecticut Avenue, NW, Suite 1100
 6        Washington, DC 20036
          202.601.1589   Fax 202.352.1877
 7        E-mail:  rgilmore@steinmitchell.com
 8
    For CVS:
 9
          WILLIAMS & CONNOLLY LLP
10        BY:  COLLEEN MCNAMARA
               GRANT GEYERMAN (TELEPHONICALLY)
11        Attorneys at Law
          725 Twelfth Strreet, NW
12        Washington, D.C. 20005
          202.434.5186   Fax 202.434.5029
13        E-mail:  cmcnamara@wc.com
                   ggeyerman@wc.com
14
15  For the Deponent:
16        THE PHOENIX LAW GROUP
          BY:  CANDIDA RUESGA
17        Attorney at Law
          8765 East Bell Road, Suite 110
18        Scottsdale, Arizona 85260
          480.444.3500
19        E-mail:  cruesga@phoenixlawgroup.com
20
    Videographer:
21
          Ryan LaFond
22
23
24
25
```

## Page 3

```
 1                    INDEX
 2                                        PAGE
 3  APPEARANCES                              2
 4  PROCEEDINGS                              5
 5
 6            INDEX TO EXAMINATION
 7
 8        WITNESS:  WILLIAM JOHN BARRE
 9
10  EXAMINATION OF:
11  Bill Barre
12   BY MS. McNAMARA                      6, 88
13   BY MR. GILMORE                         50
14
15  WITNESS DECLARATION                     90
16  DEPOSITION ERRATA SHEET                 91
17  REPORTER'S CERTIFICATE                  92
18
19  INDEX OF VIDEO MEDIA
20  Media No. 1                              6
21
22            •_____•
23
24
25
```

## Page 4

```
 1             INDEX TO EXHIBITS
 2             WILLIAM JOHN BARRE
 3         Corcoran vs. CVS Pharmacy, Inc.
 4          Thursday, November 17, 2016
 5          Harry Alan Palter, CSR No. 7708
 6
 7  MARKED        DESCRIPTION           PAGE
 8  Defense Exhibit 299   CVS Pharmacy, Inc.'s    7
                          Amended Notice of
 9                        Videotaped Deposition
                          of Bill Barre
10
11  Defense Exhibit 300   MedImpact MedCare      20
                          Pharmacy Network
12                        Agreement, CVSC-0333819
                          through CVSC-0333863
13
    Defense Exhibit 301   Salesforce document,   35
14                        MEDIMPACT000001 through
                          MEDIMPACT000003
15
16  Plaintiff Exhibit 606  TP Contracts Indexing  64
17                         Form, CVSC-0006048
                           through CVSC-0006081
18
19            •_____•
20
21
22
23
24
25
```

## Page 5

```
 1              San Diego, California
 2     Thursday, November 17, 2016; 12:59 P.M.
 3
 4
 5          THE VIDEOGRAPHER:  All right.  Good
 6  afternoon.  We are on the record.
 7          This is the videotaped deposition of Bill
 8  Barre in the matter of Christopher Corcoran, et al.,
 9  vs. CVS Pharmacy, Inc.  This deposition is taking
10  place at 12670 High Bluff Drive, San Diego,
11  California  92130.  Today's date is November 17th,
12  2016.  Time on the record is 12:59.
13          My name is Ryan LaFond.  I'm the
14  videographer with U.S. Legal Support.  Our certified
15  court reporter is Harry Palter.  Video and audio
16  recording will take place, unless all counsel have
17  agreed to go off the record.
18          Would all present please identify
19  themselves, beginning with the witness.
20          THE WITNESS:  Bill Barre.
21          MS. RUESGA:  Candida Ruesga, Phoenix Law
22  Group, on behalf of MedImpact.
23          MS. McNAMARA:  Colleen McNamara and Grant
24  Geyerman, on the phone, from Williams & Connolly on
25  behalf of CVS pharmacy.
```

Page 6

1           MR. GILMORE:  Robert Gilmore with Stein
2   Mitchell on behalf of plaintiffs and the class.
3           THE VIDEOGRAPHER:  Thank you.
4           Would the reporter please swear in the
5   witness.
6
7
8                   WILLIAM JOHN BARRE,
9   having been duly administered an oath in accordance
10  with the California Code of Civil Procedure
11  Section 2094, was examined and testified as follows:
12
13
14                  EXAMINATION
15  BY MS. McNAMARA:
16      Q    Good afternoon, Mr. Barre.
17      A    Hello.
18      Q    My name is Colleen McNamara.  I'm an
19  attorney from Williams & Connolly representing CVS
20  in this lawsuit filed by the plaintiff.
21           Could you please state your full name for
22  the record.
23      A    Sure.  It's William John Barre.
24      Q    And what is your home address?
25      A    Is 6747 Cavite, C-a-v-i-t-e, Court,

Page 7

1   San Diego, California  92120.
2       Q    And I'll start off by handing you what
3   I've marked as Defendant's Exhibit 299.
4           (Exhibit 299 marked)
5   BY MS. McNAMARA:
6       Q    That's just the amended notice of your
7   deposition today.
8       A    Okay.
9       Q    You don't have to read it.  You can just
10  put it to the side.
11      A    All right.
12      Q    Have you ever been deposed before,
13  Mr. Barre?
14      A    Yes.
15      Q    How many times?
16      A    Probably about six.  I would guesstimate.
17      Q    And when was the last time you were
18  deposed?
19      A    About two years ago.
20      Q    And those six depositions, were they
21  related to your time at MedImpact?
22      A    Some were.
23      Q    And about how many were related to
24  MedImpact?
25      A    I'd say of the six, five.

Page 8

1       Q    And what was the other one related to?
2       A    Divorce case.
3       Q    So I know you've been deposed a number of
4   times before, but I'll start off just by covering
5   the basic ground rules of the deposition.
6           We have a court reporter transcribing
7   everything we say.  So it's important that we try as
8   best we can to speak one at a time.  So I promise to
9   do my best to wait for you to finish your answer
10  before I start my next question.  And if you could
11  do the same for me, even if you know where I'm
12  going, I'd appreciate it.
13           Sound good?
14      A    Yes.
15      Q    And on the same note, it's also important
16  that we both speak in complete words.  So no head
17  shakes, no "huh-uhs" -- those are difficult for the
18  court reporter to transcribe; okay?
19      A    Understood.
20      Q    Great.
21           If I ask you a question today that you
22  don't understand, just let me know, and I'll
23  rephrase it.  And if you go ahead and answer my
24  question, I will assume you understood what I asked;
25  fair?

Page 9

1       A    Sounds good.
2       Q    All right.  And if at any time you need a
3   break, just let us know.  My only request is that
4   you answer any question that I have pending before
5   we go off the record; okay?
6       A    Understood.
7       Q    Great.  And is there any reason sitting
8   here today why you might not be able to answer my
9   questions truthfully and accurately?
10      A    No.  No reason.
11      Q    Great.
12           So are you currently working?
13      A    Yes.
14      Q    And who is your current employer?
15      A    MedImpact.
16      Q    And what is MedImpact?
17      A    MedImpact is a pharmacy benefit manager.
18      Q    And what does a pharmacy benefit manager
19  do?
20      A    Well, we either process -- or what's
21  otherwise known as "adjudicate" -- prescription drug
22  claims on behalf of consumers and payors.
23      Q    And what type of entities are MedImpact's
24  clients?
25      A    They could be health-maintenance

Page 10

1  organizations, HMOs; self-funded employer groups.
2  They could be government programs.  Could even be,
3  today, individual consumers.
4      Q    And aside from adjudicating claims, does
5  MedImpact offer any other kind of services to those
6  clients?
7      A    Well, as part of that process, we provide
8  reporting to clients.  We provide clinical advice,
9  benefit coverage recommendations, eligibility
10  maintenance -- all going into the process of how
11  pharmacy benefit is typically administered.
12      Q    And how long have you worked for
13  MedImpact?
14      A    It will be 16 years in January.
15      Q    And so -- back when you first joined
16  MedImpact, what was your position?
17      A    I was hired at MedImpact as associate
18  vice president of network development.
19      Q    And what did you do as associate vice
20  president of network development?
21      A    I was responsible for managing a team.
22  And together, we handled the negotiations with
23  retail pharmacies and mail-order pharmacies and
24  eventually specialty pharmacies.
25      Q    And how long did you hold that position

Page 11

1  as associate vice president of network development?
2      A    Two years.
3      Q    And what was your next position?
4      A    I was promoted to vice president of --
5  the title was "strategic network development."
6      Q    And what did you do in that role?
7      A    Same function.  It was just a title
8  promotion.
9      Q    About how many pharmacy contracts have
10  you negotiated on behalf of MedImpact over the
11  years?  Rough estimate.
12      A    Well over a hundred.
13      Q    Including CVS?
14      A    Including CVS.
15      Q    And do you recall negotiating a network
16  agreement with CVS during your tenure as VP of
17  strategic network development?
18      A    Yes.
19      Q    And how long were you the VP of strategic
20  network development?
21      A    Till approximately 2010.
22      Q    And did someone succeed you as VP of
23  strategic network development?
24      A    Yes.
25      Q    Who was that?

Page 12

1      A    Don't know the title of VP of strategic
2  network development, but the responsibilities --
3  still in a director position -- was Ash Yerasi.
4      Q    And does Mr. Yerasi still hold that
5  position today?
6      A    He does, and he's a vice president today.
7      Q    And what's your current position at
8  MedImpact?
9      A    I am vice president of business
10  development.
11      Q    Oh, and I'm sorry.  Let me back up.
12          When you -- when you transitioned roles
13  in 2010, what position did you move to?
14      A    To vice president of business
15  development.
16      Q    Got it.
17          And that's the position you still hold
18  today?
19      A    Correct.
20      Q    Great.  And what do you do in that role?
21      A    I'm responsible for looking forward into
22  our market to determine products, services,
23  relationships, other opportunities that will benefit
24  our customers, our customer's end customer, the
25  consumer, as well as benefit the overall

Page 13

1  organization of MedImpact.  So sort of a
2  forward-thinking -- out-of-box business
3  opportunities.
4      Q    Are you still involved at all with the
5  negotiation of contracts with pharmacies?
6      A    No.
7      Q    And now I'd like to work backward from
8  the -- or through the jobs that you held before you
9  joined MedImpact back in 2001.
10          So prior to joining MedImpact, where did
11  you work?
12      A    Target Stores.
13      Q    And what did you do for Target?
14      A    I was the national third-party manager.
15      Q    And what responsibilities did you have in
16  that role?
17      A    I was responsible for negotiating with
18  PBMs and with other payors for our -- how we would
19  be reimbursed at Target.  I also handled our
20  marketing -- pharmacy marketing budget for Target --
21  Target pharmacies.
22      Q    Got it.
23          So when you were working for Target, you
24  were kind of working for the other side, so to
25  speak?

Page 14

```
 1       A      Yes.  I was negotiating with the -- from
 2  the provider standpoint, yes.
 3       Q      Got it.
 4              So you've negotiated contracts over the
 5  years from both sides of the table; right?
 6       A      That's correct.
 7       Q      And how long were you in that position at
 8  Target?
 9       A      From 1997 -- July of 1997, to January of
10  2001.
11       Q      And before that, where did you work?
12       A      Before that, I was with Revco Drugstores.
13       Q      And what did you do for Revco?
14       A      And Revco had a small PBM operation known
15  as "Rx Connections," and I headed the regional sales
16  for the southern region.
17       Q      And when you say you headed regional
18  sales, what -- what do you mean?  What were your
19  responsibilities there?
20       A      Was to find payors, employer groups,
21  HMOs, state organizations, hospice groups -- a
22  "payor" as we would refer to it as in the PBM
23  industry -- and sell and then negotiate that
24  contract with said payor and then bring that on
25  board, bringing that live; and then as -- to
```

Page 15

```
 1  continue to serve as account manager to manage the
 2  relationship with those entities that we sold.
 3       Q      Got it.
 4              So in that position, you were still doing
 5  contracting, but it would be the contract between
 6  the PBM and the payor?
 7       A      That's correct.
 8       Q      And how long were you with Revco?
 9       A      I was there during two different time
10  periods.  This time period referring to was from
11  19 -- from about October of '96, November of '96, to
12  July of 1997.
13       Q      And prior to October 1996?
14       A      I was with CVS pharmacy.
15       Q      Okay.  And what was your role at CVS?
16       A      It was similar.  It was a sales
17  opportunity for the PBM which at that time known as
18  "Pharmacare."
19       Q      Okay.  And similar responsibilities with
20  respect to contracting with payors?
21       A      That's correct.
22       Q      And how long were you with CVS
23  Pharmacare?
24       A      From 1993 to 1996.
25       Q      And before you joined Pharmacare?
```

Page 16

```
 1       A      I was with Revco Drugstores.
 2       Q      Okay.
 3       A      With Rx Connections from 1991 to 1993.
 4       Q      Got it.
 5              What was your role there during that
 6  first tenure?
 7       A      It was also a sales position.  Regional
 8  sales position.
 9       Q      Similar responsibility?
10       A      Similar responsibilities, yes.
11       Q      And before you joined Revco, where did
12  you work?
13       A      I was still with Revco, but from 1987 to
14  1991, and that was as a pharmacist and store
15  manager.
16       Q      And you're a licensed pharmacist?
17       A      Yes, I am.
18       Q      Are you still a licensed pharmacist?
19       A      Yes, I am.
20       Q      What states are you licensed?
21       A      North Carolina.
22       Q      And prior to 1987?
23       A      College student.
24       Q      Got it.
25              Where did you go to college?
```

Page 17

