# DX-404



# Transcript of Michael D. Reichardt

**Date:** December 20, 2016

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3     ----------------------------x
 4   CHRISTOPHER CORCORAN, et al., :
 5              Plaintiffs,   :
 6      v.                    :       Case No.
 7   CVS PHARMACY, INC.,      :   3:15-cv-03504-YGR
 8              Defendant.    :
 9   ----------------------------x
10
11     Videotaped Deposition of MICHAEL D. REICHARDT
12              Schaumburg, Illinois
13           Tuesday, December 20, 2016
14                 9:08 a.m.
15
16
17
18
19
20
21
22   Job No.:  130134
23   Pages:  1 - 286
24   Reported by:  Melanie L. Humphrey-Sonntag,
25               CSR, RDR, CRR, FAPR
```

**Page 2**

```
 1     Videotaped deposition of MICHAEL D. REICHARDT,
 2   held at the location of:
 3
 4              OPTUMRx
 5              1600 McConnor Parkway
 6              Third Floor
 7              Schaumburg, Illinois 60173
 8              (800) 282-3232
 9
10
11
12
13     Pursuant to subpoena before Melanie L. Humphrey-
14   Sonntag, a Certified Shorthand Reporter, Registered
15   Diplomate Reporter, Certified Realtime Reporter, and
16   a Notary Public in and for the State of Illinois.
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4       RICHARD LEWIS, ESQUIRE
 5       MICHAELA SPERO, ESQUIRE
 6       HAUSFELD
 7       1700 K Street, NW
 8       Suite 650
 9       Washington, DC 20006
10       (202) 540-7200
11
12   ON BEHALF OF THE DEFENDANT:
13       GRANT A. GEYERMAN, ESQUIRE
14       VIVAAN NEHRU, ESQUIRE
15       WILLIAMS & CONNOLLY, LLP
16       725 Twelfth Street, NW
17       Washington, DC 20005
18       (202) 434-5000
19
20
21
22
23
24
25
```

**Page 4**

```
 1     A P P E A R A N C E S   C O N T I N U E D
 2
 3   ON BEHALF OF THE THIRD PARTY AND WITNESS:
 4       GARRETT HEENAN, ESQUIRE
 5       OptumRx
 6       2300 Main Street
 7       CA134-1000
 8       Irvine, California  92614
 9       (949) 252-4386
10
11   ALSO PRESENT:
12       STEPHEN GOETHALS, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Michael D. Reichardt

2 (5 to 8)

Conducted on December 20, 2016

---

**5**

```
1              C O N T E N T S
2  EXAMINATION OF MICHAEL D. REICHARDT        PAGE
3       By Mr. Lewis                            9
4       By Mr. Geyerman                       175
5       By Mr. Lewis                          261
6       By Mr. Geyerman                       279
7
8              E X H I B I T S
9           (Attached to transcript.)
10 PLAINTIFFS' EXHIBITS                       PAGE
11  Exhibit 690 Reichardt Subpoena           7, 14
12  Exhibit 691 Reichardt Declaration,       7, 14
13              11/20/16
14  Exhibit 692 Reichardt LinkedIn Profile   7, 14
15  Exhibit 693 Reichardt Curriculum Vitae   7, 15
16  Exhibit 694 Provider Agreement Between     46
17              OptumRx and CVS
18  Exhibit 695 Agreement Between Prescription 107
19              Solutions and CVS
20  Exhibit 696 Amendment to Agreement        114
21              Between Prescription Solutions
22              and CVS, 1/1/07
23  Exhibit 697 E-Mail Chain with Attachment  118
24
25
```

**6**

```
1       E X H I B I T S   C O N T I N U E D
2           (Attached to transcript.)
3  PLAINTIFFS' EXHIBITS                       PAGE
4   Exhibit 698 Excerpt From 2015 Optum       127
5               Provider Manual
6   Exhibit 699 Excerpt From 2016 Optum       130
7               Provider Manual
8   Exhibit 700 Pharmacy Network Agreement    132
9               Between CVS and Caremark
10
11 DEFENSE EXHIBITS                           PAGE
12  Exhibit 302  CVS Cross-Notice of          175
13               Reichardt Deposition
14  Exhibit 303  E-Mail Chain with Attachment 231
15  Exhibit 304  E-Mail Chain                 239
16  Exhibit 305  E-Mail Chain                 241
17  Exhibit 306  E-Mail Chain with Attachment 244
18
19
20
21
22
23
24
25
```

**7**

```
1            P R O C E E D I N G S
2       (Plaintiffs' Exhibits 690, 691, 692, and
3  693 marked for identification and attached to the
4  transcript.)
5       THE VIDEOGRAPHER:  We are on the record.
6  The time is 9:08.
7       Here begins Disk 1 in the videotaped
8  deposition of Michael D. Reichardt, individual, in
9  the matter of Corcoran, et al., versus CVS Pharmacy,
10 Inc., in the United States District Court, Northern
11 District of California, Case No. 3:15-cv-03504-YGR.
12      Today's date is December 20th, 2016.  The
13 videographer today is Stephen Goethals, representing
14 Planet Depos.  This video deposition is taking place
15 at 1600 McConnor Parkway, Schaumburg, Illinois.
16      Would counsel please voice-identify
17 themselves and state whom they represent.
18      MR. LEWIS:  Richard Lewis for the plaintiff.
19      MS. SPERO:  Michaela Spero for the
20 plaintiff.
21      MR. GEYERMAN:  Grant Geyerman and Vivaan
22 Nehru from Williams & Connelly on behalf of the
23 defendant, CVS Pharmacy, Inc.
24      MR. HEENAN:  And Garrett Heenan on behalf of
25 Third Party Optum.
```

**8**

```
1       THE VIDEOGRAPHER:  The court reporter today
2  is Melanie Sonntag, Certified Realtime Reporter,
3  representing Planet Depos.
4       Would the reporter please swear in the
5  witness.
6       THE COURT REPORTER:  Would you raise your
7  right hand, please.
8       (Witness sworn.)
9       THE COURT REPORTER:  Thank you.
10   A THE WITNESS:  You're welcome.
11      MR. LEWIS:  Good morning, Mr. Reichardt.
12   A THE WITNESS:  Good morning.
13      MR. LEWIS:  We met briefly.  My name's
14 Rich Lewis.  I'm one of the lawyers for the
15 plaintiffs, and I'm going to be taking your
16 deposition today, first related to your declaration
17 in your individual capacity.
18      Before we get started, I just wanted to note
19 for the record that there's an order in the case
20 from December 9th that the only objections allowed
21 are objections to form and to attorney-client
22 privilege.
23      MR. GEYERMAN:  I'll just add for the record
24 that defense counsel supplied a copy of the order
25 for the benefit of counsel for the third party here
```

**9**

1  so that counsel would have that order.
2      MR. LEWIS:  Thank you.
3      MICHAEL D. REICHARDT,
4  having been duly sworn, testified as follows:
5      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
6  BY MR. LEWIS:
7      Q  Mr. Reichardt, have you ever given a
8  deposition or had your deposition taken before?
9      A  I have.
10     Q  Was that in a professional capacity?
11     A  It was.
12     Q  And how many times?
13     A  Just once.
14     Q  And when was that?
15     A  Approximately nine years ago.
16     Q  And who were you working for at the time?
17     A  I was working for UnitedHealthcare.
18     Q  And what was the deposition about in very
19  general terms?
20     A  General terms, it was -- let me think back.
21     That's a good question.  10 years ago.
22     Q  I can withdraw it.  No problem.
23     Could you state --
24     A  It's irrelevant.
25     Q  Can you state your full name and address for

**10**

1  the record.
2      A  Sure.
3      Michael D. Reichardt.  And is that my home
4  address you'd like?
5      Q  Whatever you prefer, your home or your work
6  address.
7      A  The work address here at 1600 McConnor
8  Parkway in Schaumburg, Illinois.
9      Q  That's fine.  In terms of ground rules for
10  the deposition, I'm sure you've talked to your
11  counsel.  But just a couple of the most important
12  rules are that we allow each other to speak and
13  finish your answer or my question.  If we speak at
14  the same time, it's impossible for the court
15  reporter to -- to get our -- our comments down.
16     If I ask any questions that you don't
17  understand for any reason, if I'm mumbling or use
18  words -- mispronounce things, just let me know, and
19  I'll try to ask a clearer question.
20     A  Okay.
21     Q  If you answer my question, I'm going to
22  assume that you understood it.
23     If you need a break at any time, just let us
24  know.  If there's a question pending, I'll ask you
25  to answer it, and then we can stop and take a break.

**11**

1      Do you have any questions about those rules?
2      A  No, I don't.  Thank you.
3      Q  Is there any reason why you can't give full
4  and accurate testimony today in terms of your health
5  and state of mind?
6      A  No.
7      Q  All right.  What did you do to prepare for
8  this deposition?
9      A  Well, read back through the declaration that
10  we had signed.  I worked with Garrett.  There were a
11  few depositions that I read from others, just to get
12  a feel for what the others had basically given in
13  terms of background and content.
14     Q  Do you recall what depositions you read?
15     A  There were a couple, one from Medco, I think
16  from ESI, and then one from CVS.
17     MR. HEENAN:  As a point of clarification --
18     MR. LEWIS:  Sure.
19     MR. HEENAN:  -- I shared with Mr. Reichardt
20  declarations that were filed in this matter
21  involving other witnesses who gave, I believe,
22  similar statements as Mr. Reichardt.
23     I believe that's what he's referring to.
24  I -- I did not share any deposition transcripts
25  with him.

**12**

1      MR. LEWIS:  Okay.
2      A  THE WITNESS:  Yes, the declarations.
3      MR. LEWIS:  Thank you.
4      A  THE WITNESS:  Sorry.  I may have misspoke.
5  BY MR. LEWIS:
6      Q  And do you remember the names of the
7  declarants?
8      A  You know, I don't.  They were -- they were
9  on there but --
10     Q  Okay.  And did you see anything in the
11  declarations that you didn't know prior to reading
12  them?
13     A  No.  I think they're all pretty consistent.
14     Q  And did you see those declarations after you
15  wrote your declaration or before?
16     A  After.
17     Q  And who wrote your declaration?
18     A  Garrett and I did.
19     Q  And did you type it yourself?
20     A  I did not.
21     Q  Did you dictate it?
22     A  No, but I helped edit it.
23     Q  Did you write it out by hand?
24     A  No.
25     Not -- you're referring to the whole

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

4 (13 to 16)

13

1 beginning to end, write it by hand?
2   Q Yes.
3   A No.
4   Q Was there any particular section of it you
5 wrote out by hand?
6   A Not that I recall.
7   Q Have you talked to anybody other than your
8 attorney, who you refer to as Garrett, in terms of
9 preparing for this deposition?
10   A No. It's been Garrett and I.
11   Q You haven't talked to anybody at -- at -- at
12 Optum about the deposition other than Garrett?
13   A Not to prepare.
14      Just my boss, Joe Zavalishin. But that's
15 just to notify him that I'd be taking up,
16 potentially, a majority of the day.
17   Q Did you discuss the content of your
18 declaration with anybody at Optum other than
19 Garrett?
20   A No, I did not.
21   Q And did you discuss the content of your
22 declaration with anybody outside of Optum?
23   A No, sir.
24   Q Let's just get a couple things on the
25 record, if we could mark 690.

14

1      I'm showing you a copy of Plaintiffs'
2 Exhibit 690, which is the subpoena --
3   A Okay.
4   Q -- for your individual deposition in this
5 case. Have you seen that before?
6   A Yes.
7   Q Okay. And I'm showing you a copy of
8 Plaintiffs' Exhibit 691.
9   A Okay.
10   Q And can you identify that, please, just say
11 what it is?
12   A Yes. I've seen this. It is my declaration.
13   Q All right. I'm showing you --
14   A Do you mind if I just look through the whole
15 thing?
16   Q Please do.
17   A Yes, that's my declaration.
18   Q All right. I'm showing you a copy of
19 Plaintiffs' Exhibit 692, which is a printout of the
20 material written for you on the LinkedIn site.
21   A Okay.
22   Q Are you familiar with that information?
23   A Just give me a minute to look through it.
24      Yes, I am.
25   Q All right. And did you, in some form, enter

15

1 that information into LinkedIn?
2   A I did.
3   Q All right. Thank you.
4   A Sure.
5   Q Showing you a copy of 693, Plaintiffs'
6 Exhibit 693, which is a CV that counsel provided for
7 us this morning, can you identify that?
8   A Yes. This is my résumé.
9   Q And that's up-to-date as of what date?
10   A Prior to my employment at Catamaran.
11   Q Is that about 2014?
12   A Yes.
13   Q Okay. All right. When I first asked you if
14 you were familiar with depositions, you said you had
15 given one about 10 years ago.
16      Is there -- do you have any memory of that
17 deposition?
18   A You know, I do but I just -- it was -- let's
19 see.
20      And I believe it was between my tenure in
21 2002, 2004. I don't recall the exact content. I do
22 recall it probably took about an hour.
23   Q And you were at United at that time?
24   A Yes.
25   Q Do you know if it had anything to do with

16

1 usual and customary pricing?
2   A It did not.
3   Q Do you know if it had anything to do with
4 discounts?
5   A No.
6      MR. GEYERMAN: Objection to form.
7   Q What -- throughout the day a lawyer might
8 object, and then when -- when he or she finishes,
9 you can answer the question unless you're instructed
10 by your counsel not to do that.
11   A Okay.
12   Q Okay. In terms of your -- your personal
13 background, you started with UnitedHealthcare in
14 1999; is that correct?
15   A That's correct.
16   Q And you worked there until 2011?
17   A Yes.
18   Q And then you came back to UnitedHealthcare
19 in 2014; is that correct?
20   A Technically I came to Catamaran, who was
21 acquired by Optum. Upon acquisition, my tenure was
22 reinstated. Being a former employee.
23   Q From 1999 to 2011 your -- your employer was
24 UnitedHealthcare Group; is that correct?
25   A UnitedHealth Group at the time, correct.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

5 (17 to 20)

17

1    Q  And what -- was there an entity called Optum
2  during those years?
3    A  There was.
4    Q  And what was the relationship between Optum
5  and UnitedHealth Group in those years?
6    A  Optum was a subsidiary of UnitedHealth
7  Group.
8    Q  And what did -- what was the business of
9  Optum during those years?
10   A  Mainly the health and well-being benefits.
11       So other than the health insurance, disease
12  management, et cetera.
13   Q  Was there a prescription drug benefit
14  administered by Optum during those years?
15   A  Partially.
16   Q  And what do you mean by "partially"?
17   A  Until Prescription Solutions was acquired.
18   Q  And when was that?
19   A  I'm not sure of the date.
20   Q  Approximately.
21   A  I don't have an accurate answer for that.
22   Q  All right.  What were your major
23  responsibilities at UnitedHealthcare from 1999
24  to 2011?
25   A  Mainly managing physician, hospital, and

18

1  ancillary relationships.  And then managing a team
2  of contract negotiators that would negotiate on the
3  company's behalf with our provider network,
4  "providers" being hospitals, ancillaries, and
5  physicians.
6    Q  And did you have any responsibilities during
7  that time frame for negotiating prescription drug
8  benefits?
9    A  For a portion of that time I did.  Not
10  really benefits.  I worked for the discount card
11  program.  And we had one network that was a pharmacy
12  network.
13   Q  And what -- what is -- what was the discount
14  card program that you're referring to?
15   A  HealthAllies.
16   Q  And what is that?
17   A  That is a discount card program.
18   Q  For what?
19   A  For members either without insurance or that
20  are underinsured.  Or prefer to pay cash.
21   Q  Did that relate in any way to a prescription
22  drug benefit?
23   A  The term "benefit" is probably -- the term
24  "discount" is used and not "benefit."
25       "Benefit" usually refers to an insurance

19

1  plan, which the discount card is not.
2       So the discount card offered discounts off
3  of the -- basically -- the pharmaceuticals.
4    Q  And -- and what is your definition of the
5  word "discount"?
6    A  Discount off of the retail price.
7    Q  All right.  I'm trying to understand your
8  answers in the context of who was -- who could take
9  advantage of the discount off the price of -- off
10  the retail price of drugs.
11   A  Sure.
12   Q  And you referred to members.
13       What -- what members are you referring to?
14   A  Specifically with HealthAllies?
15   Q  Yes.
16   A  The members that enrolled in the program.
17   Q  All right.  I know I asked you this once
18  again.
19   A  That's all right.
20   Q  What is HealthAllies?
21   A  They are a discount card program.
22   Q  Is that something offered by Optum?
23   A  Yes, now Optum.  HealthAllies was an
24  acquisition by Optum.
25   Q  And the people that were able to take

20

1  advantage of this discount were members of health
2  plans who had hired Optum to administer their plan?
3    A  They could be part -- a member of the --
4  call it -- the family of UnitedHealth Group, like
5  UnitedHealthcare, or they could be members without
6  insurance.  There was a broad range.  There wasn't a
7  prerequisite, in other words, to be a member of
8  UnitedHealthcare --
9    Q  So you could be a member --
10   A  -- or had insurance.
11   Q  I'm sorry.  I'm sorry.
12   A  That's all right.
13   Q  You could be a member of HealthAllies even
14  if you didn't have insurance?
15   A  That's correct.
16   Q  And even if you weren't part of a plan that
17  had hired UnitedHealth to administer their plan?
18   A  Correct.
19   Q  And the name of that discount for
20  pharmaceutical drugs was what?
21   A  The pharmacy benefit.
22   Q  And --
23   A  Pharmacy discounts.
24   Q  Does it -- does it still exist today?
25   A  I believe so.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

6 (21 to 24)

---

**21**

1    Q  And is it still part of Health --
2  HealthAllies?
3    **A  It's part of Optum.  And I believe still**
4  **goes by the name of HealthAllies.**
5      **Again, since the acquisition, putting**
6  **"Optum" in front of "HealthAllies."**
7    Q  So do -- do -- persons that are in health
8  plans, such as employer health plans who contract
9  with Optum to administer those plans, are those
10  persons eligible for the pharmacy benefit that
11  HealthAllies offers?
12      MR. HEENAN:  Objection as to form and scope.
13      Do you want me to elaborate on the form
14  objection?
15      MR. LEWIS:  No.  That's okay.
16    Q  Can you answer that?
17    **A  THE WITNESS:  Am I advised to answer?**
18      MR. HEENAN:  You can -- you can answer.
19      I -- I do need to sort of clarify.  I mean,
20  are we talking -- we're going over his background --
21      MR. LEWIS:  Yes.
22      MR. HEENAN:  -- and prior experience, and so
23  some of these questions seem to be talking about
24  present state.
25      So I want to make sure we're clear on the

---

**22**

1  record if the question is based on his experience
2  and what happened when he was involved in that
3  program versus today.
4      MR. LEWIS:  Well, my last question was --
5  was based on his knowledge of the program that he's
6  been describing to me up until the present.
7      MR. HEENAN:  Okay.
8    **A  THE WITNESS:  Can you repeat the question,**
9  **please?**
10      MR. LEWIS:  Probably not.
11  BY MR. LEWIS:
12    Q  So do -- persons that are in health plans,
13  such as employer health plans who contract with
14  Optum to administer those plans, are those persons
15  eligible for the pharmacy benefit that HealthAllies
16  offers?
17    **A  That depends.  Because our plan came with --**
18  **it ranged from medical to pharmacy to kind of**
19  **wraparound coverage for supplies, medical supplies,**
20  **et cetera.**
21      **So the reason I say it depends is because**
22  **the member can purchase a variety of plans or**
23  **customize it.**
24      **So they may have opted not to choose the**
25  **pharmacy benefit.  And then an employer could buy**

---

**23**

1  **that to offer to their employees as an extra benefit**
2  **wrapped around their insurance.**
3    Q  For -- for a member who has this pharmacy
4  benefit, what is the discount they're entitled to on
5  the purchase of generic drugs?
6    **A  Depends on the drug.  And it depends on --**
7  **basically, it's the -- the mix.  So it depends on**
8  **the drug, and that gets specific to the discount.**
9    Q  Is -- is there any way the discount can be
10  defined in terms of, for example, the U&C price?
11      MR. GEYERMAN:  Objection to form.
12    **A  So it -- it can be defined because it's a**
13  **discount off that price.**
14    Q  Is it a discount off the U&C price?
15    **A  It's a discount off of the fee schedule**
16  **price at that time.**
17    Q  And does -- is the fee schedule tied to the
18  U&C price in any way?
19      MR. GEYERMAN:  Objection to form.
20      MR. HEENAN:  Join.
21    **A  Let me think back.**
22      **It is tied to the fee schedule.**
23    Q  Is the fee schedule price tied to the U&C in
24  any way?
25    **A  Meaning that there could be one -- there**

---

**24**

1  **could be multiple U&Cs?**
2    Q  For a particular drug is the -- is the fee
3  schedule price tied in any way to the U&C?
4      MR. GEYERMAN:  Objection to form.
5      MR. HEENAN:  Join.
6    **A  It works a little differently on the**
7  **discount program.  But the -- the discount is tied**
8  **to that price, which may be the usual and customary.**
9      **So because it's not an insurance benefit, it**
10  **is tied to -- that's why I say it's tied to the fee**
11  **schedule.**
12    Q  Are -- the custom --
13    **A  Because that how -- I'm sorry.**
14    Q  I'm sorry.  Go ahead.
15    **A  Because that's how we contracted with them.**
16    Q  This hypothetical customer that I'm asking
17  about that has this pharmacy benefit, is that
18  customer a cash customer?
19      MR. GEYERMAN:  Objection to form.
20      MR. HEENAN:  Join.
21    **A  It is.**
22    Q  And what's a cash customer?
23    **A  A customer that is not using their insurance**
24  **as a benefit.  And is paying with their own funds.**
25    Q  So just going back to UnitedHealth Group

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

7 (25 to 28)

---

25

1  from 1999 to 2011, have you described any
2  responsibilities you had during that time frame that
3  related to a -- pharmacy benefit or a discount for
4  buying pharmaceutical drugs?
5  **A So can you paraphrase the question? Are you**
6  **asking if there's any other time --**
7  Q I'm asking if you had other --
8  **A -- that I negotiated --**
9  Q I'm sorry.
10  I'm asking if you had any other experience
11  other than what we've talked about between 1999 and
12  2011 related to benefits for the prescription -- for
13  the purchase of prescription drugs.
14  **A No.**
15  Q All right. When you left UnitedHealth
16  Group, you went to CIGNA; is that correct?
17  **A That's correct.**
18  Q And what is CIGNA?
19  **A CIGNA is an insurer.**
20  Q Would it also go under the name of a
21  third-party plan?
22  **A HealthSpring. So HealthSpring was their**
23  **Medicare division.**
24  **And at the time I was at HealthSpring, CIGNA**
25  **acquired HealthSpring.**

---

26

1  Q All right. Does -- does CIGNA offer
2  prescription drug insurance to its beneficiaries or
3  its clients?
4  **A They do.**
5  Q And does HealthSpring also offer that --
6  that benefit?
7  **A They do.**
8  Q And is -- is HealthSpring limited to
9  Medicare Part D?
10  **A That's correct. And dual eligibles.**
11  Q And what does that word mean, "dual
12  eligibles"?
13  **A "Dual eligibles" is a person that has**
14  **Medicare and Medicaid --**
15  Q All right.
16  **A -- as an insurance.**
17  Q And is Medicaid -- I'm sorry.
18  Is CIGNA not so limited?
19  **A Can you paraphrase that?**
20  Q Yeah. In -- in terms of any drug benefits
21  that CIGNA offered, did they also offer a benefit
22  for people enrolled in a private plan as opposed to
23  Medicare or Medicaid?
24  **A Like an exchange?**
25  Q I believe like -- like someone who purchases

---

27

1  health insurance that has a drug prescription
2  benefit.
3  MR. GEYERMAN: Objection to form.
4  **A I just want to make sure I understand your**
5  **question.**
6  **So HealthSpring had the Part D plan and the**
7  **dual eligible.**
8  Q Okay.
9  **A Both of those offered a pharmacy benefit.**
10  **And can you continue from there?**
11  Q Did CIGNA offer any pharmacy benefits to its
12  beneficiaries or its clients who were not enrolled
13  in Medicare or Medicaid?
14  **A Yes, for commercial. So the other product**
15  **line.**
16  Q Would that include employer health plans?
17  **A Yes.**
18  Q And did you work for CIGNA and HealthSpring
19  during the time you were there?
20  **A I worked for HealthSpring, who was acquired**
21  **by CIGNA. They kept the HealthSpring name, but**
22  **essentially my paycheck said "CIGNA."**
23  Q All right. And what responsibilities did
24  you have that related to prescription drug benefits
25  during the time you were there?

---

28

1  **A I did not have any responsibility for the**
2  **prescription drug benefits. It was building a**
3  **network of hospitals, physicians, and ancillary**
4  **providers to cater to our members who were Medicare**
5  **members and then the dual-eligible members**
6  **previously mentioned that have Medicaid and**
7  **Medicare.**
8  Q Were pharmacies such as CVS ancillary
9  providers during that time frame in terms of who you
10  were working with?
11  **A No. So you're asking the "ancillary"**
12  **definition?**
13  Q Yes.
14  **A No. They were like imaging centers. They**
15  **were DME, types of providers like that.**
16  Q So when you were at CIGNA HealthSpring, you
17  were not dealing with pharmacy providers?
18  **A No, I was not.**
19  Q And you weren't negotiating contracts with
20  pharmacy providers?
21  **A No, sir.**
22  Q And were you negotiating contracts with
23  pharmacy providers at UnitedHealth from 1999
24  to 2011?
25  **A Only on my tenure within OptumHealth Allies**

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

---

29

1 that we've already reviewed. Other than that, no.
2     Q And you said in your declaration that you
3 had negotiated about 80 contracts in your career --
4     A I --
5     Q -- correct?
6     A Career specifically to this position I'm
7 in now.
8     Q I'm sorry. In your general career, you said
9 you had negotiated about 80 contracts; correct?
10     MR. GEYERMAN: Objection; form.
11     A No. That -- the 80 contracts are specific
12 to my tenure with Catamaran --
13     Q All right. Thank you.
14     A -- who is now Optum.
15     Q Thank you.
16     A You're welcome.
17     Q So at CIGNA HealthSpring you didn't have
18 any -- any professional contacts with pharmacies?
19     A That's correct.
20     Q All right.
21     A "Professional contacts" meaning I was in
22 negotiations?
23     Q Negotiations or discussing the
24 implementation or administration of a benefit.
25     A That's correct. I did not.

---

30

1     Q All right. You left CIGNA in 2013 and went
2 to Blue Cross Blue Shield; is that correct?
3     A That's correct.
4     Q What did you do there?
5     A I worked basically negotiating contracts and
6 contract strategy for our Medicare -- our dual
7 eligibles that we've mentioned earlier and the
8 commercial plan. My main responsibilities were
9 around the Medicare and dual eligibles.
10     Q And did you negotiate pharmacy drug benefits
11 for the Medicare members and the dual-eligible
12 members?
13     A No, I did not.
14     Q Did you negotiate with pharmacy providers
15 during that time?
16     A No, sir.
17     Q Who did you negotiate with?
18     A With hospitals, ancillary providers, and
19 physicians.
20     Q Did you have any professional contacts with
21 pharmacies in that position?
22     A No, I did not.
23     Q All right. When you left Blue Cross in
24 October of 2014, what was your next position?
25     A At Catamaran as the senior director of

---

31

1 then-provider relations.
2     Q And what is Catamaran?
3     A Catamaran is a pharmacy benefit manager.
4 Or PBM.
5     Q All right. And did you start with them in
6 January of 2015?
7     A Yes.
8     Q Do you know the exact date -- or your best
9 estimate of the exact date?
10     A I think it was about the 19th. Of January.
11     Q All right. And -- and between October in
12 2014, when you left Blue Cross, and January --
13 approximately January 19th -- when you began at
14 Catamaran, were you employed?
15     A No.
16     Q Were you doing any consulting?
17     A No, I was not.
18     Q Were you doing anything in the professional
19 health care world at that time?
20     A No.
21     Q And what was your first position at
22 Catamaran?
23     A I think I previously stated it was the
24 senior director of provider relations.
25     Q And what kind of providers were you dealing

---

32

1 with in that position?
2     A With pharmacies.
3     Q Exclusively with pharmacies?
4     A Yes.
5     Q Was this the first time in your career that
6 you negotiated with pharmacies?
7     A Other than OptumHealth Allies, yes.
8     Q In your position at -- in your positions at
9 Blue Cross and CIGNA, as to the Medicare Part D and
10 dual --
11     A Eligibles.
12     Q -- dual eligibles, were their purchases of
13 prescription drugs tied to the U&C price?
14     MR. GEYERMAN: Objection to form.
15     MR. HEENAN: Join.
16     A I'm not aware because I wasn't in that
17 division that handled the pharmacy so --
18     Q And when you began negotiating at -- at
19 Catamaran, what was your first negotiation that you
20 can recall?
21     A An independent pharmacy.
22     Q And was the term "usual and customary"
23 defined in that contract that you negotiated?
24     A I believe it was.
25     Q And what -- can you recall what that

---

Transcript of Michael D. Reichardt

Conducted on December 20, 2016

---

**33**

1  definition would have said?
2     MR. HEENAN:  Objection to form and scope.
3     If you can remember.
4     **A  The -- I can't remember it verbatim.  It was**
5  **an independent pharmacy that -- I remember there**
6  **weren't any issues with the definition we had at the**
7  **time for "usual and customary."  That would be our**
8  **standard definition.**
9     Q  Would that generally be "cash price
10  including discounts"?
11     MR. GEYERMAN:  Objection to form.
12     MR. HEENAN:  Same.
13  **A THE WITNESS:  The standard definition -- can**
14  **you repeat the question?**
15     MR. LEWIS:  Sure.
16     Q  Would that generally be "cash price
17  including discounts"?
18     MR. GEYERMAN:  Objection to form.
19     MR. HEENAN:  Same.
20  **A  I'm trying to think back.**
21  **I'm not sure I can give an accurate answer**
22  **because it wasn't a contested definition.**
23     Q  Have you --
24  **A  It was more of a rate negotiation than a**
25  **language negotiation, as we call it.**

---

**34**

1     Q  Prior to 2015, had you ever heard of a
2  definition of "U&C" other than "cash price including
3  discounts"?
4  **A  In the medical arena, yes.**
5     Q  How about in the pharmaceutical benefit
6  arena?
7  **A  I had not.**
8     Q  And when did -- I'm sorry.
9     In terms of the 80 contracts that you
10  negotiated since beginning your work at Catamaran,
11  were those all with pharmacy providers?
12  **A  Yes.**
13     Q  And does that include chains and independent
14  pharmacies?
15  **A  It does.**
16     Q  Are there other kinds of pharmacies other
17  than the two I mentioned?
18  **A  They break down in kind of specialty**
19  **pharmacies that might only do workers' compensation**
20  **but, in general, they all have an NCPDP number,**
21  **which would be an independent or chain code, which**
22  **would be a chain.  Beyond that I think you covered**
23  **the two broad categories.**
24     Q  So in the area of -- of chain pharmacies,
25  did you negotiate a contract with CVS?

---

**35**

1     **A  I assisted with that, correct.**
2     Q  Was that the one that was signed in late
3  January 2015?
4  **A  No, it was not.**
5     Q  What is the one you assisted with?
6  **A  The recent one that we have negotiated,**
7  **effective 1/1/17.**
8     Q  What was your role in the CVS-Optum contract
9  signed in late January 2015?
10  **A  Really, to service the contract and the**
11  **account and to take it over postnegotiation or**
12  **signature.**
13     Q  So is it fair to say you didn't participate
14  in the negotiation?
15  **A  That's correct.**
16     Q  You didn't participate in the drafting?
17  **A  Correct.**
18  **I wasn't employed at the time by Catamaran.**
19     Q  And Catamaran was -- after you began your
20  employment with Catamaran, they were -- they were
21  taken over by another company?
22  **A  They were acquired.**
23     Q  Acquired.  And who acquired them?
24  **A  Optum Health Services.**
25     Q  And approximately when was that?

---

**36**

1     **A  That was in July of last year, 2015.**
2     Q  And at that point did Optum become your
3  employer?
4  **A  Yes.**
5     Q  And is Optum your employer today?
6  **A  They are.**
7     Q  And you've been an Optum employee from July
8  '15 until today?
9  **A  That's correct.**
10     Q  When you negotiated contracts for Catamaran,
11  did your contracts include a "lesser of" or "lower
12  of" term for reimbursement to the pharmacies?
13     MR. GEYERMAN:  Objection to form.
14     MR. HEENAN:  Join.
15  **A  They did.**
16     Q  And what does that term mean?
17  **A  It means that there is a contracted rate.**
18  **There is a charge or a usual and customary that the**
19  **pharmacy would submit.  There's an agreed-in cost.**
20  **All of those things combined, that Optum at the**
21  **time -- I think you were referring to Optum -- Optum**
22  **would pay the lesser of those charges.**
23     Q  To the pharmacy?
24  **A  To the pharmacy.**
25     Q  In the form of reimbursement?

---

37

1    A That's correct.
2    Q Did Optum contracts with health plans, such
3 as employer health plans, also have a "lesser of" or
4 "lower of" term?
5       MR. GEYERMAN: Objection to form.
6       MR. HEENAN: Join.
7    A You're referring to our client contracts?
8    Q Yes.
9    A I'm not aware because I work in network
10 relations, which is -- the former title was
11 "provider relations," so we really deal directly
12 with the pharmacies and not the clients. We have a
13 separate division that does that.
14   Q Do you know if Optum's contracts with its
15 clients where Medicare Part D benefits were offered
16 included language -- included "lesser of" or "lower
17 of" terminology?
18      MR. GEYERMAN: Objection to form.
19   A So that I think my previous answer covered
20 that, but I'm not aware of the specifics in the
21 client contracts because my specific role is in
22 network relations.
23      So I couldn't really speak accurately to
24 those.
25   Q Did anybody other than counsel -- your

38

1 counsel -- contact you about working on the
2 declaration that you've given in this case?
3    A No.
4    Q When did you -- let me -- let me withdraw
5 that.
6       At -- at Blue Cross and CIGNA did any of
7 your professional responsibilities involve
8 membership clubs for -- for the purchase of
9 pharmaceuticals?
10   A No, they did not.
11   Q How about at UnitedHealth Group from '99
12 to 2011?
13   A So membership clubs? The only related
14 one -- can you define that, "membership clubs"?
15   Q Well, I was going to ask you for your
16 understanding of what a membership club is as it
17 relates to purchasing generic drugs.
18      MR. HEENAN: Objection to form.
19   A That a member must enroll in a program, and
20 then they have access to that specific pricing
21 within that program.
22      There may be a fee associated with that
23 or not. And they must either present their card or
24 identification in order to access that -- access
25 that price at the time of purchase.

39

1    Q And in terms of that definition, is that
2 written down in any contract you ever negotiated?
3    A The -- I think the closest thing is the
4 OptumHealth Allies discount card program.
5       And that would be -- encompass my previous
6 experience.
7    Q And the Allies program, do you consider that
8 a membership club for the purchase of generic drugs?
9    A It's a membership club for the access to
10 discounts off a range of products, which would
11 include pharmacy.
12   Q And those -- the members of that club were
13 cash customers; correct?
14      MR. GEYERMAN: Objection to form.
15      MR. HEENAN: Join.
16   A They were. But they might have had
17 insurance, they might have been underinsured, or it
18 might have been a plan around their insurance that
19 their employer bought, as we covered previously.
20   Q Other than the Allies program that you
21 mentioned, have you ever seen the definition of
22 "membership club" that you provided to me written
23 down in a contract between a PBM and a pharmacy?
24   A Not that I recall.
25   Q Have you ever seen it written down in a --

40

1 in a textbook that you studied in your professional
2 training?
3    A Not that I recall specifically.
4       You're defining "textbook" as?
5    Q The books that you are given when you take
6 college and graduate school or other professional
7 training courses.
8    A No.
9    Q Were you ever asked to write it down in a
10 memo when you were working in this field from 1999
11 to present?
12   A Write down -- can you clarify --
13   Q The definition that you gave me of a
14 membership club.
15   A Not that I recall.
16   Q During your training at any of these
17 positions, did anybody ever hand you a document with
18 that definition in it?
19   A I'm just processing that.
20   Q Sure.
21   A With that specific definition of a
22 membership club?
23   Q As -- as close as you can remember to the
24 definition you gave, yes.
25   A I can't specifically remember when or where

41

1   but -- I probably can't say that accurately because
2   I can't really think back to the exact time, date,
3   or person that would have given me that.
4      Q  Do you recall somebody handing you that
5   document with that definition on it?
6      A  I don't.
7         I think it comes more from personal
8   experience where one might enroll in a program,
9   et cetera.  And it's related to the programs that we
10  offer at OptumHealth Allies.
11     Q  Do you have any other experience that
12  informs your understanding of that definition?
13     A  Professionally you're referring to?
14     Q  Yes.
15     A  Other than HealthAllies -- that was really
16  the majority of membership clubs, et cetera, with my
17  professional tenure.
18     Q  Do you have an understanding of what the --
19  the lawsuit against CVS that the plaintiffs have
20  brought, the one at which you're -- in reference to
21  which you're giving your deposition today -- do you
22  have an understanding what that lawsuit's about?
23        MR. GEYERMAN:  Objection to form.
24     A  I do.
25     Q  And without disclosing anything your counsel

42

1   said to you, can you tell me what it's about?
2      A  I think, in summary, it's about a member
3   that enrolled in a health savings plan and they had
4   access to those fees because they enrolled.  When
5   they've accessed those fees, I believe there might
6   have been other options for the member to choose in
7   terms of their benefits, which they opted not to, as
8   my understanding, and they chose to stick with their
9   health savings plan membership and purchase the
10  generic drugs from that.
11     Q  And the point of your declaration is not to
12  indicate who you believe should win the lawsuit; is
13  that correct?
14     A  I'm not here to give an opinion.
15     Q  You don't have an opinion about that?
16     A  I do not.
17     Q  And you don't have an opinion as to whether
18  or not CVS reported inflated U&C prices from 2008 to
19  2016, do you?
20        MR. GEYERMAN:  Objection to form.
21     A  I do not.
22     Q  In your professional career you've never
23  been provided the data and the statistics that would
24  allow you to form an opinion about that; correct?
25        MR. GEYERMAN:  Objection to form.

43

1      A  THE WITNESS:  So are you asking for
2   professional or personal?
3         MR. LEWIS:  Professional.
4      A  THE WITNESS:  And can you repeat that
5   question?
6         MR. LEWIS:  Yeah.
7      Q  In your professional career you've never
8   been provided the data and the statistics that would
9   allow you to form an opinion about that; correct?
10     A  And then, again, that's about the usual and
11  customary charge?
12     Q  Whether CVS is reporting inflated usual and
13  customary prices.
14        MR. GEYERMAN:  Objection to form.
15     A  No, I have not.
16     Q  Is Optum a subsidiary of UnitedHealthcare
17  today?
18     A  No.  They're a subsidiary of UnitedHealth
19  Group.
20     Q  I apologize.
21     A  That's okay.
22     Q  And that's been the case since when?
23     A  When I started at UnitedHealth Group, there
24  were five subsidiaries, and they were consolidated
25  to two.

44

1         So UnitedHealth Group is the controlling
2   corporation, Optum Health Services is one of the
3   subsidiaries, and then UnitedHealthcare is the
4   other.
5         I don't know the exact date of when the
6   subsidiaries were consolidated, but it was sometime
7   in the window that I was employed with either CIGNA
8   or Blue Cross.
9      Q  Okay.  And Optum is a PBM; correct?
10     A  Part of their divisions are a PBM, correct.
11     Q  Is that the part that you are employed in?
12     A  Currently, yes, OptumRx.
13     Q  And what is a PBM?
14     A  It's a pharmacy benefit manager by
15  definition.
16        And they manage the pharmacy, the brand and
17  generic drugs, on behalf of an employer group.  So
18  they would provide a network, for example, of
19  pharmacies to that employer group.
20        And they would administer that through their
21  tenure of the contract and provide the discounted
22  price, basically, that's agreed upon in the client
23  agreement.
24     Q  So are the Optum employer groups --
25  I'm sorry.

45

1      Are the Optum clients limited to employer
2  groups?
3      A The -- I just need to think through and make
4  sure.
5      A majority of them are.
6      Q And what would be an example of some of the
7  bigger ones?
8      A By -- are you referring by client name or
9  by --
10     Q Yes.
11     A The -- any specific product line or like --
12  a commercial client?
13     Q A client who negotiates with Optum to
14  administer their pharmacy drug benefit.
15     A CIGNA.
16     Q Any others?
17     A There are several thousands.
18     Q All right.  So, for example, are there
19  manufacturing companies?
20     A I would assume so.
21     Q Are there union health and welfare funds?
22     A Yes.
23     Q Are there other general categories other
24  than --
25     A Other than like health plans?  Was the one

46

1  I mentioned.
2      Q Okay.
3      A You are correct on -- on the previous two
4  that you mentioned.
5      Q Any -- any governmental entities?
6      A Yes, there are a few.
7      Q And what would be an example of one of
8  those?
9      A The Ohio Bureau of Workers' Compensation.
10     MR. LEWIS:  Can I see that Catamaran
11  contract?
12     Can we mark this as 694?
13     (Plaintiffs' Exhibit 694 marked for
14  identification and attached to the transcript.)
15     MR. GEYERMAN:  694?
16     MR. LEWIS:  Correct.
17     Q Mr. Reichardt, I'm handing you a document
18  that's been marked as Plaintiffs' Exhibit 694.  On
19  page 21 there's a signature and a date of
20  December 10th and December 11th, 2014.
21     You can read the whole document if -- if you
22  need to for any question I ask, but I don't think it
23  would be necessary.  But let me know if it is.
24     My first question is, what is this?
25     A This is the provider agreement for pharmacy

47

1  service between Catamaran, now known as OptumRx, and
2  CVS Pharmacies.
3      Q Is -- is this agreement in effect today?
4      A Yes, it is.
5      Q And have you had any role in administering
6  benefits related to this agreement?
7      A Can you paraphrase that and -- because I'm
8  not in the role of administering benefits.  That
9  would be a different division.
10     Q Are you in the -- is your major
11  responsibility building a network and negotiating
12  contracts?
13     A It is.  And maintaining relationships that
14  we have today.
15     Q But Catamaran doesn't exist today; correct?
16     MR. GEYERMAN:  Objection to form.
17     A They were acquired by Optum or UnitedHealth
18  Group.
19     Q But Optum -- I asked you before about an
20  agreement that Optum had with CVS in late January --
21  January 29th, 2015.
22     A Uh-huh.
23     Q Do you recall that?
24     A Yes.
25     Q And that agreement is -- is -- was in -- is

48

1  in effect?
2      A I believe the January agreement, which this
3  one should be December -- yeah, December -- this is
4  the agreement that covered the Catamaran lines of
5  business and employer groups, et cetera.
6      I believe the agreement you're referring to
7  is with OptumRx, formerly Prescription Solutions.
8      Q So Catamaran agreements and OptumRx
9  agreements are not necessarily identical?
10     A Correct.  There's two separate agreements.
11     Q And -- and today there are -- there still
12  are two separate agreements governing the business
13  between those entities?
14     A That's correct.
15     Q Okay.  Can you turn to your declaration?
16  I think we marked it as 691.
17     Do you have that before you?
18     A I do -- yes, I do.
19     Q And I think you told me earlier that the
20  only person you talked to in regards to the content
21  of the declaration was your counsel.  Is that
22  correct?
23     A That's correct.
24     Q And did you review any documents in
25  preparing this declaration?

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

13 (49 to 52)

---

49

1    A  Just the current agreements with CVS that
2  we hold.
3    Q  And which -- can you identify those
4  agreements?
5    A  This was one of them, Exhibit 694.
6    Q  Okay.  Are there others?
7    A  Yes.
8    Q  About how many others?
9    A  One other.
10   Q  And can you identify it for me?
11   A  It is the pharmacy agreement that was
12 executed in January of 2015.
13   Q  All right.  Other than those two documents,
14 did you consult any other documents in preparing
15 your declaration?
16   A  Just those two.  I was trying to think if
17 there were any amendments.  I would include an
18 amendment as part of the master agreement.
19   Q  And do you recall now if you did review any
20 amendments?
21   A  I reviewed -- well, I reviewed the
22 amendments bringing us up to the current timetable.
23   Q  Did you do any other research in order to
24 put together your declaration?
25   A  Not that I recall.

---

50

1    Q  Did you do any research of other contracts
2  other than the two you mentioned?
3    A  Not that I recall.
4    In conjunction with this declaration --
5  correct? --
6    Q  Yes.
7    A  -- was the scope of your question?
8    Q  Yes.
9    A  Okay.
10   Q  Are you familiar -- do you know if any other
11 national pharmacy chains had membership clubs at any
12 point between 2008 and 2016?
13   MR. HEENAN:  Objection to form.
14   Q  Other than CVS.
15   A  So a -- not that I recall.  There might have
16 been one.  I'm not sure if it was defined as a
17 membership club because we never really -- my
18 knowledge was purely doing research on the chain
19 because I own the relationship and then seeing it on
20 the website.
21   Q  And what --
22   A  So I can't really define it as such.
23   Sorry.  Go ahead.
24   Q  What chain are you referring to?
25   A  Kinney Drugs.

---

51

1    Q  Can you spell that?
2    A  K-i-n-n-y [sic] Drugs.
3    Q  Where are they located?
4    A  In New York.
5    Q  Only in New York state?
6    A  New York and lower Vermont, I believe.
7    Q  Okay.  And you're not sure if they had a
8  membership club or not?
9    A  Well, they have part ownership in a discount
10 card program.  So through my research, getting to
11 know who the chain was, what different services they
12 offered.
13   Q  All right.  Do you know if Rite-Aid had a
14 membership club program at any time between 2008 and
15 2016?
16   A  I do not.
17   Q  Do you know if Kmart had a program in that
18 time frame?
19   A  I do not.
20   Q  Have you ever had an occasion to negotiate a
21 provider contract with Rite-Aid or Kmart?
22   A  No.  They're not part of my portfolio that
23 I manage.
24   Q  And CVS is part of your portfolio; correct?
25   A  That's correct.

---

52

1    Q  Are there other national pharmacy chains
2  part of your portfolio?
3    A  Not national chains.
4    Q  Are there other regional chains?
5    A  There are -- can you define "regional"
6  really by --
7    Q  Bigger than a state and less than a country.
8    A  There are a few.
9    Q  Is Kinney one of those?
10   A  Yes, they are.
11   Q  And can you mention -- can you give me the
12 names of the others?
13   A  Kroger drugs.  Or Kroger the grocery --
14 I think it's Kroger, Incorporated.  So I manage
15 about 75 chains.
16   Q  Did Kroger have a membership club between
17 2008 and 2016?
18   MR. GEYERMAN:  Objection to form.
19   A  Not that I'm aware of.
20   Because they're grocery chains, they might
21 have a card that you use but for food purchases.
22   So I would say those are different and
23 distinct than a -- what you're referring to.
24   Q  Did you request any information from anybody
25 in order to complete your declaration?

---

53

1       MR. GEYERMAN:  Objection to form.
2    A  Other than my counsel?
3    Q  Yes.
4    A  No, I did not.
5    Q  Did counsel provide any documents to you?
6    A  Only the documents I already had, which were
7  the contracts that we previously mentioned.
8       And I think we previously mentioned the
9  declarations from others.
10   Q  At any point in doing your work on your
11 declaration did you think that it would be helpful
12 to have data from CVS on any subject?
13      MR. GEYERMAN:  Objection to form.
14   A  That's pretty broad, "on any subject."
15   Q  Any subject you addressed in your
16 declaration.
17   A  Oh, in the declaration.  Thank you.
18   Q  Yes.
19   A  No.  I think the contracts were enough.
20   Q  And in paragraph 1 of your declaration you
21 say, "My other responsibilities include managing
22 staff and reviewing the pharmacy manual that applies
23 to network pharmacies."  Do you see that?
24   A  I do.
25   Q  And what is a pharmacy manual as used in

54

1  this paragraph?
2    A  It is an operational guide for our pharmacy
3  providers that are contracted with OptumRx -- it
4  ranges from administrative procedures to regulatory
5  requirements -- that's available to our
6  participating chains and independent providers.
7    Q  And what do you do when you review the
8  pharmacy manual?  What are you looking for?
9       MR. GEYERMAN:  Objection to form.
10   A  Looking for current edits that we might need
11 to make.  It's revised quarterly.
12      So as -- really, it's -- we each have our
13 own part that we play.  It's a pretty comprehensive
14 manual.
15      So, for example, I wouldn't be reviewing the
16 regulatory provisions.  I might be reviewing some of
17 the procedures, for example, for reprocessing claims
18 or other things that are specific to more network
19 functions.
20   Q  And if you see something in it that you
21 don't agree with or you think needs to be corrected,
22 what do you do?
23   A  There's a review --
24      MR. GEYERMAN:  Objection to form.
25   A  (Continuing.)  There's a review process that

55

1  we go through, and there's one person that keeps all
2  the edits.
3       And so we would submit edits to that person.
4  They would consolidate them and then they were
5  basically reviewed by the -- I'll call it -- the
6  group or committee that reviews all the edits to see
7  if they make it in the final version.
8    Q  All right.  And you said you -- you would
9  not look at the sections, for example, pertaining to
10 regulatory; is that correct?
11   A  Correct.  We each have our own
12 responsibility realm that we'd look at.
13   Q  And did you describe your responsibilities
14 as -- as operational?
15   A  Some of them are operational because that's
16 some of the mechanics in the contracts, and we need
17 to make sure those -- those are current.
18   Q  And would you review the definition of -- of
19 terms or glossary of terms in the manual?
20   A  That would be part of it, yes.
21   Q  Would you review the definition of "usual
22 and customary"?
23      MR. GEYERMAN:  Objection to form.
24   A  That could be part of it.
25   Q  And if you saw anything wrong with it, you

56

1  would correct it --
2       MR. GEYERMAN:  Objection to form.
3    Q  -- is that right?
4    A  I would suggest a correction that would be
5  reviewed by the final committee, sure.
6    Q  In terms of number -- Paragraph No. 2, you
7  say that Optum is one of the three largest PBMs in
8  the United States.
9       Do you see that?
10   A  I do.
11   Q  In terms of -- of Optum's business, in terms
12 of the different pharmacies that are in their --
13 that they contract with, is -- is CVS the largest of
14 the pharmacies in terms of the amount of business
15 you do with them versus a different pharmacy like
16 Rite-Aid or Walgreens?
17   A  Largest -- how do you define "largest"?
18   Q  In terms of revenues that you would link to
19 your contracts with them.
20   A  No, they are not.
21   Q  Who is the largest?
22   A  Walgreens.
23   Q  And where does CVS come in in that
24 hierarchy?
25   A  Two.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

15 (57 to 60)

---

**57**

1    Q  And who's three?
2    A  Three is, I believe, Rite-Aid.
3    Q  And do you have a sense or an estimate of
4  the revenue -- of Optum's revenue that's linked to
5  the contracts with those three entities?
6    A  I do.
7    Q  And can you tell me what your estimates are?
8      MR. HEENAN:  Objection to form.
9    A  So specifically to CVS only or --
10   Q  Let's start with CVS.
11   A  Approximately 9.2 billion.
12   Q  Is that on an annual basis?
13   A  It is.
14   Q  And does that estimate -- is that an
15  estimate for the -- the year that's just ending now,
16  2016?
17   A  Yes.  It's a prorated estimate.
18   Q  And do you recall the revenues associated
19  with your contracts with CVS for 2015?
20     MR. GEYERMAN:  Objection to form.
21     MR. HEENAN:  Join.  And can we clarify
22  revenue for who?
23     MR. LEWIS:  Yes, we could.  Revenue for
24  Optum.
25     MR. GEYERMAN:  Objection to form.

---

**58**

1      MR. HEENAN:  Yeah, join.
2    A  Yeah.  The -- you're correct.  Annual
3  revenue.
4  BY MR. LEWIS:
5    Q  And what percentage of total revenues is --
6  is the revenue associated with CVS for 2016 or 2015?
7    A  Percentage compared to our network?
8    Q  Yes.
9    A  About -- in the low 20 percents.
10   Q  In paragraph 3 you say, "I am aware, until
11  early in 2016, CVS retail pharmacies offered a
12  membership-based program called Health Savings Pass,
13  HSP."
14     Do you see that?
15   A  I do.
16   Q  And was that offered to members of the
17  public?
18     MR. GEYERMAN:  Objection to form.
19   A  I believe it was.
20   Q  And you say -- you go on to say it was
21  providing "enrollees a 90-day supply of a set list
22  of generic drugs at a set price point."
23     Do you see that?
24   A  I do.
25   Q  If a person who joined the HSP program went

---

**59**

1  to fill a prescription at CVS and the doctor had
2  written it -- it was a covered drug under the HSP
3  list and the doctor had written it for a 30-day
4  prescription and -- and requested that they pay less
5  than the 90-day price, what would happen?
6      MR. GEYERMAN:  Objection to form.
7    A  In order to purchase a 90-day script, the
8  doctor needs to write in -- that it's a 90-day
9  refill.
10     So the -- I do not believe the pharmacist
11  has the authority to just change that to a 90-day.
12  It needs to be explicitly written as such.
13   Q  All right.  So in, say, the year 2013, the
14  CVS HSP program was offering 11.99 as the price for
15  most of the generics on the list.
16   A  Uh-huh.
17   Q  And if a member of the club received a
18  prescription from their doctor for a 30-day for a
19  generic drug on the list and came into a
20  CVS Pharmacy and said, "I think 11.99 is too much,
21  that's the 90-day price, I want to pay less," what
22  would happen?
23     MR. HEENAN:  Objection to the form.
24     MR. GEYERMAN:  Objection to form.
25   A  I go back to the previous question and my

---

**60**

1  previous answer, that a member coming in with a
2  30-day script is not authorized to receive a 90-day
3  fill.
4    Q  So in my hypothetical the member would be
5  told, "You cannot use your HSP benefit to purchase a
6  30-day prescription"; is that correct?
7      MR. GEYERMAN:  Objection to form.
8      MR. HEENAN:  Join.
9    A  That's correct.  That is my understanding.
10   Q  Do you know if the pharmacist had the
11  authority to override and reduce the price from
12  11.99 to a lower price under my hypothetical?
13     MR. GEYERMAN:  Objection to form.
14     MR. HEENAN:  Join.
15   A  I do not.
16   Q  Did -- did anyone from CVS ever tell Optum
17  that they had that authority?
18   A  Based on my purview?
19   Q  Based on your knowledge.
20   A  No.
21   Q  When you say in paragraph 3 that you are
22  "aware," what's the basis of your awareness?
23   A  Again, you know, through getting to know the
24  chains and whatever services they offer.  One of
25  them was their website, to see what other products

Transcript of Michael D. Reichardt

16 (61 to 64)

Conducted on December 20, 2016

---

61

1   and services that they have besides providing the
2   pharmacy services and other programs. That was the
3   main bit of research that I usually do and pick up
4   on these.
5       Q  Did you -- did you do any research in terms
6   of talking to your -- to Optum clients or
7   beneficiaries of their plans?
8       A  Not that I recall.
9       Q  Was your awareness based on reviewing any
10  data provided by CVS?
11      A  Not that I recall. On their Health Savings
12  Pass?
13      Q  Yes.
14      A  No, not that I can recall.
15      Q  Isn't it correct that CVS didn't provide
16  data to Optum on the Health Savings Pass program?
17      MR. GEYERMAN: Objection to form.
18      A  THE WITNESS: Can you rephrase that? That
19  they did not --
20      Q  That they did not provide data to Optum
21  regarding HSP transactions.
22      A  That's correct. I'm not aware of any data
23  that was exchanged.
24      Q  When you say "exchanged," I'm asking about
25  did CVS give it to Optum. Not whether it was

---

62

1   exchanged but whether CVS gave HSP transactions data
2   to Optum.
3       MR. GEYERMAN: Objection to form.
4       A  Not that I'm aware of. That was a separate
5   program.
6       Q  And in paragraph 4 you say, "I understand
7   that the Health Savings Pass was structured as a
8   membership program." Do you see that?
9       A  I do.
10      Q  And then you say, "In order to access the
11  HSP pricing, CVS required customers to complete an
12  enrollment form, agree to the program's terms and
13  conditions, and pay an annual enrollment fee,
14  period." Do you see that?
15      A  I do.
16      Q  What's the basis of your understanding
17  expressed in paragraph 4?
18      A  From, again, the website research
19  I typically do when taking on a new relationship.
20      Q  What does that mean, "website research"?
21      A  Within the CVS website they have a -- or
22  they had a separate offer for programs, et cetera.
23  And the Health Savings Pass was one of them.
24      Q  The term you used "offer for programs," is
25  that a term of art in your field?

---

63

1       MR. GEYERMAN: Objection to form.
2       A  A term of art in terms of "offer"?
3       Q  Yes, as opposed to just the regular old use
4   of the word in the English language.
5       A  I think it takes on a couple meanings. So
6   they're offering a member that doesn't have either
7   insurance, uninsured, or doesn't have that benefit
8   within their insured an opportunity to receive a
9   discount off the 90-day supply.
10      Q  So the research that -- the basis of
11  paragraph 4 would be your Internet research by
12  looking at the CVS website and the description of
13  their offer; is that correct?
14      A  Yes, that's correct.
15      Q  Anything else?
16      A  No. I -- you know, former employees just
17  discussing what that was and, really, reiterating
18  what was on the website. I don't think there were
19  any other pertinent details.
20      But that's what I recall in terms of
21  research in order to get to know who the folks I'm
22  managing are.
23      Q  And when you say "former employees" in your
24  past answer, former employees of what entity?
25      A  Of Catamaran.

---

64

1       Q  Are former employees of Catamaran present
2   employees of Optum?
3       A  No, they aren't.
4       Q  Did you reach out to former employees of
5   Catamaran to ask about the requirements of the CVS
6   HSP program?
7       A  Not while they were not employed. So they
8   were employed with Catamaran.
9       Q  Who did you reach out to?
10      A  My supervisor at the time.
11      Q  And what was his name or her name?
12      A  His name was Justin Kaiser.
13      Q  Anybody else other than Mr. Kaiser?
14      A  Not that I recall.
15      Q  Do you -- did you consider the CVS website a
16  reliable source of information to describe the HSP
17  offer?
18      A  Yes, I did.
19      Q  And did you check any other sources of
20  information to understand that offer?
21      A  I usually read the disclaimers that are
22  within the website.
23      Q  And how did you determine that CVS actually
24  performed and carried out the offer in the real
25  world of doing business with customers?

65

1    MR. GEYERMAN: Objection to form.
2    A Since we -- we did not administer the
3 program and it wasn't really related to our
4 relationship, I think that was the extent of my
5 research. It was really on the website and not --
6 I think what you're assuming is did you do any
7 verification or checks that that's what they're
8 actually doing at the point of sale.
9    Q Yes. And the answer is you did not do any
10 verification or checks that that's what they were
11 doing at the point of sale; correct?
12   A Correct. I did not.
13   Q So your research was limited to
14 understanding the offer?
15   A Understanding the offer --
16   MR. GEYERMAN: Objection to form.
17   A THE WITNESS: Sorry.
18   Q Is that right?
19   A That's correct.
20   Q Based on your understanding of the offer,
21 did an HSP member need to meet all three criteria in
22 paragraph 4?
23   MR. GEYERMAN: Objection to form.
24   A I believe they did. But, again, the extent
25 of my research was on the website.

66

1    MR. GEYERMAN: Rich, you've been going for
2 an hour and 15 minutes. I don't know when you plan
3 on breaking.
4    MR. LEWIS: Shortly.
5    I'm sorry. Could you read back the last
6 answer? Grant threw me off on purpose.
7    MR. GEYERMAN: Sorry.
8    MR. LEWIS: It doesn't take much, Grant.
9    (Pending answer read.)
10   Q So based on your understanding of the offer,
11 if a customer met two of the criteria but not the
12 third, they would not be allowed to participate in
13 the CVS HSP program; is that correct?
14   MR. GEYERMAN: Objection to form.
15   A I'm not sure.
16   Q If a customer did not pay the enrollment
17 fee, they would not be allowed to participate in the
18 program; correct?
19   A I'm not aware if they would or wouldn't.
20   Q So you don't really know if that's a
21 requirement or not?
22   MR. GEYERMAN: Objection to form.
23   A What I read as the requirements is what I
24 know on the website.
25   Q I misspoke. You know that it was written in

67

1 the offer, but you don't know if it was a
2 requirement in the real world?
3    MR. GEYERMAN: Objection to form.
4    A So the -- I knew what I researched on the
5 website.
6    Q And that was limited to the offer, and there
7 was no data about the real world?
8    MR. GEYERMAN: Objection to form.
9    A On the website I don't believe so.
10   Q Based on your understanding of the offer,
11 did a customer have to do this on an annual basis
12 or -- or once per lifetime?
13   A I believe it was an annual enrollment fee,
14 so yearly.
15   Q Would it be your understanding, if a
16 customer paid the enrollment fee in 2013 but not
17 2014, that that customer would not be entitled to
18 the HSP benefit in 2014?
19   A I'm really not aware of CVS' practices as it
20 pertains to that.
21      Again, my research was limited to the
22 website and Justin Kaiser so --
23   Q If you found out, when you were at Optum,
24 that CVS was not requiring these criteria, would
25 that have any impact on your review of their

68

1 reporting of U&C prices?
2    MR. GEYERMAN: Objection to form.
3    A Since my research was limited to the
4 website, I think that's more of a personal opinion.
5      Which I think we're under the realm of
6 professional opinions.
7    Q Yes.
8    A So I usually base --
9    MR. LEWIS: Can you mark that?
10   A (Continuing.) I usually base that on data
11 and facts.
12   Q All right. I think I asked a bad question.
13 Let me try it again.
14      If you found out that CVS was not requiring
15 these criteria, say in the year 2015, would that
16 have any impact on your view of whether they were
17 reporting accurate U&C prices?
18   MR. GEYERMAN: Objection to form.
19   A THE WITNESS: Can you restate that question?
20   MR. LEWIS: Yes, I can.
21   Q I'll try and ask it this way: In the year
22 2015, if you found out that customers were coming
23 into CVS stores who had not paid their annual
24 enrollment fee and they were getting the 11.99 price
25 for a 90-day prescription of a listed drug, would

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

18 (69 to 72)

69

1  that have any impact on your view as to whether CVS
2  was reporting accurate U&C prices?
3       MR. GEYERMAN:  Objection to form.
4       MR. HEENAN:  Join.
5     A THE WITNESS:  Can you elaborate on the
6  circumstances of why that member would not pay an
7  enrollment fee?
8       MR. LEWIS:  No.  Just that they didn't.
9     A THE WITNESS:  Just that they didn't.
10      MR. LEWIS:  Yeah.
11      MR. GEYERMAN:  Object to the form.
12    A Not knowing if there are any special
13  circumstances on the enrollment fee?
14      It's hard for me to answer because that's
15  really CVS' operations, and they're separate and
16  distinct from what we contract with CVS for.  So
17  I think any kind of answer would be a general
18  opinion and not a professional one backed by facts.
19    Q All right.  Let me ask it this way --
20    A Sure.
21    Q -- if you found out that tens of thousands
22  of customers at CVS were getting the 11.99 price for
23  a 90-day listed drug who never paid an enrollment
24  fee, would that have any impact on your view as to
25  whether CVS was reporting accurate unit -- usual and

70

1  customary prices?
2       MR. GEYERMAN:  Objection to form.
3       MR. HEENAN:  Join.
4     A I guess my answer is, whether it was 1 or
5  10,000, it's a separate program than what we
6  contract with with CVS.
7     Q So that wouldn't have any impact on your
8  view as to whether they were reporting accurate
9  U&C prices?
10      MR. GEYERMAN:  Objection to form.
11    A Whether it was 1 or 10,000, I think paying
12  an enrollment fee and linking that to the actual
13  price -- I just -- I don't have the data or the
14  knowledge to answer that accurately.
15      MR. LEWIS:  Okay.  Do you want to take a
16  break?
17    A THE WITNESS:  I'm okay if you are.
18      MR. LEWIS:  Grant, would you like to take a
19  break?
20      MR. GEYERMAN:  I would appreciate it.
21      MR. LEWIS:  Okay.
22      MR. GEYERMAN:  It's been an hour and 21.
23      MR. LEWIS:  Let's do it.
24      MR. GEYERMAN:  Thanks.
25      THE VIDEOGRAPHER:  Off the record.  The time

71

1  is 10:28.
2       (A recess was taken from 10:28 a.m. to
3  10:37 a.m.)
4       THE VIDEOGRAPHER:  We are back on the
5  record.  The time is 10:37.
6  BY MR. LEWIS:
7     Q Mr. Reichardt, referring to your
8  declaration, Plaintiffs' Exhibit 691, can you look
9  at paragraph 10, please.
10    A Okay.
11    Q Paragraph 10 states, "Optum understands the
12  exclusion of 'discount card programs' from the
13  definition of 'usual and customary charge' to apply
14  to the CVS' Health Savings Pass program."
15      Do you see that?
16    A I do.
17    Q So are you saying that the Health Savings
18  Pass program is a discount card program --
19  I'm sorry -- was a discount card program?
20    A I think it could be defined as that.
21    Q Okay.  All right.  Going back to -- to
22  No. 4, if you found out in 2015 that CVS was not
23  requiring customers to meet the criteria that you've
24  indicated in paragraph 4, would that have any impact
25  on Optum's understanding that the exclusion of

72

1  discount card programs from the definition of
2  "U&C charge" applies to the CVS Health Savings Pass
3  program?
4       MR. GEYERMAN:  Objection to form.
5     A Rather than ask you to paraphrase it,
6  I believe I already answered that question.  Twice.
7     Q All right.  Well, let me -- I don't think
8  you did.
9     A Okay.
10    Q So let me try and -- try and drill down a
11  little bit.
12    A Yeah.  If you could paraphrase it, maybe
13  that would help --
14    Q Okay.  So --
15    A -- distinguish it from the others that
16  you've asked.
17    Q Paragraph 10 says that Optum understands
18  that the Health Savings Pass program can be excluded
19  from the U&C charge.
20      MR. GEYERMAN:  You're not reading from
21  paragraph 10.
22      MR. LEWIS:  I'm paraphrasing.
23      MR. GEYERMAN:  Okay.
24    Q Correct?
25    A One more time.

**73**

1    Q Paragraph 10 says that Optum understands
2 that -- that the exclusion -- that the -- CVS'
3 Health Savings Pass is excluded from the definition
4 of "U&C charge."
5    **A Yes.**
6    Q And what I'm asking you is if that
7 understanding would change if you found out, say in
8 the year 2015, that CVS wasn't requiring any of the
9 criteria that you mention in paragraph 4 to obtain
10 the HSP price.
11    MR. GEYERMAN: Objection to form.
12    **A So now it's just -- it's not the -- just the**
13 **enrollment fee? It's anything?**
14    Q Any of those three criteria.
15    **A And would it change the definition?**
16    Q Would it change Optum's understanding
17 whether CVS' Health Savings Pass could be
18 excluded --
19    MR. HEENAN: Objection to form.
20    Q -- from the definition of "U&C customary
21 charge"?
22    MR. GEYERMAN: Join.
23    **A Thank you for paraphrasing.**
24    **I don't believe it would. It's still a**
25 **separate program that's not billed to Optum.**

**74**

1    Q Does a -- to meet your definition this
2 morning of a membership club, do there have to be
3 requirements such as an enrollment form, agreeing to
4 the terms and conditions, and paying an annual
5 enrollment fee?
6    **A Are you asking if there has to be all three?**
7    Q Yes.
8    **A It depends on the club, I guess. Are you**
9 **referring to the HSP in particular?**
10    Q No, I'm referring to your definition of a
11 membership club.
12    **A Okay.**
13    Q Do you think a program would meet your
14 definition if it didn't meet these three criteria in
15 paragraph 4?
16    **A Depending on the club, I think they would at**
17 **least have to meet the terms and conditions. Some**
18 **clubs may choose not to have an enrollment fee, or**
19 **an enrollment form might be the form of accepting**
20 **the terms and conditions by initialing or signature,**
21 **et cetera.**
22    Q All right. Now let's turn specifically to
23 the HSP program.
24    To meet -- to meet your definition of a
25 membership club, would the HSP program have to

**75**

1 charge an enrollment fee?
2    **A Depends on the requirements.**
3    Q Well, you read them on the Internet. What
4 are they?
5    **A What are they?**
6    MR. GEYERMAN: Objection to form.
7    **A (Continuing.) That there's an enrollment**
8 **fee form and agree to the terms and conditions.**
9    Q So you would agree that, in order to qualify
10 to become a CVS HSP member under your definition of
11 a membership club and your review of the offer, the
12 member would have to pay the enrollment fee?
13    MR. GEYERMAN: Objection to form.
14    **A That would be my understanding unless, for**
15 **some reason, there were exceptions.**
16    Q So if they -- if a member didn't pay the
17 enrollment fee, they couldn't be a member of the
18 club; right?
19    **A I think that's up for CVS to define.**
20 **I don't know if there's any mitigating circumstances**
21 **around that.**
22    Q All right. When you say in paragraph 10
23 that "Optum understands the exclusion of 'discount
24 card programs' from the definition of 'usual and
25 customary charge' applies to the CVS Health Savings

**76**

1 Pass program," what's the basis of that
2 understanding?
3    **A That the Health Savings Pass program is**
4 **something separate and distinct to CVS and that we**
5 **do not receive any claims or bills from our members**
6 **for that specific program.**
7    Q If -- if persons outside of the HSP program,
8 tens of thousands of them, got the identical price
9 as persons in the HSP program, would you consider
10 that program a legitimate membership club?
11    MR. GEYERMAN: Objection; form.
12    **A I would question the integrity.**
13    Q In terms of No. 4, Paragraph No. 4, the
14 annual enrollment fee, does it matter what the
15 fee is?
16    **A Is that my professional opinion you're**
17 **asking for?**
18    Q I'm asking you to explain what you wrote in
19 paragraph 4.
20    **A I don't believe so. It depends what is**
21 **stated as the annual enrollment fee.**
22    Q So -- so --
23    **A I wasn't judging -- I'm sorry to interrupt.**
24    **I wasn't judging the amount, just the fact**
25 **that there was a fee.**

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

**77**

1    Q So if the -- if the amount was one penny, it
2 could still be a legitimate membership club with an
3 annual enrollment fee of one penny?
4    **A Technically, I believe, yes.**
5    Q Do you think that would -- the program would
6 have integrity?
7    MR. GEYERMAN: Objection to form.
8    **A That depends.**
9    Q On what?
10    **A On actually following through on the**
11 **program. And the other requirements.**
12    Q No. 5, paragraph 5, you say, "I am aware
13 that CVS did not submit its HSP price as its usual
14 and customary price on claims adjudicated by Optum
15 or its predecessors at any point during the duration
16 of the program."
17    What's the basis of that awareness?
18    **A That it was a separate and distinct program**
19 **that was administered and ran by CVS.**
20    Q When you use the phrase "separate and
21 distinct" as you have recently in answering my
22 questions, separate and distinct from what?
23    **A From a member using a pharmacy benefit**
24 **through Optum.**
25    Q And when you say "a member," you're

**78**

1 referring to a member of a health plan which has
2 negotiated with Optum for a pharmacy benefit?
3    **A That's correct.**
4    Q Are U&C prices determined by what cash
5 customers pay or what members pay?
6    **A The U&C is defined by what is charged by**
7 **that entity. I don't think it's defined by payment.**
8    Q All right. Is the U&C defined, then, as
9 what's -- as the price charged to cash customers as
10 opposed to members?
11    MR. HEENAN: Objection as to form. And
12 maybe you need to clarify.
13    Within our organization, we often speak
14 about "members" in terms of the population that we
15 serve pharmacy benefits to.
16    And so when we talk about "members" here, is
17 it possible to clarify whether or not you're talking
18 about members of the HSP program or -- or members
19 broadly that we spoke about.
20    MR. LEWIS: Yes. Yes.
21 BY MR. LEWIS:
22    Q I'm trying to use the word "members" broadly
23 as -- as you defined it and, I think, as counsel has
24 informed me.
25    So, in other words, are U&C prices

**79**

1 determined by the prices charged to cash customers
2 or to members of prescription drug plans?
3    **A They could be. They could be two separate**
4 **schedules.**
5    Q All right. So let me try to ask this again.
6    Are U&C prices the prices that are charged
7 to cash customers?
8    **A I think that's one fee schedule of usual and**
9 **customary.**
10    Q And is that the one recognized in the
11 industry?
12    **A That is one of them.**
13    Q Is that the one in the Optum contracts?
14    **A You're referring to the HSP usual and**
15 **customary charge?**
16    MR. GEYERMAN: Objection.
17    Q No. I'm referring to the cash price.
18    **A To the cash price?**
19    Q Yes.
20    **A The cash price depends on the members'**
21 **benefit or program that they're on.**
22    Q Earlier in the deposition you said that a
23 cash customer is a customer who purchases a drug
24 without insurance; correct?
25    MR. GEYERMAN: Objection to form.

**80**

1    **A That's --**
2    Q That's what you said; right?
3    **A That's one of the scenarios. There were**
4 **three.**
5    Q If a person uses their insurance to purchase
6 a drug, it's not considered a cash transaction;
7 correct?
8    **A Correct. I would consider it a noncash**
9 **transaction.**
10    Q Why?
11    **A Because they're accessing their health**
12 **benefit, which is one of the pharmacy benefits**
13 **underneath it.**
14    **And they've paid a premium to hold those**
15 **benefits and use them while needed.**
16    Q From 1999 to 2015 Optum's predecessor
17 agreement with CVS defined "usual and customary" as,
18 quote, "The price that the company pharmacy would
19 have charged the member for the prescription if the
20 member was a cash customer. This includes all
21 applicable discounts, including, but not limited to:
22 Senior citizens' discounts, frequent shopper, and
23 special customer discounts or other discounts."
24    Did I read that correctly?
25    **A I believe so.**

Transcript of Michael D. Reichardt

21 (81 to 84)

Conducted on December 20, 2016

**81**

1    Q  And that was the definition used by Optum
2  and CVS for the 16-year period from 1999 to 2015;
3  correct?
4    **A  That's my understanding.**
5    Q  And no other definition was ever used?
6    **A  That's my understanding.**
7    Q  And during that time frame, this definition
8  was consistent with the industry definition of
9  "usual and customary"; correct?
10      MR. GEYERMAN:  Objection to form.
11    **A  I can make an assumption.  Again, my tenure**
12  **started after that, but my general assumption is**
13  **I think that is generally consistent.**
14    Q  And that assumption is based on your own
15  experience; correct?
16    **A  Yes.**
17    Q  In paragraph 8 you talk about the new
18  agreement of January 29th, 2015.
19      Just to clarify, you did not participate in
20  the negotiation or the drafting of that agreement;
21  correct?
22    **A  That is correct.**
23    Q  You didn't participate in any discussions
24  about any changes in the new agreement; correct?
25      I'm sorry.

**82**

1      Any discussions leading up to the signing of
2  the contract on January 29th, 2015.
3    **A  That's correct.**
4    Q  Do you know who at Optum did participate in
5  those discussions?
6    **A  I know a few individuals that did, yes.**
7    Q  Who was that?
8    **A  Carrie Tichey and Todd Borowski.**
9    Q  And have you talked to them about this
10  negotiation?
11    **A  I have not.**
12      **About -- can I ask for a clarification?**
13    Q  Sure.
14    **A  About the negotiation that took place prior**
15  **to the January 29th, 2015, agreement?**
16    Q  Yes.
17    **A  No, I have not discussed that with them.**
18  **They're no longer with the company.**
19    Q  And in paragraph 9 you give the new
20  definition of "usual and customary charge" in the
21  new contract from January 29th, 2015; correct?
22    **A  Yes.**
23    Q  And the new definition changed the word
24  "including" to the word "excluding" in relation to
25  certain discounts; correct?

**83**

1      MR. GEYERMAN:  Objection to form.
2    **A  In general, correct.**
3    Q  And those words, "include" and "exclude,"
4  mean something very different; correct?
5      MR. GEYERMAN:  Objection to form.
6    **A  "Different" being a change, I would say**
7  **there was a change.**
8    Q  And the word "include" is not a synonym for
9  the word "exclude," is it?
10    **A  That's not my understanding.**
11    Q  It means the opposite of it; right?
12    **A  It does.**
13    Q  Now, in paragraph 10 you state in the second
14  sentence, "The definition of 'U&C charge' in the
15  agreement" -- and I think you're referring to the
16  January 2015 agreement -- "memorialized both
17  parties' prior understanding that CVS was not
18  required to submit its Health Savings Pass price as
19  its usual and customary price on claims submitted to
20  Optum under the predecessor agreement."
21      Do you see that?
22    **A  I do.**
23    Q  Now, what was memorialized on January 29th,
24  2015, to your knowledge, was never written down from
25  1999 to January 29th, 2015; correct?

**84**

1      MR. GEYERMAN:  Objection to form.
2    **A  Was never written down?**
3    Q  Yes.
4    **A  Can you elaborate on that piece?**
5    Q  You've never seen a document created between
6  1999 and July -- and January 29th, 2015, that
7  memorialized the understanding that you're
8  referring to?
9    **A  Beyond the new contract, no.**
10    Q  So from 1999 to January 29th, 2015, you have
11  never seen a document memorializing this
12  understanding; correct?
13      MR. GEYERMAN:  Objection to form.
14    **A  So during that period I wasn't employed by**
15  **them.  After that, obviously, I'd had the contract.**
16    Q  I'm asking you about any document created --
17    **A  Oh, in that window of time?**
18    Q  -- before January 29th, 2015, going back to
19  1999.
20    **A  Okay.**
21    Q  You have never seen a document memorializing
22  the agreement that you refer to in paragraph 10?
23      When I say "the agreement," the
24  understanding.
25      Correct?

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

22 (85 to 88)

85

1    A   Can I ask you to paraphrase that?
2    Q   Sure.
3        From 1999 up until July 29th, 2015 -- let's
4    make it one day earlier so it's easier, up until
5    January 28th, 2015.
6    A   Okay.
7    Q   You've never seen a document from that time
8    period that memorialized both parties' prior
9    understanding that CVS was not required to submit
10   its HSP price as its U&C price on claims submitted
11   to Optum under the predecessor agreement?
12   A   Okay.  Thank you.
13   Q   Is that correct?
14   A   That's correct.  I don't recall seeing any
15   documents.
16   Q   Do you know if Optum or its predecessor ever
17   informed its own board of their understanding that
18   CVS was not required to submit its Health Savings
19   Pass price as its U&C price?
20   A   I'm not aware of that.
21   Q   Do you know if -- if Optum ever informed an
22   officer at Medicare that CVS was not required to
23   submit its Health Savings Pass price as its
24   U&C price?
25       MR. GEYERMAN:  Objection to form.

86

1        MR. HEENAN:  Join.
2    A   At the Federal government or a division of
3    Medicare?
4    Q   At the Federal government.
5        MR. GEYERMAN:  Objection to form.
6    A   I'm not aware.
7    Q   Do you know if Optum ever informed any of
8    its clients of its understanding that CVS was not
9    required to submit its HSP price as its U&C price?
10   A   Again, I'm not aware that they did.
11   Q   Based on your experience at Optum, is it
12   important to document decisions that affect the
13   price of pharmaceuticals charged to your client's
14   members?
15       MR. GEYERMAN:  Objection to form.
16   A   It is important.
17   Q   But it wasn't done as to the understanding
18   you've described in paragraph 10 during the 16-year
19   period prior to January 28th, 2015; correct?
20   A   I can't testify whether it was or was not
21   done.
22   Q   To your knowledge.
23   A   To my knowledge, correct.
24   Q   To your knowledge, it was not done; correct?
25   A   To my knowledge, I -- I wasn't aware,

87

1    meaning that I don't know if it was done or wasn't
2    done because I did not work for the company nor did
3    I see any documents to verify that.
4        Did that help clarify?
5    Q   Yes.
6    A   Okay.
7    Q   In paragraph 11 you say, "Based on my
8    understanding of the business practices at Optum
9    and Prescription Solutions, neither company
10   interpreted the predecessor agreement's definition
11   of 'U&C' to require CVS to submit its HSP price as
12   its U&C price."
13       Do you see that?
14   A   I do.
15   Q   Now, would -- would Optum's interpretation
16   of the predecessor agreement have changed if they
17   found out that the three criteria in paragraph 4
18   were not being met by members who were getting the
19   HSP benefit from CVS?
20       MR. GEYERMAN:  Objection to form.
21   A   And I -- I'll go back and restate my
22   previous answers, that I don't know the mitigating
23   circumstances around that or if there were
24   exceptions.
25   Q   Well, if you found out they weren't meeting

88

1    their -- the criteria, would it have affected the
2    interpretation that you referred to in paragraph 11?
3        MR. GEYERMAN:  Objection to form.
4    A   THE WITNESS:  Can you restate that --
5        MR. LEWIS:  Yes.
6    A   THE WITNESS:  -- or paraphrase it?
7        MR. LEWIS:  Yes.
8    Q   In paragraph 4 you say, "CVS required
9    customers" --
10   A   Uh-huh.
11   Q   -- "to complete an enrollment form, agree to
12   the program terms and conditions, and pay an
13   enrollment fee"; correct?
14   A   Yes.
15   Q   If you found out that was not true, would it
16   impact the interpretation of the predecessor
17   agreement described in paragraph 11?
18   A   I don't believe so because it's still the
19   same program and it's not something that's billed to
20   Optum or OptumRx.
21   Q   So Optum -- Optum's interpretation of the
22   predecessor agreement would not be influenced in any
23   way by the facts as to whether CVS did require an
24   enrollment form, agreement to terms and conditions,
25   and payment of an enrollment fee; is that correct?

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

**89**

1    MR. GEYERMAN:  Objection to form.
2    **A THE WITNESS:  Can you restate that again?**
3    MR. LEWIS:  Yes.
4    Q  Optum's interpretation of the predecessor
5  agreement would not be influenced in any way by
6  acquiring knowledge that CVS really wasn't requiring
7  HSP members to complete an enrollment form, agree to
8  terms and conditions, and pay an enrollment fee?
9    **A I --**
10    MR. GEYERMAN:  Objection to form.
11    **A (Continuing.)  It's still a separate and**
12  **distinct program.  So I -- I can't say that it would**
13  **or would not be affected.**
14    **This is a hypothetical; correct?**
15    Q  Yes.
16    **A I think my answers would be speculative,**
17  **then.**
18    Q  What is the interpretation you refer to in
19  paragraph 11 based on?
20    **A That this is a separate program, the Health**
21  **Savings Pass, and it has its own fee schedule**
22  **because there are members that have, basically,**
23  **signed up with that program.**
24    Q  And when you use the word "members" in that
25  last sentence, what are you -- how are you using the

**90**

1  term?
2    **A HSP members or Health Savings Plan**
3  **members -- Pass.  Excuse me.**
4    Q  All right.  So you're telling me that the
5  members have basically signed up with the program.
6  And I'm asking you to assume, for purposes of my
7  hypothetical, that they didn't sign up and they're
8  still getting the HSP price.
9    Would that impact the interpretation you
10  describe in paragraph 11?
11    MR. GEYERMAN:  Objection to form.
12    **A I think that would be more of the business**
13  **with CVS and its enrollees.  I don't think that**
14  **would impact the U&C price because it --**
15    Q  Would it -- sorry.
16    **A -- that would be --**
17    Q  Would it impact your interpretation of the
18  predecessor agreement's definition of "U&C price"
19  and the requirement that CVS submit its Health
20  Savings Pass as the U&C price?
21    **A I --**
22    MR. GEYERMAN:  Objection to form.
23    **A (Continuing.)  Again, I think it's a**
24  **separate and distinct program.  Our U&C price is**
25  **based on the Optum members and their access to their**

**91**

1  **benefits.**
2    Q  But how is the U&C price determined?  Who
3  determines it?
4    **A Mainly CVS determines that.**
5    Q  And how do they do it?
6    **A They do that depending on the membership**
7  **type and the --**
8    Q  Are you saying that they have different
9  defi-- --
10    MR. GEYERMAN:  Can you let him finish his
11  answer?
12    MR. LEWIS:  I'm sorry.
13    MR. GEYERMAN:  I'm not sure he was done.
14    **A THE WITNESS:  Can you restate your question?**
15    MR. LEWIS:  Yes.
16    Q  How does CVS determine the U&C price for a
17  particular drug that -- that.
18    An Optum member would be purchasing using
19  their Optum coverage?
20    **A Based on the fee schedule or usual and**
21  **customary that they would charge someone with**
22  **insurance.  For a pharmacy benefit.**
23    Q  And when you're talking about the "fee
24  schedule," you're talking about the contracted rate;
25  correct?

**92**

1    **A No.  That's what the member is liable to**
2  **pay.  But what is charged could be an -- is**
3  **oftentimes different.**
4    Q  Well, an Optum member would be charged the
5  lesser of --
6    **A Uh-huh.**
7    Q  -- the contracted rate and the U&C; correct?
8    **A Yes.**
9    Q  And the U&C that we're talking about is
10  determined by CVS; correct?
11    **A Correct.**
12    Q  For a particular drug that an Optum member
13  would be -- would have coverage for purchasing?
14    **A That's correct.**
15    Q  And CVS makes that determination solely?
16  Optum doesn't make that determination of what the
17  U&C is; correct?
18    **A That's correct.**
19    Q  And CVS, to your understanding, is supposed
20  to make that determination based on what the cash
21  price is; correct?
22    **A Their fee schedule, I think, is -- I can't**
23  **speak for CVS and all of what goes into their usual**
24  **and customary charges.**
25    **So I think that is one element, but it is**

93

1    the -- it's not the -- the whole answer.  It's the
2    sum of the parts.
3        Q  Other than the cash price that they charge
4    their cash customer, what are the other elements
5    that you understood under your contract they were
6    obligated to evaluate to determine the U&C?
7        A  I think it only deals with the HSP and being
8    different and if that's a different fee schedule.
9    But then there's the usual and customary that they
10   would charge someone with insurance or a pharmacy
11   benefit.
12       Q  In -- in an Optum/CVS contract -- for
13   example, one that was in effect in 2013 --
14       A  Uh-huh.
15       Q  -- there's only one definition of "usual and
16   customary price"; correct?
17       A  Correct.
18       Q  And that definition always says that the
19   U&C price is the cash price; correct?
20       A  Correct.
21       Q  And "cash price" means the price paid by
22   cash customers who are persons that do not have
23   insurance?
24       MR. GEYERMAN:  Objection to form.
25       A  I think there's more than types that do not

94

1    have insurance.  There's underinsured and there's --
2    there's persons that would prefer to pay cash even
3    though they have insurance.
4        Q  All right.  So if persons don't use an
5    insurance benefit --
6        A  Uh-huh.
7        Q  -- they walk in off the street to buy a
8    generic drug, they pay the cash price?
9        A  The cash price.
10       Q  That's what we're talking about.  That's the
11   price that drives what the U&C is; correct?
12       A  Correct.
13       Q  If you found out that CVS wasn't using the
14   cash price to determine the U&C but using a price
15   that was higher, would that affect the
16   interpretation that you describe in paragraph 11?
17       A  And for clarification, the -- the higher
18   price is for what scenario?
19       Q  CVS is reporting a price as its U&C that's
20   higher than its cash price.
21          Would that affect the interpretation in
22   paragraph 11 if you knew that?
23       A  I believe it would.
24       Q  How would it affect it?
25       A  That the -- there was a separate usual and

95

1    customary for just our plan or Optum.
2        Q  And that would be a problem for you; right?
3        A  It could be.
4        Q  It would mean that your clients'
5    beneficiaries could be overpaying; correct?
6        MR. HEENAN:  Objection to form.
7        A  It could be.
8        Q  What data did Optum have to base its
9    understanding on in paragraph 11 that CVS was basing
10   its reported U&C on actual cash prices?
11       MR. GEYERMAN:  Objection to form.
12          What paragraph are you on?
13       Q  Can you answer, please?
14       A  THE WITNESS:  Paragraph 11.
15          Can you restate that?
16       MR. LEWIS:  Yeah.
17       Q  What data did Optum have to base its
18   understanding on in paragraph 11 that CVS was basing
19   its reported U&C on actual cash prices?
20       A  I'm not aware of the data comparison --
21       Q  You're not aware --
22       A  -- that we did at that time --
23       Q  You're not aware --
24       A  -- with your hypothetical.
25       Q  Sorry.

96

1          You're not aware, during the year 2014,
2    whether Optum had CVS' cash transaction data in
3    order to determine if they were reporting an
4    accurate U&C price; correct?
5        A  Correct.  Since I would -- at that time
6    I wasn't employed.  But what I had knowledge of was
7    what was written in the contract.  And I think
8    you're speaking to an analysis that may or may not
9    have occurred.  Is that correct?
10       Q  What I'm trying to ask you is, at any point
11   that you've been employed by UnitedHealthcare or
12   that you know about, has Optum ever had CVS' cash
13   transaction data to review in order to see if
14   they're reporting accurate U&C prices?
15       A  I believe they did have the data, but
16   I'm not aware of the actual analysis.
17       Q  Why do you think they had cash transaction
18   data from CVS?
19       A  Can you paraphrase that?  Why do I --
20       Q  What do you base this on?
21       A  Our point of service.
22       Q  What does that mean?
23       A  There is a system that exchanges the price
24   and the payment between our two organizations.  If a
25   member who is a member of OptumRx has a benefit and

**97**

1 they access that through the pharmacy, that
2 automatically submits the usual and customary
3 charge --
4   Q If a --
5   A -- and a breakdown.
6   Q Sorry.
7      If a member purchases a drug from CVS, Optum
8 gets data on that transaction; correct?
9   A Correct.
10   Q Because they're -- they're a covered member?
11 It's part of your program?
12      If a person who's not covered by Optum
13 purchases a drug at CVS, a cash customer, you don't
14 get that data; correct?
15   A We do not.
16   Q And you can't determine if CVS is reporting
17 accurate U&C prices unless you have that data;
18 correct?
19   A By and large, correct.
20   Q In paragraph 11 the second sentence says,
21 "Optum did not consider HSP members, who had
22 affirmatively enrolled in a program, to be 'cash
23 customers.'"
24      Do you see that?
25   A I do.

**98**

1   Q Now, I think you -- I think you told me you
2 had no data whatsoever on whether CVS enforced that
3 requirement. Is that correct?
4      MR. GEYERMAN: Objection to form.
5   A The requirement of --
6   Q Affirmative -- affirmative enrollment.
7   A We did not receive data on that. That I
8 know --
9   Q The next sentence says --
10   A Sorry.
11      That I know of.
12   Q The next sentence says, "Similarly, they did
13 not interpret the predecessor agreement's phrase
14 'applicable discounts' to encompass the Health
15 Savings Pass."
16      Do you see that?
17   A I do.
18   Q And by "they," you mean Optum; correct?
19   A That's correct.
20   Q And what is the definition of "applicable"?
21   A The definition of "applicable" goes back to
22 our definition of "U&C," and it is -- it is separate
23 and distinct from the Health Savings Pass.
24   Q All right. In paragraph 7, for the contract
25 in effect from 1999 to 2015, where does it say that?

**99**

1      MR. GEYERMAN: Objection to form.
2   A Where does it say that is a separate
3 program?
4   Q Yes.
5   A I don't believe it's explicit.
6   Q Is there any reference whatsoever to
7 membership programs?
8   A In the definition you just referred to?
9   Q In paragraph 7 for the definition in effect
10 for 16 years.
11   A Not that I can see.
12   Q Based on the words in paragraph 7, all
13 discounts are included in consideration of the
14 U&C price; correct?
15      MR. GEYERMAN: Objection to form.
16   A I think you left out a key word, "all
17 applicable."
18   Q Right. And what does "applicable" mean?
19   A That could encompass the membership program,
20 but it also includes, but is not limited to, senior
21 citizen discounts, et cetera.
22   Q And have you ever seen a document that says
23 what you just said other than the 2015 contract?
24   A No, I haven't.
25   Q What's your definition of "or other

**100**

1 discounts"? In paragraph 7.
2   A There could be coupons that a member brings
3 in. For example, $20 off. That would be one
4 example.
5   Q You agree that the HSP program is a discount
6 program; correct?
7   A Yes.
8   Q Are you aware of any government
9 investigations of Optum related to U&C pricing and
10 membership clubs?
11   A I am not.
12   Q Are you aware of any government
13 investigations of CVS related to U&C pricing and
14 membership clubs?
15   A No, I'm not.
16   Q Would -- would facts about a government
17 investigation of CVS' HSP program and their
18 U&C pricing be relevant to whether you maintained
19 the interpretation that you state in paragraph 11
20 that the U&C -- that the HSP did not need to be
21 reported as the U&C price?
22      MR. GEYERMAN: Objection to form.
23      MR. HEENAN: Join.
24   A THE WITNESS: Can you paraphrase that?
25      MR. LEWIS: Yeah.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

**101**

1    Q  Would it be relevant to you to know about a
2  government investigation of CVS' practices in
3  regards to U&C pricing and the HSP program and
4  Optum's determination that CVS did not need to
5  report the HSP price as the U&C price?
6    **A  Is this hypothetical?**
7    Q  No.
8      THE VIDEOGRAPHER:  Five minutes on the tape.
9    **A  Is it conclusive or final?  Or is this an**
10  **investigation you're referring to?**
11    Q  I'm asking you if there's an
12  investigation -- if that would be relevant to you.
13      MR. GEYERMAN:  Objection to form.
14      MR. HEENAN:  Continuing objection to form.
15    **A  I think the relevancy would be the**
16  **conclusion.**
17    Q  Have you ever read any opinions from Federal
18  Judges about whether membership prices could be
19  excluded from consideration of the U&C?
20    **A  I have not.**
21    Q  Would you consider the decision of a Federal
22  Judge to be conclusive?
23      MR. GEYERMAN:  Objection to form.
24    **A  I would.**
25    Q  In paragraph 12 you say, "If a pharmacy

**102**

1  required a customer to enroll in a program in order
2  to access the membership program's prices, then
3  neither Optum nor Prescription Solutions required
4  the pharmacy to submit the program prices as the
5  U&C."
6      Do you see that?
7    **A  I do.**
8    Q  What if you found out that persons who
9  weren't in the program could access the membership
10  program's prices, be charged those prices, and pay
11  those prices?  Would that impact your decision that
12  CVS didn't need to report the U&C -- the HSP as the
13  U&C price?
14      MR. GEYERMAN:  Objection to form.
15    **A  So I think my answer's consistent with the**
16  **other three or four that we talked about.**
17      **Since it's a separate and distinct program,**
18  **I don't think that would impact the U&C that is**
19  **charged to Optum members.**
20    Q  All right.  Let me make sure I understand
21  this.
22      If you found out that persons were accessing
23  that membership program price who weren't in the
24  club --
25    **A  Uh-huh.**

**103**

1    Q  -- you don't think that would have any
2  impact on whether or not Optum thought that it was
3  okay for CVS to not report the HSP price as the U&C?
4      MR. GEYERMAN:  Objection to form.
5    **A  THE WITNESS:  Can you paraphrase that again?**
6    Q  Let me just --
7      MR. LEWIS:  Do I have time to read it back?
8      THE VIDEOGRAPHER:  (Indicating.)
9      MR. LEWIS:  Okay.
10    Q  All right.  Let me make sure I understand
11  this.  If you found out that persons were accessing
12  that membership program price who weren't in the
13  club, you don't think that would have any impact on
14  whether or not Optum thought it was okay for CVS not
15  to report the HSP price as the U&C?
16      MR. GEYERMAN:  Objection to form.
17    **A  I think my answer is consistent.  It's a**
18  **separate program.**
19    Q  So your answer is --
20    **A  It's a separate U&C.**
21    Q  So your answer is, if you found out that
22  persons outside the program were getting the program
23  price, that would not have any impact on Optum's
24  view that CVS did not need to report the HSP price
25  as the U&C price?

**104**

1      Can you please answer that with a yes or no?
2    **A  Can you paraphrase it one more time?**
3    Q  Yeah.
4      So your answer is, if you found out that
5  persons outside the program were getting the program
6  price, that would not have any impact on Optum's
7  view that CVS did not need to report the HSP price
8  as the U&C price?
9    **A  And this is a hypothetical --**
10      MR. GEYERMAN:  Objection to form.
11      MR. HEENAN:  Join.
12    **A  (Continuing.)  This is a hypothetical?**
13    Q  Yes.
14    **A  It is?**
15      **Again, since it's a separate program,**
16  **I think that's between CVS and its HSP members and**
17  **not relevant to the U&C price that they're charging**
18  **Optum.**
19    Q  All right.  Thank you for that answer.
20      I'm asking a little different question.  I'm
21  not asking -- I'm asking you if it would be relevant
22  to your decision that it's okay for CVS not to
23  report the HSP price.
24      THE VIDEOGRAPHER:  One minute.
25    **A  That is the question.**

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

105

1      MR. GEYERMAN:  Objection to form.
2      **A  Not knowing all the circumstances of why**
3  **that occurred, it's hard for me to identify whether**
4  **it's relevant or not.**
5      MR. LEWIS:  Okay.  Let's take a break for
6  the tape.
7      THE VIDEOGRAPHER:  Off the record.  The time
8  is 11:22.
9      (A recess was taken from 11:22 a.m. to
10 11:27 a.m.)
11     THE VIDEOGRAPHER:  This is the beginning of
12 Disk 2.  The time is 11:27.
13 BY MR. LEWIS:
14     Q  Mr. Reichardt, returning to paragraph 10 in
15 your declaration, Plaintiffs' Exhibit 691, I want to
16 ask you a question about the first sentence, "Optum
17 understands the exclusion of 'discount card
18 programs' from the definition of 'usual and
19 customary charge' to apply to CVS' Health Savings
20 Pass."
21     Do you see that sentence?
22     **A  I do.**
23     Q  And my first question is, you have never
24 seen that understanding documented prior to the
25 January 29th, 2015, contract; correct?

106

1      MR. GEYERMAN:  Objection to form.
2      **A  That's correct.**
3      Q  And, to your understanding, Optum never
4  reported that understanding to anybody outside of
5  the company; is that correct?
6      **A  That's correct.**
7      Q  Okay.  Turning to paragraph 11, the second
8  sentence says, "Optum did not consider HSP members,
9  who had affirmatively enrolled in a program, to be
10 'cash customers.'"
11     Do you see that?
12     **A  I do.**
13     Q  And prior to the January 29th, 2015,
14 contract, you have -- you have never seen that
15 opinion of Optum documented; correct?
16     MR. GEYERMAN:  Objection to form.
17     **A  That's correct.**
18     Q  And you've never seen that opinion reported
19 to anybody outside of Optum?
20     **A  Correct.**
21     Q  And, finally, the last sentence of
22 paragraph 11 says, "Similarly, they" -- meaning
23 Optum -- "did not interpret the predecessor
24 agreement's phrase, quote, 'applicable discounts,'
25 end quote, to encompass the Health Savings Pass."

107

1      Do you see that?
2      MR. GEYERMAN:  Objection to form.
3      **A  I do.**
4      Q  Prior to the January 29th, 2015, contract,
5  you have never seen that interpretation of Optum
6  documented; correct?
7      **A  That's correct.**
8      Q  And that interpretation of Optum was never
9  reported, to your knowledge, by Optum to anyone
10 outside the company; correct?
11     **A  To my knowledge, that's correct.**
12     MR. LEWIS:  Can I have the 1999 contract?
13 What number are we up to?
14     THE COURT REPORTER:  695.
15     MR. LEWIS:  695.  Okay.
16     (Plaintiffs' Exhibit 695 marked for
17 identification and attached to the transcript.)
18     Q  Mr. Reichardt, can you identify Plaintiffs'
19 Exhibit 695?
20     **A  Sure.  It's the Prescription Solutions**
21 **agreement between CVS and Prescription Solutions.**
22     Q  And was this the agreement that was in force
23 from 1999 to January 29th, 2015?
24     **A  Yes, it looks like it is.**
25     Q  And if you turn to page 7 of the

108

1  agreement -- the numbers are in the lower right-hand
2  corner.
3      **A  (Complied.)**
4      Q  Section 9.1 is an integrated agreement or
5  something called an integration clause.  Are you
6  familiar with what that means?
7      **A  Give me a minute to read through it.**
8      Q  Sure.
9      **A  Yes, I am.**
10     Q  And is it fair to say that it means that
11 this agreement can only be amended by a written
12 document executed by both CVS and Optum?
13     MR. GEYERMAN:  Objection to form.
14     **A  I'm just reading through it one more time.**
15     Q  Sure.
16     **A  And can you paraphrase the question one more**
17 **time?**
18     Q  Yeah.  I understand you're not a lawyer.
19     I'm asking you if you have an understanding
20 that what this means is that this agreement and its
21 terms cannot be amended without a written instrument
22 executed by both CVS and Optum.
23     **A  That would be my interpretation based on the**
24 **last sentence of 9.1.**
25     Q  And you have no personal knowledge how this

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

---

109

1  agreement was interpreted from 1999 to January 28th,
2  2015; correct?
3      MR. GEYERMAN:  Objection to form.
4      **A No, I do not.**
5      Q And if you turn to page 12, there's a
6  definition of "usual and customary."
7      Do you see that?
8      **A I do.**
9      Q And that's the same definition that you've
10 put in paragraph 7 of your declaration; correct?
11     **A If you give me a minute, I'll just verify**
12 **that.**
13     **That's correct.**
14     Q And that was the definition in all Optum
15 contracts from 1999 up until January 28th, 2015;
16 correct?
17     MR. GEYERMAN:  Objection to form.
18     **A All Optum contracts excluding Catamaran.**
19     Q Excluding Catamaran.  Which is the exhibit
20 we looked at earlier?
21     **A That's correct.**
22     Q All right.  And this -- based on your
23 knowledge, this would be a typical definition used
24 in the industry during the years 1999 to 2015;
25 correct?

---

110

1      MR. GEYERMAN:  Objection to form.
2      MR. HEENAN:  Join.
3      **A I would have to make a general assumption**
4  **because I really wasn't in the pharmacy industry at**
5  **that time.  I was in, quote, "the medical industry."**
6      Q So you don't have any personal knowledge
7  whether it was used throughout the industry from
8  1999 to 2015?
9      **A I do not.**
10     Q And if you turn to page 14, this is an
11 example -- what is Exhibit D on page 14?
12     **A Just give me a minute to review that.**
13     **It's a compensation schedule for**
14 **reimbursement.**
15     Q All right.  And it includes one of those
16 "lower of" clauses in the middle of the page that we
17 talked about earlier in the deposition; correct?
18     MR. GEYERMAN:  Objection to form.
19     Q There's an asterisk that says, "If the
20 calculated price" --
21     **A Yes, so** --
22     MR. GEYERMAN:  Objection to form.
23     **A THE WITNESS:  Sorry.**
24     A (Continuing.)  Yes, it does, in the A and
25 B sections.

---

111

1      Q And -- and that type of language means that
2  the pharmacy will be reimbursed by Optum at the
3  lower of the member's co-payment or the company's
4  U&C retail price; correct?
5      MR. HEENAN:  Object to --
6      MR. GEYERMAN:  Object to form.
7      MR. HEENAN:  Object to form.  I'm going to
8  join Mr. Geyerman's prior objection to form, as
9  well.
10     **A A few clarifying questions.**
11     Q Sure.
12     **A You had mentioned co-pay.**
13     Q Yes.
14     **A Are you referring to a certain section**
15 **within Exhibit D?**
16     Q No.
17     **A Can you paraphrase that again, then?**
18     Q Sure.
19     In -- in this Exhibit D to the contract,
20 the -- the meaning of this phrase is that the
21 CVS Pharmacy will be reimbursed by Optum at the
22 lower of the member's co-payment or the company's
23 usual and customary retail price; correct?
24     MR. GEYERMAN:  Objection to form.
25     MR. HEENAN:  Join.

---

112

1      **A I don't think that's correct.**
2      Q Okay.  Can you explain to me why not?
3      **A Because the -- it's the lesser of the**
4  **U&C price or the AWP price, which is the published**
5  **price often by a nationally recognized source like**
6  **Medi-Span.**
7      Q Okay.
8      **A The co-payment is a derivative from that.**
9      Q The co-payment is a derivative from the AWP?
10     **A It is a member's responsibility.**
11     Q From 1999 to 2015 did all Optum contracts
12 with pharmacies have "lower of" language?
13     **A I can't confirm that they all did.**
14     Q Based on your knowledge.
15     **A Based on my knowledge, I think a majority of**
16 **them did.**
17     **But since, you know, I own a section of the**
18 **network, usually that's where my research is**
19 **conducted, within those chains, so it's**
20 **approximately a third of our network.**
21     Q So within your sector or your section, the
22 contracts would have "lower of" -- "lower of"
23 terminology; correct?
24     **A Correct.  That's pretty consistent.**
25     **I just can't confirm that there wasn't one**

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

113

1  contract that did not.
2    Q  All right.  And in a situation where a
3  contract had "lower of" terminology, that also means
4  that the member's co-pay could not be more than the
5  U&C --
6      MR. GEYERMAN:  Objection to --
7    Q  -- correct?
8      MR. GEYERMAN:  Objection to form.
9      MR. HEENAN:  Join.
10   A  I believe that's correct.
11   Q  And in all of the contracts that you were
12 involved in from Optum --
13     MR. LEWIS:  Guys, I got a charley horse.
14 I'm sorry.
15     MR. GEYERMAN:  Let's go off the record.
16     THE VIDEOGRAPHER:  Off the record.  The time
17 is 11:39.
18     (A recess was taken from 11:39 a.m. to
19 11:40 a.m.)
20     THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 11:40.
22 BY MR. LEWIS:
23   Q  So -- so for all the pharmacy chains that
24 you were responsible for, the pharmacies would use
25 the NCPCP [sic] telecommunications standard to

114

1  report their usual and customary price; correct?
2      MR. GEYERMAN:  Objection to form.
3    A  In general, that's correct.
4    Q  For the contracts that you were responsible
5  for, that was uniformly done for covered
6  transactions; correct?
7    A  I believe so.
8    Q  To your knowledge, did anybody in the
9  industry, any PBM or any entity, have access to
10 CVS' membership fee data?
11     MR. GEYERMAN:  Objection to form.
12   Q  In other words, data that indicated whether
13 members were actually paying the fees.
14     MR. GEYERMAN:  Objection to form.
15   A  Not that I'm aware of.
16     MR. LEWIS:  Do you have the 2007?
17     The next number is PX696.
18     (Plaintiffs' Exhibit 696 marked for
19 identification and attached to the transcript.)
20   A  THE WITNESS:  Thank you.
21   Q  Mr. Reichardt, do you have Plaintiffs'
22 Exhibit 696?
23   A  I do.
24   Q  All right.  Can you identify this?
25   A  This appears to be an amendment to the

115

1  prescription drug services agreement as of
2  January 1st, 2007, between Prescription Solutions
3  and CVS Pharmacy.
4    Q  And was this a -- was this part of your
5  responsibility at any point, this -- this
6  relationship?
7    A  Governed under this amendment?
8    Q  Well, this entity --
9    A  Prescription Solutions?
10   Q  Yes.
11   A  When I joined the company, it was OptumRx
12 so -- no, it was not.
13   Q  Have you ever seen this amendment prior to
14 today or this language prior to today?
15   A  I don't believe I've seen this amendment.
16   Q  Okay.  Can you turn to page 2?
17   A  (Complied.)
18   Q  Under "Compensation for Covered Prescription
19 Services," do you see little (b), "Company Charge to
20 Members"?
21   A  Yes, I do.
22   Q  And can you read that sentence into the
23 record, please?
24   A  Sure.  (B) reads, "Company Charges to
25 Members:  Unless otherwise specified on exhibits or

116

1  Exhibit D, the company's pharmacy shall charge the
2  member for covered prescription services the lesser
3  of, (i), the co-payment, or (ii), the usual and
4  customary price."
5    Q  And is this -- is this your understanding --
6  is this consistent with your understanding that
7  beneficiaries or covered persons would never have a
8  co-pay that's greater than the U&C price?
9      MR. HEENAN:  Objection to form.
10     MR. GEYERMAN:  Objection to form.
11   A  THE WITNESS:  You know, if I could just
12 clarify the question.
13     MR. LEWIS:  Sure.
14   A  That if the member was paying the usual and
15 customary price because it was lower, it wouldn't be
16 a co-payment.
17     They would just be paying the usual and
18 customary price.  Maybe a technicality, but I think
19 your assumption is correct.
20   Q  Thank you.
21     Was -- is it your understanding that CVS'
22 cash transaction data was proprietary for CVS?
23   A  Can you clarify "cash transaction"?
24   Q  Yes.
25     A person comes in off the street, doesn't

117

1  use an insurance benefit, purchases a generic
2  drug --
3      MR. GEYERMAN:  Objection to form.
4  Q  -- that transaction.
5      MR. GEYERMAN:  Objection to form.
6  A  So that specific transaction, I believe is
7  proprietary and confidential.
8  Q  And the definition of "U&C" on page 12,
9  that's the same definition that was in the 1999
10 agreement and paragraph 7 of your declaration;
11 correct?
12 A  Just give me a minute.
13     MR. HEENAN:  "On page 12" referring to
14 the --
15     MR. GEYERMAN:  I don't have a page 12.
16     MR. HEENAN:  -- June 1st, 1999, agreement or
17 the amendment?
18     MR. LEWIS:  I'm trying to refer to defined
19 terms on page 12, Bates No. -- lower right-hand
20 corner -- 0005716.
21     MR. HEENAN:  And that appears to be the
22 June 1st, 1999, agreement that's attached to the
23 amendment, just for clarification.
24     MR. GEYERMAN:  It's the same -- it's the
25 same document.

118

1      MR. LEWIS:  I understand.  I withdraw the
2  question.
3      Do you have the cover e-mail and the markup?
4  That would be 69 --
5      THE COURT REPORTER:  7.
6      MR. LEWIS:  -- 7.
7      (Plaintiffs' Exhibit 697 marked for
8  identification and attached to the transcript.)
9  BY MR. LEWIS:
10 Q  Mr. Reichardt, I'm showing you Exhibit 697.
11 There's a cover e-mail and then a document behind
12 it.  Let's start with the cover e-mail.
13     Do you know who Debbie Veale is?
14 A  I do.
15 Q  And do you -- do you have any knowledge
16 related to whether CVS was negotiating with Optum in
17 2013 and asked for changes in the agreement?
18     MR. GEYERMAN:  Objection to form.
19 A  Other than the document you've presented, no.
20 Q  Have you ever seen the document -- either
21 the cover e-mail or the document I've presented?
22 A  As of yesterday I did.
23 Q  All right.  Did you review documents
24 yesterday to prepare for the deposition?
25 A  I did.

119

1  Q  Was this one of them?
2  A  The e-mail was.
3  Q  The e-mail?  Not the document behind it?
4  A  No.  I couldn't access that.
5  Q  What other documents did you review
6  yesterday to prepare for the deposition?
7  A  The other declarations from, I believe, four
8  of -- four of the declarants.
9  Q  Anything else?
10 A  Just the agreements, the Catamaran legacy
11 agreement, as we call it, and the Optum agreement.
12 Q  And without disclosing anything your lawyer
13 said to you, who gave you this cover e-mail?
14 A  Our counsel did.
15 Q  And do you know why you reviewed this one
16 e-mail and no other e-mails?
17 A  I would assume it made a change to some of
18 the topics that we're talking about.  But that was
19 my assumption.
20 Q  All right.  Let's look at the -- is it -- is
21 it your assumption that CVS redlined the existing
22 agreement seeking changes in 2013?
23 A  I think it was the proposed agreement.
24 Sorry to be technical.
25 Q  No.  That's helpful.

120

1  A  But I don't think that -- I can't confirm or
2  deny that the existing agreement wasn't just put in
3  front.  But generally in negotiations we would have
4  a new proposal.
5  Q  All right.  Can you turn to page 5, the
6  definition of "usual and customary charge"?
7  A  Sure.
8  Q  And do you have that before you?
9  A  I do.
10 Q  All right.  And do you see that CVS redlined
11 the word "including" -- the words "including all
12 applicable customer discounts, such as special
13 customer, senior citizen, and frequent shopper
14 discounts"?
15 A  I do.
16 Q  And do you see that they inserted the term
17 "excluding any coupons or discount card programs"?
18 A  I do.
19 Q  And you would agree that a discount card
20 program would have been included in the clause
21 beginning with the word "included" that CVS struck;
22 correct?
23     MR. GEYERMAN:  Objection to form.
24 A  THE WITNESS:  I'm going to need you to
25 paraphrase that.

**121**

1     MR. LEWIS:  Sure.
2     **A THE WITNESS:  The last part was unclear.**
3     Q  So -- so you agree that CVS struck language
4  that reads "Including all applicable customer
5  discounts, such as special customer, senior citizen,
6  and frequent shopper discounts"; correct?
7     **A I do.  That's correct.**
8     Q  And you would agree that that language would
9  include a discount card program?
10     MR. GEYERMAN:  Objection to form.
11     Q  Correct?
12     MR. GEYERMAN:  Objection to form.
13     **A THE WITNESS:  If you could clarify that it**
14  **could or it did.**
15     MR. LEWIS:  It could.
16     MR. GEYERMAN:  Objection to form.
17     **A I think it could.  It does mention examples**
18  **of what was intended.  But it's hard for me to judge**
19  **the interpretation, not being a part of the**
20  **negotiations.**
21     Q  But the language that CVS asked for you can
22  judge.  It clearly says the discount card programs
23  would be excluded; correct?
24     MR. GEYERMAN:  Objection; form.
25     MR. HEENAN:  Same for form.

**122**

1     **A Yes.**
2     Q  And Optum ultimately agreed to that change
3  as -- as indicated in the January 29, 2015,
4  agreement?
5     **A If I could just clarify that.**
6     Q  Sure.
7     **A I have to go off my declaration.  I thought**
8  **we had a copy of that agreement as one of the**
9  **exhibits.**
10     **Could someone help me with the reference**
11  **number?**
12     Q  You mean the 2015 agreement?
13     **A Yes.**
14     Q  I can -- I can mark one and give it to you,
15  if you'd like, or you can use your declaration,
16  whatever you prefer.
17     **A I can use the declaration.**
18     **There are slight differences, so I --**
19  **I don't think it's word for word.**
20     Q  Sorry.  Have you completed your answer?
21     **A Yes.**
22     Q  So my question is a little different.  But
23  the language that CVS asked for you can judge.  It
24  clearly says that the discount card programs --
25  I'm sorry.  Let me withdraw that.

**123**

1     A  Optum agreed to the change, striking the
2  word "include," replacing it with the word
3  "exclude"; correct?
4     MR. GEYERMAN:  Objection to form.
5     MR. HEENAN:  Join.
6     MR. GEYERMAN:  Which clause are you talking
7  about?
8     Q  Can you answer that?
9     **A Do you need to answer his question?**
10     Q  No.
11     **A Okay.  I didn't think so.**
12     MR. GEYERMAN:  Objection to form.
13     **A THE WITNESS:  Sorry.  One more time.**
14     MR. LEWIS:  Yeah.
15     Q  You're looking at your declaration.
16     **A Okay.**
17     Q  You're comparing the language in the
18  agreement that was in place from 1999 to 2015 to the
19  new agreement put in place January 29, 2015;
20  correct?
21     **A Yes, that's correct.**
22     Q  And CVS, beginning in 2013 in the
23  negotiation, asked Optum to change the language from
24  including discounts to excluding discounts; correct?
25     MR. GEYERMAN:  Objection to form.

**124**

1     **A Let me just read through it one more time.**
2     Q  Sure.
3     **A Correct.**
4     Q  All right.  And you've stated in your
5  declaration that it was Optum's understanding that
6  the HSP prices did not need to be included as
7  U&C prices during the time frame the HSP program
8  existed from 2008 up until the new contract in
9  January of 2015; correct?
10     **A Correct.**
11     Q  Then why did they need to change the
12  language if they had an understanding in place for a
13  seven-year period?
14     MR. GEYERMAN:  Objection to form.
15     **A So we're asking me the intent.  It's hard,**
16  **as a contract negotiator, to know if you're not**
17  **there.  Are you asking for my opinion?**
18     Q  Yes.
19     **A That the market changes, language becomes**
20  **out of date, definitions become obsolete or in need**
21  **of a change.**
22     **Those are some of the reasons we often**
23  **update definitions or change them.  Sometimes you**
24  **have the "included but not limited to" language, and**
25  **there needs to be more clarification around what**

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

125

1   that means but not exhaust all the options.
2       Q  Do you ever remember making a contract
3   change when you took a word like "include" and you
4   substituted a word like "exclude," which was the
5   opposite?
6       MR. GEYERMAN:  Objection to form.
7       A  In this particular situation --
8       Q  Any situation where you took a word that
9   meant something and then you took a word that meant
10  the opposite and substituted it in.
11      A  Yes.
12      Q  When was that?
13      A  There are several occasions when we
14  negotiate risk contracts for medical providers.
15  Sometimes you include a service -- for example, in a
16  capitation -- that would pay them.  Sometimes you
17  exclude it.
18      Q  Sometimes you -- you include it for a number
19  of years and then you change your mind and decide to
20  exclude it?
21      A  We usually change our decision based on some
22  relevant facts and data.
23      Q  But if it was already excluded under your
24  prior interpretation, why would you change the
25  language?

126

1       MR. GEYERMAN:  Objection to form.
2       A  Again, I wasn't part of the negotiations, so
3   the exact reason why I can't interpret.
4       But going back to my previous examples,
5   there might have been services that the hospital,
6   for example, did not offer but they built a new wing
7   and now they have an MRI or they have a cancer
8   center.  And we include those services.
9       Q  Okay.  So the HSP was in place from 2008 to
10  2016; correct?
11      A  That's my understanding.
12      Q  And from 2008 through January 1st of 2015,
13  Optum had an understanding of what it -- of what its
14  contract and its definition of "U&C" meant; correct?
15      A  I would believe so.
16      Q  And their understanding was U&C doesn't --
17  doesn't include HSP; right?  That's their
18  understanding?
19      A  Correct.
20      Q  So there was no need to change the language?
21  They already had an understanding; correct?
22      MR. GEYERMAN:  Objection to form.
23      A  Again, not being part of the negotiations,
24  it's hard for me to say yes or no.  But, again,
25  these definitions from time to time need to be

127

1   updated because of either market conditions, changes
2   in programs, et cetera.
3       Q  Did something in the HSP program change?
4       A  I'm not aware.
5       MR. LEWIS:  Can I have the 2015 manual?
6   I'm going after the manual.
7       That's for you and this is the next exhibit.
8   And it's No. -- I'm sorry.
9       THE COURT REPORTER:  698.
10      (Plaintiffs' Exhibit 698 marked for
11  identification and attached to the transcript.)
12      Q  I'm showing you an excerpt from the 2015
13  Optum provider manual, and I have the full document
14  here.  If, for any reason, you want to look at it,
15  just tell me.
16      A  Okay.
17      Q  Or anybody does.  But I'm only marking an
18  excerpt, page 19.
19      A  Okay.
20      Q  Do you have that before you?
21      A  I do.
22      Q  And the 2015 manual, this was a manual to
23  give guidance and instruction to CVS for how to
24  carry out the relationship between the two
25  companies; correct?

128

1       A  It was one of the documents, I would say,
2   the contract being the other.
3       Q  Okay.  What's the relationship between
4   the two?
5       A  The contract really is the binding document
6   that outlines the terms and conditions.  The manual
7   is oftentimes binding but has more procedural.
8       Q  And did you review the 2015 manual at any
9   time when you were working at Catamaran or Optum?
10      A  My hesitation is I just want to see -- can I
11  see the full document, please?
12      Q  Sure.
13      A  When was this published?  Do you know?
14      Q  I don't recall.
15      A  Okay.  If you just could give me a moment to
16  verify that.
17      Can you repeat your question, please?
18      Q  Did you review the 2015 manual at any time
19  when you were working at Catamaran or Optum?
20      A  Yes, I did.
21      Q  On -- what were the circumstances that led
22  you to do that?
23      A  As part of my training when I was onboarded
24  or recently hired.
25      So I would look through and review and get

---

**129**

1  to know the provider manual so that I could address,
2  you know, questions, concerns from our pharmacy
3  chains.
4      Q  And how about the 2016 manual?  Did you have
5  occasion to review that?
6      A  Yes.
7      Q  And for what purpose?
8      A  For -- besides the onboarding?
9        For the purposes I mentioned, to get
10 familiar with the changes that we might have made
11 and some potential questions that the chains
12 might ask.
13     Q  And did you review the 2016 manual for
14 errors as an editor?
15     A  No, I did not.  Not the '16.  There's
16 different versions -- again, I believe they're
17 published quarterly.
18     Q  And -- and you didn't review any of the 2016
19 quarterly versions?
20     A  The 2016 I did for -- under my
21 responsibilities but it wasn't at the beginning of
22 the year.  It was midyear.
23     Q  All right.  Same thing, I'm going to mark an
24 excerpt and put the full document here for your
25 review.

---

**130**

1      A  Okay.
2        THE COURT REPORTER:  That's 699.
3        MR. LEWIS:  699.
4        MR. HEENAN:  '15.  This is the '16.
5        MR. GEYERMAN:  Sure.
6        (Plaintiffs' Exhibit 699 marked for
7  identification and attached to the transcript.)
8      Q  And --
9        MR. GEYERMAN:  Before you go on --
10       MR. LEWIS:  Sure.
11       MR. GEYERMAN:  -- can you just remind me
12 what the plaintiffs' exhibit number is --
13       MR. LEWIS:  Yes.
14       MR. GEYERMAN:  -- of the 2015 two-page
15 expert -- excerpt --
16       MR. LEWIS:  Yes.
17       MR. GEYERMAN:  -- and the plaintiffs'
18 exhibit number for the two-page 2016 excerpt?
19       MS. SPERO:  698 and 699.
20       MR. GEYERMAN:  Thank you.
21 BY MR. LEWIS:
22     Q  So I've handed you an excerpt from the 2016
23 manual, and I'd like to hand you the whole document
24 and ask you if you reviewed this document while
25 working at Optum.

---

**131**

1        And that document -- the excerpt is 699 for
2  the 2016 manual, page 19.
3      A  I reviewed parts of this.  Actually, they
4  were -- what I did is I proposed edits for another
5  line of business that I cover, which is workers'
6  compensation.
7      Q  Did you review the definition of "U&C price"
8  in either the 2015 or the 2016 manual for any
9  purpose?
10     A  If there's a -- for the purpose of going
11 back and researching if there were questions from a
12 chain, yes, not for purposes of editing.
13     Q  All right.  Well, looking at the 2016
14 excerpt, it's the same as the 2015 excerpt in terms
15 of its definition of "U&C"; correct?
16     A  I think -- let me verify that.
17     Q  Sure.
18     A  They appear to be identical.
19     Q  All right.  And if -- if CVS wanted to know
20 what the definition of "U&C" was, they could look at
21 the contract and they could look at the manual;
22 correct?
23       MR. GEYERMAN:  Objection to form.
24     A  Which contract are you referring to?
25     Q  The contract that was in place at the time.

---

**132**

1        MR. GEYERMAN:  Objection to form.
2      A  For any particular -- was it for both
3  Catamaran and Optum?
4      Q  For Optum.
5      A  For Optum?  So which contract are you
6  referencing?
7      Q  The contract -- so in 2015 --
8      A  The 2015 contract?
9      Q  Yes.
10     A  Okay.  The effective date.
11       I just want to grab that.
12     Q  I still haven't marked that.
13       Would you like -- would you like that
14 contract?
15     A  That would be great.
16       THE COURT REPORTER:  This is 700.
17       MR. LEWIS:  700.
18       (Plaintiffs' Exhibit 700 marked for
19 identification and attached to the transcript.)
20       MR. HEENAN:  This contract you just
21 supplied, it's hard to see that it's executed by CVS
22 on the back, which is maybe because it's a faded
23 copy.  And it looks like there is a date in there,
24 but I presume this is a copy -- representing a copy
25 of the executed agreement that was countersigned by

---

Transcript of Michael D. Reichardt

Conducted on December 20, 2016

133

1  CVS.
2       MR. LEWIS:  I am.
3    A  THE WITNESS:  Sorry for the delay.  I just
4  have to do some research.
5       Can you repeat your question, please?
6       MR. LEWIS:  Yeah.
7  BY MR. LEWIS:
8    Q  In 2015 or 2016, if CVS wanted to know what
9  the definition of "U&C" was, they could look at the
10  contract and the manual; correct?
11      MR. GEYERMAN:  Objection to form.
12   A  We're not referencing the Catamaran
13  contract?  Or were we?
14   Q  I would reference any -- any contract that
15  was in effect --
16   A  So --
17   Q  -- in 2015 or 2016.
18   A  It would depend on if there's a provision
19  that the contract prevails and supersedes the
20  provider manual in the event of a conflict.  In that
21  event, the pharmacy agreement would prevail.
22      So the -- it -- the company, otherwise known
23  as CVS, would look to the contract.
24   Q  All right.  And that would be based on a
25  term in the contract; correct?

134

1    A  Yes.
2    Q  And you don't -- as you sit here today, you
3  don't know what the contract says about that?
4    A  About the --
5    Q  Conflict.
6    A  -- if there's a conflict?
7       I do.
8    Q  And what does it say?
9    A  Which contract?
10   Q  The one that you're looking at.
11   A  Okay.  I'm getting there.
12   Q  Okay.
13      MR. GEYERMAN:  For the record, he's looking
14  at the 2015 Optum agreement.
15   A  THE WITNESS:  That's correct.
16      MR. LEWIS:  Yes.
17      MR. HEENAN:  It may be you're looking for
18  3.15.  Is that --
19   A  I've got 3.15, which outlines "Any such
20  changes, to the extent they do not conflict with
21  this agreement, shall be binding on the company."
22      MR. GEYERMAN:  I think you might need
23  11.1 --
24   A  THE WITNESS:  That's where I'm at right now.
25      MR. GEYERMAN:  -- which is a provision he

135

1  already showed you.  But you didn't go over the last
2  sentence of the provision.
3    A  (Continuing.)  In 11.1, about midway down,
4  it says that the agreement prevails.
5  BY MR. LEWIS:
6    Q  Okay.  Going back to the excerpts from the
7  manual at 698 and 699 --
8    A  Okay.
9    Q  -- let's look at the 2015 manual.  That
10  would be 698, page 19.
11      There's a sentence in the U&C, about five
12  lines down, that says, "Alteration of the U&C price
13  to attempt to increase claim payment without a true
14  charge -- change -- to the cash price being offered
15  to the general public will be considered
16  noncompliance and a violation of the agreement."
17      Do you see that?
18   A  I do.
19   Q  Now, that clause is not in contract -- in
20  contrast -- in conflict with the 2015 contract
21  definition of "U&C," is it?
22      MR. GEYERMAN:  Objection to form.
23   A  You are referring -- well, I guess it
24  doesn't matter, the 2015 or '16, because they were
25  the same.  And you were referring to a certain

136

1  portion of the "U&C" definition?
2    Q  Yes, the sentence that I read.
3    A  It's my interpretation that, if the
4  definition in its entirety conflicts, the agreement
5  controls.  So we cannot select words or just simple
6  sentences under it.
7    Q  So you don't think the -- the sentence about
8  alteration in the manual was in effect in 2015
9  because you think the contract is in conflict with
10  that sentence?
11   A  It's in conflict with the definition of
12  "usual and customary."
13   Q  Does the 2015 contract definition of "U&C"
14  say alteration of the U&C price to attempt to
15  increase claim payment is fine?
16   A  I believe it's silent.
17   Q  But you interpret that as a conflict?
18   A  Yes.
19   Q  Okay.  So let me just ask you what these
20  words mean in the manual, in the 2015 manual
21  definition of "U&C."  What does the term "true
22  change to the cash price" mean?
23   A  The price that's offered to the general
24  public.
25   Q  Based on your declaration, Optum believed

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

**137**

1 that the HSP price was not the cash price; correct?
2   **A Can you repeat the question again?**
3   Q Sure.
4     Based on your declaration, Optum believed
5 that the HSP price was not the cash price; correct?
6   **A That's correct.**
7   Q Did CVS tell you that?
8   **A Tell me personally or someone that worked**
9 **for the company?**
10   Q Tell you or anybody at Optum.
11   **A Given that I didn't negotiate the agreement,**
12 **I can't confirm or deny.**
13   Q How is it that you're able to say in your
14 declaration what Optum believed about whether it was
15 appropriate for CVS to not report the HSP as the
16 cash price but, when I ask you a question about
17 that, you say "Well, I wasn't involved"?
18     How can you have an opinion in paragraph 9,
19 10, 11, and 12, and then say --
20   **A Were you asking me --**
21   Q -- "I wasn't involved"?
22   **A Were you asking me to confirm or give my**
23 **opinion?**
24   Q Are these opinions -- when you say in
25 paragraph 10 "Optum understands," is that your

**138**

1 opinion?
2   **A Which part?**
3   Q What comes after the words "Optum
4 understands."
5   **A That's my interpretation.**
6   Q Your -- you intend to say there what the
7 company, Optum's, understanding was?
8   **A Uh-huh.**
9   Q That's why you used the word "Optum";
10 correct?
11   **A Correct.**
12   Q So you have an understanding personally of
13 what Optum understood as to whether it was
14 appropriate for CVS to not report the HSP as the
15 U&C price, and you express it in paragraph 10;
16 correct?
17   **A Yes.**
18   Q But then when I ask you if CVS told you that
19 their HSP price was not the U&C price, your answer
20 is "I wasn't involved"; right?
21   **A So told me during the course of the**
22 **negotiation?**
23   Q Told you or anybody at Optum. Your answer
24 was "I wasn't involved"; correct?
25   **A In the negotiation, correct. I think that's**

**139**

1 consistent with my other answers earlier.
2   Q All right. So if you weren't involved in
3 the negotiation, how do you know what Optum's
4 understanding is about a term that changed and was
5 negotiated in -- in a negotiation that you didn't
6 participate in?
7     MR. GEYERMAN: Objection to form.
8     MR. HEENAN: Join.
9   **A When you take over the account, you have to**
10 **make certain interpretations of the contract, and**
11 **that was my interpretation.**
12   Q And you based that interpret- -- the basis
13 of that interpretation did not include one single
14 document other than the 2015 contract dated
15 January 29th?
16     MR. GEYERMAN: Objection to form.
17   **A I believe that was the document.**
18   Q That was the only one; correct?
19   **A Yes. And the website research, putting**
20 **those two things together.**
21   Q But you told me before the website research
22 was limited to the offer and said nothing about what
23 actually happened in the real world as to
24 enforcement of the provisions.
25   **A Correct. But it gave me a baseline of what**

**140**

1 the program was.
2   Q Why didn't you follow up on the baseline and
3 find out if the rules of the program were being
4 enforced or not?
5     MR. HEENAN: Object to form.
6     MR. GEYERMAN: Same.
7   **A THE WITNESS: Can you restate the question?**
8     MR. LEWIS: Sure.
9   Q Why didn't you follow up on the baseline and
10 find out if the rules of the program were being
11 enforced or not?
12   **A Prior to this, it was never an issue.**
13   Q Well, if you never looked to see if they
14 were being enforced, you wouldn't know if it's an
15 issue; correct?
16     MR. GEYERMAN: Objection; form.
17   **A Depends if we were obligated to do that.**
18 **And in this circumstance I don't believe we were.**
19   Q Well, if, as a result of the decision that
20 it was okay not to report HSP prices as U&C prices,
21 CVS was reporting higher U&C, then your clients
22 had members who were paying higher co-pays? That's
23 the result of that; right?
24     MR. GEYERMAN: Objection to form.
25     MR. HEENAN: Objection.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

141

1    A Well, they're two separate fee schedules.
2  I don't see how they would be paying off the HSP fee
3  schedule if --
4      Q Let me ask it this way: If the HSP price
5  was 11.99 --
6      A Okay.
7      Q -- and the contracted price was $20 --
8      A Uh-huh.
9      Q -- okay? -- and -- and if CVS had to report
10 the HSP price as the U&C, they would have had to
11 report 11.99? But if they didn't have to report the
12 HSP price as the U&C, they reported $25.
13     I'm sorry. $15. I apologize.
14     A It's okay.
15     Q All right.
16     So under "lesser of" pricing, the
17 beneficiaries of your clients are going to pay the
18 lesser of the contracted price, $20, or the U&C $15?
19     MR. HEENAN: By "clients," we're talking
20 about Optum's health plan clients, not his --
21 I mean, with the CVS portfolio, arguably his client
22 is CVS.
23     MR. LEWIS: Thank you.
24     Q I'm talking about Optum's health plan
25 clients' beneficiaries.

142

1      A Okay.
2      Q Those beneficiaries in the scenario I just
3  laid out would get the benefit of "lesser of"
4  pricing and pay a co-pay of $15, which is less than
5  the contracted price of $20; correct?
6      MR. GEYERMAN: Objection to form.
7      MR. HEENAN: Join.
8      A So the example got a little confusing,
9  Richard.
10     Q Okay.
11     A Sorry.
12     Q No problem.
13     A It was a painful one to restate, but you're
14 going to have to --
15     Q Let me try and start over.
16     So the HSP price is 11.99.
17     A Okay.
18     Q All right?
19     Optum says you don't have to report that as
20 the U&C. That was their position.
21     A Correct.
22     Q The contracted price is $20.
23     Because CVS doesn't have to report the HSP
24 price as the U&C, the 11.99, they report a different
25 price. Let's say it's $15.

143

1      A Okay.
2      Q Okay?
3      A Is that the usual and customary?
4      Q Yes.
5      So under the -- the "lesser of" structure,
6  the co-pay that your clients' -- Optum's clients --
7  beneficiary has to pay can be no more than $15 --
8      MR. GEYERMAN: Objection to form.
9      Q -- correct?
10     MR. GEYERMAN: Objection to form.
11     MR. HEENAN: Join.
12     A In -- in that scenario, it would be the
13 lesser of as long as the provision stated that it's
14 either the contracted fees or the usual and
15 customary.
16     Q And the lesser of in that situation would
17 be $15?
18     A Yes.
19     Q But if CVS did have to report the HSP price
20 of 11.99 as the U&C, that same member would get the
21 benefit of the "lesser of" pricing and pay 11.99,
22 not $15; correct?
23     MR. GEYERMAN: Objection to form.
24     A Hypothetically.
25     Q Under this hypothetical the beneficiaries of

144

1  Optum's clients are paying more than they would have
2  if CVS had been required to report the HSP price as
3  the U&C; correct?
4      A So a few clarifying points on that: Since
5  the HSP is a separate program and it's not something
6  that we include in the lesser of, I don't see that
7  being a valid hypothetical, I guess.
8      Q So you can't answer the question?
9      A No. Because I don't think it's a
10 feasibility.
11     Q I'm sorry?
12     A I don't think it's feasible because of how
13 everything's structured.
14     Q Okay.
15     A So your HSP does not work in conjunction
16 with a usual and customary or a contracted price.
17 It works alone because a member enrolls in the
18 plan --
19     Q Right.
20     A -- et cetera, et cetera.
21     Q I mean, so in the hypothetical I asked you
22 to assume that you -- that CVS had to report the
23 HSP price of 11.99 as the U&C.
24     A Uh-huh.
25     Q You're telling me "I can't assume that."

145

1      A  Correct.
2      Q  Right?  So you can't answer my hypothetical
3  because you can't make that assumption?
4      A  Outside of the boundaries of the contract
5  and what's -- what we know as the facts, under that
6  assumption, the HSP is naturally lower than those
7  three amounts.
8      Q  Okay.  Let me ask it this way:  Let's say
9  that 11.99 is the price that cash customers pay for
10  a given drug at CVS.
11      A  Okay.
12      Q  But for that drug CVS doesn't report 11.99
13  as the U&C; they report $15.
14      What is the impact of reporting $15 instead
15  of 11.99 on the -- Optum's clients' beneficiaries
16  who have to pay a co-pay?
17      MR. HEENAN:  Objection to form.
18      MR. GEYERMAN:  Objection to form.
19      A  So in that scenario they're reporting $15;
20  the cash price is 11.99.  It's the delta between
21  the two.
22      Q  So the members -- I'm sorry.
23      The beneficiaries of the clients of Optum
24  under that hypothetical would be paying more -- the
25  difference between 11.99 and $15 -- for their co-pay

146

1  as a result of the decision that CVS did not have to
2  report 11.99 as the U&C?
3      MR. HEENAN:  Object to form.
4      MR. GEYERMAN:  Objection to form.
5      Q  Correct?
6      MR. GEYERMAN:  Same objections.
7      A  Correct, the cash price.
8      Q  Did CVS tell you or anybody at Optum that,
9  in their internal analyses, they categorized HSP
10  prices as cash prices?
11      MR. GEYERMAN:  Objection to form.
12      A  Not that I recall.
13      Q  Would that be inconsistent with your
14  understanding of the HSP program?
15      A  Can you paraphrase that?
16      Q  Yeah.
17      If -- if CVS told you, "We have internal
18  analyses and we count our HSP prices as retail cash
19  prices" -- okay?
20      A  Okay.
21      Q  -- would that be inconsistent with your
22  understanding of their program?
23      A  Yes.
24      MR. GEYERMAN:  Rich, we've been going over
25  an hour and five, I think, since your -- since the

147

1  last little break.
2      MR. LEWIS:  Let's take a break.
3      MR. GEYERMAN:  Okay.
4      THE VIDEOGRAPHER:  Off the --
5      MR. GEYERMAN:  So it's 12:30.  What's the --
6      THE VIDEOGRAPHER:  Off the record.  The time
7  is 12:31.
8      (A recess was taken from 12:31 p.m. to
9  1:15 p.m.)
10      THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 1315.
12      MR. LEWIS:  Good afternoon, Mr. Reichardt.
13      THE WITNESS:  Good afternoon.
14  BY MR. LEWIS:
15      Q  We talked this morning about the "lower of"
16  language in the Optum contracts from 1999 through
17  January of 2015.
18      What -- why did Optum -- what's the benefit
19  to Optum of -- of negotiating for that language?
20      A  One of the benefits is that the member would
21  receive the lower price.  I think that's the biggest
22  benefit.
23      We walked through a few examples.  So if the
24  U&C was $15 and the co-pay was 20, then they would
25  pay the U&C.

148

1      Q  Okay.  So the benefit to Optum is that
2  their -- their clients or the beneficiaries of their
3  clients' plans will pay a lower price or could pay a
4  lower price for generic drugs?
5      MR. GEYERMAN:  Objection to form.
6      MR. HEENAN:  Join.
7      A  Correct.
8      Q  So Optum has -- has an interest in making
9  sure they -- they get the value of that benefit;
10  correct?
11      A  Yeah, mutual in trust along with the member
12  and the client.
13      Q  And -- I'm sorry.
14      And if -- if a U&C price is reported as
15  inflated, it would interfere with that mutual in
16  trust along with the member and the client; correct?
17      MR. GEYERMAN:  Objection to form.
18      MR. HEENAN:  Join.
19      A  In general, that would be correct if the U&C
20  was inflated.
21      Q  And if Optum knew there was inflated
22  U&C prices being reported, pursuant to their
23  obligations of mutual in trust along with the member
24  and the client, they would do what they could to
25  correct the situation; right?

149

1    A Yes.
2    Q And if that led to refunds going back to the
3  beneficiaries of these plans who were overcharged
4  for generic drugs, Optum would support that;
5  correct?
6    A I think in general, yes.
7    Q Turning to your declaration, Plaintiffs'
8  Exhibit 691, paragraph 7, the second sentence says
9  that the U&C would, quote, "include all applicable
10  discounts, including, but not limited to: Senior
11  citizen discounts" -- sorry -- "frequent shopper,
12  and special customer discounts or other discounts";
13  correct?
14    I'm just asking if it says that.
15    A Yes.
16    Q And what is a senior citizen discount?
17    A In general, for the persons over a certain
18  age limit. Usually it's 65.
19    Q And how does a cash customer obtain such a
20  discount?
21    MR. GEYERMAN: Objection to form.
22    A What's the process --
23    Q Yes.
24    A -- of that?
25    They would show proof of age.

150

1    Q So they have to --
2    A And --
3    Q I'm sorry.
4    A I -- that's probably the key requirement.
5    Or you -- it's either proof of age or
6  sometimes they'll have senior citizens as Medicare
7  discounts, so it would include someone that is a --
8  a person who is disabled and receives Medicare
9  benefits.
10    Q All right. If -- as a result of a senior
11  citizen discount during the time frame 2014, if a
12  cash customer -- if cash customers with that
13  discount were paying 11.99 for a 90-day
14  prescription, would -- would you expect CVS to
15  report 11.99 as a cash price?
16    I'm sorry -- as a U&C price.
17    MR. GEYERMAN: Objection to form.
18    A I just want to make sure I have --
19    Q Sure.
20    A -- the question straight. Maybe I could
21  read it back.
22    So -- or why don't you -- can you just
23  paraphrase it?
24    Q Sure. Yes. I apologize for that.
25    A It's okay.

151

1    Q So if there's a group of cash customers who
2  have the senior citizen discount and they're charged
3  11.99 for a specific drug --
4    A Uh-huh.
5    Q -- you would agree that CVS would need to
6  include those transactions in what they report and
7  consider as U&C prices; correct?
8    MR. GEYERMAN: Objection to form.
9    A Are they including those reports to Optum?
10    Q They're including the U -- in the U&C they
11  report to Optum and everybody else into the NCPDP,
12  under the NCPDP telecommunications standard, they
13  would have to include that 11.99 that they charge to
14  cash customers who have a senior citizen discount;
15  correct?
16    A That sounds correct as long as it's not
17  being commingled with the HSP. Correct?
18    Q Okay. And if CVS didn't report that 11.99
19  senior citizen discount as its U&C but reported a
20  higher U&C, then the beneficiaries of the clients of
21  Optum would be charged a higher co-pay; correct?
22    A Let me look at --
23    MR. GEYERMAN: Objection to form.
24    MR. HEENAN: Join.
25    A THE WITNESS: Could you repeat that one more

152

1  time?
2    MR. LEWIS: Yes.
3    Q If the -- if the senior citizen cash
4  customers were getting an 11.99 discounted price and
5  CVS didn't report it as its U&C price but reported a
6  higher price, that would lead to the Optum clients'
7  beneficiaries paying higher co-pays under the
8  "lesser of" logic?
9    MR. GEYERMAN: Objection to form.
10    A So they were charged 11.99 but reported $15?
11  Was that the scenario?
12    Q We can use that detail, yes.
13    A Was that -- okay. And it was a senior
14  citizen discount?
15    Q Yes.
16    A I think the -- where I got confused a little
17  bit is you're saying they would get the senior
18  citizen discount and have the luxury of "lesser of"
19  language through our contract.
20    Q Right. So the -- the predicate of my
21  question is the facts, the hypothetical facts I'm
22  giving you about the senior citizen discount being
23  11.99.
24    A Okay.
25    Q If that were the case and CVS didn't report

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

153

1  that as -- as the U&C but reported a higher number,
2  $15 --
3  **A  Uh-huh.**
4  Q  -- there would be an impact on Optum's
5  clients' beneficiaries because it would drive up the
6  co -- the U&C, which would drive up their co-pay?
7  Do you agree?
8     MR. GEYERMAN:  Objection to form.
9     MR. HEENAN:  Join.
10 **A  The -- this is where I got -- just bear with**
11 **me -- confused on the scenario because the member,**
12 **whether they are a cash-paying customer or the**
13 **member of OptumRx, wouldn't get both.**
14 **So they're not going to have the senior**
15 **citizen discount and access a benefit plan.**
16 Q  Right.
17 **A  Okay.**
18 Q  So Customer No. 1 is a cash customer getting
19 the senior citizen discount.
20 **A  Okay.**
21 Q  Customer No. 2 is a regular beneficiary of a
22 plan who's negotiated an agreement with Optum.
23 **A  Okay.**
24 Q  All right?  So I'm saying the facts as to
25 Customer No. 1 are they get the discount of 11.99 --

154

1  **A  Yeah.**
2  Q  -- as a cash customer, gets reported --
3  U&C gets reported by CVS not as 11.99 but as $15.
4  Now I'm saying, what's the impact on
5  Customer No. 2?
6     MR. GEYERMAN:  Objection.
7  Q  I'm saying -- don't you agree that the
8  impact is that the U&C -- the higher-reported U&C at
9  15 as opposed to 11.99 leads to them paying a higher
10 co-pay?
11    MR. GEYERMAN:  Objection to form.
12 Q  Under the "lesser of" logic in the Optum
13 agreement.
14    MR. GEYERMAN:  Same agreement -- same
15 objection.
16    MR. HEENAN:  Join.
17 **A  So the member of Optum -- what you're saying**
18 **is how does the $15 impact them?**
19 Q  Yes.
20 **A  So my answer is I don't think the two relate**
21 **because No. 1 is a cash-paying customer and they're**
22 **not accessing benefits they may or may not have --**
23 Q  Right.
24 **A  -- through Optum.**
25 Q  Right.

155

1  **A  So unless --**
2  Q  I'm assuming they are not --
3     MR. GEYERMAN:  Can you let him finish his
4  answer, please?
5  Q  I'm assuming they're not accessing, No. 1,
6  and No. 2 are separate.  1 -- 2 is an Optum, 1 is
7  not.
8  **A  Okay.  Your question is, in particular, does**
9  **1 impact 2?**
10 Q  If 1 pays 11.99 for a discount price --
11 **A  Okay.**
12 Q  -- but CVS doesn't report that price as the
13 U&C, they report 15, does that impact the co-pay
14 that Customer No. 2 has to pay, the Optum member?
15    MR. GEYERMAN:  Objection to form.
16 **A  I don't think it does.**
17 Q  Why not?
18 **A  Because 11.99 is a program that that member**
19 **accessed.**
20 **So were they charged under the HSP benefit**
21 **or just charged off the street as a cash payment?**
22 Q  11.99 is a cash customer who gets a senior
23 citizen discount.  They are not in a program.
24 **A  Yeah.  Okay.  Got it.  That was my question.**
25 Q  So under that scenario, you would agree

156

1  that, if CVS didn't report the 11.99 as a cash price
2  but reported as -- as the U&C -- but reported 15, it
3  would impact Customer No. 2, the Optum customer?
4     MR. GEYERMAN:  Objection to form.
5  **A  So it depends on what CVS would be charging**
6  **as the U&C to Optum.**
7  Q  Right.  So under -- under this hypothetical
8  the contract price is 20, they're charging the
9  senior citizen 11.99, and they're reporting 15 as
10 their U&C.
11    MR. GEYERMAN:  Objection to form.
12 **A  So if -- I think what we're getting at is**
13 **No. 2, if all things are equal under a member of**
14 **Optum --**
15 Q  Uh-huh.
16 **A  -- then that's where it's a little hazy for**
17 **me because the charge and reported -- there's only**
18 **pretty much one space in our point of service**
19 **system.**
20 **So as you present that scenario, there's**
21 **either a U&C or the contracted rate.  There's not**
22 **a -- a cash price.**
23 Q  Understood.
24 **A  So it's hard for me to cross-walk that into**
25 **life of an Optum member and if they were impacted**

157

1  because of -- of a potential increase in their
2  U&C price.
3      Q  Okay.
4      A  Is that fair?
5      Q  Yes.  Let me try and explain more carefully.
6      So if CVS reports into the 426DQ usual and
7  customary field $15 --
8      A  Okay.
9      Q  -- not the 11.99 they charged the senior
10 citizen cash customer --
11     A  Okay.
12     Q  -- that's going to have an impact on the
13 Optum member beneficiary who has to pay a co-pay;
14 correct?
15     MR. GEYERMAN:  Objection to form.
16     MR. HEENAN:  Join.
17     A  I think that depends because the -- the
18 customer got a discount in Example 1.
19     Q  Cash customer, yeah.
20     A  The cash customer.  So legitimately that
21 cash customer might have paid 11.99 because that
22 was -- their discount was the delta between the
23 11.99 and the 15.  They were entitled to that
24 because there was a senior citizen discount.  So
25 I don't see how it impacts it because that discount

158

1  is separate from the Optum member.
2      So my answer would be I don't see that
3  reporting a $15 usual and customary impacts an Optum
4  member because they were not accessing the 11.99
5  price because they might have been a nonsenior.
6      Q  Okay.  Under paragraph 7, definition of
7  "U&C," the senior citizen discount is included --
8      A  Uh-huh.
9      Q  -- in the U&C price.  By definition.
10     So if they charged that 11.99, that -- that
11 needs to be included in the U&C price, but, instead,
12 CVS does not report the 11.99 --
13     A  Okay.
14     Q  -- in the 426DQ field for -- to Optum.
15 Instead, they report 15.
16     A  Okay.
17     Q  That has an impact on the beneficiary of the
18 plan that Optum has negotiated with that employer;
19 correct?
20     MR. GEYERMAN:  Objection to form.
21     MR. HEENAN:  Join.
22     A  In that example was the contracted price $20?
23     Q  Yes.
24     A  Okay.  Then it could have an impact,
25 underneath that same scenario, under the member of

159

1  Optum.
2      Q  Okay.  Now, how is -- the HSP plan in
3  the years 2008 to 2015, that -- how is that discount
4  different from the senior citizen discount we just
5  discussed?
6      MR. GEYERMAN:  Objection to form.
7      A  So what I'm aware of is the senior citizen
8  discount is a matter of age or eligibility --
9  usually just age, 65 or over.  That meaning the
10 member -- our member, Optum -- would not have to go
11 enroll and sign up and pay a fee to access the
12 senior citizen discount.
13     I think those are three major differences
14 between the two.
15     Q  Anything else?
16     A  The HSP -- you cannot use the HSP and your
17 health benefit together.  That would probably be
18 the -- the final four thing.
19     Q  But you would agree that, if CVS didn't
20 require the three criteria, No. 4, then, the HSP
21 discount, should function like the senior citizen
22 discount?
23     MR. GEYERMAN:  Objection to form.
24     A  So just to paraphrase, so there were no
25 requirements, no enrollment form, no fee?

160

1      Q  No enforced requirements, correct.
2      A  Then I think it -- all things being equal,
3  then I think the HSP would be similar to the senior
4  citizen discount because they're not doing those
5  things.
6      Q  And then under that scenario, it would be an
7  included discount?
8      MR. GEYERMAN:  Objection to form.
9      MR. HEENAN:  Join.
10     A  For that time period you're referring
11 to, yes.
12     Q  All right.  And what is the frequent shopper
13 discount in paragraph 7?
14     A  What often -- these are more for grocery
15 chains.  So chains are usually defined as mass
16 merchants, national, et cetera.
17     I would think the -- the frequent shopper,
18 though, if a -- like a Kroger has a frequent
19 shopper.  Then that's kind of their card and brand.
20 You can get discounts off of food, et cetera.
21     Q  And does CVS have a frequent shopper
22 discount during the time frame 2008-2015?
23     A  I believe they do.
24     Q  And what do you have to do to get it?
25     A  That I'm not aware of.

161

1  Q Do you have to enroll?
2  A I'm not sure.
3  Q Do you think you can get it by doing
4  nothing?
5  A I think you can get it by -- it's a --
6  literally a card when you scan it so -- I'm not
7  aware of the complete process of how a member would
8  get it.
9      But if you're getting one from a grocery
10  store, usually that means you have to sign some of
11  the terms and conditions and then you get a card.
12  Q Right. And just to be clear, I'm asking how
13  a cash customer would get it, not a member, not an
14  Optum member.
15  A They would go to the retailer. And this is
16  my assumption, is that they would have an enrollment
17  form. And the member would sign, and then they
18  would give them some kind of card for their key
19  chain or a card for the checker to scan to receive
20  discounts.
21  Q So how is that different from the CVS HSP
22  program in terms of being an included discount?
23  A The ones I've seen are not -- they are not
24  pharmacy specific. They are food and related items,
25  maybe over the counter. But you can't take your

162

1  frequent shopper card up to the pharmacy counter and
2  say, "I want to use this" and then it entitles them
3  to essentially double-dip on the discounts so you're
4  getting your contracted rate if you're a member of
5  Optum and then you get this stacked on top. Those
6  two --
7  Q Let me go back again and try to be clear.
8  I'm talking about cash customers, not members of
9  Optum.
10  A Okay.
11  Q As to cash customers how is your description
12  of a frequent shopper, noting that it is an included
13  discount, different from the description of the CVS
14  HSP program?
15  MR. GEYERMAN: Objection to form.
16  MR. HEENAN: Objection to form. And maybe
17  you can ask the witness to clarify. I mean, the
18  discussion about his understanding of cash customers
19  of CVS -- what -- what is his visibility into that
20  or his understanding of -- of what those cash
21  customers -- how they operate?
22  Q Can you answer the question, please?
23  A Can you paraphrase it?
24  Q Sure.
25  A Thank you.

163

1  Q As to cash customers, how would your
2  description of a frequent shopper program, noting
3  that this is an included discount, differ from CVS'
4  HSP program?
5  MR. GEYERMAN: Objection to form.
6  MR. HEENAN: Join.
7  A I would think, just by experience, one of
8  the differences is there's no enrollment fee.
9  Q Anything else?
10  A There is probably less terms and conditions,
11  I would think.
12  There might be terms and conditions on
13  something they'd sign for the enrollment form, but
14  they -- they're not all geared around a pharmacy
15  benefit. It's more all encompassing, like
16  I mentioned, food, over the counter.
17  Q Right.
18  A I rarely see it actually giving a discount
19  on the pharmacy cash pay.
20  Q For a cash customer?
21  A Yeah.
22  Q Even if it's in the definition of "included
23  discounts" in the CVS contract?
24  A Yes, because, if you're under the CVS
25  contract, you're not a cash-paying member. You're

164

1  using a benefit.
2  Q All right. And what is a special customer
3  discount?
4  For a cash customer.
5  A For a cash customer?
6  It could be synonymous with the frequent
7  shopper. It's probably distinct from the senior
8  citizen just because of the age factor.
9  I think that frequent shopper and special
10  customer discounts are very similar --
11  Q And --
12  A -- based on my experience.
13  Q And they can be available to cash customers
14  at pharmacies; correct?
15  A You know, I haven't, in my experience, seen
16  that you get the card as a frequent shopper or a
17  special customer discount and you can go to the
18  pharmacy and actually get a discount. I think it's
19  on all the other purchases that a customer might
20  make --
21  Q All right.
22  A -- other than the pharmacy.
23  But I don't have an all-encompassing
24  knowledge of all the programs. But I've managed
25  enough of the chains, I think, to know that pharmacy

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

165

1  discounts are pretty rare, and they usually work in
2  isolation, meaning it's just a pharmacy discount.
3  It's not, you know, 10 percent off ground chuck.
4      Q  All right.
5      And in paragraph 7 the term "or other
6  discounts," what would be examples of what that
7  refers to?
8      A  Yeah.  I think earlier I had -- just to
9  reiterate, that's probably more like a coupon that
10  is brought in.  That would be one example.
11     Q  You mean like a coupon that you cut out of
12  the newspaper?
13     A  Yeah, or on the Internet.
14     Q  And what's the difference between that and
15  the CVS HSP plan in terms of your view that one is
16  included and one is not in the agreement in place
17  from 2007 to 2015?
18     A  I guess, in general, the other discounts
19  would not have the enrollment form, the enrollment
20  fee, and, also, the -- they might have terms and
21  conditions.  That's probably the major differences
22  I see.
23     Q  And if those criteria weren't enforced, it
24  would be similar to the other discounts; correct?
25     MR. GEYERMAN:  Objection to form.

166

1      A  In that scenario, specific scenario,
2  correct.
3      Q  In terms of a -- a client of Optum or a
4  beneficiary of a client of Optum, if they wanted to
5  understand what was included in the U&C and they
6  read paragraph 7, how would they know that
7  membership prices are excluded?
8      MR. HEENAN:  Object to form.
9      MR. GEYERMAN:  Are you talking about
10  paragraph 7 of his declaration?
11     MR. LEWIS:  Yes.
12     MR. GEYERMAN:  Which is quoting from --
13     MR. LEWIS:  Please -- please, Grant --
14  there's a court order.  "Object" is all you're
15  allowed to say.
16     MR. GEYERMAN:  Well, there's no way --
17     MR. LEWIS:  That's not your problem, Grant.
18     MR. GEYERMAN:  -- members of his client is
19  going to read the declaration.
20     MR. LEWIS:  It's not your problem, Grant.
21  Just object.
22     MR. GEYERMAN:  I'm trying to help you out so
23  you're --
24     MR. LEWIS:  You're not helping me, Grant.
25  You're violating a court order.

167

1      A  THE WITNESS:  Can you repeat the question,
2  please?
3      MR. LEWIS:  Sure.
4  BY MR. LEWIS:
5      Q  If a client of Optum wanted to understand
6  what discounts were included in the U&C and they
7  read paragraph 7, how would they know that
8  membership prices are excluded?
9      MR. GEYERMAN:  Objection to form.
10     MR. HEENAN:  Join.
11     A  A couple parts in the answer.
12     Q  Sure.
13     A  Bear with me.
14     First, the member wouldn't have access to
15  any of this because it's confidential and
16  proprietary.  If a member has questions and they are
17  a member of Optum, they have our number on the back
18  of their ID card.  That's one avenue.
19     They could consult with the pharmacist.
20  I think that's the other avenue of how they would
21  know.
22     Q  You have clients who purchase drug benefits
23  for their employees who know what a U&C is; right?
24     "You" being Optum.
25     A  Does the client know or does Optum know?

168

1      Q  The client.
2      A  The client?  I'd say, in general, the people
3  that negotiate the client contracts would know.
4      Q  And how would they learn, from reading their
5  own contracts, that Optum reached an agreement with
6  CVS without any documentation that membership prices
7  don't need to be reported as U&C prices?
8      MR. HEENAN:  Object to form and scope.
9      I presume that's included in this in terms
10  of the deposition and -- and what this witness has
11  been subpoenaed to testify about.
12     MR. GEYERMAN:  Same objection; objection to
13  form.
14     A  THE WITNESS:  Can you repeat that?
15     MR. LEWIS:  Sure.
16  BY MR. LEWIS:
17     Q  So we're talking about an Optum client who
18  knows what a U&C is --
19     A  Okay.
20     Q  -- and I'm asking you, how would they learn,
21  from reading their own contracts, that Optum reached
22  an agreement with CVS without any documentation that
23  membership prices don't need to be reported as
24  U&C prices?
25     MR. GEYERMAN:  Objection to form.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

43 (169 to 172)

---

169

1    A  Well, there's two different client -- they
2  have client rates, and they have terms and
3  conditions that go with that.  So I have been privy
4  to a lot of these client contracts, but one way the
5  client would know is they have the lesser of, and
6  then we have, obviously, in our contract -- I won't
7  reiterate everything, but we have the "lesser of"
8  language.
9        So I don't know that it's within the
10  client's purview to know that because that's a --
11  that is a network function, and then there's the
12  client functions.
13        So my general assumption is the client would
14  know what they need to know to administer that
15  agreement underneath their compensation exhibit,
16  which, again, is separate and distinct from the
17  actual contract with the pharmacy.  There may be
18  guarantees in the client agreement.  There may be
19  other things that help define something like a U&C
20  that I'm not privy of.
21        MR. GEYERMAN:  And, Rich, I just want to
22  note for the record that we've passed the 3 1/2-hour
23  mark on the record.
24        We've obviously cross-noticed this
25  deposition.  I'm not suggesting you curtail your

---

170

1  examination since you said a while ago you only had
2  about a half hour left, but I do want to note for
3  the record we're now into the second half of the
4  seven hours.  And the defendant certainly reserves
5  its right to examine the witness as much as
6  necessary to respond to examination that's taken
7  place.
8        MR. LEWIS:  Understood.
9  BY MR. LEWIS:
10    Q  So the client wouldn't have any way of
11  knowing that CVS and Optum made an agreement --
12  reached an agreement or an understanding -- that CVS
13  didn't have to report HSP prices as U&C prices?
14        MR. HEENAN:  Object --
15        MR. GEYERMAN:  Objection to form.
16        MR. HEENAN:  Same.
17    A  Again, speaking from my network realm,
18  client account management's over here, not part of
19  my -- my purview.  It's hard for me to answer that
20  because I'm not privy to all the terms and
21  conditions of the client agreement.  So a client may
22  have asked that question, had it answered, and they
23  were pointed to the provision that applies to it --
24    Q  So you --
25    A  -- based on the contract.

---

171

1    Q  So it's fair to say you don't know how a
2  client of Optum would know that Optum and CVS
3  reached an undocumented agreement that CVS didn't
4  need to report U&C price -- HSP prices as U&C?
5        MR. HEENAN:  Object to form.
6        MR. GEYERMAN:  Same.
7    A  So this is -- this time period is prior
8  to --
9    Q  2008 to January 1st, 2015.
10    A  Okay.  Thanks.
11        That's hard for me to say.
12    Q  Okay.  So you don't know?
13    A  I don't know.
14    Q  Okay.
15    A  Anything else would be speculation.
16    Q  Is it reasonable for a person with a
17  prescription drug benefit to believe that, when they
18  go to CVS to buy pharmaceuticals, they're getting
19  the best price that CVS offers?
20        MR. GEYERMAN:  Objection to form.
21        MR. HEENAN:  Same objection.
22    A  So I guess it depends on what a member or
23  customer presents.  In this scenario are they
24  presenting any kind of insurance card, discount
25  card, anything?

---

172

1    Q  Proof of insurance.
2    A  Proof of insurance.
3        And then your question was how are they
4  guaranteed to get the lowest price?
5    Q  Not are they guaranteed.  Is it reasonable
6  for them to assume that they are getting the lowest
7  price?
8    A  I think it is based on their benefit
9  package.  Because our scenario was an insured
10  member; correct?
11    Q  Yes.
12    A  Okay.  Thank you.
13    Q  Is it reasonable for that member who has a
14  prescription drug benefit to assume that the
15  companies administering that benefit will do
16  everything they can to make sure the customer gets
17  the benefit of that benefit?
18        MR. HEENAN:  Object to -- object to form.
19  And I -- I need to interpose here for a moment.
20        And I'm not sure if I'm objecting -- the
21  form objections may be different, but we have had a
22  series of questions -- and, frankly, throughout the
23  deposition -- that have really called for
24  speculation, have asked Mr. Reichardt to opine about
25  members or CVS Pharmacy or clients of Optum's.

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

44 (173 to 176)

---

173

1    And I don't know that he's competent to --
2 to -- to testify on those subjects personally.  And,
3 you know, certainly, it's speculative.
4    So I just wanted to clarify that form
5 objection.
6    MR. LEWIS:  Would you like me to read back
7 the question?
8    **A THE WITNESS:  That would be great.**
9    MR. LEWIS:  Sure.
10 BY MR. LEWIS:
11    Q Is it reasonable for that member who has a
12 prescription drug benefit to assume that the
13 companies administering that benefit will do
14 everything they can to make sure the customer gets
15 the benefit of the benefit that they have obtained?
16    **A Of the pharmacy --**
17    MR. GEYERMAN:  Objection to form.
18    **A (Continuing.) So of the pharmacy benefit?**
19    Q Yes.
20    **A That they're getting the benefit of being a**
21 **beneficiary --**
22    Q Yes.
23    **A -- of OptumRx?**
24    Q Yes.
25    **A Yes, I believe that is.**

---

174

1    And I'm speaking in the -- in that example
2 **specifically to the benefits of that now-member of**
3 **OptumRx.**
4    MR. LEWIS:  Thank you.
5    Nothing further.
6    **A THE WITNESS: Okay.  Thank you.**
7    MR. GEYERMAN:  Okay.  Should I take the
8 microphone, or is this one good enough?
9    THE VIDEOGRAPHER:  Yeah, that should be
10 fine.
11    MR. GEYERMAN:  Okay.  There might be a bit
12 of paper shuffling here.  Can we go off the record
13 for just a second?
14    THE VIDEOGRAPHER:  Off the record.  The time
15 is 1349.
16    (A recess was taken from 1:49 p.m. to
17 1:51 p.m.)
18    THE VIDEOGRAPHER:  We are back on the
19 record.  The time is 1351.
20    MR. GEYERMAN:  Good afternoon, Mr. Reichardt.
21    **A THE WITNESS: Hi.**
22    MR. GEYERMAN:  My name is Grant Geyerman
23 from Williams & Connolly, and we represent
24 CVS Pharmacy in this matter.
25    EXAMINATION BY COUNSEL FOR THE DEFENDANT

---

175

1    BY MR. GEYERMAN:
2    Q You and I have never met before today; is
3 that right?
4    **A That's correct.**
5    Q And have you ever spoken with any lawyers,
6 inside counsel or outside counsel, for CVS in
7 connection with this litigation?
8    **A No, not with CVS.**
9    Q And at this deposition, is this the first
10 time that you are communicating or interacting in
11 any way with a representative of CVS in connection
12 with this litigation?
13    **A That's correct.**
14    Q You haven't spoken with any CVS employees
15 prior to today?  About this litigation or your
16 declaration.
17    **A No, I haven't.**
18    Q And you haven't spoken with any employees or
19 representatives from CVS in preparation for your
20 deposition today; is that correct?
21    **A That's correct, I have not.**
22    Q Sir, I just want to hand you what I've
23 marked as Defense Exhibit 302.
24    (Defense Exhibit 302 marked for
25 identification and attached to the transcript.)

---

176

1    MR. GEYERMAN:  I just want to note for the
2 record that my client, CVS Pharmacy, Inc., has
3 cross-noticed today's deposition, which is sort of
4 shorthand for we get a chance to ask you an equal
5 amount of questions.
6    **A THE WITNESS:  Okay.**
7    Q Have you ever seen this document before?
8    **A I don't think I have seen this document**
9 **before.**
10    **Or not the current version with the -- no.**
11    Q Sir, I just want to start by asking you a
12 few sort of background questions to make sure that
13 we have an understanding on some general principles.
14 Okay?
15    **A Okay.**
16    Q If there's any question I ask you today that
17 you don't understand, please let me know and I'll
18 try to make it more clear.
19    Would you agree that there are different
20 types of prescription drug purchases that can occur
21 when a person walks into a pharmacy?
22    **A Yes.**
23    Q For example, one type of purchase is a
24 customer uses prescription drug insurance to
25 purchase the prescription; fair?

Transcript of Michael D. Reichardt

45 (177 to 180)

Conducted on December 20, 2016

---

**177**

1    A Yes. Correct.
2    Q And a second type of purchase that can occur
3  is when the customer purchases the drug using no
4  insurance or no other form of benefit like a
5  membership program or a discount card? Would you
6  agree?
7    A Correct, a cash pay.
8    Q And that was my question, is that -- that
9  type of purchase is called a cash purchase or a
10  cash-paying customer? Would you agree?
11    A Yes, I would.
12    Q And a third type of purchase is where the
13  customer has enrolled in a form of membership
14  program such as the CVS Health Savings Pass and that
15  program entitles them to special pricing? Would you
16  agree?
17    A I do agree.
18    Q And it's your understanding -- strike that.
19    It's your belief and it's Optum's belief
20  that a purchase through the Health Savings Pass is
21  not CVS' usual and customary price under Optum's
22  contract with CVS and its predecessor contractor;
23  correct?
24    MR. LEWIS: Objection.
25    A Correct.

---

**178**

1    Q There are also purchases that can occur at a
2  pharmacy using a discount card; correct?
3    A Correct. That's an option.
4    Q And some people might call a membership
5  program a discount card purchase? Would you agree
6  with that?
7    A I would agree.
8    Q When CVS Pharmacy submits to Optum a claim
9  for an Optum insured -- and today I might use the
10  term "Optum insured" as a shorthand for a person who
11  has prescription drug insurance through a health
12  plan for whom Optum performs pharmacy benefit
13  manager services, and I'll try to use that
14  terminology consistently.
15    If at any point that is an
16  oversimplification for the nature of my questions,
17  yourself and your counsel, I'd encourage you to
18  please let me know. Because I'm not trying to
19  confuse the issue; I am trying to just simplify my
20  questions.
21    When CVS Pharmacy submits to Optum a claim
22  for an Optum-insured beneficiary as CVS' usual and
23  customary price that's submitted on that adjudicated
24  claim, would you agree that Optum expects CVS will
25  be submitting what is CVS' retail price for that

---

**179**

1  drug at that quantity at that pharmacy on that day?
2    A That's my understanding.
3    Q And another way of saying "the retail price"
4  is the cash price at that pharmacy at -- for that
5  drug in that quantity on that day; fair?
6    A That's fair, yes.
7    Q You've mentioned several times today how --
8  the fact that HSP was a separate program or a
9  separate and distinct program.
10    Do you recall that question -- question and
11  answers with plaintiffs' counsel?
12    A Yes, I do.
13    Q Okay. Can you explain to me -- well, strike
14  that.
15    The fact that HSP program members were
16  entitled to drug pricing -- HSP pricing that was
17  separate and distinct from the retail prices that
18  CVS was charging to its regular customers without
19  any form of benefit, is that part of what you're
20  referring to in saying it's a separate -- or a
21  separate and distinct program?
22    MR. LEWIS: Objection.
23    A Correct.
24    Separate and distinct, just to define that
25  further, that they can't be used in conjunction or

---

**180**

1  else it's double-dipping or -- or stacking benefits.
2  That's sometimes what it's called in the
3  marketplace. That are not -- they do not have the
4  ability to be combined.
5    Q So the HSP program was separate and
6  distinct, as you've said it, for one thing, because
7  you couldn't combine your Optum insurance benefits
8  and your HSP benefits in one -- on one transaction;
9  fair?
10    A That's fair. It's not an extra benefit or
11  discount with your insurance benefit.
12    Q And it's also a separate and distinct
13  program because you had to enroll in the program,
14  and, therefore, you were entitled to special pricing
15  that was, in some cases, more favorable than CVS'
16  regular retail price? Would you agree?
17    A I do --
18    MR. LEWIS: Objection.
19    A THE WITNESS: Sorry.
20    A (Continuing.) I do agree.
21    Q I want to ask you a couple more questions
22  about your prior experience with HealthAllies.
23    Am I pronouncing it right?
24    A Yes, that's right.
25    Q How many years, approximately, did you work

---

Transcript of Michael D. Reichardt

Conducted on December 20, 2016

46 (181 to 184)

---

181

1 at or for the HealthAllies program?

2    **A I believe it was 3 1/2.**

3    Q And explain to me at a high level how

4 HealthAllies works.

5    **A Sure.**

6       **HealthAllies is not an insurance program.**

7 **It's a cash discount program that a member can**

8 **enroll on the website that we maintained at the**

9 **time.**

10       **They can access the benefits by paying a**

11 **zero member premium a month, but they only get a**

12 **limited set of benefits. And they can upgrade that**

13 **coverage, depending on what they need, by paying a**

14 **monthly fee.**

15       **And so a member would present a HealthAllies**

16 **card at the point of service and be entitled to the**

17 **discount that's behind the benefits, whether it be a**

18 **pharmacy, medical, dental, vision. There were about**

19 **six or seven core benefits that we administered as**

20 **HealthAllies. And now known as OptumHealth Allies.**

21    Q And the part of the benefit that is free,

22 that you don't have to pay a fee for, does that

23 include prescription drug coverage?

24    **A I do not believe it did.**

25    Q Okay. But there is an ability to pay a

---

182

1 certain amount -- is it on a monthly basis? --

2    **A Yes, it's a month.**

3    Q -- to be a member?

4       And if you pay a particular monthly fee,

5 you're entitled to prescription drug benefits in

6 addition to other benefits of the HealthAllies

7 program; is that fair?

8    **A Yes, as long as the -- the member selected**

9 **that benefit package.**

10       **Or the other scenario was an employer group**

11 **actually purchased that on behalf of their**

12 **employees.**

13    Q So if I've enrolled in the HealthAllies

14 program and I have paid for the level of membership

15 that includes prescription drug coverage and I go

16 into a retail pharmacy where HealthAllies is

17 redeemable, I get a discount off of what would

18 otherwise be my regular drug price? Is that how it

19 works?

20    **A Correct.**

21    Q Okay. And if I have insurance -- let's

22 assume I'm an insured person with an Optum health

23 plan.

24       Is the discount I get off of what would have

25 been my regular purchase price using and redeeming

---

183

1 my Optum insurance?

2       MR. HEENAN: Object to form.

3    Q Let me -- let me clear that up.

4       If I have insurance through a health plan

5 that is serviced by Optum --

6    **A Uh-huh.**

7    Q -- and I go into a retail pharmacy and I'm a

8 member of the HealthAllies program, do I receive a

9 discount off of the price that I would otherwise pay

10 simply by using my health insurance that uses Optum

11 as the PBM?

12    **A Yes. And I have a point of clarification on**

13 **that.**

14       **There were -- there were a variety of fee**

15 **schedules. Some had a set rate that you would pay.**

16 **Some was a percentage off the retail price.**

17       **So in the scenario that you've proposed,**

18 **that's correct off the retail price but keeping in**

19 **mind there were other benefits that were a fixed fee**

20 **and only accessible if you were a HealthAllies or**

21 **OptumHealth Allies member.**

22    Q So you can join the HealthAllies program

23 even if you don't have prescription drug insurance

24 from anyone; fair?

25    **A Yes, that's correct.**

---

184

1    Q And if such a customer enrolls in the

2 HealthAllies program and goes to a retail pharmacy,

3 is the discount that they are entitled to for a

4 prescription purchase a discount off of the

5 pharmacy's regular retail price?

6    **A Yes. I'm just trying to think through if**

7 **there were any fixed flat-rate fees that we had with**

8 **pharmaceuticals. But in general, yes.**

9    Q And in that scenario where a customer is a

10 HealthAllies member, does not have insurance --

11    **A Okay.**

12    Q -- goes to a pharmacy, purchases a drug

13 through the HealthAllies program, causing the

14 pharmacy to dispense the drug at a selling price

15 that is lower than their regular retail price -- are

16 you with me?

17    **A Yes.**

18    Q -- that actual selling price -- Optum does

19 not take the position that that actual selling price

20 becomes the pharmacy's usual and customary price for

21 other transactions; fair?

22       MR. LEWIS: Objection.

23    **A Correct. Because it's -- it's based off of**

24 **their -- we called it the retail price, which could,**

25 **at times, be synonymous with U&C.**

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

---

185

1    Q  Right.
2       But the actual purchase price for that
3    particular HealthAllies member is at a lower amount
4    than what the pharmacy would have otherwise charged
5    a person without any form of benefit; right?
6    A  That's correct.
7    Q  And so when Optum is looking for a pharmacy
8    to submit its usual and customary price on an
9    adjudicated claim, it's looking for the regular cash
10   price, the regular retail price that the pharmacy
11   would charge someone without any form of benefit in
12   contrast to someone who has a form of benefit like
13   the HealthAllies program; fair?
14   A  That's fair, yes.
15   Q  So with respect to the HealthAllies program
16   and Optum's position that a pharmacy selling a
17   prescription to a HealthAllies member at a discount
18   off of the pharmacy's regular retail price --
19   Optum's position that that does not reset the
20   pharmacy's usual and customary price is consistent
21   with Optum's position, as you set forth in your
22   declaration, that CVS' Health Savings Pass was not
23   its usual and customary price?  Would you agree?
24      MR. LEWIS:  Objection.
25   A  Yes, I would.

---

186

1    Q  Have you ever heard, sir, of the concept of
2    minimum retail pricing?
3    A  I'm not sure I've heard it in those exact
4    words, but maybe I know what it means.
5    Q  Okay.  Tell me what formulation of words you
6    suspect you may have heard that concept.
7    A  What was it, "exact retail pricing" --
8    Q  "Minimum retail price."
9    A  "Minimum retail price."
10      Where I had heard that or what I believe
11   that is the -- you know, it's hard for me to
12   assume on that one.  I just -- I don't want to guess
13   on what it was.  I've heard things around that,
14   about the minimum retail price.
15      I'm not sure.
16   Q  That's fine.  And if I ask you questions
17   today and you don't know, that's okay.
18      Have you ever worked in a pharmacy?
19   A  No, I haven't.
20   Q  Have you ever worked for a pharmacy company
21   like a CVS or a Walgreens or Rite-Aid?
22   A  No.
23   Q  Let me just get a little bit of background
24   on Optum and its relationship to UnitedHealth.
25   I know that you covered that a little earlier in

---

187

1    the day.
2       But am I right that the name of the parent
3    company is UnitedHealth Group?
4    A  That's correct.
5    Q  And UnitedHealth Group essentially is
6    organized into two parts, UnitedHealthcare and
7    Optum?
8    A  Yes.
9    Q  And what are the lines of business, at a
10   general level, that UnitedHealthcare is in versus
11   Optum?
12   A  UnitedHealthcare is really the benefits
13   administrator.  And they are the -- basically --
14   the -- offering to employer groups or Medicare,
15   Medicaid recipients a full range of health and
16   well-being benefits.
17   Q  Would it be fair to call UnitedHealthcare
18   the insurance company?
19   A  Often people do on the street, "the
20   insurance side."  We call them "health benefits."
21   Q  Okay.  And the laymen's term would be "the
22   insurance company"?
23   A  Yeah.  I would agree.
24   Q  And then Optum is the pharmacy benefit
25   manager?

---

188

1    A  That's part of their function.  The other
2    functions are like products like chronic disease
3    management, NurseLine, the things that wrap around a
4    health insurance benefit that help administer those
5    benefits more effectively and efficiently in the
6    interest of our -- our members' health.
7    Q  Is Optum the pharmacy benefit manager for
8    the health plans offered by UnitedHealthcare?
9    A  Yes.
10      And there's one caveat to the yes.  Unless
11   there's a recent acquisition that I'm not aware of
12   that still has their own PBM, pharmacy benefit
13   manager.  But by and large, yes.
14   Q  Does it sound about right that it was in
15   approximately 2005 that UnitedHealthcare and Optum
16   combined into some form and came underneath the
17   umbrella UnitedHealth Group?
18   A  That sounds about right.
19   Q  And prior to Optum and UnitedHealthcare
20   joining together, Optum was called Prescription
21   Solutions?
22   A  Yes.  That was the acquired company.
23   Q  And --
24      MR. HEENAN:  Grant, if I may again -- if I
25   can interject -- and, again, you can ask the

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

189

1  witness, you know, if this is his understanding, too.
2      But just sort of in terms of describing the
3  company, Optum is a very large services wing of
4  UnitedHealth Group. Within that Optum company are
5  many, many businesses. The -- the company I think
6  at issue here is the prescription benefit manager,
7  which is OptumRx. That's how it's branded.
8      So when we talk about legacy organizations
9  like Prescription Solutions, it's that OptumRx
10  entity that -- I think that's where you're going
11  with this, but I just want to make sure we don't
12  conflate Optum and OptumRx.
13      Q  Well, is there an entity called Optum?
14      MR. HEENAN:  There is -- oh, I'll let you
15  ask the witness.
16      MR. GEYERMAN:  Let me -- I guess I --
17      MR. HEENAN:  The witness may know.
18      MR. GEYERMAN:  And I'm going to --
19      MR. HEENAN:  I want to get off the rails
20  here.
21  BY MR. GEYERMAN:
22      Q  I don't want to -- my questions don't need
23  to get too specific into the corporate structure,
24  but I did want to distinguish between the health
25  insurer component of the business and the -- the

190

1  pharmacy benefit manager component of the business,
2  which, to this point, I've been calling, for
3  shorthand, "Optum."
4      Is that a -- is that fair?
5      A  Yes. So maybe I could start --
6      Q  Yes.
7      A  -- and reset the --
8      Q  Please do.
9      A  -- the food tree.
10      So UnitedHealth Group is at the top, and
11  then you have Optum to the left as one subsidiary
12  and UnitedHealthcare as the other.
13      Underneath those subsidiaries are divisions.
14  So OptumRx is a division of Optum. As are other
15  divisions.
16      And UnitedHealthcare has divisions depending
17  on the actual product. So they have community and
18  state. They have E&I or, basically, our commercial
19  book of business. And then those drop down from the
20  UnitedHealthcare.
21      So I thought it might be helpful to take it
22  a layer down to understand what the two subsidiaries
23  really function as.
24      Q  So underneath the Optum entity, one of the
25  divisions is OptumRx?

191

1      A  Correct.
2      Q  And what is one of the sister entities
3  called? Sister divisions, I should say.
4      A  Under Optum?
5      Q  Correct.
6      A  There's Optum -- and these might -- Care
7  Solutions.
8      Q  Okay. Are there any others?
9      A  There are. I'm trying to think of the
10  official name. Used to be Ingenix.
11      It's Optum -- I forgot. It's basically
12  Optum and they are formerly known as Ingenix.
13      MR. HEENAN:  The OptumInsight?
14      A  THE WITNESS:  Thank you.
15      A  (Continuing.)  OptumInsight.
16      Q  OptumInsight is a fourth division of Optum?
17      A  Correct.
18      Q  And the Catamaran line of business to which
19  there's been discussion earlier today, is that a
20  further component of the OptumRx division?
21      A  Yes. I believe we call it an affiliate of
22  OptumRx.
23      Q  Are -- is -- strike that.
24      Is Care Solutions a PBM?
25      A  The -- I'm trying to think. There's a very

192

1  similar name in workers' comp that is not a PBM.
2  The Optum Care Solutions that I spoke of earlier is
3  not a PBM. It's all under OptumRx.
4      Care Solutions does have HealthAllies, a gym
5  reimbursement program. And I'm not sure if it's
6  still active but a website where members can
7  purchase discounts off of health clubs and a variety
8  of goods and services.
9      Q  Is Ingenix a PBM?
10      A  No, they're not.
11      Q  Is OptumInsight a PBM?
12      A  No, they're not.
13      THE VIDEOGRAPHER:  Five minutes on the tape.
14      Q  So within Optum the division that is either
15  exclusively or far and away the largest component
16  that provides PBM services is OptumRx; fair?
17      A  That's correct.
18      Q  And when you were saying earlier that Optum
19  is setting aside, perhaps, some recent acquisitions
20  that are still serviced by a legacy PBM -- setting
21  that aside, is OptumRx the division that you were
22  referring to that is far and away the PBM servicer
23  of UnitedHealthcare health plans?
24      A  Yes, definitely.
25      Q  Catamaran, which was discussed earlier,

193

1 actually was a combination of Catalyst, a PBM, and
2 SXC Health Solutions; is that correct?
3    A That's correct.
4    Q And does it sound right that they merged in
5 approximately 2012?
6    A Yes.
7    Q And the merged entity was renamed Catamaran?
8    A That's correct.
9    Q And it's that Catamaran that is now an
10 affiliate of OptumRx?
11    A That's correct.
12    Q In the last eight years or so, would you say
13 there's been significant consolidation in the PBM
14 industry?
15    A Yes.
16    Q And what's your basis for saying that?
17    A The prior acquisitions. Catamaran is no
18 exception. There are a conglomeration of,
19 I believe, seven different acquisitions over
20 the years that got you to the Catamaran name.
21 That -- you look at the current market activity --
22 even Optum buying Catamaran and public information
23 about Walgreens trying to purchase Rite-Aid. Given
24 all of that activity, I would call it some
25 significant consolidation, the ones that get the

194

1 headlines, more or less, the other ones that are
2 just happening every day that are smaller in size.
3       MR. GEYERMAN: Why don't we change the tape.
4       THE VIDEOGRAPHER: Off the record. The time
5 is 1418.
6       (A recess was taken from 2:18 p.m. to
7 2:24 p.m.)
8       THE VIDEOGRAPHER: This is the beginning of
9 Disk 3. The time is 1424.
10 BY MR. GEYERMAN:
11    Q Mr. Reichardt, before we broke we were
12 talking a little bit about the corporate structure,
13 and I have a question about the relative size of
14 Catamaran and OptumRx prior to the two merging
15 together.
16       Do you have a sense for which of the two was
17 the bigger PBM prior to the merger?
18    A Are you considering "bigger" by membership
19 count or revenue or --
20    Q Well, let's --
21    A -- in general?
22    Q -- start with covered lives. Is that a
23 phrase you've heard in the PBM industry before?
24    A (No verbal response.)
25    Q Which of the two PBMs was bigger in terms of

195

1 covered lives?
2    A I believe that OptumRx was bigger, and we
3 were four and five in the market when you look at it
4 ranked-wise. Slightly bigger.
5    Q OptumRx being four and Catamaran being five
6 premerger?
7    A Yes.
8    Q And when the two PBMs merged, they became --
9 the combined OptumRx became one of the three biggest
10 PBMs in the United States; is that fair?
11    A Yes.
12    Q And who would the other two biggest PBMs as
13 of today in the United States be?
14    A Caremark and ESI.
15    Q Sir, I'm going to ask you some questions
16 about Plaintiffs' Exhibit 691 --
17    A Okay.
18    Q -- which was the declaration that you
19 executed and that CVS submitted in support of its
20 opposition to class certification in this case.
21       First of all, let me ask you, did you know
22 that this declaration was submitted to a Court in
23 opposition to certify a class action?
24    A Yes.
25    Q Sitting here today, sir, are there any

196

1 statements or opinions that are contained in this
2 declaration that you don't still stand behind?
3    A There was just one typo --
4    Q Okay.
5    A -- that was on No. 9.
6    Q Okay. Why don't you tell us.
7    A Sure. I can pinpoint it here.
8       Under the second sentence, it says the --
9 "'Usual and customary charge' to mean 'the price
10 that a cash-paying customer pays'" -- this should be
11 "CVS" and not "Optum."
12    Q You're referring to the bracketed insertion
13 in paragraph 9 of the declaration that currently
14 says, "Optum"?
15    A Yes.
16    Q And that should be "CVS"?
17    A That's correct.
18    Q Apart from that typographical error, are
19 there any statements or opinions that are in this
20 declaration that you do not stand behind today?
21    A I do stand behind all of them today.
22    Q I want to ask you, sir, about paragraph 11.
23    A Okay.
24    Q And let me just start by reading it. Tell
25 me if I read this correctly: "Based on my

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

197

1 understanding of the business practices at Optum and
2 Prescription Solutions, neither company interpreted
3 the predecessor agreement's definition of 'usual and
4 customary' to require CVS to submit its Health
5 Savings Pass price as its U&C price.  Optum did not
6 consider HSP members, who had affirmatively enrolled
7 in a program, to be 'cash customers.'  Similarly,
8 they did not interpret the predecessor agreement's
9 phrase 'applicable discounts' to encompass the
10 Health Savings Pass."
11     Did I read that correctly?
12     **A Yes.**
13     Q Is -- the "they" that is in the last
14 sentence of paragraph 11, who's the "they"?
15     MR. LEWIS:  Objection.
16     Q Let me -- I'll say it differently.
17     Who did you mean to refer to when you said
18 the word "they" in this declaration?
19     MR. LEWIS:  Objection.
20     **A Optum.**
21     Q And when you say "Optum," are you intending
22 to exclude Prescription Solutions, or are you using
23 "Optum" as Optum and Prescription Solutions that are
24 now the same company?
25     **A I believe in the recitals there that --**

198

1 **No. 6, it defines who Optum is.  And the**
2 **predecessor.**
3     **So the "they" that's referred to in the**
4 **second half of 11 on page 3 under all of our**
5 **scenarios would be OptumRx.**
6     Q So -- and Optum -- strike that.
7     Prescription Solutions was renamed Optum;
8 correct?
9     **A I believe OptumRx.**
10     Q Okay.  And that happened sometime in the
11 mid-2000s?  We --
12     **A Yes.**
13     Q -- addressed the year earlier --
14     **A Correct.**
15     Q -- in the deposition.
16     I guess what my question is, is the last
17 sentence that says, "Similarly, they did not
18 interpret the predecessor agreement's phrase
19 'applicable discounts' to encompass the Health
20 Savings Pass" -- you are referring to not just the
21 entity after the name change in the mid-2000s but,
22 also, the entity back to 1999 when the agreement
23 that you're referring to was executed; fair?
24     **A Fair.  "They" would incorporate the**
25 **predecessors.**

199

1     Q Okay.  Fair enough.
2     Tell me, sir, in the first sentence, when
3 you say "Based on my understanding of the business
4 practices at Optum and Prescription Solutions," what
5 did you do to satisfy yourself before executing this
6 declaration that, in fact, the business practices at
7 Optum and Prescription Solutions back to 1999 -- or
8 strike that.
9     What did you do to satisfy yourself that the
10 business practices of Optum and Prescription
11 Solutions, back to the time of 2008 when the CVS
12 Health Savings Pass was launched, did not consider
13 the Health Savings Pass to be part of the
14 contractual definitions of "usual and customary
15 price"?
16     **A So the -- the research was, of course, the**
17 **agreement research I mentioned earlier.**
18     **We had the luxury at the time of comparing**
19 **the legacy Catamaran agreement and the OptumRx**
20 **agreement, so you had, basically, two sources of**
21 **truth of what that meant.**
22     **And then my website research.  I think those**
23 **three elements led me to these statements.**
24     Q And would part of your understanding of the
25 business practices have been the fact that Optum and

200

1 Prescription Solutions never sought a recoupment
2 from CVS for alleged overreimbursement on the basis
3 that you submitted a usual and customary price that
4 wasn't your Health Savings Pass to us?
5     **A Not that I'm aware of.  There was nothing.**
6     Q Let me ask -- let me ask my question a
7 little more precisely.
8     Are you aware, from 2008 to the present, of
9 Optum or Prescription Solutions ever pursuing from
10 CVS any type of collection of an alleged overpayment
11 on the basis that you didn't submit to us your
12 Health Savings Pass price as your usual and
13 customary price but you should have?
14     **A Okay.  Thanks for the clarification.**
15     **No, I am not.**
16     Q Okay.  And is the fact that you're not aware
17 of any such pursuit by Optum and Prescription
18 Solutions of such an alleged overpayment a basis
19 upon which you are comfortable saying that it's the
20 business practices of Optum and Prescription
21 Solutions to consider Health Savings Pass outside
22 the contractual definition of "usual and customary
23 price"?
24     **A Yes.**
25     Q Who -- just tell me who you report to in the

201

1 hierarchy here at OptumRx.
2    **A  Sure.**
3       **So I directly report to Joe Zavalishin.**
4    Q  And who does Joe report to?
5    **A  Joe reports to Edward Lagerstrom.**
6    Q  And do you know what level or what title
7 Joe has?
8    **A  Yes.  He's our SVP, senior VP.**
9       **And Ed is our executive vice president, EVP.**
10    Q  And is Joe a senior vice president of
11 OptumRx?
12    **A  Yes.**
13    Q  And is your title still today,
14 Mr. Reichardt, senior director of network relations
15 at OptumRx?
16    **A  Yes, it is.**
17    Q  And who does Edward Lagerstrom report to, as
18 far as you know?
19    **A  I believe Mark Thierer.**
20    Q  And who's that?
21    **A  He is the CEO of OptumRx.**
22    Q  Have you had any conversations with your
23 direct supervisor -- and I'm not going to say his
24 last name because I know I won't get it right --
25 Joe, Joe Z -- have you had any conversations with

202

1 him about the topics of usual and customary pricing
2 and membership programs, whether they fall in or out
3 of that term?
4    **A  Not for CVS'.**
5    Q  But -- I'm talking in general.  Have you had
6 conversations with him about that topic?
7    **A  Yeah.  I think they came up naturally**
8 **because we would review U&C.  That might not be the**
9 **impetus of our review, but when -- we review that**
10 **and the "lesser of" language to make sure we're**
11 **capturing everything.**
12    Q  And so you've had conversations with your
13 senior vice president about perhaps not CVS'
14 specific membership program but other pharmacies'
15 membership programs and whether or not membership
16 program prices fall within "usual and customary
17 price" definition; is that fair?
18       MR. LEWIS: Objection.
19    **A  That's fair.  I think the -- most of the**
20 **discussions were around constructing a new base**
21 **agreement to see if these terms fit the current**
22 **marketplace.**
23    Q  And can you -- and so that discussion with
24 your senior vice president obviously happened before
25 you executed this declaration.  Fair?

203

1    **A  Yes, that's fair.**
2    Q  And so there are other membership programs
3 offered by other pharmacies besides CVS; fair?
4    **A  Yes.**
5       **They might be owned or partnered with,**
6 **et cetera, but -- yes.  So they might not actually**
7 **own the entity that they're promoting.**
8    Q  I'm not sure I understood that comment.
9    **A  So there's other programs that may function**
10 **out of a pharmacy but they may not be wholly owned**
11 **by the pharmacy corporation.  They might be**
12 **partnering with them to offer members a need that**
13 **are paying a cash price, a -- for example -- a**
14 **discount card.**
15    Q  Optum doesn't consider cash discount card
16 prices to be within their contractual definitions of
17 "usual and customary"; fair?
18    **A  Correct.**
19    Q  Please look at still that last sentence of
20 paragraph 11.  Again, it says, "Similarly, they did
21 not interpret the predecessor agreement's phrase
22 'applicable discounts' to encompass the Health
23 Savings Pass."
24       Do you remember plaintiffs' counsel was
25 asking you some questions about the phrase

204

1 "applicable discounts" and whether it could
2 encompass a membership program?
3    **A  I do.**
4    Q  Okay.  And I just don't want there to be any
5 ambiguity in the record.
6       While one might be able to make the argument
7 that that language ought to include a membership
8 program, is it your testimony that Optum and
9 Prescription Solutions did not interpret the phrase
10 "applicable discounts" to include the Health Savings
11 Pass?
12       MR. LEWIS: Objection.
13       MR. HEENAN: Join.
14    **A  That's correct.**
15    Q  Nor did Optum or Prescription Solutions
16 interpret any other language in either the
17 predecessor agreement from 1999 or the superseding
18 agreement in 2015, in the "usual and customary
19 price" definition, as encompassing the Health
20 Savings Pass; correct?
21       MR. LEWIS: Objection.
22    **A  THE WITNESS:  Can you break that apart and**
23 **give me a couple segments?**
24       MR. GEYERMAN:  Yeah.  That was pretty long.
25 No problem.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

205

1    A  THE WITNESS:  I can answer them as you
2  break.
3    Q  Let's take the 1999 agreement first.
4       Neither Prescription Solutions nor OptumRx
5  interpreted any aspect of the definition of "usual
6  and customary price" in that contract as
7  encompassing the Health Savings Pass program price;
8  correct?
9    A  Correct.
10    Q  And neither -- strike that.
11       OptumRx did not interpret any aspect of the
12  definition of "usual and customary price" in the
13  2015 agreement that replaced the 1999 agreement as
14  encompassing the Health Savings Pass program as
15  correct?
16    A  Correct.
17    Q  The last paragraph in your declaration that
18  says, "I understand that Optum and Prescription
19  Solutions took a consistent position with respect to
20  membership-based generic programs offered by
21  pharmacies other than CVS," do you see that
22  sentence?
23    A  I do.
24    Q  What are you saying here?
25    A  That the position was that the -- programs

206

1  similar to the Health Savings Pass that CVS offers
2  were excluded, as well.
3    Q  In other words, Prescription Solutions and
4  Optum wasn't giving CVS special treatment?
5       MR. LEWIS:  Objection.
6    A  If I could paraphrase that, I think that the
7  term "consistent approach" could be synonymous with
8  that no one chain was treated differently and that
9  our consistent approach was applied to the network,
10  not a specific chain or independent pharmacy.
11    Q  Optum and Prescription Solutions' position
12  with respect to membership programs was the same
13  regardless of which pharmacy was offering the
14  membership program?  Is that --
15    A  That's my understanding, correct.
16    Q  And tell me what that understanding is based
17  upon.
18    A  I -- the agreement research that was
19  previously done.  On the -- then the 2015 agreement
20  for Optum and the -- likewise -- the 2015 agreement
21  for Catamaran.
22    Q  And would you also consider the discussion
23  you had with your senior vice president about
24  membership programs and usual and customary pricing
25  as part of your understanding that forms the basis

207

1  of paragraph 12?
2       MR. LEWIS:  Objection.
3    A  Yeah, I think some of that does.  Although
4  we weren't specifically relating it to the Health
5  Savings Pass, it was a -- more of a strategic
6  session to say, "Here's our current "lesser of"
7  language.  Are we missing anything or has anything
8  changed in the marketplace that would behoove us to
9  make modifications to that language?"
10    Q  And it's still the position today of
11  OptumRx, is it not, that membership programs are not
12  part of usual and customary pricing?
13    A  Correct.
14       It goes back to my comments that they're
15  separate and distinct and the two programs cannot be
16  used in conjunction with one another.
17    Q  In paragraph 11 of the declaration, there's
18  no reference when describing the business practices
19  of Optum and Prescription Solutions with respect to
20  the Health Savings Pass to the enrollment fee that
21  was charged as part of the Health Savings Pass, only
22  in reference to the affirmative enrollment in a
23  program?  Do you agree?
24       I'm sorry.  I'm jumping around on you.
25    A  It's okay.

208

1    Q  Go to paragraph 11.
2    A  That's correct.
3    Q  And from this am I correct in inferring that
4  the presence or absence of an enrollment fee is not
5  necessary -- strike that.
6       Would I be correct in inferring from your
7  declaration that Optum and Prescription Solutions
8  did not view the presence of an enrollment fee as
9  being necessary to a membership program being
10  outside of the contractual definition of "usual and
11  customary price"?
12    A  I would agree with that under the basis that
13  others had programs that maybe did not have a fee.
14       So it was the action of the member or the
15  customer enrolling, receiving some kind of card,
16  et cetera.  Whether or not they all had to pay
17  enrollment fees, I think that varied.
18    Q  Sitting here today, can you name any
19  pharmacy membership program that you believe did not
20  charge an enrollment fee?
21    A  I'm trying to think if Walmart did.  I don't
22  think Walmart charged an enrollment fee, but they
23  had a benefit --
24    Q  And --
25    A  -- for generic drugs.

209

1    Q And -- and do you remember that Walmart
2    passed on its $4 price to Optum as its usual and
3    customary price?
4        MR. LEWIS: Objection.
5        A No. Those were two separate programs.
6        That's -- probably the most notable is
7    Walmart. There are a couple others. I think
8    Sam's Club had one.
9        And KPH or Kinney Drugs actually is part
10   owner, I believe, of ProAct, which is a health cash
11   card discount program.
12   Q Okay. If you could please pull out the
13   January 2015 OptumRx-CVS executed agreement, please.
14   That was Plaintiffs' Exhibit 700.
15   A (Complied.)
16       MR. GEYERMAN: You guys marked the '99
17   agreement, didn't you?
18       Yes, you did.
19   Q And pull up Plaintiffs' Exhibit 695, as
20   well, which is the 1999 agreement. I just want you
21   to have those both handy.
22   A Okay. I have them both.
23   Q First of all, are the contracts that have
24   been marked as Plaintiffs' Exhibit 695 and
25   Plaintiffs' Exhibit 700 the two contracts that are

210

1    referenced in your declaration that's been marked as
2    Plaintiffs' Exhibit 691?
3        A I believe the reference pertained to the
4    Optum agreement, the January 29, 2015, which would
5    be Exhibit 700. And your question was did it also
6    apply to 695 or that exhibit?
7    Q Yeah. If you look at paragraph 6 of your
8    declaration, you refer to "the prescription drug
9    services agreement between CVS and Optum's
10   predecessor company, Pacific Care Pharmacy Centers,
11   Inc., doing business as Prescription Solutions."
12   A Yes.
13   Q And that predecessor agreement is Plaintiffs'
14   Exhibit 695; right?
15   A Correct.
16   Q So go to the 2015 agreement, sir.
17   A (Complied.)
18   Q I just have a question on a couple of
19   provisions in here. If you can look at
20   paragraph 1.13, it's entitled "Cost-Sharing" or
21   "Cost-Sharing Amounts." Are you with me?
22   A Yes.
23   Q It says, "Cost-sharing' or 'cost-sharing
24   amounts' shall mean those co-insurance, co-pays, or
25   other amounts which company is entitled to collect

211

1    from a member for covered prescription services in
2    accordance with the terms and conditions of the
3    member's benefit plan."
4        Did I read that right?
5        A Yes.
6    Q What's a benefit plan?
7        A A benefit plan is a plan that, in general,
8    an employer group -- if they're a commercial
9    account, the employer group would sponsor and
10   procure that benefit plan -- in this case, PBM
11   benefits -- from OptumRx.
12       And then the members or employees, in this
13   case, would have a benefit plan that was agreed upon
14   by the company and its administrator, which --
15   "administrator" being OptumRx, "company" being the
16   employer group.
17   Q And is it fair to say that the benefit plan
18   that a particular person has chosen or employer has
19   chosen determines what the co-payment structure is
20   going to be for that person's prescription coverage?
21   A That's correct.
22   Q Does OptumRx design benefit plans?
23   A They do in conjunction with the client. So
24   we often get a design from the client, and we would
25   be in a consulting position.

212

1    Q Would it be fair to say that OptumRx, then,
2    provides PBM services to a variety of different
3    types of benefit plans?
4        A Yes. Because it's a -- it's a component of
5    the overarching health plan that would include
6    medical, dental, vision, your pharmacy benefit.
7    Q But "benefit plan" as used in this contract
8    is specific about a pharmacy benefit plan; correct?
9        A That's correct.
10   Q And can you quantify for me approximately
11   how many different benefit plan designs Optum
12   provides PBM services for?
13       Just an approximation.
14   A It's got to be close to 350 to 500, just
15   kind of thinking through the clients, and some
16   clients have a slightly different benefit plan.
17   Q So does that mean that there can be upwards
18   of 350 to 500 different structures for how
19   co-payments are going to be calculated?
20   A No. I think the benefit plans some might
21   choose really -- the variations really come with the
22   network, first.
23       So an employer group may want the whole
24   network or a subset of that, which, in our realm
25   here under network relations, we would build a

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

54 (213 to 216)

213

1  network, whether it has 50,000 pharmacies, 35,000,
2  et cetera.
3       I think that's the main variations of what
4  network you're getting that drive -- the benefit
5  plans -- we're not seeing a huge spectrum of
6  co-pays. It's usually, you know, 5 to $20.
7    Q  Okay. And -- but it's whichever way --
8  whichever particular benefit plan you choose, and
9  the co-payment rules within that benefit plan are
10 what drive how much a co-payment is going to be on a
11 given prescription; is that fair?
12   A  I think that would be fair.
13   Q  Can you look at Section 3.3.3?
14   A  In the 2015 agreement?
15   Q  Yes, sir.
16   A  Okay.
17   Q  The section is entitled "Cost-Sharing
18 Amounts." Do you see that?
19   A  3.3?
20   Q  3.3.3.
21   A  One more.
22      Yes, I'm on that.
23   Q  The section is entitled "Cost-Sharing
24 Amounts."
25      You'll see it starts, "Claims processor

214

1  shall communicate to company, via the POS system,
2  the cost-sharing amounts applicable to covered
3  prescription services. Unless otherwise required
4  under this agreement, company shall collect the full
5  cost-sharing amounts, if any, that are applicable to
6  covered prescription services being dispensed to
7  members."
8       Did I read that first two sentences
9  correctly?
10   A  Yes.
11   Q  Do you understand what that -- those
12 two sentences are saying?
13   A  I do.
14   Q  Can you tell us, why is -- why is a
15 provision like this included in an agreement with a
16 retail pharmacy?
17   A  Because, in this case, the administrator,
18 being OptumRx, needs to communicate to the company
19 at the point of sale -- which is the POS or point of
20 service; they're synonymous -- what the covered
21 benefit is and what are the financial breakdown of
22 that benefit so that the pharmacist knows what, if
23 any, amount the member would owe through a co-pay or
24 coinsurance.
25   Q  When you said "the company," which is the

215

1  language of this provision, is that referring to the
2  pharmacy?
3    A  Yes.
4    Q  And when you talk about what amount the
5  member would owe through a co-pay, you're talking
6  about an amount that OptumRx calculates?
7    A  Correct.
8    Q  During the adjudication process?
9    A  (No verbal response.)
10   Q  I'm sorry. You need to -- maybe we -- we
11 probably talked over.
12      When you were referring to an amount that
13 the member would owe through a co-payment, you're
14 talking about an amount that OptumRx calculates
15 during the adjudication process?
16   A  That's correct.
17      So once the pharmacist enters the BIN and
18 PCN and usually the group number, that is specific
19 to a health benefit plan for pharmacy services that
20 we maintain at OptumRx, and so that design is
21 basically interfaced with, and then it's sent back
22 to the pharmacy with the specific amounts that the
23 member may owe and then the specific reimbursement
24 amount that a company would see on their
25 reimbursement.

216

1    Q  So let's go to paragraph 2.1, which I think
2  relates to what you were just referring to.
3    A  (Complied.)
4    Q  2.1 is entitled "Information and Pharmacy
5  Plan Specifications"; is that correct?
6    A  That's correct.
7    Q  And that provision reads to start,
8  "Administrator shall provide or make available to
9  company (via POS system) the information company
10 reasonably needs to dispense covered prescription
11 services and perform its other obligations under
12 this agreement, including the pharmacy plan
13 specifications, benefit coverage information (such
14 as cost-sharing amounts, deductible limits,
15 covered -- covered drugs, benefit exclusion, and
16 days' supply)," and then it goes on.
17      Did I read the first part of this provision
18 correctly?
19   A  Yes, you did.
20   Q  Is what is described in what I just read the
21 process you were referring to earlier that, during
22 the adjudication process, OptumRx, the
23 administrator, calculates the co-payment amount,
24 amongst other things, and instructs the pharmacy
25 about that information?

217

1    A That's correct.
2    Q Pharmacies don't calculate co-payments?
3    Would you agree?
4    **A I would agree. They are dependent on the**
5    **specific benefit structure that's communicated**
6    **through the POS system.**
7    Q And the pharmacy doesn't have access to or
8    insight into what the benefit structure is for a
9    given customer at their pharmacy? Would you agree?
10   **A I would agree. The pharmacists are so busy,**
11   they tend to know three things: What is the BIN,
12   PC, and the group ID. The rest of the information
13   is provided to them.
14   Q By the PBM through the POS system?
15   **A That's correct.**
16   Q Can you go to Section 4.2.1, please?
17   **A Sure.**
18   Q This provision is called "Covered
19   Prescription Services"; is that right?
20   **A That's correct.**
21   Q And it starts, "The company shall and shall
22   ensure that each pharmacy" -- and then there's
23   two subparts to this provision; right?
24   **A Correct.**
25   Q And the second subpart says "follow any

218

1    instructions, including NCPDP-defined messages
2    unless prohibited by state or Federal law,
3    communicated by administrator to company, including,
4    but not limited to, what, if any, cost-sharing
5    amounts the company shall collect from the member."
6    Did I read that second part of this
7    provision correctly?
8    **A Yes, you did.**
9    Q And is this yet another provision in the
10   Optum-CVS master agreement from 2015 that indicates,
11   in substance, that the pharmacy is supposed to
12   collect the co-payment amount as communicated to it
13   via the POS system?
14   **A That's correct.**
15   Q During your time at Catamaran or Optum, have
16   you ever encountered any problem with CVS Pharmacies
17   failing to collect the co-payment amount that they
18   are instructed by the adjudicating PBM?
19   **A Can you paraphrase that? That --**
20   Q Sure.
21   And I guess -- let me break it down a
22   little bit.
23   **A Okay.**
24   Q Would you agree that, based on several of
25   these provisions that we've looked at in this

219

1    agreement, Optum is of the view that pharmacies are
2    contractually required to collect from the member
3    the co-payment that Optum tells them -- tells them,
4    the pharmacy, to collect?
5    **A Yes, that's correct.**
6    Q Okay. During your time at Optum, have you
7    any -- have you had any instances or experiences
8    where CVS Pharmacies have been in violation of that
9    contractual provision or there's been a concern
10   about whether CVS is following that contractual
11   obligation?
12   MR. LEWIS: Objection.
13   **A No. I think oftentimes if there's -- since**
14   **there is a dependency on the administrator, which is**
15   **OptumRx, to supply that information, if that**
16   **information is incorrect, then that's where we just**
17   **have a remedy where we'd reimburse the member or**
18   **make the situation whole.**
19   Q If the PBM adjudicating the claim makes an
20   error in the determination of the co-payment, you're
21   saying, then, the -- in your experience -- the
22   remedy is the member is paid back?
23   **A Either the member is paid back or -- you**
24   **know, first, the system is corrected if there's an**
25   **error. The member may be reimbursed if there is an**

220

1    overpayment on behalf of the member.
2    Q But I'm talking about -- do you have any
3    experience with CVS Pharmacies failing to collect
4    the co-payment that the online system tells them
5    they're supposed to collect?
6    **A Not that I know of.**
7    **That was the part I was going to get to.**
8    **The typical issues are with the setup design**
9    **being incorrect.**
10   Q And the setup design, is that a setup
11   process that takes place at the PBM?
12   **A Yes.**
13   Q How about at your time at Catamaran? Do you
14   have any experience with -- well, let me back up.
15   I assume it's your understanding that the
16   notion that a pharmacy is supposed to collect the
17   co-payment amount a PBM administrator tells
18   them to collect on the POS system is a standard part
19   of the claims adjudication process.
20   **A Yes. That -- that can apply to both legacy**
21   **Catamaran as well as OptumRx.**
22   Q That is not a contractual requirement that
23   is unique to Optum pharmacy network agreements;
24   fair?
25   **A That's fair. I think that's the industry**

221

1  standard.
2    Q  Okay.  So based on your time at Catamaran,
3  do you have any experience with CVS Pharmacies
4  failing to honor the contractual obligation that the
5  CVS Pharmacy will collect the co-payment amount as
6  instructed to it by the POS system?
7    **A  None that I recall.**
8    Q  Do you know why Optum requires a pharmacy to
9  collect the co-payment amount that they're
10  instructed to on the POS system as opposed to
11  allowing the pharmacy the ability to just not charge
12  the co-payment?
13    **A  A couple reasons.  In the member's evidence**
14  **of benefit, it's required, usually, to have whatever**
15  **plan design and collect that co-pay.  So there's,**
16  **let's say, a member agreement with their employer**
17  **that we all sign up for.**
18    **And the -- the co-pay is -- it's not of the**
19  **discretion of a company like CVS to waive that or to**
20  **take control over the benefit design.  They should**
21  **follow the instructions on the point of sale system.**
22    Q  Optum doesn't want pharmacies like CVS to do
23  something that arguably could be deemed to be
24  interfering with the pharmacies' -- strike that.
25    Optum doesn't want pharmacies like CVS to be

222

1  doing something that arguably could be seen as
2  interfering with the particular benefit design for
3  the Optum insureds; is that fair?
4    **A  That's fair.**
5    Q  Can you go to Section 9.3, please?
6    **A  (Complied.)**
7    Q  This provision is entitled "Telephonic
8  Real-Time POS Quality Reviews."  Are you there?
9    **A  Yes.**
10    Q  And it reads, "Administrator or auditor may
11  contact company's pharmacies telephonically for
12  single-claim inquiries, generally within one --
13  (1) -- business day of claim submission to
14  verify/provide certain information over the phone so
15  that auditor may determine if the claim was
16  submitted correctly as a clean claim."
17    Did I read that sentence correctly?
18    **A  Yes.**
19    Q  Are you familiar with provisions like this
20  in pharmacy network agreements of Optum's or
21  Catamaran's?
22    **A  Yes.  Sometimes it's worded a little**
23  **differently --**
24    Q  And I --
25    **A  -- but it has the same meaning.**

223

1    Sorry to interrupt you.
2    Q  Yeah.  I'm talking about provisions that, in
3  substance, seek to accomplish the same type of
4  purpose.
5    Why don't you tell me what the purpose of a
6  provision like this serves.
7    **A  Well, in the event an OptumRx member's**
8  **benefit setup is not in the system or maybe the**
9  **company -- in this case, let's say CVS -- installed**
10  **the benefits late for one reason or another and a**
11  **member presents themselves at the pharmacy and**
12  **there's no record that a pharmacist can pull up on**
13  **our point of sale system.**
14    **We may have more detailed data within, for**
15  **example, member services, so a pharmacist would call**
16  **member services and try to obtain that detail.**
17    Q  Do you agree this provision, as phrased,
18  speaks of the administrator or Optum contacting the
19  pharmacies to validate information submitted on the
20  claim?
21    MR. LEWIS:  Objection.
22    Please answer.
23    **A  Yes.  I think I spoke of a service example,**
24  **so that -- that was probably incorrect for this**
25  **context.**

224

1    **So the realtime telephonic audits, as they**
2  **call it here, I am familiar with.**
3    Q  And would it -- an example of an audit that
4  is permitted by this section be Optum calling up a
5  pharmacy to ask what their cash price is for a given
6  drug on a given day at a given quantity?
7    MR. LEWIS:  Objection.
8    **A  That could be one of the questions that's**
9  **asked.**
10    Q  Can you go to the -- Section 1.9?
11    **A  (Complied.)**
12    Q  It's a definition of the word "clean claim."
13    **A  Okay.**
14    Q  Have you ever heard the word "clean claim"
15  before?
16    **A  I have.**
17    Q  I'm not going to read the whole definition
18  of "clean claim" here because it's kind of long.
19  But it's obviously a defined term in the CVS-Optum
20  agreement; fair?
21    **A  Yes, that's correct.**
22    Q  And do you see if -- strike that.
23    Do you see the last sentence of Section 1.9
24  speaks about claims submitted in non-NCPDP standard
25  format not being considered a clean claim and,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

57 (225 to 228)

225

1  therefore, subject to a claim-processing charge?
2      A I do see that.
3      Q I didn't read it verbatim, but in substance
4  that's what the last sentence says?
5      A Correct.
6      Q So does Optum, under its provision referring
7  to clean claims, believe that, if a particular
8  adjudicated claim is not in NCPDP format, that Optum
9  has the ability to charge the pharmacy for that
10 claim?
11     MR. LEWIS:  Objection.
12     Please answer.
13     A Yes, that's correct.  Another word for that
14 would be "a manual claim" or "paper claim."
15     Q Or even a claim submitted electronically
16 that's not in NCPDP format?  Would that be fair?
17     A That's fair.
18     Q And do you understand that the NCPDP acronym
19 stands for the National Council of Prescription Drug
20 Programs?
21     A I do.
22     Q This provision, 1.9, also mentions
23 submitting a claim to Optum with a usual and
24 customary charge; right?
25     It's in the --

226

1      A Yes.
2      Q -- third and second-to-last sentences --
3  third-to-last and second-to-last.
4      A Yeah.  Second-to-last in the parentheses,
5  correct.
6      Q Based on this provision, would you agree
7  that Optum could impose a claim-processing charge if
8  it believed that a pharmacy was improperly
9  populating the usual and customary NCPDP field in
10 violation of the standard?
11     MR. LEWIS:  Objection.
12     A Yes.  That could be one of the outcomes.
13     Q To your knowledge, has Optum ever charged a
14 pharmacy offering a membership program, such as CVS,
15 a claim-processing charge under this section or a
16 similar section in a contract on the basis that the
17 U&C price submitted was noncompliant with NCPDP
18 because it wasn't the membership program price?
19     MR. LEWIS:  Objection.
20     A To the best of my knowledge, no, if it was
21 compared to a membership program like the Health
22 Savings Pass.
23     Q In other words -- well, I'm not trying to
24 put words in your mouth, but my -- my question
25 is that there's an allegation that's been made in

227

1  this case that it was a violation of the NCPDP
2  standard for CVS to not report its Health Savings
3  Pass on adjudicated claims to PBMs.
4      Do you understand that that's part of the
5  allegation in this case?
6      A I do.
7      MR. LEWIS:  Objection.
8      A THE WITNESS:  Sorry.
9      A (Continuing.) I do.
10     Q And based on my reading of Section 1.9,
11 Optum has negotiated for itself the right to impose
12 a financial penalty on a pharmacy if the pharmacy is
13 submitting usual and customary prices in violation
14 of what the PBM understands to be the NCPDP standard
15 as concerns "usual and customary."
16     Are you with me?
17     A I'm with you.
18     Q And, to your knowledge, Optum has never
19 imposed a financial penalty on a pharmacy under a
20 provision like this because they didn't report their
21 membership program price and, on that basis, one --
22 like the plaintiffs -- might say that that was a
23 violation of the NCPDP standard; correct?
24     MR. LEWIS:  Objection.
25     Q To your knowledge, you're not aware of Optum

228

1  ever imposing a penalty on that basis?
2      MR. LEWIS:  Objection.
3      A That's correct.  To the best of my
4  knowledge, I am not.
5      Q There were -- there were questions earlier
6  today from plaintiffs' counsel about Walgreens and
7  Rite-Aid and whether they had membership programs.
8      Do you remember that?
9      A I do.
10     Q Several hours ago.
11     Do you know whether Walgreens or Rite-Aid
12 ever offered a membership program for generic drugs?
13     A I can't recall that I've witnessed or seen
14 or read about either one of those having one.
15     Q Walgreens has never been one of your
16 accounts while you've been working at a PBM; is that
17 fair?
18     A They -- they were for about the first
19 four months that I worked here.
20     Q Here at Optum?
21     A At Catamaran --
22     Q At Catamaran?
23     A -- and now Optum.
24     Q Okay.  And why did you only work on that
25 account for four months?

229

1    A We had a -- one of our other directors that
2 branched off and took those on her own. I think
3 there was more of a better dispersement of accounts
4 than me having too many, so we split some up and
5 gave Walgreens to another director.
6    Q Has Rite-Aid ever been your account while
7 you've been working at a PBM?
8    A No, they haven't.
9    Q Is it your testimony today that Walgreens
10 and Rite-Aid did not, in fact, have membership
11 programs or simply that you don't know because
12 you've never really had reason to check it out?
13    MR. LEWIS: Objection.
14    Please answer.
15    A The latter so that -- to the best of my
16 knowledge, they did not have one, that I know of.
17    Q But you've never had reason to investigate
18 it, either?
19    A That's where I was going, yeah.
20    So there -- there hadn't been a reason to
21 investigate or do any kind of contract research
22 comparison, et cetera.
23    Mainly because they weren't part of -- we,
24 as the owners of the account, own the agreement. So
25 if they weren't part of the agreement, oftentimes --

230

1 unless there was an issue, there wouldn't be a need
2 to research.
3    Q Can you pull out, please, Plaintiffs'
4 Exhibit 697, which was the February 5th, 2013,
5 e-mail from Debbie Veale to Christopher Smithson.
6    A Okay. I have that.
7    Q And it was a thick document that's the
8 e-mail and then the attachment to the document;
9 right?
10    A That's correct.
11    Q And if you -- specifically the attachment is
12 a redlined version of a pharmacy network agreement
13 that's under negotiation; correct?
14    A Yes. That's what it appears to be.
15    Q And if you flip to page 5, there was a
16 redlined definition of "usual and customary charge";
17 right?
18    A Yes, that's correct.
19    Q And you were asked several questions about
20 this redline by plaintiffs' counsel earlier today.
21 Do you remember that?
22    A I do recall.
23    Q And do you remember plaintiffs' counsel's
24 questioning suggesting that CVS and Optum did an
25 about-face with respect to their inclusion of

231

1 certain language and then exclusion of other
2 language? Do you remember that sort of line of
3 questioning?
4    A I do.
5    Q Okay. Prior to today, you have not reviewed
6 the series of communications that led up to the
7 document that is Plaintiffs' Exhibit 697; is that
8 correct?
9    A That's correct.
10    Q Okay. I'd like to go through the documents
11 to make a record of the issue that plaintiffs'
12 counsel was asking you about that suggested that the
13 parties did an about-face on this language.
14    MR. LEWIS: Objection. Move to strike.
15    (An off-the-record discussion was held.)
16    MR. GEYERMAN: And I'll rely on you guys to
17 watch the clock because I have no idea how long I've
18 been going.
19    I'm marking here as Defense Exhibit 303 --
20    (Defense Exhibit 303 marked for
21 identification and attached to the transcript.)
22    A THE WITNESS: Thank you.
23    Q Who is Christopher Smithson -- well, let me
24 back up.
25    The document that we've marked as 303,

232

1 defense exhibit, is an e-mail from November of 2012
2 from Christopher Smithson to Debbie Veale, copying
3 Deborah Uemura; correct?
4    A That's correct.
5    Q Who's Christopher Smithson? If you know.
6    A I did not personally know him, but the
7 second page says he's the senior manager of network
8 account management.
9    Q And is that an equivalent position to what
10 you have right now?
11    A It's an equivalent position of those
12 I manage. So I have two senior managers on my team.
13    Q The -- this would -- someone in
14 Mr. Smithson's position would actually be a
15 subordinate to you?
16    A Typically, yes.
17    Q Okay. And do you know who Debbie -- or
18 Deborah Uemura is?
19    A I do.
20    Q Who's that?
21    A Deborah Uemura is our contracts
22 administrator.
23    So she oftentimes helps with the actual
24 redline changes. And maintains the master documents
25 to make sure we have version control.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

59 (233 to 236)

233

1    Q  Meaning if CVS and Optum are negotiating
2  back and forth, Ms. Uemura --
3    A  Uemura.
4    Q  -- Uemura -- will make sure that, if we're
5  on the second draft, that doesn't get confused with
6  the first draft, et cetera?
7    A  Exactly.
8    Q  Okay.  So the subject of this e-mail from
9  Mr. Smithson to Debbie Veale -- who is at CVS;
10 right? --
11   A  She is.
12   Q  -- is "New OptumRx Boilerplate Document."
13 Did I read that right?
14   A  Yes.
15   Q  And attached to this e-mail are three
16 different documents according to the "Attachments"
17 line; correct?
18   A  Yes, it appears so.
19   Q  Chris writes, "Debbie, I apologize for not
20 being able to send this to you yesterday.  I got
21 tied up in some other matters in the afternoon.  At
22 any rate, I mentioned" -- sorry.  Start over.
23      She writes, "I apologize for not being able
24 to send this to you yesterday.  I got tied up in
25 some other matters in the afternoon.

234

1      "At any rate, as Shaun and I mentioned in
2  our phone conversation yesterday, attached please
3  find OptumRx's new contract boilerplate with CVS'
4  redlines/comments from the 2010 version overlaid on
5  top of it (see file 'CVS 2011 PNA 10.16.12 ORX f
6  (w-prior revisions)')."
7      Did I read that right?
8    A  Yes.
9    Q  He then proceeds to describe in the rest of
10 the e-mail what the second and third attachments are
11 to his document; correct?
12      To his e-mail.
13   A  Correct, the 1 and 2 underneath, "To also
14 aid in your review, I have" attached.
15   Q  And it appears from this -- would you
16 agree? -- that as of 2010 CVS and Optum were
17 negotiating a new contract.
18   A  It appears?  Yes, they were negotiating.
19   Q  Okay.  And I want to go to the first
20 attachment to this exhibit.  These attachments are
21 in the order in which they were attached to the
22 e-mail.  I'll represent that to you.
23      And if you go to the "usual and customary
24 charge" definition, which is Section 1.41 --
25   A  Okay.

235

1    Q  And for clarity of the record, the page that
2  I'm looking at is Bates-numbered at the bottom right
3  corner CVSC-0385589.
4      Is that where you're at?
5    A  Yes, it is.
6    Q  Okay.  And do you see "usual and customary
7  charge" definition with some redlining in that
8  provision?
9    A  I do.
10   Q  And there is one clause in this contract
11 that has been stricken in redline, and it includes
12 the language "including all applicable customer
13 discounts, such as special customer, senior citizen,
14 and frequent shopper discounts."  Right?
15   A  Yes, that's correct.
16   Q  And that was half of the redlining that we
17 saw in Plaintiffs' Exhibit 697 that was shown to you
18 by plaintiffs' counsel?  Would you agree?
19   A  If you just give me a minute to verify.
20   Q  Absolutely.
21   A  Can you repeat your question again?
22   Q  Sure.
23      Just a second.  I'm getting my paper just a
24 little discombobulated.
25      Okay.  So in Plaintiffs' [sic] Exhibit 303,

236

1  which is dated November of 2012, the redlining on
2  the "usual and customary charge" definition includes
3  a strikeout of "including all applicable customer
4  discounts" through the language "frequent shopper
5  discounts"; right?
6    A  That's correct.
7    Q  And that stricken language is the first half
8  of the redlines in Plaintiffs' Exhibit 697 that you
9  were asked about by plaintiffs' counsel?
10   A  That's correct.
11   Q  The redline of the document that's exchanged
12 between Optum and CVS as of November 2012, which is
13 Defense Exhibit 303, does not have the language that
14 by February of 2013 is being proposed to add that
15 says "excluding any coupons or discount card
16 programs"; correct?
17   A  That's correct.
18   Q  So earlier in the questioning by plaintiffs'
19 counsel, if there was a suggestion that the striking
20 of the language "including all applicable customer
21 discounts, such as special customer, senior citizen,
22 and frequent shopper discounts" was somehow tied to
23 the addition of the language "excluding any coupons
24 or discount card programs," that would not be
25 consistent with the redline that the parties were

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

60 (237 to 240)

---

237

1 exchanging in Defense Exhibit 303 several months
2 earlier when only -- when the only issue that was
3 being modified at that point was the striking of
4 "including all applicable customer discounts, such
5 as special customer, senior citizen, and frequent
6 shopper discounts"; correct?
7    MR. LEWIS:  Objection.
8    A  That appears to be correct.
9    Q  Do you see that the footer in the attachment
10 to Defense Exhibit 303 that we've been looking at
11 and the footer to Plaintiffs' Exhibit 697 is the
12 same?  "Pharmacy Network Agreement, 2011, hyphen,
13 11.15.11"?
14    A  Yes.  Those appear to be the same.
15    Q  And, obviously, Plaintiffs' Exhibit 697
16 comes three months after Defense Exhibit 303.  Would
17 you agree?
18    A  Yes, I do.  Based on the dates of the
19 e-mail.
20    Q  So the sequence of things so far is in
21 November of 2012 Optum sends CVS a redline of a new
22 contract that apparently had been negotiated
23 starting back in 2010 and, three months later, in
24 February of 2015, CVS responds to that redline;
25 fair?

---

238

1    MR. LEWIS:  Objection.
2    A  THE WITNESS:  Sorry.
3    MR. GEYERMAN:  If you need me to break it
4 down, I'm happy to do that.
5    A  THE WITNESS:  Can you repeat your
6 affirmation?
7    MR. GEYERMAN:  Sure.
8    Q  I just want to -- I just want to sort of
9 summarize what I think we've established step by
10 step, and the sequence of events appears to be the
11 following:  In November of 2012 Optum sends to CVS a
12 redline of a contract under negotiation that
13 apparently began back in 2010.
14    A  Correct.
15    Q  And then --
16    MR. LEWIS:  Objection.
17    Q  -- three months after that, CVS adds
18 redlines on top of what Optum sent to CVS in
19 November of 2012.
20    MR. LEWIS:  Objection.
21    Q  Is that right?
22    A  Yes.  Yes, that's correct the way I see it.
23    Q  And are you aware of CVS or Optum
24 introducing any earlier than February of 2013 the
25 language "excluding any coupons or discount card

---

239

1 programs"?
2    MR. LEWIS:  Objection.
3    A  I am not aware.
4    MR. GEYERMAN:  I'm going to mark, sir, what
5 we're marking as Defense Exhibit 304.
6    (Defense Exhibit 304 marked for
7 identification and attached to the transcript.)
8    A  THE WITNESS:  Thank you.
9    Q  Take a minute and read the document, sir.
10    A  (Complied.)
11    Q  Is this an e-mail chain dated February 25th,
12 2013 -- strike that.
13    Is this an e-mail dated February 25th, 2013,
14 from Christopher Smithson at Optum to Debbie Veale
15 at CVS?
16    A  Yes, it appears to be.
17    Q  And the title is "Forward:  CVS redline
18 agreement questions re:  Sections 1.41, 3.10, 4.2.3,
19 and 11.13"; right?
20    A  That's correct.
21    Q  And Section 1.41 is the usual and customary
22 charge provision that we've been looking at;
23 correct?
24    A  Yes.
25    Q  Mr. Smithson writes, "Debbie, I have some

---

240

1 questions for you regarding CVS' redline of our
2 contract boilerplate.  If you could provide
3 insight/answers to the questions below, it would
4 help us to better understand CVS' viewpoint and then
5 respond appropriately."
6    And after that, Section 1.41, "Usual and
7 Customary Charge," is excerpted into Mr. Smithson's
8 e-mail; correct?
9    A  Yes.
10    Q  And he writes, "Question:  Any insight as to
11 why the discounts were deleted.  Does CVS have a
12 special discount program?"
13    Did I read that right?
14    A  Yes.
15    Q  And as we looked at in Plaintiffs'
16 Exhibit 697, the language in Section 4.1 that was
17 proposed to be deleted, to use Mr. Smithson's
18 language, is the language "including all applicable
19 customer discounts, such as special customer, senior
20 citizen, and frequent shopper discounts"; right?
21    A  Yes.
22    Q  So in Defense Exhibit 304, Mr. Smithson is
23 asking Ms. Veale, in substance, "Why have you
24 proposed deleting that language from Section 1.41?"
25 Right?

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

61 (241 to 244)

241

1    A That's what it appears, correct.
2    Q And he asks, "Does CVS have a special
3  discount program?" that would be within the language
4  that has been struck?
5    A Uh-huh.
6    Q Agreed?
7    A Agreed.
8      MR. LEWIS: Object to foundation.
9    Q Now I'm showing you, sir, what we've marked
10 as Defense Exhibit 305, and it is Ms. Veale's
11 response to the questions posed by Mr. Smithson.
12     (Defense Exhibit 305 marked for
13 identification and attached to the transcript.)
14    Q Do you see that this is an e-mail chain? At
15 the top, March 1st, 2013, Ms. Veale is replying to
16 Mr. Smithson, and at the bottom of the chain is the
17 e-mail that we just looked at.
18    A Yes, that's correct.
19    Q And Ms. Veale writes, on March 1st, 2013,
20 "See response below in green (or at least that is
21 the color it appears on my computer)."
22    A Okay.
23    Q And so if you go down in line to
24 Mr. Smithson's e-mail, in response to the question,
25 "Any insight as to why the discounts were deleted.

242

1  Does CVS have a special discount program?"
2  Ms. Veale has written, "No, we do not offer
3  discounts on rx drugs and do not want this to imply
4  discounts, i.e., cash discount programs."
5      Did I read that correctly?
6    A You did.
7    Q And as of 2013, when Ms. Veale is answering
8  Mr. Smithson's questions --
9    A Uh-huh.
10    Q -- you don't have any reason to disbelieve
11 that, in fact, CVS no longer had any applicable
12 customer discounts, such as special customer, senior
13 citizen, and frequent shopper discounts; correct?
14     MR. LEWIS: Objection.
15    A That's what it appears, correct, based on
16 Debbie Veale's answer.
17    Q Do you know whether CVS at any time had a
18 senior discount program?
19    A I do not. I did not hear that they had one.
20    Q In your experience in this industry, is a
21 senior discount program something that was more
22 prevalent historically and in comparison to today is
23 less prevalent?
24    A I would think it's less prevalent just
25 because of the options today.

243

1    Q Meaning like Medicare Part D?
2    A Membership programs, Medicare Part --
3    Q Go ahead.
4    A You're okay.
5    Q Tell me why, in your experience, senior
6  citizen discount programs are less prevalent today
7  than they have been historically.
8    A I would think the options that they have
9  today are far greater than they did in the past.
10 Where a simple discount program might have been
11 available or insurance, now a Medicare beneficiary
12 has options. They have your health plan option,
13 your more -- like an AARP-type option. They also
14 have the options of joining a membership club, for
15 example, like a Health Savings Pass.
16     So I think it's -- it's less just about
17 because you're 65 you get a discount. It's more
18 about tying it to the Part D benefit.
19    Q And if I told you that CVS, up to and in
20 2013, they were in the process of discontinuing
21 their senior discount program -- so they had a
22 senior discount program but no longer do -- would
23 that representation be consistent with your
24 understanding that, in general, senior discount
25 programs were more prevalent historically than they

244

1  are today?
2      MR. LEWIS: Objection.
3    A Yes, that would.
4      (An off-the-record discussion was held.)
5      MR. GEYERMAN: I've just got a couple more
6  documents in this line, and then I'm happy to take a
7  break if you want. Or we can take it --
8      MR. HEENAN: I was just asking -- it's 3:45.
9  I just asked the witness if he needs a break.
10     MR. GEYERMAN: We can take it now if you
11 want.
12    A THE WITNESS: No. I'm okay.
13     MR. GEYERMAN: Okay. You've got a lot of
14 stamina over there.
15    Q Sir, I'm going to mark here what is Defense
16 Exhibit 306.
17     (Defense Exhibit 306 marked for
18 identification and attached to the transcript.)
19    Q This, sir, is a document that is an e-mail
20 from Christopher Smithson to Debbie Veale dated
21 June of 2013 with the attachment to that e-mail; is
22 that correct?
23    A Yes.
24    Q Christopher Smithson writes, "Debbie,
25 attached is the OptumRx response to CVS -- CVS'

245

1  redlines to the Pharmacy Network Agreement.
2  Please review and provide your responses back to
3  Jeff Theaker at your earliest convenience."
4      Did I read that paragraph correctly?
5      **A  Yes.**
6      Q  Who's Jeff Theaker?
7      **A  I haven't heard that name before, and**
8  **I don't see they're copied here.**
9      Q  Based on the context, would you presume
10 Mr. Theaker is an employee of Optum or CVS?
11     **A  Optum.**
12     Q  Does Christopher Smithson still work at
13 Optum, to your knowledge?
14     **A  I don't believe so.**
15     Q  The attachment, if we look at it and go to
16 the provision we've been focusing on, Section 1.41,
17 has the same redlines that appear in Plaintiffs'
18 Exhibit 697, which is Ms. Veale's February 5th,
19 2013, set of redlines to Optum, if you would please
20 verify that.
21     **A  Sure.  Just give me a minute.**
22     **Yes, they appear to be the same.**
23     Q  The redlines are exactly the same, and the
24 only change to Section 1.41 is that Optum has
25 inserted a comment bubble that says "OK"?  Would you

246

1  agree?
2      **A  I agree.**
3      Q  And the "OK" is, as Mr. Smithson writes in
4  his cover e-mail, "OptumRx's response to CVS'
5  redlines"?  Would you agree?
6      **A  It appears so, yes.**
7      Q  And the language as redlined in Section 1.41
8  of Defense Exhibit 306, the Optum response to
9  CVS' edits, is the same language that ultimately is
10 in the executed agreement for Section 1.41 of the
11 2015 document, which has been marked as Plaintiffs'
12 Exhibit 700, if you would please validate that.
13     **A  It is the same language.**
14     Q  So the language of Section 1.41, as
15 ultimately appearing in the executed agreement, did
16 not change from the version that Optum okayed
17 through its comment bubble in this document?
18     **A  Yes.**
19     Q  And you were asked some questions earlier
20 about your statement in your declaration that the
21 2015 agreement and its express exclusion of discount
22 programs codified what had earlier been an
23 understanding between Prescription Solutions and
24 Optum and CVS dating back to the beginning of the
25 Health Savings Pass, which was that HSP was not

247

1  encompassed within the contractual definition
2  of "U&C."
3      Do you remember that line of questioning?
4      **A  I do.**
5      Q  And you were asked some questions about, if
6  there was already an understanding between the
7  parties that HSP was not part of "usual and
8  customary price," why would there be a need to add
9  the language in the "U&C" definition of "excluding
10 discount programs."
11     Do you remember that specific questioning?
12     **A  I do.**
13     Q  Have you ever encountered the instance in
14 the negotiation of your 80-some contracts that
15 you've talked about before where it might not be
16 necessary to memorialize a prior understanding but
17 it can be prudent to do so, to make explicit which
18 is already an unwritten, understood agreement
19 between the parties?
20     MR. LEWIS:  Objection.
21     **A  It's certainly come up in other**
22 **negotiations.  Not this specific topic but the need**
23 **to memorialize, basically, certain terms, et cetera,**
24 **and provisions.**
25     Q  And it's not your testimony that, to ensure

248

1  Health Savings Pass was not part of "usual and
2  customary," there needed to be the express exclusion
3  that ultimately was incorporated into the 2015
4  agreement but that can be a prudent or advisable
5  thing to include nonetheless; fair?
6      MR. LEWIS:  Objection.
7      **A  I think that's a fair statement.**
8      MR. GEYERMAN:  Shall we take a short break?
9      MR. HEENAN:  I --
10     MR. GEYERMAN:  I mean, I can keep going if
11 you want.
12     MR. HEENAN:  Let's take a short one, yeah.
13 Let's break.
14     THE VIDEOGRAPHER:  Off the record.  The time
15 is 1551.
16     (A recess was taken from 3:51 p.m. to
17 4:02 p.m.  The following proceedings were outside
18 the video record:)
19     THE COURT REPORTER:  Garrett, do you want a
20 copy of the transcript?
21     MR. HEENAN:  If you're preparing it for the
22 parties, if I can get a copy of it, that would be
23 great, yeah.  With a copy of the exhibits on there,
24 too.
25     THE COURT REPORTER:  Yes.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

249

1       (The following proceedings were on the
2   video record:)
3       THE VIDEOGRAPHER:  We are back on the
4   record.  The time is 1602.
5   BY MR. GEYERMAN:
6       Q  Sir, can you please pull up Plaintiffs'
7   Exhibit 694, which was the Catamaran agreement with
8   CVS Pharmacy?
9       **A  Sure.**
10      **Okay.  I have that.**
11      Q  Can you go to Section 1.14, "Usual and
12  Customary or U&C"?
13      **A  Okay.**
14      Q  Can you read into the record that definition
15  in the CVS-Catamaran agreement?
16      **A  Sure.**
17      **1.14 states, '"Usual and customary' or 'U&C'**
18  **shall mean the lowest price a CVS Pharmacy would**
19  **charge a cash-paying customer for the same service**
20  **or medication at the specific pharmacy on the**
21  **applicable day, excluding any coupons, discount card**
22  **programs, or programs where a member pays a fee to**
23  **join."**
24      Q  OptumRx does not consider that definition to
25  include the Health Savings Pass price as the usual

250

1   and customary price; fair?
2       **A  Oh, that's fair.**
3       Q  And in that respect, the contract between
4   CVS and Catamaran is consistent with the contract
5   between CVS and Prescription Solutions back to 1999
6   and the contract between CVS and OptumRx executed in
7   2015?  Would you agree?
8       MR. LEWIS:  Objection.
9       **A  Based on what I've researched, I would**
10  **agree.**
11      Q  Do you remember plaintiffs' counsel was
12  asking you a series of questions about whether
13  you're -- whether you're offering an opinion on
14  whether CVS submitted to Optum inflated usual and
15  customary prices?
16      **A  I do recall.**
17      Q  Do you understand that the allegation that
18  the plaintiffs are making in this case is that CVS'
19  Health Savings Pass program price was CVS' usual and
20  customary price?
21      MR. LEWIS:  Objection.
22      **A  THE WITNESS:  Can you paraphrase that?**
23      MR. GEYERMAN:  Sure.
24      Q  Do you understand that the allegations that
25  the plaintiffs are advancing are that CVS',

251

1   quote/unquote, "true usual and customary price" was
2   the pharmacies' Health Savings Pass price and not
3   the usual and customary price that CVS, over time,
4   has been submitting to PBMs and payers?
5       Do you understand that's the allegation?
6       MR. LEWIS:  Objection.
7       **A  Yes.**
8       Q  And do you understand that the allegation
9   that the plaintiffs are making is that the Health
10  Savings Pass price is a lower price than the
11  reported usual and customary price that CVS
12  submitted to PBMs and payers?
13      **A  Yes.**
14      Q  And if it's plaintiffs' argument that CVS'
15  usual and customary price submitted to PBMs and
16  payers was, quote, "inflated," end quote, because it
17  was not the Health Savings Pass price, then your
18  declaration, at least, does address that allegation
19  because it says, under the contracts between CVS and
20  Optum and its predecessors, Health Savings Pass was
21  not the usual and customary price?  Would you agree?
22      MR. LEWIS:  Objection.
23      **A  Yes.  The -- they're two separate, distinct**
24  **programs, just like I've been consistently saying**
25  **all along.**

252

1       **So I would agree with that.**
2       Q  And when you say "they're two distinct
3   programs," you're saying that CVS' usual and
4   customary price is one thing and its Health Savings
5   Pass price is another; is that fair?
6       **A  That's correct.**
7       Q  You were asked a series of questions by the
8   plaintiffs earlier today about revenues associated
9   with CVS.
10      Can you just make clear for the record
11  whether CVS pays money to Optum, a PBM who
12  adjudicates claims dispensed at CVS Pharmacies?
13      **A  Let me recap it.**
14      **The -- so I was asked about the ranking and**
15  **where CVS falls, which is number two.  We're a PBM**
16  **so we pay the pharmacy corporations.**
17      **So it would be revenue to CVS in that**
18  **instance, revenue to Walgreens.  That's the stack**
19  **rank of the -- the network pharmacies.**
20      Q  So when you were referring to revenue
21  associated with CVS --
22      **A  Uh-huh.**
23      Q  -- were you referring to an approximate
24  amount of money that Optum, the PBM, pays to CVS?
25      **A  That's correct.**

253

1    Q  You were not referring to an amount of money
2  that CVS, the pharmacy, purportedly pays to the PBM;
3  fair?
4    A  Correct.  I was not referring to that.
5    Q  That's not how it works?  Pharmacies don't
6  pay money to PBMs?  It's the other way around;
7  right?
8    A  Correct.
9    Q  You were asked a series of questions about
10 price overrides.  Do you remember that?
11   A  I believe so.
12   Q  And just to set the context, what's your
13 understanding of what a price override is?
14   A  "Price override" is there may be a price
15 that -- there may be a standard price, and then
16 there may be a price that overrides that standard,
17 is one way to say it.
18   Q  So would an instance of that be I'm a
19 customer, I walk into a pharmacy, the pharmacy's
20 retail price is $10 --
21   A  Uh-huh.
22   Q  -- and, for whatever reason, given the
23 particular circumstances of my situation, I get an
24 exception and the pharmacy sells the -- the product
25 to me at a price lower than $10?

254

1     Is that a -- can that be an example of a
2  price override?
3    A  I think that could be.
4    Q  Okay.  And are you offering a position or
5  opinion in this deposition or in the declaration
6  about whether the existence or nonexistence of price
7  overrides affects a pharmacy's usual and customary
8  price?
9    A  So is this reflecting back on what I've
10 already testified, or is this an opinion of myself?
11   Q  Well, I guess I'm asking about the
12 declaration.
13   A  Okay.
14   Q  There's nothing in the declaration that you
15 talk about price overrides?
16   A  Yeah.  I didn't recall any, yeah.
17   Q  Okay.  And plaintiffs' counsel was asking
18 you some questions earlier about price overrides,
19 and you were doing your job here today by answering
20 his questions.
21   But I -- I just wanted to know -- you're not
22 intending to offer opinions in this case about the
23 implications of price overrides on pharmacies' usual
24 and customary pricing; is that fair?
25   MR. LEWIS:  Objection.

255

1    A  That's fair because I think there's a lot of
2  different circumstances why an override might be in
3  place.  And it's not just price, but there's certain
4  edits that a claim would reject.
5    So we often focus on price, but there is a
6  whole band or body of edits that go onto a claim.
7    Q  And in your experience at Optum and
8  Catamaran, do those PBMs consider isolated instances
9  of price overrides as setting the company's usual
10 and customary price?
11   MR. LEWIS:  Objection.
12   Q  If you know.
13   A  You know, I -- I don't believe so because
14 the overrides are based off either the U&C or some
15 kind of "lesser of."
16   I would imagine.
17   Q  You were asked a series of questions by
18 plaintiffs' counsel about what documentation, if
19 any, you are aware of that memorialized certain
20 understandings between CVS and Optum, CVS and
21 Prescription Solutions, or CVS and Catamaran.  And
22 you didn't identify any documentation in response to
23 plaintiffs' counsel.
24   In -- am I to infer from that that you don't
25 know, one way or the other, whether such

256

1  documentation occurs?  Or is it your testimony that,
2  no, in fact, there is no such documentation out
3  there?
4    MR. LEWIS:  Objection.
5    A  THE WITNESS:  Sorry.
6    A  I believe my testimony was none that I was
7  aware of.  That does not mean that documentation
8  doesn't exist.
9    Q  To prepare yourself for today's deposition,
10 have you undertaken to determine whether, within the
11 OptumRx organization, there is documentation that is
12 of the nature that plaintiffs' counsel was asking
13 you about?
14   MR. LEWIS:  Objection.
15   A  If the question is did I research or do any
16 investigation, no.  The main reason was a lot of
17 these people -- all of them aren't here except for
18 a few.  But I saw one name that's still here.
19   Q  And nor for purposes of -- strike that.
20   So would it be fair to say that
21 documentation might exist that is responsive to the
22 categories that plaintiffs' counsel was asking
23 about; it's just that you're not the person that can
24 answer that one way or the other?
25   A  I think that's --

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

65 (257 to 260)

257

1    MR. LEWIS:  Objection.
2    **A (Continuing.)  I think that's a fair**
3    **statement.**
4    Q  Along the same lines, you were asked about
5    whether there was any communication outside the
6    company -- and I think "the company" was intended to
7    mean Optum or its predecessors -- about the
8    understanding that the contractual definitions of
9    "usual and customary price" with CVS in the various
10   contracts did not include the Health Savings Pass.
11   Do you remember that line of questioning?
12   **A  I believe so.**
13   Q  It was essentially to the effect you can't
14   identify any communications outside the organization
15   that the U&C definitions were interpreted to exclude
16   the Health Savings Pass.
17   Do you remember that?
18   **A  I do.**
19   Q  You would agree with me that CVS, at least,
20   understood what Optum and Prescription Solutions
21   themselves understood, that the Health Savings
22   Pass was not part of the "usual and customary"
23   definitions; correct?
24   MR. LEWIS:  Objection.
25   **A  That's correct.**

258

1    Q  So your testimony should not be interpreted
2    to mean that at least CVS and -- and your
3    organization didn't have a shared understanding
4    between themselves that HSP was not to be included
5    within U&C; fair?
6    **A  I --**
7    MR. LEWIS:  Same objection.
8    **A  (Continuing.)  I think that's a fair**
9    **statement.**
10   Q  And to prepare for today's deposition, have
11   you undertaken to determine whether there ever was a
12   communication by Optum or Prescription Solutions to
13   its clients about how the "usual and customary
14   price" definition between CVS and the PBM either
15   included or didn't include membership programs?
16   Have you undertaken that objective?
17   **A  No, I have not.**
18   Q  So you're not testifying that, no, as a
19   matter of fact, there never were such communications
20   to health plans or members of health plans?  It's
21   just that, sitting here today, you're not in a
22   position to identify any?
23   **A  Sitting here today, I'm not in a position to**
24   **identify any.**
25   Q  Are you offering in this case a legal

259

1    opinion on what it means to be a price offered to
2    the general public?
3    **A  No, I'm not.  I'm not a licensed attorney.**
4    Q  You were asked a series of questions about
5    the NCPDP standard and if you could name a contract
6    with a pharmacy that Optum has that doesn't follow
7    the NCPDP standard.
8    Are you a member of NCPDP yourself?
9    **A  I was.  I think my membership has expired.**
10   Q  Do you know how long you were a member,
11   approximately?
12   **A  About a year and a half.**
13   Q  When was that?
14   **A  About a half year ago.  So the first year**
15   **I was employed, I was a member.  I believe my**
16   **renewal had lapsed.**
17   Q  Were you active during the time that you
18   were a member of NCPDP?
19   **A  I was.  I attended the workers' compensation**
20   **workshops.**
21   Q  Any other workshops?
22   **A  No, just those.  I was trying to ramp up my**
23   **learning curve on that business.**
24   Q  And are you -- strike that.
25   Is it fair to say you're not -- you don't

260

1    hold yourself out as an expert on how to interpret
2    the NCPDP standard?
3    **A  I would think that would be accurate.**
4    **I do not.**
5    Q  You're not purporting to offer a -- such an
6    opinion in this case, at least; right?
7    **A  Correct.  I'm not an expert at the NCPDP**
8    **rules.  But we have others that are experts within**
9    **the organization I'd go to.**
10   Q  And during your time at Optum and Catamaran,
11   you've never heard one of the NCPDP subject matter
12   experts at the PBM say that it would be a violation
13   of the NCPDP telecommunications standard for a
14   pharmacy to not report its membership program price
15   as its usual and customary price?  Would that be
16   fair?
17   MR. LEWIS:  Objection.
18   **A  Yes, it would be.**
19   MR. GEYERMAN:  I don't have any further
20   questions at this time, Mr. Reichardt.  Thank you.
21   **A THE WITNESS:  Thank you.**
22   MR. LEWIS:  I have some follow-up.
23   THE WITNESS:  Sure.
24   MR. LEWIS:  Okay?
25   ///

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

---

261

1      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
2    BY MR. LEWIS:
3      Q  I think, in responding to Grant's questions,
4    you repeated an answer that you gave earlier in the
5    day that -- that the -- the U&C and the HSP are --
6    are separate and distinct programs.  Is that right?
7      A  Correct.
8        Well, I would -- they're two separate --
9    one's a program; one's more of a practice, the U&C.
10     Q  The -- the U&C is more of a practice?
11     A  More of like a standard that maybe a --
12   sorry -- that maybe a pharmacy has.
13       So they -- I don't think the two are
14   programs, necessarily.  The one is a program.  So
15   I just wanted to clarify that.
16     Q  So the U -- the U&C you were referring to is
17   a practice that a pharmacy has, and that relates to
18   the reporting of their cash prices; correct?
19     A  Correct.
20     Q  And if a pharmacy reported prices as the U&C
21   that were not the cash prices, you would think that
22   was deceptive; correct?
23       MR. GEYERMAN:  Objection to form.
24       A  THE WITNESS:  Can you repeat that?
25       MR. LEWIS:  Yes.

---

262

1      Q  If a pharmacy reported as the U&C a price
2    that was not its cash price, you would consider that
3    deceptive; correct?
4        MR. GEYERMAN:  Objection.
5      A  I would think so, based on the examples we
6    went through earlier.
7      Q  And if you found out that there were
8    thousands of persons outside the program being
9    charged, say, a price of 11.99 and that was also the
10   HSP price and the pharmacy was reporting as its U&C
11   a price of -- above 11.99, you would think that's
12   improper; correct?
13       MR. GEYERMAN:  Objection to form.
14       A  THE WITNESS:  Can you paraphrase that?
15       MR. LEWIS:  Sure.
16     Q  If the membership price is 11.99 --
17     A  Okay.
18     Q  -- and you found out that there's thousands
19   of persons outside the club, cash customers, paying
20   11.99 but CVS is reporting a higher U&C price than
21   11.99, you would believe that's improper; correct?
22       MR. GEYERMAN:  Objection to form.
23       A  I think this is the -- just to verify -- the
24   hypothetical we talked about earlier --
25     Q  Yes.

---

263

1      A  -- where the U&C was $15 and the --
2      Q  That the reported --
3      A  -- HSP was --
4      Q  Yes, the reported U&C is above 11.99.
5    Correct?
6      A  And the HSP is not considered a program that
7    would be replaced by a cash-paying customer;
8    correct?
9        The amounts confuse me because you used
10   11.99.
11     Q  Yes.  I'm saying that 11.99 is the HSP price
12   but cash customers in the thousands are paying 11.99
13   outside the program.  Yet CVS, if they reported a
14   higher U&C than 11.99, you would think that's
15   improper.
16       MR. GEYERMAN:  Objection to form.
17     A  Can I restate and just make sure
18   I understand it?
19       So the HSP price is 11.99, the cash price is
20   11.99, but the reported U&C is 15?
21     Q  Yes.
22     A  Whereas it should be 11.99?
23     Q  Yes.
24     A  Then I would think that is an issue.
25     Q  It's improper to report it as 15?

---

264

1      A  Correct.
2      Q  You have to give a verbal answer.
3      A  Yes.
4      Q  And the fact that the U&C program is
5    separate from the HSP -- or the U&C practice is a
6    separate thing, as you described it, from the HSP
7    program doesn't negate the answer you just gave me;
8    correct?
9        MR. GEYERMAN:  Objection to form.
10     A  No, because you replace the HSP with a
11   cash-paying customer that did not enroll.  So
12   I think the scenario had changed.
13     Q  All right.  Thank you.
14     A  Sure.
15     Q  Now, the fact that Optum and their
16   predecessor never complained to CVS about their
17   practices related to the reporting of U&C prices
18   doesn't mean that Optum had CVS' cash transaction
19   data and could independently verify if they were
20   reporting accurate U&C prices; correct?
21       MR. GEYERMAN:  Objection to form.
22     A  It's hard for me to verify that because
23   I think there's a different team that runs our
24   analytics.  That's a different division and that
25   would be more of their responsibilities.  Part of

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

67 (265 to 268)

---

265

1 their responsibilities would be to inform network
2 relations that we have an issue, and then we broker
3 that back through with our relationship.
4     Q But in your prior answers to Mr. Geyerman,
5 you said that, as far as you know, Optum hadn't
6 complained to CVS about CVS reporting inflated
7 U&C prices; correct?
8     A Correct, if I could elaborate.
9     Q Please.
10     A The pharmacy analytics team would be one of
11 those responsible for doing the analysis and then
12 troubleshooting and seeing if there are trends or
13 analytics that lead to an issue.
14     And then -- again, I'll just stick with the
15 same response that I had -- they broker that back
16 through network relations, which is the department
17 I work in, to go and approach the particular
18 pharmacy to try to resolve the issue.
19     Q You're not testifying that Optum obtained
20 CVS' cash transaction data and independently
21 verified that they were reporting accurate
22 U&C prices, are you?
23     A I'm not. I believe what I testified is that
24 I was not aware of any issues within that data
25 because it was not brought to my attention.

---

266

1     Q And you have no knowledge from 2007 to 2015
2 that Optum ever had that data, that being the CVS
3 cash transaction data?
4     A Well, naturally, we had it because that's
5 what was submitted. But --
6     Q The only thing submitted to Optum was the
7 data for its members; correct?
8     A The -- the U&C data was submitted.
9     Q Okay. The U&C prices were submitted;
10 correct?
11     A Correct.
12     Q The underlying cash transactions to show
13 what the true U&C prices were were not submitted to
14 Optum by CVS at any point in time --
15     MR. GEYERMAN: Objection to form.
16     Q -- correct?
17     MR. GEYERMAN: Objection to form.
18     A That probably gets more into analytics. But
19 what I believe is we received the single U&C price
20 that was delivered through our point of sale system.
21     Q And you did not receive the full data from
22 2008 to 2015 of what the actual true cash prices
23 were being charged by CVS; correct?
24     MR. GEYERMAN: Objection to form.
25     A Not that I know of because that's not my

---

267

1 department. It's not to say that pharmacy analytics
2 or another team did.
3     Q That would be speculation on your behalf?
4     A Correct.
5     Q Now, during the years 2008 up until the time
6 you got to Catamaran in mid-January of 2015, you had
7 no role in interpreting any CVS, Catamaran, or Optum
8 contracts as it relates to the U&C; correct?
9     A That's correct.
10     Q So anything you know now about
11 interpretation during that time frame is secondhand
12 information you must have gotten from somebody else;
13 correct?
14     A That's correct.
15     Q And you're not testifying that, during
16 the years that 11.99 was the HSP price, that CVS
17 didn't routinely offer that same price to cash
18 customers who had no benefit?
19     A Can you paraphrase that one?
20     Q Yeah.
21     You're not giving an opinion today, during
22 the years that the HSP price was 11.99, during those
23 same years that CVS wasn't charging that same price
24 to people outside the program who had no benefit?
25     MR. HEENAN: Object to form.

---

268

1     You can answer.
2     MR. GEYERMAN: Join.
3     A No, I'm not testifying in that respect.
4     Q And you're not testifying that -- putting
5 aside all HSP prices, putting them totally aside,
6 you're not testifying that CVS reported accurate
7 U&C prices based on the cash prices that it actually
8 charged customers alone? You're not giving that
9 opinion today?
10     MR. GEYERMAN: Objection to form.
11     A I'm not giving an opinion that they did or
12 did not.
13     Q Because you don't know?
14     A Correct.
15     Q Nor do you know if CVS enforced their
16 membership fees for the HSP program; correct?
17     MR. GEYERMAN: Objection to form.
18     A That's correct.
19     Q Now, you talked a little bit with
20 Mr. Geyerman about the variation in different plans.
21 Do you recall that?
22     A Yes.
23     Q And the plans that you're familiar with all
24 utilize "lesser of" pricing; correct?
25     A For the most part, that's correct.

---

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

68 (269 to 272)

269

1    Q  And when we talk about "lesser of" pricing
2  or "lower of" pricing, we're talking about at least
3  two prices and we're trying to figure out what's the
4  lesser of or what's the lower of; correct?
5    A  I think that's a good general analogy.
6    Q  And under "lesser of" or "lower of" pricing,
7  if the U&C is less than the contracted price, all
8  the variation in the world about contracted prices
9  and how are they developed and what they are is
10  meaningless when it comes to what price is actually
11  paid by the beneficiary when they pick up their
12  prescription if it -- it's a covered transaction;
13  correct?
14    MR. GEYERMAN:  Objection to form.
15    A  Correct, the -- if it -- the U&C was lower
16  than the contracted price.
17    Q  All the other variation in the plan is
18  meaningless; correct?
19    MR. GEYERMAN:  Objection to form.
20    MR. HEENAN:  Join.
21    A  Correct.
22    Q  Now, you were asked some questions about
23  does Optum calculate what the beneficiary at the
24  pharmacy window has to pay; correct?
25    A  Can you repeat that, please?

270

1    Q  Yeah.
2    You were asked some questions about is it --
3  is it Optum, the PBM, who does the calculation of
4  what the beneficiary has to pay when they pick up
5  their pharmaceutical drug?
6    A  Correct, through our POS system.
7    Q  But before Optum makes a single calculation
8  in time, they have to get a reported U&C; correct?
9    A  Correct.
10    Q  And that's -- gets reported in the NCPDP in
11  Field 426?
12    A  Okay.
13    Q  Correct?
14    A  That's my understanding.
15    Q  And it gets reported, for a CVS transaction,
16  by CVS; correct?
17    A  Yes.  They're responsible for reporting
18  that.
19    Q  It could never be reported by Optum?
20    A  No.  It's the responsibility of the
21  pharmacy.
22    Q  And the pricing that follows from that first
23  step is all driven by what the U&C is; correct?
24    MR. GEYERMAN:  Objection to form.
25    A  THE WITNESS:  Can you paraphrase that?  So

271

1  the pricing --
2    MR. LEWIS:  Sure.
3    Q  If the U&C is less than the contracted
4  price --
5    A  Okay.
6    Q  -- the reporting -- that first step by CVS
7  alone, without any participation by Optum -- drives
8  the pricing; correct?
9    MR. GEYERMAN:  Objection to form.
10    A  Correct.  It would be the lesser of.
11    Q  And -- and if CVS reports an inflated
12  U&C price and Optum doesn't know it, there's nothing
13  they can do in all their steps to undo that;
14  correct?
15    MR. GEYERMAN:  Objection to form.
16    A  If they suspect that, they could audit.
17  They --
18    Q  But if they don't suspect it --
19    THE COURT REPORTER:  Wait, wait, wait.
20    MR. GEYERMAN:  Let him finish answering,
21  please.
22    THE COURT REPORTER:  Wait, wait, wait.
23    A  (Continuing.)  So if -- if we suspect
24  something like that, we can perform an audit.
25    Within that audit we could test the

272

1  U&C price, what was submitted and actual, by
2  requesting documents from CVS.  To the best of my
3  knowledge, that hasn't happened since I've been
4  here.
5    Q  To the best of your knowledge, as you told
6  me earlier in the day, from 2007 to 2015 CVS never
7  provided the proprietary cash transaction data to
8  Optum or their predecessors; correct?
9    MR. GEYERMAN:  Objection to form.
10    A  I think my answer was I didn't know.  So
11  I could not confirm or deny.
12    Q  But the only entity that has responsibility
13  for reporting a true and accurate U&C price is the
14  pharmacy?
15    A  Correct.  That's what we covered.
16    Q  And if the U&C price is less than the
17  contracted price, a reporting of an inflated U&C
18  will lead to an inflated price for the beneficiary
19  who picks up their generic drug if it's a covered
20  transaction?
21    MR. GEYERMAN:  Objection to form.
22    A  That could be a scenario, correct.
23    THE VIDEOGRAPHER:  Five minutes on the tape.
24    Q  NCPDP is a standard-setting organization;
25  correct?

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

273

1    A  Correct.
2    Q  And they've -- they've developed a field for
3  the reporting of U&C data by pharmacies; correct?
4    A  Correct, I believe on the 835 form.
5    Q  And they don't police the integrity or
6  accuracy of that report by the pharmacy, do they?
7        MR. GEYERMAN:  Objection to form.
8    A  That I'm not sure of.
9    Q  Do you have -- have you ever heard of the
10  NCPDP policing as opposed to just setting up the
11  standard for the reporting of information?
12    A  I have not.
13    Q  Now, there was a discussion about the word
14  "include" and "exclude" in the negotiation leading
15  up to the 2015 agreement.  Do you recall that?
16    A  Yes.
17    Q  And that negotiation took a certain period
18  of time, more than a year; correct?
19    A  Based on this documentation, it appeared so.
20    Q  And when the negotiation began, the
21  definition of "U&C" included discount -- discount
22  prices; correct?
23        MR. GEYERMAN:  Objection to form.
24    A  I like -- if you allow me, I want to look
25  back at the --

274

1    Q  Sure.
2    A  -- first document.
3    Q  Let me ask it this way.  It might be
4  quicker.
5        The existing agreement, the one that was in
6  place, the 1999 agreement --
7    A  Uh-huh.
8    Q  -- when the negotiation began that
9  Mr. Geyerman asked you about, that agreement had
10  language defining a "U&C customary charge" as
11  including discount prices; correct?
12        MR. GEYERMAN:  Objection to form.
13    A  I don't think it was discount prices.  It
14  was discount programs.
15    Q  Thank you.
16        That definition of "usual and customary
17  charge" had language including discount programs;
18  correct?
19    A  I'm going to verify.
20        MR. GEYERMAN:  Objection to form.
21        Sorry.
22        MR. LEWIS:  All right.
23    A  THE WITNESS:  Can you let me know what
24  exhibit you're referring to?
25        MR. LEWIS:  Well --

275

1        MR. GEYERMAN:  I think it's Plaintiffs'
2  Exhibit 695.  It's the 1999 agreement.
3    A  THE WITNESS:  Yeah.
4        MR. LEWIS:  The second way I asked the
5  question, that's correct.  695.
6    A  THE WITNESS:  Okay.  I have it.
7        MR. LEWIS:  So that would be page 12.
8    A  THE WITNESS:  Thank you.
9        MR. GEYERMAN:  Can you read back the
10  question?
11        MR. LEWIS:  Sure.  I'll reask it.
12        Are you ready?
13    A  THE WITNESS:  I'm ready.
14  BY MR. LEWIS:
15    Q  You're looking at page 12, the definition of
16  "usual and customary" in the 1999 agreement?
17    A  Correct.
18    Q  And Mr. Geyerman asked you questions about
19  the negotiations, 2012 and '13, that led to the
20  2015 January 29 agreement.  Do you recall that?
21    A  I do.
22    Q  And when those negotiations began, the
23  existing contract, 695, under the definition of
24  "usual and customary," said, "This includes all
25  applicable discounts, including, but not limited to,

276

1  senior citizen discounts, frequent shopper, and
2  special customer discounts or other discounts";
3  correct?
4    A  Correct.
5    Q  And at the end of that negotiation in
6  January 29th, 2015, discounts were excluded;
7  correct?
8        MR. GEYERMAN:  Objection to form.
9    A  THE WITNESS:  I just want to go back --
10        MR. LEWIS:  Sure.
11    A  THE WITNESS:  -- to that agreement real
12  quick.
13        MR. LEWIS:  I think it's 700.
14        MR. GEYERMAN:  Yeah.
15    A  THE WITNESS:  Okay.  I just wanted to be
16  specific.
17        MR. LEWIS:  Sure.
18        THE VIDEOGRAPHER:  One minute on the tape.
19    A  The exclusions were coupons and discount
20  card programs.
21  BY MR. LEWIS:
22    Q  So the underlying agreement included
23  discount programs; correct?
24        MR. GEYERMAN:  Objection to form.
25    A  The -- the previous agreement before -- yes,

277

1  it included.
2      Q  And the 2015 agreement excluded discount
3  programs; correct?
4      MR. GEYERMAN:  Objection to form.
5      I'll withdraw that objection.
6  **A  So the -- the prior agreement, before 2015,**
7  **it did not exclude discount programs explicitly.**
8  **So if we read it, it's applicable discounts.**
9  **They include senior citizen discounts, frequent**
10 **shopper, and special customer discounts and other**
11 **discounts.**
12     Q  All right.
13 **A  Somewhat technical, but I just want to make**
14 **sure for the record.**
15 **There were two exclusions, then, on the**
16 **2015 agreement, Exhibit 700, that excluded coupons**
17 **or discount card programs.**
18     MR. LEWIS:  All right.  We have to stop.
19 I went too far on the tape.  I apologize.
20     THE VIDEOGRAPHER:  Off the record.  The time
21 is 1641.
22     (A recess was taken from 4:41 p.m. to
23 4:44 p.m.)
24     THE VIDEOGRAPHER:  This is the beginning of
25 Disk 4.  The time is 1644.

278

1  BY MR. LEWIS:
2      Q  Thanks for your patience, Mr. Reichardt.
3      The question that I'm trying to ask about
4  PX695, the 1999 contract, is, in defining "usual and
5  customary," it had affirmative inclusion language
6  identifying included discounts; correct?
7  **A  Correct.  There were a variety of discounts**
8  **that were included.**
9      Q  And among that variety was a category called
10 "other discounts"; correct?
11 **A  Yes.**
12     Q  That's a broad category; right?
13     MR. GEYERMAN:  Objection to form.
14 **A  It appears to be.**
15     Q  Now, in the 2015 agreement, there are no
16 discounts included in the definition of "usual and
17 customary charge"; correct?
18 **A  The way I interpret it, there are two**
19 **excluded, coupons or the discount card programs.**
20     Q  And do you see the inclusion of any
21 discounts in that definition?
22 **A  I do not.  It's silent.**
23     Q  And that's a change from the 1999 agreement;
24 correct?
25     MR. GEYERMAN:  Objection to form.

279

1  **A  Yes.**
2      MR. LEWIS:  Thank you.  Nothing further.
3      MR. GEYERMAN:  I've got -- sorry --
4  **A  THE WITNESS:  That's all right.**
5      MR. GEYERMAN:  -- a couple questions.
6  They're pretty limited.
7      EXAMINATION BY COUNSEL FOR THE DEFENDANT
8  BY MR. GEYERMAN:
9      Q  You were asked questions about your
10 knowledge of Optum complaining to CVS based on
11 information from the analytics department, if
12 there -- if there ever was such a circumstance.
13     I want to make sure I understand your
14 testimony.
15 **A  Sure.**
16     Q  You don't work in the analytics department;
17 correct?
18 **A  That's correct.**
19     Q  You do, however, manage the relationship
20 between Optum and CVS Pharmacy; correct?
21 **A  That's correct.**
22     Q  If the analytics department had run an
23 analysis and concluded that CVS was submitting to
24 Optum on adjudicated transactions inflated usual and
25 customary prices, would that be a finding you would

280

1  expect the analytics team to make you aware of as
2  the manager of the Optum-CVS relationship?
3  **A  Yes.**
4      Q  And you are not aware of the analytics team
5  ever having come to that conclusion when looking at
6  CVS' data; fair?
7  **A  That's correct.**
8      Q  You were asked questions about whether CVS
9  has ever provided its cash transaction data to Optum
10 to your knowledge.
11     Had Optum asked for CVS' cash data, do you
12 know whether CVS would have provided it?
13     MR. LEWIS:  Objection.
14 **A  I would have to look under the contract to**
15 **see if that's a requirement.  Beyond that, it would**
16 **be business to business.**
17 **But in answer -- I don't see a reason why**
18 **they would not provide it, even outside of the**
19 **contract.**
20     Q  If asked?
21 **A  If asked.**
22     Q  Do you know whether Optum ever asked CVS to
23 provide its cash transaction data to Optum?
24 **A  I do not.  If it was asked, it would**
25 **probably be asked in conjunction with an audit.**

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

71 (281 to 284)

281

1    Q  Do you know whether any other national
2  pharmacy chain or independent pharmacy has
3  affirmatively provided its cash transaction data and
4  its membership program data to Optum?
5    A  Not that I'm aware of.
6    Q  In this case, if the plaintiffs are
7  suggesting that the fact that CVS has never
8  affirmatively provided its cash and HSP transaction
9  data to a PBM as evidence that that's some nefarious
10 thing, would you think that's an -- a proper
11 inference based on your experience in the industry
12 of what pharmacies do or do not provide to PBMs?
13    MR. LEWIS:  Objection.
14    A  THE WITNESS:  Can you maybe consolidate that
15 as a question?
16    MR. GEYERMAN:  Yeah.
17    A  THE WITNESS:  Thank you.
18    Q  If the plaintiffs in this case are
19 suggesting that there's something nefarious about
20 CVS not having affirmatively disclosed to PBMs its
21 cash transaction data and its CVS transaction --
22 sorry.  Too late in the day.
23    If the plaintiffs in this case are
24 suggesting that there's something nefarious about
25 the fact that CVS has not affirmatively volunteered

282

1  its cash transaction data and its HSP transaction
2  data to PBMs, based on your experience in the
3  industry of what information pharmacies do provide
4  voluntarily to a PBM, would you conclude there's
5  something nefarious about CVS' nonvoluntering
6  of that?
7    MR. LEWIS:  Objection.
8    A  I would not.  The -- because the HSP
9  program, again, is a separate program that is not
10 billed, paid, or interacts with a pharmacy benefit
11 of one of our members, being a member of OptumRx.
12    Q  And the same would be true of CVS' cash
13 transactions?
14    A  Correct.
15    Q  All right.  On the '99 and 2015 agreement,
16 I think I have four questions that makes the record
17 totally clear.
18    MR. LEWIS:  I'll just --
19    Q  Can you look --
20    MR. LEWIS:  -- object and move to strike.
21    MR. GEYERMAN:  Okay.  Fine.  All right.
22    MR. LEWIS:  It's a nice argument.
23    MR. GEYERMAN:  I'm just trying to give you a
24 context of what I'm doing here.
25    MR. LEWIS:  Or an answer to the question.

283

1    MR. GEYERMAN:  No, I'm not.
2    MR. LEWIS:  No, no.  Okay.
3    Q  I'm pretty sure the record is quite good for
4  us, but because counsel asked you some questions,
5  I have, I think, four questions on the '99 and
6  2015 agreement.
7    Can you pull those in front of you?
8    A  Sure.
9    The '99 and 2015?
10    Q  Yes, sir.
11    A  So Exhibit 700 and 695?
12    Q  Exactly.
13    A  Okay.  I have them.
14    Q  Okay.  The phrase "discount programs" --
15 strike that.
16    The phrase "discount card programs" or
17 "discount programs" is nowhere in the words in the
18 definition of "usual and customary" -- strike that.
19 That's poorly worded.
20    You don't see the phrase "discount card
21 programs" or "discount cards" in the text of the
22 "usual and customary" definition of Plaintiffs'
23 Exhibit 695?  Would you agree?
24    A  I'm just researching that.
25    Q  Take your time.

284

1    A  Can you repeat the question?
2    Q  Sure.
3    In the text of the definition that is "usual
4  and customary" in Plaintiffs' Exhibit 695, the
5  1999 Prescription Solutions agreement, the words
6  "discount program" and "discount card program" don't
7  appear; agree?
8    A  I agree.  That's correct.
9    Q  Now pull up the 2015 agreement.
10    A  (Complied.)
11    Q  The phrase "discount card programs" do
12 appear in the "usual and customary charge"
13 definition in the 2015 Optum agreement which is
14 Plaintiffs' Exhibit 700; agreed?
15    A  Agree under 1.41.
16    Q  And they appear after the word "excluding
17 any"; correct?
18    A  That's correct.
19    MR. GEYERMAN:  I don't have any further
20 questions, sir.
21    MR. LEWIS:  Nothing further.
22    MR. GEYERMAN:  Thank you for -- thank you
23 very much for your time today.
24    A  THE WITNESS:  You're welcome.
25    MR. LEWIS:  Thank you.

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

72 (285 to 288)

285

1       THE VIDEOGRAPHER:  Off the record.  The time
2   is 1652.
3       (A recess was taken from 4:52 p.m. to
4   4:58 p.m.  The following proceedings were outside
5   the video record:)
6       MR. LEWIS:  All right.  This is Richard
7   Lewis.
8       I've conferred with counsel for CVS and
9   counsel for Optum.  We have completed the individual
10  declarant deposition.  We are not going to open the
11  noticed and subpoenaed 30(b)(6) deposition at this
12  time.
13      We're going to meet and confer on it in the
14  coming days and get back to Optum counsel on whether
15  or not we think it needs to go forward and, if so,
16  if it can be scheduled.
17      MR. HEENAN:  Great.
18      MR. GEYERMAN:  Okay.
19      Thank you to the witness.
20      MR. LEWIS:  Thank you.
21      MR. GEYERMAN:  We appreciate your time.
22      MR. LEWIS:  Thank you.
23      (Off the record at 4:59 p.m.)
24
25

286

1   CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3       I, Melanie L. Humphrey-Sonntag, Certified
4   Shorthand Reporter No. 084-004299, CSR, RDR, CRR,
5   CRC, FAPR, and a Notary Public in and for the County
6   of Kane, State of Illinois, the officer before whom
7   the foregoing deposition was taken, do hereby
8   certify that the foregoing transcript is a true and
9   correct record of the testimony given; that said
10  testimony was taken by me stenographically and
11  thereafter reduced to typewriting under my
12  direction; that reading and signing was not requested;
13  and that I am neither counsel for, related to, nor
14  employed by any of the parties to this case and have
15  no interest, financial or otherwise, in its outcome.
16      IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my notarial seal this 2nd day of
18  January, 2017.
19
20  My commission expires:  May 31, 2017
21
22  _____
23  Notary Public in and for the
24  State of Illinois
25

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                          73

| A |
|---|

**aarp-type**
243:13
**ability**
180:4, 181:25,
221:11, 225:9
**able**
19:25, 137:13,
204:6, 233:20,
233:23
**about-face**
230:25, 231:13
**about;**
256:23
**above**
262:11, 263:4
**absence**
208:4
**absolutely**
235:20
**accepting**
74:19
**access**
38:20, 38:24,
39:9, 42:4,
62:10, 90:25,
97:1, 102:2,
102:9, 114:9,
119:4, 153:15,
159:11, 167:14,
181:10, 217:7
**accessed**
42:5, 155:19
**accessible**
183:20
**accessing**
80:11, 102:22,
103:11, 154:22,
155:5, 158:4
**accomplish**
223:3
**accordance**
211:2
**according**
233:16
**account**
35:11, 139:9,

170:18, 211:9,
228:25, 229:6,
229:24, 232:8
**accounts**
228:16, 229:3
**accuracy**
273:6
**accurate**
11:4, 17:21,
33:21, 68:17,
69:2, 69:25,
70:8, 96:4,
96:14, 97:17,
260:3, 264:20,
265:21, 268:6,
272:13
**accurately**
37:23, 41:1,
70:14
**acquired**
16:21, 17:17,
25:25, 27:20,
35:22, 35:23,
47:17, 188:22
**acquiring**
89:6
**acquisition**
16:21, 19:24,
21:5, 188:11
**acquisitions**
192:19, 193:17,
193:19
**acronym**
225:18
**action**
195:23, 208:14
**active**
192:6, 259:17
**activity**
193:21, 193:24
**actual**
70:12, 95:10,
95:19, 96:16,
169:17, 184:18,
184:19, 185:2,
190:17, 232:23,
266:22, 272:1
**actually**
64:23, 65:8,

77:10, 114:13,
131:3, 139:23,
163:18, 164:18,
182:11, 193:1,
203:6, 209:9,
232:14, 268:7,
269:10
**add**
8:23, 236:14,
247:8
**addition**
182:6, 236:23
**address**
9:25, 10:4,
10:6, 10:7,
129:1, 251:18
**addressed**
53:15, 198:13
**adds**
238:17
**adjudicated**
77:14, 178:23,
185:9, 225:8,
227:3, 279:24
**adjudicates**
252:12
**adjudicating**
218:18, 219:19
**adjudication**
215:8, 215:15,
216:22, 220:19
**administer**
20:2, 20:17,
21:9, 22:14,
44:20, 45:14,
65:2, 169:14,
188:4
**administered**
17:14, 77:19,
181:19
**administering**
47:5, 47:8,
172:15, 173:13
**administration**
29:24
**administrative**
54:4
**administrator**
187:13, 211:14,

214:17, 216:8,
216:23, 218:3,
219:14, 220:17,
222:10, 223:18,
232:22
**administrator"**
211:15
**advancing**
250:25
**advantage**
19:9, 20:1
**advisable**
248:4
**advised**
21:17
**affect**
86:12, 94:15,
94:21, 94:24
**affected**
88:1, 89:13
**affects**
254:7
**affiliate**
191:21, 193:10
**affirmation**
238:6
**affirmative**
98:6, 207:22,
278:5
**affirmatively**
97:22, 106:9,
197:6, 281:3,
281:8, 281:20,
281:25
**affixed**
286:17
**after**
12:14, 12:16,
35:19, 81:12,
84:15, 127:6,
138:3, 198:21,
237:16, 238:17,
240:6, 284:16
**afternoon**
147:12, 147:13,
174:20, 233:21,
233:25
**again**
19:18, 21:5,

43:10, 60:23,
62:18, 65:24,
67:21, 68:13,
79:5, 81:11,
86:10, 89:2,
90:23, 103:5,
104:15, 111:17,
126:2, 126:23,
126:24, 129:16,
137:2, 162:7,
169:16, 170:17,
188:24, 188:25,
203:20, 235:21,
265:14, 282:9
**against**
41:19
**age**
149:18, 149:25,
150:5, 159:8,
159:9, 164:8
**ago**
9:15, 9:21,
15:15, 170:1,
228:10, 259:14
**agree**
54:21, 62:12,
75:8, 75:9,
88:11, 89:7,
100:5, 120:19,
121:3, 121:8,
151:5, 153:7,
154:7, 155:25,
159:19, 176:19,
177:6, 177:10,
177:16, 177:17,
178:5, 178:7,
178:24, 180:16,
180:20, 185:23,
187:23, 207:23,
208:12, 217:3,
217:4, 217:9,
217:10, 218:24,
223:17, 226:6,
234:16, 235:18,
237:17, 246:1,
246:2, 246:5,
250:7, 250:10,
251:21, 252:1,

257:19, 283:23,
284:7, 284:8,
284:15
**agreed**
44:22, 122:2,
123:1, 211:13,
241:6, 241:7,
284:14
**agreed-in**
36:19
**agreeing**
74:3
**agreement"**
83:15
**agreement's**
87:10, 90:18,
98:13, 106:24,
197:3, 197:8,
198:18, 203:21
**agreement;**
81:20, 81:24,
224:20, 278:23
**agreements**
48:8, 48:9,
48:10, 48:12,
49:1, 49:4,
119:10, 222:20
**agreements;**
220:23
**ahead**
24:14, 50:23,
243:3
**aid**
234:14
**al**
1:4, 7:9
**all-encompassing**
164:23
**allegation**
226:25, 227:5,
250:17, 251:5,
251:8, 251:18
**allegations**
250:24
**alleged**
200:2, 200:10,
200:18
**allies**
28:25, 32:7,

39:4, 39:7,
39:20, 41:10,
181:20, 183:21
**allow**
10:12, 42:24,
43:9, 273:24
**allowed**
8:20, 66:12,
66:17, 166:15
**allowing**
221:11
**alone**
144:17, 268:8,
271:7
**along**
148:11, 148:16,
148:23, 251:25,
257:4
**already**
29:1, 53:6,
72:6, 125:23,
126:21, 135:1,
247:6, 247:18,
254:10
**also**
4:11, 25:20,
26:5, 26:21,
37:3, 99:20,
113:3, 165:20,
178:1, 180:12,
198:22, 206:22,
210:5, 225:22,
234:13, 243:13,
262:9
**alteration**
135:12, 136:8,
136:14
**although**
207:3
**always**
93:18
**ambiguity**
204:5
**amended**
108:11, 108:21
**amendment**
5:20, 49:18,
114:25, 115:7,

115:13, 115:15,
117:17, 117:23
**amendments**
49:17, 49:20,
49:22
**among**
278:9
**amongst**
216:24
**amount**
56:14, 76:24,
77:1, 176:5,
182:1, 185:3,
214:23, 215:4,
215:6, 215:12,
215:14, 215:24,
216:23, 218:12,
218:17, 220:17,
221:5, 221:9,
252:24, 253:1
**amounts**
145:7, 210:21,
210:25, 213:18,
213:24, 214:2,
214:5, 215:22,
216:14, 218:5,
263:9
**amounts'**
210:24
**analogy**
269:5
**analyses**
146:9, 146:18
**analysis**
96:8, 96:16,
265:11, 279:23
**analytics**
264:24, 265:10,
265:13, 266:18,
267:1, 279:11,
279:16, 279:22,
280:1, 280:4
**ancillaries**
18:4
**ancillary**
18:1, 28:3,
28:8, 30:18
**ancillary"**
28:11

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

75

annual
57:12, 58:2,
62:13, 67:11,
67:13, 68:23,
74:4, 76:14,
76:21, 77:3
another
35:21, 131:4,
179:3, 207:16,
218:9, 223:10,
225:13, 229:5,
267:2
another;
252:5
answer
10:13, 10:21,
10:25, 16:9,
17:21, 21:16,
21:17, 21:18,
33:21, 37:19,
60:1, 63:24,
65:9, 66:6,
66:9, 69:14,
69:17, 70:4,
70:14, 91:11,
93:1, 95:13,
103:17, 103:19,
103:21, 104:1,
104:4, 104:19,
122:20, 123:8,
123:9, 138:19,
138:23, 144:8,
145:2, 154:20,
155:4, 158:2,
162:22, 167:11,
170:19, 205:1,
223:22, 225:12,
229:14, 242:16,
256:24, 261:4,
264:2, 264:7,
268:1, 272:10,
280:17, 282:25
answer's
102:15
answered
72:6, 170:22
answering
77:21, 242:7,

254:19, 271:20
answers
19:8, 87:22,
89:16, 139:1,
179:11, 240:3,
265:4
any";
284:17
anybody
13:7, 13:11,
13:18, 13:22,
37:25, 40:17,
52:24, 64:13,
106:4, 106:19,
114:8, 127:17,
137:10, 138:23,
146:8
anyone
60:16, 107:9
anyone;
183:24
anything
12:10, 15:25,
16:3, 31:18,
41:25, 55:25,
63:15, 73:13,
119:9, 119:12,
159:15, 163:9,
171:15, 171:25,
207:7, 267:10
apart
196:18, 204:22
apologize
43:20, 141:13,
150:24, 233:19,
233:23, 277:19
apparently
237:22, 238:13
appear
131:18, 237:14,
245:17, 245:22,
284:12, 284:16
appear;
284:7
appeared
273:19
appearing
246:15

appears
114:25, 117:21,
230:14, 233:18,
234:15, 234:18,
237:8, 238:10,
239:16, 241:1,
241:21, 242:15,
246:6, 278:14
applicable
80:21, 98:14,
99:17, 106:24,
120:12, 121:4,
149:9, 197:9,
198:19, 203:22,
204:1, 204:10,
214:2, 214:5,
235:12, 236:3,
236:20, 237:4,
240:18, 242:11,
249:21, 275:25,
277:8
applicable"
98:20, 98:21,
99:18
applied
206:9
applies
53:22, 72:2,
75:25, 170:23
apply
71:13, 105:19,
210:6, 220:20
appreciate
70:20, 285:21
approach
206:9, 265:17
approach"
206:7
appropriate
137:15, 138:14
appropriately
240:5
approximate
252:23
approximately
9:15, 17:20,
31:13, 35:25,
57:11, 112:20,

180:25, 188:15,
193:5, 212:10,
259:11
approximation
212:13
area
34:24
aren't
64:3, 256:17
arena
34:4, 34:6
arguably
141:21, 221:23,
222:1
argument
204:6, 251:14,
282:22
around
23:2, 30:9,
39:18, 75:21,
87:23, 124:25,
163:14, 186:13,
188:3, 202:20,
207:24
around;
253:6
art
62:25, 63:2
aside
192:19, 192:21,
268:5
asked
15:13, 19:17,
40:9, 47:19,
68:12, 72:16,
118:17, 121:21,
122:23, 123:23,
144:21, 170:22,
172:24, 224:9,
230:19, 236:9,
244:9, 246:19,
247:5, 252:7,
252:14, 253:9,
255:17, 257:4,
259:4, 269:22,
270:2, 274:9,
275:4, 275:18,
279:9, 280:8,

280:11, 280:20,
280:21, 280:22,
280:24, 280:25,
283:4
**asking**
24:16, 25:6,
25:7, 25:10,
28:11, 43:1,
61:24, 73:6,
74:6, 76:17,
76:18, 84:16,
90:6, 101:11,
104:20, 104:21,
108:19, 124:15,
124:17, 137:20,
137:22, 149:14,
161:12, 168:20,
176:11, 203:25,
231:12, 240:23,
244:8, 250:12,
254:11, 254:17,
256:12, 256:22
**asks**
241:2
**aspect**
205:5, 205:11
**assisted**
35:1, 35:5
**associated**
38:22, 57:18,
58:6, 252:8,
252:21
**assume**
10:22, 45:20,
90:6, 119:17,
144:22, 144:25,
172:6, 172:14,
173:12, 182:22,
186:12, 220:15
**assuming**
65:6, 155:2,
155:5
**assumption**
81:11, 81:12,
81:14, 110:3,
116:19, 119:19,
119:21, 145:3,
145:6, 161:16,

169:13
**asterisk**
110:19
**at;**
239:22
**attached**
5:9, 6:2, 7:3,
46:14, 107:17,
114:19, 117:22,
118:8, 127:11,
130:7, 132:19,
175:25, 231:21,
233:15, 234:2,
234:14, 234:21,
239:7, 241:13,
244:18, 244:25
**attachment**
5:23, 6:14,
6:17, 230:8,
230:11, 234:20,
237:9, 244:21,
245:15
**attachments**
234:10, 234:20
**attachments"**
233:16
**attempt**
135:13, 136:14
**attended**
259:19
**attention**
265:25
**attorney**
13:8, 259:3
**attorney-client**
8:21
**audit**
224:3, 271:16,
271:24, 271:25,
280:25
**auditor**
222:10, 222:15
**audits**
224:1
**authority**
59:11, 60:11,
60:17
**authorized**
60:2

**automatically**
97:2
**available**
54:5, 164:13,
216:8, 243:11
**avenue**
167:18, 167:20
**aware**
32:16, 37:9,
37:20, 52:19,
58:10, 60:22,
61:22, 62:4,
66:19, 67:19,
77:12, 85:20,
86:6, 86:10,
86:25, 95:20,
95:21, 95:23,
96:1, 96:16,
100:8, 100:12,
114:15, 127:4,
159:7, 160:25,
161:7, 188:11,
200:5, 200:8,
200:16, 227:25,
238:23, 239:3,
255:19, 256:7,
265:24, 280:1,
280:4, 281:5
**awareness**
60:22, 61:9,
77:17
**away**
192:15, 192:22
**awp**
112:4, 112:9

---
**B**
---

**b)**
115:19, 115:24
**b) (6)**
285:11
**back**
9:20, 11:9,
16:18, 23:21,
24:25, 33:20,
41:2, 59:25,
66:5, 71:4,
71:21, 84:18,

87:21, 98:21,
103:7, 113:20,
126:4, 131:11,
132:22, 135:6,
147:10, 149:2,
150:21, 162:7,
167:17, 173:6,
174:18, 198:22,
199:7, 199:11,
207:14, 215:21,
219:22, 219:23,
220:14, 231:24,
233:2, 237:23,
238:13, 245:2,
246:24, 249:3,
250:5, 254:9,
265:3, 265:15,
273:25, 275:9,
276:9, 285:14
**backed**
69:18
**background**
11:13, 16:13,
21:20, 176:12,
186:23
**bad**
68:12
**band**
255:6
**base**
68:8, 68:10,
95:8, 95:17,
96:20, 202:20
**based**
22:1, 22:5,
60:18, 60:19,
61:9, 65:20,
66:10, 67:10,
81:14, 86:11,
87:7, 89:19,
90:25, 91:20,
92:20, 99:12,
108:23, 109:22,
112:14, 112:15,
125:21, 133:24,
136:25, 137:4,
139:12, 164:12,
170:25, 172:8,

184:23, 196:25,
199:3, 206:16,
218:24, 221:2,
226:6, 227:10,
237:18, 242:15,
245:9, 250:9,
255:14, 262:5,
268:7, 273:19,
279:10, 281:11,
282:2

**baseline**
139:25, 140:2,
140:9

**basically**
11:12, 19:3,
23:7, 30:5,
44:22, 55:5,
89:22, 90:5,
187:13, 190:18,
191:11, 199:20,
215:21, 247:23

**basing**
95:9, 95:18

**basis**
57:12, 60:22,
62:16, 63:10,
67:11, 76:1,
77:17, 139:12,
182:1, 193:16,
200:2, 200:11,
200:18, 206:25,
208:12, 226:16,
227:21, 228:1

**bates**
117:19

**bates-numbered**
235:2

**bear**
153:10, 167:13

**became**
195:8, 195:9

**because**
22:17, 22:21,
23:12, 24:9,
24:13, 24:15,
32:16, 33:22,
37:9, 37:21,
41:1, 42:4,

47:7, 50:17,
50:19, 52:20,
55:15, 69:14,
80:11, 87:2,
88:18, 89:22,
90:14, 97:10,
110:4, 112:3,
116:15, 127:1,
132:22, 135:24,
136:9, 142:23,
144:9, 144:12,
144:17, 145:3,
153:5, 153:11,
154:21, 155:18,
156:17, 157:1,
157:17, 157:21,
157:24, 157:25,
158:4, 158:5,
160:4, 163:24,
164:8, 167:15,
169:10, 170:20,
172:9, 178:18,
180:6, 180:13,
184:23, 201:24,
202:8, 212:4,
214:17, 224:18,
226:18, 227:20,
229:11, 229:23,
231:17, 242:25,
243:17, 251:16,
251:19, 255:1,
255:13, 263:9,
264:10, 264:22,
265:25, 266:4,
266:25, 268:13,
282:8, 283:4

**become**
36:2, 75:10,
124:20

**becomes**
124:19, 184:20

**been**
9:4, 13:10,
22:6, 36:7,
39:17, 39:18,
42:6, 42:23,
43:8, 43:22,
46:18, 50:16,

66:1, 70:22,
96:11, 120:20,
126:5, 144:2,
146:24, 158:5,
168:11, 169:3,
182:25, 190:2,
191:19, 193:13,
199:25, 209:24,
210:1, 219:8,
219:9, 226:25,
228:15, 228:16,
229:6, 229:7,
229:20, 231:18,
235:11, 237:10,
237:22, 239:22,
241:4, 243:7,
243:10, 245:16,
246:11, 246:22,
251:4, 251:24,
272:3

**before**
2:13, 8:18,
9:8, 12:15,
14:5, 47:19,
48:17, 84:18,
120:8, 127:20,
130:9, 139:21,
175:2, 176:7,
176:9, 194:11,
194:23, 199:5,
202:24, 224:15,
245:7, 247:15,
270:7, 276:25,
277:6, 286:6

**began**
31:13, 32:18,
35:19, 238:13,
273:20, 274:8,
275:22

**beginning**
13:1, 34:10,
105:11, 120:21,
123:22, 129:21,
194:8, 246:24,
277:24

**begins**
7:7

**behalf**
3:3, 3:12, 4:3,

7:22, 7:24,
18:3, 44:17,
182:11, 220:1,
267:3

**behind**
118:11, 119:3,
181:17, 196:2,
196:20, 196:21

**behoove**
207:8

**being**
16:22, 18:4,
83:6, 87:18,
93:7, 121:19,
126:23, 128:2,
135:14, 140:3,
140:10, 140:14,
144:7, 148:22,
151:17, 152:22,
160:2, 161:22,
167:24, 173:20,
195:5, 208:9,
211:15, 214:6,
214:18, 220:9,
224:25, 233:20,
233:23, 236:14,
237:3, 262:8,
266:2, 266:23,
282:11

**belief**
177:19

**believe**
11:21, 11:23,
15:20, 20:25,
21:3, 26:25,
32:24, 42:5,
42:12, 48:2,
48:6, 51:6,
57:2, 58:19,
59:10, 65:24,
67:9, 67:13,
72:6, 73:24,
76:20, 77:4,
80:25, 88:18,
94:23, 96:15,
99:5, 113:10,
114:7, 115:15,
117:6, 119:7,

126:15, 129:16,
136:16, 139:17,
140:18, 160:23,
171:17, 173:25,
181:2, 181:24,
186:10, 191:21,
193:19, 195:2,
197:25, 198:9,
201:19, 208:19,
209:10, 210:3,
225:7, 245:14,
253:11, 255:13,
256:6, 257:12,
259:15, 262:21,
265:23, 266:19,
273:4
**believed**
136:25, 137:4,
137:14, 226:8
**below**
240:3, 241:20
**beneficiaries**
26:2, 27:12,
61:7, 95:5,
116:7, 141:17,
141:25, 142:2,
143:25, 145:15,
145:23, 148:2,
149:3, 151:20,
152:7, 153:5
**beneficiary**
143:7, 153:21,
157:13, 158:17,
166:4, 173:21,
178:22, 243:11,
269:11, 269:23,
270:4, 272:18
**benefit"**
18:23, 18:25
**benefit;**
148:9, 185:5
**benefits**
17:10, 18:8,
18:10, 25:12,
26:20, 27:11,
27:24, 28:2,
30:10, 37:15,
42:7, 47:6,

47:8, 78:15,
80:12, 80:15,
91:1, 147:20,
150:9, 154:22,
167:22, 174:2,
180:1, 180:7,
180:8, 181:10,
181:12, 181:17,
181:19, 182:5,
182:6, 183:19,
187:12, 187:16,
187:20, 188:5,
211:11, 223:10
**besides**
61:1, 129:8,
203:3
**best**
31:8, 171:19,
226:20, 228:3,
229:15, 272:2,
272:5
**better**
229:3, 240:4
**between**
5:16, 5:18,
5:21, 6:9,
15:20, 17:4,
25:11, 31:11,
39:23, 47:1,
48:13, 50:12,
51:14, 52:16,
84:5, 96:24,
104:16, 107:21,
115:2, 127:24,
128:3, 145:20,
145:25, 157:22,
159:14, 165:14,
189:24, 210:9,
236:12, 246:23,
247:6, 247:19,
250:3, 250:5,
250:6, 251:19,
255:20, 258:4,
258:14, 279:20
**beyond**
34:22, 84:9,
280:15
**bigger**
45:7, 52:7,

194:17, 194:25,
195:2, 195:4
**bigger"**
194:18
**biggest**
147:21, 195:9,
195:12
**billed**
73:25, 88:19,
282:10
**billion**
57:11
**bills**
76:5
**bin**
215:17, 217:11
**binding**
128:5, 128:7,
134:21
**bit**
61:3, 72:11,
152:17, 174:11,
186:23, 194:12,
218:22, 268:19
**blue**
30:2, 30:23,
31:12, 32:9,
38:6, 44:8
**board**
85:17
**body**
255:6
**boilerplate**
233:12, 234:3,
240:2
**book**
190:19
**books**
40:5
**borowski**
82:8
**boss**
13:14
**both**
27:9, 83:16,
85:8, 108:12,
108:22, 132:2,
153:13, 209:21,

209:22, 220:20
**bottom**
235:2, 241:16
**bought**
39:19
**boundaries**
145:4
**bracketed**
196:12
**branched**
229:2
**brand**
44:16, 160:19
**branded**
189:7
**break**
10:23, 10:25,
34:18, 70:16,
70:19, 105:5,
147:1, 147:2,
204:22, 205:2,
218:21, 238:3,
244:7, 244:9,
248:8, 248:13
**breakdown**
97:5, 214:21
**breaking**
66:3
**briefly**
8:13
**bringing**
49:22
**brings**
100:2
**broad**
20:6, 34:23,
53:14, 278:12
**broadly**
78:19, 78:22
**broke**
194:11
**broker**
265:2, 265:15
**brought**
41:20, 165:10,
265:25
**bubble**
245:25, 246:17

build
212:25
building
28:2, 47:11
built
126:6
bureau
46:9
business
17:8, 48:5,
48:12, 56:11,
56:14, 64:25,
87:8, 90:12,
131:5, 187:9,
189:25, 190:1,
190:19, 191:18,
197:1, 199:3,
199:6, 199:10,
199:25, 200:20,
207:18, 210:11,
222:13, 259:23,
280:16
businesses
189:5
busy
217:10
buy
22:25, 94:7,
171:18
buying
25:4, 193:22
by:
1:24

**C**

ca-
4:7
calculate
217:2, 269:23
calculated
110:20, 212:19
calculates
215:6, 215:14,
216:23
calculation
270:3, 270:7
california
1:2, 4:8, 7:11

call
20:4, 33:25,
55:5, 119:11,
178:4, 187:17,
187:20, 191:21,
193:24, 223:15,
224:2
called
17:1, 58:12,
108:5, 172:23,
177:9, 180:2,
184:24, 188:20,
189:13, 191:3,
217:18, 278:9
calling
190:2, 224:4
came
16:18, 16:20,
22:17, 59:19,
188:16, 202:7
can't
11:3, 33:4,
40:25, 41:1,
41:2, 50:22,
86:20, 89:12,
92:22, 97:16,
112:13, 112:25,
120:1, 126:3,
137:12, 144:8,
144:25, 145:2,
145:3, 161:25,
179:25, 228:13,
257:13
cancer
126:7
cannot
60:5, 108:21,
136:5, 159:16,
207:15
capacity
8:17, 9:10
capitation
125:16
capturing
202:11
card
18:10, 18:14,
18:17, 19:1,

19:2, 19:21,
38:23, 39:4,
51:10, 52:21,
71:12, 71:18,
71:19, 72:1,
75:24, 105:17,
120:17, 120:19,
121:9, 121:22,
122:24, 160:19,
161:6, 161:11,
161:18, 161:19,
162:1, 164:16,
167:18, 171:24,
171:25, 177:5,
178:5, 181:16,
203:14, 203:15,
208:15, 209:11,
236:15, 236:24,
238:25, 249:21,
276:20, 277:17,
278:19, 283:16,
283:20, 284:6,
284:11
card;
178:2
cards"
283:21
care
31:19, 191:6,
191:24, 192:2,
192:4, 210:10
career
29:3, 29:6,
29:8, 32:5,
42:22, 43:7
carefully
157:5
caremark
6:9, 195:14
carrie
82:8
carried
64:24
carry
127:24
case
1:6, 7:11,
8:19, 14:5,

38:2, 43:22,
152:25, 195:20,
211:10, 211:13,
214:17, 223:9,
227:1, 227:5,
250:18, 254:22,
258:25, 260:6,
281:6, 281:18,
281:23, 286:14
cases
180:15
cash-paying
153:12, 154:21,
163:25, 177:10,
196:10, 249:19,
263:7, 264:11
catalyst
193:1
catamaran
15:10, 16:20,
29:12, 30:25,
31:2, 31:3,
31:14, 31:22,
32:19, 34:10,
35:18, 35:19,
35:20, 36:10,
46:10, 47:1,
47:15, 48:4,
48:8, 63:25,
64:1, 64:5,
64:8, 109:18,
109:19, 119:10,
128:9, 128:19,
132:3, 133:12,
191:18, 192:25,
193:7, 193:9,
193:17, 193:20,
193:22, 194:14,
195:5, 199:19,
206:21, 218:15,
220:13, 220:21,
221:2, 228:21,
228:22, 249:7,
250:4, 255:8,
255:21, 260:10,
267:6, 267:7
catamaran's
222:21

categories
34:23, 45:23,
256:22
categorized
146:9
category
278:9
category;
278:12
cater
28:4
causing
184:13
caveat
188:10
center
126:8
centers
28:14, 210:10
ceo
201:21
certain
82:25, 111:14,
135:25, 139:10,
149:17, 182:1,
222:14, 231:1,
247:23, 255:3,
255:19, 273:17
certainly
170:4, 173:3,
247:21
certificate
286:1
certification
195:20
certified
2:14, 2:15,
8:2, 286:3
certify
195:23, 286:8
cetera
17:12, 22:20,
41:9, 41:16,
48:5, 62:22,
74:21, 99:21,
127:2, 144:20,
160:16, 160:20,
203:6, 208:16,

213:2, 229:22,
233:6, 247:23
chain
5:23, 6:14,
6:15, 6:16,
6:17, 34:21,
34:22, 34:24,
50:18, 50:24,
51:11, 131:12,
161:19, 206:8,
206:10, 239:11,
241:14, 241:16,
281:2
chains
34:13, 50:11,
52:1, 52:3,
52:4, 52:15,
52:20, 54:6,
60:24, 112:19,
113:23, 129:3,
129:11, 160:15,
164:25
chance
176:4
change
59:11, 73:7,
73:15, 73:16,
83:6, 83:7,
119:17, 122:2,
123:1, 123:23,
124:11, 124:21,
124:23, 125:3,
125:19, 125:21,
125:24, 126:20,
127:3, 135:14,
136:22, 194:3,
198:21, 245:24,
246:16, 278:23
changed
82:23, 87:16,
139:4, 207:8,
264:12
changes
81:24, 118:17,
119:22, 124:19,
127:1, 129:10,
134:20, 232:24
charge
36:18, 43:11,

72:19, 73:4,
75:1, 79:15,
91:21, 93:3,
93:10, 97:3,
115:19, 116:1,
135:14, 151:13,
156:17, 185:11,
208:20, 221:11,
225:1, 225:9,
226:7, 226:15,
239:22, 240:7,
249:19
charge"
72:2, 73:21,
82:20, 120:6,
234:24, 235:7,
236:2, 274:10,
274:17, 284:12
charge";
230:16, 278:17
charge'
71:13, 75:25,
83:14, 105:19,
196:9
charge;
225:24
charged
78:6, 78:9,
79:1, 79:6,
80:19, 86:13,
92:2, 92:4,
102:10, 102:19,
151:2, 151:21,
152:10, 155:20,
155:21, 157:9,
158:10, 185:4,
207:21, 208:22,
226:13, 262:9,
266:23, 268:8
charges
36:22, 92:24,
115:24
charging
104:17, 156:5,
156:8, 179:18,
267:23
charley
113:13

check
64:19, 229:12
checker
161:19
checks
65:7, 65:10
choose
22:24, 42:6,
74:18, 212:21,
213:8
chose
42:8
chosen
211:18, 211:19
chris
233:19
christopher
1:4, 230:5,
231:23, 232:2,
232:5, 239:14,
244:20, 244:24,
245:12
chronic
188:2
chuck
165:3
cigna
25:18, 25:19,
25:24, 26:1,
26:18, 26:21,
27:11, 27:18,
27:21, 27:22,
28:16, 29:17,
30:1, 32:9,
38:6, 44:7,
45:15
cigna;
25:16
circumstance
140:18, 279:12
circumstances
69:6, 69:13,
75:20, 87:23,
105:2, 128:21,
253:23, 255:2
citizen
99:21, 120:13,
121:5, 149:11,

149:16, 150:11,
151:2, 151:14,
151:19, 152:3,
152:14, 152:18,
152:22, 153:15,
153:19, 155:23,
156:9, 157:10,
157:24, 158:7,
159:4, 159:7,
159:12, 159:21,
160:4, 164:8,
235:13, 236:21,
237:5, 240:20,
242:13, 243:6,
276:1, 277:9
**citizens**
150:6
**citizens'**
80:22
**claim**
135:13, 136:15,
178:8, 178:21,
178:24, 185:9,
219:19, 222:13,
222:15, 222:16,
223:20, 224:12,
224:25, 225:8,
225:10, 225:14,
225:15, 225:23,
255:4, 255:6
**claim"**
224:14, 224:18,
225:14
**claim-processing**
225:1, 226:7,
226:15
**claims**
54:17, 76:5,
77:14, 83:19,
85:10, 213:25,
220:19, 224:24,
225:7, 227:3,
252:12
**clarification**
11:17, 82:12,
94:17, 117:23,
124:25, 183:12,
200:14

**clarify**
21:19, 40:12,
57:21, 78:12,
78:17, 81:19,
87:4, 116:12,
116:23, 121:13,
122:5, 162:17,
173:4, 261:15
**clarifying**
111:10, 144:4
**clarity**
235:1
**class**
195:20, 195:23
**clause**
108:5, 120:20,
123:6, 135:19,
235:10
**clauses**
110:16
**clean**
222:16, 224:12,
224:14, 224:18,
224:25, 225:7
**clear**
21:25, 161:12,
162:7, 176:18,
183:3, 252:10,
282:17
**clearer**
10:19
**clearly**
121:22, 122:24
**client**
37:7, 37:21,
44:22, 45:8,
45:12, 45:13,
141:21, 148:12,
148:24, 166:3,
166:4, 166:18,
167:5, 167:25,
168:1, 168:2,
168:3, 168:17,
169:1, 169:2,
169:4, 169:5,
169:12, 169:13,
169:18, 170:10,
170:18, 170:21,

**client**
171:2, 176:2,
211:23, 211:24
**client's**
86:13, 169:10
**client;**
148:16
**clients**
26:3, 27:12,
37:12, 37:15,
45:1, 61:6,
86:8, 140:21,
141:17, 141:19,
141:20, 143:6,
144:1, 145:23,
148:2, 151:20,
167:22, 172:25,
212:15, 212:16,
258:13
**clients'**
95:4, 141:25,
143:6, 145:15,
148:3, 152:6,
153:5
**clock**
231:17
**close**
40:23, 212:14
**closest**
39:3
**club**
38:16, 39:8,
39:9, 39:12,
40:14, 40:22,
50:17, 51:8,
51:14, 52:16,
59:17, 74:2,
74:8, 74:11,
74:16, 74:25,
75:11, 76:10,
77:2, 102:24,
103:13, 209:8,
243:14, 262:19
**club"**
39:22
**club;**
75:18
**clubs**
38:8, 38:13,

41:16, 50:11,
74:18, 100:10,
100:14, 192:7
**clubs"**
38:14
**co-insurance**
210:24
**co-pay**
111:12, 113:4,
116:8, 142:4,
143:6, 145:16,
145:25, 147:24,
153:6, 154:10,
155:13, 214:23,
215:5, 221:15,
221:18
**co-pay;**
151:21, 157:13
**co-payment**
111:3, 111:22,
112:8, 112:9,
116:3, 116:16,
211:19, 213:9,
213:10, 215:13,
216:23, 218:12,
218:17, 219:3,
219:20, 220:4,
220:17, 221:5,
221:9, 221:12
**co-payments**
212:19, 217:2
**co-pays**
140:22, 152:7,
210:24, 213:6
**code**
34:21
**codified**
246:22
**coinsurance**
214:24
**collect**
210:25, 214:4,
218:5, 218:12,
218:17, 219:2,
219:4, 220:3,
220:5, 220:16,
220:18, 221:5,
221:9, 221:15

collection
200:10
college
40:6
color
241:21
combination
193:1
combine
180:7
combined
36:20, 180:4,
188:16, 195:9
come
56:23, 212:21,
247:21, 280:5
comes
41:7, 116:25,
138:3, 237:16,
269:10
comfortable
200:19
coming
60:1, 68:22,
285:14
comment
203:8, 245:25,
246:17
comments
10:15, 207:14,
234:4
commercial
27:14, 30:8,
45:12, 190:18,
211:8
commingled
151:17
commission
286:20
committee
55:6, 56:5
communicate
214:1, 214:18
communicated
217:5, 218:3,
218:12
communicating
175:10

communication
257:5, 258:12
communications
231:6, 257:14,
258:19
community
190:17
comp
192:1
companies
45:19, 172:15,
173:13
companies;
127:25
company
35:21, 80:18,
82:18, 87:2,
87:9, 115:11,
115:19, 115:24,
133:22, 134:21,
137:9, 138:7,
186:20, 187:3,
187:18, 188:22,
189:3, 189:4,
189:5, 197:2,
197:24, 210:10,
210:25, 211:14,
214:1, 214:4,
214:18, 214:25,
215:24, 216:9,
217:21, 218:3,
218:5, 221:19,
223:9, 257:6
company"
187:22, 211:15,
257:6
company's
18:3, 111:3,
111:22, 116:1,
222:11, 255:9
company;
106:5, 107:10
compared
58:7, 226:21
comparing
123:17, 199:18
comparison
95:20, 229:22,

242:22
compensation
34:1, 46:9,
110:13, 115:18,
131:6, 169:15,
259:19
competent
173:1
complained
264:16, 265:6
complaining
279:10
complete
52:25, 62:11,
88:11, 89:7,
161:7
completed
122:20, 285:9
complied
108:3, 115:17,
209:15, 210:17,
216:3, 222:6,
224:11, 239:10,
284:10
component
189:25, 190:1,
191:20, 192:15,
212:4
comprehensive
54:13
computer)
241:21
concept
186:1, 186:6
concern
219:9
concerns
129:2, 227:15
conclude
282:4
concluded
279:23
conclusion
101:14, 280:5
conclusive
101:9, 101:22
conditions
62:13, 74:4,

74:17, 74:20,
75:8, 88:12,
88:24, 89:8,
127:1, 128:6,
161:11, 163:10,
163:12, 165:21,
169:3, 170:21,
211:2
conducted
112:19
confer
285:13
conferred
285:8
confidential
117:7, 167:15
confirm
112:13, 112:25,
120:1, 137:12,
137:22, 272:11
conflate
189:12
conflict
133:20, 134:5,
134:6, 134:20,
135:20, 136:9,
136:11, 136:17
conflicts
136:4
confuse
178:19, 263:9
confused
152:16, 153:11,
233:5
confusing
142:8
conglomeration
193:18
conjunction
50:4, 144:15,
179:25, 207:16,
211:23, 280:25
connection
175:7, 175:11
connelly
7:22
connolly
3:15, 174:23

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    83

consider
39:7, 64:15,
76:9, 80:8,
97:21, 101:21,
106:8, 151:7,
197:6, 199:12,
200:21, 203:15,
206:22, 249:24,
255:8, 262:2
consideration
99:13, 101:19
considered
80:6, 135:15,
224:25, 263:6
considering
194:18
consistent
12:13, 81:8,
81:13, 102:15,
103:17, 112:24,
116:6, 139:1,
185:20, 205:19,
206:7, 206:9,
236:25, 243:23,
250:4
consistently
178:14, 251:24
consolidate
55:4, 281:14
consolidated
43:24, 44:6
consolidation
193:13, 193:25
constructing
202:20
consult
49:14, 167:19
consulting
31:16, 211:25
contact
38:1, 222:11
contacting
223:18
contacts
29:18, 30:20
contacts"
29:21
contained
196:1

content
11:13, 13:17,
13:21, 15:21,
48:20
contested
33:22
context
19:8, 223:25,
245:9, 253:12,
282:24
continue
27:10
continuing
54:25, 68:10,
75:7, 89:11,
90:23, 101:14,
104:12, 110:24,
135:3, 173:18,
180:20, 191:15,
227:9, 257:2,
258:8, 271:23
contract
18:2, 21:8,
22:13, 30:6,
32:23, 34:25,
35:8, 35:10,
39:2, 39:23,
44:21, 46:11,
51:21, 56:13,
69:16, 70:6,
82:2, 82:21,
84:9, 84:15,
93:5, 93:12,
96:7, 98:24,
99:23, 106:14,
107:4, 107:12,
111:19, 113:1,
113:3, 124:8,
124:16, 125:2,
126:14, 128:2,
128:5, 131:21,
131:24, 131:25,
132:5, 132:7,
132:8, 132:14,
132:20, 133:10,
133:13, 133:14,
133:19, 133:23,
134:3, 134:9,

135:19, 135:20,
136:9, 136:13,
139:10, 139:14,
145:4, 152:19,
156:8, 163:23,
163:25, 169:6,
169:17, 170:25,
177:22, 205:6,
212:7, 226:16,
229:21, 234:3,
234:17, 235:10,
237:22, 238:12,
240:2, 250:3,
250:4, 250:6,
259:5, 275:23,
278:4, 280:14,
280:19
contract;
105:25, 133:25
contracted
24:15, 36:17,
54:3, 91:24,
92:7, 141:7,
141:18, 142:5,
142:22, 143:14,
144:16, 156:21,
158:22, 162:4,
269:7, 269:8,
269:16, 271:3,
272:17
contractor;
177:22
contracts
28:19, 28:22,
29:3, 29:11,
30:5, 34:9,
36:10, 36:11,
37:2, 37:7,
37:14, 37:21,
47:12, 50:1,
53:7, 53:19,
55:16, 56:19,
57:5, 57:19,
79:13, 109:15,
109:18, 112:11,
112:22, 113:11,
114:4, 125:14,
147:16, 168:3,

168:5, 168:21,
169:4, 209:23,
209:25, 232:21,
247:14, 251:19,
257:10, 267:8
contracts;
29:9
contractual
199:14, 200:22,
203:16, 208:10,
219:9, 219:10,
220:22, 221:4,
247:1, 257:8
contractually
219:2
contrast
135:20, 185:12
control
221:20, 232:25
controlling
44:1
controls
136:5
convenience
245:3
conversation
234:2
conversations
201:22, 201:25,
202:6, 202:12
copied
245:8
copy
8:24, 14:1,
14:7, 14:18,
15:5, 122:8,
132:23, 132:24,
248:20, 248:22,
248:23
copying
232:2
corcoran
1:4, 7:9
core
181:19
corner
108:2, 117:20,
235:3

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                        84

corporate
189:23, 194:12
corporation
44:2, 203:11
corporations
252:16
corrected
54:21, 219:24
correction
56:4
correctly
80:24, 197:11,
214:9, 216:18,
218:7, 222:16,
222:17, 242:5,
245:4
correctly:
196:25
cost
36:19
cost-sharing
210:21, 210:23,
213:17, 213:23,
214:2, 214:5,
216:14, 218:4
cost-sharing"
210:20
cost-sharing'
210:23
could
9:23, 13:25,
19:8, 20:3,
20:5, 20:9,
20:13, 22:25,
23:25, 24:1,
55:24, 57:23,
66:5, 71:20,
72:12, 73:17,
77:2, 79:3,
92:2, 95:3,
95:5, 95:7,
99:19, 100:2,
101:18, 102:9,
113:4, 116:11,
121:13, 121:14,
121:15, 121:17,
122:5, 122:10,
128:15, 129:1,

131:20, 131:21,
133:9, 148:3,
148:24, 150:20,
151:25, 158:24,
164:6, 167:19,
184:24, 190:5,
204:1, 206:6,
206:7, 209:12,
221:23, 222:1,
224:8, 226:7,
226:12, 240:2,
254:3, 259:5,
264:19, 265:8,
270:19, 271:16,
271:25, 272:11,
272:22
couldn't
37:23, 75:17,
119:4, 180:7
council
225:19
counsel
7:16, 8:24,
8:25, 9:1, 9:5,
10:11, 15:6,
16:10, 37:25,
38:1, 41:25,
48:21, 53:2,
53:5, 78:23,
119:14, 174:25,
175:6, 178:17,
179:11, 203:24,
228:6, 230:20,
231:12, 235:18,
236:9, 236:19,
250:11, 254:17,
255:18, 255:23,
256:12, 256:22,
261:1, 279:7,
283:4, 285:8,
285:9, 285:14,
286:13
counsel's
230:23
count
146:18, 194:19
counter
161:25, 162:1,

163:16
countersigned
132:25
country
52:7
county
286:5
couple
10:11, 11:15,
13:24, 63:5,
167:11, 180:21,
204:23, 209:7,
210:18, 221:13,
244:5, 279:5
coupon
165:9, 165:11
coupons
100:2, 120:17,
236:15, 236:23,
238:25, 249:21,
276:19, 277:16,
278:19
course
138:21, 199:16
courses
40:7
court
1:1, 7:10, 8:1,
8:6, 8:9, 10:14,
107:14, 118:5,
127:9, 130:2,
132:16, 166:14,
166:25, 195:22,
248:19, 248:25,
271:19, 271:22,
286:1
cover
118:3, 118:11,
118:12, 118:21,
119:13, 131:5,
246:4
coverage
22:19, 91:19,
92:13, 181:13,
181:23, 182:15,
211:20, 216:13
covered
34:22, 37:19,

39:19, 48:4,
59:2, 97:10,
97:12, 114:5,
115:18, 116:2,
116:7, 186:25,
194:22, 195:1,
211:1, 214:2,
214:6, 214:20,
216:10, 216:15,
217:18, 269:12,
272:15, 272:19
crc
286:5
created
84:5, 84:16
criteria
65:21, 66:11,
67:24, 68:15,
71:23, 73:9,
73:14, 74:14,
87:17, 88:1,
159:20, 165:23
cross
30:2, 30:23,
31:12, 32:9,
38:6, 44:8
cross-notice
6:12
cross-noticed
169:24, 176:3
cross-walk
156:24
crr
1:25, 286:4
csr
1:25, 286:4
current
49:1, 49:22,
54:10, 55:17,
176:10, 193:21,
202:21, 207:6
currently
44:12, 196:13
curriculum
5:15
curtail
169:25
curve
259:23

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    85

| | | | |
|---|---|---|---|
| **custom** | **customary"** | **customers** | **cvs-catamaran** |
| 24:12 | 32:22, 55:22, | 62:11, 64:25, | 249:15 |
| **customary** | 80:17, 257:22, | 68:22, 69:22, | **cvs-optum** |
| 16:1, 24:8, | 275:16, 283:18, | 71:23, 78:5, | 35:8, 224:19 |
| 33:7, 36:18, | 283:22, 284:4 | 78:9, 79:1, | **cvs;** |
| 43:11, 43:13, | **customary";** | 79:7, 93:22, | 92:10, 203:3, |
| 70:1, 71:13, | 81:9, 203:17 | 97:23, 106:10, | 233:9, 266:23, |
| 73:20, 75:25, | **customary'** | 145:9, 150:12, | 270:16 |
| 77:14, 79:9, | 197:4, 249:17 | 151:1, 151:14, | **cvsc-** |
| 79:15, 82:20, | **customer** | 152:4, 162:8, | 235:3 |
| 83:19, 91:21, | 24:16, 24:18, | 162:11, 162:18, | |
| 92:24, 93:9, | 24:22, 24:23, | 162:21, 163:1, | **D** |
| 93:16, 95:1, | 66:11, 66:16, | 164:13, 179:18, | **data** |
| 97:2, 105:19, | 67:11, 67:16, | 197:7, 262:19, | 42:23, 43:8, |
| 109:6, 111:23, | 67:17, 79:23, | 263:12, 267:18, | 53:12, 61:10, |
| 114:1, 116:4, | 80:20, 80:23, | 268:8 | 61:16, 61:20, |
| 116:15, 116:18, | 93:4, 97:13, | **customers"** | 61:22, 62:1, |
| 120:6, 136:12, | 102:1, 120:12, | 88:9 | 67:7, 68:10, |
| 143:3, 143:15, | 120:13, 121:4, | **customers;** | 70:13, 95:8, |
| 144:16, 157:7, | 121:5, 149:12, | 39:13 | 95:17, 95:20, |
| 158:3, 177:21, | 149:19, 150:12, | **customize** | 96:2, 96:13, |
| 178:23, 184:20, | 153:12, 153:18, | 22:23 | 96:15, 96:18, |
| 185:8, 185:20, | 153:21, 153:25, | **cut** | 97:8, 98:2, |
| 185:23, 196:9, | 154:2, 154:5, | 165:11 | 98:7, 114:10, |
| 199:14, 200:3, | 154:21, 155:14, | **cv** | 114:12, 116:22, |
| 200:13, 200:22, | 155:22, 156:3, | 15:6 | 125:22, 223:14, |
| 202:1, 202:16, | 157:10, 157:18, | **cvs"** | 264:19, 265:20, |
| 204:18, 205:6, | 157:19, 157:20, | 196:11, 196:16 | 265:24, 266:2, |
| 205:12, 206:24, | 157:21, 161:13, | **cvs'** | 266:3, 266:7, |
| 207:12, 208:11, | 163:20, 164:2, | 67:19, 69:15, | 266:8, 266:21, |
| 209:3, 225:24, | 164:4, 164:5, | 71:14, 73:2, | 272:7, 273:3, |
| 226:9, 227:13, | 164:10, 164:17, | 73:17, 96:2, | 280:9, 280:11, |
| 227:15, 230:16, | 164:19, 171:23, | 96:12, 100:17, | 280:23, 281:3, |
| 234:23, 235:6, | 172:16, 173:14, | 101:2, 105:19, | 281:4, 281:9, |
| 236:2, 239:21, | 176:24, 177:3, | 114:10, 116:21, | 281:21, 282:1, |
| 240:7, 247:8, | 177:10, 177:13, | 163:3, 177:21, | 282:2 |
| 248:2, 249:12, | 184:1, 184:9, | 178:22, 178:25, | **data;** |
| 250:1, 250:15, | 196:10, 208:15, | 180:15, 185:22, | 97:14, 97:17, |
| 250:20, 251:1, | 217:9, 235:12, | 202:4, 202:13, | 280:6 |
| 251:3, 251:11, | 235:13, 236:3, | 234:3, 240:1, | **date** |
| 251:15, 251:21, | 236:20, 236:21, | 240:4, 244:25, | 7:12, 15:9, |
| 252:4, 254:7, | 237:4, 237:5, | 246:4, 246:9, | 17:19, 31:8, |
| 254:24, 255:10, | 240:19, 242:12, | 250:18, 250:19, | 31:9, 41:2, |
| 257:9, 258:13, | 249:19, 253:19, | 250:25, 251:14, | 44:5, 46:19, |
| 260:15, 274:10, | 264:11, 276:2, | 252:3, 264:18, | 124:20, 132:10, |
| 274:16, 275:24, | 277:10 | 265:20, 280:6, | 132:23 |
| 278:5, 278:17, | **customer;** | 280:11, 282:5, | **dated** |
| 279:25, 284:12 | 263:7 | 282:12 | 139:14, 236:1, |

239:11, 239:13,
244:20
**dates**
237:18
**dating**
246:24
**day**
13:16, 16:7,
58:21, 59:3,
59:5, 59:7,
59:8, 59:11,
59:18, 59:21,
60:2, 60:6,
63:9, 68:25,
69:23, 85:4,
150:13, 179:1,
187:1, 194:2,
222:13, 224:6,
249:21, 261:5,
272:6, 281:22,
286:17
**day;**
179:5
**days**
285:14
**days'**
216:16
**dc**
3:9, 3:17
**deal**
37:11
**dealing**
28:17, 31:25
**deals**
93:7
**debbie**
118:13, 230:5,
232:2, 232:17,
233:9, 233:19,
239:14, 239:25,
242:16, 244:20,
244:24
**deborah**
232:3, 232:18,
232:21
**december**
1:13, 7:12,
8:20, 46:20,

48:3
**deceptive;**
261:22, 262:3
**decide**
125:19
**decision**
101:21, 102:11,
104:22, 125:21,
140:19, 146:1
**decisions**
86:12
**declarant**
285:10
**declarants**
12:7, 119:8
**declaration**
5:12, 8:16,
11:9, 12:15,
12:17, 13:18,
13:22, 14:12,
14:17, 29:2,
38:2, 42:11,
48:15, 48:21,
48:25, 49:15,
49:24, 50:4,
52:25, 53:11,
53:16, 53:17,
53:20, 71:8,
105:15, 122:7,
122:15, 122:17,
123:15, 124:5,
136:25, 137:4,
137:14, 149:7,
166:10, 166:19,
175:16, 185:22,
195:18, 195:22,
196:2, 196:13,
196:20, 197:18,
199:6, 202:25,
205:17, 207:17,
208:7, 210:1,
210:8, 246:20,
251:18, 254:5,
254:12, 254:14
**declaration;**
109:10, 117:10
**declarations**
11:20, 12:2,

12:11, 12:14,
53:9, 119:7
**deductible**
216:14
**deemed**
221:23
**defendant**
1:8, 7:23,
170:4, 174:25,
279:7
**defendant:**
3:12
**defense**
6:11, 8:24,
175:23, 175:24,
231:19, 231:20,
232:1, 236:13,
237:1, 237:10,
237:16, 239:5,
239:6, 240:22,
241:10, 241:12,
244:15, 244:17,
246:8
**defi-**
91:9
**define**
38:14, 50:22,
52:5, 56:17,
75:19, 169:19,
179:24
**defined**
23:10, 23:12,
32:23, 50:16,
71:20, 78:6,
78:7, 78:8,
78:23, 80:17,
117:18, 160:15,
224:19
**defines**
198:1
**defining**
40:4, 274:10,
278:4
**definitely**
192:24
**definition**
19:4, 28:12,
33:1, 33:6,

33:8, 33:13,
33:22, 34:2,
39:1, 39:21,
40:13, 40:18,
40:21, 40:24,
41:5, 41:12,
44:15, 55:18,
55:21, 71:13,
72:1, 73:3,
73:15, 73:20,
74:1, 74:10,
74:14, 74:24,
75:10, 75:24,
81:1, 81:5,
81:7, 81:8,
82:20, 82:23,
83:14, 87:10,
90:18, 93:15,
93:18, 98:20,
98:21, 98:22,
99:8, 99:9,
99:25, 105:18,
109:6, 109:9,
109:14, 109:23,
117:8, 117:9,
120:6, 126:14,
131:7, 131:15,
131:20, 133:9,
135:21, 136:1,
136:4, 136:11,
136:13, 136:21,
158:6, 158:9,
163:22, 197:3,
200:22, 204:19,
205:5, 205:12,
208:10, 224:12,
224:17, 230:16,
234:24, 235:7,
236:2, 247:1,
247:9, 249:14,
249:24, 258:14,
273:21, 274:16,
275:15, 275:23,
278:16, 278:21,
283:18, 283:22,
284:3, 284:13
**definition;**
202:17

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                87

definitions
124:20, 124:23,
126:25, 199:14,
203:16, 257:8,
257:15
definitions;
257:23
delay
133:3
deleted
240:11, 240:17,
241:25
deleting
240:24
delivered
266:20
delta
145:20, 157:22
dental
181:18, 212:6
deny
120:2, 137:12,
272:11
department
265:16, 267:1,
279:11, 279:22
department;
279:16
depend
133:18
dependency
219:14
dependent
217:4
depending
74:16, 91:6,
181:13, 190:16
depends
22:17, 22:21,
23:6, 23:7,
74:8, 75:2,
76:20, 77:8,
79:20, 140:17,
156:5, 157:17,
171:22
depos
7:14, 8:3
deposition
1:11, 2:1,

6:13, 7:8, 7:14,
8:16, 9:8, 9:18,
10:10, 11:8,
11:24, 13:9,
13:12, 14:4,
15:17, 41:21,
79:22, 118:24,
119:6, 168:10,
169:25, 172:23,
175:9, 175:20,
176:3, 198:15,
254:5, 256:9,
258:10, 285:10,
285:11, 286:7
deposition;
110:17
depositions
11:11, 11:14,
15:14
derivative
112:8, 112:9
describe
55:13, 64:16,
90:10, 94:16,
234:9
described
25:1, 86:18,
88:17, 216:20,
264:6
describing
22:6, 189:2,
207:18
description
63:12, 162:11,
162:13, 163:2
design
211:22, 211:24,
215:20, 220:8,
220:10, 221:15,
221:20, 222:2
designs
212:11
detail
152:12, 223:16
detailed
223:14
details
63:19

determination
92:15, 92:16,
92:20, 101:4,
219:20
determine
64:23, 91:16,
93:6, 94:14,
96:3, 97:16,
222:15, 256:10,
258:11
determined
78:4, 79:1,
91:2, 92:10
determines
91:3, 91:4,
211:19
developed
269:9, 273:2
dictate
12:21
differ
163:3
difference
145:25, 165:14
differences
122:18, 159:13,
163:8, 165:21
different
47:9, 51:11,
52:22, 56:12,
56:15, 91:8,
92:3, 93:8,
104:20, 122:22,
129:16, 142:24,
159:4, 161:21,
162:13, 169:1,
172:21, 176:19,
193:19, 212:2,
212:11, 212:16,
212:18, 233:16,
255:2, 264:23,
264:24, 268:20
different"
83:6
different;
83:4
differently
24:6, 197:16,

206:8, 222:23
diplomate
2:15
direct
201:23
direction;
286:12
directly
37:11, 201:3
director
30:25, 31:24,
201:14, 229:5
directors
229:1
disabled
150:8
disbelieve
242:10
disclaimers
64:21
disclosed
281:20
disclosing
41:25, 119:12
discombobulated
235:24
discontinuing
243:20
discount"
18:24, 19:5
discount;
151:14
discounted
44:21, 152:4
discounts
16:4, 19:2,
20:23, 39:10,
80:21, 80:22,
80:23, 99:13,
99:21, 106:24,
120:12, 121:5,
123:24, 149:10,
149:12, 150:7,
160:20, 161:20,
162:3, 164:10,
165:1, 165:6,
165:18, 167:6,
192:7, 235:13,

235:14, 236:21,
237:4, 240:11,
240:19, 241:25,
242:3, 242:4,
242:12, 275:25,
276:1, 276:2,
276:6, 277:8,
277:9, 277:10,
277:11, 278:7,
278:16, 278:21
**discounts"**
33:10, 33:17,
34:3, 100:1,
120:14, 149:11,
163:23, 204:1,
204:10, 236:4,
236:22
**discounts";**
121:6, 149:12,
236:5, 237:6,
240:20, 276:2,
278:10
**discounts'**
98:14, 197:9,
198:19, 203:22
**discounts;**
82:25, 123:24,
165:24, 242:13,
278:6
**discretion**
221:19
**discuss**
13:17, 13:21
**discussed**
82:17, 159:5,
192:25
**discussing**
29:23, 63:17
**discussion**
162:18, 191:19,
202:23, 206:22,
231:15, 244:4,
273:13
**discussions**
81:23, 82:1,
82:5, 202:20
**disease**
17:11, 188:2

**disk**
7:7, 105:12,
194:9, 277:25
**dispense**
184:14, 216:10
**dispensed**
214:6, 252:12
**dispersement**
229:3
**distinct**
52:23, 69:16,
76:4, 77:18,
77:22, 89:12,
90:24, 98:23,
102:17, 164:7,
169:16, 179:9,
179:17, 179:21,
179:24, 180:6,
180:12, 207:15,
251:23, 252:2,
261:6
**distinct"**
77:21
**distinguish**
72:15, 189:24
**district**
1:1, 1:2, 7:10,
7:11
**division**
25:23, 32:17,
37:13, 47:9,
86:2, 190:14,
191:16, 191:20,
192:14, 192:21,
264:24
**divisions**
44:10, 190:13,
190:15, 190:16,
190:25, 191:3
**dme**
28:15
**doctor**
59:1, 59:3,
59:8, 59:18
**document**
40:17, 41:5,
46:17, 46:21,
84:5, 84:11,

84:16, 84:21,
85:7, 86:12,
99:22, 108:12,
117:25, 118:11,
118:19, 118:20,
118:21, 119:3,
127:13, 128:5,
128:11, 129:24,
130:23, 130:24,
131:1, 139:14,
139:17, 176:7,
176:8, 230:7,
231:7, 231:25,
233:12, 236:11,
239:9, 244:19,
246:11, 246:17,
274:2
**document;**
230:8, 234:11
**documentation**
168:6, 168:22,
255:18, 255:22,
256:1, 256:2,
256:7, 256:11,
256:21, 273:19
**documented**
105:24
**documented;**
106:15, 107:6
**documents**
48:24, 49:13,
49:14, 53:5,
53:6, 85:15,
87:3, 118:23,
119:5, 128:1,
231:10, 232:24,
233:16, 244:6,
272:2
**doing**
31:16, 31:18,
50:18, 53:10,
64:25, 65:8,
65:11, 160:4,
161:3, 210:11,
222:1, 254:19,
265:11, 282:24
**done**
86:17, 86:21,

87:1, 87:2,
91:13, 114:5,
206:19
**done;**
86:24
**double-dip**
162:3
**double-dipping**
180:1
**down**
10:15, 34:18,
39:2, 39:23,
39:25, 40:9,
40:12, 72:10,
83:24, 84:2,
135:3, 135:12,
190:19, 190:22,
218:21, 238:4,
241:23
**dq**
157:6, 158:14
**draft**
233:5, 233:6
**drafting**
35:16, 81:20
**drill**
72:10
**drive**
153:5, 153:6,
213:4, 213:10
**driven**
270:23
**drives**
94:11, 271:7
**drop**
190:19
**drug**
17:13, 18:7,
18:22, 23:6,
23:8, 24:2,
26:2, 26:20,
27:1, 27:24,
28:2, 30:10,
45:14, 59:2,
59:19, 68:25,
69:23, 79:2,
79:23, 80:6,
91:17, 92:12,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                     89

94:8, 97:7,
97:13, 115:1,
117:2, 145:10,
145:12, 151:3,
167:22, 171:17,
172:14, 173:12,
176:20, 176:24,
177:3, 178:11,
179:1, 179:5,
179:16, 181:23,
182:5, 182:15,
182:18, 183:23,
184:12, 184:14,
210:8, 224:6,
225:19, 270:5,
272:19
**drugs**
19:10, 20:20,
23:5, 25:4,
25:13, 32:13,
38:17, 39:8,
42:10, 44:17,
50:25, 51:2,
52:13, 58:22,
148:4, 149:4,
208:25, 209:9,
216:15, 228:12,
242:3
**dual**
26:10, 26:11,
26:13, 27:7,
30:6, 30:9,
32:10, 32:12
**dual-eligible**
28:5, 30:11
**duly**
9:4
**duration**
77:15
**during**
17:2, 17:9,
17:14, 18:6,
25:2, 27:19,
27:25, 28:9,
30:15, 40:16,
77:15, 81:7,
84:14, 86:18,
96:1, 109:24,

124:7, 138:21,
150:11, 160:22,
215:8, 215:15,
216:21, 218:15,
219:6, 259:17,
260:10, 267:5,
267:11, 267:15,
267:21, 267:22

**E**

**e&i**
190:18
**e-mail**
5:23, 6:14,
6:15, 6:16,
6:17, 118:3,
118:11, 118:12,
118:21, 119:2,
119:3, 119:13,
119:16, 230:5,
230:8, 232:1,
233:8, 233:15,
234:10, 234:12,
234:22, 237:19,
239:11, 239:13,
241:14, 241:17,
241:24, 244:19,
246:4
**e-mail;**
240:8, 244:21
**e-mails**
119:16
**each**
10:12, 54:12,
55:11, 217:22
**earlier**
30:7, 48:19,
79:22, 85:4,
109:20, 110:17,
139:1, 165:8,
186:25, 191:19,
192:2, 192:18,
192:25, 198:13,
199:17, 216:21,
228:5, 230:20,
236:18, 237:2,
238:24, 246:19,
246:22, 252:8,

254:18, 261:4,
262:6, 262:24,
272:6
**earliest**
245:3
**early**
58:11
**easier**
85:4
**ed**
201:9
**edit**
12:22
**editing**
131:12
**editor**
129:14
**edits**
54:10, 55:2,
55:3, 55:6,
131:4, 246:9,
255:4, 255:6
**edward**
201:5, 201:17
**effect**
47:3, 48:1,
93:13, 98:25,
99:9, 133:15,
136:8, 257:13
**effective**
35:7, 132:10
**effectively**
188:5
**efficiently**
188:5
**eight**
193:12
**either**
18:19, 38:23,
44:7, 63:6,
118:20, 127:1,
131:8, 143:14,
150:5, 156:21,
192:14, 204:16,
219:23, 228:14,
229:18, 255:14,
258:14
**elaborate**
21:13, 69:5,

84:4, 265:8
**electronically**
225:15
**element**
92:25
**elements**
93:4, 199:23
**eligibility**
159:8
**eligible**
21:10, 22:15,
27:7
**eligibles**
26:10, 30:7,
30:9, 32:11,
32:12
**eligibles"**
26:12, 26:13
**else**
63:15, 64:13,
119:9, 151:11,
159:15, 163:9,
171:15, 180:1
**else;**
267:12
**employed**
31:14, 35:18,
44:7, 44:11,
64:7, 64:8,
84:14, 96:6,
96:11, 259:15,
286:14
**employee**
16:22, 36:7,
245:10
**employees**
23:1, 63:16,
63:24, 64:1,
64:2, 64:4,
167:23, 175:14,
175:18, 182:12,
211:12
**employees"**
63:23
**employer**
16:23, 21:8,
22:13, 22:25,
27:16, 36:3,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

90

36:5, 37:3,
39:19, 44:17,
44:19, 44:24,
45:1, 48:5,
182:10, 187:14,
211:8, 211:9,
211:16, 211:18,
212:23, 221:16
**employer;**
158:18
**employment**
15:10, 35:20
**encompass**
39:5, 98:14,
99:19, 106:25,
197:9, 198:19,
203:22, 204:2
**encompassed**
247:1
**encompassing**
163:15, 204:19,
205:7, 205:14
**encountered**
218:16, 247:13
**encourage**
178:17
**end**
13:1, 106:25,
251:16, 276:5
**ending**
57:15
**enforced**
98:2, 140:4,
140:11, 140:14,
160:1, 165:23,
268:15
**enforcement**
139:24
**english**
63:4
**enough**
53:19, 164:25,
174:8, 199:1
**enroll**
38:19, 41:8,
102:1, 159:11,
161:1, 180:13,
181:8, 264:11

**enrolled**
19:16, 26:22,
27:12, 42:3,
42:4, 97:22,
106:9, 177:13,
182:13, 197:6
**enrollees**
58:21, 90:13
**enrolling**
208:15
**enrollment**
62:12, 62:13,
66:16, 67:13,
67:16, 68:24,
69:7, 69:13,
69:23, 70:12,
73:13, 74:3,
74:5, 74:18,
74:19, 75:1,
75:7, 75:12,
75:17, 76:14,
76:21, 77:3,
88:11, 88:13,
88:24, 88:25,
89:7, 89:8,
98:6, 159:25,
161:16, 163:8,
163:13, 165:19,
207:20, 207:22,
208:4, 208:8,
208:17, 208:20,
208:22
**enrolls**
144:17, 184:1
**ensure**
217:22, 247:25
**enter**
14:25
**enters**
215:17
**entirety**
136:4
**entities**
46:5, 48:13,
57:5, 191:2
**entitled**
23:4, 67:17,
157:23, 179:16,

180:14, 181:16,
182:5, 184:3,
210:20, 210:25,
213:17, 213:23,
216:4, 222:7
**entitles**
162:2, 177:15
**entity**
17:1, 63:24,
78:7, 114:9,
115:8, 189:10,
189:13, 190:24,
193:7, 198:21,
198:22, 203:7,
272:12
**equal**
156:13, 160:2,
176:4
**equivalent**
232:9, 232:11
**error**
196:18, 219:20,
219:25
**errors**
129:14
**esi**
11:16, 195:14
**esquire**
3:4, 3:5, 3:13,
3:14, 4:4
**essentially**
27:22, 162:3,
187:5, 257:13
**established**
238:9
**estimate**
31:9, 57:3,
57:14, 57:15,
57:17
**estimates**
57:7
**et**
1:4, 7:9,
17:12, 22:20,
41:9, 41:16,
48:5, 62:22,
74:21, 99:21,
127:2, 144:20,

160:16, 160:20,
203:6, 208:16,
213:2, 229:22,
233:6, 247:23
**evaluate**
93:6
**even**
20:13, 20:16,
94:2, 163:22,
183:23, 193:22,
225:15, 280:18
**event**
133:20, 133:21,
223:7
**events**
238:10
**ever**
9:7, 34:1,
39:2, 39:21,
39:25, 40:9,
40:17, 51:20,
60:16, 81:5,
85:16, 85:21,
86:7, 96:12,
99:22, 101:17,
115:13, 118:20,
125:2, 175:5,
176:7, 186:1,
186:18, 186:20,
200:9, 218:16,
224:14, 226:13,
228:1, 228:12,
229:6, 247:13,
258:11, 266:2,
273:9, 279:12,
280:5, 280:9,
280:22
**every**
194:2
**everybody**
151:11
**everything**
169:7, 172:16,
173:14, 202:11
**everything's**
144:13
**evidence**
221:13, 281:9

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    91

evp
201:9
exact
15:21, 31:8,
31:9, 41:2,
44:5, 126:3,
186:3, 186:7
exactly
233:7, 245:23,
283:12
examination
5:2, 9:5,
170:1, 170:6,
174:25, 261:1,
279:7
examine
170:5
example
23:10, 44:18,
45:6, 45:18,
46:7, 54:15,
54:17, 55:9,
93:13, 100:3,
100:4, 110:11,
125:15, 126:6,
142:8, 157:18,
158:22, 165:10,
174:1, 176:23,
203:13, 223:15,
223:23, 224:3,
243:15, 254:1
examples
121:17, 126:4,
147:23, 165:6,
262:5
except
256:17
exception
193:18, 253:24
exceptions
75:15, 87:24
excerpt
6:4, 6:6,
127:12, 127:18,
129:24, 130:15,
130:18, 130:22,
131:1, 131:14
excerpted
240:7

excerpts
135:6
exchange
26:24
exchanged
61:23, 61:24,
62:1, 236:11
exchanges
96:23
exchanging
237:1
exclude
83:3, 83:9,
125:4, 125:17,
125:20, 197:22,
257:15, 277:7
exclude"
273:14
exclude";
123:3
excluded
72:18, 73:3,
73:18, 101:19,
125:23, 166:7,
167:8, 206:2,
277:2, 277:16,
278:19
excluded;
121:23, 276:6
excluding
109:18, 109:19,
120:17, 123:24,
236:15, 236:23,
238:25, 247:9,
249:21, 284:16
excluding"
82:24
exclusion
71:12, 71:25,
73:2, 75:23,
105:17, 216:15,
231:1, 246:21,
248:2
exclusions
276:19, 277:15
exclusively
32:3, 192:15
excuse
90:3

executed
49:12, 108:12,
108:22, 132:21,
132:25, 195:19,
202:25, 209:13,
246:10, 246:15,
250:6
executed;
198:23
executing
199:5
executive
201:9
exhaust
125:1
exhibit
5:11, 5:12,
5:14, 5:15,
5:16, 5:18,
5:20, 5:23, 6:4,
6:6, 6:8, 6:12,
6:14, 6:15,
6:16, 6:17,
14:2, 14:8,
14:19, 15:6,
46:13, 46:18,
49:5, 71:8,
105:15, 107:16,
107:19, 109:19,
110:11, 111:15,
111:19, 114:18,
114:22, 116:1,
118:7, 118:10,
127:7, 127:10,
130:6, 130:12,
130:18, 132:18,
149:8, 169:15,
175:23, 175:24,
195:16, 209:14,
209:19, 209:24,
209:25, 210:2,
210:5, 210:6,
210:14, 230:4,
231:7, 231:19,
231:20, 232:1,
234:20, 235:17,
235:25, 236:8,
236:13, 237:1,

237:10, 237:11,
237:15, 237:16,
239:5, 239:6,
240:16, 240:22,
241:10, 241:12,
244:16, 244:17,
245:18, 246:8,
246:12, 249:7,
274:24, 275:2,
277:16, 283:11,
283:23, 284:4,
284:14
exhibits
5:10, 6:3,
6:11, 7:2,
115:25, 122:9,
248:23
exist
20:24, 47:15,
256:8, 256:21
existed
124:8
existence
254:6
existing
119:21, 120:2,
274:5, 275:23
expect
150:14, 280:1
expects
178:24
experience
21:22, 22:1,
25:10, 39:6,
41:8, 41:11,
86:11, 163:7,
164:12, 164:15,
180:22, 219:21,
220:3, 220:14,
221:3, 242:20,
243:25, 255:7,
281:11, 282:2
experience;
81:15
experiences
219:7
expert
130:15, 260:1,

260:7
**experts**
260:8, 260:12
**expired**
259:9
**expires:**
286:20
**explain**
76:18, 112:2,
157:5, 179:13,
181:3
**explicit**
99:5, 247:17
**explicitly**
59:12, 277:7
**express**
138:15, 246:21,
248:2
**expressed**
62:17
**extent**
65:4, 65:24,
134:20
**extra**
23:1, 180:10
**F**
**fact**
76:24, 179:8,
179:15, 199:6,
199:25, 200:16,
229:10, 242:11,
256:2, 258:19,
264:4, 264:15,
281:7, 281:25
**factor**
164:8
**facts**
68:11, 69:18,
88:23, 100:16,
125:22, 145:5,
152:21, 153:24
**faded**
132:22
**failing**
218:17, 220:3,
221:4
**fair**
35:13, 108:10,

157:4, 171:1,
176:25, 179:5,
179:6, 180:9,
180:10, 182:7,
183:24, 184:21,
185:13, 185:14,
187:17, 190:4,
192:16, 195:10,
198:23, 198:24,
199:1, 202:17,
202:19, 202:25,
203:1, 203:3,
203:17, 211:17,
212:1, 213:11,
213:12, 220:24,
220:25, 222:3,
222:4, 224:20,
225:16, 225:17,
228:17, 237:25,
248:5, 248:7,
250:1, 250:2,
252:5, 253:3,
254:24, 255:1,
256:20, 257:2,
258:5, 258:8,
259:25, 260:16,
280:6
**fall**
202:2, 202:16
**falls**
252:15
**familiar**
14:22, 15:14,
50:10, 108:6,
129:10, 222:19,
224:2, 268:23
**family**
20:4
**fapr**
1:25, 286:5
**far**
192:15, 192:22,
201:18, 237:20,
243:9, 265:5,
277:19
**favorable**
180:15
**feasibility**
144:10

**feasible**
144:12
**february**
230:4, 236:14,
237:24, 238:24,
239:11, 239:13,
245:18
**federal**
86:2, 86:4,
101:17, 101:21,
218:2
**fee**
23:15, 23:17,
23:22, 23:23,
24:2, 24:10,
38:22, 62:13,
66:17, 67:13,
67:16, 68:24,
69:7, 69:13,
69:24, 70:12,
73:13, 74:5,
74:18, 75:1,
75:8, 75:12,
75:17, 76:14,
76:15, 76:21,
76:25, 77:3,
79:8, 89:8,
89:21, 91:20,
91:23, 92:22,
93:8, 114:10,
141:1, 141:2,
159:11, 159:25,
163:8, 165:20,
181:14, 181:22,
182:4, 183:14,
183:19, 207:20,
208:4, 208:8,
208:13, 208:20,
208:22, 249:22
**fee";**
88:13
**fee;**
88:25
**feel**
11:12
**fees**
42:4, 42:5,
114:13, 143:14,

184:7, 208:17,
268:16
**few**
11:11, 46:6,
52:8, 82:6,
111:10, 144:4,
147:23, 176:12,
256:18
**field**
40:10, 62:25,
157:7, 158:14,
226:9, 270:11,
273:2
**figure**
269:3
**file**
234:5
**filed**
11:20
**fill**
59:1, 60:3
**final**
55:7, 56:5,
101:9, 159:18
**finally**
106:21
**financial**
214:21, 227:12,
227:19, 286:15
**find**
140:3, 140:10,
234:3
**finding**
279:25
**fine**
10:9, 136:15,
174:10, 186:16,
282:21
**finish**
10:13, 91:10,
155:3, 271:20
**finishes**
16:8
**first**
8:16, 15:13,
31:21, 32:5,
32:19, 46:24,
105:16, 105:23,

167:14, 175:9,
195:21, 199:2,
205:3, 209:23,
212:22, 214:8,
216:17, 219:24,
228:18, 233:6,
234:19, 236:7,
259:14, 270:22,
271:6, 274:2
**fit**
202:21
**five**
43:24, 101:8,
135:11, 146:25,
192:13, 195:3,
195:5, 272:23
**fixed**
183:19, 184:7
**flat-rate**
184:7
**flip**
230:15
**floor**
2:6
**focus**
255:5
**focusing**
245:16
**folks**
63:21
**follow**
140:2, 140:9,
217:25, 221:21,
259:6
**follow-up**
260:22
**following**
77:10, 219:10,
248:17, 249:1,
285:4
**following:**
238:11
**follows**
270:22
**follows:**
9:4
**food**
52:21, 160:20,

161:24, 163:16,
190:9
**footer**
237:9, 237:11
**force**
107:22
**foregoing**
286:7, 286:8
**forgot**
191:11
**format**
224:25, 225:8,
225:16
**former**
16:22, 37:10,
63:16, 63:23,
63:24, 64:1,
64:4
**formerly**
48:7, 191:12
**forms**
206:25
**formulation**
186:5
**forth**
185:21, 233:2
**forward**
285:15
**forward:**
239:17
**found**
67:23, 68:14,
68:22, 69:21,
71:22, 73:7,
87:17, 87:25,
88:15, 94:13,
102:8, 102:22,
103:11, 103:21,
104:4, 262:7,
262:18
**foundation**
241:8
**four**
102:16, 119:7,
119:8, 159:18,
195:3, 195:5,
228:19, 228:25,
282:16, 283:5

**fourth**
191:16
**frame**
18:7, 25:2,
28:9, 51:18,
81:7, 124:7,
150:11, 160:22,
267:11
**frankly**
172:22
**free**
181:21
**frequent**
80:22, 120:13,
121:6, 149:11,
160:12, 160:17,
160:18, 160:21,
162:1, 162:12,
163:2, 164:6,
164:9, 164:16,
235:14, 236:4,
236:22, 237:5,
240:20, 242:13,
276:1, 277:9
**front**
21:6, 120:3,
283:7
**full**
9:25, 11:3,
127:13, 128:11,
129:24, 187:15,
214:4, 266:21
**function**
159:21, 169:11,
188:1, 190:23,
203:9
**functions**
54:19, 169:12,
188:2
**funds**
24:24, 45:21
**further**
174:5, 179:25,
191:20, 260:19,
279:2, 284:19,
284:21

**G**

**garrett**
4:4, 7:24,

11:10, 12:18,
13:8, 13:10,
13:12, 13:19,
248:19
**gave**
11:21, 40:13,
40:24, 62:1,
119:13, 139:25,
229:5, 261:4,
264:7
**geared**
163:14
**general**
9:19, 9:20,
29:8, 34:20,
45:23, 81:12,
83:2, 110:3,
114:3, 135:15,
136:23, 148:19,
149:6, 149:17,
165:18, 168:2,
169:13, 176:13,
184:8, 187:10,
194:21, 203:24,
211:7, 243:24,
259:2, 269:5
**generally**
33:9, 33:16,
81:13, 120:3,
222:12
**generic**
23:5, 38:17,
39:8, 42:10,
44:17, 58:22,
59:19, 94:8,
117:1, 148:4,
149:4, 205:20,
208:25, 228:12,
272:19
**generics**
59:15
**getting**
51:10, 60:23,
68:24, 69:22,
87:18, 90:8,
103:22, 104:5,
134:11, 152:4,
153:18, 156:12,

161:9, 162:4,
171:18, 172:6,
173:20, 213:4,
235:23
**geyerman**
3:13, 5:4, 5:6,
7:21, 174:22,
265:4, 268:20,
274:9, 275:18
**geyerman's**
111:8
**give**
11:3, 14:23,
33:21, 42:14,
52:11, 61:25,
82:19, 108:7,
109:11, 110:12,
117:12, 122:14,
127:23, 128:15,
137:22, 161:18,
204:23, 235:19,
245:21, 264:2,
282:23
**given**
9:7, 11:12,
15:15, 38:2,
40:5, 41:3,
137:11, 145:10,
193:23, 213:11,
217:9, 224:5,
224:6, 253:22
**given;**
286:9
**giving**
41:21, 152:22,
163:18, 206:4,
267:21, 268:8,
268:11
**glossary**
55:19
**go**
24:14, 25:20,
50:23, 55:1,
58:20, 59:25,
87:21, 113:15,
122:7, 130:9,
135:1, 159:10,
161:15, 162:7,

164:17, 169:3,
171:18, 174:12,
182:15, 183:7,
208:1, 210:16,
216:1, 217:16,
222:5, 224:10,
231:10, 234:19,
234:23, 241:23,
243:3, 245:15,
249:11, 255:6,
260:9, 265:17,
276:9, 285:15
**goes**
21:4, 92:23,
98:21, 184:2,
184:12, 207:14,
216:16
**goethals**
4:12, 7:13
**going**
8:15, 10:21,
21:20, 24:25,
38:15, 66:1,
71:21, 84:18,
111:7, 120:24,
126:4, 127:6,
129:23, 131:10,
135:6, 141:17,
142:14, 146:24,
149:2, 153:14,
157:12, 166:19,
189:10, 189:18,
195:15, 201:23,
211:20, 212:19,
213:10, 220:7,
224:17, 229:19,
231:18, 239:4,
244:15, 248:10,
274:19, 285:10,
285:13
**good**
8:11, 8:12,
9:21, 147:12,
147:13, 174:8,
174:20, 269:5,
283:3
**goods**
192:8

**gotten**
267:12
**governed**
115:7
**governing**
48:12
**government**
86:2, 86:4,
100:8, 100:12,
100:16, 101:2
**governmental**
46:5
**grab**
132:11
**graduate**
40:6
**grant**
3:13, 7:21,
66:6, 66:8,
70:18, 166:13,
166:17, 166:20,
166:24, 174:22,
188:24
**grant's**
261:3
**great**
132:15, 173:8,
248:23, 285:17
**greater**
116:8, 243:9
**green**
241:20
**grocery**
52:13, 52:20,
160:14, 161:9
**ground**
10:9, 165:3
**group**
16:25, 17:5,
17:7, 20:4,
24:25, 25:16,
38:11, 43:19,
43:23, 44:1,
44:17, 44:19,
47:18, 55:6,
151:1, 182:10,
187:3, 187:5,
188:17, 189:4,

190:10, 211:8,
211:9, 211:16,
212:23, 215:18,
217:12
**group;**
16:24
**groups**
44:24, 45:2,
48:5, 187:14
**guaranteed**
172:4, 172:5
**guarantees**
169:18
**guess**
70:4, 74:8,
135:23, 144:7,
165:18, 171:22,
186:12, 189:16,
198:16, 218:21,
254:11
**guidance**
127:23
**guide**
54:2
**guys**
113:13, 209:16,
231:16
**gym**
192:4

**H**

**half**
170:2, 170:3,
198:4, 235:16,
236:7, 259:12,
259:14
**hand**
8:7, 12:23,
13:1, 13:5,
40:17, 130:23,
175:22, 286:17
**handed**
130:22
**handing**
41:4, 46:17
**handled**
32:17
**handy**
209:21

happen
59:5, 59:22
happened
22:2, 139:23,
198:10, 202:24,
272:3
happening
194:2
happy
238:4, 244:6
hard
69:14, 105:3,
121:18, 124:15,
126:24, 132:21,
156:24, 170:19,
171:11, 186:11,
264:22
hausfeld
3:6
have"
234:14
hazy
156:16
headlines
194:1
healthallies
18:15, 19:14,
19:20, 19:23,
20:13, 21:2,
21:4, 21:6,
21:11, 22:15,
41:15, 180:22,
181:1, 181:4,
181:6, 181:15,
181:20, 182:6,
182:13, 182:16,
183:8, 183:20,
183:22, 184:2,
184:10, 184:13,
185:3, 185:13,
185:15, 185:17,
192:4
healthspring
25:22, 25:24,
25:25, 26:5,
26:8, 27:6,
27:18, 27:20,
27:21, 28:16,

29:17
hear
242:19
heard
34:1, 186:1,
186:3, 186:6,
186:10, 186:13,
194:23, 224:14,
245:7, 260:11,
273:9
heenan
4:4, 7:24
heenan:
7:24, 11:17,
11:19, 21:12,
21:18, 21:22,
22:7, 23:20,
24:5, 24:20,
32:15, 33:2,
33:12, 33:19,
36:14, 37:6,
38:18, 39:15,
50:13, 57:8,
57:21, 58:1,
59:23, 60:8,
60:14, 69:4,
70:3, 73:19,
78:11, 86:1,
95:6, 100:23,
101:14, 104:11,
110:2, 111:5,
111:7, 111:25,
113:9, 116:9,
117:13, 117:16,
117:21, 121:25,
123:5, 130:4,
132:20, 134:17,
139:8, 140:5,
140:25, 141:19,
142:7, 143:11,
145:17, 146:3,
148:6, 148:18,
151:24, 153:9,
154:16, 157:16,
158:21, 160:9,
162:16, 163:6,
166:8, 167:10,
168:8, 170:14,

170:16, 171:5,
171:21, 172:18,
183:2, 188:24,
189:14, 189:17,
189:19, 191:13,
204:13, 244:8,
248:9, 248:12,
248:21, 267:25,
269:20, 285:17
held
2:2, 231:15,
244:4
help
72:13, 87:4,
122:10, 166:22,
169:19, 188:4,
240:4
helped
12:22
helpful
53:11, 119:25,
190:21
helping
166:24
helps
232:23
here
7:7, 8:25,
10:7, 42:14,
78:16, 127:14,
129:24, 134:2,
170:18, 172:19,
174:12, 189:6,
189:20, 195:25,
196:7, 201:1,
205:24, 208:18,
210:19, 212:25,
224:2, 224:18,
228:19, 228:20,
231:19, 244:15,
245:8, 254:19,
256:17, 256:18,
258:21, 258:23,
272:4, 282:24
here's
207:6
hereby
286:7

hereunto
286:16
hesitation
128:10
hi
174:21
hierarchy
56:24, 201:1
high
181:3
higher
94:15, 94:17,
94:20, 140:21,
140:22, 151:20,
151:21, 152:6,
152:7, 153:1,
154:9, 262:20,
263:14
higher-reported
154:8
hired
20:2, 20:17,
128:24
historically
242:22, 243:7,
243:25
hold
49:2, 80:14,
260:1
home
10:3, 10:5
honor
221:4
horse
113:13
hospital
17:25, 126:5
hospitals
18:4, 28:3,
30:18
hour
15:22, 66:2,
70:22, 146:25,
170:2
hours
170:4, 228:10
however
279:19

hsp;
126:17
huge
213:5
humphrey-
2:13
humphrey-sonntag
1:24, 286:3
hyphen
237:12
hypothetical
24:16, 60:4,
60:12, 90:7,
95:24, 101:6,
104:9, 104:12,
143:25, 144:7,
144:21, 145:2,
145:24, 152:21,
156:7, 262:24
hypothetical;
89:14
hypothetically
143:24

I

i)
116:3
id
167:18, 217:12
idea
231:17
identical
48:9, 76:8,
131:18
identification
7:3, 38:24,
46:14, 107:17,
114:19, 118:8,
127:11, 130:7,
132:19, 175:25,
231:21, 239:7,
241:13, 244:18
identify
14:10, 15:7,
49:3, 49:10,
105:3, 107:18,
114:24, 255:22,
257:14, 258:22,

258:24
identifying
278:6
ii)
116:3
illinois
1:12, 2:7,
2:16, 7:15,
10:8, 286:6,
286:24
imagine
255:16
imaging
28:14
impact
67:25, 68:16,
69:1, 69:24,
70:7, 71:24,
88:16, 90:9,
90:14, 90:17,
102:11, 102:18,
103:2, 103:13,
103:23, 104:6,
145:14, 153:4,
154:4, 154:8,
154:18, 155:9,
155:13, 156:3,
157:12, 158:17,
158:24
impacted
156:25
impacts
157:25, 158:3
impetus
202:9
implementation
29:24
implications
254:23
imply
242:3
important
10:11, 86:12,
86:16
impose
226:7, 227:11
imposed
227:19

imposing
228:1
impossible
10:14
improper
263:15, 263:25
improper;
262:12, 262:21
improperly
226:8
inc
1:7, 7:10,
7:23, 176:2,
210:11
include
27:16, 34:13,
36:11, 39:11,
49:17, 53:21,
121:9, 123:2,
125:15, 125:18,
126:8, 126:17,
139:13, 144:6,
149:9, 150:7,
151:6, 151:13,
181:23, 204:7,
204:10, 212:5,
248:5, 249:25,
257:10, 258:15,
277:9
include"
83:3, 83:8,
125:3, 273:14
included
37:16, 99:13,
120:20, 124:6,
124:24, 158:7,
158:11, 160:7,
161:22, 162:12,
163:3, 163:22,
165:16, 166:5,
167:6, 168:9,
214:15, 258:4,
258:15, 273:21,
276:22, 277:1,
278:6, 278:8,
278:16
included"
120:21

includes
80:20, 99:20,
110:15, 182:15,
235:11, 236:2,
275:24
including
33:10, 33:17,
34:2, 80:21,
120:11, 121:4,
123:24, 149:10,
151:9, 151:10,
216:12, 218:1,
218:3, 235:12,
236:3, 236:20,
237:4, 240:18,
274:11, 274:17,
275:25
including"
82:24, 120:11
inclusion
230:25, 278:5,
278:20
inconsistent
146:13, 146:21
incorporate
198:24
incorporated
52:14, 248:3
incorrect
219:16, 220:9,
223:24
increase
135:13, 136:15,
157:1
independent
32:21, 33:5,
34:13, 34:21,
54:6, 206:10,
281:2
independently
264:19, 265:20
indicate
42:12
indicated
71:24, 114:12,
122:3
indicates
218:10

indicating
103:8
individual
7:8, 8:17,
14:4, 285:9
individuals
82:6
industry
79:11, 81:8,
109:24, 110:4,
110:5, 110:7,
114:9, 193:14,
194:23, 220:25,
242:20, 281:11,
282:3
infer
255:24
inference
281:11
inferring
208:3, 208:6
inflated
42:18, 43:12,
148:15, 148:20,
148:21, 250:14,
251:16, 265:6,
271:11, 272:17,
272:18, 279:24
influenced
88:22, 89:5
inform
265:1
information
14:22, 15:1,
52:24, 64:16,
64:20, 193:22,
216:4, 216:9,
216:13, 216:25,
217:12, 219:15,
219:16, 222:14,
223:19, 267:12,
273:11, 279:11,
282:3
informed
78:24, 85:17,
85:21, 86:7
informs
41:12

ingenix
191:10, 191:12,
192:9
initialing
74:20
inquiries
222:12
inserted
120:16, 245:25
insertion
196:12
inside
175:6
insight
217:8, 240:3,
240:10, 241:25
installed
223:9
instance
247:13, 252:18,
253:18
instances
219:7, 255:8
instead
145:14, 158:11,
158:15
instructed
16:9, 218:18,
221:6, 221:10
instruction
127:23
instructions
218:1, 221:21
instructs
216:24
instrument
108:21
insurance
17:11, 18:19,
18:25, 20:6,
20:10, 20:14,
23:2, 24:9,
24:23, 26:2,
26:16, 27:1,
39:17, 39:18,
63:7, 80:5,
91:22, 93:10,
93:23, 94:1,

94:3, 94:5,
117:1, 171:24,
172:1, 172:2,
176:24, 177:4,
178:11, 180:7,
180:11, 181:6,
182:21, 183:1,
183:4, 183:10,
183:23, 184:10,
187:18, 187:20,
187:22, 188:4,
243:11
insurance;
79:24
insured
63:8, 172:9,
178:9, 182:22
insured"
178:10
insureds;
222:3
insurer
25:19, 189:25
integrated
108:4
integration
108:5
integrity
76:12, 77:6,
273:5
intend
138:6
intended
121:18, 257:6
intending
197:21, 254:22
intent
124:15
interacting
175:10
interacts
282:10
interest
148:8, 188:6,
286:15
interfaced
215:21
interfere
148:15

interfering
221:24, 222:2
interject
188:25
internal
146:9, 146:17
internet
63:11, 75:3,
165:13
interpose
172:19
interpret
98:13, 106:23,
126:3, 136:17,
197:8, 198:18,
203:21, 204:9,
204:16, 205:11,
260:1, 278:18
interpret-
139:12
interpretation
87:15, 88:2,
88:16, 88:21,
89:4, 89:18,
90:9, 90:17,
94:16, 94:21,
100:19, 107:5,
107:8, 108:23,
121:19, 125:24,
136:3, 138:5,
139:11, 139:13,
267:11
interpretations
139:10
interpreted
87:10, 109:1,
197:2, 205:5,
257:15, 258:1
interpreting
267:7
interrupt
76:23, 223:1
introducing
238:24
investigate
229:17, 229:21
investigation
100:17, 101:2,

101:10, 101:12,
256:16
**investigations**
100:9, 100:13
**involve**
38:7
**involved**
22:2, 113:12,
139:2
**involved"**
137:17, 137:21
**involved";**
138:20, 138:24
**involving**
11:21
**irrelevant**
9:24
**irvine**
4:8
**is;**
92:17, 92:21,
94:11, 167:23,
270:23
**isolated**
255:8
**isolation**
165:2
**issue**
140:12, 189:6,
230:1, 231:11,
237:2, 263:24,
265:2, 265:13,
265:18
**issue;**
140:15, 178:19
**issues**
33:6, 220:8,
265:24
**it;**
83:11
**items**
161:24
**itself**
227:11

---
**J**
---

**january**
31:6, 31:10,

31:12, 31:13,
35:3, 35:9,
47:20, 47:21,
48:2, 49:12,
81:18, 82:2,
82:15, 82:21,
83:16, 83:23,
83:25, 84:6,
84:10, 84:18,
85:5, 86:19,
105:25, 106:13,
107:4, 107:23,
109:1, 109:15,
115:2, 122:3,
123:19, 124:9,
126:12, 139:15,
147:17, 171:9,
209:13, 210:4,
275:20, 276:6,
286:18
**jeff**
245:3, 245:6
**job**
1:22, 254:19
**joe**
13:14, 201:3,
201:4, 201:5,
201:7, 201:10,
201:25
**join**
23:20, 24:5,
24:20, 32:15,
36:14, 37:6,
39:15, 57:21,
58:1, 60:8,
60:14, 69:4,
70:3, 73:22,
86:1, 100:23,
104:11, 110:2,
111:8, 111:25,
113:9, 123:5,
139:8, 142:7,
143:11, 148:6,
148:18, 151:24,
153:9, 154:16,
157:16, 158:21,
160:9, 163:6,
167:10, 183:22,

204:13, 249:23,
268:2, 269:20
**joined**
58:25, 115:11
**joining**
188:20, 243:14
**judge**
101:22, 121:18,
121:22, 122:23
**judges**
101:18
**judging**
76:23, 76:24
**july**
36:1, 36:7,
84:6, 85:3
**jumping**
207:24
**june**
117:16, 117:22,
244:21
**justin**
64:12, 67:22

---
**K**
---

**k-i-n-n-y**
51:2
**kaiser**
64:12, 64:13,
67:22
**kane**
286:6
**keep**
248:10
**keeping**
183:18
**keeps**
55:1
**kept**
27:21
**key**
99:16, 150:4,
161:18
**kind**
22:18, 31:25,
34:18, 69:17,
160:19, 161:18,
171:24, 208:15,

212:15, 224:18,
229:21, 255:15
**kinds**
34:16
**kinney**
50:25, 52:9,
209:9
**kmart**
51:17, 51:21
**knew**
67:4, 94:22,
148:21
**knowing**
69:12, 105:2,
170:11
**knowledge**
22:5, 50:18,
60:19, 70:14,
83:24, 86:22,
86:23, 86:24,
86:25, 89:6,
96:6, 107:9,
107:11, 108:25,
109:23, 110:6,
112:14, 112:15,
114:8, 118:15,
164:24, 226:13,
226:20, 227:18,
227:25, 228:4,
229:16, 245:13,
266:1, 272:3,
272:5, 279:10,
280:10
**known**
47:1, 133:22,
181:20, 191:12
**knows**
168:18, 214:22
**kph**
209:9
**kroger**
52:13, 52:14,
52:16, 160:18

---
**L**
---

**lagerstrom**
201:5, 201:17
**laid**
142:3

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

99

**language**
33:25, 37:16,
63:4, 111:1,
112:12, 115:14,
121:3, 121:8,
121:21, 122:23,
123:17, 123:23,
124:12, 124:19,
124:24, 125:25,
126:20, 147:16,
147:19, 152:19,
169:8, 202:10,
204:7, 204:16,
207:7, 207:9,
215:1, 231:1,
231:2, 231:13,
235:12, 236:4,
236:7, 236:13,
236:20, 236:23,
238:25, 240:16,
240:18, 240:24,
241:3, 246:7,
246:9, 246:13,
246:14, 247:9,
274:10, 274:17,
278:5
**lapsed**
259:16
**large**
97:19, 188:13,
189:3
**largest**
56:7, 56:13,
56:17, 56:21,
192:15
**largest"**
56:17
**last**
22:4, 36:1,
66:5, 89:25,
106:21, 108:24,
121:2, 135:1,
147:1, 193:12,
197:13, 198:16,
201:24, 203:19,
205:17, 224:23,
225:4
**late**
35:2, 35:9,

**later**
47:20, 223:10,
281:22
**later**
237:23
**latter**
229:15
**launched**
199:12
**law**
218:2
**lawsuit**
41:19
**lawsuit's**
41:22
**lawsuit;**
42:12
**lawyer**
16:7, 108:18,
119:12
**lawyers**
8:14, 175:5
**layer**
190:22
**laymen's**
187:21
**lead**
152:6, 265:13,
272:18
**leading**
82:1, 273:14
**leads**
154:9
**learn**
168:4, 168:20
**learning**
259:23
**least**
74:17, 241:20,
251:18, 257:19,
258:2, 269:2
**least;**
260:6
**led**
128:21, 149:2,
199:23, 231:6,
275:19
**left**
25:15, 30:1,

**later**
30:23, 31:12,
99:16, 170:2,
190:11
**legacy**
119:10, 189:8,
192:20, 199:19,
220:20
**legal**
258:25
**legitimate**
76:10, 77:2
**legitimately**
157:20
**less**
52:7, 59:4,
59:21, 142:4,
163:10, 194:1,
242:23, 242:24,
243:6, 243:16,
269:7, 271:3,
272:16
**lesser**
36:11, 36:22,
37:3, 37:16,
92:5, 112:3,
116:2, 141:16,
141:18, 142:3,
143:5, 143:13,
143:16, 143:21,
144:6, 152:8,
152:18, 154:12,
169:5, 169:7,
202:10, 207:6,
255:15, 268:24,
269:1, 269:4,
269:6, 271:10
**let's**
13:24, 15:18,
57:10, 70:23,
74:22, 85:3,
105:5, 113:15,
118:12, 119:20,
135:9, 142:25,
145:8, 147:2,
182:21, 194:20,
205:3, 216:1,
221:16, 223:9,
248:12, 248:13

**level**
181:3, 182:14,
187:10, 201:6
**lewis**
3:4, 5:3, 5:5,
7:18, 8:14,
285:7
**liable**
92:1
**licensed**
259:3
**life**
156:25
**lifetime**
67:12
**likewise**
206:20
**limit**
149:18
**limited**
26:8, 26:18,
45:1, 65:13,
67:6, 67:21,
68:3, 80:21,
99:20, 124:24,
139:22, 149:10,
181:12, 218:4,
275:25, 279:6
**limits**
216:14
**line**
27:15, 45:11,
131:5, 191:18,
231:2, 241:23,
244:6, 247:3,
257:11
**line;**
233:17
**lines**
48:4, 135:12,
187:9, 257:4
**link**
56:18
**linked**
57:4
**linkedin**
5:14, 14:20,
15:1

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    100

linking
70:12
list
58:21, 59:3,
59:15, 59:19
listed
68:25, 69:23
literally
161:6
litigation
175:7, 175:12,
175:15
little
24:6, 72:11,
104:20, 115:19,
122:22, 142:8,
147:1, 152:16,
156:16, 186:23,
186:25, 194:12,
200:7, 218:22,
222:22, 235:24,
268:19
lives
194:22, 195:1
llp
3:15
located
51:3
location
2:2
logic
152:8, 154:12
long
143:13, 151:16,
182:8, 204:24,
224:18, 231:17,
259:10
longer
82:18, 242:11,
243:22
look
14:14, 14:23,
55:9, 55:12,
71:8, 119:20,
127:14, 128:25,
131:20, 131:21,
133:9, 133:23,
135:9, 151:22,

193:21, 195:3,
203:19, 210:7,
210:19, 213:13,
245:15, 273:24,
280:14, 282:19
looked
109:20, 140:13,
218:25, 240:15,
241:17
looking
54:8, 54:10,
63:12, 123:15,
131:13, 134:10,
134:13, 134:17,
185:7, 185:9,
235:2, 237:10,
239:22, 275:15,
280:5
looks
107:24, 132:23
lot
169:4, 244:13,
255:1, 256:16
low
58:9
lower
36:11, 37:4,
37:16, 51:6,
60:12, 108:1,
110:16, 111:3,
111:22, 112:12,
112:22, 113:3,
116:15, 117:19,
145:6, 147:15,
147:21, 148:3,
148:4, 184:15,
185:3, 251:10,
253:25, 269:2,
269:4, 269:6,
269:15
lowest
172:4, 172:6,
249:18
luxury
152:18, 199:18

---
M
---

made
119:17, 129:10,

170:11, 226:25
main
4:6, 30:8,
61:3, 213:3,
256:16
mainly
17:10, 17:25,
91:4, 229:23
maintain
215:20
maintained
100:18, 181:8
maintaining
47:13
maintains
232:24
major
17:22, 47:10,
159:13, 165:21
majority
13:16, 41:16,
45:5, 112:15
make
21:25, 27:4,
45:3, 54:11,
55:7, 55:17,
81:11, 85:4,
92:16, 92:20,
102:20, 103:10,
110:3, 139:10,
145:3, 150:18,
164:20, 172:16,
173:14, 176:12,
176:18, 189:11,
202:10, 204:6,
207:9, 216:8,
219:18, 231:11,
232:25, 233:4,
247:17, 252:10,
263:17, 277:13,
279:13, 280:1
makes
92:15, 219:19,
270:7, 282:16
making
125:2, 148:8,
250:18, 251:9
manage
44:16, 51:23,

52:14, 232:12,
279:19
managed
164:24
management
17:12, 188:3,
232:8
management's
170:18
manager
31:3, 44:14,
178:13, 187:25,
188:7, 188:13,
189:6, 190:1,
232:7, 280:2
managers
232:12
managing
17:25, 18:1,
53:21, 63:22
manual
6:5, 6:7,
53:22, 53:25,
54:8, 54:14,
55:19, 127:5,
127:6, 127:13,
127:22, 128:6,
128:8, 128:18,
129:1, 129:4,
129:13, 130:23,
131:2, 131:8,
133:20, 135:7,
135:9, 136:8,
136:20, 225:14
manual;
131:21, 133:10
manufacturing
45:19
many
9:12, 49:8,
180:25, 189:5,
212:11, 229:4
march
241:15, 241:19
mark
13:25, 46:12,
68:9, 122:14,
129:23, 169:23,

201:19, 239:4,
244:15
**marked**
7:3, 46:13,
46:18, 48:16,
107:16, 114:18,
118:7, 127:10,
130:6, 132:12,
132:18, 175:23,
175:24, 209:16,
209:24, 210:1,
231:20, 231:25,
239:6, 241:9,
241:12, 244:17,
246:11
**market**
124:19, 127:1,
193:21, 195:3
**marketplace**
180:3, 202:22,
207:8
**marking**
127:17, 231:19,
239:5
**markup**
118:3
**mass**
160:15
**master**
49:18, 218:10,
232:24
**material**
14:20
**matter**
7:9, 11:20,
76:14, 135:24,
159:8, 174:24,
258:19, 260:11
**matters**
233:21, 233:25
**maybe**
72:12, 78:12,
116:18, 132:22,
150:20, 161:25,
162:16, 186:4,
190:5, 208:13,
215:10, 223:8,
261:11, 261:12,

281:14
**mcconnor**
2:5, 7:15, 10:7
**me;**
264:7
**mean**
17:16, 21:19,
26:11, 36:16,
62:20, 83:4,
95:4, 96:22,
98:18, 99:18,
122:12, 136:20,
136:22, 141:21,
144:21, 162:17,
165:11, 196:9,
197:17, 210:24,
212:17, 248:10,
249:18, 256:7,
257:7, 258:2,
264:18
**meaning**
23:25, 29:21,
87:1, 106:22,
111:20, 159:9,
165:2, 222:25,
233:1, 243:1
**meaningless**
269:10
**meaningless;**
269:18
**meanings**
63:5
**means**
36:17, 83:11,
93:21, 108:6,
108:10, 108:20,
111:1, 113:3,
125:1, 161:10,
186:4, 259:1
**meant**
125:9, 199:21
**meant;**
126:14
**mechanics**
55:16
**medco**
11:15
**medi-span**
112:6

**medicaid**
26:14, 26:17,
26:23, 27:13,
28:6, 187:15
**medical**
22:18, 22:19,
34:4, 110:5,
125:14, 181:18,
212:6
**medicare**
25:23, 26:9,
26:14, 26:23,
27:13, 28:4,
28:7, 30:6,
30:9, 30:11,
32:9, 37:15,
85:22, 86:3,
150:6, 150:8,
187:14, 243:1,
243:2, 243:11
**medication**
249:20
**meet**
65:21, 71:23,
74:1, 74:13,
74:14, 74:17,
74:24, 285:13
**meeting**
87:25
**melanie**
1:24, 2:13,
8:2, 286:3
**member**
20:3, 20:7,
20:9, 20:13,
22:22, 23:3,
38:19, 42:2,
42:6, 59:17,
60:1, 60:4,
63:6, 65:21,
69:6, 75:10,
75:12, 75:16,
75:17, 77:23,
77:25, 78:1,
80:19, 80:20,
91:18, 92:1,
92:4, 92:12,
96:25, 97:7,

97:10, 100:2,
116:2, 116:14,
143:20, 144:17,
147:20, 148:11,
148:16, 148:23,
153:11, 153:13,
154:17, 155:14,
155:18, 156:13,
156:25, 157:13,
158:1, 158:4,
158:25, 159:10,
161:7, 161:13,
161:14, 161:17,
162:4, 163:25,
167:14, 167:16,
167:17, 171:22,
172:13, 173:11,
181:7, 181:11,
181:15, 182:3,
182:8, 183:8,
183:21, 184:10,
185:3, 185:17,
208:14, 211:1,
214:23, 215:5,
215:13, 215:23,
218:5, 219:2,
219:17, 219:22,
219:23, 219:25,
220:1, 221:16,
223:11, 223:15,
223:16, 249:22,
259:8, 259:10,
259:15, 259:18,
282:11
**member's**
111:3, 111:22,
112:10, 113:4,
211:3, 221:13,
223:7
**member;**
172:10
**members**
18:19, 19:12,
19:13, 19:16,
20:1, 20:5,
28:4, 28:5,
30:11, 30:12,
39:12, 58:16,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    102

76:5, 78:5,
78:10, 78:18,
79:2, 86:14,
87:18, 89:7,
89:22, 90:2,
90:3, 90:5,
90:25, 97:21,
102:19, 104:16,
106:8, 114:13,
140:22, 145:22,
162:8, 166:18,
172:25, 179:15,
192:6, 197:6,
203:12, 211:12,
214:7, 258:20,
282:11
**members"**
78:14, 78:16,
78:22, 89:24,
115:20
**members'**
79:20, 188:6
**members:**
115:25
**members;**
266:7
**membership**
38:8, 38:13,
38:14, 38:16,
39:8, 39:9,
39:22, 40:14,
40:22, 41:16,
42:9, 50:11,
50:17, 51:8,
51:14, 52:16,
62:8, 74:2,
74:11, 74:25,
75:11, 76:10,
77:2, 91:6,
99:7, 99:19,
100:10, 100:14,
101:18, 102:2,
102:9, 102:23,
103:12, 114:10,
166:7, 167:8,
168:6, 168:23,
177:5, 177:13,
178:4, 182:14,

194:18, 202:2,
202:14, 202:15,
203:2, 204:2,
204:7, 206:12,
206:14, 206:24,
207:11, 208:9,
208:19, 226:14,
226:18, 226:21,
227:21, 228:7,
228:12, 229:10,
243:2, 243:14,
258:15, 259:9,
260:14, 262:16,
268:16, 281:4
**membership-based**
58:12, 205:20
**memo**
40:10
**memorialize**
247:16, 247:23
**memorialized**
83:16, 83:23,
84:7, 85:8,
255:19
**memorializing**
84:11, 84:21
**memory**
15:16
**mention**
52:11, 73:9,
121:17
**mentioned**
28:6, 30:7,
34:17, 39:21,
46:1, 46:4,
50:2, 53:7,
53:8, 111:12,
129:9, 163:16,
179:7, 199:17,
234:1
**mentioned"**
233:22
**mentions**
225:22
**merchants**
160:16
**merged**
193:4, 193:7,

195:8
**merger**
194:17
**merging**
194:14
**messages**
218:1
**met**
8:13, 66:11,
87:18, 175:2
**michael**
1:11, 2:1, 5:2,
7:8, 9:3, 10:3
**michaela**
3:5, 7:19
**microphone**
174:8
**mid-january**
267:6
**mid-s**
198:11, 198:21
**middle**
110:16
**midway**
135:3
**midyear**
129:22
**might**
16:7, 34:19,
39:16, 39:17,
39:18, 41:8,
42:5, 50:15,
52:20, 54:10,
54:16, 74:19,
126:5, 129:10,
129:12, 134:22,
157:21, 158:5,
163:12, 164:19,
165:20, 174:11,
178:4, 178:9,
190:21, 191:6,
202:8, 203:5,
203:6, 203:11,
204:6, 212:20,
227:22, 243:10,
247:15, 255:2,
256:21, 274:3
**mind**
11:5, 14:14,

125:19, 183:19
**minimum**
186:2, 186:8,
186:9, 186:14
**minute**
14:23, 104:24,
108:7, 109:11,
110:12, 117:12,
235:19, 239:9,
245:21, 276:18
**minutes**
66:2, 101:8,
192:13, 272:23
**mispronounce**
10:18
**missing**
207:7
**misspoke**
12:4, 66:25
**mitigating**
75:20, 87:22
**mix**
23:7
**modifications**
207:9
**modified**
237:3
**moment**
128:15, 172:19
**money**
252:11, 252:24,
253:1, 253:6
**month**
181:11, 182:2
**monthly**
181:14, 182:1,
182:4
**months**
228:19, 228:25,
237:1, 237:16,
237:23, 238:17
**more**
33:24, 41:7,
54:18, 68:4,
72:25, 90:12,
93:25, 104:2,
108:14, 108:16,
113:4, 123:13,

124:1, 124:25,
128:7, 143:7,
144:1, 145:24,
151:25, 157:5,
160:14, 163:15,
165:9, 176:18,
180:15, 180:21,
188:5, 194:1,
200:7, 207:5,
213:21, 223:14,
229:3, 242:21,
243:13, 243:17,
243:25, 244:5,
261:9, 261:10,
261:11, 264:25,
266:18, 273:18
**morning**
8:11, 8:12,
15:7, 74:2,
147:15
**most**
10:11, 59:15,
202:19, 209:6,
268:25
**mouth**
226:24
**move**
231:14, 282:20
**mri**
126:7
**much**
59:20, 66:8,
156:18, 170:5,
213:10, 284:23
**multiple**
24:1
**mumbling**
10:17
**must**
38:19, 38:23,
267:12
**mutual**
148:11, 148:15,
148:23
**myself**
254:10

**N**

**name**
9:25, 20:19,

21:4, 25:20,
27:21, 45:8,
64:11, 64:12,
174:22, 187:2,
191:10, 192:1,
193:20, 198:21,
201:24, 208:18,
245:7, 256:18,
259:5
**name's**
8:13
**names**
12:6, 52:12
**national**
50:11, 52:1,
52:3, 160:16,
225:19, 281:1
**nationally**
112:5
**naturally**
145:6, 202:7,
266:4
**nature**
178:16, 256:12
**ncpcp**
113:25
**ncpdp**
34:20, 151:11,
151:12, 225:8,
225:16, 225:18,
226:9, 226:17,
227:1, 227:14,
227:23, 259:5,
259:7, 259:8,
259:18, 260:2,
260:7, 260:11,
260:13, 270:10,
272:24, 273:10
**ncpdp-defined**
218:1
**necessarily**
48:9, 261:14
**necessary**
46:23, 170:6,
208:5, 208:9,
247:16
**need**
10:23, 21:19,

45:3, 46:22,
54:10, 55:16,
65:21, 78:12,
100:20, 101:4,
102:12, 103:24,
104:7, 120:24,
123:9, 124:6,
124:11, 124:20,
126:20, 126:25,
134:22, 151:5,
168:7, 168:23,
169:14, 171:4,
172:19, 181:13,
189:22, 203:12,
215:10, 230:1,
238:3, 247:8,
247:22
**needed**
80:15, 248:2
**needs**
54:21, 59:8,
59:12, 124:25,
158:11, 214:18,
216:10, 244:9,
285:15
**nefarious**
281:9, 281:19,
281:24, 282:5
**negate**
264:7
**negotiate**
18:2, 30:10,
30:14, 30:17,
34:25, 51:20,
125:14, 137:11,
168:3
**negotiated**
25:8, 29:3,
29:9, 32:6,
32:23, 34:10,
35:6, 36:10,
39:2, 78:2,
139:5, 153:22,
158:18, 227:11,
237:22
**negotiates**
45:13
**negotiating**
18:7, 28:19,

28:22, 30:5,
32:18, 47:11,
118:16, 147:19,
233:1, 234:17,
234:18
**negotiation**
32:19, 33:24,
33:25, 35:14,
81:20, 82:10,
82:14, 123:23,
138:22, 138:25,
139:3, 139:5,
238:12, 247:14,
273:14, 273:17,
273:20, 274:8,
276:5
**negotiation;**
230:13
**negotiations**
29:22, 29:23,
120:3, 121:20,
126:2, 126:23,
247:22, 275:19,
275:22
**negotiator**
124:16
**negotiators**
18:2
**nehru**
3:14, 7:22
**neither**
87:9, 102:3,
197:2, 205:4,
205:10, 286:13
**network**
6:8, 18:3,
18:11, 18:12,
28:3, 37:9,
37:22, 44:18,
47:11, 53:23,
54:18, 58:7,
112:18, 112:20,
169:11, 170:17,
201:14, 206:9,
212:22, 212:24,
212:25, 213:1,
213:4, 220:23,
222:20, 230:12,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

104

232:7, 237:12,
245:1, 252:19,
265:1, 265:16
**never**
42:22, 43:7,
50:17, 69:23,
83:24, 84:2,
84:5, 84:11,
84:21, 85:7,
105:23, 106:3,
106:14, 106:18,
107:5, 107:8,
116:7, 140:12,
140:13, 175:2,
200:1, 227:18,
228:15, 229:12,
229:17, 258:19,
260:11, 264:16,
270:19, 272:6,
281:7
**new**
51:4, 51:5,
51:6, 62:19,
81:17, 81:24,
82:19, 82:21,
82:23, 84:9,
120:4, 123:19,
124:8, 126:6,
202:20, 233:12,
234:3, 234:17,
237:21
**newspaper**
165:12
**next**
30:24, 98:9,
98:12, 114:17,
127:7
**nice**
282:22
**nine**
9:15
**non-ncpdp**
224:24
**noncash**
80:8
**noncompliance**
135:16
**noncompliant**
226:17

**none**
221:7, 256:6
**nonetheless;**
248:5
**nonexistence**
254:6
**nonsenior**
158:5
**nonvolunteering**
282:5
**northern**
1:2, 7:10
**notable**
209:6
**notarial**
286:17
**notary**
2:16, 286:1,
286:5, 286:23
**note**
8:18, 169:22,
170:2, 176:1
**nothing**
139:22, 161:4,
174:5, 200:5,
254:14, 271:12,
279:2, 284:21
**noticed**
285:11
**notify**
13:15
**noting**
162:12, 163:2
**notion**
220:16
**november**
232:1, 236:1,
236:12, 237:21,
238:11, 238:19
**now-member**
174:2
**nowhere**
283:17
**number**
34:20, 56:6,
107:13, 114:17,
122:11, 125:18,
130:12, 130:18,

153:1, 167:17,
215:18, 252:15
**numbers**
108:1
**nurseline**
188:3
**nw**
3:7, 3:16

**O**

**object**
16:8, 69:11,
111:5, 111:6,
111:7, 140:5,
146:3, 166:8,
166:21, 168:8,
170:14, 171:5,
172:18, 183:2,
241:8, 267:25,
282:20
**object"**
166:14
**objecting**
172:20
**objection;**
29:10, 76:11,
121:24, 140:16,
168:12
**objections**
8:20, 8:21,
146:6, 172:21
**objective**
258:16
**obligated**
93:6, 140:17
**obligation**
219:11, 221:4
**obligations**
148:23, 216:11
**obsolete**
124:20
**obtain**
73:9, 149:19,
223:16
**obtained**
173:15, 265:19
**obviously**
84:15, 169:6,

169:24, 202:24,
224:19, 237:15
**occasion**
51:20, 129:5
**occasions**
125:13
**occur**
176:20, 177:2,
178:1
**occurred**
96:9, 105:3
**occurs**
256:1
**october**
30:24, 31:11
**of"**
36:11, 36:12,
37:3, 37:4,
37:16, 37:17,
110:16, 112:12,
112:22, 113:3,
141:16, 142:3,
143:5, 143:21,
147:15, 152:8,
152:18, 154:12,
169:7, 202:10,
207:6, 268:24,
269:1, 269:2,
269:6
**of:**
2:2
**of;**
269:4
**off-the-record**
231:15, 244:4
**offer**
23:1, 26:1,
26:5, 26:21,
27:11, 41:10,
60:24, 62:22,
62:24, 64:17,
64:20, 64:24,
65:14, 65:15,
65:20, 66:10,
67:1, 67:6,
67:10, 75:11,
126:6, 139:22,
203:12, 242:2,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    105

254:22, 260:5,
267:17
**offer"**
63:2
**offer;**
63:13
**offered**
19:2, 19:22,
26:21, 27:9,
37:15, 51:12,
58:11, 58:16,
135:14, 136:23,
188:8, 203:3,
205:20, 228:12,
259:1
**offering**
59:14, 63:6,
187:14, 206:13,
226:14, 250:13,
254:4, 258:25
**offers**
21:11, 22:16,
171:19, 206:1
**officer**
85:22, 286:6
**official**
191:10
**often**
78:13, 112:5,
124:22, 160:14,
187:19, 211:24,
255:5
**oftentimes**
92:3, 128:7,
219:13, 229:25,
232:23
**oh**
53:17, 84:17,
189:14, 250:2
**ohio**
46:9
**ok"**
245:25, 246:3
**okayed**
246:16
**old**
63:3
**onboarded**
128:23

**onboarding**
129:8
**once**
9:13, 19:17,
67:12, 215:17
**one's**
261:9
**one;**
139:18
**ones**
45:7, 161:23,
193:25, 194:1
**online**
220:4
**only**
8:20, 28:25,
34:19, 38:13,
48:20, 51:5,
53:6, 57:9,
93:7, 93:15,
108:11, 127:17,
139:18, 156:17,
170:1, 181:11,
183:20, 207:21,
228:24, 237:2,
245:24, 266:6,
272:12
**open**
285:10
**operate**
162:21
**operational**
54:2, 55:14,
55:15
**operations**
69:15
**opine**
172:24
**opinion**
42:14, 42:15,
42:17, 42:24,
43:9, 68:4,
69:18, 76:16,
106:15, 106:18,
124:17, 137:18,
137:23, 138:1,
250:13, 254:5,
254:10, 259:1,

260:6, 267:21,
268:9, 268:11
**opinions**
68:6, 101:17,
137:24, 196:1,
196:19, 254:22
**opportunity**
63:8
**opposed**
26:22, 63:3,
78:10, 154:9,
221:10, 273:10
**opposite**
83:11, 125:5,
125:10
**opposition**
195:20, 195:23
**opted**
22:24, 42:7
**option**
178:3, 243:12,
243:13
**options**
42:6, 125:1,
242:25, 243:8,
243:12, 243:14
**optum"**
21:6, 196:14,
197:23
**optum";**
138:9
**optum's**
37:14, 56:11,
57:4, 71:25,
73:16, 80:16,
87:15, 88:21,
89:4, 101:4,
103:23, 104:6,
124:5, 138:7,
139:3, 141:20,
141:24, 143:6,
144:1, 145:15,
153:4, 172:25,
177:19, 177:21,
185:16, 185:19,
185:21, 210:9,
222:20
**optum-cvs**
218:10, 280:2

**optum-insured**
178:22
**optum;**
98:18, 198:7
**optumhealth**
28:25, 32:7,
39:4, 41:10,
181:20, 183:21
**optuminsight**
191:13, 191:15,
191:16, 192:11
**optumrx**
2:4, 4:5, 5:17,
44:12, 47:1,
48:7, 48:8,
54:3, 88:20,
96:25, 115:11,
153:13, 173:23,
174:3, 189:7,
189:9, 189:12,
190:14, 190:25,
191:20, 191:22,
192:3, 192:21,
193:10, 194:14,
195:2, 195:5,
195:2, 198:5,
198:9, 199:19,
201:1, 201:11,
201:15, 201:21,
205:4, 205:11,
207:11, 211:11,
211:15, 211:22,
212:1, 214:18,
215:6, 215:14,
215:20, 216:22,
219:15, 220:21,
223:7, 233:12,
244:25, 249:24,
250:6, 256:11,
282:11
**optumrx's**
234:3, 246:4
**optumrx-cvs**
209:13
**optumrx;**
192:16
**order**
8:19, 8:24,

9:1, 38:24,
49:23, 52:25,
59:7, 62:10,
63:21, 75:9,
96:3, 96:13,
102:1, 166:14,
166:25, 234:21
**organization**
78:13, 256:11,
257:14, 258:3,
260:9
**organization;**
272:24
**organizations**
96:24, 189:8
**organized**
187:6
**orx**
234:5
**others**
11:11, 11:12,
45:16, 49:6,
49:8, 52:12,
53:9, 72:15,
191:8, 208:13,
209:7, 260:8
**otherwise**
115:25, 133:22,
182:18, 183:9,
185:4, 214:3,
286:15
**ought**
204:7
**out**
12:23, 13:5,
64:4, 64:9,
64:24, 67:23,
68:14, 68:22,
69:21, 71:22,
73:7, 87:17,
87:25, 88:15,
94:13, 99:16,
102:8, 102:22,
103:11, 103:21,
104:4, 124:20,
127:24, 140:3,
140:10, 142:3,
165:11, 166:22,

202:2, 203:10,
209:12, 229:12,
230:3, 256:2,
260:1, 262:7,
262:18, 269:3
**outcome**
286:15
**outcomes**
226:12
**outlines**
128:6, 134:19
**outside**
13:22, 76:7,
103:22, 104:5,
106:4, 106:19,
107:10, 145:4,
175:6, 200:21,
208:10, 248:17,
257:5, 257:14,
262:8, 262:19,
263:13, 267:24,
280:18, 285:4
**over**
21:20, 35:11,
35:21, 135:1,
139:9, 142:15,
146:24, 149:17,
159:9, 161:25,
163:16, 170:18,
193:19, 215:11,
221:20, 222:14,
233:22, 244:14,
251:3
**overarching**
212:5
**overcharged**
149:3
**overlaid**
234:4
**overpaying;**
95:5
**overpayment**
200:10, 200:18,
220:1
**overreimbursement**
200:2
**override**
60:11, 253:13,

254:2, 255:2
**override"**
253:14
**overrides**
253:10, 253:16,
254:7, 254:15,
254:18, 254:23,
255:9, 255:14
**oversimplification**
178:16
**owe**
214:23, 215:5,
215:13, 215:23
**own**
24:24, 50:19,
54:13, 55:11,
81:14, 85:17,
89:21, 112:17,
168:5, 168:21,
188:12, 203:7,
229:2, 229:24
**owned**
203:5, 203:10
**owner**
209:10
**owners**
229:24
**ownership**
51:9

---

**P**

**pacific**
210:10
**package**
172:9, 182:9
**page**
5:2, 5:10, 6:3,
6:11, 46:19,
107:25, 109:5,
110:10, 110:11,
110:16, 115:16,
117:8, 117:13,
117:15, 117:19,
120:5, 127:18,
131:2, 135:10,
198:4, 230:15,
232:7, 235:1,
275:7, 275:15

**pages:**
1:23
**paid**
67:16, 68:23,
69:23, 80:14,
93:21, 157:21,
182:14, 219:22,
219:23, 269:11,
282:10
**painful**
142:13
**paper**
174:12, 225:14,
235:23
**paragraph**
53:20, 54:1,
56:6, 58:10,
60:21, 62:6,
62:17, 63:11,
65:22, 71:9,
71:11, 71:24,
72:17, 72:21,
73:1, 73:9,
74:15, 75:22,
76:13, 76:19,
77:12, 81:17,
82:19, 83:13,
84:22, 86:18,
87:7, 87:17,
88:2, 88:8,
88:17, 89:19,
90:10, 94:16,
94:22, 95:9,
95:12, 95:14,
95:18, 97:20,
98:24, 99:9,
99:12, 100:1,
100:19, 101:25,
105:14, 106:7,
106:22, 109:10,
117:10, 137:18,
137:25, 138:15,
149:8, 158:6,
160:13, 165:5,
166:6, 166:10,
167:7, 196:13,
196:22, 197:14,
203:20, 205:17,

207:1, 207:17,
208:1, 210:7,
210:20, 216:1,
245:4
**paraphrase**
25:5, 26:19,
47:7, 72:5,
72:12, 85:1,
88:6, 96:19,
100:24, 103:5,
104:2, 108:16,
111:17, 120:25,
146:15, 150:23,
159:24, 162:23,
206:6, 218:19,
250:22, 262:14,
267:19, 270:25
**paraphrasing**
72:22, 73:23
**parent**
187:2
**parentheses**
226:4
**parkway**
2:5, 7:15, 10:8
**part**
20:3, 20:16,
21:1, 21:3,
26:9, 27:6,
32:9, 37:15,
44:10, 44:11,
49:18, 51:9,
51:22, 51:24,
52:2, 54:13,
55:20, 55:24,
97:11, 115:4,
121:2, 121:19,
126:2, 126:23,
128:23, 138:2,
170:18, 179:19,
181:21, 188:1,
199:13, 199:24,
206:25, 207:12,
207:21, 209:9,
216:17, 218:6,
220:7, 220:18,
227:4, 229:23,
229:25, 243:1,

243:2, 243:18,
247:7, 248:1,
257:22, 264:25,
268:25
**partially**
17:15
**partially"**
17:16
**participate**
35:13, 35:16,
66:12, 66:17,
81:19, 81:23,
82:4, 139:6
**participating**
54:6
**participation**
271:7
**particular**
13:4, 24:2,
74:9, 91:17,
92:12, 125:7,
132:2, 155:8,
182:4, 185:3,
211:18, 213:8,
222:2, 225:7,
253:23, 265:17
**parties**
231:13, 236:25,
247:7, 247:19,
248:22, 286:14
**parties'**
83:17, 85:8
**partnered**
203:5
**partnering**
203:12
**parts**
93:2, 131:3,
167:11, 187:6
**party**
4:3, 7:25, 8:25
**pass**
58:12, 61:12,
61:16, 62:7,
62:23, 71:14,
71:18, 72:2,
72:18, 73:3,
73:17, 76:1,

76:3, 83:18,
85:19, 85:23,
89:21, 90:3,
90:20, 98:15,
98:23, 105:20,
106:25, 177:14,
177:20, 185:22,
197:5, 197:10,
199:12, 199:13,
200:4, 200:12,
200:21, 203:23,
204:11, 205:7,
205:14, 206:1,
207:5, 207:20,
207:21, 226:22,
227:3, 243:15,
246:25, 248:1,
249:25, 250:19,
251:2, 251:10,
251:17, 251:20,
252:5, 257:10,
257:16, 257:22
**pass"**
198:20
**pass;**
204:20
**passed**
169:22, 209:2
**past**
63:24, 243:9
**patience**
278:2
**pay**
18:20, 36:22,
59:4, 59:21,
62:13, 66:16,
69:6, 75:12,
75:16, 78:5,
88:12, 89:8,
92:2, 94:2,
94:8, 102:10,
125:16, 141:17,
142:4, 143:7,
143:21, 145:9,
145:16, 147:25,
148:3, 155:14,
157:13, 159:11,
163:19, 177:7,

181:22, 181:25,
182:4, 183:9,
183:15, 208:16,
252:16, 253:6,
270:4
**pay;**
269:24
**paycheck**
27:22
**payers**
251:4, 251:12,
251:16
**paying**
24:24, 70:11,
74:4, 114:13,
116:14, 116:17,
140:22, 141:2,
144:1, 145:24,
150:13, 152:7,
154:9, 181:10,
181:13, 203:13,
262:19, 263:12
**payment**
78:7, 88:25,
96:24, 135:13,
136:15, 155:21
**pays**
155:10, 249:22,
252:11, 252:24,
253:2
**pays'"**
196:10
**pbm**
31:4, 39:23,
44:10, 44:13,
114:9, 183:11,
188:12, 191:24,
192:1, 192:3,
192:9, 192:11,
192:16, 192:20,
192:22, 193:1,
193:13, 194:17,
194:23, 211:10,
212:2, 212:12,
217:14, 218:18,
219:19, 220:11,
220:17, 227:14,
229:7, 252:11,

252:15, 252:24,
258:14, 260:12,
270:3, 281:9,
282:4
**pbm;**
44:9, 228:16,
253:2
**pbms**
56:7, 194:25,
195:8, 195:10,
195:12, 227:3,
251:4, 251:12,
251:15, 253:6,
255:8, 281:12,
281:20, 282:2
**pc**
217:12
**pcn**
215:18
**penalty**
227:12, 227:19,
228:1
**pending**
10:24, 66:9
**penny**
77:1, 77:3
**people**
19:25, 26:22,
168:2, 178:4,
187:19, 256:17,
267:24
**percent**
165:3
**percentage**
58:5, 58:7,
183:16
**percents**
58:9
**perform**
216:11, 271:24
**performed**
64:24
**performs**
178:12
**perhaps**
192:19, 202:13
**period**
62:14, 81:2,

84:14, 85:8,
86:19, 124:13,
160:10, 171:7,
273:17
**permitted**
224:4
**person**
26:13, 41:3,
48:20, 55:1,
55:3, 58:25,
80:5, 97:12,
116:25, 150:8,
171:16, 176:21,
178:10, 182:22,
185:5, 211:18,
256:23
**person's**
211:20
**personal**
16:12, 41:7,
43:2, 68:4,
69:17, 108:25,
110:6
**personally**
137:8, 138:12,
173:2, 232:6
**persons**
21:7, 21:10,
22:12, 22:14,
76:7, 76:9,
93:22, 94:2,
94:4, 102:8,
102:22, 103:11,
103:22, 104:5,
116:7, 149:17,
262:8, 262:19
**pertained**
210:3
**pertaining**
55:9
**pertains**
67:20
**pertinent**
63:19
**pharmaceutical**
20:20, 25:4,
34:5, 270:5
**pharmaceuticals**
19:3, 38:9,

86:13, 171:18,
184:8
**pharmacies**
28:8, 29:18,
30:21, 32:2,
32:3, 32:6,
34:14, 34:16,
34:19, 34:24,
36:12, 37:12,
44:19, 47:2,
53:23, 56:12,
56:14, 58:11,
112:12, 113:24,
203:3, 205:21,
213:1, 217:2,
218:16, 219:1,
219:8, 220:3,
221:3, 221:22,
221:25, 222:11,
223:19, 252:12,
252:19, 253:5,
281:12, 282:3
**pharmacies'**
202:14, 221:24,
251:2, 254:23
**pharmacies;**
164:14, 273:3
**pharmacist**
59:10, 60:10,
167:19, 214:22,
215:17, 223:12,
223:15
**pharmacists**
217:10
**pharmacy"**
217:22
**pharmacy's**
184:5, 184:20,
185:18, 185:20,
253:19, 254:7
**pharmacy;**
279:20
**phone**
222:14, 234:2
**phrase**
77:20, 98:13,
106:24, 111:20,
194:23, 197:9,

198:18, 203:21,
203:25, 204:9,
283:14, 283:16,
283:20, 284:11
**phrased**
223:17
**physician**
17:25
**physicians**
18:5, 28:3,
30:19
**pick**
61:3, 269:11,
270:4
**picks**
272:19
**piece**
84:4
**pinpoint**
196:7
**place**
7:14, 82:14,
123:18, 123:19,
124:12, 126:9,
131:25, 165:16,
170:7, 220:11,
255:3, 274:6
**plaintiff**
7:18, 7:20
**plaintiffs**
1:5, 8:15, 9:5,
41:19, 227:22,
250:18, 250:25,
251:9, 252:8,
261:1, 281:6,
281:18, 281:23
**plaintiffs'**
5:10, 6:3, 7:2,
14:1, 14:8,
14:19, 15:5,
46:13, 46:18,
71:8, 105:15,
107:16, 107:18,
114:18, 114:21,
118:7, 127:10,
130:6, 130:12,
130:17, 132:18,
149:7, 179:11,

195:16, 203:24,
209:14, 209:19,
209:24, 209:25,
210:2, 210:13,
228:6, 230:3,
230:20, 230:23,
231:7, 231:11,
235:17, 235:18,
235:25, 236:8,
236:9, 236:18,
237:11, 237:15,
240:15, 245:17,
246:11, 249:6,
250:11, 251:14,
254:17, 255:18,
255:23, 256:12,
256:22, 275:1,
283:22, 284:4,
284:14
**plaintiffs:**
3:3
**plan**
19:1, 20:2,
20:16, 20:17,
22:17, 25:21,
26:22, 27:6,
30:8, 39:18,
42:3, 42:9,
66:2, 78:1,
90:2, 95:1,
141:20, 141:24,
144:18, 153:15,
153:22, 158:18,
159:2, 165:15,
178:12, 182:23,
183:4, 211:3,
211:6, 211:7,
211:10, 211:13,
211:17, 212:5,
212:11, 212:16,
213:8, 213:9,
215:19, 216:5,
216:12, 221:15,
243:12, 269:17
**plan"**
212:7
**plan;**
212:8

**planet**
7:14, 8:3
**plans**
20:2, 21:8,
21:9, 22:12,
22:13, 22:14,
22:22, 27:16,
37:2, 37:3,
45:25, 61:7,
79:2, 148:3,
149:3, 188:8,
192:23, 211:22,
212:3, 212:20,
213:5, 258:20,
268:20, 268:23
**play**
54:13
**please**
7:16, 8:4, 8:7,
14:10, 14:16,
22:9, 71:9,
95:13, 104:1,
115:23, 128:11,
128:17, 133:5,
155:4, 162:22,
166:13, 167:2,
176:17, 178:18,
190:8, 203:19,
209:12, 209:13,
217:16, 222:5,
223:22, 225:12,
229:14, 230:3,
234:2, 245:2,
245:19, 246:12,
249:6, 265:9,
269:25, 271:21
**pna**
234:5
**point**
11:17, 36:2,
42:11, 50:12,
53:10, 58:22,
65:8, 65:11,
77:15, 96:10,
96:21, 115:5,
156:18, 178:15,
181:16, 183:12,
190:2, 214:19,

221:21, 223:13,
237:3, 266:14,
266:20
**pointed**
170:23
**points**
144:4
**police**
273:5
**policing**
273:10
**poorly**
283:19
**populating**
226:9
**population**
78:14
**portfolio**
51:22, 52:2,
141:21
**portfolio;**
51:24
**portion**
18:9, 136:1
**pos**
214:1, 214:19,
216:9, 217:6,
217:14, 218:13,
220:18, 221:6,
221:10, 222:8,
270:6
**posed**
241:11
**position**
29:6, 30:21,
30:24, 31:21,
32:1, 32:8,
142:20, 184:19,
185:16, 185:19,
185:21, 205:19,
205:25, 206:11,
207:10, 211:25,
232:9, 232:11,
232:14, 254:4,
258:22, 258:23
**positions**
32:8, 40:17
**possible**
78:17

**postnegotiation**
35:11
**potential**
129:11, 157:1
**potentially**
13:16
**practice**
261:9, 261:10,
261:17, 264:5
**practices**
67:19, 87:8,
101:2, 197:1,
199:4, 199:6,
199:10, 199:25,
200:20, 207:18,
264:17
**precisely**
200:7
**predecessor**
80:16, 83:20,
85:11, 85:16,
87:10, 87:16,
88:16, 88:22,
89:4, 90:18,
98:13, 106:23,
177:22, 197:3,
197:8, 198:2,
198:18, 203:21,
204:17, 210:10,
210:13, 264:16
**predecessors**
77:15, 198:25,
251:20, 257:7
**predecessors;**
272:8
**predicate**
152:20
**prefer**
10:5, 18:20,
94:2, 122:16
**premerger**
195:6
**premium**
80:14, 181:11
**preparation**
175:19
**prepare**
11:7, 13:13,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                      110

118:24, 119:6,
256:9, 258:10
**preparing**
13:9, 48:25,
49:14, 248:21
**prerequisite**
20:7
**prescription**
5:18, 5:21,
17:13, 17:17,
18:7, 18:21,
25:12, 25:13,
26:2, 27:1,
27:24, 28:2,
32:13, 48:7,
59:1, 59:4,
59:18, 68:25,
79:2, 80:19,
87:9, 102:3,
107:20, 107:21,
115:1, 115:2,
115:9, 115:18,
116:2, 150:14,
171:17, 172:14,
173:12, 176:20,
176:24, 178:11,
181:23, 182:5,
182:15, 183:23,
184:4, 185:17,
188:20, 189:6,
189:9, 197:2,
197:22, 197:23,
198:7, 199:4,
199:7, 199:10,
200:1, 200:9,
200:17, 200:20,
204:9, 204:15,
205:4, 205:18,
206:3, 206:11,
207:19, 208:7,
210:8, 210:11,
211:1, 211:20,
214:3, 214:6,
216:10, 217:19,
225:19, 246:23,
250:5, 255:21,
257:20, 258:12,
269:12, 284:5

**prescription"**;
60:6
**prescription**;
176:25, 213:11
**presence**
208:4, 208:8
**present**
21:24, 22:6,
38:23, 40:11,
64:1, 156:20,
181:15, 200:8
**present**:
4:11
**presented**
118:19, 118:21
**presenting**
171:24
**presents**
171:23, 223:11
**president**
201:9, 201:10,
202:13, 202:24,
206:23
**presume**
132:24, 168:9,
245:9
**pretty**
12:13, 53:14,
54:13, 112:24,
156:18, 165:1,
204:24, 279:6,
283:3
**prevail**
133:21
**prevails**
133:19, 135:4
**prevalent**
242:22, 242:23,
242:24, 243:6,
243:25
**previous**
37:19, 39:5,
46:3, 59:25,
60:1, 87:22,
126:4, 276:25
**previously**
28:6, 31:23,
39:19, 53:7,

53:8, 206:19
**price"**
90:18, 93:21,
110:20, 131:7,
136:22, 179:3,
199:15, 200:23,
202:17, 204:19,
205:6, 205:12,
208:11, 251:1,
257:9, 258:14
**price"**;
93:16
**price**;
93:19, 96:4,
99:14, 111:4,
111:23, 114:1,
137:1, 137:5,
205:7, 205:14,
250:1
**prices**
42:18, 43:13,
68:1, 68:17,
69:2, 70:1,
70:9, 78:4,
78:25, 79:1,
79:6, 95:10,
95:19, 96:14,
97:17, 101:18,
102:2, 102:4,
102:10, 102:11,
124:6, 124:7,
140:20, 146:10,
146:18, 148:22,
166:7, 167:8,
168:6, 168:7,
168:23, 168:24,
170:13, 171:4,
179:17, 202:16,
203:16, 227:13,
250:15, 261:20,
261:21, 264:17,
265:22, 266:9,
266:13, 266:22,
268:5, 268:7,
269:3, 269:8,
274:13, 279:25
**prices"**
146:19

**prices**;
151:7, 261:18,
264:20, 265:7,
273:22, 274:11
**pricing**
16:1, 38:20,
62:11, 100:9,
100:13, 100:18,
101:3, 141:16,
142:4, 143:21,
177:15, 179:16,
180:14, 186:2,
202:1, 206:24,
207:12, 269:1,
269:2, 269:6,
270:22, 271:1
**pricing"**
186:7
**pricing**;
254:24, 268:24,
271:8
**principles**
176:13
**printout**
14:19
**prior**
12:11, 15:10,
21:22, 34:1,
82:14, 83:17,
85:8, 86:19,
105:24, 106:13,
107:4, 111:8,
115:13, 115:14,
125:24, 140:12,
171:7, 175:15,
180:22, 188:19,
193:17, 194:14,
194:17, 231:5,
247:16, 265:4,
277:6
**private**
26:22
**privilege**
8:22
**privy**
169:3, 169:20,
170:20
**proact**
209:10

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    111

**probably**
15:22, 18:23,
22:10, 41:1,
150:4, 159:17,
163:10, 164:7,
165:9, 165:21,
209:6, 215:11,
223:24, 266:18,
280:25
**problem**
9:22, 95:2,
142:12, 166:17,
166:20, 204:25,
218:16
**procedural**
128:7
**procedures**
54:4, 54:17
**proceedings**
248:17, 249:1,
285:4
**proceeds**
234:9
**process**
54:25, 149:22,
161:7, 215:8,
215:15, 216:21,
216:22, 220:11,
220:19, 243:20
**processing**
40:19
**processor**
213:25
**procure**
211:10
**product**
27:14, 45:11,
190:17, 253:24
**products**
39:10, 60:25,
188:2
**professional**
9:10, 29:18,
29:21, 30:20,
31:18, 38:7,
40:1, 40:6,
41:17, 42:22,
43:2, 43:3,

43:7, 68:6,
69:18, 76:16
**professionally**
41:13
**profile**
5:14
**program"**
284:6
**program's**
62:12, 102:2,
102:10
**program;**
66:13, 66:18,
100:6, 182:7,
185:13, 261:9,
268:16
**programs**
41:9, 61:2,
62:22, 62:24,
72:1, 99:7,
121:22, 122:24,
127:2, 164:24,
202:2, 202:15,
203:2, 203:9,
205:20, 205:25,
206:12, 206:24,
207:11, 207:15,
208:13, 209:5,
225:20, 228:7,
229:11, 236:24,
242:4, 243:2,
243:6, 243:25,
246:22, 247:10,
249:22, 251:24,
252:3, 258:15,
261:6, 261:14,
274:14, 276:20,
277:7, 277:17,
278:19
**programs"**
120:17, 239:1,
283:14, 283:16,
283:17, 283:21,
284:11
**programs";**
236:16
**programs'**
71:12, 75:24,

105:18
**programs;**
274:17, 276:23,
277:3
**prohibited**
218:2
**promoting**
203:7
**pronouncing**
180:23
**proof**
149:25, 150:5,
172:1, 172:2
**proper**
281:10
**proposal**
120:4
**proposed**
119:23, 131:4,
183:17, 236:14,
240:17, 240:24
**proprietary**
116:22, 117:7,
167:16, 272:7
**prorated**
57:17
**provide**
44:18, 44:21,
53:5, 61:15,
61:20, 216:8,
222:14, 240:2,
245:2, 280:18,
280:23, 281:12,
282:3
**provided**
15:6, 39:22,
42:23, 43:8,
61:10, 217:13,
272:7, 280:9,
280:12, 281:3,
281:8
**provider**
5:16, 6:5, 6:7,
18:3, 31:24,
37:11, 46:25,
51:21, 127:13,
129:1, 133:20
**providers**
28:4, 28:9,

28:15, 28:17,
28:20, 28:23,
30:14, 30:18,
31:25, 34:11,
54:3, 54:6,
125:14
**providers"**
18:4
**provides**
192:16, 212:2,
212:12
**providing**
58:21, 61:1
**provision**
133:18, 134:25,
135:2, 143:13,
170:23, 214:15,
215:1, 216:7,
216:17, 217:18,
218:7, 218:9,
219:9, 222:7,
223:6, 223:17,
225:6, 225:22,
226:6, 227:20,
235:8, 239:22,
245:16
**provision;**
217:23
**provisions**
54:16, 139:24,
210:19, 218:25,
222:19, 223:2,
247:24
**prudent**
247:17, 248:4
**public**
2:16, 58:17,
135:15, 136:24,
193:22, 259:2,
286:1, 286:5,
286:23
**published**
112:4, 128:13,
129:17
**pull**
209:12, 209:19,
223:12, 230:3,
249:6, 283:7,

284:9
**purchase**
22:22, 23:5,
25:13, 38:8,
38:25, 39:8,
42:9, 59:7,
60:5, 80:5,
167:22, 176:23,
176:25, 177:2,
177:9, 177:12,
177:20, 178:5,
182:25, 184:4,
185:2, 192:7,
193:23
**purchased**
182:11
**purchases**
26:25, 32:12,
52:21, 79:23,
97:7, 97:13,
117:1, 164:19,
176:20, 177:3,
178:1, 184:12
**purchasing**
38:17, 91:18,
92:13
**purely**
50:18
**purportedly**
253:2
**purporting**
260:5
**purpose**
66:6, 129:7,
131:9, 131:10,
223:4, 223:5
**purposes**
90:6, 129:9,
131:12, 256:19
**pursuant**
2:13, 148:22
**pursuing**
200:9
**pursuit**
200:17
**purview**
60:18, 169:10,
170:19

**put**
49:24, 109:10,
120:2, 123:19,
129:24, 226:24
**putting**
21:5, 139:19,
268:4, 268:5
**px**
114:17, 278:4

---

**Q**

**qualify**
75:9
**quality**
222:8
**quantify**
212:10
**quantity**
179:1, 179:5,
224:6
**quarterly**
54:11, 129:17,
129:19
**question**
9:21, 10:13,
10:19, 10:21,
10:24, 16:9,
22:1, 22:4,
22:8, 25:5,
27:5, 33:14,
43:5, 46:22,
46:24, 50:7,
59:25, 68:12,
68:19, 72:6,
76:12, 91:14,
104:20, 104:25,
105:16, 105:23,
108:16, 116:12,
118:2, 122:22,
123:9, 128:17,
133:5, 137:2,
137:16, 140:7,
144:8, 150:20,
152:21, 155:8,
155:24, 162:22,
167:1, 170:22,
172:3, 173:7,
176:16, 177:8,

179:10, 194:13,
198:16, 200:6,
210:5, 210:18,
226:24, 235:21,
241:24, 256:15,
275:5, 275:10,
278:3, 281:15,
282:25, 284:1
**question:**
240:10
**questioning**
230:24, 231:3,
236:18, 247:3,
247:11, 257:11
**questions**
10:16, 11:1,
21:23, 77:22,
111:10, 129:2,
129:11, 131:11,
167:16, 172:22,
176:5, 176:12,
178:16, 178:20,
180:21, 186:16,
189:22, 195:15,
203:25, 224:8,
228:5, 230:19,
239:18, 240:1,
240:3, 241:11,
242:8, 246:19,
247:5, 250:12,
252:7, 253:9,
254:18, 254:20,
255:17, 259:4,
260:20, 261:3,
269:22, 270:2,
275:18, 279:5,
279:9, 280:8,
282:16, 283:4,
283:5, 284:20
**quick**
276:12
**quicker**
274:4
**quite**
283:3
**quote**
80:18, 106:24,
106:25, 110:5,

149:9, 251:1,
251:16
**quoting**
166:12

---

**R**

**rails**
189:19
**raise**
8:6
**ramp**
259:22
**ran**
77:19
**range**
20:6, 39:10,
187:15
**ranged**
22:18
**ranges**
54:4
**rank**
252:19
**ranked-wise**
195:4
**ranking**
252:14
**rare**
165:1
**rarely**
163:18
**rate**
33:24, 36:17,
92:7, 156:21,
162:4, 183:15,
233:22, 234:1
**rate;**
91:24
**rates**
169:2
**rather**
72:5
**rdr**
1:25, 286:4
**re:**
239:18
**reach**
64:4, 64:9

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    113

**reached**
168:5, 168:21,
170:12, 171:3
**read**
11:9, 11:11,
11:14, 46:21,
64:21, 66:5,
66:9, 66:23,
75:3, 80:24,
101:17, 103:7,
108:7, 115:22,
124:1, 136:2,
150:21, 166:6,
166:19, 167:7,
173:6, 196:25,
197:11, 211:4,
214:8, 216:17,
216:20, 218:6,
222:17, 224:17,
225:3, 228:14,
233:13, 234:7,
239:9, 240:13,
242:5, 245:4,
249:14, 275:9,
277:8
**reading**
12:11, 72:20,
108:14, 168:4,
168:21, 196:24,
227:10, 286:12
**reads**
115:24, 121:4,
216:7, 222:10
**ready**
275:12, 275:13
**real**
64:24, 67:2,
67:7, 139:23,
276:11
**real-time**
222:8
**really**
18:10, 35:10,
37:11, 37:23,
41:2, 41:15,
50:17, 50:22,
52:6, 54:12,
63:17, 65:3,

65:5, 66:20,
67:19, 69:15,
89:6, 110:4,
128:5, 172:23,
187:12, 190:23,
212:21, 229:12
**realm**
55:12, 68:5,
170:17, 212:24
**realtime**
2:15, 8:2,
224:1
**reask**
275:11
**reason**
10:17, 11:3,
22:21, 75:15,
126:3, 127:14,
223:10, 229:12,
229:17, 229:20,
242:10, 253:22,
256:16, 280:17
**reasonable**
171:16, 172:5,
172:13, 173:11
**reasonably**
216:10
**reasons**
124:22, 221:13
**recall**
11:14, 13:6,
15:21, 15:22,
32:20, 32:25,
39:24, 40:3,
40:15, 41:4,
47:23, 49:19,
49:25, 50:3,
50:15, 57:18,
61:8, 61:11,
61:14, 63:20,
64:14, 85:14,
128:14, 146:12,
179:10, 221:7,
228:13, 230:22,
250:16, 254:16,
268:21, 273:15,
275:20
**recap**
252:13

**receive**
60:2, 63:8,
76:5, 98:7,
147:21, 161:19,
183:8, 266:21
**received**
59:17, 266:19
**receives**
150:8
**receiving**
208:15
**recent**
35:6, 188:11,
192:19
**recently**
77:21, 128:24
**recess**
71:2, 105:9,
113:18, 147:8,
174:16, 194:6,
248:16, 277:22,
285:3
**recipients**
187:15
**recitals**
197:25
**recognized**
79:10, 112:5
**record**
7:5, 8:19,
8:23, 10:1,
13:25, 22:1,
70:25, 71:5,
105:7, 113:15,
113:16, 113:21,
115:23, 134:13,
147:6, 147:11,
169:22, 169:23,
170:3, 174:12,
174:14, 174:19,
176:2, 194:4,
204:5, 223:12,
231:11, 235:1,
248:14, 249:4,
249:14, 252:10,
277:14, 277:20,
282:16, 283:3,
285:1, 285:23,

286:9
**record:)**
248:18, 249:2,
285:5
**recoupment**
200:1
**redeemable**
182:17
**redeeming**
182:25
**redline**
230:20, 232:24,
235:11, 236:11,
236:25, 237:21,
238:12, 239:17,
240:1
**redline;**
237:24
**redlined**
119:21, 120:10,
230:12, 230:16,
246:7
**redlines**
234:4, 236:8,
238:18, 245:1,
245:17, 245:19,
245:23
**redlines"**
246:5
**redlining**
235:7, 235:16,
236:1
**reduce**
60:11
**reduced**
286:11
**refer**
13:8, 84:22,
89:18, 117:18,
197:17, 210:8
**reference**
41:20, 99:6,
122:10, 133:14,
207:18, 207:22,
210:3
**referenced**
210:1
**referencing**
132:6, 133:12

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                      114

| | | | |
|---|---|---|---|
| **referred** | 182:18, 182:25, | 264:17, 286:13 | 257:17 |
| 19:12, 88:2, | 184:5, 184:15, | **relates** | **remind** |
| 99:8, 198:3 | 185:9, 185:10, | 38:17, 216:2, | 130:11 |
| **referring** | 185:18 | 261:17, 267:8 | **renamed** |
| 11:23, 12:25, | **regulatory** | **relating** | 193:7, 198:7 |
| 18:14, 19:13, | 54:4, 54:16 | 207:4 | **renewal** |
| 36:21, 37:7, | **regulatory;** | **relation** | 259:16 |
| 41:13, 45:8, | 55:10 | 82:24 | **repeat** |
| 48:6, 50:24, | **reichardt** | **relations** | 22:8, 33:14, |
| 52:23, 71:7, | 1:11, 2:1, 5:2, | 31:1, 31:24, | 43:4, 128:17, |
| 74:9, 74:10, | 5:11, 5:12, | 37:10, 37:11, | 133:5, 137:2, |
| 78:1, 79:14, | 5:14, 5:15, | 37:22, 201:14, | 151:25, 167:1, |
| 79:17, 83:15, | 6:13, 7:8, 8:11, | 212:25, 265:2, | 168:14, 235:21, |
| 84:8, 101:10, | 9:3, 9:7, 10:3, | 265:16 | 238:5, 261:24, |
| 111:14, 117:13, | 11:19, 11:22, | **relationship** | 269:25, 284:1 |
| 131:24, 135:23, | 46:17, 71:7, | 17:4, 50:19, | **repeated** |
| 135:25, 160:10, | 105:14, 107:18, | 62:19, 65:4, | 261:4 |
| 179:20, 192:22, | 114:21, 118:10, | 115:6, 127:24, | **rephrase** |
| 196:12, 198:20, | 147:12, 172:24, | 128:3, 186:24, | 61:18 |
| 198:23, 215:1, | 174:20, 194:11, | 265:3, 279:19, | **replace** |
| 215:12, 216:2, | 201:14, 260:20, | 280:2 | 264:10 |
| 216:21, 225:6, | 278:2 | **relationships** | **replaced** |
| 252:20, 252:23, | **reimburse** | 18:1, 47:13 | 205:13, 263:7 |
| 253:1, 253:4, | 219:17 | **relative** | **replacing** |
| 261:16, 274:24 | **reimbursed** | 194:13 | 123:2 |
| **refers** | 111:2, 111:21, | **relevancy** | **replying** |
| 18:25, 165:7 | 219:25 | 101:15 | 241:15 |
| **refill** | **reimbursement** | **relevant** | **report** |
| 59:9 | 36:12, 36:25, | 100:18, 101:1, | 101:5, 102:12, |
| **reflecting** | 110:14, 192:5, | 101:12, 104:17, | 103:3, 103:15, |
| 254:9 | 215:23, 215:25 | 104:21, 105:4, | 103:24, 104:7, |
| **refunds** | **reinstated** | 125:22 | 104:23, 114:1, |
| 149:2 | 16:22 | **reliable** | 137:15, 138:14, |
| **regarding** | **reiterate** | 64:16 | 140:20, 141:9, |
| 61:21, 240:1 | 165:9, 169:7 | **rely** | 141:11, 142:19, |
| **regardless** | **reiterating** | 231:16 | 142:23, 142:24, |
| 206:13 | 63:17 | **remedy** | 143:19, 144:2, |
| **regards** | **reject** | 219:17, 219:22 | 144:22, 145:12, |
| 48:20, 101:3 | 255:4 | **remember** | 145:13, 146:2, |
| **regional** | **relate** | 12:6, 33:3, | 150:15, 151:6, |
| 52:4 | 18:21, 154:20 | 33:4, 33:5, | 151:11, 151:18, |
| **regional"** | **related** | 40:23, 40:25, | 152:5, 152:25, |
| 52:5 | 8:16, 25:3, | 125:2, 203:24, | 155:12, 155:13, |
| **registered** | 25:12, 27:24, | 209:1, 228:8, | 156:1, 158:12, |
| 2:14 | 38:13, 41:9, | 230:21, 230:23, | 158:15, 170:13, |
| **regular** | 47:6, 65:3, | 231:2, 247:3, | 171:4, 200:25, |
| 63:3, 153:21, | 100:9, 100:13, | 247:11, 250:11, | 201:3, 201:4, |
| 179:18, 180:16, | 118:16, 161:24, | 253:10, 257:11, | 201:17, 227:2, |

227:20, 260:14,
263:25, 273:6
**reported**
1:24, 42:18,
95:10, 95:19,
100:21, 106:4,
106:18, 107:9,
141:12, 148:14,
148:22, 151:19,
152:5, 152:10,
153:1, 154:2,
154:3, 156:2,
156:17, 168:7,
168:23, 251:11,
261:20, 262:1,
263:2, 263:4,
263:13, 263:20,
268:6, 270:8,
270:10, 270:15,
270:19
**reporter**
2:14, 2:15,
8:1, 8:2, 8:4,
10:15, 286:1,
286:4
**reporter:**
8:6, 8:9,
107:14, 118:5,
127:9, 130:2,
132:16, 248:19,
248:25, 271:19,
271:22
**reporting**
43:12, 68:1,
68:17, 69:2,
69:25, 70:8,
94:19, 96:3,
96:14, 97:16,
140:21, 145:14,
145:19, 156:9,
158:3, 261:18,
262:10, 262:20,
264:17, 264:20,
265:6, 265:21,
270:17, 271:6,
272:13, 272:17,
273:3, 273:11
**reports**
151:9, 157:6,

201:5, 271:11
**represent**
7:17, 174:23,
234:22
**representation**
243:23
**representative**
175:11
**representatives**
175:19
**representing**
7:13, 8:3,
132:24
**reprocessing**
54:17
**request**
52:24
**requested**
59:4
**requested;**
286:12
**requesting**
272:2
**require**
87:11, 88:23,
159:20, 197:4
**required**
62:11, 83:18,
85:9, 85:18,
85:22, 86:9,
88:8, 102:1,
102:3, 144:2,
214:3, 219:2,
221:14
**requirement**
66:21, 67:2,
90:19, 98:3,
98:5, 150:4,
220:22, 280:15
**requirements**
54:5, 64:5,
66:23, 74:3,
75:2, 77:11,
159:25, 160:1
**requires**
221:8
**requiring**
67:24, 68:14,

71:23, 73:8,
89:6
**research**
49:23, 50:1,
50:18, 51:10,
61:3, 61:5,
62:18, 63:10,
63:11, 63:21,
65:5, 65:13,
65:25, 67:21,
68:3, 112:18,
133:4, 139:19,
139:21, 199:16,
199:17, 199:22,
206:18, 229:21,
230:2, 256:15
**research"**
62:20
**researched**
67:4, 250:9
**researching**
131:11, 283:24
**reserves**
170:4
**reset**
185:19, 190:7
**resolve**
265:18
**respect**
185:15, 205:19,
206:12, 207:19,
230:25, 250:3,
268:3
**respond**
170:6, 240:5
**responding**
261:3
**responds**
237:24
**response**
194:24, 215:9,
241:11, 241:20,
241:24, 244:25,
246:4, 246:8,
255:22, 265:15
**responses**
245:2
**responsibilities**
17:23, 18:6,

25:2, 27:23,
30:8, 38:7,
53:21, 55:13,
129:21, 264:25,
265:1
**responsibility**
28:1, 47:11,
55:12, 112:10,
115:5, 270:20,
272:12
**responsible**
113:24, 114:4,
265:11, 270:17
**responsive**
256:21
**rest**
217:12, 234:9
**restate**
68:19, 87:21,
88:4, 89:2,
91:14, 95:15,
140:7, 142:13,
263:17
**result**
140:19, 140:23,
146:1, 150:10
**retail**
19:6, 19:10,
58:11, 111:4,
111:23, 146:18,
178:25, 179:3,
179:17, 180:16,
182:16, 183:7,
183:16, 183:18,
184:2, 184:5,
184:15, 184:24,
185:10, 185:18,
186:2, 186:7,
186:8, 186:9,
186:14, 214:16,
253:20
**retailer**
161:15
**returning**
105:14
**revenue**
57:4, 57:22,
57:23, 58:3,

58:6, 194:19,
252:17, 252:18,
252:20
**revenues**
56:18, 57:18,
58:5, 252:8
**review**
48:24, 49:19,
54:7, 54:23,
54:25, 55:18,
55:21, 67:25,
75:11, 96:13,
110:12, 118:23,
119:5, 128:8,
128:18, 128:25,
129:5, 129:13,
129:18, 129:25,
131:7, 202:8,
202:9, 234:14,
245:2
**reviewed**
29:1, 49:21,
55:5, 56:5,
119:15, 130:24,
131:3, 231:5
**reviewing**
53:22, 54:15,
54:16, 61:9
**reviews**
55:6, 222:8
**revised**
54:11
**revisions)')**
234:6
**rich**
8:14, 66:1,
146:24, 169:21
**richard**
3:4, 7:18,
142:9, 285:6
**right-hand**
108:1, 117:19
**risk**
125:14
**rite-aid**
51:13, 51:21,
56:16, 57:2,
186:21, 193:23,

228:7, 228:11,
229:6, 229:10
**role**
35:8, 37:21,
47:5, 47:8,
267:7
**routinely**
267:17
**rules**
10:9, 10:12,
11:1, 140:3,
140:10, 213:9,
260:8
**run**
279:22
**runs**
264:23
**rx**
242:3
**résumé**
15:8

---
**S**
---

**said**
15:14, 27:22,
29:2, 29:8,
33:1, 42:1,
55:8, 59:20,
79:22, 99:23,
119:13, 139:22,
170:1, 180:6,
197:17, 214:25,
265:5, 275:24,
286:9
**said;**
80:2
**sale**
65:8, 214:19,
221:21, 223:13,
266:20
**sale;**
65:11
**sam's**
209:8
**same**
10:14, 33:12,
33:19, 88:19,
109:9, 117:9,

117:24, 117:25,
121:25, 129:23,
131:14, 135:25,
140:6, 143:20,
146:6, 154:14,
158:25, 168:12,
170:16, 171:6,
171:21, 197:24,
206:12, 222:25,
223:3, 237:12,
237:14, 245:17,
245:22, 245:23,
246:9, 246:13,
249:19, 257:4,
258:7, 265:15,
267:17, 267:23,
282:12
**satisfy**
199:5, 199:9
**savings**
42:3, 42:9,
58:12, 61:11,
61:16, 62:7,
62:23, 71:14,
71:17, 72:2,
72:18, 73:3,
73:17, 75:25,
76:3, 83:18,
85:18, 85:23,
89:21, 90:2,
90:20, 98:15,
98:23, 105:19,
106:25, 177:14,
177:20, 185:22,
197:5, 197:10,
198:20, 199:12,
199:13, 200:4,
200:12, 200:21,
203:23, 204:10,
204:20, 205:7,
205:14, 206:1,
207:5, 207:20,
207:21, 226:22,
227:2, 243:15,
246:25, 248:1,
249:25, 250:19,
251:2, 251:10,
251:17, 251:20,

252:4, 257:10,
257:16, 257:21
**saw**
55:25, 235:17,
256:18
**say**
14:10, 22:21,
24:10, 35:13,
41:1, 52:22,
53:21, 56:7,
58:10, 58:20,
59:13, 60:21,
61:24, 62:6,
62:10, 63:23,
68:15, 73:7,
75:22, 77:12,
77:25, 83:6,
84:23, 87:7,
88:8, 89:12,
98:25, 99:2,
101:25, 108:10,
126:24, 128:1,
134:8, 136:14,
137:13, 137:17,
137:19, 137:24,
138:6, 142:25,
145:8, 162:2,
166:15, 168:2,
171:1, 171:11,
191:3, 193:12,
197:16, 197:21,
199:3, 201:23,
207:6, 211:17,
212:1, 221:16,
223:9, 227:22,
252:2, 253:17,
256:20, 259:25,
260:12, 262:9,
267:1
**saying**
71:17, 91:8,
152:17, 153:24,
154:4, 154:7,
154:17, 179:3,
179:20, 192:18,
193:16, 200:19,
205:24, 214:12,
219:21, 251:24,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    117

**says**
72:17, 73:1,
93:18, 97:20,
98:9, 98:12,
99:22, 106:8,
106:22, 110:19,
121:22, 122:24,
134:3, 135:4,
135:12, 142:19,
149:8, 149:14,
196:8, 196:14,
198:17, 203:20,
205:18, 210:23,
217:25, 225:4,
232:7, 236:15,
245:25, 251:19
**scan**
161:6, 161:19
**scenario**
94:18, 142:2,
143:12, 145:19,
152:11, 153:11,
155:25, 156:20,
158:25, 160:6,
166:1, 171:23,
172:9, 182:10,
183:17, 184:9,
264:12, 272:22
**scenarios**
80:3, 198:5
**schaumburg**
1:12, 2:7,
7:15, 10:8
**schedule**
23:15, 23:17,
23:22, 23:23,
24:3, 24:11,
79:8, 89:21,
91:20, 91:24,
92:22, 93:8,
110:13, 141:3
**scheduled**
285:16
**schedules**
79:4, 141:1,
183:15
**school**
40:6

**scope**
21:12, 33:2,
50:7, 168:8
**script**
59:7, 60:2
**seal**
286:17
**second**
83:13, 97:20,
106:7, 149:8,
170:3, 174:13,
177:2, 196:8,
198:4, 217:25,
218:6, 232:7,
233:5, 234:10,
235:23, 275:4
**second-to-last**
226:2, 226:3,
226:4
**secondhand**
267:11
**section**
13:4, 108:4,
111:14, 112:17,
112:21, 213:13,
213:17, 213:23,
217:16, 222:5,
224:4, 224:10,
224:23, 226:15,
226:16, 227:10,
234:24, 239:21,
240:6, 240:16,
240:24, 245:16,
245:24, 246:7,
246:10, 246:14,
249:11
**sections**
55:9, 110:25,
239:18
**sector**
112:21
**see**
12:10, 12:14,
15:19, 46:10,
53:23, 54:20,
55:6, 56:9,
58:14, 58:23,
60:25, 62:8,

62:14, 71:15,
83:21, 87:3,
87:13, 96:13,
97:24, 98:16,
99:11, 102:6,
105:21, 106:11,
107:1, 109:7,
115:19, 120:10,
120:16, 128:10,
128:11, 132:21,
135:17, 140:13,
141:2, 144:6,
157:25, 158:2,
163:18, 165:22,
202:21, 205:21,
213:18, 213:25,
215:24, 224:22,
224:23, 225:2,
234:5, 235:6,
237:9, 238:22,
241:14, 241:20,
245:8, 278:20,
280:15, 280:17,
283:20
**seeing**
50:19, 85:14,
213:5, 265:12
**seek**
223:3
**seeking**
119:22
**seem**
21:23
**seen**
14:5, 14:12,
39:21, 39:25,
84:5, 84:11,
84:21, 85:7,
99:22, 105:24,
106:14, 106:18,
107:5, 115:13,
115:15, 118:20,
161:23, 164:15,
176:7, 176:8,
222:1, 228:13
**segments**
204:23
**select**
136:5

**selected**
182:8
**selling**
184:14, 184:18,
184:19, 185:16
**sells**
253:24
**send**
233:20, 233:24
**sends**
237:21, 238:11
**senior**
30:25, 31:24,
80:22, 99:20,
120:13, 121:5,
149:10, 149:16,
150:6, 150:10,
151:2, 151:14,
151:19, 152:3,
152:13, 152:17,
152:22, 153:14,
153:19, 155:22,
156:9, 157:9,
157:24, 158:7,
159:4, 159:7,
159:12, 159:21,
160:3, 164:7,
201:8, 201:10,
201:14, 202:13,
202:24, 206:23,
232:7, 232:12,
235:13, 236:21,
237:5, 240:19,
242:12, 242:18,
242:21, 243:5,
243:21, 243:22,
243:24, 276:1,
277:9
**sense**
57:3, 194:16
**sent**
215:21, 238:18
**sentence**
83:14, 89:25,
97:20, 98:9,
98:12, 105:16,
105:21, 106:8,
106:21, 108:24,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                               118

115:22, 135:2,
135:11, 136:2,
136:7, 136:10,
149:8, 196:8,
197:14, 198:17,
199:2, 203:19,
205:22, 222:17,
224:23, 225:4
**sentences**
136:6, 214:8,
214:12, 226:2
**separate**
37:13, 48:10,
48:12, 62:4,
62:22, 69:15,
70:5, 73:25,
76:4, 77:18,
77:20, 77:22,
79:3, 89:11,
89:20, 90:24,
94:25, 98:22,
99:2, 102:17,
103:18, 103:20,
104:15, 141:1,
144:5, 155:6,
158:1, 169:16,
179:8, 179:9,
179:17, 179:20,
179:21, 179:24,
180:5, 180:12,
207:15, 209:5,
251:23, 261:6,
261:8, 264:5,
264:6, 282:9
**sequence**
237:20, 238:10
**series**
172:22, 231:6,
250:12, 252:7,
253:9, 255:17,
259:4
**serve**
78:15
**serves**
223:6
**service**
35:10, 47:1,
96:21, 125:15,

156:18, 181:16,
223:23, 249:19
**service;**
214:20
**serviced**
183:5, 192:20
**servicer**
192:22
**services**
35:24, 44:2,
51:11, 60:24,
61:1, 61:2,
115:1, 115:19,
116:2, 126:5,
126:8, 178:13,
189:3, 192:8,
192:16, 210:9,
211:1, 212:2,
212:12, 214:3,
214:6, 215:19,
216:11, 223:15,
223:16
**services";**
217:19
**session**
207:6
**set**
58:21, 58:22,
181:12, 183:15,
185:21, 245:19,
253:12, 286:16
**setting**
192:19, 192:20,
255:9, 273:10
**setup**
220:8, 220:10,
223:8
**seven**
170:4, 181:19,
193:19
**seven-year**
124:13
**several**
45:17, 125:13,
179:7, 218:24,
228:10, 230:19,
237:1
**shall**
116:1, 134:21,

210:24, 214:1,
214:4, 216:8,
217:21, 218:5,
248:8, 249:18
**share**
11:24
**shared**
11:19, 258:3
**shaun**
234:1
**shield;**
30:2
**shopper**
80:22, 120:13,
121:6, 149:11,
160:12, 160:17,
160:19, 160:21,
162:1, 162:12,
163:2, 164:7,
164:9, 164:16,
235:14, 236:4,
236:22, 237:6,
240:20, 242:13,
276:1, 277:10
**short**
248:8, 248:12
**shorthand**
2:14, 176:4,
178:10, 190:3,
286:4
**shortly**
66:4
**should**
42:12, 48:3,
159:21, 174:7,
174:9, 191:3,
196:10, 196:16,
200:13, 221:20,
258:1, 263:22
**show**
149:25, 266:12
**showed**
135:1
**showing**
14:1, 14:7,
14:13, 14:18,
15:5, 118:10,
127:12, 241:9

**shown**
235:17
**shuffling**
174:12
**sic**
51:2, 113:25,
235:25
**side**
187:20
**sign**
90:7, 159:11,
161:10, 161:17,
163:13, 221:17
**signature**
35:12, 46:19,
74:20
**signature-mogiu**
286:21
**signed**
11:10, 35:2,
35:9, 89:23,
90:5
**significant**
193:13, 193:25
**signing**
82:1, 286:12
**silent**
136:16, 278:22
**similar**
11:22, 160:3,
164:10, 165:24,
192:1, 206:1,
226:16
**similarly**
98:12, 106:22,
197:7, 198:17,
203:20
**simple**
136:5, 243:10
**simplify**
178:19
**simply**
183:10, 229:11
**since**
21:5, 34:10,
43:22, 65:2,
68:3, 96:5,
102:17, 104:15,

112:17, 144:4,
146:25, 170:1,
219:13, 272:3
**single**
139:13, 266:19,
270:7
**single-claim**
222:12
**sir**
13:23, 28:21,
30:16, 175:22,
176:11, 186:1,
195:15, 195:25,
196:22, 199:2,
210:16, 213:15,
239:4, 239:9,
241:9, 244:15,
244:19, 249:6,
283:10, 284:20
**sister**
191:2, 191:3
**sit**
134:2
**site**
14:20
**sitting**
195:25, 208:18,
258:21, 258:23
**situation**
113:2, 125:7,
125:8, 143:16,
219:18, 253:23
**situation;**
148:25
**six**
181:19
**size**
194:2, 194:13
**slight**
122:18
**slightly**
195:4, 212:16
**smaller**
194:2
**smithson**
230:5, 231:23,
232:2, 232:5,
233:9, 239:14,

239:25, 240:22,
241:11, 241:16,
244:20, 244:24,
245:12, 246:3
**smithson's**
232:14, 240:7,
240:17, 241:24,
242:8
**solely**
92:15
**solutions**
5:19, 5:21,
17:17, 48:7,
87:9, 102:3,
107:20, 107:21,
115:2, 115:9,
188:21, 189:9,
191:7, 191:24,
192:2, 192:4,
197:2, 197:22,
197:23, 198:7,
199:4, 199:7,
199:11, 200:1,
200:9, 200:18,
200:21, 204:9,
204:15, 205:4,
205:19, 206:3,
207:19, 208:7,
210:11, 246:23,
250:5, 255:21,
257:20, 258:12,
284:5
**solutions'**
206:11
**solutions;**
193:2
**some**
14:25, 21:23,
45:6, 54:16,
55:15, 55:16,
74:17, 75:15,
119:17, 124:22,
125:21, 129:11,
133:4, 161:10,
161:18, 176:13,
178:4, 180:15,
183:15, 183:16,
188:16, 192:19,

193:24, 195:15,
203:25, 207:3,
208:15, 212:15,
212:20, 229:4,
233:21, 233:25,
235:7, 239:25,
246:19, 247:5,
247:14, 254:18,
255:14, 260:22,
269:22, 270:2,
281:9, 283:4
**somebody**
41:4, 267:12
**somehow**
236:22
**someone**
26:25, 91:21,
93:10, 122:10,
137:8, 150:7,
185:11, 185:12,
232:13
**something**
19:22, 54:20,
76:4, 83:4,
88:19, 108:5,
125:9, 127:3,
144:5, 163:13,
169:19, 221:23,
222:1, 242:21,
271:24, 281:19,
281:24, 282:5
**sometime**
44:6, 198:10
**sometimes**
124:23, 125:15,
125:16, 125:18,
150:6, 180:2,
222:22
**somewhat**
277:13
**sonntag**
2:14, 8:2
**sorry**
12:4, 20:11,
24:13, 24:14,
25:9, 26:17,
29:8, 34:8,
44:25, 50:23,

65:17, 66:5,
66:7, 71:19,
76:23, 81:25,
90:15, 91:12,
95:25, 97:6,
98:10, 110:23,
113:14, 119:24,
122:20, 122:25,
123:13, 127:8,
133:3, 141:13,
142:11, 144:11,
145:22, 148:13,
149:11, 150:3,
150:16, 180:19,
207:24, 215:10,
223:1, 227:8,
233:22, 238:2,
256:5, 261:12,
274:21, 279:3,
281:22
**sort**
21:19, 176:3,
176:12, 189:2,
231:2, 238:8
**sought**
200:1
**sound**
188:14, 193:4
**sounds**
151:16, 188:18
**source**
64:16, 112:5
**sources**
64:19, 199:20
**space**
156:18
**speak**
10:12, 10:13,
37:23, 78:13,
92:23
**speaking**
96:8, 170:17,
174:1
**speaks**
223:18, 224:24
**special**
69:12, 80:23,
120:12, 121:5,

149:12, 164:2,
164:9, 164:17,
177:15, 180:14,
206:4, 235:13,
236:21, 237:5,
240:12, 240:19,
241:2, 242:1,
242:12, 276:2,
277:10
**specialty**
34:18
**specific**
23:8, 29:11,
37:21, 38:20,
40:21, 45:11,
54:18, 76:6,
117:6, 151:3,
161:24, 166:1,
189:23, 202:14,
206:10, 212:8,
215:18, 215:22,
215:23, 217:5,
247:11, 247:22,
249:20, 276:16
**specifically**
19:14, 29:6,
40:3, 40:25,
57:9, 74:22,
174:2, 207:4,
230:11
**specifications**
216:13
**specifications";**
216:5
**specifics**
37:20
**specified**
115:25
**spectrum**
213:5
**speculation**
171:15, 172:24,
267:3
**speculative**
89:16, 173:3
**spell**
51:1
**spero**
3:5, 7:19

**spero:**
7:19, 130:19
**split**
229:4
**spoke**
78:19, 192:2,
223:23
**spoken**
175:5, 175:14,
175:18
**sponsor**
211:9
**stack**
252:18
**stacked**
162:5
**stacking**
180:1
**staff**
53:22
**stamina**
244:14
**stand**
196:2, 196:20,
196:21
**standard**
33:8, 33:13,
113:25, 151:12,
220:18, 221:1,
224:24, 226:10,
227:2, 227:14,
253:15, 253:16,
259:5, 259:7,
260:2, 260:13,
261:11, 273:11
**standard-setting**
272:24
**standard;**
227:23
**stands**
225:19
**start**
31:5, 57:10,
118:12, 142:15,
176:11, 190:5,
194:22, 196:24,
216:7, 233:22
**started**
8:18, 16:13,

43:23, 81:12
**starting**
237:23
**starts**
213:25, 217:21
**state**
2:16, 7:17,
9:23, 9:25,
11:5, 21:24,
51:5, 52:7,
83:13, 100:19,
190:18, 218:2,
286:6, 286:24
**stated**
31:23, 76:21,
124:4, 143:13
**statement**
246:20, 248:7,
257:3, 258:9
**statements**
11:22, 196:1,
196:19, 199:23
**states**
1:1, 7:10,
56:8, 71:11,
195:13, 249:17
**states;**
195:10
**statistics**
42:23, 43:8
**stenographically**
286:10
**step**
238:9, 238:10,
270:23, 271:6
**stephen**
4:12, 7:13
**steps**
271:13
**stick**
42:8, 265:14
**still**
20:24, 21:1,
21:3, 48:11,
73:24, 77:2,
88:18, 89:11,
90:8, 132:12,
188:12, 192:6,

192:20, 196:2,
201:13, 203:19,
207:10, 245:12,
256:18
**stop**
10:25, 277:18
**store**
161:10
**stores**
68:23
**straight**
150:20
**strategic**
207:5
**strategy**
30:6
**street**
3:7, 3:16, 4:6,
94:7, 116:25,
155:21, 187:19
**stricken**
235:11, 236:7
**strike**
177:18, 179:13,
191:23, 198:6,
199:8, 205:10,
208:5, 221:24,
224:22, 231:14,
239:12, 256:19,
259:24, 282:20,
283:15, 283:18
**strikeout**
236:3
**striking**
123:1, 236:19,
237:3
**struck**
121:3, 241:4
**struck;**
120:21
**structure**
143:5, 189:23,
194:12, 211:19,
217:5, 217:8
**structured**
62:7, 144:13
**structures**
212:18

studied
40:1
subject
53:12, 53:14,
53:15, 225:1,
233:8, 260:11
subjects
173:2
submission
222:13
submit
36:19, 55:3,
77:13, 83:18,
85:9, 85:18,
85:23, 86:9,
87:11, 90:19,
102:4, 185:8,
197:4, 200:11
submits
97:2, 178:8,
178:21
submitted
83:19, 85:10,
178:23, 195:19,
195:22, 200:3,
222:16, 223:19,
224:24, 225:15,
226:17, 250:14,
251:12, 251:15,
266:5, 266:6,
266:8, 266:13,
272:1
submitted;
266:9
submitting
178:25, 225:23,
227:13, 251:4,
279:23
subordinate
232:15
subpart
217:25
subparts
217:23
subpoena
2:13, 5:11,
14:2
subpoenaed
168:11, 285:11

subset
212:24
subsidiaries
43:24, 44:3,
44:6, 190:13,
190:22
subsidiary
17:6, 43:16,
43:18, 190:11
substance
218:11, 223:3,
225:3, 240:23
substituted
125:4, 125:10
suggest
56:4
suggested
231:12
suggesting
169:25, 230:24,
281:7, 281:19,
281:24
suggestion
236:19
suite
3:8
sum
93:2
summarize
238:9
summary
42:2
supersedes
133:19
superseding
204:17
supervisor
64:10, 201:23
supplied
8:24, 132:21
supplies
22:19
supply
58:21, 63:9,
219:15
supply)
216:16
support
149:4, 195:19

supposed
92:19, 218:11,
220:5, 220:16
sure
10:2, 10:10,
11:18, 15:4,
17:19, 19:11,
21:25, 27:4,
33:15, 33:21,
40:20, 45:4,
50:16, 51:7,
55:17, 56:5,
66:15, 69:20,
82:13, 85:2,
91:13, 102:20,
103:10, 107:20,
108:8, 108:15,
111:11, 111:18,
115:24, 116:13,
120:7, 121:1,
122:6, 124:2,
128:12, 130:5,
130:10, 131:17,
137:3, 140:8,
148:9, 150:18,
150:19, 150:24,
161:2, 162:24,
167:3, 167:12,
168:15, 172:16,
172:20, 173:9,
173:14, 176:12,
181:5, 186:3,
186:15, 189:11,
192:5, 196:7,
201:2, 202:10,
203:8, 217:17,
218:20, 232:25,
233:4, 235:22,
238:7, 245:21,
249:9, 249:16,
250:23, 260:23,
262:15, 263:17,
264:14, 271:2,
273:8, 274:1,
275:11, 276:10,
276:17, 277:14,
279:13, 279:15,
283:3, 283:8,

284:2
suspect
186:6, 271:16,
271:18, 271:23
svp
201:8
swear
8:4
sworn
8:8, 9:4
sxc
193:2
synonym
83:8
synonymous
164:6, 184:25,
206:7, 214:20
system
96:23, 156:19,
214:1, 217:6,
217:14, 218:13,
219:24, 220:4,
220:18, 221:6,
221:10, 221:21,
223:8, 223:13,
266:20, 270:6
system)
216:9

### T

take
10:25, 19:8,
19:25, 35:11,
40:5, 66:8,
70:15, 70:18,
105:5, 139:9,
147:2, 161:25,
174:7, 184:19,
190:21, 205:3,
221:20, 239:9,
244:6, 244:7,
244:10, 248:8,
248:12, 283:25
taken
9:8, 35:21,
71:2, 105:9,
113:18, 147:8,
170:6, 174:16,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                                          122

194:6, 248:16,
277:22, 285:3,
286:7, 286:10
**takes**
63:5, 220:11
**taking**
7:14, 8:15,
13:15, 62:19
**talk**
78:16, 81:17,
189:8, 215:4,
254:15, 269:1
**talked**
10:10, 13:7,
13:11, 25:11,
48:20, 82:9,
102:16, 110:17,
147:15, 215:11,
247:15, 262:24,
268:19
**talking**
21:20, 21:23,
61:6, 78:17,
91:23, 91:24,
92:9, 94:10,
119:18, 123:6,
141:19, 141:24,
162:8, 166:9,
168:17, 194:12,
202:5, 215:5,
215:14, 220:2,
223:2, 269:2
**tape**
101:8, 105:6,
192:13, 194:3,
272:23, 276:18,
277:19
**team**
18:1, 232:12,
264:23, 265:10,
267:2, 280:1,
280:4
**technical**
119:24, 277:13
**technicality**
116:18
**technically**
16:20, 77:4

**telecommunications**
113:25, 151:12,
260:13
**telephonic**
222:7, 224:1
**telephonically**
222:11
**tell**
42:1, 57:7,
60:16, 127:15,
137:7, 137:8,
137:10, 146:8,
186:5, 196:6,
196:24, 199:2,
200:25, 206:16,
214:14, 223:5,
243:5
**telling**
90:4, 144:25
**tells**
219:3, 220:4,
220:17
**tend**
217:11
**tens**
69:21, 76:8
**tenure**
15:20, 16:21,
28:25, 29:12,
41:17, 44:21,
81:11
**term**
18:23, 32:22,
36:12, 36:16,
37:4, 62:24,
62:25, 63:2,
90:1, 120:16,
133:25, 136:21,
139:4, 165:5,
178:10, 187:21,
202:3, 206:7,
224:19
**terminology**
37:17, 113:3,
178:14
**terminology;**
112:23
**terms**
9:19, 9:20,

10:9, 11:4,
11:13, 13:8,
16:12, 23:10,
26:20, 28:9,
34:9, 39:1,
42:7, 55:19,
56:6, 56:11,
56:14, 56:18,
61:5, 62:12,
63:2, 63:20,
74:4, 74:17,
74:20, 75:8,
76:13, 78:14,
88:12, 88:24,
89:8, 108:21,
117:19, 128:6,
131:14, 161:11,
161:22, 163:10,
163:12, 165:15,
165:20, 166:3,
168:9, 169:2,
170:20, 189:2,
194:25, 202:21,
211:2, 247:23
**test**
271:25
**testified**
9:4, 254:10,
265:23
**testify**
86:20, 168:11,
173:2
**testifying**
258:18, 265:19,
267:15, 268:3,
268:4, 268:6
**testimony**
11:4, 204:8,
229:9, 247:25,
256:1, 256:6,
258:1, 279:14,
286:9, 286:10
**text**
283:21, 284:3
**textbook**
40:1
**textbook"**
40:4

**th**
7:12, 31:10,
31:13, 46:20,
47:21, 81:18,
82:2, 82:15,
82:21, 83:23,
83:25, 84:6,
84:10, 84:18,
85:3, 85:5,
86:19, 105:25,
106:13, 107:4,
107:23, 109:1,
109:15, 139:15,
239:11, 239:13,
276:6
**thank**
8:9, 9:2, 11:2,
12:3, 15:3,
29:13, 29:15,
53:17, 73:23,
85:12, 104:19,
114:20, 116:20,
130:20, 141:23,
162:25, 172:12,
174:4, 174:6,
191:14, 231:22,
239:8, 260:20,
260:21, 264:13,
274:15, 275:8,
279:2, 281:17,
284:22, 284:25,
285:19, 285:20,
285:22
**thanks**
70:24, 171:10,
200:14, 278:2
**that:**
144:4
**that;**
42:24, 43:9,
140:23, 149:4,
271:13
**theaker**
245:3, 245:6,
245:10
**themselves**
7:17, 223:11,
257:21, 258:4

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                123

then-provider
31:1
thereafter
286:11
therefore
180:14, 225:1
they"
106:22, 197:13,
197:14, 197:18,
198:3, 198:24
they'd
163:13
thick
230:7
thierer
201:19
thing
14:15, 39:3,
129:23, 159:18,
180:6, 248:5,
252:4, 264:6,
266:6, 281:10
things
10:18, 13:24,
36:20, 54:18,
139:20, 156:13,
160:2, 160:5,
169:19, 186:13,
188:3, 216:24,
237:20
things:
217:11
thinking
212:15
third
2:6, 4:3, 7:25,
8:25, 66:12,
112:20, 177:12,
226:2, 234:10
third-party
25:21
third-to-last
226:3
this"
162:2
thought
103:2, 103:14,
122:7, 190:21

thousands
45:17, 69:21,
76:8, 262:8,
262:18, 263:12
three
56:7, 57:1,
57:2, 57:5,
65:21, 73:14,
74:6, 74:14,
80:4, 87:17,
102:16, 145:7,
159:13, 159:20,
195:9, 199:23,
217:11, 233:15,
237:16, 237:23,
238:17
threw
66:6
through
11:9, 14:14,
14:23, 44:20,
45:3, 51:10,
55:1, 60:23,
77:10, 77:24,
97:1, 108:7,
108:14, 124:1,
126:12, 128:25,
147:16, 147:23,
152:19, 154:24,
177:20, 178:11,
183:4, 184:6,
184:13, 212:15,
214:23, 215:5,
215:13, 217:6,
217:14, 231:10,
236:4, 246:17,
262:6, 265:3,
265:16, 266:20,
270:6
throughout
16:7, 110:7,
172:22
tichey
82:8
tied
23:17, 23:22,
23:23, 24:3,
24:7, 24:10,

32:13, 233:21,
233:24, 236:22
time
7:6, 9:16,
10:14, 10:23,
15:23, 16:25,
18:7, 18:9,
23:16, 25:2,
25:6, 25:24,
27:19, 27:25,
28:9, 30:15,
31:19, 32:5,
33:7, 35:18,
36:21, 38:25,
41:2, 51:14,
51:18, 64:10,
70:25, 71:5,
72:25, 81:7,
84:17, 85:7,
95:22, 96:5,
103:7, 104:2,
105:7, 105:12,
108:14, 108:17,
110:5, 113:16,
113:21, 123:13,
124:1, 124:7,
126:25, 128:9,
128:18, 131:25,
147:6, 147:11,
150:11, 152:1,
160:10, 160:22,
171:7, 174:14,
174:19, 175:10,
181:9, 194:4,
194:9, 199:11,
199:18, 218:15,
219:6, 220:13,
221:2, 242:17,
248:14, 249:4,
251:3, 259:17,
260:10, 260:20,
266:14, 267:5,
267:11, 270:8,
273:18, 277:20,
277:25, 283:25,
284:23, 285:1,
285:12, 285:21
times
9:12, 179:7,

184:25
timetable
49:22
title
37:10, 201:6,
201:13, 239:17
to"
124:24
to:
80:21, 149:10
today
7:13, 8:1,
8:16, 11:4,
20:24, 22:3,
36:5, 36:8,
41:21, 43:17,
47:3, 47:14,
48:11, 115:14,
134:2, 175:15,
176:16, 178:9,
179:7, 186:17,
191:19, 195:13,
195:25, 196:20,
196:21, 201:13,
207:10, 208:18,
228:6, 229:9,
230:20, 231:5,
242:22, 242:25,
243:6, 243:9,
244:1, 252:8,
254:19, 258:21,
258:23, 267:21,
268:9, 284:23
today's
7:12, 176:3,
256:9, 258:10
today;
47:15, 175:2,
175:20
todd
82:8
together
49:24, 139:20,
159:17, 188:20,
194:15
told
48:19, 60:5,
98:1, 138:18,

138:21, 138:23,
139:21, 146:17,
243:19, 272:5
**took**
15:22, 82:14,
125:3, 125:8,
125:9, 205:19,
229:2, 273:17
**top**
162:5, 190:10,
234:5, 238:18,
241:15
**topic**
202:6, 247:22
**topics**
119:18, 202:1
**total**
58:5
**totally**
268:5, 282:17
**training**
40:2, 40:7,
40:16, 128:23
**transaction**
80:9, 96:2,
96:13, 96:17,
116:22, 117:4,
117:6, 264:18,
265:20, 266:3,
270:15, 272:7,
272:20, 280:9,
280:23, 281:3,
281:8, 281:21,
282:1
**transaction"**
116:23
**transaction;**
80:6, 97:8,
180:8, 269:12
**transactions**
61:21, 62:1,
151:6, 266:12,
279:24, 282:13
**transactions;**
114:6, 184:21
**transcript**
5:9, 6:2, 7:4,
46:14, 107:17,

114:19, 118:8,
127:11, 130:7,
132:19, 175:25,
231:21, 239:7,
241:13, 244:18,
248:20, 286:8
**transcripts**
11:24
**treated**
206:8
**treatment**
206:4
**tree**
190:9
**trends**
265:12
**troubleshooting**
265:12
**true**
88:15, 135:13,
136:21, 251:1,
266:13, 266:22,
272:13, 282:12,
286:8
**trust**
148:11, 148:16,
148:23
**truth**
199:21
**try**
10:19, 68:13,
68:21, 72:10,
79:5, 142:15,
157:5, 162:7,
176:18, 178:13,
223:16, 265:18
**trying**
19:7, 33:20,
49:16, 78:22,
96:10, 117:18,
166:22, 178:18,
178:19, 184:6,
191:9, 191:25,
193:23, 208:21,
226:23, 259:22,
269:3, 278:3,
282:23
**tuesday**
1:13

**turn**
48:15, 74:22,
107:25, 109:5,
110:10, 115:16,
120:5
**turning**
106:7, 149:7
**twelfth**
3:16
**twice**
72:6
**two**
34:17, 34:23,
43:25, 46:3,
48:10, 48:12,
49:13, 49:16,
50:2, 56:25,
66:11, 79:3,
96:24, 127:24,
128:4, 139:20,
141:1, 145:21,
154:20, 159:14,
162:6, 169:1,
187:6, 190:22,
194:14, 194:16,
194:25, 195:8,
195:12, 199:20,
207:15, 209:5,
209:25, 214:8,
214:12, 217:23,
232:12, 251:23,
252:2, 252:15,
261:8, 261:13,
269:3, 277:15,
278:18
**two-page**
130:14, 130:18
**tying**
243:18
**type**
12:19, 91:7,
111:1, 176:23,
177:2, 177:9,
177:12, 200:10,
223:3
**types**
28:15, 93:25,
176:20, 212:3

**typewriting**
286:11
**typical**
109:23, 220:8
**typically**
62:19, 232:16
**typo**
196:3
**typographical**
196:18

U

**u&c"**
34:2, 117:8,
126:14, 131:20,
133:9, 136:1,
136:13, 247:9,
249:12, 273:21
**u&c";**
131:15
**u&c'**
87:11, 249:17
**u&c;**
92:7, 144:3,
145:13, 258:5,
267:8, 270:8
**u&cs**
24:1
**uemura**
232:18, 232:21,
233:2, 233:3,
233:4
**uemura;**
232:3
**uh-huh**
47:22, 59:16,
88:10, 92:6,
93:14, 94:6,
102:25, 138:8,
141:8, 144:24,
151:4, 153:3,
156:15, 158:8,
183:6, 241:5,
242:9, 252:22,
253:21, 274:7
**ultimately**
122:2, 246:9,
246:15, 248:3

**umbrella**
188:17
**unclear**
121:2
**under**
25:20, 59:2,
60:12, 68:5,
75:10, 83:20,
85:11, 93:5,
115:7, 115:18,
125:23, 129:20,
136:6, 141:16,
143:5, 143:25,
145:5, 145:24,
151:12, 152:7,
154:12, 155:20,
155:25, 156:7,
156:13, 158:6,
158:25, 160:6,
163:24, 177:21,
191:4, 192:3,
196:8, 198:4,
208:12, 212:25,
214:4, 216:11,
225:6, 226:15,
227:19, 230:13,
238:12, 251:19,
269:6, 275:23,
280:14, 284:15,
286:11
**underinsured**
18:20, 39:17,
94:1
**underlying**
266:12, 276:22
**underneath**
80:13, 158:25,
169:15, 188:16,
190:13, 190:24,
234:13
**understand**
10:17, 19:7,
27:4, 62:6,
64:20, 102:20,
103:10, 108:18,
118:1, 166:5,
167:5, 176:17,
190:22, 205:18,

214:11, 225:18,
227:4, 240:4,
250:17, 250:24,
251:5, 251:8,
263:18, 279:13
**understanding**
38:16, 41:12,
41:18, 41:22,
42:8, 60:9,
62:16, 65:14,
65:15, 65:20,
66:10, 67:10,
67:15, 71:25,
73:7, 73:16,
75:14, 76:2,
81:4, 81:6,
83:10, 83:17,
84:7, 84:24,
85:9, 85:17,
86:8, 86:17,
87:8, 92:19,
95:9, 95:18,
105:24, 106:3,
106:4, 108:19,
116:5, 116:6,
116:21, 124:5,
124:12, 126:11,
126:13, 126:16,
126:18, 138:7,
138:12, 139:4,
146:14, 146:22,
162:18, 162:20,
170:12, 176:13,
177:18, 179:2,
189:1, 197:1,
199:3, 199:24,
206:15, 206:16,
206:25, 220:15,
243:24, 246:23,
247:6, 247:16,
253:13, 257:8,
258:3, 270:14
**understanding;**
84:12, 126:21
**understandings**
255:20
**understands**
71:11, 72:17,

73:1, 75:23,
105:17, 137:25,
138:4, 227:14
**understood**
10:22, 93:5,
138:13, 156:23,
170:8, 203:8,
247:18, 257:20,
257:21
**undertaken**
256:10, 258:11,
258:16
**undo**
271:13
**undocumented**
171:3
**uniformly**
114:5
**uninsured**
63:7
**union**
45:21
**unique**
220:23
**unit**
69:25
**united**
1:1, 7:10,
15:23, 56:8,
195:10, 195:13
**unitedhealth**
16:25, 17:5,
17:6, 20:4,
20:17, 24:25,
25:15, 28:23,
38:11, 43:18,
43:23, 44:1,
47:17, 186:24,
187:3, 187:5,
188:17, 189:4,
190:10
**unitedhealthcare**
9:17, 16:13,
16:18, 16:24,
17:23, 20:5,
20:8, 43:16,
44:3, 96:11,
187:6, 187:10,

187:12, 187:17,
188:8, 188:15,
188:19, 190:12,
190:16, 190:20,
192:23
**unless**
16:9, 75:14,
97:17, 115:25,
155:1, 188:10,
214:3, 218:2,
230:1
**unquote**
251:1
**until**
16:16, 17:17,
22:6, 36:8,
58:10, 85:3,
85:4, 109:15,
124:8, 267:5
**unwritten**
247:18
**up-to-date**
15:9
**update**
124:23
**updated**
127:1
**upgrade**
181:12
**upwards**
212:17
**use**
10:17, 52:21,
60:5, 63:3,
77:20, 78:22,
80:15, 89:24,
94:4, 113:24,
117:1, 122:15,
122:17, 152:12,
159:16, 162:2,
178:9, 178:13,
240:17
**uses**
80:5, 176:24,
183:10
**using**
24:23, 77:23,
89:25, 91:18,

94:13, 94:14,
164:1, 177:3,
178:2, 182:25,
183:10, 197:22
**usual**
16:1, 24:8,
32:22, 33:7,
36:18, 43:10,
43:12, 55:21,
69:25, 71:13,
75:24, 77:13,
79:8, 79:14,
80:17, 81:9,
82:20, 83:19,
91:20, 92:23,
93:9, 93:15,
94:25, 97:2,
105:18, 109:6,
111:23, 114:1,
116:3, 116:14,
116:17, 120:6,
136:12, 143:3,
143:14, 144:16,
157:6, 158:3,
177:21, 178:22,
184:20, 185:8,
185:20, 185:23,
196:9, 197:3,
199:14, 200:3,
200:12, 200:22,
202:1, 202:16,
203:17, 204:18,
205:5, 205:12,
206:24, 207:12,
208:10, 209:2,
225:23, 226:9,
227:13, 227:15,
230:16, 234:23,
235:6, 236:2,
239:21, 240:6,
247:7, 248:1,
249:11, 249:25,
250:14, 250:19,
251:1, 251:3,
251:11, 251:15,
251:21, 252:3,
254:7, 254:23,
255:9, 257:9,

257:22, 258:13,
260:15, 274:16,
275:16, 275:24,
278:4, 278:16,
279:24, 283:18,
283:22, 284:3,
284:12
**usually**
18:25, 61:3,
64:21, 68:8,
68:10, 112:18,
125:21, 149:18,
159:9, 160:15,
161:10, 165:1,
213:6, 215:18,
221:14
**utilize**
268:24

---
**V**
---

**valid**
144:7
**validate**
223:19, 246:12
**value**
148:9
**variation**
268:20, 269:8,
269:17
**variations**
212:21, 213:3
**varied**
208:17
**variety**
22:22, 183:14,
192:7, 212:2,
278:7, 278:9
**various**
257:9
**veale**
118:13, 230:5,
232:2, 233:9,
239:14, 240:23,
241:15, 241:19,
242:2, 242:7,
244:20
**veale's**
241:10, 242:16,

245:18
**verbal**
194:24, 215:9,
264:2
**verbatim**
33:4, 225:3
**verification**
65:7, 65:10
**verified**
265:21
**verify**
87:3, 109:11,
128:16, 131:16,
222:14, 235:19,
245:20, 262:23,
264:19, 264:22,
274:19
**vermont**
51:6
**version**
55:7, 176:10,
230:12, 232:25,
234:4, 246:16
**versions**
129:16, 129:19
**versus**
7:9, 22:3,
56:15, 187:10
**via**
214:1, 216:9,
218:13
**vice**
201:9, 201:10,
202:13, 202:24,
206:23
**video**
7:14, 248:18,
249:2, 285:5
**videographer**
4:12, 7:13
**videographer:**
7:5, 8:1,
70:25, 71:4,
101:8, 103:8,
104:24, 105:7,
105:11, 113:16,
113:20, 147:4,
147:6, 147:10,

174:9, 174:14,
174:18, 192:13,
194:4, 194:8,
248:14, 249:3,
272:23, 276:18,
277:20, 277:24,
285:1
**videotaped**
1:11, 2:1, 7:7
**view**
68:16, 69:1,
69:24, 70:8,
103:24, 104:7,
165:15, 208:8,
219:1
**viewpoint**
240:4
**violating**
166:25
**violation**
135:16, 219:8,
226:10, 227:1,
227:13, 227:23,
260:12
**visibility**
162:19
**vision**
181:18, 212:6
**vitae**
5:15
**vivaan**
3:14, 7:21
**voice-identify**
7:16
**voluntarily**
282:4
**volunteered**
281:25
**vp**
201:8

---
**W**
---

**w-prior**
234:6
**wait**
271:19, 271:22
**waive**
221:19

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    127

**walgreens**
56:16, 56:22,
186:21, 193:23,
228:6, 228:11,
228:15, 229:5,
229:9, 252:18
**walk**
94:7, 253:19
**walked**
147:23
**walks**
176:21
**walmart**
208:21, 208:22,
209:1, 209:7
**want**
21:13, 21:25,
27:4, 59:21,
70:15, 105:15,
127:14, 128:10,
132:11, 150:18,
162:2, 169:21,
170:2, 175:22,
176:1, 176:11,
180:21, 186:12,
189:11, 189:19,
189:22, 189:24,
196:22, 204:4,
209:20, 212:23,
221:22, 221:25,
234:19, 238:8,
242:3, 244:7,
244:11, 248:11,
248:19, 273:24,
276:9, 277:13,
279:13
**wanted**
8:18, 131:19,
133:8, 166:4,
167:5, 173:4,
254:21, 261:15,
276:15
**washington**
3:9, 3:17
**watch**
231:17
**way**
18:21, 23:9,

23:18, 23:24,
24:3, 69:19,
88:23, 89:5,
166:16, 169:4,
170:10, 175:11,
179:3, 213:7,
238:22, 253:6,
253:17, 255:25,
256:24, 274:3,
275:4, 278:18
**way:**
68:21, 141:4,
145:8
**we're**
21:20, 21:25,
68:5, 92:9,
94:10, 119:18,
124:15, 133:12,
141:19, 156:12,
168:17, 170:3,
202:10, 213:5,
233:4, 239:5,
252:15, 269:2,
269:3, 285:13
**we've**
25:11, 29:1,
30:7, 146:24,
169:22, 169:24,
218:25, 231:25,
237:10, 238:9,
239:22, 241:9,
245:16
**website**
50:20, 60:25,
62:18, 62:20,
62:21, 63:12,
63:18, 64:15,
64:22, 65:5,
65:25, 66:24,
67:5, 67:9,
67:22, 68:4,
139:19, 139:21,
181:8, 192:6,
199:22
**welcome**
8:10, 29:16,
284:24
**welfare**
45:21

**well-being**
17:10, 187:16
**went**
25:16, 30:1,
58:25, 262:6,
277:19
**weren't**
20:16, 28:19,
33:6, 87:25,
102:9, 102:23,
103:12, 139:2,
165:23, 207:4,
229:23, 229:25
**whatever**
10:5, 60:24,
122:16, 221:14,
253:22
**whatsoever**
98:2, 99:6
**whereas**
263:22
**whereof**
286:16
**whether**
42:17, 43:12,
61:25, 62:1,
68:16, 69:1,
69:25, 70:4,
70:8, 70:11,
73:17, 78:17,
86:20, 88:23,
96:2, 98:2,
100:18, 101:18,
103:2, 103:14,
105:3, 110:7,
114:12, 118:16,
137:14, 138:13,
153:12, 181:17,
202:2, 202:15,
204:1, 208:16,
213:1, 219:10,
228:7, 228:11,
242:17, 250:12,
250:13, 250:14,
252:11, 254:6,
255:25, 256:10,
257:5, 258:11,
280:8, 280:12,

280:22, 281:1,
285:14
**whichever**
213:7, 213:8
**whole**
12:25, 14:14,
46:21, 93:1,
130:23, 212:23,
219:18, 224:17,
255:6
**wholly**
203:10
**williams**
3:15, 7:22,
174:23
**win**
42:12
**window**
44:7, 84:17,
269:24
**wing**
126:6, 189:3
**withdraw**
9:22, 38:4,
118:1, 122:25,
277:5
**within**
28:25, 38:21,
62:21, 63:8,
64:22, 78:13,
111:15, 112:19,
112:21, 169:9,
189:4, 192:14,
202:16, 203:16,
213:9, 222:12,
223:14, 241:3,
247:1, 256:10,
258:5, 260:8,
265:24, 271:25
**without**
18:19, 20:5,
41:25, 79:24,
108:21, 119:12,
135:13, 168:6,
168:22, 179:18,
185:5, 185:11,
271:7
**witness**
8:5, 8:8,

162:17, 168:10,
170:5, 189:1,
189:15, 189:17,
244:9, 285:19,
286:16
**witness:**
4:3, 8:10,
8:12, 12:2,
12:4, 21:17,
22:8, 33:13,
43:1, 43:4,
61:18, 65:17,
68:19, 69:5,
69:9, 70:17,
88:4, 88:6,
89:2, 91:14,
95:14, 100:24,
103:5, 110:23,
114:20, 116:11,
120:24, 121:2,
121:13, 123:13,
133:3, 134:15,
134:24, 140:7,
147:13, 151:25,
167:1, 168:14,
173:8, 174:6,
174:21, 176:6,
180:19, 191:14,
204:22, 205:1,
227:8, 231:22,
238:2, 238:5,
239:8, 244:12,
250:22, 256:5,
260:21, 260:23,
261:24, 262:14,
270:25, 274:23,
275:3, 275:6,
275:8, 275:13,
276:9, 276:11,
276:15, 279:4,
281:14, 281:17,
284:24
**witnessed**
228:13
**witnesses**
11:21
**word**
19:5, 26:11,

63:4, 78:22,
82:23, 82:24,
83:8, 83:9,
89:24, 99:16,
120:11, 120:21,
122:19, 123:2,
125:3, 125:4,
125:8, 125:9,
138:9, 197:18,
224:12, 224:14,
225:13, 273:13,
284:16
**worded**
222:22, 283:19
**words**
10:18, 20:7,
78:25, 83:3,
99:12, 114:12,
120:11, 136:5,
136:20, 138:3,
186:4, 186:5,
206:3, 226:23,
226:24, 283:17,
284:5
**work**
10:5, 10:7,
27:18, 34:10,
37:9, 53:10,
87:2, 144:15,
165:1, 180:25,
228:24, 245:12,
265:17, 279:16
**worked**
11:10, 16:16,
18:10, 27:20,
30:5, 137:8,
186:18, 186:20,
228:19
**workers'**
34:19, 46:9,
131:5, 192:1,
259:19
**working**
9:16, 9:17,
28:10, 38:1,
40:10, 128:9,
128:19, 130:25,
228:16, 229:7

**works**
24:6, 144:17,
181:4, 182:19,
253:5
**workshops**
259:20, 259:21
**world**
31:19, 64:25,
67:2, 67:7,
139:23, 269:8
**wouldn't**
54:15, 66:19,
70:7, 116:15,
140:14, 153:13,
167:14, 170:10,
230:1
**wrap**
188:3
**wraparound**
22:19
**wrapped**
23:2
**write**
12:23, 13:1,
40:9, 40:12,
59:8
**writes**
233:19, 233:23,
239:25, 240:10,
241:19, 244:24,
246:3
**written**
14:20, 39:2,
39:22, 39:25,
59:2, 59:3,
59:12, 66:25,
83:24, 84:2,
96:7, 108:11,
108:21, 242:2
**wrong**
55:25
**wrote**
12:15, 12:17,
13:5, 76:18

**Y**

**yeah**
26:20, 43:6,

48:3, 58:1,
58:2, 69:10,
72:12, 95:16,
100:25, 104:3,
108:18, 123:14,
133:6, 146:16,
148:11, 154:1,
155:24, 157:19,
163:21, 165:8,
165:13, 174:9,
187:23, 202:7,
204:24, 207:3,
210:7, 223:2,
226:4, 229:19,
248:12, 248:23,
254:16, 267:20,
270:1, 275:3,
276:14, 281:16
**year**
36:1, 57:15,
59:13, 68:15,
68:21, 73:8,
81:2, 86:18,
96:1, 129:22,
198:13, 259:12,
259:14
**year;**
273:18
**yearly**
67:14
**years**
9:15, 9:21,
15:15, 17:2,
17:5, 17:9,
17:14, 99:10,
109:24, 125:19,
159:3, 180:25,
193:12, 193:20,
267:5, 267:16,
267:22, 267:23
**yesterday**
118:22, 118:24,
119:6, 233:20,
233:24, 234:2
**york**
51:4, 51:5,
51:6
**you"**
167:24

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                    129

| | | | |
|---|---|---|---|
| **you;** | **.12** | 71:11, 72:17, | 150:13, 150:15, |
| 95:2 | 234:5 | 72:21, 73:1, | 151:3, 151:13, |
| **yourself** | **.3** | 75:22, 83:13, | 151:18, 152:4, |
| 12:19, 178:17, | 213:13, 213:20, | 84:22, 86:18, | 152:10, 152:23, |
| 199:5, 199:9, | 239:18 | 105:14, 137:19, | 153:25, 154:3, |
| 256:9, 259:8, | **O** | 137:25, 138:15, | 154:9, 155:10, |
| 260:1 | **0005716** | 165:3 | 155:18, 155:22, |
| **Z** | 117:20 | **10,000** | 156:1, 156:9, |
| **zavalishin** | **004299** | 70:5, 70:11 | 157:9, 157:21, |
| 13:14, 201:3 | 286:4 | **10.16** | 157:23, 158:4, |
| **zero** | **02** | 234:5 | 158:10, 158:12, |
| 181:11 | 248:17 | **1000** | 262:9, 262:11, |
| **"** | **03504** | 4:7 | 262:16, 262:20, |
| 97:23, 106:10 | 1:7, 7:11 | **107** | 262:21, 263:4, |
| **"usual** | **0385589** | 5:18 | 263:10, 263:11, |
| 249:17 | 235:3 | **11** | 263:12, 263:14, |
| **$** | **08** | 5:13, 46:20, | 263:19, 263:20, |
| **$10** | 1:14, 7:6 | 87:7, 88:2, | 263:22, 267:16, |
| 253:20, 253:25 | **084** | 88:17, 89:19, | 267:22 |
| **$15** | 286:4 | 90:10, 94:16, | **114** |
| 141:13, 141:18, | **1** | 94:22, 95:9, | 5:20 |
| 142:4, 142:25, | **1)** | 95:14, 95:18, | **118** |
| 143:7, 143:17, | 222:13 | 97:20, 100:19, | 5:23 |
| 143:22, 145:13, | **1.13** | 105:8, 105:9, | **12** |
| 145:14, 145:19, | 210:20 | 105:10, 105:12, | 101:25, 109:5, |
| 145:25, 147:24, | **1.14** | 106:7, 106:22, | 117:8, 117:13, |
| 152:10, 153:2, | 249:11, 249:17 | 113:17, 113:18, | 117:15, 117:19, |
| 154:3, 154:18, | **1.41** | 113:19, 113:21, | 137:19, 147:5, |
| 157:7, 158:3, | 234:24, 239:18, | 137:19, 196:22, | 147:7, 147:8, |
| 263:1 | 239:21, 240:6, | 197:14, 198:4, | 207:1, 275:7, |
| **$20** | 240:24, 245:16, | 203:20, 207:17, | 275:15 |
| 100:3, 141:7, | 245:24, 246:7, | 208:1 | **127** |
| 141:18, 142:5, | 246:10, 246:14, | **11.1** | 6:4 |
| 142:22, 158:22, | 284:15 | 134:23, 135:3 | **13** |
| 213:6 | **1.9** | **11.13** | 275:19 |
| **$25** | 224:10, 224:23, | 239:19 | **130** |
| 141:12 | 225:22, 227:10 | **11.15** | 6:6 |
| **$4** | **1/1/07** | 237:13 | **130134** |
| 209:2 | 5:22 | **11.99** | 1:22 |
| **.** | **1/1/17** | 59:14, 59:20, | **1315** |
| **.1** | 35:7 | 60:12, 68:24, | 147:11 |
| 217:16 | **10** | 69:22, 141:5, | **132** |
| **.11** | 9:21, 15:15, | 141:11, 142:16, | 6:8 |
| 237:13 | 46:20, 71:1, | 142:24, 143:20, | **134** |
| | 71:2, 71:3, | 143:21, 144:23, | 4:7 |
| | 71:5, 71:9, | 145:9, 145:12, | **1349** |
| | | 145:15, 145:20, | 174:15 |
| | | 145:25, 146:2, | **1351** |
| | | | 174:19 |

Transcript of Michael D. Reichardt
Conducted on December 20, 2016

130

**14**
5:11, 5:12,
5:14, 110:10,
110:11
**1418**
194:5
**1424**
194:9
**15**
1:7, 5:15,
7:11, 36:8,
66:2, 130:4,
147:9, 154:9,
155:13, 156:2,
156:9, 157:23,
158:15, 263:20,
263:25
**1551**
248:15
**16**
1:13, 5:13,
7:12, 81:2,
86:18, 99:10,
129:15, 130:4,
135:24
**1600**
2:5, 7:15, 10:7
**1602**
249:4
**1641**
277:21
**1644**
277:25
**1652**
285:2
**1700**
3:7
**175**
5:4, 6:12
**18**
194:6
**19**
31:10, 31:13,
127:18, 131:2,
135:10
**1999**
16:14, 16:23,
17:23, 25:1,

25:11, 28:23,
40:10, 80:16,
81:2, 83:25,
84:6, 84:10,
84:19, 85:3,
98:25, 107:12,
107:23, 109:1,
109:15, 109:24,
110:8, 112:11,
117:9, 117:16,
117:22, 123:18,
147:16, 198:22,
199:7, 204:17,
205:3, 205:13,
209:20, 250:5,
274:6, 275:2,
275:16, 278:4,
278:23, 284:5
**1:**
147:9, 174:16,
174:17
**1st**
115:2, 117:16,
117:22, 126:12,
171:9, 241:15,
241:19

**2**

**2-hour**
169:22
**2.1**
216:1, 216:4
**20**
1:13, 5:13,
7:12, 58:9,
147:24, 156:8
**2000**
198:11, 198:21
**20005**
3:17
**20006**
3:9
**2002**
15:21
**2004**
15:21
**2005**
188:15

**2007**
114:16, 115:2,
165:17, 266:1,
272:6
**2008**
42:18, 50:12,
51:14, 52:17,
124:8, 126:9,
126:12, 159:3,
160:22, 171:9,
199:11, 200:8,
266:22, 267:5
**2010**
234:4, 234:16,
237:23, 238:13
**2011**
16:16, 16:23,
17:24, 25:1,
25:12, 28:24,
38:12, 234:5,
237:12
**2012**
193:5, 232:1,
236:1, 236:12,
237:21, 238:11,
238:19, 275:19
**2013**
30:1, 59:13,
67:16, 93:13,
118:17, 119:22,
123:22, 230:4,
236:14, 238:24,
239:12, 239:13,
241:15, 241:19,
242:7, 243:20,
244:21, 245:19
**2014**
15:11, 16:19,
30:24, 31:12,
46:20, 67:17,
67:18, 96:1,
150:11
**2016**
1:13, 6:6,
7:12, 42:19,
50:12, 51:15,
52:17, 57:16,
58:6, 58:11,

126:10, 129:4,
129:13, 129:18,
129:20, 130:18,
130:22, 131:2,
131:8, 131:13,
133:8, 133:17
**2017**
286:18, 286:20
**202**
3:10, 3:18
**21**
46:19, 70:22
**22**
105:8, 105:9
**2300**
4:6
**231**
6:14
**239**
6:15
**24**
194:7
**241**
6:16
**244**
6:17
**25**
239:11, 239:13
**252**
4:9
**261**
5:5
**27**
105:10, 105:12
**279**
5:6
**28**
71:1, 71:2,
85:5, 86:19,
109:1, 109:15
**282**
2:8
**286**
1:23
**29**
47:21, 81:18,
82:2, 82:15,
82:21, 83:23,

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                    131

83:25, 84:6,
84:10, 84:18,
85:3, 105:25,
106:13, 107:4,
107:23, 122:3,
123:19, 139:15,
210:4, 275:20,
276:6
**2:**
194:6, 194:7
**2nd**
286:17

---
**3**
---

**3.10**
239:18
**3.15**
134:18, 134:19
**3.3**
213:13, 213:19,
213:20
**30**
59:3, 59:18,
60:2, 60:6,
147:5, 285:11
**302**
6:12, 175:23,
175:24
**303**
6:14, 231:19,
231:20, 231:25,
235:25, 236:13,
237:1, 237:10,
237:16
**304**
6:15, 239:5,
239:6, 240:22
**305**
6:16, 241:10,
241:12
**306**
6:17, 244:16,
244:17, 246:8
**31**
147:7, 147:8,
286:20
**3232**
2:8

**35,000**
213:1
**350**
212:14, 212:18
**37**
71:3, 71:5
**39**
113:17, 113:18
**3:**
244:8, 248:16
**3:-cv--ygr**
1:7, 7:11

---
**4**
---

**4.1**
240:16
**4.2**
217:16, 239:18
**40**
113:19, 113:21
**41**
277:22
**426**
157:6, 158:14,
270:11
**434**
3:18
**4386**
4:9
**44**
277:23
**45**
244:8
**46**
5:16
**49**
174:16
**4:**
248:17, 277:22,
277:23, 285:3,
285:4, 285:23

---
**5**
---

**50,000**
213:1
**500**
212:14, 212:18
**5000**
3:18

**51**
174:17, 248:16
**52**
285:3
**540**
3:10
**58**
285:4
**59**
285:23
**5th**
230:4, 245:18

---
**6**
---

**60173**
2:7
**65**
149:18, 159:9,
243:17
**650**
3:8
**69**
118:4
**690**
5:11, 7:2,
13:25, 14:2
**691**
5:12, 7:2,
14:8, 48:16,
71:8, 105:15,
149:8, 195:16,
210:2
**692**
5:14, 7:2,
14:19
**693**
5:15, 7:3,
15:5, 15:6
**694**
5:16, 46:12,
46:13, 46:15,
46:18, 49:5,
249:7
**695**
5:18, 107:14,
107:15, 107:16,
107:19, 209:19,
209:24, 210:6,

210:14, 275:2,
275:5, 275:23,
278:4, 283:11,
283:23, 284:4
**696**
5:20, 114:17,
114:18, 114:22
**697**
5:23, 118:7,
118:10, 230:4,
231:7, 235:17,
236:8, 237:11,
237:15, 240:16,
245:18
**698**
6:4, 127:9,
127:10, 130:19,
135:7, 135:10
**699**
6:6, 130:2,
130:3, 130:6,
130:19, 131:1,
135:7

---
**7**
---

**700**
6:8, 132:16,
132:17, 132:18,
209:14, 209:25,
210:5, 246:12,
276:13, 277:16,
283:11, 284:14
**7200**
3:10
**725**
3:16
**75**
52:15

---
**8**
---

**80**
29:3, 29:9,
29:11, 34:9,
247:14
**800**
2:8
**835**
273:4

Transcript of Michael D. Reichardt
Conducted on December 20, 2016                                132

**9**

**9.1**
108:4, 108:24
**9.2**
57:11
**9.3**
222:5
**90**
58:21, 59:5,
59:7, 59:8,
59:11, 59:21,
60:2, 63:9,
68:25, 69:23,
150:13
**92614**
4:8
**949**
4:9
**99**
38:11, 209:16,
282:15, 283:5,
283:9
**9:**
1:14, 7:6
**9th**
8:20

**;**

**;**
239:19