# DX-428



# Transcript of **Thomas E. Morrison**

**Date:** July 20, 2016

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos, LLC
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

**Page 1**

```
 1       UNITED STATES DISTRICT COURT
 2       NORTHERN DISTRICT OF CALIFORNIA
 3
 4   -----------------------------------x
 5   CHRISTOPHER CORCORAN, ET AL,    :
 6        Plaintiffs    :
 7   v.              : Case No.  3:15CV03504-YGR
 8   CVS PHARMACY, INC.,            :
 9        Defendants    :
10   -----------------------------------x
11
12
13
14        Videotaped Deposition of
15         THOMAS E. MORRISON
16       Wednesday, July 20, 2016
17         Boston, Massachusetts
18           9:03 a.m.
19
20
21
22   Job No.: 116928
23
24
25   Reported by:  Sandra A. Deschaine, CSR, RPR,
```

**Page 2**

```
 1        Videotaped Deposition of THOMAS E.
 2   MORRISON, held at:
 3
 4
 5        Ropes & Gray LLP
 6        800 Boylston Street
 7        Boston, Massachusetts
 8        617.951.7000
 9
10
11
12
13      Pursuant to subpoena, before Sandra
14   Deschaine, Registered Professional Reporter,
15   Certified LiveNote Reporter, Notary Public in
16   and for the Commonwealth of Massachusetts.
```

**Page 3**

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3      ROBERT GILMORE, ESQUIRE
 4      STEIN, MITCHELL, CIPOLLONE, BEATO &
 5      MISSNER LLP
 6      1100 Connecticut Avenue, N.W.
 7      Washington, D.C. 20036
 8      (202) 737-777
 9
10   ON BEHALF OF THE DEFENDANTS:
11      GRANT A. GEYERMAN, ESQUIRE
12      COLLEEN MCNAMARA, ESQUIRE
13      WILLIAMS & CONNOLLY LLP
14      725 Twelfth Street, N.W.
15      Washington, D.C.  20005
16      (202) 434-5833
17
18   Also Present:  Ray Awadbdeh
19           Mark Vernazza
20           Robert Sweig, videographer
```

**Page 4**

```
 1
 2             CONTENTS
 3   EXAMINATION OF THOMAS E. MORRISON     PAGE
 4     By Mr. Gilmore              7
 5           EXHIBITS
 6   DEPOSITION EXHIBIT              PAGE
 7   Exhibit 5   PX-0005             27
 8     Code of Ethics for Pharmacists
 9   Exhibit 6   PX-0006             51
10     CVS Health Code of Conduct
11   Exhibit 10  PX-0010            183
12     Email from August 15th, 2008
13   Exhibit 11  PX-0011            203
14     "Cash Discount RX Programs
15      PBC discussion August 18th, 2008."
16   Exhibit 16  PX-0016            236
17     "TP Contracts Indexing Form Contract
18      Identity - Medco Health Solutions."
19   EXHIBIT 17  PX-0017            239
20     Letter dated June 5th, 2006
21   Exhibit 24  PX-0024            226
22     "Generic Drug Discount Programs and
23      Usual And Customary Charges"
24   Exhibit 34  PX-0034            189
25     Email chain from late October - early
```

**41**

BY MR. GILMORE:
Q. Does CVS, as a pharmacy company, have a duty to tell the truth to its patients?
    MR. GEYERMAN: Objection to form, calls for a legal conclusion.
A. CVS is an entity. If you're asking -- ask it differently. This is more focused on a person not a wall, not a stone wall, not an entity.
Q. Does CVS, as a pharmacy company, have a duty to tell the truth to its patients?
    MR. GEYERMAN: Objection to form, asked and answered, calls for a legal conclusion.
A. I think I stated that everyone has a duty to tell the truth and with integrity. So that would include employees at CVS, that would include employees at your office. Everyone does.
Q. What do you think that duty to tell the truth to patients involves?
    MR. GEYERMAN: Objection to form, ambiguous, calls for a legal conclusion.
A. If you had specific examples, I could address it. You're asking a very vague

**42**

question.
Q. Well, can you give me some specific examples that you think CVS, as a pharmacy, has a duty of truthfulness to its patients?
    MR. GEYERMAN: Objection to form, lack of foundation, calls for a legal conclusion.
A. I'm not trying to be argumentative or whatever, but I would suggest that you're here to ask the questions, and I'm here to try to give you a truthful answer.
Q. That's correct.
And the question I just asked was: Can you give me specific examples of situations where you think CVS, as a pharmacy, has a duty of truthfulness to its patients?
    MR. GEYERMAN: Objection to form.
