# DX-429



# Transcript of **Elizabeth Scott Wingate**

**Date:** October 20, 2016

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos, LLC
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: <www.planetdepos.com>

Worldwide Court Reporting | Interpretation | Trial Services

Case 4:15-cv-03504-YGR Document 277-11 Filed 06/06/17 Page 3 of 9
Videotaped Deposition of Elizabeth Scott Wingate
Conducted on October 20, 2016

1 (Pages 1 to 4)

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3   --------------- x
 4   CHRISTOPHER CORCORAN, et al., :
 5        Plaintiffs,      :
 6   v.              : Case No.:
 7   CVS PHARMACY, INC.         : 3:15-cv-03504-YGR
 8        Defendant.       :
 9   --------------- X
10
11   Videotaped Deposition of ELIZABETH SCOTT WINGATE
12              Washington, DC
13            Thursday, October 20, 2016
14                8:53 a.m.
15
...
23   Job No.: 125709
24   Pages 1 - 177
25   Reported by:  Debra A. Whitehead
```

**Page 2**

```
 1      Videotaped Deposition of ELIZABETH SCOTT WINGATE,
 2   held at the offices of:
 3
 4        WILLIAMS & CONNOLLY LLP
 5        725 12th Street, NW
 6        Washington, DC 20005
 7        (202) 434-5000
 8
...
11      Pursuant to notice, before Debra A. Whitehead, an
12   Approved Reporter of the United States District Court
13   and Notary Public of the District of Columbia.
```

**Page 3**

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS AND THE CLASS:
 3        ROBERT B. GILMORE, ESQUIRE
 4        STEIN MITCHELL CIPOLLONE BEATO & MISSNER LLP
 5        1100 Connecticut Avenue, NW
 6        Washington, DC 20036
 7        (202) 737-7777
 8
 9   ON BEHALF OF DEFENDANTS:
10        GRANT A. GEYERMAN, ESQUIRE
11        COLLEEN McNAMARA, ESQUIRE
12        WILLIAMS & CONNOLLY LLP
13        725 12th Street, NW
14        Washington, DC 20005
15        (202) 434-5000
16
17
18   ALSO PRESENT:
19        DEREK FOX, Video Specialist
```

**Page 4**

```
 1              C O N T E N T S
 2   EXAMINATION OF ELIZABETH SCOTT WINGATE       PAGE
 3   By Mr. Gilmore                  7
 4
 5       EXHIBITS MARKED IN TODAY'S SESSION
 6              (None)
 7
 8       EXHIBITS MARKED IN PRIOR SESSIONS
 9            (Retained by Counsel)
10   PLAINTIFFS' DEPOSITION EXHIBIT          PAGE
11   Exhibit 14  E-mail String          72
12   Exhibit 42  E-mail String         115
13   Exhibit 135 E-mail String          77
14   Exhibit 218 E-mail String         151
15   Exhibit 223 E-mail String         154
16   Exhibit 223A Attachment to Plaintiffs'    154
17        Exhibit 223
18   Exhibit 239 1/19/09 E-mail from        95
19        Mr. Tierney to Ms. Wingate
20   Exhibit 432 5/27/10 Letter from       132
21        Ms. Wingate to Mr. McCormick
22   Exhibit 436 6/7/10 Letter from        144
23        Mr. Starkowski to Ms. Wingate
24   Exhibit 437 E-mail String          56
25   Exhibit 441 E-mail String         162
```

105

1  me that there's an expectation that a pharmacy is
2  going to follow what the provider manual says.
3       Right?
4    A  Yes.
5    Q  And that was true, you had that
6  expectation when you worked at Express Scripts with
7  respect to pharmacies that were signing up with
8  Express Scripts, like CVS and others. Right?
9    A  Correct.
10   Q  After you got this e-mail from
11 Mr. Tierney, did you have any communications with
12 Medco on this subject?
13   A  I did have communications with Medco
14 regarding clarification of this, that the Health
15 Savings Pass was not included in this definition.
16   Q  And why was the Health Savings Pass not
17 included in this definition, according to the
18 communications that you had with Medco?
19   A  Again, I already said the -- this
20 definition does not include health -- Health Savings
21 Pass.
22   Q  And is the only reason that you think that
23 this definition doesn't include Health Savings Pass
24 program is because you think that the Health Savings
25 Pass membership program fees were not nominal?

