# PX-662



# Exhibit 17

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| Christopher Corcoran, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>CVS Pharmacy, Inc.<br><br><br><br>          Defendant. | Case No. 15-cv-03504-YGR<br><br>CLASS ACTION<br><br>**DECLARATION OF G. WILLIAM STREIN** |

I, G. William Strein, pursuant to 28 U.S.C. § 1746, hereby affirm that I am over 18 years of age and competent to make the following Declaration.

**Personal Background**

1. I have been retired since 2013.  I worked almost my entire 45-year professional career as a pharmacist with 13 years of my final working years in the pharmacy benefit management ("PBM") industry.  Since retiring, I have done consulting work for the PBM and pharmacy industries.  I have not done, and am not doing currently, consulting engagements for CVS Pharmacy, Inc. ("CVS").

2. From 2008 through 2012, I was Vice President, Provider Relations at Medco Health Solutions, Inc. ("Medco" or the "Company").  Prior to becoming Vice President, Provider Relations for Medco, I held the following positions within the Company: Senior Director, Provider Relations since 1999.

3. In my capacity as Vice President at Medco, I was responsible for, among other things, negotiating PBM contracts with pharmacies and representation for Medco at state and national professional pharmacy organizations, network pharmacy communications; policy development; dispute resolution and regulatory input at local, state, and national levels as well as indirect support for Audit and Finance on network pharmacy matters.

**"Usual and Customary" Price**

4. The usual and customary ("U&C") price is generally a term defined in a contract or provider manual. Medco's 2009 Pharmacy Services Manual, finalized in or around November 2008, defined the U&C price as:

> The lowest net price a cash patient or customer would have paid the day the prescription was dispensed, inclusive of all applicable discounts. These discounts include, but are not limited to, senior citizen discounts, "loss leaders" frequent shopper or special customer discounts, competitor's matched price, and other discounts offered to customers, including but not limited to buyer's clubs with nominal membership fees, discount buying cards and programs.

2009 Pharmacy Services Manual at 69.

5. In the next edition of the Pharmacy Services Manual (the 2009/2010 Pharmacy Services Manual), Medco revised its definition of U&C to mean "the lowest net cash price a cash patient or customer would have paid the day the prescription was dispensed, inclusive of all applicable discounts." 2009/2010 Pharmacy Services Manual at 86.

**Pharmacy Discount Generic Programs**

6. In late 2006, Walmart announced its "$4 generics" list, which offered all Walmart pharmacy customers a set list of generic medications for $4 for a 30-day supply. This announcement received significant attention in the insurance, pharmacy, and PBM industries.

7. I recall discussing Walmart's program with my colleagues at Medco. We determined that Walmart's $4 price list constituted the U&C prices for those medications, because Walmart charged those prices to every Walmart customer. We took the same approach to similar price lists charged by other pharmacies to each of their customers, i.e., that these prices set by a pharmacy, and communicated via a defined listing of specific medications, constituted that pharmacy's U&C price for each medication.

8. In the years following Walmart's announcement, it came to Medco's attention from a variety of sources (e.g., network pharmacies, Medco's clients, our audit department) that some pharmacy chains and retailers were introducing membership-based programs that provided customers with special pricing on set lists of generic medications. Unlike Walmart, these pharmacies required customers to opt into, or enroll in, a program and pay a membership fee in order to access the special pricing.

9. Upon learning of these programs, my colleagues and I considered whether membership programs in any way affected the U&C price our pharmacies were required to include in each claim submitted by the pharmacy to Medco for payment by Medco to the pharmacy. I recall discussing this issue with a number of colleagues, including at a minimum Laizer Kornwasser, Franceen Spadaccino, and Calvin Corum, as well as in-house lawyers for Medco. We determined that Medco's definition of "usual and customary" in its Pharmacy

2

Services Manual did not encompass membership program prices.  We viewed program members – particularly where program members had paid a membership fee to access the pharmacy's special pricing – as separate and distinct from "cash customers" who paid the pharmacy's retail price.  We communicated Medco's position to the various pharmacies that had membership programs.

10. While at Medco, I was aware that CVS offered a program called "Health Savings Pass" ("HSP"), which allowed members to purchase generic medications for a set price.  I learned about HSP around the same time I learned about other pharmacies' membership programs.

11. I understood that CVS required HSP members to affirmatively opt into the program and pay a membership fee in order to access the program pricing.  I further understood that CVS enforced the membership fee and did not routinely waive it.  Based on my understanding of the program, CVS was not required to submit the HSP price as its U&C price on Medco claims.

12. The U&C definition in Medco's 2009 Pharmacy Services Manual included the phrase "buyer's clubs with nominal membership fees, discount buying cards and programs."  2009 Pharmacy Services Manual at 69.  I recall discussing the meaning of "nominal" with my colleagues in late 2008 or early 2009.  We decided not to designate any particular dollar amount as "nominal" because what is "nominal" is subjective and could vary by geographic market area.  I recall removing the reference to "nominal" fees from the next version of the Pharmacy Services Manual to simply acknowledge that individual business practices would establish a chain-specific membership fee based on the pharmacy's local markets and that Medco, as a one of several payors, could not define membership fees appropriate to all membership programs.

13. After Medco changed the U&C definition, it read as follows in the subsequent Pharmacy Services Manuals (2009/2010, 2011, and 2012 editions):

> The lowest net cash price a cash patient or customer would have paid the day the prescription was dispensed, inclusive of all applicable discounts.

2009/2010 Pharmacy Services Manual at 86; 2011 Pharmacy Services Manual at 94; 2012 Pharmacy Services Manual at 96.  Under this definition, Medco did not consider membership program prices to be "applicable discounts" to cash customers because pharmacies with a membership program required customers to pay a membership fee before they could access the program's special pricing.

DATED: November 18, 2016

_____
G. William Strein

3