Bonny E. Sweeney (Cal. Bar No. 176174)
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, California 94111
Tel: 415-633-1908
Fax: 415-358-4980
bsweeney@hausfeld.com

Richard Lewis (admitted *pro hac vice*)
Sathya S. Gosselin (Cal. Bar No. 269171)
HAUSFELD LLP
1700 K St. NW, Suite 650
Washington, D.C. 20006
Tel: 202-540-7200
Fax: 202-540-7201
rlewis@hausfeld.com

Pat A. Cipollone, P.C. (admitted *pro hac vice*)
Rebecca R. Anzidei (admitted *pro hac vice*)
Robert B. Gilmore (admitted *pro hac vice*)
STEIN MITCHELL CIPOLLONE BEATO &
 MISSNER LLP
1100 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel: (202) 737-7777
pcipollone@steinmitchell.com
ranzidei@steinmitchell.com
rgilmore@steinmitchell.com

Elizabeth C. Pritzker (Cal. Bar No. 146267)
Jonathan K. Levine (Cal. Bar No. 220289)
Bethany L. Caracuzzo (Cal. Bar No. 190687)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, California 94612
Tel. 415-692-0772
Fax. 415-366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com

*Interim Class Counsel*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| Christopher Corcoran, et al., | Case No. 4:15-cv-03504-YGR |
| Plaintiffs, | <u>CLASS ACTION</u> |
| v. | **PLAINTIFFS' RESPONSIVE SEPARATE STATEMENT IN OPPOSITION TO CVS PHARMACY INC.'S MOTION FOR SUMMARY JUDGMENT** |
| CVS Pharmacy, Inc. | |
| Defendant. | Date: July 18, 2017<br>Time: 2:00pm<br>Courtroom: 1<br>Judge: Honorable Yvonne Gonzalez Rogers |

<u>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u>

| Issue No. | Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence |
|---|---|---|
| 1&2 | Fact 1. CVS Pharmacy, Inc. ("CVS") is a chain pharmacy that dispenses prescription drugs.<br>Third Amended Comp. ¶¶ 4, 40 | Undisputed.[1] |
| 1&2 | Fact 2. CVS operated the Health Savings Pass ("HSP") program from 11/9/08 through 2/1/16.<br>DX-423 at 193:14-194:20 (CVS 30(b)(6)) | Undisputed. |
| 1&2 | Fact 3. CVS intended HSP primarily as a program to retain existing customers, not as a program to attract new customers to CVS.<br>PX-40 (CVS Email); DX-428 at 175:3-181:15 (Morrison Dep. (July 20, 2016)) | Disputed. CVS ███████████████ ████████████████████████████ ████████████████████████████ ███ and told investors to expect increased revenue and store traffic. CVS intended to shield its insurance based profits while offering a cash discount to increase its cash business. PX-59 (CVS email); PX-58 at CVSC-0222952 (CVS email); DX-439 at CVSC-0384902 (CVS Earnings Call); PX-508 (CVS email); PX-254 (CVS Presentation); PX-806, Gibbons (TX) Dep.(TX) Dep. 246:12-247:13; PX-821, Ferschke (TX) Dep. 120:18-121:17; PX-164 (ScriptSave Presentation). |
| 1&2 | Fact 4. HSP was a membership program.<br>DX-428 at 134:17-135:18; DX-80 (HSP enrollment form); DX-441 (HSP enrollment form) | Disputed. CVS policies and procedures for the HSP program state "there are no restrictions to program enrollment." Former senior CVS executive testified that ████████████████ ████████████████ The HSP "membership" criteria included trivial information already available to CVS, and CVS frequently did not enforce the membership criteria, giving HSP pricing to non-HSP members.<br>PX-47, CVS/Pharmacy Health Savings Pass Policies & Procedures [at CVSC-0222898]; PX-807, Morrison (TX) Dep. 227:2-22; PX-809[2] at ¶¶ 40-41 & Tab. 3 (10/3/16 Hay Decl.); PX-810 at ¶¶ 18-21; 32-34 & Tabs 1-3, 7 (1/9/17 Hay |

---

[1] Where Plaintiffs state a Fact is "Undisputed," they do not necessarily agree that the evidence CVS cites in this Statement supports that Fact, but rather that, from Plaintiffs' knowledge of the record and facts of this case, they agree that the Fact is supported elsewhere. Additionally, Plaintiffs' statement that a Fact is "Undisputed" does not necessarily mean they agree the Fact is material to the case.

[2] All references to "PX" exhibits refer to Plaintiffs' exhibits to the Gilmore Decl. unless otherwise stated.

| | | | |
|---|---|---|---|
| | | | Rebut. Decl.); PX-804, Dudley 30(b)(6) 229:14-230:3. |
| | 1&2 | **Fact 5.** CVS required enrollees to complete an enrollment form; agree to the program's terms and conditions, including a waiver or authorization under HIPAA; and pay an annual membership fee ($10 through December 31, 2010, and $15 thereafter). DX-428 at 134:17-135:18; DX-423 at 193:14-194:3; DX-80; DX-441 | Disputed. CVS's data show it did not uniformly collect membership fees from "members" of the HSP program. PX-810 at ¶¶ 27, 32-34 & Tab. 7 (1/9/17 Hay Rebut. Decl.); PX-804, Dudley 30(b)(6) 229:14-230:3. |
| | 1&2 | **Fact 6.** HSP provided members a set price–$9.99 through December 31, 2010 and $11.99 thereafter–for a standard 90-day supply of approximately 400 common generic drugs. (A limited number of drugs had a different price.) The set $9.99/$11.99 price applied to supplies of less than 90 days. HSP also offered members a discount at MinuteClinics in CVS pharmacies. DX-432 at 3; DX-437 (Nov. 2013 HSP Medication List) | Disputed. CVS's data show it gave the HSP cash discount prices to non-HSP members, and HSP drugs often sold below HSP price of $9.99/$11.99 for supplies of less than 90 days. PX-809 at ¶¶ 40-42 & Tables 3&4 (10/3/16 Hay Decl.); PX-810 at ¶¶ 18-21 & Tables 1-3 (1/9/17 Hay Rebut. Decl.). |
| | 1&2 | **Fact 7.** CVS designed HSP as a membership program and offered the lower HSP price only to HSP members. DX-428 at 134:17-135:18; DX-432 at 3-6; DX-408 ¶¶ 79-81 (Barlag Rep.) | Disputed. CVS's data show it gave HSP-pricing to non-HSP members and that it frequently did not collect membership fees from "members." PX-809 at ¶¶ 40-41 & Table 3 (10/3/16 Hay Decl.); PX-810 at ¶¶ 18-21 & Tables 1-3, ¶¶ 32-38 & Table 7 (1/9/17 Hay Rebut. Decl.). |
| | 1&2 | **Fact 8.** Per HSP's policies and procedures, CVS did not prorate downward the price charged in an HSP transaction, even when the enrollee purchased less than a 90-day supply. The price was increased, however, if the enrollee required a quantity greater than that dispensed in a standard 90-day supply. DX-431 at 1-3 (HSP P&P); DX-432 at 4; DX-408 ¶¶ 63, 92-96 | Disputed. CVS data show there were ███████ ████████████████████████████████ HSP drugs that CVS priced below HSP prices. PX-809 at ¶¶ 42-43 & Tab. 4 (10/3/16 Hay Decl.); *See* Resp. to Facts 6, 7. |
| | 1&2 | **Fact 9.** HSP program purchases never accounted for more than 1.12% of total prescriptions purchased at CVS in any year from 2009-2015 in the Plaintiffs' 11 states. DX-408 ¶ 30 fig.2 | Disputed. CVS frequently charged non-HSP customers the HSP prices. *See* Resp. to Facts 6, 7. |
| | 1&2 | **Fact 10.** Cash customers who purchased HSP-eligible drugs outnumbered HSP members by more than 25 to 1 in the Plaintiffs' 11 states. DX-408 ¶ 48 & fig.9; DX-411 at 209:25-210:11 (Hay Dep.) | Undisputed that customers CVS categorized as non-HSP member cash customers outnumbered customers CVS categorized as HSP members. But disputed in that (1) HSP customers are cash customers under industry standards, and therefore distinction in assertion is incorrect, *see* Resp. to Fact 15, and (2) CVS frequently charged non-HSP customers the HSP prices, *see* Resp. to Facts 6, 7. |