```
 1       A      Massachusetts College of Pharmacy and
 2  Allied Health Sciences -- takes a little bit to get
 3  out.
 4              Massachusetts College of Pharmacy and
 5  Allied Health Sciences.
 6       Q      And I take it you graduated?
 7       A      Graduated in June of 1987.
 8       Q      And what was your degree?
 9       A      Bachelor of science in pharmacy.
10       Q      So I asked you earlier if you recalled
11  executing a Pharmacy Network Agreement with CVS
12  during your tenure at MedImpact.
13       A      Yes.
14       Q      Yes.  And were you involved in the
15  negotiation of that contract?
16       A      Yes, I was.
17       Q      Could you describe your involvement in
18  that negotiation with CVS?
19              MR. GILMORE:  Objection.  Form.
20  BY MS. McNAMARA:
21       Q      Go ahead.
22       A      I had a team of folks that would have had
23  responsibility for certain pharmacies and chains.
24  And as we negotiated with those chains, I would
25  have -- they would have served at the forefront, and
```

Page 18

1  I would have served as coming in as their
2  supervisor -- as boss -- to help that negotiation
3  process get through and to eventually get to a
4  signed agreement.
5      Q     So do you recall reviewing red lines of
6  the contract and exchanging red lines?
7      A     There would have been multiple contracts,
8  but yes.
9      Q     And were you in contact with employees at
10 CVS during that time?
11     A     Yes.
12     Q     And can you just describe your
13 interactions with any CVS employees that you
14 remember during that negotiation?
15           MR. GILMORE:  Objection.  Form.
16           THE WITNESS:  Well, it would have been a
17 combination of working through negotiations on a
18 contract or specific opportunity, primarily related
19 to reimbursement rates, payment terms -- typical
20 things you would find in a payment-type agreement.
21           We would also work from a relationship
22 status.  We wanted to be able to ensure we were
23 representing their best interests as well and being
24 able to find things that a retailer might be doing
25 that we could promote and use with our payor

Page 19

1  clients, if they were offering special services or
2  things of that nature.
3  BY MS. McNAMARA:
4      Q     And who were your primary contacts at CVS
5  during the negotiation of this contract?
6      A     Well, it wouldn't be this contract but
7  several contracts over a period of time.  It would
8  have involved several individuals during -- during
9  that time period.
10     Q     And when you say, "several contracts,"
11 what are you referring to?
12     A     When we -- as a PBM -- or any PBM
13 contracts -- you may have a national agreement that
14 allows you to utilize what you've negotiated for any
15 size plan.  You might have specific agreements that
16 are either regionally based or market-specific based
17 or for-a-specific-client based or even for a
18 specific type of business -- a Medicare versus a
19 commercial contract, for example.
20     Q     Got it.
21           So you recall -- do you recall
22 negotiating a national agreement, specifically with
23 CVS?
24     A     Yes.
25     Q     And then a number of these other more

Page 20

1  specific contracts over the years?
2      A     Yes.
3      Q     Okay.  Was one of your contacts Beth
4  Wingate?
5      A     At a point in time, yes.
6      Q     And how often did you interact with
7  Ms. Wingate when she was at CVS?
8      A     I would say several times a year.
9      Q     And was Sharon Edmunds another contact
10 for you?
11     A     Yes.
12     Q     And who was the person on your team who
13 was responsible for the CVS relationship?
14     A     At the time, Suzanne Andrews would have
15 had those negotiations, as you specifically refer to
16 those individuals at that point.  Earlier to that,
17 it probably would have been a gentleman named Robert
18 Carney.
19     Q     I'm going to hand you what I've marked
20 Defendant's Exhibit 300.
21           (Exhibit 300 marked)
22           MS. McNAMARA:  This is a document, for
23 the record, titled, "MedCare Pharmacy Network
24 Agreement," produced with the Bates label CVS
25 C-0333819 through -863.

Page 21

1  BY MS. McNAMARA:
2      Q     Do you recognize this document,
3  Mr. Barre?
4      A     It looks like a standard MedCare pharmacy
5  agreement that we would have used with pharmacies.
6      Q     And in the bottom right-hand corner,
7  there are two sets of initials.  Do you see that?
8      A     Yes, I do.
9      Q     Is one of those sets yours?
10     A     Looks like it is, yes.
11     Q     And I'd like you to turn to page 22 of
12 the document.  It's the page with the Bates label
13 ending in -40.
14     A     Hmm-hmm.
15     Q     Do you see under, "Agreed and accepted,"
16 there are two sets of signatures?
17     A     Yes, I do.
18     Q     Is that your signature?
19     A     The signature on the right.
20     Q     On the right?
21     A     Yes.
22     Q     So is this the network -- the national
23 network agreement that you negotiated with CVS
24 during your tenure as VP of strategic network
25 development?

Page 22

1      A    It would be the agreement we would have
2  signed per that date.  Previously, we may have had
3  other national agreements of some type.  But to this
4  date, that would be, yes.
5      Q    And I'd like you to turn to page 20 of
6  the agreement.  And that is the Bates label ending
7  in -838.
8      A    Hmm-hmm.
9      Q    And about two-thirds of the way down the
10 page is a definition of, "Usual and customary or
11 U&C."  Do you see that?
12     A    Yes, I do.
13     Q    And it says, "Usual and customary or U&C,
14 means the lowest price member pharmacy would charge
15 to a cash-paying customer at that location for an
16 identical prescription on that day.  This price must
17 include any applicable discounts, promotions, or
18 other offers to attract customers."
19          Did I read that correctly?
20     A    Yes.
21     Q    And this would be the definition of "U&C"
22 that you and CVS agreed to as of the date of this
23 contract; correct?
24     A    Yes.
25     Q    Are you familiar with the term "cash

Page 23

1  discount card"?
2      A    Yes.
3      Q    What is a "cash discount card"?
4      A    A "cash discount card" is a card that a
5  consumer brings to a pharmacy and typically receives
6  a discount to that card compared to the pharmacy's
7  usual and customary price.
8      Q    And when you say, "discount compared to
9  the pharmacy's usual and customary price," what do
10 you mean?
11     A    We would negotiate a formula for pricing
12 drugs for cash discount business with a pharmacy or
13 a chain of pharmacies.  And the claims would price
14 at those contracted, calculated rates or the
15 pharmacy's usual and customary, whichever is a lower
16 price.
17     Q    And at the time you executed this
18 agreement with CVS, did you understand the
19 definition of "usual and customary" to require CVS
20 to submit cash discount card prices as usual and
21 customary?
22          MR. GILMORE:  Objection.  Form.
23 Foundation.
24          THE WITNESS:  No.  We would not have
25 considered that to be their usual and customary

Page 24

1  price.  It would have been the price of that
2  particular card program separate.
3  BY MS. McNAMARA:
4      Q    And why not?  Why wouldn't cash discount
5  cards be included in this definition?
6      A    Our view of usual and customary is as
7  it's defined in this agreement here (Indicating);
8  someone that has walked off the street, has not
9  shown any other type of processing or adjudication
10 associated with that card.
11          Passively, what would they be charged for
12 that drug without presenting any type of a -- other
13 form of either payment or form of a cash discount
14 card that would provide some type of a different
15 adjudication process.
16          So from a passive basis, you or myself or
17 anybody walking off the street -- what would that
18 price of that product be at that store at that given
19 point in time?
20     Q    Got it.
21          And did your understanding of whether
22 cash discount cards would be included in this U&C
23 definition ever change?
24     A    No.
25     Q    Do you recall that back in 2006, Walmart

Page 25

1  started to offer a list of generic drugs for $4?
2      A    Yes.
3      Q    And what do you remember about that
4  offering?
5      A    Well, that Walmart -- it was
6  approximately 400 drugs, almost all generic.  I
7  don't think there was any brand associated with
8  that.  It was a 30-day supply.  And they were
9  putting that list together and offering that as
10 their usual and customary price -- a $4 price tag --
11 for those particular drugs.
12     Q    And do you recall that they were offering
13 that price to anybody who walked in off the street
14 and purchased the drug?
15     A    We viewed that as Walmart's usual and
16 customary price.  Again, it was a passive
17 experience.  A person would not have to show any
18 type of ID card, or discount card or insurance card
19 or anything else to obtain that price.
20     Q    And do you recall in the 2007-2008
21 timeframe other pharmacies coming out with
22 membership programs offering special pricing on
23 generics?
24     A    Yes.
25     Q    And tell me what you remember about those

Page 26

1  programs.
2       A    What I recall is that several pharmacy
3  chains offered a membership program to which -- may
4  or may not have had a fee applied to -- and it was a
5  card specific to that pharmacy.
6       So, in other words, if you had a CVS
7  program, it wouldn't work at Walgreens, by way of
8  example -- and because a person had actively joined
9  that program, they were eligible to either get
10 either 30-day programs or some 90-day programs and
11 others -- prescriptions for those day supplies at a
12 discounted price.
13      Q    And did you view those programs as
14 different from the Walmart $4 offering?
15      A    Yes.
16      Q    And why was that?
17      A    Again, it's this passive vs. active
18 scenario.
19           In a passive model, the Walgreens usual
20 and customary was obtained by a consumer without
21 taking any action on their part.
22           In the example of a club program -- or
23 however you want to refer to these programs -- a
24 person had actively joined.  They either registered
25 or gave their name and information, but they were

Page 27

1  connected to a specific type of program that an
2  individual not enrolled in that program would not be
3  eligible to receive that pricing model.
4       Q    And you mentioned you recalled some
5  programs having a fee and others not having a fee.
6            Was the fee a determining factor for you
7  or was it the active-passive distinction that you've
8  been articulating?
9       A    It was the active --
10           MR. GILMORE:  Objection.  Form,
11 foundation.
12           THE WITNESS:  Excuse me.
13           It was the -- it was the active vs.
14 passive.
15           In passive, again meaning Walmart, a
16 person took no action and received that opportunity.
17           As far as a CVS or Walgreens or any other
18 type of program of these "club programs" as we
19 generically referred to them as, the individual had
20 made a decision to actively become part of such
21 program.  So we viewed that as different.
22 BY MS. McNAMARA:
23      Q    And did you view those -- well, and tell
24 me how you viewed membership programs with respect
25 to the pharmacy's usual and customary price.

Page 28

1       A    The --
2            MR. GILMORE:  Objection.  Form.
3  Foundation.
4            THE WITNESS:  The membership program was
5  a program that a consumer actively enrolled in, as
6  if they were joining -- and that was different than
7  a usual and customary, which we viewed as what would
8  be that -- what would be that price point if a
9  consumer was not taking any action, simply coming to
10 the pharmacy and presenting their prescription
11 without any other insurance card or discount program
12 or anything of that nature; what would that price
13 calculate -- what would they choose to charge for
14 that price?
15 BY MS. McNAMARA:
16      Q    And do you recall CVS having a membership
17 program?
18      A    Yes.
19      Q    And what do you recall about that
20 program?
21      A    I remember the program came out -- I
22 believe the program was really specifically for
23 90 days' medications at the time.  I believe they
24 had some type of charge associated with the program,
25 if I remember correctly.  And the program began

Page 29

1  somewhere in the 2007 or '8 range.  I can't exactly
2  remember when, but it sounds about right timewise.
3       Q    And CVS's program was also an
4  enrollment-based program, to your recollection?
5            MR. GILMORE:  Objection.  Form.
6  Foundation.
7            THE WITNESS:  Yes.  We saw it as an
8  enrollment program.
9  BY MS. McNAMARA:
10      Q    And how did you learn about CVS's
11 program?
12      A    Don't remember exactly the specific
13 event, but it was generally known in the industry
14 that CVS was offering such programs.  So whether --
15 some type of chain drugstore publication or whether
16 some type of industry information piece -- I'm sure
17 that's how we found out about it.
18      Q    And do you recall when you learned about
19 it?
20      A    Somewhere right around the beginning that
21 it started.  So in the 2007-'8 range, but not
22 specifically.
23      Q    And do you recall discussing membership
24 programs with other MedImpact employees in your
25 group?

Page 30

1     A     Yes.

2     Q     And tell me about those discussions.

3     A     Well, we typically -- as anything that

4  was pharmacy news or retail oriented, we probably

5  would discuss such a program being offered.  I can't

6  recall any specific conversations.  Just the general

7  aspect that we were aware that they were out there.

8     Q     And who do you recall speaking with?

9     A     Suzanne Andrews that worked with me.

10  Howard Wile was another individual that worked with

11  me.

12     Q     And did they share your view that -- that

13  membership programs were outside of a pharmacy's

14  usual and customary?

15     A     I don't recall.

16     Q     And I don't think I asked this question

17  with respect to CVS specifically, but in your view,

18  was CVS required to submit its membership program

19  price as its usual and customary price?

20           MR. GILMORE:  Objection.  Form.

21  Foundation.  Calls for a legal conclusion.

22  BY MS. McNAMARA:

23     Q     In light of what you knew about the

24  program.

25           MR. GILMORE:  Same objections.

Page 31

1           THE WITNESS:  No.  We did not require

2  them to.

3  BY MS. McNAMARA:

4     Q     And at any time during your tenure at

5  MedImpact, did you learn whether CVS was or was not,

6  in fact, submitting the membership program price's

7  U&C?

8     A     Our belief was they were not unless they

9  chose that that membership fee price was the same as

10  their usual and customary price.  Then they'd be

11  submitting that's as the usual and customary price.

12     Q     But they weren't required to --

13     A     They were not --

14           MR. GILMORE:  Objection.

15  BY MS. McNAMARA:

16     Q     -- under the terms of the contract?

17           I'm sorry.

18           MR. GILMORE:  Objection.  Form.

19  Foundation.  Calls for a legal conclusion.

20           THE WITNESS:  We looked at what they

21  submitted as a usual and customary price as the

22  passive price that was available to anyone walking

23  in.  We did not contact that to any type of club or

24  loyalty program or anything of that nature that they

25  were doing.

Page 32

1  BY MS. McNAMARA:

2     Q     And do you recall any conversations with

3  any CVS employee regarding whether CVS would be

4  submitting the HSB price as U&C?

5     A     No, I don't remember any specific

6  conversation.

7     Q     I'd like to go back to the contract

8  definition of U&C that we read earlier.

9     A     Okay.

10     Q     The contract defines U&C as, "The lowest

11  price a member pharmacy would charge to a

12  cash-paying customer at that location for an

13  identical prescription on that day."

14           In -- in your view, is a customer who

15  joins a membership program a cash customer?

16     A     No.

17           MR. GILMORE:  Objection.  Form and

18  foundation.

19  BY MS. McNAMARA:

20     Q     And why not?

21     A     Because they've actively chosen to join a

22  program.  It's not really any different than what we

23  refer to as these "cash discount programs" earlier.

24  It just happens to be one CVS was sponsoring or

25  offering to their clientele.

Page 33

1     Q     And the definition goes on to say, "This

2  price must include any applicable discounts,

3  promotions, or other offers to attract customers."

4           In your mind, was a membership program

5  like CVS's Health Savings Pass and applicable

6  discount?

7     A     No.

8           MR. GILMORE:  Objection.  Form.

9  Foundation.  Calls for a legal conclusion.

10  BY MS. McNAMARA:

11     Q     Was it a promotion?

12     A     No.

13     Q     An offer to attract customers?

14     A     By nature it may have attracted

15  customers.  But we did not see it as being -- as

16  being part of the definition.

17     Q     And that's, again, because it was a

18  program that someone actively had to join; fair?

19     A     That is correct.  Yes.

20     Q     Do you recall telling any MedImpact

21  clients that -- well, strike that.

22           In your role as VP of strategic network

23  development, did you interact with MedImpact's

24  clients?

25     A     Yes.

Page 34

1       Q       And do you recall telling any of those
2   clients that CVS or any other pharmacy would not be
3   submitting a membership program price as U&C?
4       A       Yes.
5       Q       And what clients did you recall talking
6   to about that membership-program issue?
7       A       Harvard Pilgrim comes to mind as one.
8               THE REPORTER:  Harvey?
9               THE WITNESS:  Harvard.
10              THE REPORTER:  Oh.
11              THE WITNESS:  H-a-r-v-a-r-d Pilgrim.
12  BY MS. MCNAMARA:
13      Q       And what do you remember about that
14  conversation with Harvard Pilgrim?
15      A       General curiosity to what a club program
16  was.  And just explained that was something that CVS
17  was offering to consumers going in or consumers that
18  were enrolling actively in this program to get a
19  90-day medication.
20      Q       And do you recall Harvard Pilgrim raising
21  it with you?
22      A       Most likely, yes.
23      Q       And what was their response when you
24  explained that it was outside of U&C?
25      A       Don't really remember any specific

Page 35

1   response.  Just a clarity of explanation of what the
2   program was.
3       Q       And they didn't object, I take it?
4       A       I don't recall.
5               MR. GILMORE:  Objection.  Form and
6   foundation.
7               THE WITNESS:  I don't recall any
8   objection.
9   BY MS. MCNAMARA:
10      Q       And do you recall any -- any
11  conversations with any other MedImpact clients about
12  membership program?
13      A       No.  That's the only one I can recall.
14      Q       I'm going to hand you what I've marked
15  Defendant's Exhibit 301.
16              (Exhibit 301 marked)
17  BY MS. MCNAMARA:
18      Q       And this is a document that was produced
19  with Bates label MedImpact 000001, and the header
20  says, "Case: 00259517 Salesforce Unlimited Edition."
21  And this document has a Salesforce logo in the upper
22  left-hand corner.
23      A       Yes.
24      Q       It's a cute little snowman.  Are you
25  familiar with Salesforce?

Page 36

1       A       Yes.
2       Q       What is it?
3       A       Salesforce for MedImpact is our work
4   management solution tools.  So as issues to resolve,
5   tasks to perform, et cetera.  People typically enter
6   in as a Salesforce case and direct that to the right
7   individual to receive either a response or an action
8   to be taken.
9       Q       So what prompts the opening of a case in
10  Salesforce?
11      A       Could be multiple of reasons.  But,
12  generally, it's a need to have either a question
13  answered or a need to have some type of project
14  completed or some type of document completed or --
15  you know, really anything that needs to be seen
16  through its completion.  It's a way for us to track
17  work effort in the building.
18      Q       And once a case is open, it can then be
19  directed to the appropriate person to handle --
20      A       Yes.
21      Q       -- the issue?
22      A       Yes.  That's correct.
23      Q       And who uses Salesforce?
24      A       It's used throughout the organization.
25      Q       So can you give me a general overview of

Page 37

1   the process of how a Salesforce case is resolved?
2       A       Sure.
3       Q       After -- after it's opened, what happens?
4       A       A sales case is opened.  And it's
5   typically assigned to an individual.  An individual
6   receives that and reviews that and either answers it
7   and resolves it or will forward it to another entity
8   or individual for resolution.
9               Once that information is -- the work is
10  kind of waved through the system and the originator
11  of that has received a response -- that maybe
12  they're satisfied then -- they can close the case.
13  And if it is not met with their expectations, they
14  can either reassign it or re-create or close the
15  case as a nonresolved case.
16      Q       So taking a look at this specific case,
17  which is No. 00259517, sticking, again, to the
18  general format of Salesforce first, about halfway
19  down the first page, there's a header that says, "To
20  Be Completed By Requester."  Do you see that?
21      A       Yes.
22      Q       And then two lines down, there's the case
23  owner.  Do you see that?
24      A       Marty Heightsman, yes.
25      Q       So what is the "case owner"?

Page 38

1    A    The "case owner" would be the person
2  who's originating the case and looking for a
3  question or a need to have a product or a solution
4  or document or whatever produced.  So it's who
5  originated the case.
6    Q    And this particular case owner is Marty
7  Heightsman.  Do you know Marty Heightsman?
8    A    Yes.
9    Q    And who is Marty?
10    A    I am not sure of her exact current role.
11  But at that point in time, I know she's been an
12  account executive representing the business needs of
13  our clients.
14    Q    And what do account executives do,
15  generally?
16    A    Generally, they're assigned to a client
17  or series of clients -- meaning, payors -- that we
18  contract with.  And they're there to strategically
19  manage the business needs and recommendations of
20  their client.  They may manage a team of folks who
21  may assist in development things like benefit plan
22  changes.  They may direct clinical pharmacists under
23  their watch, may be advising the client on certain
24  things change in benefit design or certain trends to
25  be aware of.  So, basically, the person responsible

Page 39

1  for the account, the client, the payor.
2    Q    And in this particular case, Marty is a
3  she?
4    A    That's correct.  Yes.
5    Q    Ms. Heightsman.  Ms. Heightsman opened a
6  case with the subject, "$4 generic program."  Do you
7  see that?
8    A    May have to focus a little.
9    Yes, I do see that.  My eyes are a little
10  off here.
11    Q    No problem.
12    And in the description underneath the
13  subject, it says, "(Redacted text) is asking if they
14  are receiving pricing for the CVS, Walmart, and
15  Target $4 generic programs.  How can we confirm this
16  is happening?"  Do you see that?
17    A    Yes.
18    Q    And so Ms. Heightsman opened this case.
19  And then what happens -- and then -- strike that.
20    So after she opens this case, what
21  happens to kind of move it to toward resolution?
22    A    The case would be assigned to who Marty
23  would think would be the best person to resolve it
24  or the best department to resolve it.  Cases can be
25  sent to a department.

Page 40

1    And then -- that is -- ultimately gets to
2  an individual who either answers or forwards
3  that on to who they believe is the next to the
4  department or entity to appropriately answer the
5  question or services that need to be done to -- I
6  need a report, for example, to be able to get that
7  information generated.
8    Q    And on the second page of this document,
9  down at the bottom of the page, there's a table with
10  the header, "Case History."  Do you see that?
11    A    "Case History."  Yes, I do.
12    Q    And in the second column from the left is
13  a list of users.  Do you see that?
14    A    Yes, I do.
15    Q    So would this list under the Case History
16  reflect the people to whom this particular case has
17  been assigned?
18    A    Yes.
19    Q    And then above that, there's a table with
20  a number of case comments.  Do you see that?
21    A    Yes, I do.
22    Q    And the last comment, which is at the top
23  of the Case Comments table, was created by Jeannine
24  Robertson.  Do you see that?
25    A    Yes.

Page 41

1    Q    Who is "Jeannine Robertson"?
2    A    Jeannine Robertson is a MedImpact
3  employee who works in the pharmacy network
4  department.
5    Q    And was that -- and this particular
6  comment was made on January 30th, 2009.  The
7  pharmacy networking group -- was that the group you
8  were in charge of at the time?
9    A    At the point in time, we had two
10  different units.  We had pharmacy network
11  development.
12    Q    Okay.
13    A    That was the relational management and
14  contracting unit.  And that reported up through me.
15  And we had a group called "PNO" -- "Pharmacy Network
16  Operations" -- that would have reported up through
17  our operating arm.  The two interacted closely, but
18  I did not have responsibility for the pharmacy
19  network operations team.
20    Q    Got it.
21    And Ms. Robertson was in the pharmacy
22  operations team?
23    A    As best I can remember.  I don't recall
24  her working directly for me.  So I assume that, yes,
25  she was in the network operations department.

Page 42

1    Q    Got it.

2         And Ms. Robertson made a three-paragraph

3    comment, but -- and you should review the comment,

4    but I'm most interested in the last paragraph where

5    she says, "As for CVS, I don't believe they have a

6    $4 generic program.  They advertise a $10 90-day

7    program, but members have to enroll and pay $10 per

8    year to get it.  So it won't be passed to us.  It's

9    marketed as a program for members who don't have

10   drug coverage."

11        MS. RUESGA:  You want to take some time

12   to look at the beginning?

13        MS. McNAMARA:  Feel free.

14        MS. RUESGA:  I know it's really small.

15        THE WITNESS:  Once you hit 50, it's

16   downhill guys.  Let me tell you.

17        THE REPORTER:  I have a magnifier.

18        (Brief pause)

19        THE WITNESS:  (Examining document) I'm

20   still having trouble just focusing on -- would you

21   mind reading that over, if you don't mind?

22   BY MS. McNAMARA:

23   Q    No problem.

24        She says, "Hi, Marty."  Take a look at

25   the attached spreadsheet.  I ran a report of all

Page 43

1    generic claims from Target or Walmart for AAH01 for

2    December 2008.  The first tab of the spreadsheet

3    shows those claims where the store submitted the $4

4    rate (the field submitted claim pay amount in the

5    U&C that the store submitted).

6         "You'll also see that we paid $4 or less

7    for all of these.  The second tab is where the store

8    submitted more than $4.  I started going through

9    that list to validate that all of those claims

10   should not have been billed at $4.  I didn't get

11   through the whole list (it's time-consuming), but

12   the ones I looked at, I was able to find a reason

13   (shown in the last column) why they weren't billed

14   at $4.  Either the item wasn't on the list, the

15   quantity exceeded the $4 quantity, or the drug is

16   asterisked on the list to say that it doesn't apply

17   in California.  Maybe it would make sense to just

18   show the first tab to redacted.  If they would

19   accept that as proof.  If we want to give them the

20   second tab, someone will need to spend the time to

21   go through each claim and validate why it didn't pay

22   at $4.  Also note that at the bottom of the first

23   tab, I added some $10, 90-day claims, which is also

24   part of the advertised deal.

25        "As for CVS, I don't believe they have a

Page 44

1    $4 generic program.  They advertise a $10, 90-day

2    program, but members have to enroll and pay $10 per

3    year to get it, so it won't be passed to us.  It's

4    marketed as a program for members who don't have

5    drug coverage."

6    A    Okay.

7    Q    So in her response, Ms. Robertson appears

8    to be distinguishing between the $4 programs offered

9    by Walmart and Target and the membership program

10   offered by CVS; fair?

11   A    That's fair.

12   Q    And that's the same distinction that

13   we've been discussing regarding Walmart and programs

14   like CVS's; right?

15   A    Yes.

16        MR. GILMORE:  Objection.  Form.

17   Foundation.

18        THE WITNESS:  Yes, it is.

19   BY MS. McNAMARA:

20   Q    And Ms. Robertson says, "Members have to

21   enroll and pay $10 per year to get it, so it won't

22   be passed to us."

23        What's your understanding of what she

24   means by, "it won't be passed to us"?

25        MR. GILMORE:  Objection.  Form.

Page 45

1    Foundation.

2         THE WITNESS:  What I assume that Jeannine

3    is referring to is that this is an active enrollment

4    program of some type.  In this particular case,

5    she's identifying that it's a $10 charge for that,

6    but it's a program that people have actively elected

7    to participate in, contrasting that with the

8    Walmart/Target programs which described earlier are

9    passive programs, meaning you as a consumer did not

10   have to take any action in order to receive such

11   pricing.

12   BY MS. McNAMARA:

13   Q    So when she says, "it won't be passed to

14   us," do you interpret that to mean it won't be

15   submitted as U&C?

16        MR. GILMORE:  Objection.  Form.

17   Foundation.

18        THE WITNESS:  That's correct.

19        CVS could either be using that price,

20   could be using a lower or a higher price for what

21   they would consider the usual and customary to

22   submit to us, but it would not be connected to this

23   $10 membership program that's in place.

24   BY MS. McNAMARA:

25   Q    And the view that Ms. Robertson is

Page 46

1  expressing here is consistent with your view that
2  CVS wasn't required to submit the HSP price's U&C;
3  right?
4                    MR. GILMORE:  Objection.  Form and
5  foundation.
6                    THE WITNESS:  It is consistent with my
7  viewpoint, yes.
8  BY MS. McNAMARA:
9       Q       Back in 2006 to 2008, do you recall the
10  Walmart offering getting a lot of attention in the
11  marketplace?
12      A       Yes.
13      Q       And do you recall membership programs
14  receiving a similar amount of attention?
15                    MR. GILMORE:  Objection.  Form.
16  Foundation.
17                    THE WITNESS:  I recall to a much lesser
18  extent than the $4 Walmart generic programs.  That
19  was an industry changer for Walmart.
20  BY MS. McNAMARA:
21      Q       Walmart was the game-changer?
22      A       Correct.
23      Q       And why do you think that membership
24  programs didn't get as much attention?
25                    MR. GILMORE:  Objection.  Form.

Page 47

1  Foundation.
2                    THE WITNESS:  Number one, I don't think
3  it received as much press.  When the Walmart $4
4  generic program broke, it was everywhere.  It was on
5  the nightly news as something that took place.
6                    As additional retailers even mimicked
7  their program, such as Target, it wasn't as much as
8  the $4 Walmart generic program received in the
9  marketplace.  As other retailers began to offer
10  membership programs, it certainly was something we
11  recognized as something in the industry, but not to
12  the general public that the amount of press that you
13  would have seen associated with the $4 generic
14  program that Walmart was just not as evident.
15  BY MS. McNAMARA:
16      Q       And did you think that these membership
17  programs would catch on with consumers?
18                    MR. GILMORE:  Objection.  Form.
19  Foundation.
20                    THE WITNESS:  By the time we got to 2008
21  in the world, the vast majority of folks -- our
22  business was concentrated with people that had
23  funded benefit.
24                    If someone did not have an insurance
25  program, they could go out and find a cash discount

Page 48

1  program.  And we viewed this as just another version
2  of CVS in essence offering a cash discount program
3  designed for 90-day supplies in this case.
4  BY MS. McNAMARA:
5       Q       We've been talking a lot in the 2007 and
6  2008 era, but have membership programs been a topic
7  of discussion at MedImpact at any time after that
8  initial launch period?
9       A       Yes.
10      Q       And what do you recall about those
11  discussions?
12      A       Well, through one of our subsidiary
13  organizations, they begin to promote such programs
14  and to be able to offer those to certain retailers
15  in the industry.
16      Q       Do you recall any MedImpact clients ever
17  expressing concern that the HSP price might be lower
18  than their contracted rate?
19      A       I don't recall any specific instance.
20      Q       And fair to say that no client that you
21  recall ever demanded that you -- that the HSP or a
22  membership program price be submitted as U&C?
23      A       I do not recall any such request.
24      Q       Do you recall ever discussing membership
25  programs with your counterparts at other PBMs?

Page 49

1       A       Yes.
2       Q       And tell me about those discussions.
3                    MR. GILMORE:  Objection.  Form.
4                    THE WITNESS:  Casual in nature.  Just:
5  "Did you see what CVS did?"
6  BY MS. McNAMARA:
7       Q       And did you get a sense from those
8  discussions whether other PBMs were of the same
9  opinion as you, that those programs were outside of
10  U&C?
11                    MR. GILMORE:  Objection.  Form and
12  foundation.
13                    THE WITNESS:  No real opinion either way.
14                    MS. McNAMARA:  I have nothing further for
15  Mr. Barre at this time.
16                    MS. RUESGA:  Did you want to take a break
17  or anything?
18                    THE WITNESS:  Yeah.  I'll get more water.
19                    THE REPORTER:  Off the record.
20                    THE VIDEOGRAPHER:  Off the record at
21  1:48.
22                    (Off the record)
23                    THE VIDEOGRAPHER:  All right.  We're back
24  on the record at 1:51.
25

Page 50