Q. That's my question. And I'd like an answer.
    MR. GEYERMAN: Objection to form, calls for speculation, calls for a legal conclusion.
A. My difficulty is that CVS is not a person. CVS is a company. They don't speak. The individuals at CVS do the thinking and

**43**

speaking. So if you gave me a specific example, I'd be glad to answer you.
Q. Do you think the employees of CVS, acting on behalf of the company, have a duty to ensure that a patient is given truthful information about a prescription drug that they purchased from CVS?
    MR. GEYERMAN: Objection to form, calls for speculation, ambiguous, lack of foundation.
A. When I practiced, I did that.
Q. Do you under -- strike that.
Do you agree that the employees of CVS, acting on behalf of the company, have a duty to ensure that a patient is given truthful information about a prescription drug that the patient purchased from CVS?
    MR. GEYERMAN: Objection to form, ambiguous, calls for speculation, calls for a legal conclusion.
A. I would like to think that pharmacists who are trained and certified would give correct information about the prescription activity that a -- or medication that a patient would be taking that is under their care.

**44**

Q. I'd like to think that too, and my problem is that that's not really answering my question. So I'll ask it again. Just try and listen and answer my question.
Do you agree that the employees of CVS, acting on behalf of the company, have a duty to ensure that a patient is given truthful information about a prescription drug that the patient purchased from CVS?
    MR. GEYERMAN: Objection to form, asked and answered three times, calls for speculation, calls for a legal conclusion.
A. I'll give you a specific example. I'll get a pharmacist from a local CVS Pharmacy. I'll have him come in here and talk to you about your prescription medications. I don't think he could do it because he doesn't have a relationship with you. He doesn't know your medication. He hasn't had discussions with you. So your statement can't be acted upon. And that's the vagueness that I'm trying to convey to you in your questioning.
Q. So employees of CVS, acting on behalf of the company, do not have a duty to ensure that a patient is given truthful information

Page 45

1 about a prescription drug that the patient
2 purchased from CVS?
3         MR. GEYERMAN: Objection to form.
4         MR. GILMORE: Actually, I'll strike
5     that question. I'll save you the time.
6     Q. You can't tell the jury, one way or the
7 other, whether CVS employees, acting on behalf
8 of the company, have a duty to give truthful
9 information to CVS's patients about the
10 prescription drug that the patients purchased
11 from CVS?
12         MR. GEYERMAN: Objection to form,
13     misstates his testimony, calls for
14     speculation, calls for a legal conclusion.
15     This isn't an expert.
16     A. What I tried to explain to you, and I
17 don't want -- I'm trying to repeat it. Is that
18 my expectation would be that a pharmacist should
19 be truthful, honest, have a relationship with
20 the patient, explain their medications
21 appropriately, clinically, to give them the
22 appropriate direction, and I think -- I'm trying
23 to do the best I can for you.
24     Q. Do you believe that CVS employees,
25 acting on behalf of the company, have a duty to

Page 46

1 give truthful information to CVS's patients
2 about the prices of the prescription drugs that
3 the patients purchase from CVS?
4         MR. GEYERMAN: Objection to form,
5     foundation, calls for a legal conclusion.
6     A. What do you mean by "duty"?
7     Q. As a matter of ethics, should CVS
8 employees give -- acting on behalf of the
9 company, give truthful information to patients
10 about the pricing of the prescription drugs that
11 the patients buy from CVS?
12         MR. GEYERMAN: Objection to form,
13     foundation.
14         You already asked him about his
15     awareness, sitting here today, about Codes
16     of Ethics, and he told you the extent of
17     his ability to testify. Now, after he told
18     you he can't recite those for you chapter
19     and verse, you want to have him try to
20     apply specifics?
21     Q. You can answer my question.
22     A. The pharmacist, when asked about the
23 pricing of a prescription, hopefully would be
24 able to provide some insight as to how it
25 occurred or provide direction on how the patient

Page 47

1 could get a better understanding as to how it
2 occurred.
3     Q. Do CVS employees acting on behalf of
4 the company -- strike that.
5         Should CVS employees, acting on behalf
6 of the company, give truthful information to CVS
7 patients about the prices those patients are
8 entitled to under their health insurance plans
9 when they go to buy the drugs from CVS?
10         MR. GEYERMAN: Objection to form, calls
11     for a legal conclusion, lack of
12     foundation.
13     A. I think I stated earlier that a
14 pharmacist, if asked, should be able to give
15 some direction as to the pricing of the
16 prescription or direction as to get better
17 understanding as to the pricing of the
18 prescription. There are many third-party
19 programs that have very special pricing
20 arrangements, very unique, they're all
21 different, and pharmacists will not know how the
22 exact formula works, and so they may direct the
23 patient to call their insurance company.