106

1     MR. GEYERMAN: Objection. Misstates her
2  testimony.
3    A  Again, the Health Savings Pass had a lot
4  of attributes that don't include -- that would not
5  include them in this program.
6    Q  What specifically about the Health Savings
7  Pass program can you point to, other than a
8  membership fee which you think is not a nominal fee,
9  that would have taken the HSP program out of this
10 definition we're looking at in the Medco Provider
11 Manual?
12   A  That would be the main point of the
13 definition. And these people -- this is not a --
14 this is not a cash patient; they are enrolled in the
15 program. They are part of a third party.
16   Q  Earlier in this deposition we looked at
17 several e-mails from the September 2008 time frame
18 that referred to the HSP program as a cash-offering
19 cash program; didn't we?
20   A  But it -- it didn't -- it wasn't meant
21 like someone paid cash.
22   Q  Okay. Let me hand you what's marked as
23 Plaintiffs' Exhibit 446.
24      (Plaintiffs' Exhibit 446, previously
25 marked, retained by counsel.)

107

1     MR. GILMORE: Hold on. Yeah, that's fine.
2    Q  This is an e-mail date -- Bates Number
3  CVSC 386102, and it's from the April 2009 time
4  frame. Right?
5    A  Yes.
6    Q  And it is -- just to orient ourselves,
7  that's a -- about three months after the e-mail from
8  Mr. Tierney forwarding the Medco Provider Manual
9  that we looked at a moment ago. Right?
10   A  Yes.
11   Q  Let's work our way through this e-mail
12 chain. If you start on the second page, the
13 beginning e-mail is an e-mail from Tina Egan to you,
14 dated April 7, 2009. Right?
15   A  Correct.
16   Q  And the Subject line is, "Re Medco U&C.
17 Please pass to Medco legal."
18      Right?
19   A  Yes.
20   Q  Ms. Egan is a lawyer in-house at CVS.
21      Right?
22   A  Correct.
23   Q  She writes, "Beth, please forward this
24 revision of our U&C clarification on to Medco's
25 legal group and ask them to contact me directly.

108

1  Thanks."
2       Did I read that correctly?
3    A  Yes.
4    Q  And then below that is the revision of the
5  U&C that Ms. Egan is asking you to -- to forward to
6  Medco.
7       Right?
8    A  Correct.
9    Q  And that revision reads, "The lowest net
10 price a cash patient or customer would have paid the
11 day the prescription was dispensed inclusive of all
12 applicable cash discounts, but excluding discount
13 card programs such as CVS Health Savings Pass."
14      Did I read all that correctly?
15   A  Yes.
16   Q  And, Ms. Wingate, if you and others at CVS
17 really thought that the definition in the Medco
18 Provider Manual that we looked at a moment ago
19 didn't include the Health Savings Pass program, you
20 wouldn't be coming up with a new definition of U&C
21 to send over to Medco; would you?
22   A  All this is is a clarification to make it
23 clear that this is not part of our usual and
24 customary.
25   Q  Well, you send this clarification to Cal

109

1  Corum and Medco.  Right?
2     A   Correct.
3     Q   And you write, "Cal, can you get this
4  approved by your legal.  Can Tina just call them
5  directly.  I need to close this up.  Please advise,
6  Beth."
7         Do you see that?
8     A   Yes.
9     Q   And a couple -- you sent that e-mail on
10 April 28th.  Right?
11    A   Yes.
12    Q   Do you know why you waited almost three
13 weeks between Ms. Egan's e-mail and you sending this
14 e-mail on the 28th to Mr. Corum?
15    A   I don't know.
16    Q   Mr. Corum writes back a couple of days
17 later.  Right?
18    A   Yes.
19    Q   He says, "Beth, Medco current definition
20 of U&C does not include discount cards that charge a
21 more than nominal enrollment fee that is not
22 routinely waived.  A formal written response to your
23 letter dated March 20th, 2009, is being sent under
24 separate cover."
25        Do you see that?