| | | |
|---|---|---|
| 1&2 | <u>Fact 11.</u> Cash purchases outnumbered HSP purchases in every year of the program, and in each one of the Plaintiffs' 11 states. DX-408 ¶¶ 30 fig.2, 46 & fig.7, 77 | Undisputed that transactions CVS categorized as cash purchases outnumbered transactions CVS categorized as HSP purchases each year. But, disputed in that (1) HSP customers are cash customers under industry standards, and therefore distinction in assertion is incorrect, *see* Resp. to Fact 15, and ███████████ ██████████████████████████ ███████ *see* Resp. to Facts 6, 7. |
| 1&2 | <u>Fact 12.</u> In the Plaintiffs' 11 states, there were 27.19 million cash transactions and only 5.82 million HSP transactions for HSP-eligible drugs between Nov. 9, 2008 and Dec. 7, 2015 – a ratio of over 4.5 to 1. DX-408 ¶¶ 46, 48 & figs.7, 9; DX-411 at 208:11-209:24 | Disputed. HSP customers are cash customers under industry standards, and therefore distinction in assertion is incorrect. *See* Resp. to Fact 15. ████████████████████████ ████████████████████████ ████ PX-810 at ¶ 19 & Tab. 2 (1/9/17 Hay Rebut. Decl.) |
| 1&2 | <u>Fact 13.</u> Approximately 78% of cash customers would have paid more by enrolling in HSP and making those purchases under the HSP program. DX-418 ¶ 13 (Salve Rep.) | Disputed. HSP customers are cash customers under industry standards, and therefore distinction in assertion is incorrect. *See* Resp. to Fact 15. CVS's data show CVS frequently gave HSP discounts to non-HSP members and did not collect enrollment fees from HSP "members." CVS also advertised HSP with "sign up and save!" and its CEO referred to HSP, including the enrollment fee, as an "affordable option" for people "struggling" to pay their health care costs. PX-810 at ¶¶ 18-21 & Tables 1-3, ¶¶ 35-38 (1/9/17 Hay Rebut. Decl); DX-439, at CVSC-0384902 (CVS Earnings Call Transcript); DX-440 (CVS advertising). |
| 1&2 | <u>Fact 14.</u> The typical CVS cash customer purchases only 1 or 2 prescriptions per year. DX-408 ¶ 49; DX-411 at 210:12-213:19 | Immaterial. Disputed. Statement appears to exclude HSP customers, but HSP customers are cash customers under industry standards. *See* Resp. to Fact 15. |
| 1&2 | <u>Fact 15.</u> A "cash customer" is an industry term that refers to a customer who purchases a prescription without any form of prescription benefit, including insurance, discount card, or membership program. The "cash price" price is the amount charged to the "cash customer." PX-618 ¶ 18 (Compton Decl.); PX-701 ¶12 (Lavin Decl.); PX-691 ¶ 11 (Reichardt Decl.); PX-662 ¶9 (Strein Decl.); PX-663 ¶ 10 (Spadaccino Decl.); DX-321 ¶13 (Zavalishin Decl.); DX-400 at 23:24-24:19 | Disputed. CVS admitted to this Court that a "'cash' customer typically means a customer who purchases a drug without using insurance." Internally, CVS described the HSP program as a ████████████████████████ indicated that the HSP program would be ████ ████████████████████████ ████████████████ and grouped the HSP program as part of its retail cash business. In its marketing materials, CVS described the program as offering "discounts." ██████████ |

| | | | |
|---|---|---|---|
| | | (Barre Dep.); DX-415 at 3, 6 (McGinley Rep.) | ██████████████████████████ ████████████████ PX-816, Reichardt Dep. 24:22-24 ("Q. And what's a cash customer? A. A customer that is not using their insurance as a benefit. And is paying with their own funds."); Dec. 4, 2015 CVS Pharmacy Mot. to Dismiss [Dkt. No. 56] at 15; PX-285, CVS list of "Cash Discount" programs that including HSP program, at 7; PX-40, ██████████████ ████████████████████████████████ PX-60, ████████████████████████████ ████████████████ PX-42, ████████████ ████████████████████████████████████; PX-14, ████████████████████████ ████████████████████████ PX-803, Navarro A&S Decl. ¶¶ 20, 53; PX-20 at CVSC-0025030 (CVS-Meridian RX Contract); PX-335 at CVSC-0355496-497 & 505 (CVS Policy & Procedure # 000-000-176). |
| 1&2 | | **Fact 16.** The HSP enrollment fee reduced customer interest in joining the HSP program to a statistically significant degree. DX-419 ¶¶ 9-12, 35-44, 47 (Simonson Rep.) | Immaterial. Disputed. CVS executives described the fee as ██████ PX-42, at CVSC-0222767 (CVS email); PX-806, Gibbons (TX) Dep. 214:8-215:20. CVS's data show it gave HSP-pricing to non-HSP members and that it frequently did not collect membership fees from "members." PX-809 at ¶¶ 40-41 & Tab. 3 (10/3/16 Hay Decl.); PX-810 at ¶¶ 18-21 & Tabs. 1-3, ¶¶ 32-38 & Tab. 7 (1/9/17 Hay Rebut. Decl.). |
| 1&2 | | **Fact 17.** Plaintiffs described the amount of the HSP enrollment fee ($10-$15) as a significant or meaningful amount of money. DX-454 (Pl. Testimony Chart) | Disputed. CVS cites testimony of only four Plaintiffs, and Plaintiffs did not say that the fee amount was too high or something they would not have paid in this context. DX-454 |
| 1&2 | | **Fact 18.** At launch, CVS posted details about HSP on its website, in stores, and in weekly circulars; issued a press release; secured coverage on NBC's *Today* show; published an op-ed by the CEO in *The Boston Globe*; and discussed HSP during its 2008 Q3 earnings call (attended by multiple PBMs and TPPs). DX-499 at A15 (*Boston Globe*); DX-489 (CVS.com screenshots (Nov., 2008)); DX-492 (CVS press release); DX-442 (Email re. HSP publicity); DX-438 (CVS 2008 Q3 Earnings Call Event Report); DX-439 at 6 (Earnings Call Transcript); DX-440 (HSP Marketing Materials) | Disputed that CVS marketed the HSP program extensively. CVS emails indicated that ██████ ████████████████████████████████████████ ████████████████████████████ CVS did not inform any Plaintiffs of the existence of the HSP program, and Plaintiffs were unaware of its existence prior to this lawsuit. Undisputed that there is a CVS email purporting to summarize television coverage of the launch of HSP in stories lasting from 15-50 seconds in markets around the country, although mostly in states that are not at issue in this case. DX-442. |

| | | PX-58 at CVSC-0222952 (CVS email); PX-59 (CVS email); PX-66 at CVSC-0222986 ███ ████████████████████████████████ ████████████████████████████ █ PX-807, Morrison (TX) Dep. 100:16-22. |
|---|---|---|
| 1&2 | **Fact 19.** Industry publications and newspapers ran stories on HSP, noting its enrollment fee. DX-497 at 4 (*Drug Store News*); DX-498 at 50 (*Drug Store News*); DX-493 (*Dallas Morning News*); DX-494 (*LA Times*); DX-495 (*Consumer Reports*) | Undisputed that several newspapers ran stories quoting CVS's CEO that HSP was meant as an "affordable" option for people struggling to pay their health costs (DX-494, DX-497), mentioning HSP and its "nominal signup fee" (DX-498) that could be recouped through CVS Extra Bucks (DX-497) or through discounts in the MinuteClinic (DX-493), and that programs like HSP are meant to steal customers from other pharmacies (DX-494). None of these stories reference U&C pricing. |
| 1&2 | **Fact 20.** The national and local news that broadcast stories on HSP, as of November 4, 2008, reportedly reached an estimated audience of more than 7 million viewers. DX-443 (Email re. HSP publicity) | Disputed. Lack of foundation; inadmissible hearsay. |
| 1&2 | **Fact 21.** The specific issue of CVS's non-submission of the HSP price as its U&C price received press coverage in 2010, when CVS and Connecticut Medicaid disputed whether an amended state Medicaid regulation required submitting the HSP price as the U&C price. DX-500 (*W.S.J.*); DX-501 (*Assoc. Press Online*); DX-502 (*Drug Benefit News*) | Disputed. None of the articles reference U&C or any relation to commercial insurance. CVS subsequently agreed to reimburse Connecticut Medicaid for all charges for HSP-eligible drugs that exceed the HSP price. PX-108 (Connecticut Letter to CVS) |
| 1&2 | **Fact 22.** CVS never submitted the HSP price as its U&C price on third-party (e.g., insured) prescription drug claims. TAC ¶ 71; Defendant's Answer to the 2nd Am. Compl. [Dkt. No. 100] ¶ 13 | Undisputed. |
| 1&2 | **Fact 23.** The above fact notwithstanding, starting in August 2010, there were occasional cash transactions for which the regular retail or cash price was $11.99. In such instances, CVS submitted $11.99 to PBMs as its U&C price because it was the cash price. DX-409 ¶¶ 23 & n.28, 26-29 & figs. 5-7 (Barlag Rebuttal Rep.) | Disputed. HSP customers are cash customers under industry standards, and therefore distinction in assertion is incorrect. *See* Resp. to Fact 15. CVS data establish that $11.99 was the most common non-HSP cash price charged by CVS. CVS did not report $11.99 as its U&C price in all instances where that price was the HSP price for an HSP-eligible drug, instead reporting higher U&C prices. PX-809 ¶ 40 & Tab. 3 (Hay Decl.); PX-810 ¶¶ 18-19 & Tab. 2 (Hay Rebuttal Decl.) |
| 1 | **Fact 24.** Health insurers or employer groups providing prescription drug coverage to insureds are known as third-party payors | Undisputed. |