```
1              EXAMINATION
2  BY MR. GILMORE:
3      Q    Good afternoon, Mr. Barre.  Again, my
4  name is Robert Gilmore.  I'm one of the attorneys
5  representing the plaintiffs and the class they
6  represent in this lawsuit against CVS.
7           We haven't met before today, have we?
8      A    No, we have not.
9      Q    And you and I have never spoken before
10 this deposition today; right?
11     A    That is correct.
12     Q    Did you speak with anyone from CVS before
13 today's deposition?
14     A    With CVS, no.
15     Q    Did you speak with any of CVS's lawyers
16 before your deposition today?
17     A    Yes.
18     Q    Which lawyers from CVS did you talk with
19 before your deposition today?
20     A    To be honest, I'll have to refer back to
21 counsel for names on that.  I just can't recall who
22 the individuals were.
23     Q    There were several attorneys representing
24 --
25     A    I believe it was --
```

Page 51

```
1           THE REPORTER:  We have to do this one at
2  a time.
3           (Record read by the reporter as follows:)
4           "QUESTION:  There were
5           several attorneys representing
6           -- "
7  BY MR. GILMORE:
8      Q    -- CVS who you spoke with prior to
9  today's deposition?
10     A    If I recall, I think it was two
11 individuals on the phone.
12     Q    Was Ms. McNamara one of them, do you
13 know?
14     A    I believe so, yes.
15     Q    And was Mr. Geyerman, who's on the phone
16 here with us -- was he one of the attorneys?
17     A    I believe that was the other individual.
18 Yes.
19     Q    How many times did you talk with them?
20     A    One -- one phone call.
21     Q    How about -- how long -- strike that.
22           How long was that phone call?
23     A    I recall somewhere about 25 minutes.
24     Q    Did they tell you the questions that they
25 intended to ask you in today's deposition?
```

Page 52

```
1      A    Not specific questions, no.
2      Q    Did they cover the topics that they
3  wanted to talk with you about today?
4      A    Yes, in a general sense.
5      Q    And did you tell them the answers you
6  think you would give to those kinds of questions?
7      A    Yes, to the best of my ability.
8      Q    Other than attorneys -- other than your
9  attorneys or MedImpact's attorneys -- did you talk
10 with anyone at MedImpact about your deposition
11 today?
12     A    No.
13     Q    Have you read plaintiff's Complaint in
14 this lawsuit?
15     A    Scanned it briefly.
16     Q    What's your understanding about what
17 plaintiffs are suing CVS for?
18     A    My understanding is that the plaintiffs
19 in the case where -- were able to -- are looking to
20 receive the discount associated with this club or
21 card program, whatever you want to refer to it as --
22 because that pricing may have been less than their
23 copay experience through their insurance program.
24     Q    First of all, you're not here testifying
25 that the discount pricing that CVS offered in its
```

Page 53

```
1  Health Savings Pass program wasn't lower than the
2  copayments that these plaintiffs paid?
3           MS. McNAMARA:  Objection to form.
4  Misstates the record.  Foundation.
5           THE WITNESS:  No.  I'm not aware -- I
6  wouldn't know what their particular copayment would
7  be so I wouldn't be able to comment on that.
8  BY MR. GILMORE:
9      Q    You're not here to testify that the
10 actual usual and customary prices that CVS submitted
11 to MedImpact or any other payor or PBM were CVS's
12 truthful and accurate usual and customary prices?
13           MS. McNAMARA:  Objection to form.  Vague
14 and ambiguous.  Foundation.
15           THE WITNESS:  I'm not sure what I'm being
16 asked to testify to, but I'd say that from our
17 perception that the usual and customary definition
18 as it was indicated in the contract.
19 BY MR. GILMORE:
20     Q    My question was a little different.  Let
21 me try and rephrase it.
22           You haven't done an analysis yourself to
23 figure out did CVS submit the right usual and
24 customary prices to MedImpact?
25     A    No, I have not done an analysis.
```

Page 54

1    Q    And you're not aware of any of your
2    colleagues at MedImpact who have done such an
3    analysis and concluded, in fact, CVS did submit the
4    right U&C prices to MedImpact?
5         MS. McNAMARA:  Objection to form.  Vague
6    and ambiguous.  Calls for speculation.  Compound.
7         THE WITNESS:  I do not recall any
8    specific analysis.
9    BY MR. GILMORE:
10   Q    You testified earlier that MedImpact is a
11   pharmacy benefit manager; correct?
12   A    Yes.
13   Q    And I think you also testified that its
14   clients include HMOs; right?
15   A    Yes.
16   Q    Its clients include self-funded
17   employee-benefit plans?
18   A    Yes.
19   Q    And it's -- MedImpact's clients include
20   individuals themselves; right?
21   A    Yes.
22   Q    One of the jobs of a PBM is to obtain
23   lower prices for prescription drugs for its clients;
24   agreed?
25        MS. McNAMARA:  Objection.  Form.  Vague

Page 55

1    and ambiguous.
2         THE WITNESS:  Our responsibilities are to
3    negotiate reimbursement rates that we will pay to
4    pharmacies.
5    BY MR. GILMORE:
6    Q    In the process of negotiating
7    reimbursement rates that MedImpact will pay to
8    pharmacies, one of MedImpact's responsibilities is
9    to obtain the lowest rate it can from the pharmacy
10   for the benefit of MedImpact's clients; right?
11        MS. McNAMARA:  Objection to form.  Vague
12   and ambiguous.
13        THE WITNESS:  I would say a goal versus
14   responsibility.  That would be in our best interests
15   for business to obtain the best possible discounts
16   that we could obtain with the pharmacy.
17   BY MR. GILMORE:
18   Q    Earlier in questions from counsel, you
19   referred to "claim adjudication."
20   A    Yes.
21   Q    You're familiar with the National Council
22   of Prescription Drug Programs?
23        (Telephonic interruption at 1:58 P.M.)
24   MR. GILMORE:  Off the record real quick.
25   THE VIDEOGRAPHER:  Off the record at

Page 56

1    1:58.
2         (Off the record)
3         THE VIDEOGRAPHER:  Back on the record at
4    1:58.
5         (Record read by the reporter as follows:)
6         "QUESTION:  You're
7         familiar with the National
8         Council of Prescription Drug
9         Programs?"
10        THE WITNESS:  Yes.
11   BY MR. GILMORE:
12   Q    Acronym for that organization is the
13   NCPDP; right?
14   A    Yes.
15   Q    The NCPDP has a standard format for
16   pharmacies to report claims to PBMs and payors;
17   right?
18   A    Yes.
19   Q    That process is essentially the same for
20   all purchases of drugs using insurance through the
21   industry, fair?
22   A    Fair statement.
23   Q    Are you familiar with some of the
24   elements of data that are transmitted in claim
25   adjudication through the NCPDP format?

Page 57

1    A    Yes.
2    Q    One of those elements is a pharmacy's
3    usual and customary price; right?
4    A    Yes.
5    Q    Fair to say that pharmacies submit their
6    usual and customary price in every transaction
7    that's adjudicated through the NCPDP format?
8    A    Yes.
9    Q    And, in fact, the NCPDP format has a
10   specific field for transmitting usual and customary
11   price, 426(d)(q); right?
12   A    I understand it's a specific field.  I
13   couldn't name that for you if I tried.
14   Q    Are you aware of the NCPDP's definition
15   of usual and customary price?
16   A    No, I am not.
17   Q    I'm going to represent to you that the
18   NCPDP's definition of usual and customary price is,
19   quote, "the amount charged cash customers for the
20   prescription exclusive of sales tax and other
21   amounts claimed," end quote.
22        You don't have any disagreement with that
23   definition, do you?
24        MS. McNAMARA:  Objection to form.
25   Foundation.

Page 58

```
1              THE WITNESS:  No.
2    BY MR. GILMORE:
3         Q    Now, MedImpact typically uses the usual
4    and customary price in its pricing with the
5    pharmacies with which it contracts?
6         A    Yes.
7         Q    Can you think of any agreement -- well,
8    strike that.
9              During your tenure at MedImpact, to your
10   knowledge, have all of MedImpact's agreements with
11   CVS used usual and customary pricing as a price
12   component?
13             MS. McNAMARA:  Objection to form.
14   Ambiguous.  Calls for speculation.
15             THE WITNESS:  As far as I'm aware, yes.
16   BY MR. GILMORE:
17        Q    The general idea of using usual and
18   customary pricing is that a person using his or her
19   insurance to buy a prescription drug should not be
20   paying more than a person paying cash for that same
21   drug; fair?
22             MS. McNAMARA:  Objection to form.
23             THE WITNESS:  I would say that it's a
24   person's cash pricing -- they're not using any other
25   form or any other system to be able to calculate a
```

Page 59

```
1    price for them.
2              Again, this argument about passive price,
3    walking off the street would pay simply walking in
4    the door without any other type of either insurance
5    or adjudication that would reflect a different
6    pricing.
7    BY MR. GILMORE:
8         Q    My question was probably unclear.  I'm
9    going to ask you some more about your definition of
10   "usual and customary pricing" you testified earlier.
11             Right now, I'm asking about how usual and
12   customary price is used in contracts with CVS.
13        A    Hmm-hmm.
14        Q    And, in general, MedImpact's contracts
15   provide that a pharmacy will be paid the lower of a
16   contracted rate or the pharmacy's reported usual and
17   customary price; fair?
18        A    Fair.
19        Q    And that concept -- let's call it lower
20   of U&C pricing -- is widely present throughout the
21   pharmacy industry, to your knowledge; right?
22        A    To my knowledge, yes.
23        Q    That's part of the reason why a pharmacy
24   like CVS submits its usual and customary price to a
25   PBM payor on every adjudicated prescription drug
```

Page 60