24     Q. Does CVS, as a company -- strike that.
25         Do CVS employees, acting on behalf of

Page 48

1 the company, should they give truthful
2 information to health insurance companies about
3 the pricing of the generic prescription drugs
4 that are being submitted to a health insurance
5 company for reimbursement on a purchase?
6         MR. GEYERMAN: Objection to form, lack
7     of foundation, calls for a legal
8     conclusion.
9     A. Could you give me an example of the
10 kind of question that an insurance company might
11 ask that you want the pharmacist to provide this
12 insight or this information?
13     Q. Do CVS employees, acting on behalf of
14 the company, should they give truthful
15 information about CVS's usual and customary
16 price of a generic prescription drug to a health
17 insurance company when submitting information to
18 its health insurance company on a prescription
19 drug insurance claim?
20         MR. GEYERMAN: Objection to form, calls
21     for a legal conclusion.
22     A. Is your understanding that an insurance
23 company would call our pharmacists to obtain the
24 U&C, as you call it, information?
25     Q. I'm not limiting my question to

**Page 133**

1 transmitting information and receiving
2 information to and from insurers and PBMs?
3     A. My tenure was long. In the early days
4 of my tenure, there were different formats, but
5 in the latter part, I would say that NCPDP has
6 been the accepted standard throughout.
7     Q. So from 2006 to the end of your tenure
8 in May 2010, was the NCPDP format for
9 transmitting information, that standard format
10 was the one CVS used?
11     A. Yes.
12     Q. And in terms of the data points
13 themselves that go in the different fields of
14 the NCPDP format, while those may have varied,
15 were you aware of any differences in the format
16 itself for conveying information between CVS and
17 different TPPs or PBMs?
18         MR. GEYERMAN: Objection to form.
19     A. While I'm familiar with the standards,
20 since I was involved with NCPDP for years, I did
21 not get down to the level which identified what
22 information was populated into the standard.
23 And as I said earlier, there were contracts that
24 we had that used the standard but they didn't
25 want what is required in the standard. So their

**Page 134**

1 contract called for put A, B, C in this block,
2 rather than D, E, F. But the standard was used.
3     Q. That was my question. That's the point
4 I was making. While the data that would go into
5 the different fields in the NCPDP format may
6 have varied from among the TPPs and PBMs, the
7 format, sort of the system itself was
8 essentially the same for CVS. Is that fair?
9         MR. GEYERMAN: Objection to form,
10     ambiguous.
11     A. It's my understanding that that was
12 used for all of our programs, and to your point,
13 there might be variation predicated on the
14 contract but the standard was similar.
15     Q. Let's talk about the Health Savings
16 Pass program in some detail.
17         First of all, can you tell the jury, in
18 general terms, what is the Health Savings Pass
19 program, at least as it existed during your
20 tenure at CVS?
21     A. Right. The Health Savings Pass program
22 was a defined benefit plan that provided
23 prescription services to members who chose to
24 opt in, pay the enrollment fee, waive the HIPAA
25 requirement. And it was really, as I indicated,

**Page 135**

1 it was the patient's choice as to whether they
2 wanted that. It was a very limited number of
3 prescriptions. There was a limitation also on
4 the quantity because it was based upon usual and
5 customary or the -- I shouldn't say that word.
6 It was based on the appropriate dispensing
7 patterns.
8         So, in other words, medications have a
9 recommended dispensing pattern and so they might
10 take one pill a day, two pills a day, three
11 pills a day, whatever the dispensing pattern
12 was, that's what it fit. So if somebody were
13 taking five pills a day, the program might have
14 only been designed for two pills a day. So I
15 want to make you understand that variation. And
16 so basically the member had to make a
17 determination for themselves, is this worthwhile
18 and made decisions for that.
19     Q. I think I heard you say that there were
20 three eligibility criteria for a patient to join
21 the HSP program. The first one is essentially
22 fill out an enrollment form?
23         MR. GEYERMAN: Outside the scope,
24     misstates the testimony.
25     A. Yes.

**Page 136**

1     Q. Let me rephrase. I want to ask you
2 about what the eligibility criteria were, to
3 join.
4         The first one I think you just told me
5 was a patient at CVS had to fill out an
6 enrollment form. Is that true?
7     A. That's true.
8     Q. Was a second eligibility criteria to
9 sign a HIPAA, H-I-P-A-A, waiver regarding their
10 protected health information?
11     A. That's true.
12     Q. A third eligibility criteria was to pay
13 an enrollment fee; right?