110

1     A   Yes.
2     Q   And he references -- well, first of all,
3  in this e-mail he doesn't say, We agree with the U&C
4  clarification and we're going to adopt it.  He
5  doesn't say that; does he?
6         MR. GEYERMAN:  Objection.  Misstates the
7  document.
8     A   He doesn't name Health Savings Pass.
9     Q   Right.  Now, he references your letter
10 dated March 20th, 2009.
11        Do you see that?
12    A   Yes.
13    Q   Do you remember that letter?
14    A   Do I remember that exact letter?
15    Q   Yes.
16    A   I don't remember the exact letter.
17    Q   Did you see it in preparing for today's
18 deposition?
19    A   I did not.
20    Q   Do you remember anything about what would
21 have been in that letter?
22    A   What would have been in that letter would
23 have been just clarification, which we had.
24 Clarification that in case anyone did require, what
25 the response would be.

111

1     Q   When you send letters like that to a
2  payor, a PBM, when you did that as part of your job
3  responsibilities, was there a process that you
4  followed to file those letters, keep them stored
5  somewhere?
6     A   I mean, I would have given it to my
7  secretary to file or electronic file.
8     Q   Who was your secretary at the time?
9     A   Christina Merlino.
10    Q   Do you know if she's still at CVS?
11    A   I don't know.
12    Q   Would you have given this kind of letter
13 to a lawyer within CVS, like Ms. Egan or someone
14 else?
15    A   A copy of the letter?  It would have had
16 legal review, so she would have been involved in it,
17 yes.
18    Q   How about the final letter after you sent
19 it?
20    A   She would have approved the final letter.
21    Q   After you sent the final letter to Medco,
22 would you have forwarded or cc'd someone in the
23 legal department so that they had for their files a
24 copy of the letter?
25    A   The contracts were filed in payor

112

1  relations.  Legal had access to them, but the
2  physical storing was in the department.
3         MR. GILMORE:  And again I'll renew our
4  request.  And I think you told us, Mr. Geyerman,
5  that you're looking for the letter but haven't found
6  it yet.  So we obviously ask that you undertake a
7  reasonably diligent effort and find it and produce
8  it, if you're able to locate it.
9         MR. GEYERMAN:  We certainly will.
10    Q   I'm handing you what's marked as
11 Plaintiffs' Exhibit 445.
12        (Plaintiffs' Exhibit 445, previously
13 marked, retained by counsel.)
14    Q   This is an April 30th, 2009, letter from
15 Cal Corum at Medco, to Tina Egan at CVS, with a cc
16 to you.  Right?
17    A   Correct.
18    Q   Bates numbers on this is CVSC 356466.
19        Correct?
20    A   Correct.
21    Q   Mr. Corum writes, "Dear Tina, We are in
22 receipt of the letter dated March 20th, 2009, by
23 Elizabeth Wingate.  At this time we are unwilling to
24 alter the contractual language as set out in the
25 Medco pharmacy services manual as you request."

**113**

1  Did I read all that correctly?
2  A  Yes.
3  Q  So in this letter he's saying Medco does
4  not agree to the -- alter the contractual language
5  per the request that we saw in Plaintiffs' Exhibit
6  446. Am I right?
7     MR. GEYERMAN: Objection. Misstates the
8  document.
9  **A  It's the next sentence that the policy --**
10 **he clarifies it does not include the programs that**
11 **have the fee.**
12 Q  Well, we'll go on to the next sentence. I
13 just -- in a minute. I just want to make sure we
14 are all on the same page.
15    When he says, We are -- we, Medco -- are
16 unwilling to alter the contractual language as set
17 out in the Medco pharmacy services manual as you
18 request, is he not talking about the change that we
19 see in Plaintiffs' Exhibit 446, that e-mail that we
20 looked at a moment ago? Is that he -- is that what
21 he was referring to?
22 A  That is what he was referring to.
23 Q  Okay. Then in this letter that he sends
24 to you and Ms. Egan, Mr. Corum goes on to say, "Our
25 current policy is that the Medco definition of U&C