| | | | |
|---|---|---|---|
| 1 | | ("TPPs").<br>TAC ¶¶ 44, 46; DX-412 at 4 (Jones Rep.) | |
| 2 | 1 | <u>Fact 25.</u> Most TPPs contract with pharmacy benefit managers ("PBMs") to, *inter alia*, administer their members' pharmacy benefits.  PBMs, in turn, contract with pharmacies to  establish networks of pharmacies to service  members of the PBM's clients (i.e., TPPs).<br>DX-417 at 13:19-14:16, 22:15-23:2 (Navarro Dep.); DX-412 at 8-9 | Undisputed. |
| 7<br>8 | 1 | <u>Fact 26.</u> In the minority of cases, TPPs handle  claims administration (e.g., adjudication)  internally without contracting with a PBM. DX-412 at 9 n.10 | Undisputed. |
| 9<br>10<br>11<br>12<br>13 | 1 | <u>Fact 27.</u> For example, prior to January 1, 2011,  Aetna, an insurance company, administered its  own claims in-house and, therefore, contracted  directly with CVS. Since 2011, however, Aetna  has contracted with an outside PBM–Caremark–to adjudicate its claims.<br>DX-407 at 14:7-15:14 (Zavalishin Dep.); PX- 785 (CVS/Aetna contract); DX 425 ¶ 13 (Colbert Decl. (Nov. 21, 2016)) | Undisputed. |
| 14<br>15<br>16<br>17<br>18<br>19<br>20 | 1 | <u>Fact 28.</u> Claim "adjudication" is the process where the pharmacy submits patient, prescription and insurance information to the  PBM (or TPP), and the PBM deter-mines, *inter alia*, whether the claim is approved and if so, what amounts the customer and TPP will owe as  payment. The PBM then sends the pharmacy a response transaction indicating what copay amount, if any, the pharmacy should collect.<br>Navarro Rep. ¶17; DX-412:12-14 | Disputed. During the adjudication process, a pharmacy also submits its U&C price to the PBM/TPP, which, under their contracts with CVS caps the amount of the copay. Proper adjudication requires accurate U&C reporting. Answer ¶¶ 12, 48-49; PX-803, (Navarro A&S Decl.) ¶¶ 20-24. These contracts limit payments to CVS's U&C price to ensure that patients "never pay greater than the usual and customary price." PX-806, Gibbons (TX) Dep. 61:23-62:8. |
| 20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 1 | <u>Fact 29.</u> For insured prescriptions, the cost can be shared between the TPP and the member. The member's share (e.g., copayment) depends  upon his or her particular benefit plan design.<br>TAC ¶ 10, 44; DX-412 at 5-6 | Undisputed that "for insured prescriptions, the cost can be shared between the TPP and the member." Disputed in that regardless of plan design, an insured's cost share cannot exceed CVS's U&C price, because the CVS-PBM contracts cap an insured's cost share at the U&C. PX-530 (Aetna Contract) at Ex. A., II.F.2.; PX-546 (Caremark Contract) at ¶¶ 4.3.1 & 4.3.2; PX-541 (Optum Contract) at Ex. D; PX-532 (Express Scripts Contract) at § 2.4(a); PX-676 (MedImpact Contract) at § XVI(6); PX-677 (Medco Contract) at ¶ 2.3.3; PX-806, Gibbons (TX) Dep. 60:20-61:16; PX-826, Colbert (TX) Dep. 184:8-185:9; PX-821, Ferschke (TX) Dep. 26:10-25; PX-827, Greenwood Dep. 70:10-17, 76:22-78:3; PX-808, Morrison Dep. 116:1-14. |

| | | | |
|---|---|---|---|
| 1 | | Fact 30. PBMs (or TPPs) calculate copayments. Pharmacies do not calculate copayments. DX-427 at 44:16-45:6, 46:4-47:8 (Gibbons Dep.); DX-424 at 87:18-88:3, 95:22-96:2 | Undisputed that PBMs or TPPs calculate copayments based on the data that pharmacies provide. Disputed because during claim adjudication a pharmacy submits its U&C price to the PBM/TPP, which, under CVS-PBM contracts caps the amount of the copay. Proper adjudication requires accurate U&C reporting. PX-803, Navarro A&S Decl. ¶¶ 19-22; Resp. to Fact 29. |
| 1 | | Fact 31. As a pharmacy, CVS does not possess enough information about an insured's benefits to calculate the copay, nor is CVS privy to the formulas or algorithms the PBM (or TPP) uses to calculate the insured's copay. DX-412 at 11; DX-415 at 7-8; DX-423 at 153:1-8, 154:7-16; Navarro Rep. ¶ 25 n.33 | Disputed. During claim adjudication a pharmacy submits its U&C price to the PBM/TPP, which, under CVS-PBM contracts caps the amount of the copay. Proper adjudication requires accurate U&C reporting. CVS may not calculate the copayment but it knows what the insured's copayment amount is at the time of sale, and also knows that the copayment is not supposed to exceed CVS's U&C price. PX-530 (Aetna Contract) at Ex. A., II.F.2; PX-546 (Caremark Contract) at ¶¶ 4.3.1 & 4.3.2; PX-541 (Optum Contract) at Ex. D; PX-532 (Express Scripts Contract) at § 2.4(a); PX-676 (MedImpact Contract) at § XVI(6); PX-677 (Medco Contract) at ¶ 2.3.3; PX-806, Gibbons (TX) Dep. 60:20-61:16; PX-826, Colbert (TX) Dep. 184:8-185:9; PX-821, Ferschke (TX) Dep. 26:10-25; PX-827, Greenwood Dep. 70:10-17, 76:22-78:3; PX-808, Morrison Dep. 116:1-14; PX-803, Navarro A&S Decl. ¶¶ 23-31. |
| 1 | | Fact 32. The phrase "usual and customary price" is a defined term in most PBM-pharmacy or TPP-pharmacy contracts. DX-449 (Contract Compilation Chart); DX-412 at 17; DX-415 at 6 | Undisputed. |
| 1 | | Fact 33. U&C definitions are worded differently in different contracts. DX-449; DX-424, 247:20-248:17 | Disputed. There are no material differences in the relevant Class PBM contracts' definitions of U&C. PX-530 (Aetna Contract) at ¶ 1.54; PX-546 (Caremark Contract) at ¶¶ 4.3.1 & 4.3.2; PX-541 (Optum Contract) at Ex. D; PX-532 (Express Scripts Contract) at § 2.4(a); PX-676 (MedImpact Contract) at § XVI(14); PX-677 (Medco Contract) at ¶ 2.3.3. |
| 1&2 | | Fact 34. The record contains testimony from eight executives at six PBMs or TPPs (the "Six Intermediaries") whose job responsibilities involved negotiating contracts with pharmacies. | Disputed in part as explained below. Aetna: Undisputed until March 2009. Disputed thereafter, as Zavalishin left Aetna is March 2009. PX-815, Zavalishin Dep. 9:21-10:17; 12:10-21; 13:3-7; 90:18-91:2; 120:18-24; 121:18-22. |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | | DX-321 ¶¶ 1, 4 (Aetna); PX-701 ¶¶ 1-2, 7 (Caremark); PX-618 ¶¶ 1-5 (Express Scripts); PX-662 ¶ 1-3 (Medco); PX-663 ¶ 1 (Medco); DX-400 at 10:12-11:21 (MedImpact); PX-691 ¶ 1 (OptumRx/ Prescription Solutions) | **Caremark**: Lavin did not testify that he had responsibilities for negotiating pharmacy contracts prior to 2011. CVS and Caremark entered into their contract in 1997 and the HSP program was rolled out in November 2008. He is not aware of any internal discussions within Caremark about the HSP program. PX-701 [Lavin Decl.] ¶¶ 3 (started negotiating pharmacy contracts in 2011); PX-820, Lavin Dep. 126:6-127:1; 106:18-107:15; 107:25-108:11; 127:9-128:17; 129:2-7; 131:6-132:2; 132:4-133:11; 136:8-15; 148:17-149:1; PX-546 (Caremark Contract).<br>**Express Scripts**: Compton does not testify that she negotiated the contract with CVS. She became V.P. of retail contracting in 2010, after the relevant contract here. Compton never discussed the HSP program with CVS or anyone at Express Scripts, including her supervisors, during the relevant contract period or at any time. PX-812, Compton Dep. 10:4-15; 12:17-13:12; 15:1-18:1; 19:3-9; 21:19-22:11; 54:10-55:13; 56:12-57:9; PX-532 (Express Scripts Contract)<br>**Medco**: Spadaccino does not describe her job duties as negotiating pharmacy contracts, and she does not indicate that she negotiated the CVS contract. Her job was to ensure successful claims processing. PX-817, Spadaccino Dep. 20:18-23:4; PX-677 (Medco Contract). Strein is not a signatory to the CVS contract and does not indicate that he negotiated any contracts with CVS. PX-677 (Medco Contract); PX-662, Strein Decl.<br>**Optum**: Reichardt was not involved in negotiating with CVS at all until January 2017, and was not involved in, and has no knowledge of, any pharmacy negotiations until July 2015. PX-816, Reichardt Dep. 13:7-23; 16:23-17:7; 25:15-26:10; 28:22-29:1; 29:17-25; 30:23-31:15; 32:5-7; 34:1-7; 34:24-35:18; 81:19-82:18; 83:13-85:15; 104:20-106:6; 108:25-109:2; 137:4-138:5. |
| 26<br>27<br>28 | 1 | **Fact 35.** In September 2006, Walmart announced that it would offer all customers 30-day supplies of certain generic drugs for $4.  To purchase a $4 prescription, Walmart did not  require customers to join a program or pay a fee. DX-503 (Walmart press release); PX-701 ¶ | Undisputed. |