```
1    transaction; right?
2         A    To the best of my knowledge, yes.
3         Q    Because PBMs and payors like MedImpact
4    use the usual and customary price to figure out how
5    much the pharmacy's going to get paid on that claim;
6    right?
7              MS. McNAMARA:  Objection to form.
8              THE WITNESS:  How much they will get
9    paid, and also how the consumer's price may be
10   calculated, yes.
11   BY MR. GILMORE:
12        Q    Now, it's true, though, that MedImpact
13   does not monitor on its own whether a pharmacy is
14   submitting accurate usual and customary prices;
15   right?
16             MS. McNAMARA:  Objection to form.
17   Ambiguous.  Foundation.
18             THE WITNESS:  I'm not aware of anything
19   we specifically do to check that usual and customary
20   price.
21   BY MR. GILMORE:
22        Q    It's fair to say that MedImpact relies on
23   a pharmacy to submit a correct usual and customary
24   price?
25             MS. McNAMARA:  Objection to form.
```

Page 61

```
1    Ambiguous.
2              THE WITNESS:  Fair.
3    BY MR. GILMORE:
4         Q    MedImpact's -- does not know what prices
5    CVS actually charges its uninsured cash customers.
6              MS. McNAMARA:  Objection.
7    BY MR. GILMORE:
8         Q    They don't have that kind of set of data
9    from CVS in the ordinary course of business; right?
10             MS. McNAMARA:  Objection to form.  Vague
11   and ambiguous.  Foundation.  Calls for speculation.
12             THE WITNESS:  As far as I'm aware, we do
13   not have any specific usual and customary
14   information from CVS beyond what we receive in the
15   NCPDP field.
16   BY MR. GILMORE:
17        Q    Now, if CVS or any other pharmacy submits
18   an inflated usual and customary price, that can
19   result in CVS or another pharmacy being paid more
20   than what it is supposed to; right?
21             MS. McNAMARA:  Objection to form.  Vague
22   and ambiguous.  Foundation.  Calls for speculation.
23   BY MR. GILMORE:
24        Q    Let me give an example, just to make it
25   more concrete.
```

Page 62

1      Imagine CVS -- CVS's true usual and
2  customary price is $10, but it submits to MedImpact
3  in the usual and customary field a usual and
4  customary price of $20.  In that kind of scenario,
5  CVS could end up being paid more by MedImpact and
6  MedImpact's insured members; right?
7      MS. McNAMARA:  Objection to form.  True
8  usual and customary price is vague and ambiguous.
9  Calls for speculation.
10     THE WITNESS:  If a pharmacy submitted $20
11 as a usual and customary and their actual $10 was
12 their supposed to be true usual and customary, our
13 system would calculate to reimburse the pharmacy at
14 the lower of the calculated price that we've
15 negotiated through contract or the usual and
16 customary.
17 BY MR. GILMORE:
18     Q    In the scenario that I described, if $10
19 would have been the lowest of the various price
20 components in MedImpact's contracts with CVS but $20
21 would not have been, in that kind of scenario, CVS
22 could be overpaid by MedImpact or MedImpact's
23 patients; right?
24     MS. McNAMARA:  Objection to form.
25 Incomplete hypothetical.  Calls for speculation.

Page 63

1      THE WITNESS:  If CVS were to submit to me
2  $20 in their usual and customary field versus $10 --
3  which was their actual experience -- and it was
4  compared to contracted rate, if the $20 was still
5  lower than the contracted rate, they would be net
6  reimbursed at the $20.
7  BY MR. GILMORE:
8      Q    And if the $20 was higher than the
9  contracted rate but the contracted rate was higher
10 than $10, CVS would be paid somewhere in between 10
11 and $20; right?
12     MS. McNAMARA:  Objection to form.
13 Incomplete hypothetical.  Calls for speculation.
14     THE WITNESS:  We wouldn't have a basis to
15 contract off of the 10, because we'd have no
16 knowledge of that.  But if $20 was the usual and
17 customary and, by example, the calculated contracted
18 price was 15, CVS would be net reimbursed at $15.
19 BY MR. GILMORE:
20     Q    I'm going to hand you what we've
21 premarked as Plaintiff's Exhibit 606.  This is
22 another version -- it may not have all of the
23 attachments, but the attachments that are attached
24 to it are unredacted versus the version that
25 Ms. McNamara handed you in Defense Exhibit 300.

Page 64

1      (Exhibit 606 marked)
2  BY MR. GILMORE:
3      Q    Do you see that?
4      A    I see the MedCare Pharmacy Network
5  Agreement, yes.
6      Q    So Plaintiff's Exhibit 606, which as you
7  said is a version of the 2008 MedCare Pharmacy
8  Network Agreement between MedImpact and CVS, is --
9  to your knowledge, is this the Master Agreement
10 that's still in place between CVS and MedImpact
11 today?
12     MS. McNAMARA:  Objection.  Foundation.
13     THE WITNESS:  I -- I don't know.  Having
14 moved from network development somewhere in the 2010
15 range, I'm not familiar with what current agreements
16 would be in place.
17 BY MR. GILMORE:
18     Q    You're not aware, then, that there, in
19 fact, is a more current Master Agreement, other than
20 this one?
21     A    I am not aware if there is or not.  I
22 just don't have knowledge.
23     MS. McNAMARA:  Objection.  Foundation to
24 that one, also.
25 ///

Page 65

1  BY MR. GILMORE:
2      Q    Let's turn to the definition of "usual
3  and customary price," which is on page 20 of the
4  document -- in this version, Plaintiff's
5  Exhibit 606, it is found at Bates No. 6071.
6      A    Okay.
7      Q    And the definition of "usual and
8  customary price" that's in this contract with CVS
9  and MedImpact -- to your recollection, was this
10 something that was negotiated between the two
11 parties?
12     A    Well, the entire contract is negotiated.
13 I don't recall this particular passage as being
14 something that was negotiated for any reason.
15     Q    I want to go through each part.
16     First, "usual and customary" means the
17 lowest price member pharmacy would price to a
18 cash-paying customer.
19     And what is your expectation of lowest
20 price mean?
21     A    The context of lowest-price member
22 pharmacy would charge to a cash-paying customer,
23 what would that price point be for a customer that
24 walked in and didn't have any type of active
25 engagement -- in other words, presenting any other

Page 66

1   type of a card, program, enrollment, anything else
2   of that nature, so simply walking in off the street,
3   what would that person expect to pay at the
4   point-of-sale at CVS.  And that would be defined as
5   the cash price, the usual and customary price or
6   that lowest price.
7        Q    Let me focus on the lowest price.
8             Why does MedImpact want to have a
9   definition of "usual and customary price" that calls
10  that price the lowest price that a pharmacy's
11  offering?
12            MS. McNAMARA:  Objection.  Foundation.
13            THE WITNESS:  We would want to ensure
14  that a consumer coming in without taking any other
15  activity -- this passive definition we referred to
16  earlier, that the consumer end plan would benefit
17  from whatever that price would be.
18            It would be a challenge to go to either a
19  consumer or to a plan and say, "Congratulations.
20  You used the card, and it cost more than if you were
21  to simply walk off the street and not use any type
22  of a card, or program, or anything of that nature."
23            Member disruption -- back to the plan --
24  in most cases it really reflects to the individual.
25  But even if it reflects back to the plan, ensuring

Page 67

1   that that price would take place.
2             We'd also look, when we would define
3   "lowest price" in that meaning if there was
4   something from a passive nature, that consumer would
5   be eligible for.  For example, they don't really
6   exist anymore, but at the point in time, a senior
7   citizen discount was a -- sometimes was offered by
8   certain pharmacies that might offer a lower price
9   than the typical -- the walk-in-off-the-street price
10  would be that that consumer still didn't have to do
11  anything by nature.  It was simply the pharmacist
12  entered in the birthdate information it would
13  automatically calculate to some type of discount.
14  BY MR. GILMORE:
15       Q    The definition of "usual and customary
16  price" in this contract goes on to say, this price
17  must include any applicable discounts promotions or
18  other offers to attract customers; right?
19       A    Yes.
20       Q    As written, the definition of "usual and
21  customary price" does not contain an exception for
22  discounts, promotions, or offers that involve a
23  membership program?
24       A    I was reading that here.  I don't see
25  membership listed in there, yes.

Page 68

1        Q    And nor does this definition of "usual
2   and customary" have a expressed written exception
3   that if you have to pay a fee for a discount that
4   doesn't -- that's not included?
5             MS. McNAMARA:  Objection.  The document
6   speaks for itself.
7             THE WITNESS:  As I read this definition,
8   I don't see that included.
9   BY MR. GILMORE:
10       Q    You've referred several times today to a
11  distinction between active and passive discount
12  programs; right?
13       A    Active and passive pricing, yes.
14       Q    That distinction you're referring to,
15  again, isn't written into this definition of "usual
16  and customary price" that MedImpact and CVS agreed
17  to?
18            MS. McNAMARA:  Objection.  The document
19  speaks for itself.
20            THE WITNESS:  As I read this, I don't see
21  those words specified.
22  BY MR. GILMORE:
23       Q    Can you point me to any written
24  communication that you're aware of where MedImpact
25  memorializes that active vs. passive discount

Page 69

1   program -- that distinction that you're referring
2   to -- aren't to be considered usual and customary
3   pricing?
4             MS. McNAMARA:  Objection to form.
5             THE WITNESS:  I don't recall any specific
6   documentation to that.
7   BY MR. GILMORE:
8        Q    This Pharmacy Network Agreement, is this
9   an agreement that ends up being shared with
10  MedImpact's clients -- payors and PBMs -- I'm sorry
11  -- MedImpact's payor and individual other plan
12  clients?
13            MS. McNAMARA:  Objection to form.  Calls
14  for speculation.
15            THE WITNESS:  I'm not aware of any
16  incidents that we would have shared a specific
17  pharmacy agreement with any payor.  If we did, I
18  would have by nature taken that back to our legal
19  channel and had it managed.  But during my tenure, I
20  cannot recall any incident where we would have
21  shared that with anyone specifically.
22  BY MR. GILMORE:
23       Q    Are you familiar with MedImpact's
24  contracts that it has with payors of HMOs, employee
25  plans -- any --

Page 70

1      A      Not specific agreements, but from a
2  general contracting basis, yes.
3      Q      Do you know whether or not those general
4  contracts -- strike that.
5           Do you know whether generally those
6  contracts reflect the concept of usual and customary
7  pricing?
8      A      I'm not sure.
9      Q      Do you know -- strike that.
10          Payors and PBMs -- strike that.
11          The concept of usual and customary
12  pricing is something that you'd expect payors to be
13  familiar with given this prevalence throughout the
14  pharmacy industry; right?
15          MS. McNAMARA:  Objection to form.
16  Foundation.  Calls for speculation.
17          THE WITNESS:  I would say it would depend
18  on the sophistication of the payor.
19  BY MR. GILMORE:
20      Q      You mentioned a conversation that you
21  claim you had with someone at Harvard Pilgrim about
22  CVS's HSB program; right?
23      A      Yes.
24      Q      You're not testifying that the person --
25  whoever you spoke with at Harvard Pilgrim -- said,

Page 71

1  "Yes, we agree with you, MedImpact.  CVS doesn't
2  need to report its Health Savings Pass price as its
3  usual and customary price"?
4          MS. McNAMARA:  Objection to form.
5  Misstates testimony.
6          THE WITNESS:  I only recall it being an
7  informational conversation.
8  BY MR. GILMORE:
9      Q      Can you point us to any written
10  communication from any of MedImpact's clients where
11  those clients said, "We understand CVS isn't
12  reporting the Health Savings Pass price as its usual
13  and customary price and we are okay with that" --
14  words to that effect?
15      A      I don't recall any written documentation
16  on the program at all.
17      Q      And other than this one conversation that
18  you claim you had with someone at Harvard Pilgrim,
19  do you remember any other conversations that you had
20  with any other of MedImpact's clients about CVS's
21  Health Savings Pass program?
22      A      No.
23          MS. McNAMARA:  Objection.  Asked and
24  answered.
25          THE WITNESS:  Not about the CVS Health

Page 72

1  Pass Program.
2  BY MR. GILMORE:
3      Q      Do you know whether CVS offers the Health
4  Savings Pass prices to customers who do not enroll
5  in the program and pay the membership fee?
6          MS. McNAMARA:  Objection to form.
7  Foundation.  Calls for speculation.
8          THE WITNESS:  I'm not aware of what their
9  rules or parameters are.
10  BY MR. GILMORE:
11      Q      Do you know if there are any eligibility
12  criteria for enrolling in the Health Savings Pass
13  program?
14      A      I --
15          MS. McNAMARA:  Objection to form.
16  Foundation.  Ambiguous.
17          THE WITNESS:  I do not know.
18  BY MR. GILMORE:
19      Q      So far as you know, anyone can come in
20  off the street to a CVS pharmacy at least when the
21  Health Savings Pass program was in place and join
22  the program?
23      A      I don't know what the membership
24  requirements are to join.
25      Q      Did anyone at CVS ever tell you that CVS,

Page 73

1  in fact, has offered many non-HSB members the HSB
2  prices for the same drugs that are in the HSB
3  program?
4          MS. McNAMARA:  Objection to form.
5  Misstates the record.  Calls for speculation.
6  Foundation.
7          THE WITNESS:  I don't recall any specific
8  mention of that.
9  BY MR. GILMORE:
10      Q      Assume with me that that is the case;
11  that CVS, in fact, has offered many non-HSB members
12  the HSB prices for the same drugs.
13          Is that information that you and others
14  at MedImpact would have wanted to know?
15          MS. McNAMARA:  Objection to form.
16  Incomplete hypothetical.  Ambiguous.  Calls for
17  speculation.  Ambiguous.
18          MR. GILMORE:  Let me ask it a different
19  way.
20  BY MR. GILMORE:
21      Q      Without knowing that CVS, in fact, has
22  offered many non-HSB members the same prices for the
23  same drugs as offered in the HSB program, MedImpact
24  did not make fully informed decisions about whether
25  CVS should have been reporting its Health Savings

Page 74

1   Pass prices as its usual and customary prices;
2   right?
3          MS. McNAMARA:  Objection to form.
4   Misstates the record.  Incomplete hypothetical.
5   Ambiguous.
6          THE WITNESS:  I'm not sure.  I don't know
7   that we would connect those two events together.
8   BY MR. GILMORE:
9      Q    If you didn't have to join the HSB
10  program in order to get the HSB prices, that's
11  information that you and others at MedImpact would
12  have wanted to know during the course of your
13  business relationship with CVS; right?
14         MS. McNAMARA:  Objection to form.
15  Incomplete hypothetical.  Misstates the record.
16  Calls for speculation.
17         THE WITNESS:  If we -- I would assume
18  that if we -- if this was a program simply offered
19  to any individual -- a price point was offered to an
20  individual, you know, going on out without any -- or
21  it was done without even the person requesting or
22  going on in, that they would be -- that from our
23  end, we -- I don't know.  I don't know where we
24  would have been related to that, to be honest.  I
25  just don't recall being in that context of being in

Page 75

1   a conversation or having any knowledge of that, so I
2   really can't comment on it.
3   BY MR. GILMORE:
4      Q    Even if you don't know what MedImpact
5   would have done, you would have liked to have known
6   that if, in fact, that was the case that CVS was
7   offering -- strike that.
8          You would have liked to have known
9   whether or not you had to join the HSB program in
10  order to get the HSB prices as a CVS customer.
11  Regardless of what MedImpact would or wouldn't done,
12  that's something you would have liked to have known;
13  right?
14         MS. McNAMARA:  Objection to form.
15  Incomplete hypothetical.  Compound.  Misstates the
16  record.  Calls for speculation.
17         THE WITNESS:  I'm not sure I would
18  have -- would have particularly cared.
19         We look at the usual and customary price
20  as what we assume CVS was charging as their everyday
21  retail price.  We would have been more focused on
22  the actual calculated discounts and ensure -- since
23  we control how that was paid, we were able to ensure
24  that we were getting our appropriate reimbursement
25  or our appropriate payments to the reimbursement

Page 76

1   office.
2   BY MR. GILMORE:
3      Q    If the Health Savings Pass prices were
4   the most common prices that CVS charged cash paying
5   customers who were not enrolled in the HSB program,
6   would MedImpact have wanted those prices to be
7   reported as usual and customary prices?
8          MS. McNAMARA:  Objection to form.
9   Incomplete hypothetical.  Ambiguous.  Calls for
10  speculation.
11         THE WITNESS:  If by nature CVS was
12  providing that price point to a consumer -- no
13  action required or requested by the consumer -- and
14  they simply went out and provided their price
15  point -- let's just say, for example, that was $10,
16  we would expect that $10 to be CVS's usual and
17  customary price.
18  BY MR. GILMORE:
19     Q    I asked you earlier -- and you didn't
20  remember any insurance plan telling MedImpact we
21  understand and agree CVS's Health Savings Pass
22  program prices are not CVS's usual and customary
23  prices.  Let me ask you with respect to federal
24  government regulators.
25         Do you know of any federal government

Page 77

1   regulator who told MedImpact:  CVS's Health Savings
2   Pass prices are not CVS's -- don't need to be
3   submitted as CVS's usual and customary prices?
4          MS. McNAMARA:  Objection to form.
5   Foundation.
6          THE WITNESS:  I don't recall any
7   conversation of that nature.
8   BY MR. GILMORE:
9      Q    Do you recall any state government
10  regulator telling you or anyone else you know of at
11  MedImpact that CVS does not need to submit its
12  Health Savings Pass prices as its usual and
13  customary prices?
14         MS. McNAMARA:  Objection to form.
15  Foundation.  Calls for speculation.
16         THE WITNESS:  I don't recall any
17  conversation of that nature.
18  BY MR. GILMORE:
19     Q    Are you aware of any federal or state
20  government entity telling MedImpact or anyone else
21  that a membership program like the Health Savings
22  Pass program purportedly is -- does not need to be
23  reported as usual and customary prices?
24     A    I don't recall any conversation --
25         MS. McNAMARA:  Objection to form.  Sorry.

Page 78

1       THE WITNESS:  That's fine.  I do not
2   recall any conversation to that nature.
3   BY MR. GILMORE:
4       Q       And I'm asking sort of more broadly than
5   a conversation you had --
6       A       I don't --
7       Q       -- pronouncement, you know, law,
8   regulation, statement from a regulator -- you're not
9   aware of any of those kinds of statements from
10  anyone in the government saying:  This kind of
11  program price doesn't need to be reported as a
12  pharmacy's usual and customary prices?
13      MS. McNAMARA:  Objection to form.
14  Compound.
15      THE WITNESS:  I have no knowledge of any
16  government interaction, conversation, request --
17  anything to MedImpact with respect to such a program
18  in any nature.
19  BY MR. GILMORE:
20      Q       We mentioned the NCPDP before.
21      To your knowledge, has the NCPDP come out
22  with any kind of statement, communication --
23  anything like that -- to the effect that a pharmacy
24  doesn't need to report prices offered through a
25  membership discount program as its usual and

Page 79

1   customary prices?
2       A       I have no knowledge of any of that.
3       Q       Are you a member of the NCPDP?
4       A       Yes, I am.
5       Q       Do you agree with me, sir, that it's
6   reasonable for an individual customer at a CVS store
7   who's using his or her insurance to think that he or
8   she is better off using that insurance rather than
9   paying cash to buy the prescription drug?
10      A       Not necessarily.
11      Q       Isn't the reason why people have
12  insurance to protect against the costs of drugs that
13  they're buying?  Isn't that the main reason why
14  people have prescription drug coverage?
15      MS. McNAMARA:  Objection to form.
16  Compound.  Ambiguous.
17      THE WITNESS:  I don't know to speak why
18  some -- what somebody would individually perceive as
19  their reason for having a prescription drug benefit
20  coverage.
21  BY MR. GILMORE:
22      Q       Do you have prescription drug coverage?
23      A       Yes.
24      Q       And isn't the reason that you have
25  prescription drug coverage -- strike that.

Page 80

1       Is it insurance coverage?
2       A       I have -- I have an insurance program of
3   which prescription coverage is part of that
4   insurance program.
5       Q       And isn't the reason why you have
6   prescription drug insurance coverage so that you're
7   better off in terms of the prices you pay for
8   prescription drugs than if you didn't have that
9   insurance?
10      A       Not necessarily.
11      Q       Is there any other reason -- any other
12  purpose that you use your prescription drug
13  insurance for other than to pay lower prices than
14  you might if you were not using insurance?
15      A       Any other reason to use that -- it could
16  be going towards my deductible, but there may be
17  other sources that I could be receiving a lower
18  price than my insurance coverage.
19      Q       You would agree that it's reasonable for
20  an individual customer to believe that companies
21  involved in his or her insurance is making sure that
22  the individual gets the benefit of that insurance?
23      MS. McNAMARA:  Objection to form.
24  Ambiguous.  Calls for speculation.
25      THE WITNESS:  I can't speak to why an

Page 81

1   individual would make such decisions.  I can't think
2   for them.
3   BY MR. GILMORE:
4       Q       So you're not able to say that it's
5   reasonable for an individual customer to think that
6   a company like MedImpact who's involved in his
7   insurance coverage -- making sure the individual
8   gets the benefit of that insurance?
9       MS. McNAMARA:  Objection to form.
10  Ambiguous.  Calls for speculation.  Asked and
11  answered.
12      THE WITNESS:  I'm not sure I even
13  understand how that question comes about or what
14  you're looking for me to answer to that.
15  BY MR. GILMORE:
16      Q       Customers who go into a pharmacy and use
17  their insurance expect to be getting the benefit of
18  their prescription drug insurance; right?
19      MS. McNAMARA:  Objection to form.
20  Ambiguous.  Calls for speculation.
21      THE WITNESS:  Customers may use their
22  insurance card for -- of what they -- as part of
23  what they perceive as the payment for their
24  prescriptions.
25  ///

Page 82

BY MR. GILMORE:

2    Q    Now -- you mentioned earlier a -- call it
3  a subsidiary of MedImpact -- actually involved in a
4  Health Savings Pass program called "ScriptSave"?
5    A    I don't know if --
6         MS. McNAMARA:  Objection.  Misstates his
7  testimony.
8  BY MR. GILMORE:
9    Q    I'll rephrase the question.
10        MedImpact owns a company called
11  "ScriptSave"; right?
12        MS. McNAMARA:  Objection.  Foundation.
13        THE WITNESS:  I don't know the exact
14  structure of ownership -- if it's MedImpact or if
15  it's a holding company or how the exact corporate
16  structures are established.
17  BY MR. GILMORE:
18    Q    So ScriptSave is part of the MedImpact
19  business regardless of what the exact corporate
20  structure is; right?
21    A    Fair, yes.
22    Q    And you know that in 2013, CVS hired
23  ScriptSave to help administer the Health Savings
24  Pass program; right?
25        MS. McNAMARA:  Objection.  Foundation.

Page 83

1         THE WITNESS:  I don't know that,
2  specifically.  I'm not involved in the ScriptSave
3  business.
4  BY MR. GILMORE:
5    Q    Well, whether or not you know it,
6  specifically -- I think you alluded to it earlier --
7  you're generally aware that ScriptSave at some point
8  in time was hired by CVS to help administer the
9  Health Savings Pass program?
10        MS. McNAMARA:  Objection.
11        MS. RUESGA:  Objection.  I think that
12  misstates the testimony.
13        THE WITNESS:  I don't know what the
14  program between CVS and ScriptSave is specifically
15  called today.
16  BY MR. GILMORE:
17    Q    I think you're referring to something a
18  little different, and I was going to get to that.
19        My question was simply:  At some point in
20  the past, CVS hired ScriptSave to help administer
21  the Health Savings Pass program; true?
22        MS. McNAMARA:  Objection.  Asked and
23  answered.  Foundation.
24        THE WITNESS:  I don't know 'cause I don't
25  know what they called the program.

Page 84

BY MR. GILMORE:

2    Q    Were you aware that in this year in
3  February, CVS transferred all of its HSB members who
4  didn't opt out of the transfer over to a
5  ScriptSave-branded discount card?
6    A    I am aware that there is a ScriptSave
7  relationship with CVS, but I don't know any of the
8  specifics of the program.
9    Q    CVS has been paying the ScriptSave in
10  connection with the HSB program; right?
11        MS. McNAMARA:  Objection.  Foundation.
12        MS. RUESGA:  Same objection.
13        THE WITNESS:  I do not have working
14  knowledge of what that relationship is.
15  BY MR. GILMORE:
16    Q    Are you aware of MedImpact employees
17  internally questioning why just having a fee would
18  make a price not a usual and customary price?
19        MS. McNAMARA:  Objection to form.
20  Foundation.  Calls for speculation.
21        THE WITNESS:  I have no recollection of
22  any conversation on that level.
23  BY MR. GILMORE:
24    Q    Would you be surprised if your colleagues
25  expressed in e-mails questions about why a program

Page 85

1  like the Health Savings Pass program would be
2  excluded from the usual and customary program --
3  prices that CVS has --
4         MS. McNAMARA:  Objection to form.
5  Foundation.  Calls for speculation.  Misstates the
6  record.
7         THE WITNESS:  I don't think I have an
8  opinion on what I would think of that not knowing
9  the specific situation.
10  BY MR. GILMORE:
11    Q    Who are -- you've reported to senior
12  executives within MedImpact over the course of your
13  career?
14    A    Yes.
15    Q    To your knowledge, have any of those
16  senior executives to whom you reported agreed with
17  your view that a -- CVS did not need to submit
18  Health Savings Pass prices as its usual and
19  customary prices?
20        MS. McNAMARA:  Objection.  Calls for
21  speculation.
22        THE WITNESS:  I don't recall any
23  conversations with any senior executive about that.
24  BY MR. GILMORE:
25    Q    Are you the person within the

Page 86

1  MedImpact -- strike that.
2      Are you the person who has been over the
3  course of -- I'll withdraw the question.
4      Let's go off the record.
5      THE VIDEOGRAPHER:  Off the record at
6  2:37.
7      (Off the record)
8      THE VIDEOGRAPHER:  Back on the record at
9  2:46.
10 BY MR. GILMORE:
11     Q    Mr. Barre, I understand from counsel that
12 you wanted to clarify one of your prior answers?
13     A    Sure.  I wanted to address just the line
14 of questions we were going on down -- if CVS were to
15 offer this price point -- health point, whatever
16 that is -- to a consumer as the everyday price that
17 they were offering, we would expect that to be the
18 usual and customary price at CVS.
19         So if 9.99 was, let's say, that price
20 point going on out and the consumer simply came in
21 off the street and the request going in wasn't
22 enrolled in the program and the price point was
23 provided to that individual consumer.  Our
24 expectations would be that would be the submitted
25 usual and customary price for CVS.

Page 87

1      Q    Thank you for that answer, Mr. Barre.
2          If MedImpact learns that its clients had,
3  in fact, been overcharged for prescriptions that
4  they purchased from CVS, MedImpact would want CVS to
5  reimburse those clients for those overcharges; fair?
6      MS. RUESGA:  Objection.  Foundation.
7      THE WITNESS:  We may take on a variety of
8  tactics or negotiations to that.  But in an auditing
9  process, we'd expect we'd have a right to recover
10 that on behalf of clients.
11 BY MR. GILMORE:
12     Q    And if the clients themselves had paid
13 out of pocket an amount more than they should have
14 been, MedImpact would want those clients to be
15 reimbursed for those out of pocket overcharges --
16     MS. RUESGA:  Objection.  Foundation.
17 BY MR. GILMORE:
18     Q    -- right?
19     A    Specific case, not knowing, but it would
20 be a reasonable expectation.
21     Q    And you personally, sir -- if you learned
22 that you had been overcharged for a prescription
23 that you purchased from a pharmacy, you personally
24 would want a refund; right?
25     A    If I were personally overcharged for

Page 88

1  anything, I would expect to receive a refund
2  associated with it.
3      MR. GILMORE:  No further questions.
4      MS. McNAMARA:  I just have a couple of
5  follow-up questions for you.
6  ///
7          FURTHER EXAMINATION
8  BY MS. McNAMARA:
9      Q    Do you recall the name of the person from
10 Harvard Pilgrim with whom you spoke about membership
11 programs?
12     A    I believe it was Andrea Grande.
13     Q    And how do you spell Ms. Grande's last
14 name?
15     A    I think it's G-r-a-n-d-e, if I recall.
16     Q    Earlier today, you mentioned adjudication
17 being a component of these membership programs.  Do
18 you recall that?
19     A    Yes.
20     Q    Do you regard a transaction that is
21 priced through a pharmacy's internal dispensing
22 system as a price set by the pharmacy to be the same
23 as a transaction that is submitted to a third-party
24 adjudicator and happens to come back with the same
25 price?

Page 89

1      MR. GILMORE:  Objection.
2      MS. RUESGA:  Objection.
3      MR. GILMORE:  Form.  Foundation.
4      MS. RUESGA:  Ambiguous.
5      THE WITNESS:  A pharmacy could be using
6  their own internal system as an adjudication system
7  platform to either create a billing or to create a
8  membership pricing or anything else associated with
9  that.  So, yes.
10     MS. McNAMARA:  I have nothing further.
11     MR. GILMORE:  No further questions.
12     THE WITNESS:  All right.
13     MS. RUESGA:  We don't have any questions.
14     THE WITNESS:  Means I gotta go to my
15 4:00 o'clock meeting.
16     (Laughter)
17     THE VIDEOGRAPHER:  Off the record at
18 2:50.
19     (The deposition concluded at 2:50 P.M.)
20
21         *   *   *
22
23
24
25

Page 90