14     A. That's true.
15     Q. And originally that enrollment fee was
16 $10 when the program launched; correct?
17     A. That's my recollection, yes.
18     Q. Other than those three criteria for a
19 patient to join the HSP program, there were no
20 other criteria for enrolling. Is that a fair
21 statement?
22         MR. GEYERMAN: Objection to form,
23     misstates the record.
24     A. For eligibility and to become a member
25 of the program, that is true.

---

173

1    Q.  Or a prorated price from the HSP
2  program.  Do pharmacies have discretion to offer
3  those prices?
4        MR. GEYERMAN:  Objection to form, lacks
5     foundation, calls for speculation.
6     A.  There is nothing that I read that gave
7  them that permission or policy to allow them to
8  do that.
9     Q.  Was there a policy or rule within CVS,
10 during your tenure, that prohibited pharmacies
11 from having that discretion to offer a lower
12 prorated price for prescriptions of less than a
13 90 pill length?
14    A.  Repeat that again.
15    Q.  Was there was a policy or rule within
16 CVS, during your tenure, that prohibited
17 pharmacies from -- in their discretion, offering
18 a price lower than the 90-day HSP price for a
19 prescription of a shorter duration?
20       MR. GEYERMAN:  Objection to form,
21    foundation.
22    A.  Well, there was in place, for
23 pharmacists, directions on how to fill a
24 prescription, directions on how the computer
25 calculates the price and that they then charged

174

1  that price to the consumer.  They did not have
2  the right, it was a policy, did not have the
3  right to override that prescription unless
4  approved by somebody in a higher position.
5        So the pharmacists did not have any --
6  there was nothing that prohibited them, other
7  than the fact that there was direction on how to
8  do it and that they couldn't price match.  So,
9  in essence, they're told they can't do that.
10    Q.  If they received permission to offer a
11 lower prorated price from the price for a
12 shorter prescription length, then the
13 pharmacists were able to do that.  Is that what
14 you're saying?
15       MR. GEYERMAN:  Are you talking about in
16    HSP transaction or non-HSP --
17       MR. GILMORE:  For any drug that's on
18    the HSP list.
19    A.  There was a process that if a
20 pharmacist felt that there was a public -- a PR
21 issue or consumer issue, that they felt
22 needed some modification, there was a process
23 for them to contact their -- I can't remember if
24 it was their supervisor or the district manager.
25 I forget who the entity was, and that person

175

1  could approve it.  But that's for any
2  prescription.
3     Q.  Let me hand you what's been marked as
4  Plaintiffs' Exhibit 40.
5  (Exhibit 40, was premarked for identification
6   and attached to the transcript.)
7     A.  I'm sorry.  What was it?
8     Q.  Plaintiffs' Exhibit 40.
9        This is an email chain among you and
10 others in the CVS organization in April 2008;
11 right?
12    A.  That's correct.
13    Q.  And let's start at the earlier email
14 and work our way up.  The bottom of the first
15 page there's an email from Bari Harlam?
16    A.  Bari.
17    Q.  April 9th, 2008?
18    A.  Yes.  Actually, April 9th.
19    Q.  April 9th, 2008?
20    A.  2008.
21    Q.  And it's sent to you and Matthew
22 Leonard and Rob Price and David Purdy; right?
23    A.  Correct.
24    Q.  Who are -- who is Mr. Leonard?
25    A.  Matt worked for me on my team for a

176

1  number of years.  I'm assuming at this point he
2  was promoted to what we call pharmacy
3  purchasing, and so he was over -- so he was
4  overseeing the department on purchasing.
5     Q.  Who was Rob Price?
6     A.  Rob Price was our head of marketing.
7     Q.  And David Purdy, who is he?
8     A.  David Purdy is an operator.  I think he
9  was a regional manager.  I forget which state he
10 was in.  I'm sorry, not a regional manager.  He
11 was an area vice president, but I don't remember
12 his area.
13    Q.  What were Bari Harlam's
14 responsibilities at this time?
15    A.  She was in marketing,
16 marketing/merchandising.  So she was responsible
17 for putting together various programs, like this
18 and others, that CVS would participate in.
19    Q.  Was she more senior than you or were
20 you more senior than her or were you peers at
21 this time?
22    A.  We were peers.
23    Q.  Ms. Harlam writes, "Tom and Matt,
24 here's a brief summary of Larry's input."
25       Do you see that?

177

1  A. Yes.
2  Q. She's referring to Larry Merlo; right?
3  A. Right.
4     MR. GEYERMAN: Objection to form.
5  A. THE WITNESS: Sorry.
6  Q. And at this time, in August -- I'm
7  sorry -- April of 2008, what was Mr. Merlo's
8  position within the CVS organization?