**114**

1  does not include discount cards that charge a more
2  than nominal enrollment fee that is not routinely
3  waived."
4     Do you see that?
5  A  Yes.
6  Q  Did you or others at CVS tell Mr. Corum
7  that the HSP membership fee is a nominal fee?
8  **A  Cal was very aware that we were -- that**
9  **the HSP pricing was not part of our usual and**
10 **customary. This is clarification that he agreed**
11 **that HSP pricing was not usual and customary.**
12 Q  My question was a little different.
13    Did you or others at CVS have discussions
14 with Mr. Corum or anyone else at Medco in which the
15 CVS folks said, This is not a nominal fee, told
16 Medco the HSP fee is not a nominal fee?
17    MR. GEYERMAN: Objection. Lack of
18 foundation.
19    You can answer for yourself. This
20 question is you and others at CVS.
21 Q  If you know of others having had that
22 communication. And throughout today, when I ask a
23 question, I'm asking about your personal knowledge.
24    MR. GEYERMAN: And I'll continue to object
25 insofar as the way a question is phrased is not

**115**

1  making that apparent.
2     Do you have the question in mind, or do
3  you want him to repeat it?
4     MR. GILMORE: I'll ask it again.
5  Q  Did you, or to your knowledge anyone else
6  at CVS, have discussions with Mr. Corum or anyone
7  else at Medco in which the CVS folks said, Our
8  membership fees are not nominal?
9  **A  I don't recall what the exact words were.**
10 **But Cal was very aware of what the fee was and**
11 **agreed that it was meaningful and it would not be**
12 **included in usual and customary pricing.**
13 Q  I'm going to hand you what's been marked
14 as Plaintiffs' Exhibit 42.
15    (Plaintiffs' Exhibit 42, previously
16 marked, retained by counsel.)
17    MR. GILMORE: That might be the only one.
18 I don't know if I have an extra.
19 Q  This is a document Bates-numbered CVSC
20 222766. And it is an e-mail chain from August 3rd
21 and August 4th, 2008. Correct?
22 A  Correct.
23 Q  And I will rep -- tell you, you can see
24 your name is not listed on this e-mail chain here.
25 But I want to ask you if you're aware of the

**116**

1  contents.
2     The beginning e-mail in the chain is one
3  from Doug Ghertner to a number of people within CVS.
4     Right?
5  A  Yes.
6  Q  And including among the recipients are Tom
7  Gibbons. Right?
8  A  Yes.
9  Q  And Tom Morrison, as well.
10    Do you see that?
11 A  Yes.
12 Q  And both Mr. Gibbons and Mr. Morrison at
13 the time were senior executives in payor relations?
14    MR. GEYERMAN: Objection. Misstates the
15 record.
16 **A  Tom Gibbons was not in payor relations.**
17 Q  Okay. Were both Tom Gibbons and Tom
18 Morrison at the time senior executives within CVS
19 Pharmacy?
20 **A  No. Tom Gibbons was Caremark.**
21 Q  Tom Gibbons was Caremark at this point in
22 time?
23    Tom Morrison was the head of payor
24 relations at this point in time in August of 2008.
25    Right?

**121**

1 were. Right?
2    A   I wouldn't tell any PBM any information
3 about percentage of sales, even third party.
4        MR. GILMORE: I know it's not quite an
5 hour. Should we take our lunch break now?
6        MR. GEYERMAN: Can we -- do you want -- is
7 there a reason we can't finish out an hour so we're
8 basically halfway down and have lunch?
9        MR. GILMORE: That's fine, yeah. Do you
10 want to -- it's up to you.
11        MR. GEYERMAN: It's up to you.
12        MR. GILMORE: It's up to you, really.
13        MR. GEYERMAN: We only have about ten more
14 minutes before we're --
15        MR. GILMORE: Okay.
16 BY MR. GILMORE:
17    Q   If Medco really was fine with CVS not
18 reporting its HSP price as usual and customary
19 price, why didn't Medco agree to the change that you
20 guys wanted that we looked at in this e-mail,
21 Plaintiffs' Exhibit 446?
22        MR. GEYERMAN: Objection. Calls for
23 speculation.
24    Q   Do you know?
25    A   CVS was fine with written communication