| | | | |
|---|---|---|---|
| 1 | | 13; PX-618 ¶ 7 | |
| | 1 | <u>Fact 36.</u> After Walmart's announcement, Kroger, Safeway, and other retailers announced similar price reductions–a lower price to all customers for select generic drugs, without any requirement to join a program or pay an enrollment fee.<br>DX-504 (Safeway email); DX-506 (Kroger press release); PX-703; PX-704; PX-701 ¶ 15 | Undisputed. |
| | 1&2 | <u>Fact 37.</u> PBMs were aware of Walmart's announcement and other companies' similar offerings when they were launched.<br>DX-400 at 24:25-25:24; PX-618 ¶ 7; PX-701 ¶¶ 13-14; PX-662 ¶¶ 7-8; DX-321 ¶ 11 | Undisputed. |
| | 1 | <u>Fact 38.</u> PBMs considered Walmart's $4 price its U&C price under their PBM/Walmart contracts.<br>DX-400 at 24:25-25:19; PX-618 ¶ 10; PX-701 ¶ 15; PX-662 ¶ 7; PX-663 ¶ 7; DX-407 at 87:6-20 | Undisputed. |
| | 1 | <u>Fact 39.</u> In Nov. 2007, Walgreens launched its Prescriptions Savings Club ("PSC"). PSC required enrollment and payment of a fee. In Sept. 2008, Rite Aid launched its own membership program, the "Rx Savings" program. Some other pharmacies, grocers, and retailers also launched membership programs.<br><br>DX-504 (Rite Aid release); PX-704 (Care-mark internal spreadsheet); DX-490 (*Drug Channel News*); DX-491 (*Chain Store Age*) | Undisputed. |
| | 1 | <u>Fact 40.</u> Membership programs were different from Walmart's $4 offering in that the former offered the preferential pricing to program members, not to all customers. A membership program typically required customers to fill out an application, pay an enrollment fee, agree to terms and conditions, or some combination of those steps.<br><br>PX-618 ¶¶ 9-10; DX-400 at 26:17-27:3; PX-701 ¶¶ 13-17; PX-662 ¶¶ 6-9; DX-407 at 55:15-56:17; DX-412 at 15 | Immaterial. General statements about how other pharmacies may have conducted membership programs do not bear on how CVS conducted its HSP program.<br>Disputed. CVS's evidence does not support that any purported "membership programs" that "typically" require the customer to take some steps mean that the price offerings and/or other benefits of that program were not available to all customers or that Walmart's $4 offering was different in terms of calculation of U&C. The CVS-Class PBM contracts address what is included in the U&C calculation.<br><u>Aetna:</u> PX-815, Zavalishin Dep. 118:18-119:4 (if a fee wasn't charged, then a program was no different than Walmart's) 9:21-10:14; 12:10-21; 13:3-7; 90:18-91:3; 120:18-24; 121:18-22 (does |

| | | | not speak on behalf of Aetna).<br>Caremark: PX-820, Lavin Dep. 126:6-127:1; 131:6-132:2-133:11; 136:8-15. (Lavin has no knowledge about the requirements of the HSP program, so could not compare it to another program).<br>Express Scripts: PX-812, Compton Dep. 44:5-46:16; 47:22-48:14; 59:15-60:8 (Compton does not know the terms of the HSP and made her own assumptions that she does not know if Express Scripts shared).<br>Medco: PX-818, Strein Dep. 98:21-100:20; 115:5-22 (only knowledge came from newspaper clipping).<br>MedImpact: PX-819, Barre Dep. 29:10-17; 32:2-6; 71:9-16; 72:3-73:9; 85:11-23 (Barre has no knowledge of the parameters of the HSP program; just knew that "such programs" were offered "generally" in the industry).<br>Optum: PX-816, Reichardt Dep. 13:7-23; 16:23-17:7; 25:15-26:10; 28:22-29:1; 29:17-25; 30:23-31:15; 32:5-7; 34:1-7; 34:24-35:18; 81:19-82:18; 83:13-85:15; 105:1-106:6; 108:25-109:2; 137:5-138:5. (Reichardt was not involved in pharmacy contract negotiations for Optum until July 2015). |
| 1 | Fact 41. PBMs were aware of Walgreens's and other companies' membership programs when they were launched. DX-400 at 25:20-29:2; PX-618 ¶¶ 8-9; PX-701 ¶¶ 3, 16; PX-662 ¶ 8; DX-321 ¶8 | Undisputed. |
| 1 | Fact 42. For U&C purposes, PBMs distinguish the pricing in membership programs from the simple lowering of a company's list price (e.g., Walmart).<br><br>DX-400 at 25:20-28:14; PX-618 ¶ 10; PX-701 ¶¶ 14-17; DX-403 at 104:23-106:17 (Lavin Dep.); PX-662 ¶ 7-9; PX-691 ¶ 12; DX-407 at 52:21-53:14; DX-707 (Caremark email) | Immaterial. Disputed that this distinction is one permitted or recognized by relevant contracts between CVS and PBMs. The PBMs' understanding is not material to whether CVS should have included its HSP pricing as part of its U&C determination because Plaintiffs, as third-party beneficiaries to the contracts between the Class-PBMs and CVS, are entitled to enforce the plain language of those contracts.<br>Obj.- Parol Evidence.[3] |
| 1&2 | Fact 43. The Six Intermediaries, independently, deliberated internally regarding how to treat prices offered through pharmacy membership programs under their respective contracts with | Immaterial. Internal deliberations are not material as to how the CVS-PBM contracts obligated CVS to calculate its U&C. Disputed except as to Medco. CVS's cited evidence does not support this fact or lacks foundation as to |