```
1              DECLARATION UNDER PENALTY OF PERJURY
2
3         I, William John Barre, do hereby certify under
4    penalty of perjury that I have read the foregoing
5    transcript of my deposition taken on November 17, 2016;
6    that I have made such corrections as appear noted on the
7    Deposition Errata Sheet, attached hereto, signed by me;
8    that my testimony as contained herein, as corrected, is
9    true and correct.
10
11        Dated this _____ day of _____, 20___, at
12   _____, California.
13
14
15             _____
16             William John Barre
17
18
19
20
21
22
23
24
25
```

Page 91

```
1              DEPOSITION ERRATA SHEET
2
    Page No._____ Line No. _____
3
    Change:_____
4
    Reason for change: _____
5
    Page No._____ Line No. _____
6
    Change:_____
7
    Reason for change: _____
8
    Page No._____ Line No. _____
9
    Change:_____
10
    Reason for change: _____
11
    Page No._____ Line No. _____
12
    Change:_____
13
    Reason for change: _____
14
    Page No._____ Line No. _____
15
    Change:_____
16
    Reason for change: _____
17
    Page No._____ Line No. _____
18
    Change:_____
19
    Reason for change: _____
20
    Page No._____ Line No. _____
21
    Change:_____
22
    Reason for change: _____
23
24
25   _____      _____
         William John Barre          Dated
```

Page 92