9  A. He was responsible for operations, so
10 he was the executive vice president of
11 operations and that was just for the retail
12 segment.
13 Q. The subject of Ms. Harlam's email is
14 "Cash Card Discussion with Larry."
15    Do you see that? The subject line.
16 A. Oh, the subject line. Yes.
17 Q. And the cash card that she's referring
18 to is what ended up becoming the -- launched as
19 the HSP program; right?
20    MR. GEYERMAN: Objection, form, lacks
21 foundation.
22 A. That's correct.
23 Q. She writes -- Ms. Harlem writes to you
24 and Mr. Leonard Price and Purdy, "This is a
25 retention play. We are not trying to attract as

178

1  people as possible into the program because that
2  creates a cannibalization of the existing cash
3  customer's problem."
4     Do you see that?
5  A. I do.
6  Q. And you understood that as input from
7  Mr. Merlo into the program, how it was to be
8  structured. Is that fair?
9     MR. GEYERMAN: Objection to form.
10 A. I'm not sure whose it was, whether it
11 would be Bari or Larry.
12 Q. She describes it as a brief summary of
13 Larry's input not of Bari's input; right?
14 A. But I can't attest to you today that
15 this was all Larry's input. Because Bari and I
16 were very active together in putting this
17 program together and we identified it to be a
18 retention plan. Do I know that she said to him,
19 "Hey, we're planning this to be a retention
20 play," and Larry said, "Yeah, that sounds fine."
21 I have no idea.
22 Q. Did you have conversations with
23 Mr. Merlo about the HSP program when you were
24 developing it at CVS in 2008?
25 A. We have a group at CVS called the BPC,

179

1  the business planning committee, and Larry was a
2  member of that committee. And so any major
3  project that is put together throughout the
4  organization, at some point or another will
5  present to the BPC to get their input. They all
6  have good experience and knowledge, and we seek
7  out to get their direction and input on various
8  programs that we're implementing before we
9  implement them. So we had such times when we
10 met with the BPC.
11 Q. In this time frame, 2008, do you
12 remember who the members of the business
13 planning committee were?
14 A. Well, Tom Ryan was one, Larry Merlo,
15 Dave Ricker, and then an IT person. It may have
16 been John Roberts, but it may have been his
17 predecessor. Chris Bodine, and I can't think of
18 any others. But there may have been.
19 Q. Was Helena Foulkes on the business
20 planning committee?
21 A. I'm not sure if Helena was on there
22 yet. She's on it today. She's been on it a
23 long time, I'm not sure exactly when she was put
24 on the BPC.
25 Q. At this time frame in 2008, was

180

1  Ms. Foulkes senior to you?
2  A. Yes.
3  Q. Were you on the business planning
4  committee?
5  A. No.
6  Q. Was Bari Harlam on the business
7  planning committee?
8  A. No.
9  Q. Under point 2 in Ms. Harlam's email on
10 April 9, 2008, she says, "Insuring that this is
11 a compelling offer for customers and store teams
12 is key. This needs to be a way to hold on to
13 cash customers who are at-risk of leaving for $4
14 programs."
15    Do you see that?
16 A. Correct.
17 Q. Was one goal of the HSP program to
18 compete with companies like WalMart that were
19 offering $4 generic discounted drug prices?
20 A. This may require a longer answer.
21    I wouldn't say compete, necessarily.
22 You might recall that I stated earlier that one
23 of the goals was derived from input that we
24 received from the pharmacists and field
25 personnel indicating that they were having

Videotaped Deposition of Thomas E. Morrison
Conducted on July 20, 2016

46 (Pages 181 to 184)

181

patients request either to, you know, get the same pricing or they're going elsewhere, and some left.
And so what we needed to do, one of the many things that I tried to articulate earlier, was that we needed to put together a program that gave a tool to our pharmacists that allowed them to offer this as an alternative to their consumers with the goal of trying to retain them.
So our goal here was trying to retain the customers from leaving CVS and providing them a benefit that they perceived was as good, equal to, better than or even maybe not as good but worth them to stay at CVS.
MR. GEYERMAN: Rob, if you're done with that document, it's been like an hour and 20 something since our lunch break.
MR. GILMORE: Let's go take a break.
THE VIDEOGRAPHER: We're going off the record at 2:49 p.m.
(A recess was taken.)
THE VIDEOGRAPHER: We're back on the record at 3:07 p.m.
BY MR. GILMORE:

182

Q. Mr. Morrison, while you were working at CVS on developing and launching the HSP program, did you and your colleagues identify possible risks to CVS of launching the program?