**122**

1 from Cal. It was a negotiation, and we were fine
2 with the resolution. He was clear it didn't include
3 HSP.
4    Q   If Medco was clear that the U&C didn't
5 include the Health Savings Pass program, why didn't
6 it just write that? Did you have discussions with
7 them about that?
8        MR. GEYERMAN: Objection. Calls for
9 speculation. If you want to know what Medco
10 thought, you can ask Mr. Corum on November 2nd.
11    Q   Have you had any discussions with
12 Mr. Corum recently?
13    A   I have not.
14    Q   When was the last time you spoke with him?
15    A   I haven't spoken to him in quite some
16 time. I probably had an e-mail on LinkedIn a year
17 ago.
18    Q   Do you know whether other people in Medco
19 knew about the discussions and correspondence that
20 you had with Mr. Corum?
21    A   Well, he states in the -- in the e-mails
22 that he had his legal department involved.
23    Q   Do you know who those people are?
24    A   I do not.
25    Q   You say he says in the e-mails -- I think

**123**

1 you ask whether he can get it approved by your
2 legal. Let's look at Plaintiffs' Exhibit 446 again.
3        Do you want to pull that out.
4    A   Yes, I asked him to get his legal,
5 approved by his legal.
6    Q   He doesn't actually say whether he has
7 gotten legal involved in his response back to you;
8 does he?
9    A   No. That's a question for him.
10    Q   Can you think of any communication that
11 you received in writing, letter or e-mail, something
12 like that, other than a contract definition that
13 excluded discounts, can you think of any
14 communication from any payor or PBM in writing where
15 the payor or PBM said, We know you're not reporting
16 the HSP prices as your usual and customary prices,
17 CVS, and that's okay, or words to that effect?
18    A   In writing?
19    Q   Yeah.
20    A   Are you talking from me, I'm assuming?
21 Because I'm not responsible for all the contracts.
22    Q   I'm asking if you're aware of any during
23 your tenure at CVS. Any payors or PBMs saying
24 something like that in writing, We know about your
25 HSP program prices, we know you're not reporting

**124**

1 them as usual and customary prices, and that's okay.
2    A   I don't know if it's in writing in e-mails
3 or verbal conversations, but -- I -- I don't know.
4 I mean, I'm sure you found them if they were in
5 writing.
6    Q   I'm not sure that I found any. But I'm
7 not the one testifying.
8    A   Well, you found Medco.
9    Q   Well, I think this document speaks for
10 itself what it says or doesn't say.
11        You said conversations. And I think in
12 your prior deposition you claimed you had a
13 conversation with a gentleman named Chuck Kneese or
14 Kneese?
15    A   Kneese.
16    Q   And he is at Express Scripts. Right? Or
17 he was?
18    A   He was at Express Scripts.
19    Q   Is he there anymore?
20    A   No, he's not.
21    Q   What conversation did you have with
22 Mr. Kneese at Express Scripts -- actually, strike
23 that.
24        What was Mr. Kneese's job at Express
25 Scripts when you had this conversation?

125

1  A   When I had the conversation he was in the
2  provider relations department.  He was in the
3  provider relations department when I was there, as
4  well.  He reported to me.
5  Q   So you were his boss?
6  A   I was his boss.
7  Q   And the conversation that -- that you are
8  saying you had with Mr. Kneese, was it about the
9  Health Savings Pass program?
10 A   It's the same conversation that I had with
11 all of them, just clarifying that it is -- what
12 Health Savings Pass was, and it's not our usual and
13 customary.
14 Q   And did Mr. Kneese ever put anything in
15 writing that reflects this conversation you claim
16 you had with him?  Or anyone else at Express
17 Scripts?
18 A   Did he put it in writing at Express
19 Scripts?  I have no idea.
20 Q   Was it not the normal practice, when you
21 were at Express Scripts and at CVS, if the two sides
22 in a contract reach an understanding of what that
23 contract means, to put it in writing?  Isn't that
24 what normally happens?
25 A   No.  If you agreed.