---

[3] "Obj." refers to the portion of Plaintiffs' Opposition outlined Plaintiffs' objections to CVS's evidence. In this statement, following the insert of "Obj." there will be a corresponding objection (i.e., "Parol Evidence"), which refers to a more fulsome objection in the Opposition brief.

| | | | |
|---|---|---|---|
| 1 | | pharmacies.<br>DX-400 at 29:23-30:11; DX-403 at 105:7-107:6; DX-401 at 20:14-22:4 (Compton Dep.); PX-662 ¶ 9; DX-404 at 201:22-203:4, 206:22- 207:16 (Reichardt Dep.); DX-321 ¶ 7 | how witnesses have personal knowledge of the PBM's policy-level deliberations.<br>Obj. - FRE 602.<br><u>Aetna</u>: Zavalishin testified he does not and "cannot" speak on behalf of or represent Aetna on these issues. PX-815, Zavalishin Dep. 13:3-7; 90:18-91:2; 120:18-24; 121:18-22.<br><u>Caremark</u>: Lavin is not aware of any internal discussions within Caremark regarding HSP and cannot identify decision maker or documents evidencing any discussions or decisions. PX-820, Lavin Dep. 81:23-81:4; 126:6-127:1; 106:18-107:15; 107:25-108:11; 127:9-128:17; 129:2-7; 131:6-132:2; 132:24-133:11; 136:8-15; 148:17-149:1 (not aware of a single internal document on issue); 132:4-22.<br><u>Express Scripts:</u> Compton never discussed the HSP program with anyone at Express Scripts and offered only her personal opinions at deposition. PX-812, Compton Dep. 10:5-12; 12:17-13:12; 15:1-18:1; 19:3-9; 21:19-22:11; 54:10-55:12; 56:12-57:9; 59:15-60:7.<br><u>MedImpact</u>: Barre does not recall specifically discussing HSP internally or if anyone shared his views on HSP, and was not familiar with the HSP program.<br>PX-819, Barre Dep. 11:19-20; 13:4-6; 29:23-30:15; 65:7-14; 68:23-69:3; 72:3-78:10; 85:11-23.<br><u>Optum:</u> Reichardt was not employed by Optum during the relevant period and has no knowledge of Optum's pharmacy contracting until July 2015, and did not discuss it with anyone before then. PX-816, Reichardt Dep. 13:7-23; 16:23-17:7; 25:15-26:10; 28:22-29:1; 29:17-25; 30:23-31:15; 32:5-7; 34:1-7; 34:24-35:18; 81:19-82:18; 83:13-85:15; 104:20-106:6; 108:25-109:2; 137:4-138:5. |
| 1 | | <u>Fact 44.</u> The Six Intermediaries, independently, each concluded that prices offered through membership programs were not U&C under their contracts with pharmacies.<br><br>DX-400 at 27:23-28:14; PX-618 ¶¶ 10-11; PX- 701 ¶¶ 14-17; PX-662 ¶¶ 8-9; DX-406 at 88:15-89:21; 90:10-13 (Strein Dep.); PX-663 ¶¶ 6-7; DX-321 ¶¶ 11-12. | Immaterial. The PBMs' (and CVS's) post-contract understandings and conclusions is not material as to how the fully-integrated CVS-PBM contracts obligated CVS to calculate its U&C, nor the parties' intent at the time of contracting. Obj. - Parol Evidence. Disputed. Lack of foundation that the cited witnesses have personal knowledge of the PBMs' conclusions. *See* Obj. - FRE 602. *See* Resp. to Fact 43 and the contracts: PX-530 (Aetna Contract) at §§ 9.1, 9.13; PX-546 (Caremark Contract) at §§ 1.3, 9.7; PX-532 (Express Scripts Contract) at §§ 7.3, 7.4; PX-677 (Medco Contract) at § 10.7; PX-676 (MedImpact |

| | | | |
|---|---|---|---|
| | | | Contract) at § XIII; PX-541 (Optum Contract) at ¶¶ 9.1; PX-819, Barre 67:15-68:21. |
| 2 | 1 | **Fact 45.** By the time CVS launched HSP in November 2008, PBMs and TPPs had already formulated their position that membership programs should not be treated as U&C. <br> DX-403 at 100:5-102:3, 106:1-107:6; PX-703; DX-321 ¶ 11 | Immaterial. The PBMs' position is irrelevant (*see* Resp. to Fact 44). Obj. - Parol Evidence. Disputed that all PBMs/TPPs formulated this position. CVS only cites Lavin Dep. and Zavalishin Decl., and both fail to provide foundation as to how they have personal knowledge of this fact. Obj. - FRE 602. <br> *See* Resp. to Fact 43 and the contracts cited in response to Fact 44. |
| 8 | 1&2 | **Fact 46.** By November 2008, there was a general awareness among PBMs that membership program prices were not considered U&C. <br> DX-321 ¶ 9; DX-407 at 85:6-86:2; 87:2-89:11; DX-403 at 100:5-102:3 | Immaterial. The PBMs' awareness is irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed that PBMs had this "general awareness." CVS cites only to Lavin and Zavalishin, and both fail to provide foundation as to how they have personal knowledge of this fact. Obj. - FRE 602. <br> *See* Resp. to Fact 43 and the contracts cited in response to Fact 44. |
| 12 | 1 | **Fact 47.** By at least October 2008, internal documentation at Caremark memorialized the distinction between membership programs ("Club Plans," in Caremark terminology) and programs that charged the lower price to all customers ("Set Price Generic Programs" or "Standard Set Price Generic Programs"). PX-703; DX-403 at 100:5-101:9 | Immaterial. The PBMs' understanding is irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. The cited document does not reflect a distinction as to how Caremark treated "Club Plans" versus "Set Price" programs with respect to reporting of discount prices as U&C prices. PX-820, Lavin Dep. 101:17-102:3. |
| 17 | 1&2 | **Fact 48.** PBMs were aware of HSP at or near its launch in November 2008. <br> DX-400 at 28:16-29:22; PX-701 ¶ 22; DX-406 at 74:24-75:13; DX-321 ¶¶ 7-8; DX-445 (Excellus Email); DX-444 (MedMetrics Email) | Immaterial. The PBMs' awareness is irrelevant (*see* Fact 44). Disputed. Misstates evidence; cited testimony lacks foundation as to how the witness had personal knowledge of PBMs' "aware[ness] of HSP at or near its launch". Obj. - FRE 602. *See* Resps. to Fact 43, 44. |
| 21 | 1 | **Fact 49.** CVS executives orally advised PBMs, their typical counterparties, that it did not consider the HSP price to be its U&C price. <br> PX-701 ¶ 22; DX-429 at 114:6-115:12, 124:11-128:3 (Wingate Dep.) | Immaterial. CVS's and the PBMs' understanding is irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. CVS infers this fact applies to all PBMs, but it cites only to inadmissible hearsay testimony from one Caremark employee, an indirect subsidiary of CVS Health. Obj. - hearsay. PX-820, Lavin Dep. 20:10-11; 142:17-144:21; 147:21-148:4; 148:17-149:1; Resp. to Fact 44. |
| 25 | 1 | **Fact 50.** CVS had a "template" or standard written description of HSP. Among other things, the template stated: "CVS's pro-gram is very different from the discount pricing WalMart and others have introduced and therefore it does not constitute Usual | Immaterial. CVS's understanding is irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed; no evidence of a "standard written description of HSP" or that CVS "generally attached" any materials to communications sent to any other party, which would be hearsay. Obj. - Hearsay. |