```
1    STATE OF CALIFORNIA    )
2                          )
3    COUNTY OF SAN DIEGO    )
4
5
6         I, Harry A. Palter, a Certified Shorthand
7    Reporter of the State of California, do hereby certify:
8         That prior to being examined, the witness in
9    the foregoing proceedings was by me duly sworn to
10   testify to the truth, the whole truth, and nothing but
11   the truth;
12        That said proceedings were taken before me at
13   the time and place therein set forth and were taken down
14   by me in shorthand and thereafter transcribed into
15   typewriting under my direction and supervision;
16        I further certify that I am neither counsel
17   for, nor related to, any party to said proceedings, nor
18   in any way interested in the outcome thereof.
19        In witness whereof, I have hereunto
20   subscribed my name.
21   Dated: November 18, 2016
22
23
24   _____
         HARRY ALAN PALTER
25       CSR No. 7708
```

| $ | 2 | 6 |
|---|---|---|

**$**

**$10**   42:6,7 43:23
  44:1,2,21 45:5,23
  62:2,11,18 63:2,10
  76:15,16
**$15**   63:18
**$20**   62:4,10,20 63:2,
  4,6,8,11,16
**$4**   25:1,10 26:14
  39:6,15 42:6 43:3,6,
  8,10,14,15,22 44:1,8
  46:18 47:3,8,13

**-**

**-40**   21:13
**-838**   22:7
**-863**   20:25

**0**

**000001**   35:19
**00259517**   35:20 37:17

**1**

**1**   3:20
**10**   63:10,15
**110**   2:17
**1100**   2:5
**12670**   5:10
**12:59**   5:2,12
**15**   63:18
**16**   10:14
**17**   4:4 5:2
**17th**   5:11
**19**   15:11
**1987**   16:13,22 17:7
**1991**   16:3,14
**1993**   15:24 16:3
**1996**   15:13,24
**1997**   14:9 15:12
**1:48**   49:21
**1:51**   49:24
**1:58**   56:1,4
**1:58 P.M**   55:23

**2**

**2**   3:3
**20**   4:11 22:5 65:3
**20005**   2:12
**2001**   13:9 14:10
**20036**   2:6
**2006**   24:25 46:9
**2007**   29:1 48:5
**2007-'8**   29:21
**2007-2008**   25:20
**2008**   43:2 46:9 47:20
  48:6 64:7
**2009**   41:6
**2010**   11:21 12:13
  64:14
**2013**   82:22
**2016**   4:4 5:2,12
**202.352.1877**   2:6
**202.434.5029**   2:12
**2094**   6:11
**22**   21:11
**25**   51:23
**299**   4:8 7:3,4
**2:37**   86:6
**2:46**   86:9
**2:50**   89:18,19

**3**

**30-day**   25:8 26:10
**300**   4:11 20:20,21
  63:25
**301**   4:13 35:15,16
**30th**   41:6
**35**   4:13

**4**

**400**   25:6
**426(d)(q)**   57:11
**4:00**   89:15

**5**

**5**   3:4
**50**   3:13 42:15

**6**

**6**   3:12,20
**606**   4:16 63:21 64:1,6
  65:5
**6071**   65:5
**64**   4:16
**6747**   6:25

**7**

**7**   4:8
**7708**   4:5

**8**

**8**   29:1
**85260**   2:18
**88**   3:12

**9**

**9.99**   86:19
**90**   3:15 28:23
**90-day**   26:10 34:19
  42:6 43:23 44:1 48:3
**91**   3:16
**92**   3:17
**92120**   7:1
**92130**   5:11
**96**   15:11

**A**

**AAH01**   43:1
**ability**   52:7
**accept**   43:19
**accepted**   21:15
**accordance**   6:9
**account**   15:1 38:12,14
  39:1
**accurate**   53:12 60:14
**accurately**   9:9
**Acronym**   56:12
**action**   26:21 27:16
  28:9 36:7 45:10
  76:13

**active**  26:17 27:9,13
  45:3 65:24 68:11,13,
  25
**active-passive**  27:7
**actively**  26:8,24
  27:20 28:5 32:21
  33:18 34:18 45:6
**activity**  66:15
**actual**  53:10 62:11
  63:3 75:22
**added**  43:23
**additional**  47:6
**address**  6:24 86:13
**adjudicate**  9:21
**adjudicated**  57:7
  59:25
**adjudicating**  10:4
**adjudication**  24:9,15
  55:19 56:25 59:5
  88:16 89:6
**adjudicator**  88:24
**administer**  82:23
  83:8,20
**administered**  6:9
  10:11
**advertise**  42:6 44:1
**advertised**  43:24
**advice**  10:8
**advising**  38:23
**afternoon**  5:6 6:16
  50:3
**agree**  71:1 76:21 79:5
  80:19
**agreed**  5:17 21:15
  22:22 54:24 68:16
  85:16
**agreement**  4:12 11:16
  17:11 18:4,20 19:13,
  22 20:24 21:5,23
  22:1,6 23:18 24:7
  58:7 64:5,8,9,19
  69:8,9,17
**agreements**  19:15 22:3
  58:10 64:15 70:1
**ahead**  8:23 17:21
**Alan**  4:5
**Allied**  17:2,5
**alluded**  83:6
**ambiguous**  53:14 54:6
  55:1,12 58:14 60:17
  61:1,11,22 62:8

**amended**  4:8 7:6
**amount**  43:4 46:14
  47:12 57:19 87:13
**amounts**  57:21
**analysis**  53:22,25
  54:3,8
**Andrea**  88:12
**Andrews**  20:14 30:9
**answers**  37:6 40:2
  52:5 86:12
**anymore**  67:6
**APPEARANCES**  2:1 3:3
**appears**  44:7
**applicable**  22:17
  33:2,5 67:17
**applied**  26:4
**apply**  43:16
**appropriately**  40:4
**approximately**  11:21
  25:6
**argument**  59:2
**Arizona**  2:18
**arm**  41:17
**articulating**  27:8
**Ash**  12:3
**aspect**  30:7
**assigned**  37:5 38:16
  39:22 40:17
**assist**  38:21
**associate**  10:17,19
  11:1
**assume**  8:24 41:24
  45:2 73:10 74:17
  75:20
**asterisked**  43:16
**attached**  42:25 63:23
**attachments**  63:23
**attention**  46:10,14,24
**attorney**  2:5,17 6:19
**attorneys**  2:11 50:4,
  23 51:5,16 52:8,9
**attract**  22:18 33:3,13
  67:18
**attracted**  33:14
**audio**  5:15
**auditing**  87:8

**automatically**  67:13
**Avenue**  2:5
**aware**  30:7 38:25 53:5
  54:1 57:14 58:15
  60:18 61:12 64:18,21
  68:24 69:15 72:8
  77:19 78:9 83:7
  84:2,6,16

**B**

**Bachelor**  17:9
**back**  10:15 12:11 13:9
  24:25 32:7 46:9
  49:23 50:20 56:3
  66:23,25 69:18 86:8
  88:24
**backward**  13:7
**Barre**  3:8,11 4:2,9
  5:8,20 6:8,16,23
  7:13 21:3 49:15 50:3
  86:11 87:1
**based**  19:16,17
**basic**  8:5
**basically**  38:25
**basis**  24:16 63:14
  70:2
**Bates**  20:24 21:12
  22:6 35:19 65:5
**BEATO**  2:4
**began**  28:25 47:9
**begin**  48:13
**beginning**  5:19 29:20
  42:12
**behalf**  5:22,25 6:2
  9:22 11:10 87:10
**belief**  31:8
**Bell**  2:17
**benefit**  9:17,18 10:9,
  11 12:23,25 38:21,24
  47:23 54:11 55:10
  66:16 79:19 80:22
  81:8,17
**Beth**  20:3
**Bill**  3:11 4:9 5:7,20
**billed**  43:10,13
**billing**  89:7
**birthdate**  67:12
**bit**  17:2
**Bluff**  5:10

board  14:25
boss  18:2
bottom  21:6 40:9
  43:22
brand  25:7
break  9:3 49:16
briefly  52:15
bring  14:24
bringing  14:25
brings  23:5
broadly  78:4
broke  47:4
budget  13:20
building  36:17
business  12:9,14 13:2
  19:18 23:12 38:12,19
  47:22 55:15 61:9
  74:13 82:19 83:3
buy  58:19 79:9
buying  79:13

---

                C

C-0333819  20:25
C-a-v-i-t-e  6:25
calculate  28:13 58:25
  62:13 67:13
calculated  23:14
  60:10 62:14 63:17
  75:22
California  5:1,11
  6:10 7:1 43:17
call  51:20,22 59:19
  82:2
called  41:15 82:4,10
  83:15,25
calls  30:21 31:19
  33:9 54:6 58:14
  61:11,22 62:9,25
  63:13 66:9 69:13
  70:16 72:7 73:5,16
  74:16 75:16 76:9
  77:15 80:24 81:10,20
  84:20 85:5,20
Candida  2:16 5:21
card  23:1,3,4,6,20
  24:2,10,14 25:18
  26:5 28:11 52:21
  66:1,20,22 81:22
  84:5

cards  24:5,22
cared  75:18
career  85:13
Carney  20:18
Carolina  16:21
case  8:2 35:20 36:6,
  9,18 37:1,4,12,15,
  16,22,25 38:1,2,5,6
  39:2,6,18,20,22
  40:10,11,15,16,20,23
  45:4 48:3 52:19
  73:10 75:6 87:19
cases  39:24 66:24
cash  22:25 23:3,4,12,
  20 24:4,13,22 32:15,
  23 47:25 48:2 57:19
  58:20,24 61:5 66:5
  76:4 79:9
cash-paying  22:15
  32:12 65:18,22
Casual  49:4
catch  47:17
Cavite  6:25
CERTIFICATE  3:17
certified  5:14
cetera  36:5
chain  23:13 29:15
chains  17:23,24 26:3
challenge  66:18
change  24:23 38:24
changer  46:19
channel  69:19
charge  22:14 28:13,24
  32:11 41:8 45:5
  65:22
charged  24:11 57:19
  76:4
charges  61:5
charging  75:20
check  60:19
choose  28:13
chose  31:9
chosen  32:21
Christopher  5:8
CIPOLLONE  2:4
citizen  67:7
Civil  6:10
claim  43:4,21 55:19
  56:24 60:5 70:21
  71:18

claimed  57:21
claims  9:22 10:4
  23:13 43:1,3,9,23
  56:16
clarify  86:12
clarity  35:1
class  6:2 50:5
client  38:16,20,23
  39:1 48:20
clientele  32:25
clients  9:24 10:6,8
  19:1 33:21,24 34:2,5
  35:11 38:13,17 48:16
  54:14,16,19,23 55:10
  69:10,12 71:10,11,20
  87:2,5,10,12,14
clinical  10:8 38:22
close  37:12,14
closely  41:17
club  26:22 27:18
  31:23 34:15 52:20
cmcnamara@wc.com  2:13
Code  6:10
colleagues  54:2 84:24
Colleen  2:10 5:23
  6:18
college  16:23,25
  17:1,4
column  40:12 43:13
combination  18:17
comment  40:22 41:6
  42:3 53:7 75:2
comments  40:20,23
commercial  19:19
common  76:4
communication  68:24
  71:10 78:22
companies  80:20
company  81:6 82:10,15
compared  23:6,8 63:4
Complaint  52:13
complete  8:16
completed  36:14 37:20
completion  36:16
component  58:12 88:17
components  62:20
Compound  54:6 75:15
  78:14 79:16
concentrated  47:22

concept 59:19 70:6,11
concern 48:17
concluded 54:3 89:19
conclusion 30:21
  31:19 33:9
concrete 61:25
confirm 39:15
Congratulations 66:19
connect 74:7
connected 27:1 45:22
Connecticut 2:5
connection 84:10
Connections 14:15
  16:3
Connolly 2:9 5:24
  6:19
considered 23:25 69:2
consistent 46:1,6
consumer 12:25 23:5
  26:20 28:5,9 45:9
  66:14,16,19 67:4,10
  76:12,13 86:16,20,23
consumer's 60:9
consumers 9:22 10:3
  34:17 47:17
contact 18:9 20:9
  31:23
contacts 19:4 20:3
context 65:21 74:25
continue 15:1
contract 14:24 15:5
  17:15 18:6,18 19:5,
  6,19 22:23 31:16
  32:7,10 38:18 53:18
  62:15 63:15 65:8,12
  67:16
contracted 23:14
  48:18 59:16 63:4,5,
  9,17
contracting 15:5,20
  41:14 70:2
contracts 4:16 11:9
  13:5 14:4 18:7 19:7,
  10,13 20:1 58:5
  59:12,14 62:20 69:24
  70:4,6
contrasting 45:7
control 75:23
conversation 32:6
  34:14 70:20 71:7,17
  75:1 77:7,17,24

78:2,5,16 84:22
conversations 30:6
  32:2 35:11 71:19
  85:23
copay 52:23
copayment 53:6
copayments 53:2
Corcoran 4:3 5:8
corner 21:6 35:22
corporate 82:15,19
correct 12:19 14:6
  15:7,21 22:23 33:19
  36:22 39:4 45:18
  46:22 50:11 54:11
  60:23
correctly 22:19 28:25
cost 66:20
costs 79:12
Council 55:21 56:8
counsel 5:16 50:21
  55:18 86:11
counterparts 48:25
couple 88:4
court 5:15 6:25 8:6,
  18
cover 52:2
coverage 10:9 42:10
  44:5 79:14,20,22,25
  80:1,3,6,18 81:7
covering 8:4
create 89:7
created 40:23
criteria 72:12
cruesga@
phoenixlawgroup.com
  2:19
CSR 4:5
curiosity 34:15
current 9:14 12:7
  38:10 64:15,19
customary 22:10,13
  23:7,9,15,19,21,25
  24:6 25:10,16 26:20
  27:25 28:7 30:14,19
  31:10,11,21 45:21
  53:10,12,17,24 57:3,
  6,10,15,18 58:4,11,
  18 59:10,12,17,24
  60:4,14,19,23 61:13,
  18 62:2,3,4,8,11,12,
  16 63:2,17 65:3,8,16

66:5,9 67:15,21
  68:2,16 69:2 70:6,11
  71:3,13 74:1 75:19
  76:7,17,22 77:3,13,
  23 78:12 79:1 84:18
  85:2,19 86:18,25
customer 12:24 22:15
  32:12,14,15 65:18,
  22,23 75:10 79:6
  80:20 81:5
customer's 12:24
customers 12:24 22:18
  33:3,13,15 57:19
  61:5 67:18 72:4 76:5
  81:16,21
cute 35:24
CVS 2:8 4:3,8 5:9,25
  6:19 11:13,14,16
  15:14,15,22 17:11,18
  18:10,13 19:4,23
  20:7,13,24 21:23
  22:22 23:18,19 26:6
  27:17 28:16 29:14
  30:17,18 31:5 32:3,
  24 34:2,16 39:14
  42:5 43:25 44:10
  45:19 46:2 48:2 49:5
  50:6,12,14,18 51:8
  52:17,25 53:10,23
  54:3 58:11 59:12,24
  61:5,9,14,17,19
  62:1,5,20,21 63:1,
  10,18 64:8,10 65:8
  66:4 68:16 71:1,11,
  25 72:3,20,25 73:11,
  21,25 74:13 75:6,10,
  20 76:4,11 77:11
  79:6 82:22 83:8,14,
  20 84:3,7,9 85:3,17
  86:14,18,25 87:4
CVS'S 29:3,10 33:5
  44:14 50:15 53:11
  62:1 70:22 71:20
  76:16,21,22 77:1,2,3
CVSC-0006048 4:16
CVSC-0006081 4:17
CVSC-0333819 4:12
CVSC-0333863 4:12

---

## D

D.C. 2:12

data  56:24 61:8
date  5:11 22:2,4,22
day  22:16 26:11 32:13
days'  28:23
DC  2:6
deal  43:24
December  43:2
decision  27:20
decisions  73:24 81:1
DECLARATION  3:15
deductible  80:16
Defendant's  7:3 20:20
  35:15
Defense  4:8,11,13
  63:25
define  67:2
defined  24:7 66:4
defines  32:10
definition  22:10,21
  23:19 24:5,23 32:8
  33:1,16 53:17 57:14,
  18,23 59:9 65:2,7
  66:9,15 67:15,20
  68:1,7,15
degree  17:8
demanded  48:21
department  39:24,25
  40:4 41:4,25
depend  70:17
Deponent  2:15
deposed  7:12,18 8:3
deposition  3:16 4:9
  5:7,9 7:7 8:5 50:10,
  13,16,19 51:9,25
  52:10 89:19
depositions  7:20
describe  17:17 18:12
description  4:7 39:12
design  38:24
designed  48:3
determine  12:22
determining  27:6
development  10:18,20
  11:1,5,17,20,23
  12:2,10,15 21:25
  33:23 38:21 41:11
  64:14
Diego  5:1,10 7:1
difficult  8:17

direct  36:6 38:22
directed  36:19
directly  41:24
director  12:3
disagreement  57:22
discount  23:1,3,4,6,
  8,12,20 24:4,13,22
  25:18 28:11 32:23
  33:6 47:25 48:2
  52:20,25 67:7,13
  68:3,11,25 78:25
  84:5
discounted  26:12
discounts  22:17 33:2
  55:15 67:17,22 75:22
discuss  30:5
discussing  29:23
  44:13 48:24
discussion  48:7
discussions  30:2
  48:11 49:2,8
dispensing  88:21
disruption  66:23
distinction  27:7
  44:12 68:11,14 69:1
distinguishing  44:8
Divorce  8:2
document  4:13 20:22
  21:2,12 35:18,21
  36:14 38:4 40:8
  42:19 65:4 68:5,18
documentation  69:6
  71:15
door  59:4
downhill  42:16
Drive  5:10
drug  9:21 24:12 25:14
  42:10 43:15 44:5
  55:22 56:8 58:19,21
  59:25 79:9,14,19,22,
  25 80:6,12 81:18
drugs  23:12 25:1,6,11
  54:23 56:20 73:2,12,
  23 79:12 80:8
drugstore  29:15
Drugstores  14:12 16:1
duly  6:9

_____
|            E            |
|_____|

E-mail  2:7,13,19
e-mails  84:25
earlier  17:10 20:16
  32:8,23 45:8 54:10
  55:18 59:10 66:16
  76:19 82:2 83:6
  88:16
East  2:17
Edition  35:20
Edmunds  20:9
effect  71:14 78:23
effort  36:17
elected  45:6
elements  56:24 57:2
eligibility  10:9
  72:11
eligible  26:9 27:3
  67:5
employee  32:3 41:3
  69:24
employee-benefit
  54:17
employees  18:9,13
  29:24 84:16
employer  9:14 10:1
  14:20
end  12:24 57:21 62:5
  66:16 74:23
ending  21:13 22:6
ends  69:9
engagement  65:25
enroll  42:7 44:2,21
  72:4
enrolled  27:2 28:5
  76:5 86:22
enrolling  34:18 72:12
enrollment  29:8 45:3
  66:1
enrollment-based  29:4
ensure  18:22 66:13