A. Yeah, going through the due diligence, we identified a number of risks and benefits and we had various, I want to say report, it's not a report, just a --
Q. Assessments of the risk or discussions of the risk?
A. Well, a deck that would identify all of the various things, a PowerPoint.
Q. Was cannibalization of the existing sales, was that one risk that you and your colleagues identified from launching the HSP program?
A. Cannibalization of what case?
Q. Of existing sales.
A. Of our existing cash sales?
Q. Well, we can start with cash sales.
A. We may have had that on there. I don't recall.
Q. How about cannibalization of sales involving insurance?
A. I don't recall.

183

Q. Was a risk to the reimbursement that CVS was getting from insurance companies and PBMs, was that a risk that you and your colleagues identified?
A. I do remember that we did put that on there, yes.
Q. And that risk included the risk that insurance companies and PBMs would consider the HSP program CVS's new usual and customary price; fair?
A. Early on when we put everything on there that was listed on there, but as time went on we did our analy- -- we did our due diligence and I got input from everyone that I felt I needed to. I was very comfortable that our program was not gonna to create any issues relative to redefining our U&C for our defined benefit plans.
Q. Let me hand you what's marked as Plaintiffs' Exhibit 10.
(Exhibit 10, was premarked for identification and attached to the transcript.)
A. Thank you.
Q. And I'm going to ask you about the email from Mr. Leonard on August 15th, 2008, to

184

you, Mr. Foulkes and Mr. Christopher Diluro?
The subject line of this email is "Forward Cash Discount Program Drug list - AVG TPM cell";" right?
A. Did you say every -- AVG. Okay. Yes, did you did. Yes.
Q. "AVG average TPM cell."
This email is referring to the Health Savings Pass program; correct?
MR. GEYERMAN: Objection to form, foundation.
A. That's correct.
Q. I want to ask you about some statements that Mr. Leonard makes in his email to you and others in the third paragraph of his email on the first page.
A. Uh-huh.
Q. The paragraph that begins "From my perspective."
A. Okay.
Q. Now, he says, "From my perspective, in other words, to reduce the risk of further erosion of product reimbursement in the commercial marketplace," and I just want to stop there. He says other things but I want to focus

Videotaped Deposition of Thomas E. Morrison
Conducted on July 20, 2016

66 (Pages 261 to 264)

261

1      MR. GEYERMAN: Sorry. I'll take out
2  the calls for speculation. I'm still going
3  to object to the form.
4      Q. Let me re-ask the question just so we
5  have a clean transcript.
6      Are you aware of anything in writing
7  from Medco that says CVS does not have to report
8  its Health Savings Pass price as its usual and
9  customary price?
10     **A. You showed me a document just
11  previously that Vijay had had a conversation
12  with Cal, and he identified that it would not
13  come under -- would not affect our U&C.**
14     Q. Well, we can take a look at that
15  document. Can you pull out Plaintiffs' Exhibit
16  34?
17     Is this the email that you were
18  referring to a moment ago?
19     **A. That's right.**
20     Q. And you see, sir, this email is from
21  November 2006; right?
22     **A. (No verbal response.)**
23     Q. This is two years before CVS had
24  developed and launched its current HSP program;
25  right?

262

1      **A. The second one.**
2      Q. Right. And, in fact, this program
3  doesn't refer to anything about either the old
4  or the new HSP program; fair? In terms of your
5  communications with -- the email that you and
6  others at CVS have?
7          MR. GEYERMAN: Objection to form.
8      **A. Okay. You're right, it doesn't talk
9  about the current Health Savings Pass program.**
10     Q. Other than Medco, do you recall having
11  any other communications with PBMs or
12  third-party payors about the definition of usual
13  and customary pricing?
14         MR. GEYERMAN: Objection to form.
15     **A. Not in particular. I'd have to go to
16  the contracts to look at it.**
17     Q. So let's put the contracts to one side.
18     Other than what's in contracts, do you
19  recall having any communications, you yourself,
20  with anyone at PBMs or third-party payors about
21  the definition of usual and customary pricing?
22         MR. GEYERMAN: Objection to form,
23  ambiguous.
24     **A. It's my practice that I would have a
25  file on any negotiation that I did, so if I had**

263

1  **discussions with them during the negotiation, I
2  might have copies in a file. But I don't recall
3  any specific conversations that I had.**
4      Q. Other than the conversation that you
5  claim you had with Mr. Kornwasser about the
6  Health Savings Pass program, did you personally
7  have any other conversations with anyone else
8  from any other PBM or third-party payor about
9  the Health Savings Pass program?