126

1  Q   I believe in your prior deposition in the
2  Texas attorney general investigation you also
3  identified a conversation you claim you had with
4  someone named I think John Barre or Barre?
5  A   Bill.
6  Q   Bill Barre.  I apologize.
7  A   Yeah.  Uh-huh.
8  Q   And he's with MedImpact?
9  A   Correct.
10 Q   What was Mr. -- is it Barre or Barre?
11 A   Barre.
12 Q   What was Mr. Barre's role with MedImpact?
13 A   At that time it was provider relations.
14 Q   Going back to the conversation that you
15 claim you had with Mr. Kneese at Express Scripts.
16 When did that occur; do you remember?
17 A   I don't recall.
18 Q   Was it over the phone or in person?
19 A   Over the phone.
20 Q   How long did the conversation last; do you
21 remember?
22 A   I don't remember.
23 Q   How about the conversation that you claim
24 you had with Mr. Barre at MedImpact; was that in
25 person or telephone?

127

1  A   Phone.
2  Q   Do you remember when it happened?
3  A   I don't.
4  Q   Do you remember how long it lasted?
5  A   I don't.
6  Q   Did you speak with anyone else within
7  MedImpact other than Mr. Barre?
8  A   I did not.
9  Q   And did you speak with anyone else within
10 Express Scripts other than Mr. Kneese about the
11 Health Savings Pass program?
12 A   No.  These were my contacts.
13 Q   In your prior deposition in the Texas
14 attorney general's office you mentioned that you had
15 a conversation with John Lavin or Lavin?
16 A   Lavin.
17 Q   And he works at Caremark.  Right?
18 A   Correct.
19 Q   And Caremark is the PBM that CVS itself
20 owns, as we talked about earlier.  Right?
21 A   Yes.
22 Q   So he's going to agree with whatever CVS
23 wants.  Right?
24     MR. GEYERMAN:  Objection.  Argumentative.
25 Misstates the record.

128

1  A   No, he doesn't agree with CVS with
2  every -- everything.  Caremark was another PBM I had
3  to negotiate with, every attribute of the contract.
4  Q   Caremark was the one entity that was
5  actually administering the Health Savings Pass
6  program for CVS.  Right?
7  A   Were they -- they were the PBM for Health
8  Savings Pass.  Correct.
9  Q   Is there -- was this an in-person meeting
10 or telephone call that you --
11 A   Telephone call.  These people lived in
12 different states.
13 Q   Do you remember when you had this
14 telephone call with Mr. Lavin?
15 A   I don't.
16 Q   Other than the conversations with
17 Mr. Corum, Mr. Lavin, and Mr. Barre that we've
18 talked about, can you recall any other conversations
19 you had with payors or PBMs, representatives of
20 payors or PBMs, about the Health Savings Pass
21 program?
22 A   And Express Scripts.
23     MR. GEYERMAN:  You left out Mr. Chuck
24 Kneese.
25 A   Chuck.

```
                                                            280
 1    COMMONWEALTH OF MASSACHUSETTS
 2    SUFFOLK, SS.
 3
 4
         I, Sandra A. Deschaine, Registered
 5    Professional Reporter and Notary Public within
      and for the Commonwealth of Massachusetts at
 6    large, do hereby certify that the deposition of
      Thomas E. Morrison., in the matter of
 7    Christopher Corcoran, et al. vs. CVS Pharmacy,
      Inc., at Ropes & Gray, 800 Boylston Street,
 8    Boston, Massachusetts, on July 20, 2016, was
      taken and transcribed by me; that the witness
 9    provided satisfactory evidence of identification
      as prescribed by Executive Order 455 (03-13)
10    issued by the Governor of the Commonwealth of
      Massachusetts; that the transcript produced by
11    me is a true record of the proceedings to the
      best of my ability; that review was not requested;
12    that I am neither counsel for, related to, nor
      employed by any of the parties to the action in
13    which this deposition was taken, and further that
      I am not a relative or employee of any attorney
14    or counsel employed by the parties thereto,
      nor financially or otherwise interested in the
15    outcome of the  action, on this 2nd day of
      August 2016.
16
17
18
19            _____
                    Sandra A. Deschaine
20                  Notary Public
                    Registered Professional Reporter
21
22
23
24
      My Commission Expires:
25    July 7, 2017
```