| | | |
|---|---|---|
| | and Customary pricing for our Medicaid clients." When it provided the template to PBMs or TPPs, CVS generally attached the HSP enrollment form and marketing materials.<br>DX-321 ¶ 9, Ex. A; DX-435 & DX-436 (TX Medicaid); DX-434 (CT Medicaid) | The evidence as to Connecticut and Texas shows (1) CVS agreed to reimburse Connecticut the difference between HSP and any Connecticut Medicaid purchases, and (2) Texas sued CVS because it believes CVS made misrepresentations in the cited document that HSP was not U&C. PX-108 (Connecticut Letter to CVS); PX-828, Tex. Compl. ¶¶ 50-52 (discussing DX-435). |
| 1 | Fact 51. CVS provided at least three examples of the template to PBMs or payers in 2008 and 2009 –Aetna, Texas Medicaid, and Connecticut Medicaid.<br><br>DX-321 ¶ 9, Ex. A; DX-434; DX-436 | Undisputed that CVS provided the referenced documents to Aetna, Texas Medicaid, and Connecticut Medicaid. Disputed insofar as this fact implies that there were additional similar communications beyond the cited documents. Immaterial: CVS's and the PBMs' understanding is irrelevant (*see* Fact 44). Obj. - Parol Evidence. Obj. - Hearsay. |
| 1&2 | Fact 52. The Six Intermediaries knew CVS did not consider the HSP price to be its U&C price.<br>DX-400 at 25:20-31:2; PX-618 ¶ 17; PX-701 ¶ 22; PX-662 ¶¶ 9-11; PX-691 ¶5; DX-321 ¶ 9 | Immaterial. The PBMs' and CVS's understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Lack of foundation that witnesses cited had personal knowledge of what the PBMs understood. Obj. - FRE 602. *See* Resp. to Fact 43 above, for example: Reichardt did not have any involvement with CVS's contracts until Jan. 2017. |
| 1&2 | Fact 53. MedImpact advised Harvard Pilgrim, which insured plaintiff Garber, that it did not consider the HSP price to be CVS's U&C price. DX-400 at 34:1-35:8; DX-465 at 96:3-20 (Garber Dep.) | Immaterial. The PBM's understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Testimony cited is inadmissible hearsay.<br>PX-676 (MedImpact Contract) at § XIII. |
| 1 | Fact 54. CVS's master agreements with five of the Six Intermediaries include a U&C definition. Medco defines U&C in its Provider Manual, which is incorporated into its master agreement.<br>PX-546 at 20 (CVS/Caremark contract); PX-532 ¶ 1.17 (CVS/ Express Scripts contract); PX-695 at 12 (CVS/Optum predecessor contract (1999-2015)); PX-674 §1.41 (CVS/Optum current contract (2015-present)); DX-300 at XVI- 14 (CVS/MedImpact contract); PX-785 § 1.54 (CVS/Aetna contract); DX-266 at 86 (Medco 2009/2010 Provider Manual); PX-551 at 69 (Medco 2009 Provider Manual) | Undisputed. |
| 1 | Fact 55. Express Scripts did not interpret its contract with CVS to require CVS to submit the HSP price as the U&C price. It did not consider HSP transactions to be "cash transaction[s]" or as "discounts" or "special promotions" as those terms are used in the U&C definition. | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates evidence. Compton testified only as to her personal opinions and was not aware of Express Script's view of the HSP. Also, her testimony lacks foundation as to her personal |

| | | |
|---|---|---|
| | PX-618 ¶¶ 16-18; PX-532 at ¶ 1.17 | knowledge of Express Script's interpretation of the contract. Obj. - FRE 602. PX-812, Compton Dep. 10:5-12; 12:17-13:12; 15:1-18:1; 19:3-9; 21:19-22:11; 54:10-55:12; 56:12-57:9; 59:15-60:8; 66:-68:3; PX-532 (Express Scripts Contract) at §§ 7.3, 7.4. |
| 1 | **Fact 56.** Express Scripts' rationale was that CVS did not charge its membership price to all cash customers, but instead required enrollment and payment of a fee to receive the lower price. PX-618 ¶ 17 | Immaterial. The PBMs' and CVS's understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates the evidence of Compton's testimony and lacks foundation as to personal knowledge. Obj. - FRE 602. *See* Resp. to Fact 55. |
| 1 | **Fact 57.** Caremark did not interpret its contract with CVS to require CVS to submit its HSP member price as its U&C price. Caremark did not consider HSP transactions to be "cash" trans-actions or "applicable discounts" as those terms are used in its U&C definition. PX-701 ¶¶ 20-21; PX-546 at 20 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates evidence because Lavin is not aware of *any* internal discussions within Caremark about the HSP program and lacks foundation as to Lavin's personal knowledge of Caremark's interpretation. Obj. - FRE 602. PX-546 (Caremark Contract) at §§ 1.3, 9.7; PX-820, Lavin Dep. 126:6-127:1; 106:18-107:15; 107:25-108:11; 127:9-128:17; 129:2-7; 131:6-131:2; 132:24-133:10; 136:8-15; 148:17-149:1; 132:4-22 |
| 1 | **Fact 58.** Caremark's rationale was that HSP qualified as a "Club Plan" and not a "Standard Set Price Generic Program" under Caremark's policy. HSP pricing was charged to HSP members, not to all CVS customers. PX-701 ¶¶ 14-17, 19-20; DX-403 at 104:19-105:21; 164:11-165:4; DX-707 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed, misstates evidence (*see* Fact 57). *See* Resp. to Fact 57. |
| 1 | **Fact 59.** Medco did not interpret its contract with CVS to require CVS to submit its HSP member price as its U&C price. Medco did not consider membership program prices to be "applicable discounts" to "cash patient[s]" as those terms were used in its U&C definition. PX-662 ¶¶ 11, 13; PX-663 ¶ 5; DX-266 at 86; PX-551 at 69 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates evidence; lack of foundation that both witnesses have personal knowledge of Medco's interpretation of the contract. Obj. - FRE 602. PX-677 (Medco Contract) at § 10.7; PX-817, Spadaccino Dep. 20:18-23:4. PX-818, Strein Dep. 87:21-88:14; 101:25-103:21; 102:18-103:21; 104:16-105:11 |
| 1 | **Fact 60.** Medco's rationale was based primarily on the existence of the enrollment fee. PX-662 ¶ 11; PX-663 ¶ 7; DX-265 (Letter from Medco to CVS) | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates evidence because DX-265 also reflects that Medco was not willing to amend its Pharmacy Services Manual to expressly exclude the HSP, and Strein testified that the letter "is not a policy." Lack of foundation that cited witnesses have personal |

| | | | |
|---|---|---|---|
| 1 | | | knowledge of Medco's interpretation of the contract. Obj. - FRE 602. *See* Resp. to Fact 59; PX-818, Strein Dep. 156:9-23. |
| 2 | | | |
| 3 | 1 | Fact 61. In April 2009, Medco sent a letter to CVS stating: "Our current policy is that the Medco definition of U&C does not include discount cards that charge a more than nominal enrollment fee that is not routinely waived." The letter was responding to CVS's outreach to Medco about the fact that HSP was not U&C and memorialized Medco's understanding that CVS did not need to submit HSP as U&C. DX-265; DX-264 (Email from CVS to Medco); DX-429 at 107:2-115:12 (Wingate Dep.) | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed; DX-265 does not support this fact. Strein testified that the letter "is not a policy." DX-265 also reflects that Medco was not willing to amend its Pharmacy Services Manual to expressly exclude the HSP. PX-818, Strein Dep. 156:9-23. |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | 1 | Fact 62. Optum and its predecessor Prescription Solutions did not interpret the definitions of U&C in their respective contracts with CVS to require CVS to submit the HSP price as the U&C price. Optum (and Prescription Solutions) did not consider HSP members to be "cash customers," or interpret the phrase "applicable discounts" to encompass the HSP price, as those phrases appear in the U&C definition. PX-691 ¶¶ 10-11; PX-695 at 12; PX-674 § 1.41 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Misstates evidence as Reichardt was not involved in negotiating with CVS until January 2017 and admitted he has no knowledge of any of Optum's pharmacy contracting until July 2015. Lacks foundation as to how Reichardt has personal knowledge to testify as to Optum's interpretation. Obj. - FRE 602. PX-541 (Optum Contract) at ¶¶ 9.1; PX-816, Reichardt Dep. 13:7-23; 16:23-17:7; 25:15-26:10; 28:22-29:1; 29:17-25; 30:23-31:15; 32:5-7; 34:1-7; 34:24-35:18; 81:19-82:18; 83:13-85:15; 104:20-106:6; 108:25-109:4; 137:4-138:5; PX-176, at CVSC-0291529-30 (CVS-Optum email). |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | 1 | Fact 63. Optum's rationale was that CVS required HSP members to complete an enrollment form and agree to the programs terms and conditions to receive the HSP price. DX-404 at 74:16-21; PX-691 ¶¶ 4, 11 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Lacks foundation as to Barre's personal knowledge as to MedImpact's interpretation of the contract. Obj. - FRE 602. Barre does not recall discussing HSP internally or if anyone shared his views on HSP, and he was not familiar with how the HSP program worked. PX-819, Barre Dep. 11:19-21; 13:4-6; 29:23-30:15; 50:15-52:7; 65:7-14; 68:23-69:3; 72:3-78:10; 85:11-23; PX-676 (MedImpact Contract) at § XIII. |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | 1 | Fact 64. MedImpact did not interpret its contract with CVS to require CVS to submit the HSP price as its U&C price. MedImpact did not consider HSP members to be "cash paying customers," or HSP-pricing "applicable discounts," as those | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. CVS misstates the evidence and fails to provide admissible testimony as to MedImpact's interpretation. Obj. - FRE 602. |
| 27 | | | |
| 28 | | | |