  75:22,23
ensuring  66:25
enter  36:5
entered  67:12
entire  65:12
entities  9:23 15:2

entity  37:7 40:4
  77:20
era  48:6
ERRATA  3:16
essence  48:2
essentially  56:19
established  82:16
estimate  11:11
et al  5:8
event  29:13
events  74:7
eventually  10:24 18:3
everyday  75:20 86:16
evident  47:14
exact  38:10 82:13,15,
  19
EXAMINATION  3:6,10
  6:14 50:1 88:7
examined  6:11
examining  42:19
exceeded  43:15
exception  67:21 68:2
exchanging  18:6
excluded  85:2
exclusive  57:20
Excuse  27:12
executed  23:17
executing  17:11
executive  38:12 85:23
executives  38:14
  85:12,16
exhibit  4:8,11,13,16
  7:3,4 20:20,21
  35:15,16 63:21,25
  64:1,6 65:5
EXHIBITS  4:1
exist  67:6
expect  66:3 70:12
  76:16 81:17 86:17
  87:9 88:1
expectation  65:19
  87:20
expectations  37:13
  86:24
experience  25:17
  52:23 63:3
explained  34:16,24
explanation  35:1
expressed  68:2 84:25

expressing  46:1 48:17
extent  46:18
eyes  39:9

_____

F

fact  31:6 54:3 57:9
  64:19 73:1,11,21
  75:6 87:3
factor  27:6
fair  8:25 33:18
  44:10,11 48:20
  56:21,22 57:5 58:21
  59:17,18 60:22 61:2
  82:21 87:5
familiar  22:25 35:25
  55:21 56:7,23 64:15
  69:23 70:13
Fax  2:6,12
February  84:3
federal  76:23,25
  77:19
fee  26:4 27:5,6 31:9
  68:3 72:5 84:17
Feel  42:13
field  43:4 57:10,12
  61:15 62:3 63:2
figure  53:23 60:4
filed  6:20
find  14:20 18:20,24
  43:12 47:25
fine  78:1
finish  8:9
focus  39:8 66:7
focused  75:21
focusing  42:20
folks  17:22 38:20
  47:21
follow-up  88:5
for-a-specific-client
  19:17
forefront  17:25
form  4:16 17:19 18:15
  23:22 24:13 27:10
  28:2 29:5 30:20
  31:18 32:17 33:8
  35:5 44:16,25 45:16
  46:4,15,25 47:18
  49:3,11 53:3,13
  54:5,25 55:11 57:24
  58:13,22,25 60:7,16,

25 61:10,21 62:7,24
  63:12 69:4,13 70:15
  71:4 72:6,15 73:4,15
  74:3,14 75:14 76:8
  77:4,14,25 78:13
  79:15 80:23 81:9,19
  84:19 85:4 89:3
format  37:18 56:15,25
  57:7,9
formula  23:11
forward  12:21 37:7
forward-thinking  13:2
forwards  40:2
found  29:17 65:5
foundation  23:23
  27:11 28:3 29:6
  30:21 31:19 32:18
  33:9 35:6 44:17
  45:1,17 46:5,16
  47:1,19 49:12 53:4,
  14 57:25 60:17
  61:11,22 64:12,23
  66:12 70:16 72:7,16
  73:6 77:5,15 82:12,
  25 83:23 84:11,20
  85:5 87:6,16 89:3
free  42:13
full  6:21
fully  73:24
function  11:7
funded  47:23

_____

G

G-r-a-n-d-e  88:15
game-changer  46:21
gave  26:25
general  30:6 34:15
  36:25 37:18 47:12
  52:4 58:17 59:14
  70:2,3
generally  29:13 36:12
  38:15,16 70:5 83:7
generated  40:7
generic  25:1,6 39:6,
  15 42:6 43:1 44:1
  46:18 47:4,8,13
generically  27:19
generics  25:23
gentleman  20:17

Geyerman  2:10 5:24
   51:15
ggeyerman@wc.com  2:13
Gilmore  2:4 3:13 6:1
   17:19 18:15 23:22
   27:10 28:2 29:5
   30:20,25 31:14,18
   32:17 33:8 35:5
   44:16,25 45:16 46:4,
   15,25 47:18 49:3,11
   50:2,4 51:7 53:8,19
   54:9 55:5,17,24
   56:11 58:2,16 59:7
   60:11,21 61:3,7,16,
   23 62:17 63:7,19
   64:2,17 65:1 67:14
   68:9,22 69:7,22
   70:19 71:8 72:2,10,
   18 73:9,18,20 74:8
   75:3 76:2,18 77:8,18
   78:3,19 79:21 81:3,
   15 82:1,8,17 83:4,16
   84:1,15,23 85:10,24
   86:10 87:11,17 88:3
   89:1,3,11
give  36:25 43:19 52:6
   61:24
goal  55:13
good  5:5 6:16 8:13
   9:1 50:3
gotta  89:14
government  10:2
   76:24,25 77:9,20
   78:10,16
graduated  17:6,7
Grande  88:12
Grande's  88:13
Grant  2:10 5:23
Great  8:20 9:7,11
   12:20
ground  8:5
group  2:16 5:22 29:25
   41:7,15
groups  10:1 14:20,21
guesstimate  7:16
guys  42:16

---

### H

H-a-r-v-a-r-d  34:11

halfway  37:18
hand  20:19 35:14
   63:20
handed  63:25
handing  7:2
handle  36:19
handled  10:22 13:19
happening  39:16
Harry  4:5 5:15
Harvard  34:7,9,14,20
   70:21,25 71:18 88:10
Harvey  34:8
head  8:16
headed  14:15,17
header  35:19 37:19
   40:10
health  17:2,5 33:5
   53:1 71:2,12,21,25
   72:3,12,21 73:25
   76:3,21 77:1,12,21
   82:4,23 83:9,21
   85:1,18 86:15
health-maintenance
   9:25
Heightsman  37:24 38:7
   39:5,18
held  13:8
High  5:10
higher  45:20 63:8,9
hired  10:17 82:22
   83:8,20
History  40:10,11,15
hit  42:15
Hmm-hmm  21:14 22:8
   59:13
HMOS  10:1 14:21 54:14
   69:24
hold  10:25 12:4,17
holding  82:15
home  6:24
honest  50:20 74:24
hospice  14:21
Howard  30:10
HSB  32:4 70:22 73:1,
   2,12,23 74:9,10
   75:9,10 76:5 84:3,10
HSP  46:2 48:17,21
huh-uhs  8:17
hundred  11:12

hypothetical  62:25
   63:13 73:16 74:4,15
   75:15 76:9

---

### I

ID  25:18
idea  58:17
identical  22:16 32:13
identify  5:18
identifying  45:5
Imagine  62:1
important  8:7,15
Inc.'s  4:8
incident  69:20
incidents  69:16
include  22:17 33:2
   54:14,16,19 67:17
included  24:5,22
   68:4,8
Including  11:13,14
Incomplete  62:25
   63:13 73:16 74:4,15
   75:15 76:9
INDEX  3:1,6,19 4:1
Indexing  4:16
Indicating  24:7
individual  10:3 27:2,
   19 30:10 36:7 37:5,8
   40:2 51:17 66:24
   69:11 74:19,20 79:6
   80:20,22 81:1,5,7
   86:23
individually  79:18
individuals  19:8
   20:16 50:22 51:11
   54:20
industry  14:23 29:13,
   16 46:19 47:11 48:15
   56:21 59:21 70:14
inflated  61:18
information  26:25
   29:16 37:9 40:7
   61:14 67:12 73:13
   74:11
informational  71:7
informed  73:24
initial  48:8
initials  21:7

instance  48:19
insurance  25:18 28:11
  47:24 52:23 56:20
  58:19 59:4 76:20
  79:7,8,12 80:1,2,4,
  6,9,13,14,18,21,22
  81:7,8,17,18,22
insured  62:6
intended  51:25
interact  20:6 33:23
interacted  41:17
interaction  78:16
interactions  18:13
interested  42:4
interests  18:23 55:14
internal  88:21 89:6
internally  84:17
interpret  45:14
interruption  55:23
involve  67:22
involved  13:4 17:14
  19:8 80:21 81:6 82:3
  83:2
involvement  17:17
issue  34:6 36:21
issues  36:4
item  43:14

### J

January  10:14 14:9
  41:6
Jeannine  40:23 41:1,2
  45:2
jobs  13:8 54:22
John  3:8 4:2 6:8,23
join  32:21 33:18
  72:21,24 74:9 75:9
joined  10:15 13:9
  15:25 16:11 26:8,24
joining  13:10 28:6
joins  32:15
July  14:9 15:12
June  17:7

### K

kind  10:5 13:24 37:10
  39:21 61:8 62:4,21
  78:10,22

kinds  52:6 78:9
knew  30:23
knowing  73:21 85:8
  87:19
knowledge  58:10
  59:21,22 60:2 63:16
  64:9,22 75:1 78:15,
  21 79:2 84:14 85:15

### L

label  20:24 21:12
  22:6 35:19
Lafond  2:21 5:13
Laughter  89:16
launch  48:8
law  2:5,11,16,17 5:21
  78:7
lawsuit  6:20 50:6
  52:14
lawyers  50:15,18
learn  29:10 31:5
learned  29:18 87:21
learns  87:2
left  40:12
left-hand  35:22
legal  5:14 30:21
  31:19 33:9 69:18
lesser  46:17
level  84:22
licensed  16:16,18,20
light  30:23
lines  18:5,6 37:22
list  25:1,9 40:13,15
  43:9,11,14,16
listed  67:25
live  14:25
LLP  2:9
location  22:15 32:12
logo  35:21
long  10:12,25 11:19
  14:7 15:8,22 51:21,
  22
looked  31:20 43:12
lot  46:10 48:5
lower  23:15 45:20
  48:17 53:1 54:23
  59:15,19 62:14 63:5
  67:8 80:13,17

lowest  22:14 32:10
  55:9 62:19 65:17,19
  66:6,7,10 67:3
lowest-price  65:21
loyalty  31:24

### M

made  27:20 41:6 42:2
magnifier  42:17
mail-order  10:23
main  79:13
maintenance  10:10
majority  47:21
make  43:17 61:24
  73:24 81:1 84:18
making  80:21 81:7
manage  15:1 38:19,20
managed  69:19
management  36:4 41:13
manager  9:17,18 13:14
  15:1 16:15 54:11
managing  10:21
marked  4:7 7:3,4
  20:19,21 35:14,16
  64:1
market  12:22
market-specific  19:16
marketed  42:9 44:4
marketing  13:20
marketplace  46:11
  47:9
Marty  37:24 38:6,7,9
  39:2,22 42:24
Massachusetts  17:1,4
Master  64:9,19
matter  5:8
Mcnamara  2:10 3:12
  5:23 6:15,18 7:5
  17:20 19:3 20:22
  21:1 24:3 27:22
  28:15 29:9 30:22
  31:3,15 32:1,19
  33:10 34:12 35:9,17
  42:13,22 44:19
  45:12,24 46:8,20
  47:15 48:4 49:6,14
  51:12 53:3,13 54:5,
  25 55:11 57:24
  58:13,22 60:7,16,25
  61:6,10,21 62:7,24

63:12,25 64:12,23
66:12 68:5,18 69:4,
13 70:15 71:4,23
72:6,15 73:4,15
74:3,14 75:14 76:8
77:4,14,25 78:13
79:15 80:23 81:9,19
82:6,12,25 83:10,22
84:11,19 85:4,20
88:4,8 89:10
**meaning** 27:15 38:17
45:9 67:3
**means** 22:14 44:24
65:16 89:14
**Medcare** 4:11 20:23
21:4 64:4,7
**Media** 3:19,20
**Medicare** 19:18
**medication** 34:19
**medications** 28:23
**Medimpact** 4:11 5:22
7:21,24 9:15,16,17
10:5,13,16,17 11:10
12:8 13:1,9,10 17:12
29:24 31:5 33:20
35:11,19 36:3 41:2
48:7,16 52:10 53:11,
24 54:2,4,10 55:7
58:3,9 60:3,12,22
62:2,5,22 64:8,10
65:9 66:8 68:16,24
71:1 73:14,23 74:11
75:4,11 76:6,20
77:1,11,20 78:17
81:6 82:3,10,14,18
84:16 85:12 86:1
87:2,4,14
**Medimpact's** 9:23
33:23 52:9 54:19
55:8,10 58:10 59:14
61:4 62:6,20,22
69:10,11,23 71:10,20
**MEDIMPACT000001** 4:14
**MEDIMPACT000003** 4:14
**meeting** 89:15
**member** 22:14 32:11
65:17,21 66:23 79:3
**members** 42:7,9 44:2,
4,20 62:6 73:1,11,22
84:3
**membership** 25:22 26:3
27:24 28:4,16 29:23

30:13,18 31:6,9
32:15 33:4 34:3
35:12 44:9 45:23
46:13,23 47:10,16
48:6,22,24 67:23,25
72:5,23 77:21 78:25
88:10,17 89:8
**membership-program**
34:6
**memorializes** 68:25
**mention** 73:8
**mentioned** 27:4 70:20
78:20 82:2 88:16
**met** 37:13 50:7
**mimicked** 47:6
**mind** 33:4 34:7 42:21
**minutes** 51:23
**MISSNER** 2:4
**misstates** 53:4 71:5
73:5 74:4,15 75:15
82:6 83:12 85:5
**Mitchell** 2:4 6:2
**model** 26:19 27:3
**monitor** 60:13
**move** 12:13 39:21
**moved** 64:14
**multiple** 18:7 36:11

---

## N

**named** 20:17
**names** 50:21
**national** 13:14 19:13,
22 21:22 22:3 55:21
56:7
**nature** 19:2 28:12
31:24 33:14 49:4
66:2,22 67:4,11
69:18 76:11 77:7,17
78:2,18
**NCPDP** 56:13,15,25
57:7,9 61:15 78:20,
21 79:3
**NCPDP'S** 57:14,18
**necessarily** 79:10
80:10
**negotiate** 14:23 23:11
55:3
**negotiated** 11:10 14:4
17:24 19:14 21:23
62:15 65:10,12,14

**negotiating** 11:15
13:17 14:1 19:22
55:6
**negotiation** 13:5
17:15,18 18:2,14
19:5
**negotiations** 10:22
18:17 20:15 87:8
**net** 63:5,18
**network** 4:11 10:18,20
11:1,5,15,17,20,23
12:2 17:11 20:23
21:22,23,24 33:22
41:3,10,15,19,25
64:4,8,14 69:8
**networking** 41:7
**news** 30:4 47:5
**nightly** 47:5
**non-hsb** 73:1,11,22
**nonresolved** 37:15
**North** 16:21
**note** 8:15 43:22
**notice** 4:8 7:6
**November** 4:4 5:2,11
15:11
**number** 8:3 19:25
40:20 47:2
**NW** 2:5,11

---

## O

**oath** 6:9
**object** 35:3
**objection** 17:19 18:15
23:22 27:10 28:2
29:5 30:20 31:14,18
32:17 33:8 35:5,8
44:16,25 45:16 46:4,
15,25 47:18 49:3,11
53:3,13 54:5,25
55:11 57:24 58:13,22
60:7,16,25 61:6,10,
21 62:7,24 63:12
64:12,23 66:12 68:5,
18 69:4,13 70:15
71:4,23 72:6,15
73:4,15 74:3,14
75:14 76:8 77:4,14,
25 78:13 79:15 80:23
81:9,19 82:6,12,25
83:10,11,22 84:11,

12,19 85:4,20 87:6,
   16 89:1,2
**objections** 30:25
**obtain** 25:19 54:22
   55:9,15,16
**obtained** 26:20
**October** 15:11,13
**offer** 10:5 25:1 33:13
   47:9 48:14 67:8
   86:15
**offered** 26:3 30:5
   44:8,10 52:25 67:7
   73:1,11,22,23 74:18,
   19 78:24
**offering** 19:1 25:4,9,
   12,22 26:14 29:14
   32:25 34:17 46:10
   48:2 66:11 75:7
   86:17
**offers** 22:18 33:3
   67:18,22 72:3
**office** 76:1
**open** 36:18
**opened** 37:3,4 39:5,18
**opening** 36:9
**opens** 39:20
**operating** 41:17
**operation** 14:14
**operations** 41:16,19,
   22,25
**opinion** 49:9,13 85:8
**opportunities** 12:23
   13:3
**opportunity** 15:17
   18:18 27:16
**opt** 84:4
**order** 45:10 74:10
   75:10
**ordinary** 61:9
**organization** 13:1
   36:24 56:12
**organizations** 10:1
   14:21 48:13
**oriented** 30:4
**originated** 38:5
**originating** 38:2
**originator** 37:10
**out-of-box** 13:2
**overcharged** 87:3,22,
   25

**overcharges** 87:5,15
**overpaid** 62:22
**overview** 36:25
**owner** 37:23,25 38:1,6
**ownership** 82:14
**owns** 82:10

---

### P

**P.M.** 5:2 89:19
**paid** 43:6 53:2 59:15
   60:5,9 61:19 62:5
   63:10 75:23 87:12
**Palter** 4:5 5:15
**paragraph** 42:4
**parameters** 72:9
**part** 10:7 26:21 27:20
   33:16 43:24 59:23
   65:15 80:3 81:22
   82:18
**participate** 45:7
**parties** 65:11
**Pass** 33:5 53:1 71:2,
   12,21 72:1,4,12,21
   74:1 76:3,21 77:2,
   12,22 82:4,24 83:9,
   21 85:1,18
**passage** 65:13
**passed** 42:8 44:3,22,
   24 45:13
**passive** 24:16 25:16
   26:17,19 27:14,15
   31:22 45:9 59:2
   66:15 67:4 68:11,13,
   25
**Passively** 24:11
**past** 83:20
**patients** 62:23
**pause** 42:18
**pay** 42:7 43:4,21
   44:2,21 55:3,7 59:3
   66:3 68:3 72:5 80:7,
   13
**paying** 58:20 76:4
   79:9 84:9
**payment** 18:19 24:13
   81:23
**payment-type** 18:20
**payments** 75:25
**payor** 14:22,24 15:6

18:25 39:1 53:11
   59:25 69:11,17 70:18
**payors** 9:22 13:18
   14:20 15:20 38:17
   56:16 60:3 69:10,24
   70:10,12
**PBM** 14:14,22 15:6,17
   19:12 53:11 54:22
   59:25
**PBMS** 13:18 48:25 49:8
   56:16 60:3 69:10
   70:10
**pending** 9:4
**people** 36:5 40:16
   45:6 47:22 79:11,14
**perceive** 79:18 81:23
**perception** 53:17
**perform** 36:5
**period** 15:10 19:7,9
   48:8
**periods** 15:10
**person** 20:12 25:17
   26:8,24 27:16 36:19
   38:1,25 39:23 58:18,
   20 66:3 70:24 74:21
   85:25 86:2 88:9
**person's** 58:24
**personally** 87:21,23,
   25
**Pharmacare** 15:18,23,
   25
**pharmacies** 10:23,24
   13:5,21 17:23 21:5
   23:13 25:21 55:4,8
   56:16 57:5 58:5 67:8
**pharmacist** 16:14,16,
   18 67:11
**pharmacists** 38:22
**pharmacy** 4:3,8,11
   5:9,25 9:17,18 10:11
   11:9 13:20 15:14
   17:1,4,9,11 20:23
   21:4 22:14 23:5,12
   26:2,5 28:10 30:4
   32:11 34:2 41:3,7,
   10,15,18,21 54:11
   55:9,16 59:15,21,23
   60:13,23 61:17,19
   62:10,13 64:4,7
   65:17,22 69:8,17
   70:14 72:20 78:23
   81:16 87:23 88:22

89:5
**pharmacy's** 23:6,9,15
  27:25 30:13 57:2
  59:16 60:5 66:10
  78:12 88:21
**Phoenix** 2:16 5:21
**phone** 5:24 51:11,15,
  20,22
**piece** 29:16
**Pilgrim** 34:7,11,14,20
  70:21,25 71:18 88:10