10         MR. GEYERMAN: Objection to form to
11  form.
12     **A. If I did, I don't recall one.**
13     Q. Did you personally ever tell any
14  third-party payor or pharmacy benefit manager
15  that CVS was not going to report its HSP price
16  as its usual and customary price?
17         MR. GEYERMAN: Objection to form.
18     **A. I didn't find that that was necessary,
19  so I do not recall that I did that.**
20     Q. Do you know of anyone else at CVS, any
21  specific person who told a third-party payor or
22  a pharmacy benefit manager that CVS was not
23  going to report the HSP price as CVS's usual and
24  customary price?
25     **A. I don't recall that.**

264

1      Q. Are you aware of any third-party payor
2  or PBM that told you or anyone else at CVS that
3  the HSP price did not need to be reported as
4  CVS's usual and customary price?
5          MR. GEYERMAN: Objection to form, calls
6  for speculation.
7      **A. Could you repeat that question again?**
8      Q. Are you aware of any third-party payor
9  or PBM that told you or anyone else at CVS that
10  the HSP price did not need to be reported as
11  CVS's usual and customary price?
12         MR. GEYERMAN: Objection to form, calls
13  for speculation.
14     **A. The recollection that I had was having
15  a conversation with Laizer at Medco. I told you
16  that one. I do not recall other conversations
17  that were told to me by my colleagues or one
18  that I may have had. But the history shows that
19  we have not been passing that as our U&C for
20  either one of the Health Savings Pass programs,
21  and you can be assured that if they felt that it
22  was required, they'd be in touch with us.**
23     Q. So the answer to my question is, other
24  than the one oral conversation that you claim
25  you had with Mr. Cornwasser at Medco, you are

```
                                                    265
 1   not aware of any communication from any other
 2   third-party payor or PBM to CVS that said the
 3   HSP price did not need to be reported as CVS's
 4   usual and customary price?
 5         MR. GEYERMAN:  Objection to form,
 6      misstates his testimony, asked and
 7      answered.
 8      A.  Other than the one conversation, I do
 9   not recall other conversations that I may have
10   had or my clients may have had.
11      Q.  And you're not aware of any
12   communications in writing from any third-party
13   payor or PBM to CVS saying CVS does not need to
14   report its Health Savings Pass price as the
15   usual and customary price?
16      A.  I'm not aware of anything in writing
17   that says that we do -- that we do not have to
18   pass it.  As I am not aware of anything in
19   writing that says we do have to pass it, since
20   we've had it in place for all these years.
21         MR. GEYERMAN:  If you're going to move
22      to another subject, should we take our last
23      break.  We're a little over an hour here.
24         MR. GILMORE:  Yeah, that's fine.
25         THE VIDEOGRAPHER:  We're going off the
```

```
                                                    266
 1      record at 5:36 p.m.
 2   (A recess was taken.)
 3         THE VIDEOGRAPHER:  We're back on the
 4      record at 5:47 p.m.
 5   BY MR. GILMORE:
 6      Q.  Can you pull back out Plaintiffs'
 7   Exhibit 37?  I think it's that top document that
 8   you have your thumb on.
 9      A.  Oh, this one here?
10      Q.  Yeah.
11      A.  Okay.
12      Q.  And I -- we didn't finish up the other
13   definitions here.  I wanted to just finish off
14   this chart.
15         We covered CVS Caremark and Medco.  The
16   definition of usual and customary pricing that's
17   in the contract for Express Scripts, according
18   to this chart, says that it includes any
19   discounts or special promotions offered on such
20   a date.
21         Do you see that at the bottom of that--
22      A.  At the end of this sentence, yes.
23      Q.  For Anthem/WellPoint, in the provider
24   manual, definition of usual and customary price
25   that this --
```

```
                                                    267
 1         MR. GEYERMAN:  Definition of customary
 2      and reasonable charges.
 3         MR. GILMORE:  Okay.  Thank you.
 4      Q.  Under the column U&C language, "The
 5   term 'customary and reasonable charges' shall
 6   mean those amounts that pharmacy normally
 7   charges its regular private customers for
 8   comparable covered prescriptions/covered
 9   services, including any offered discounts."
10         Did I read that correctly?
11      A.  You did.
12      Q.  Go to the next page, under the contract
13   for prescription solution.  The definition of
14   usual and customary, according to this chart,
15   says that it is to include all applicable
16   discounts --
17      A.  Wait a minute.  Go ahead.
18      Q.  The definition says, of usual and
19   customary prices, says that "The pricing to
20   include all applicable discounts including, but
21   not limited to senior citizen discounts,
22   frequent shopper and special customer discounts
23   or other discounts"; right?