| | | |
|---|---|---|
| 1 | terms are used in the U&C definition. DX-400 at 30:16-33:19; DX-300 at Art. XVI-14 | *See* Resp. to Fact 63. |
| 2 3 4 5 6 7 | 1 | Fact 65. MedImpact's rationale turned on the distinction between "active" and "passive" pricing. "Active" pricing is not U&C because the customer had to take affirmative steps to receive the price. "Passive" discounts are U&C because they are automatic-ally given to all customers without requiring any action. MedImpact considers HSP pricing "active" pricing. DX-400 at 24:6-19, 26:13-28:14 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. CVS misstates the evidence and fails to provide admissible testimony as to MedImpact's interpretation. Obj. - FRE 602. *See* Resp. to Fact 63. |
| 8 9 10 | 1 | Fact 66. Aetna learned about HSP in late 2008, while negotiating a new master agreement with CVS.<br><br>DX-321 ¶¶ 6-8 | Undisputed. Immaterial. |
| 11 12 13 14 15 16 | 1 | Fact 67. The week after HSP's launch in 2008, CVS reviewed the HSP program with five Aetna representatives, including at least three VP-or-above-level executives, at a meeting in Hartford, Connecticut.<br><br>DX-330 (Aetna-CVS Meeting Agenda); DX-407 at 140:14-144:16 | Disputed. Misstates evidence because cited hearsay document (an agenda [DX-330]) only indicates a meeting was scheduled that was to include "review of CVS Health Savings Pass Program"; there is no evidence it took place or what was actually discussed, and Zavalishin has no personal knowledge of this meeting. Obj. - FRE 602; Hearsay. PX-815, Zavalishin Dep. 9:21-10:17; 12:10-21; 13:3-7; 90:18-91:2; 120:18-24; 121:18-22; 140:14-141:2. |
| 17 18 19 20 | 1 | Fact 68. In December 2008, CVS provided its template description of HSP to Aetna's Joseph Zavalishin, Vice President of Pharmacy Networks. DX-321 at ¶ 10, Ex. A | Disputed. Zavalishin's testimony and cited Ex. A are both hearsay evidence. Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. *See* Resp. to Fact 67; PX-530 (Aetna Contract) at §§ 9.1, 9.13. |
| 21 22 23 24 | 1 | Fact 69. Aetna did not interpret its contract with CVS to require CVS to submit the HSP price as its U&C price. Aetna did not consider HSP pricing an "applicable customer discount[]" or CVS's "cash price" as those terms are used in its U&C definition. DX-321 ¶¶ 11-13 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Lack of foundation as to how witness had personal knowledge as to how Aetna interpreted its contract with CVS. Obj. - FRE 602. *See* Resp. to Fact 67. |
| 25 26 27 | 1 | Fact 70. Aetna's rationale was that the HSP program required enrollment and charged a fee. DX-321 ¶ 13 | Immaterial. The PBMs' understandings are irrelevant (*see* Fact 44). Obj. - Parol Evidence. Disputed. Lack of foundation as to personal knowledge. Obj. - FRE 602. *See* Resp. to Fact 67. |
| 28 | 1&2 | Fact 71. A PBM could see (visually) that CVS was not submitting the HSP price as | Disputed. Misstates evidence; because PBMs lacked any access to CVS's cash transaction |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8 | | its U&C price simply by examining the values submitted in the U&C data field on the prescription claim record.<br>DX-417 at 172:4-173:21 (Navarro Dep.); DX-412 at 21 | data, they could not determine what the actual U&C price was supposed to be. CVS has no evidence it ever provided HSP or non-HSP cash purchase data to PBMs. PX-801, CVS 1st Supp. Resps. and Objs. To Pls.' RFAs Nos. 219, 221. The Express Scripts, Medco, Aetna and Optum "witnesses" do not have any personal knowledge about their PBM's auditing abilities or practices. PX-812, Compton Dep. 91:10-19. PX-817, Spadaccino Dep. 43:1-44:8; 53:19-25; PX-815, Zavalishin Dep. 44:3-7. Caremark witness does not know if it ever even conducted an audit with respect to CVS's U&C. PX-820, Lavin Dep. 47:22-48:15. |
| 9<br>10<br>11<br>12<br>13<br>14 | 1&2 | <u>Fact 72.</u> PBMs have the right to audit information CVS submits on prescription claim records, including its submitted U&C prices.<br>DX-417 at 172:4-173:21 (Navarro Dep.); DX- 401 at 91:6-19; DX-404 at 222:5-224:9; DX-405 at 73:10-74:8 (Spadaccino Dep.); DX-406 at 150:1-150:14; PX-679 at 33 (Caremark Provider Manual); PX-615 § 6 (Express Scripts Provider Manual); PX-551 at § 7.2 (2009 Medco Provider Man.) | Disputed that the PBMs had access to cash transaction data from CVS and disputed that they conducted such audits.<br>*See* Resp. to Fact 71. |
| 15<br>16<br>17<br>18<br>19 | 1&2 | <u>Fact 73.</u> After Walmart's $4 announcement, some PBMs began auditing the U&C prices submitted by companies that lowered their list prices for all customers to ensure those lower prices were being submitted as U&C.<br>DX-403 at 119:1-120:1; DX-412 at 15 | Disputed. No evidence that (1) the PBMs had access to cash transaction data from CVS and disputed that they conducted such audits, (2) this fact applies to Express Scripts, Medco, MedImpact, Aetna, or Optum (Fact 73 cites only to Caremark), and (3) any of the PBMs ever did or could conduct such audits.<br>*See* Resp. to Fact 71. |
| 20<br>21<br>22<br>23 | 1&2 | <u>Fact 74.</u> Caremark evaluated how a particular pharmacy's program was designed (i.e., club program vs. set pricing charged to all customers), and monitored and audited the U&C prices submitted by companies that offered set pricing to all customers.<br>DX-403 at 116:8-117:12; PX-703; PX-704 | Disputed. No evidence Caremark ever did or could conduct such audits. Lack of personal knowledge because Lavin does not know if Caremark ever conducted an audit with respect to CVS's U&C. Obj. - FRE 602.<br>PX-820, Lavin Dep. 47:22-48:15; *see* Resp. to Fact 72. |
| 24<br>25<br>26<br>27<br>28 | 1&2 | <u>Fact 75.</u> Aetna conducted spot checks of CVS's cash prices on prescription drugs by calling individual pharmacies and requesting price quotes. Aetna's former VP of Pharmacy Networks could not recall an instance when the spot checks found that CVS's quoted retail price differed from the U&C price submitted to Aetna.<br>DX-407 at 39:5-15, 40:8-14, 41:3-6 | Disputed. Misstates evidence; Zavalishin testified that he has no knowledge of whether Aetna audited CVS to check on its reporting of U&C. Obj. - FRE 602.<br>PX-815, Zavalishin 9:21-10:14; 12:10-21; 13:3-7; 43:22-44:7; 90:18-91:3; 120:18-24; 121:18-22. |

| | | | |
|---|---|---|---|
| 1&2 | Fact 76. Optum's audit department sent secret shoppers to pharmacy chains to confirm that a cash price for a prescription was the same as the pharmacy's U&C submitted to Optum. DX-413 at 95:16-96:10 | Disputed. Misstates evidence; John Jones testified he does not know whether Optum sent secret shoppers to CVS. PX-829, Jones Dep. 96:6-10. |
| 1&2 | Fact 77. Medco had a pharmacy audit team that audited prescription claims. DX-405 at 70:18-74:8; PX-551 at Ch. 7 | Disputed. Misstates evidence: there is no evidence that Medco's audit team (1) could have audited CVS's cash transactions that did not involve Medco's members, (2) ever audited for CVS's U&C, and (3) that the cited "witness" had any personal knowledge to support this "fact"; she testified she did not. PX-817, Spadaccino Dep. 42:20-44:8; 70:23-71:2; 76:8-77:9; PX-818, Strein Dep. 128:24-129:10; 129-23-130:21; 161:16-21; 162:13-17; *See also* response to Facts 72, 73 above. |
| 1&2 | Fact 78. Medco sent secret shoppers to pharmacy chains with membership programs to confirm that a customer would receive membership pricing only if he or she enrolled in the program and paid the fee. PX-663 ¶¶ 8, 11; DX-405 at 35:3-14, 37:21-38:7 | Disputed. Misstates evidence as it applies to CVS; Spadaccino does not know if the shopper ever went to any CVS store, and she never saw or heard any report back as to the shopper's alleged findings. PX-817, Spadaccino Dep. 35:3-37:17; 38:8-14. |
| 1&2 | Fact 79. The Six Intermediaries administered more than half of Plaintiffs' at-issue transactions. DX-426 ¶ 10 (Colbert Decl. (June 2, 2017)) | Undisputed |
| 1&2 | Fact 80. The Six Intermediaries administered at-issue purchases for Plaintiffs Avis, Barrett, Brown, Caine, Clark, Corcoran, Garber, Gilbert, Jenks, and Samuelson. DX-426 ¶ 11 | Undisputed. |
| 2 | Fact 81. Plaintiffs Avis, Barrett, Brown, Caine, Clark, Corcoran, Garber, Gargiulo, Gilbert, Hagert, Jenks, and Washington continued purchasing prescriptions from CVS after they consulted with counsel about this lawsuit. DX-458 (Pls.' Revised Privilege log); DX-456 (Pl. Testimony Chart & Transaction Records); DX-453 (Pl. testimony chart) | Undisputed. |
| 2 | Fact 82. Plaintiffs Avis, Barrett, Caine, Clark, Corcoran, Garber, and Jenks filled HSP-eligible prescriptions at CVS after they consulted with counsel about this lawsuit. DX-456 | Disputed. PX-810, Hay Rebuttal Decl. ¶ 43 & Ex. G. |
| 2 | Fact 83. Plaintiffs purchased medications from CVS and at least one other pharmacy during the class period. | Disputed. There is no evidence that Barrett (DX-475) purchased at any other Pharmacy. Clark |

| | | | |
|---|---|---|---|
| 1 | | DX-474-DX-488 (Pls.' Resps. & Objections to CVS's First RFAs) | (DX-478) and Garber (DX-480) specifically denied making any such purchases. Undisputed as to Avis, Jenks, Samuelson, and Washington. |
| 3 | 1 | <u>Fact 84.</u> CVS did not make false or misleading statements about the availability or nature of the HSP program to Plaintiffs. DX-6, DX-28, DX-83, DX-92, DX-102, DX-118, DX-165, DX-185, DX-193, DX-201, DX-217, DX-218, DX-239, DX-258, DX-270 (Pls.' Resps. Interrog. No. 12 (39-56)); DX-455 (Pl. Testimony Chart) | Disputed.<br><br>PX-840, Pls.' Feb. 24, 2017 Omnibus Supp. Resps. to CVS Interrogs., Nos. 12, 14. |
| 8 | 1&2 | <u>Fact 85.</u> Before the litigation, Plaintiffs did not know how their copayments are determined. DX-457 (Pl. Testimony Chart) | Undisputed. |
| 10 | 1&2 | <u>Fact 86.</u> Before the litigation, Plaintiffs drew no association between a pharmacy's U&C price and the amount of their copayment. DX-457 (Pl. Testimony Chart) | Undisputed. |
| 12 | 1&2 | <u>Fact 87.</u> Before the litigation, Plaintiffs were unfamiliar with the concept of U&C pricing. DX-457 (Pl. Testimony Chart) | Undisputed. |

| | | |
|---|---|---|
| | **PLAINTIFFS' ADDITIONAL FACTS AND SUPPORTING EVIDENCE** | |
| 1&2 | | <u>Add. Fact 1.</u> Patients using insurance typically pay a portion of the cost (copayment) and the PBMs or TPPs pay the remainder. Answer [Dkt. No. 144] ¶¶ 10-11, 44. |
| 1 | | <u>Add. Fact 2.</u> The NCPDP defines U&C as "[a]mount charged cash customers for the prescription exclusive of sales tax and other amounts claimed." Answer ¶ 53. |
| 1 | | <u>Add. Fact 3.</u> The U&C price is an industry term meaning the cash price paid by the general public. Dec. 4, 2015 CVS Mot. to Dismiss [Dkt. No. 56] at 15; PX-83, at CVSC-0313152 (CVS HSP Reconciliation Process); PX-240 at CVSC-0068458 (CVS Glossary of Terms). |
| 1&2 | | <u>Add. Fact 4.</u> CVS alone determines its U&C price according to a proprietary methodology. PX-801, CVS 1st Suppl. Resps. & Objs. To Pls.' RFA Nos. 7, 8. |
| 1 | | <u>Add. Fact 5.</u> CVS believes it can make up its U&C price to be whatever it wants. PX-830, Wingate (TX) Dep. 129:4-6; PX-831, Gibbons 71:8-15. |
| 1&2 | | <u>Add. Fact 6.</u> CVS alone is responsible for submitting its U&C price to PBMs when an |

| | | |
|---|---|---|
| | | insured makes a prescription purchase. PX-801, CVS 1st Suppl. Resps. & Objs. To Pls.' RFA Nos. 7, 8. |
| 1 | | <u>Add. Fact 7.</u> CVS's goal in setting U&C prices is to ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████ PX-832, Melkonian Dep. 103:15-25. |
| 1&2 | | <u>Add. Fact 8.</u> CVS communicates the copayment to the patient and collects that amount directly from its customers. PX-803, Navarro A&S Decl. ¶ 17; Answer ¶¶ 11, 49. |
| 1 | | <u>Add. Fact 9.</u> CVS was aware of, and concerned about, its HSP prices having to be reported as U&C, and the impact that would have on its third-party reimbursements. PX-66, at CVSC-0222986 (CVS Presentation); PX-239 (CVS email re Medco U&C); PX-36, at CVSC-0222535, -536, -540, -545, -546, & -550 (CVS email thread re U&C definitions); PX-242 (CVS chart re CT Medicaid); PX-251 (CVS email re Emdeon/ScriptSave); PX-163 & PX-164 (ScriptSave Business Case); PX-254 (CVS Presentation); PX-11 (CVS Presentation, at CVSC-0001263). |
| 1 | | <u>Add. Fact 10.</u> Unlike the great majority of CVS's contracts (including those at issue here), a few of CVS's contracts actually expressly exclude discount card programs from the definition of a U&C price. PX-20, CVS-Meridian Rx LLC Pharmacy Services Agreement, at CVSC-0025030. |
| 1 | | <u>Add. Fact 11.</u> CVS's policy was to try to ████████████████████████████████. PX-335, CVS Third Party Contract Administration Policy & Procedure No. 000-000-176 (eff. 11/10/2000), at CVSC-0355496-97 ████████████████████████████████ ████████████████████████████████████████ █████████████████████████████ *see also id.* at CVSC-0355505 (2012 revision). |
| 1&2 | | <u>Add. Fact 12.</u> CVS did not inform Plaintiffs about the HSP program, that it was charging them inflated copayments by excluding the HSP prices from its submitted U&C prices, or that |

| | | CVS and any PBM agreed CVS could do so. PX-801, May 10, 2017 CVS 1st Supp. Resps. To Pls.' Reqs for Admission Nos. 58-59, 116. |
| --- | --- | --- |

**ATTORNEY ATTESTATION:**

I attest that the evidence cited herein fairly and accurately support the facts as asserted.

By: _/s/ Robert B. Gilmore_

_Interim Class Counsel_