**place** 5:10,16 45:23
  47:5 64:10,16 67:1
  72:21
**plaintiff** 4:16 6:20
**plaintiff's** 52:13
  63:21 64:6 65:4
**plaintiffs** 2:3 6:2
  50:5 52:17,18 53:2
**plan** 19:15 38:21
  66:16,19,23,25 69:11
  76:20
**plans** 54:17 69:25
**platform** 89:7
**PNO** 41:15
**pocket** 87:13,15
**point** 20:5,16 24:19
  28:8 38:11 41:9
  65:23 67:6 68:23
  71:9 74:19 76:12,15
  83:7,19 86:15,20,22
**point-of-sale** 66:4
**position** 10:16,25
  11:3 12:3,5,7,13,17
  14:7 15:4 16:7,8
**premarked** 63:21
**prescription** 9:21
  22:16 28:10 32:13
  54:23 55:22 56:8
  57:20 58:19 59:25
  79:9,14,19,22,25
  80:3,6,8,12 81:18
  87:22
**prescriptions** 26:11
  81:24 87:3
**present** 5:18 59:20
**presenting** 24:12
  28:10 65:25
**president** 10:18,20
  11:1,4 12:6,9,14

**press** 47:3,12
**prevalence** 70:13
**Previously** 22:2
**price** 22:14,16 23:7,
  9,13,16 24:1,18
  25:10,13,16,19 26:12
  27:25 28:8,12,14
  30:19 31:9,10,11,21,
  22 32:4,11 33:2 34:3
  45:19,20 48:17,22
  57:3,6,11,15,18
  58:4,11 59:1,2,12,
  17,24 60:4,9,20,24
  61:18 62:2,4,8,14,19
  63:18 65:3,8,17,20,
  23 66:5,6,7,9,10,17
  67:1,3,8,9,16,21
  68:16 71:2,3,12,13
  74:19 75:19,21
  76:12,14,17 78:11
  80:18 84:18 86:15,
  16,18,19,22,25
  88:22,25
**price's** 31:6 46:2
**priced** 88:21
**prices** 23:20 53:10,
  12,24 54:4,23 60:14
  61:4 72:4 73:2,12,22
  74:1,10 75:10 76:3,
  4,6,7,22,23 77:2,3,
  12,13,23 78:12,24
  79:1 80:7,13 85:3,
  18,19
**pricing** 23:11 25:22
  27:3 39:14 45:11
  52:22,25 54:4,11,18,
  24 59:6,10,20 68:13
  69:3 70:7,12 89:8
**primarily** 18:18
**primary** 19:4
**prior** 13:10 15:13
  16:22 51:8 86:12
**problem** 39:11 42:23
**Procedure** 6:10
**PROCEEDINGS** 3:4
**process** 9:20 10:7,10
  18:3 24:15 37:1 55:6
  56:19 87:9
**processing** 24:9
**produced** 20:24 35:18
  38:4

**product** 24:18 38:3
**products** 12:22
**program** 24:2 26:3,7,
  9,22 27:1,2,18,21
  28:4,5,11,17,20,21,
  22,24,25 29:3,4,8,11
  30:5,18,24 31:6,24
  32:15,22 33:4,18
  34:3,15,18 35:2,12
  39:6 42:6,7,9 44:1,
  2,4,9 45:4,6,23
  47:4,7,8,14,25 48:1,
  2,22 52:21,23 53:1
  66:1,22 67:23 69:1
  70:22 71:16,21 72:1,
  5,13,21,22 73:3,23
  74:10,18 75:9 76:5,
  22 77:21,22 78:11,
  17,25 80:2,4 82:4,24
  83:9,14,21,25 84:8,
  10,25 85:1,2 86:22
**programs** 10:2 25:22
  26:1,10,13,23 27:5,
  18,24 29:14,24 30:13
  32:23 39:15 44:8,13
  45:8,9 46:13,18,24
  47:10,17 48:6,13,25
  49:9 55:22 56:9
  68:12 88:11,17
**project** 36:13
**promise** 8:8
**promote** 18:25 48:13
**promoted** 11:4
**promotion** 11:8 33:11
**promotions** 22:17 33:3
  67:17,22
**prompts** 36:9
**pronouncement** 78:7
**proof** 43:19
**protect** 79:12
**provide** 10:7,8 24:14
  59:15
**provided** 76:14 86:23
**provider** 14:2
**providing** 76:12
**public** 47:12
**publication** 29:15
**purchased** 25:14 87:4,
  23
**purchases** 56:20

**purportedly**  77:22
**purpose**  80:12
**put**  7:10
**putting**  25:9

---

**Q**

**quantity**  43:15
**question**  8:10,21,24
  9:4 30:16 36:12 38:3
  40:5 51:4 53:20 56:6
  59:8 81:13 82:9
  83:19 86:3
**questioning**  84:17
**questions**  9:9 51:24
  52:1,6 55:18 84:25
  86:14 88:3,5 89:11,
  13
**quick**  55:24
**quote**  57:19,21

---

**R**

**raising**  34:20
**ran**  42:25
**range**  29:1,21 64:15
**rate**  43:4 48:18 55:9
  59:16 63:4,5,9
**rates**  18:19 23:14
  55:3,7
**re-create**  37:14
**read**  7:9 22:19 32:8
  51:3 52:13 56:5
  68:7,20
**reading**  42:21 67:24
**real**  49:13 55:24
**reason**  9:7,10 43:12
  59:23 65:14 79:11,
  13,19,24 80:5,11,15
**reasonable**  79:6 80:19
  81:5 87:20
**reasons**  36:11
**reassign**  37:14
**recall**  11:15 18:5
  19:21 24:25 25:12,20
  26:2 28:16,19 29:18,
  23 30:6,8,15 32:2
  33:20 34:1,5,20
  35:4,7,10,13 41:23
  46:9,13,17 48:10,16,
  19,21,23,24 50:21

51:10,23 54:7 65:13
69:5,20 71:6,15 73:7
74:25 77:6,9,16,24
78:2 85:22 88:9,15,
18
**recalled**  17:10 27:4
**receive**  27:3 36:7
  45:10 52:20 61:14
  88:1
**received**  27:16 37:11
  47:3,8
**receives**  23:5 37:6
**receiving**  39:14 46:14
  80:17
**recognize**  21:2
**recognized**  47:11
**recollection**  29:4
  65:9 84:21
**recommendations**  10:9
  38:19
**record**  5:6,12,17 6:22
  9:5 20:23 49:19,20,
  22,24 51:3 53:4
  55:24,25 56:2,3,5
  73:5 74:4,15 75:16
  85:6 86:4,5,7,8
  89:17
**recording**  5:16
**recover**  87:9
**red**  18:5,6
**redacted**  39:13 43:18
**refer**  14:22 20:15
  26:23 32:23 50:20
  52:21
**referred**  27:19 55:19
  66:15 68:10
**referring**  15:10 19:11
  45:3 68:14 69:1
  83:17
**reflect**  40:16 59:5
  70:6
**reflects**  66:24,25
**refund**  87:24 88:1
**regard**  88:20
**region**  14:16
**regional**  14:15,17
  16:7
**regionally**  19:16
**registered**  26:24
**regulation**  78:8

**regulator**  77:1,10
  78:8
**regulators**  76:24
**reimburse**  62:13 87:5
**reimbursed**  13:19
  63:6,18 87:15
**reimbursement**  18:19
  55:3,7 75:24,25
**related**  7:21,23 8:1
  18:18 74:24
**relational**  41:13
**relationship**  15:2
  18:21 20:13 74:13
  84:7,14
**relationships**  12:23
**relies**  60:22
**remember**  18:14 25:3,
  25 28:21,25 29:2,12
  32:5 34:13,25 41:23
  71:19 76:20
**rephrase**  8:23 53:21
  82:9
**report**  40:6 42:25
  56:16 71:2 78:24
**reported**  41:14,16
  59:16 76:7 77:23
  78:11 85:11,16
**reporter**  5:15 6:4
  8:6,18 34:8,10 42:17
  49:19 51:1,3 56:5
**REPORTER'S**  3:17
**reporting**  10:8 71:12
  73:25
**represent**  50:6 57:17
**representing**  6:19
  18:23 38:12 50:5,23
  51:5
**request**  9:3 48:23
  78:16 86:21
**requested**  76:13
**Requester**  37:20
**requesting**  74:21
**require**  23:19 31:1
**required**  30:18 31:12
  46:2 76:13
**requirements**  72:24
**resolution**  37:8 39:21
**resolve**  36:4 39:23,24
**resolved**  37:1
**resolves**  37:7

**respect**  15:20 27:24
  30:17 76:23 78:17
**response**  34:23 35:1
  36:7 37:11 44:7
**responsibilities**  12:2
  13:15 14:19 15:19
  16:10 55:2,8
**responsibility**  16:9
  17:23 41:18 55:14
**responsible**  10:21
  12:21 13:17 20:13
  38:25
**result**  61:19
**retail**  10:23 30:4
  75:21
**retailer**  18:24
**retailers**  47:6,9
  48:14
**Revco**  14:12,13,14
  15:8 16:1,11,13
**review**  42:3
**reviewing**  18:5
**reviews**  37:6
**rgilmore@
steinmitchell.com**  2:7
**right-hand**  21:6
**Road**  2:17
**Robert**  2:4 6:1 20:17
  50:4
**Robertson**  40:24 41:1,
  2,21 42:2 44:7,20
  45:25
**role**  11:6 12:20 13:16
  15:15 16:5 33:22
  38:10
**roles**  12:12
**Rough**  11:11
**Ruesga**  2:16 5:21
  42:11,14 49:16 83:11
  84:12 87:6,16 89:2,
  4,13
**rules**  8:5 72:9
**Rx**  14:15 16:3
**Ryan**  2:21 5:13

---

S

**sales**  14:15,18 15:16
  16:7,8 37:4 57:20
**Salesforce**  4:13
  35:20,21,25 36:3,6,

  10,23 37:1,18
**San**  5:1,10 7:1
**satisfied**  37:12
**Savings**  33:5 53:1
  71:2,12,21 72:4,12,
  21 73:25 76:3,21
  77:1,12,21 82:4,23
  83:9,21 85:1,18
**Scanned**  52:15
**scenario**  26:18 62:4,
  18,21
**science**  17:9
**Sciences**  17:2,5
**Scottsdale**  2:18
**Scriptsave**  82:4,11,
  18,23 83:2,7,14,20
  84:6,9
**Scriptsave-branded**
  84:5
**Section**  6:11
**self-funded**  10:1
  54:16
**sell**  14:23
**senior**  67:6 85:11,16,
  23
**sense**  43:17 49:7 52:4
**separate**  24:2
**series**  38:17
**serve**  15:1
**served**  17:25 18:1
**services**  10:5 12:22
  19:1 40:5
**set**  61:8 88:22
**sets**  21:7,9,16
**shakes**  8:17
**share**  30:12
**shared**  69:9,16,21
**Sharon**  20:9
**SHEET**  3:16
**show**  25:17 43:18
**shown**  24:9 43:13
**shows**  43:3
**side**  7:10 13:24
**sides**  14:5
**signature**  21:18,19
**signatures**  21:16
**signed**  18:4 22:2
**similar**  15:16,19
  16:9,10 46:14

**simply**  28:9 59:3
  66:2,21 67:11 74:18
  76:14 83:19 86:20
**sir**  79:5 87:21
**sitting**  9:7
**situation**  85:9
**size**  19:15
**small**  14:14 42:14
**snowman**  35:24
**sold**  15:2
**solution**  36:4 38:3
**sophistication**  70:18
**sort**  13:1 78:4
**Sound**  8:13
**sounds**  9:1 29:2
**sources**  80:17
**southern**  14:16
**speak**  8:8,16 13:25
  50:12,15 79:17 80:25
**speaking**  30:8
**speaks**  68:6,19
**special**  19:1 25:22
**specialty**  10:24
**specific**  18:18 19:15,
  18 20:1 26:5 27:1
  29:12 30:6 32:5
  34:25 37:16 48:19
  52:1 54:8 57:10,12
  61:13 69:5,16 70:1
  73:7 85:9 87:19
**specifically**  19:22
  20:15 28:22 29:22
  30:17 60:19 69:21
  83:2,6,14
**specifics**  84:8
**speculation**  54:6
  58:14 61:11,22 62:9,
  25 63:13 69:14 70:16
  72:7 73:5,17 74:16
  75:16 76:10 77:15
  80:24 81:10,20 84:20
  85:5,21
**spell**  88:13
**spend**  43:20
**spoke**  51:8 70:25
  88:10
**spoken**  50:9
**sponsoring**  32:24
**spreadsheet**  42:25
  43:2

standard  21:4 56:15
standpoint  14:2
start  7:2 8:4,10
started  25:1 29:21
  43:8
state  6:21 14:21
  77:9,19
statement  56:22 78:8,
  22
statements  78:9
states  16:20
status  18:22
Stein  2:4 6:1
sticking  37:17
store  16:14 24:18
  43:3,5,7 79:6
Stores  13:12
strategic  11:5,17,19,
  23 12:1 21:24 33:22
strategically  38:18
street  24:8,17 25:13
  59:3 66:2,21 72:20
  86:21
strike  33:21 39:19
  51:21 58:8 70:4,9,10
  75:7 79:25 86:1
Strreet  2:11
structure  82:14,20
structures  82:16
student  16:23
subject  39:6,13
submit  23:20 30:18
  45:22 46:2 53:23
  54:3 57:5 60:23 63:1
  77:11 85:17
submits  59:24 61:17
  62:2
submitted  31:21 43:3,
  4,5,8 45:15 48:22
  53:10 62:10 77:3
  86:24 88:23
submitting  31:6,11
  32:4 34:3 60:14
subsidiary  48:12 82:3
succeed  11:22
suing  52:17
Suite  2:5,17
supervisor  18:2
supplies  26:11 48:3

supply  25:8
Support  5:14
supposed  61:20 62:12
surprised  84:24
Suzanne  20:14 30:9
swear  6:4
system  37:10 58:25
  62:13 88:22 89:6

---

### T

tab  43:2,7,18,20,23
table  14:5 40:9,19,23
tactics  87:8
tag  25:10
takes  17:2
taking  5:9 26:21 28:9
  37:16 66:14
talk  50:18 51:19
  52:3,9
talking  34:5 48:5
Target  13:12,13,19,
  20,21,23 14:8 39:15
  43:1 44:9 47:7
tasks  36:5
tax  57:20
team  10:21 17:22
  20:12 38:20 41:19,22
telephonic  55:23
TELEPHONICALLY  2:10
telling  33:20 34:1
  76:20 77:10,20
tenure  11:16 16:6
  17:12 21:24 31:4
  58:9 69:19
term  22:25
terms  18:19 31:16
  80:7
testified  6:11 54:10,
  13 59:10
testify  53:9,16
testifying  52:24
  70:24
testimony  71:5 82:7
  83:12
text  39:13
things  18:20,24 19:2
  38:21,24
third-party  13:14
  88:23

three-paragraph  42:2
Thursday  4:4 5:2
Till  11:21
time  5:12 7:17,21 8:8
  9:2 15:9,10,17 18:10
  19:7,9 20:5,14 23:17
  24:19 28:23 31:4
  38:11 41:8,9 42:11
  43:20 47:20 48:7
  49:15 51:2 67:6 83:8
time-consuming  43:11
timeframe  25:21
times  7:15 8:4 20:8
  51:19 68:10
timewise  29:2
title  11:5,7 12:1
titled  20:23
today  7:7 8:21 9:8
  10:3 12:5,6,18 50:7,
  10,16,19 52:3,11
  64:11 68:10 83:15
  88:16
today's  5:11 50:13
  51:9,25
told  77:1
tools  36:4
top  40:22
topic  48:6
topics  52:2
TP  4:16
track  36:16
transaction  57:6 60:1
  88:20,23
transcribe  8:18
transcribing  8:6
transfer  84:4
transferred  84:3
transitioned  12:12
transmitted  56:24
transmitting  57:10
trends  38:24
trouble  42:20
true  60:12 62:1,7,12
  83:21
truthful  53:12
truthfully  9:9
turn  21:11 22:5 65:2
Twelfth  2:11
two-thirds  22:9

**type** 9:23 19:18 22:3
   24:9,12,14 25:18
   27:1,18 28:24 29:15,
   16 31:23 36:13,14
   45:4 59:4 65:24
   66:1,21 67:13
**typical** 18:19 67:9
**typically** 10:11 23:5
   30:3 36:5 37:5 58:3

---

**U**

**U&c** 22:11,13,21 24:22
   31:7 32:4,8,10 34:3,
   24 43:5 45:15 46:2
   48:22 49:10 54:4
   59:20
**U.S.** 5:14
**ultimately** 40:1
**unclear** 59:8
**underneath** 39:12
**understand** 8:22 23:18
   57:12 71:11 76:21
   81:13 86:11
**understanding** 24:21
   44:23 52:16,18
**understood** 8:19,24
   9:6
**uninsured** 61:5
**unit** 41:14
**units** 41:10
**Unlimited** 35:20
**unredacted** 63:24
**upper** 35:21
**users** 40:13
**usual** 22:10,13 23:7,
   9,15,19,20,25 24:6
   25:10,15 26:19 27:25
   28:7 30:14,19 31:10,
   11,21 45:21 53:10,
   12,17,23 57:3,6,10,
   15,18 58:3,11,17
   59:10,11,16,24 60:4,
   14,19,23 61:13,18
   62:1,3,8,11,12,15
   63:2,16 65:2,7,16
   66:5,9 67:15,20
   68:1,15 69:2 70:6,11
   71:3,12 74:1 75:19
   76:7,16,22 77:3,12,
   23 78:12,25 84:18

**85**:2,18 86:18,25
**utilize** 19:14

---

**V**

**vague** 53:13 54:5,25
   55:11 61:10,21 62:8
**validate** 43:9,21
**variety** 87:7
**vast** 47:21
**version** 48:1 63:22,24
   64:7 65:4
**versus** 19:18 55:13
   63:2,24
**vice** 10:18,19 11:1,4
   12:6,9,14
**Video** 3:19 5:15
**view** 24:6 26:13 27:23
   30:12,17 32:14 45:25
   46:1 85:17
**viewed** 25:15 27:21,24
   28:7 48:1
**viewpoint** 46:7
**VP** 11:16,19,22 12:1
   21:24 33:22

---

**W**

**wait** 8:9
**Walgreens** 26:7,19
   27:17
**walk** 66:21
**walk-in-off-the-street**
   67:9
**walked** 24:8 25:13
   65:24
**walking** 24:17 31:22
   59:3 66:2
**Walmart** 24:25 25:5
   26:14 27:15 39:14
   43:1 44:9,13 46:10,
   18,19,21 47:3,8,14
**Walmart's** 25:15
**Walmart/target** 45:8
**wanted** 18:22 52:3
   73:14 74:12 76:6
   86:12,13
**Washington** 2:6,12
**watch** 38:23

**water** 49:18
**waved** 37:10
**whichever** 23:15
**widely** 59:20
**Wile** 30:10
**William** 3:8 4:2 6:8,
   23
**Williams** 2:9 5:24
   6:19
**Wingate** 20:4,7
**withdraw** 86:3
**words** 8:16 26:6 65:25
   68:21 71:14
**work** 13:7,11 14:11
   16:12 18:21 26:7
   36:3,17 37:9
**worked** 10:12 30:9,10
**working** 9:12 13:23,24
   18:17 41:24 84:13
**works** 41:3
**world** 47:21
**written** 67:20 68:2,
   15,23 71:9,15

---

**Y**

**year** 20:8 42:8 44:3,
   21 84:2
**years** 7:19 10:14
   11:2,11 14:5 20:1
**Yerasi** 12:3,4