24         MR. GEYERMAN:  Objection, misstates the
25      document.
```

```
                                                    268
 1      A.  That's what it reads.  The portion that
 2   you read.
 3      Q.  The definition in the Aetna contract of
 4   usual and customary price, according to this
 5   chart, "is the cash price less all applicable
 6   customer discounts which pharmacy usually
 7   charges customers for providing pharmaceutical
 8   services"; right?
 9      A.  That's what it says there.
10      Q.  The definition of usual and customary
11   charge in the Argus contract, according to this
12   chart, says that it's "to include any special
13   promotions or discounts available to the public
14   on such date of dispensing."
15         Do you see that language in there?
16      A.  I do.
17         MR. GEYERMAN:  Objection, misstates the
18      document.
19      A.  I do see the language.
20      Q.  The definition of usual and customary
21   in the CIGNA contract with CVS, according to
22   this chart, says, "Usual and customary means the
23   established pharmacy retail cash price less all
24   applicable customer discounts that pharmacies
25   usually charges its customers regardless of the
```

Case 4:15-cv-03504-YGR Document 277-10 Filed 06/06/17 Page 12 of 12

Videotaped Deposition of Thomas E. Morrison
Conducted on July 20, 2016

70 (Pages 277 to 280)

---

**Page 277**

1  decision not to report the HSP price as CVS's
2  usual and customary price, at least during your
3  tenure, you knew that the result would be that
4  CVS would be able to receive higher
5  reimbursements from third-party payors and PBMs
6  on insured transactions; right?
7      MR. GEYERMAN: Objection to form,
8  misstates his testimony, misstates the
9  record, lack of foundation.
10     **A. On the analytics that I had performed,**
11  **we -- I do not recall any analytics that ever**
12  **looked at using the Health Savings Pass pricing**
13  **structure as our U&C in any of our defined**
14  **benefit plan programs to see what the impact**
15  **would be. So it was never a concern of mine**
16  **that I felt that it should even be applied. So**
17  **I didn't do that research.**
18     Q. Do you know if others at CVS did
19  examine whether or not CVS would face
20  significantly reduced reimbursements from
21  third-party payors and PBMs if CVS reported its
22  Health Savings Pass prices as its usual and
23  customary price?
24     MR. GEYERMAN: Objection to form, calls
25  for speculation.

**Page 278**

1      **A. I am not aware of any analysis to**
2  **that -- as you're describing it.**
3      Q. Knowing what you do about CVS's
4  business --
5      **A. Back then?**
6      Q. From the time that the HSP program
7  launched to the present day. If CVS had been
8  reporting, during this whole time, its HSP
9  program price as its usual and customary price,
10  would you be -- would you think that CVS would
11  have made hundreds of millions of dollars less
12  in reimbursements from third-party payors and
13  PBMs?
14     MR. GEYERMAN: Objection to form,
15  speculation, lack of foundation.
16     **A. I don't know what the dollar amount**
17  **would be. It's just too large of a number for**
18  **me to think of all the prescriptions that may be**
19  **impacted. I could not guess at that.**
20     Q. It would be a large number, though,
21  right?
22     MR. GEYERMAN: Objection to form.
23     Q. I'm not talking about a few dollars.
24  Millions, tens of millions or hundreds of
25  millions of dollars; fair?

**Page 279**

1      MR. GEYERMAN: Objection to form, calls
2  for speculation, calls for speculation,
3  lack of foundation, incomplete
4  hypothetical.
5      **A. I have no idea what it could be. I**
6  **don't even want to suggest anything.**
7      MR. GILMORE: I don't have any further
8  questions at this point.
9      A. THE WITNESS: Thank you.
10     MR. GEYERMAN: Very good.
11     THE VIDEOGRAPHER: This concludes the
12  videotaped deposition of Thomas E. Morrison
13  consisting of two disks. The time is 6:05
14  p.m. We are now off the record.
15  (Off the record at 06:05 PM.)

**Page 280**

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS.

I, Sandra A. Deschaine, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts at large, do hereby certify that the deposition of Thomas E. Morrison., in the matter of Christopher Corcoran, et al. vs. CVS Pharmacy, Inc., at Ropes & Gray, 800 Boylston Street, Boston, Massachusetts, on July 20, 2016, was taken and transcribed by me; that the witness provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts; that the transcript produced by me is a true record of the proceedings to the best of my ability; that review was not requested; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action, on this 2nd day of August 2016.

_____
Sandra A. Deschaine
Notary Public
Registered Professional Reporter

My Commission Expires:
July 7, 2017

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM