1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

8
9
10

| | |
|---|---|
| **CHRISTOPHER CORCORAN, ET AL.,** | CASE NO. 15-cv-03504-YGR |
| Plaintiffs, | **ORDER GRANTING IN PART PLAINTIFFS'** |
| vs. | **MOTION FOR CLASS CERTIFICATION;** |
| | **GRANTING IN PART DEFENDANTS' MOTION** |
| **CVS HEALTH, ET AL.,** | **TO EXCLUDE CERTAIN OPINIONS BY DR.** |
| Defendants. | **HAY; GRANTING DEFENDANTS' MOTION** |
| | **FOR SUMMARY JUDGMENT** |
| | Re: Dkt. Nos. 271, 274, 287 |

11
12
13
14
15
16

Plaintiffs bring this putative class action against defendants alleging that they knowingly overcharged millions of insured patients by submitting falsely inflated drug prices to pharmacy benefit managers ("PBMs") and third-party payor insurance providers ("TPPs"), which resulted in higher copayment obligations for plaintiffs. Specifically, plaintiffs raise claims under the laws of eleven states: (i) each state's statutory laws proscribing unfair and deceptive acts and practices ("UDAP"); and common law claims for (ii) fraud, (iii) negligent misrepresentation, and (iv) unjust enrichment.

Now before the Court are the following motions: First, plaintiffs have filed a renewed motion for class certification, significantly narrowing the classes and issues which they seek to certify. Second, defendants move to exclude certain opinions from Dr. Hay, submitted in support of plaintiffs' motion for class certification. And third, defendants' move for summary judgment

on all claims in this action arguing that plaintiffs have failed to demonstrate either any misrepresentations or reliance, essential elements of their claims.[1]

Having carefully reviewed the pleadings, the papers submitted on each motion, the parties oral arguments at the hearing held on July 18, 2017, and for the reasons set forth more fully below, the Court **ORDERS** as follows: The Court **GRANTS IN PART** plaintiffs' motion for class certification, certifying a California, Florida, Illinois, and Massachusetts class, but limited only to the PBM that adjudicated each class representative's claim. The Court **DENIES** the motion to certify a New York and Arizona class because the proposed class representatives fail to satisfy the typicality requirement of Rule 23(a). The Court **GRANTS IN PART** defendants' motion to exclude certain opinions by Dr. Hay and **STRIKES** Dr. Hay's opinion that CVS's Health Savings Pass ("HSP") prices are the "Usual and Customary" ("U&C") prices as defined in CVS's contracts. The Court **GRANTS** defendants' motion for summary judgment finding no triable issue of fact exists with regard to whether CVS misrepresented its U&C price to the PBMs.

## I.   BACKGROUND

Plaintiffs seek to certify eleven state classes composed of individuals who "have filled prescriptions for generic drugs at CVS pharmacies using coverage provided by their [TPP] plans." (Dkt. No. 101, Third Amended Complaint ("TAC") ¶ 10.) The following facts and allegations relate to the instant motions:

CVS is a national retail pharmacy chain with over seven thousand pharmacies operating under its trade name in the United States and Puerto Rico, managing more than one billion prescriptions annually. (*Id.* at ¶ 4.) In 2014, CVS' retail pharmacy business generated more than $67 billion in revenues, 70% of which came from prescription drugs. Since 2008, CVS has

---

[1] The parties have also filed administrative motions to seal certain exhibits and portions thereof at Docket Numbers 272, 281, 286, 300, 302, and 314. The Court addresses each by separate order, under the appropriate "compelling reasons" standard. *See Kamakana v. City and Cty. of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006) (holding that the moving party must present "compelling reasons" to outweigh the public's interest in disclosure with regard to dispositive motions such as summary judgment); *see also Aldapa v. Fowler Packing Co., Inc.*, No. 15-CV-420-DAD, 2017 WL 2546606, at *2 n.2 (E.D. Cal. June 13, 2017) (applying heightened "compelling reasons" standard to motions to seal connected with a motion for class certification where the certification issues are "clearly more than tangentially related to the merits of the case" and where denial of the same "would almost certainly be dispositive of th[e] case").

captured more than one third of total prescription growth in the United States.  (*Id.*)
Approximately ninety percent of Americans—including plaintiffs— are enrolled in a private or
public health care plan that shares prescription drug costs.  (*Id.* at ¶ 8.)  Generally, when plan
participants fill a prescription under one of these TPP health care plans, the plan "pays a portion of
the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy in
the form of a copayment or copay."  (*Id.*)  Many TPPs typically contract with a PBM to administer
their prescription benefits with a pharmacy.

When a plan participant fills a prescription at CVS, the pharmacist generates a claim by
transmitting patient, prescription, and insurance information electronically to the customer's
insurer directly or the PBM.  (*Id.* at ¶¶ 47–48.)  The electronic CVS claims process utilizes
standardized data fields developed by the National Council for Prescription Drug Programs
("NCPDP"), a standard-setting organization in the healthcare industry.  (*Id.* at ¶¶ 50–51.)  One
data field on NCPDP's standard layout is Field No. 426-DQ, the U&C price.  (*Id.* at ¶ 53.)  The
U&C price is "generally defined as the cash price to the general public, which is the amount
charged [to] cash customers for the prescription, exclusive of sales tax or other amounts claimed."
(*Id.*)  Under most of CVS's contracts with TPPs and PBMs, the copayment must generally be the
lower of the following:  (a) the drug's average wholesale price as set by the industry; (b) a
maximum allowable cost determined by the pharmacy's contract with the PBM or TPP; or (c) the
U&C price.

In 2008, CVS introduced its HSP program.  (*Id.* at ¶ 60.)  The HSP program provides
discounted pricing on hundreds of generic prescription medications, including some of the most
commonly prescribed drugs for cardiovascular, allergy, and diabetes conditions, among others.
(*Id.* at ¶ 62.)[2]  Plaintiffs allege that the price charged by CVS under the HSP program for the HSP
generics was the true U&C price for those drugs.  (*Id.* at ¶ 70.)  However, CVS continued to
submit amounts higher than the HSP price for all HSP generics (rather than the HSP program

---

[2]  From November 9, 2008 through 2010, cash paying customers could join the HSP
program for a $10 fee, and be entitled to $9.99 prices for a ninety-day supply of an HSP generic.
(*Id.* at ¶ 62.)  Beginning in 2011, CVS raised the HSP enrollment fee to $15 a year and the cost of
a ninety-day supply of an HSP generic rose to $11.99.  (*Id.*)

United States District Court
Northern District of California

price) as the U&C price to TPPs and PBMs.  (*Id.* at ¶ 71.)  As a result, in some instances, plaintiffs allege they paid copayments that exceeded the HSP price or the "true U&C price."  (*Id.* at ¶¶ 76, 80.)  Defendants discontinued the HSP program on February 1, 2016.

## II. LEGAL FRAMEWORK

### A. Motion for Class Certification

Under Federal Rule of Civil Procedure 23(a), the Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Courts refer to these four requirements as "numerosity, commonality, typicality[,] and adequacy of representation."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Once plaintiffs establish that the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 1432 (2013).  Here, plaintiffs seek certification under Rule 23(b)(3) only.

Rule 23(b)(3) requires plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

### B. Motion to Exclude Expert Opinion

Rule 702 permits opinion testimony by an expert as long as the witness is qualified and their opinion is relevant and reliable.  Fed. R. Evid. 702.  An expert witness may be qualified by "knowledge, skill, experience, training, or education."  *Id.*

At the class certification stage, courts analyze challenges to expert testimony under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ellis*, 657 F.3d at 982. "[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Culley v. Lincare Inc.*, No. 15-CV-00081-MCE-CMK, 2016 WL 4208567, at *1 (E.D. Cal. Aug. 10, 2016) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 492–93 (C.D. Cal. 2012)).

The trial judge has discretion to determine reasonable measures of reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999). The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments). An expert should be permitted to testify if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Thompson v. Whirlpool Corp.*, No. 06-CV-1804-JCC, 2008 WL 2063549, at *3 (W.D. Wash. May 13, 2008) (citing *Daubert*, 509 U.S. at 589–94).

### C.     Motion for Summary Judgment

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247–48 (dispute as to a material fact is "genuine" if sufficient evidence exists for a reasonable jury to return a verdict for the non-moving party) (emphases in original).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun*

*v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the opposing party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that the opposing party lacks evidence to support its case. *Id*. If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id*. (quoting *Anderson*, 477 U.S. at 250). The opposing party's evidence must be more than "merely colorable" and must be "significantly probative." *Anderson*, 477 U.S. at 249–50. Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows a genuine issue of material fact exists for trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [defendants'] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, in determining whether to grant or deny summary judgment, a court need not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations and citation omitted). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *See id*. (internal quotations and citation omitted); *Carmen v. San Francisco Unified Sch. Dist*., 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citation omitted).

### III. MOTION FOR CLASS CERTIFICATION

Plaintiffs now seek to certify six state classes under Federal Rule of Civil Procedure 23(b)(3) defined as follows:

> All CVS customers in [California,] [Arizona,] [Florida,] [Illinois,] [Massachusetts,] [and New York] who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by one of the following pharmacy benefit managers: Caremark/PCS, Express Scripts, Medco, MedImpact, or Optum/Prescription Solutions (prior to January 29, 2015); and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

Plaintiffs proffer the following representatives for each state class: California (Tyler Clark); Arizona (Zulema Avis); Florida (Debbie Barrett and Robert Jenks); Illinois (Robert Jenks and Carl Washington); Massachusetts (Robert Garber); and New York (Onnolee Samuelson).

Defendants contend that certification of these classes is inappropriate because the classes and class representatives fail to satisfy the requirements for a Rule 23(b)(3) class, namely: (i) typicality; (ii) predominance and commonality;[3] and (iii) superiority.[4] The Court addresses each.

#### A. Typicality

Defendants raise three arguments with respect to typicality: first, each state representative is not typical of other class members in their state whose claims were adjudicated by a different PBM; second, given the limited time period, plaintiffs Avis (Arizona) and Samuelson (New York)

---

[3] For efficiency, the Court addresses commonality under Rule 23(a) together with predominance under Rule 23(b)(3). *See, e.g.*, *Collins v. ITT Educ. Servs., Inc.*, No. 12-CV-1395, 2013 WL 6925827, at *3 (S.D. Cal. July 30, 2013) (addressing commonality and predominance together) (citing *Amchem Prods.*, 521 U.S. at 609 ("Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.")); *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, No. 13-CV-2468, 2014 WL 4627271, at *8 (C.D. Cal. Sept. 8, 2014).

[4] Defendants also raise adequacy issues to preserve the same for purposes of appeal, but concede that the Court has previously rejected the very same argument in its prior order denying plaintiffs' first motion for class certification. (Dkt. No. 301 at 30.) For the same reasons the Court previously rejected defendants' arguments in this regard, they are rejected here. Accordingly, the Court finds that plaintiffs have satisfied the adequacy requirement for class certification.

1    have no qualifying transactions; and third, all plaintiffs except for Samuelson continued shopping

2    at CVS after learning of the alleged deception. The Court previously rejected defendants' third

3    argument, and, for the same reasons, does so again here. (Dkt. No. 249 at 14.) Thus, the Court

4    addresses only defendants' first and second arguments.

### 1.    *Different PBM Adjudicators*

6        Defendants argue that each class representative is atypical with respect to other potential

7    class members whose claims were adjudicated by a different PBM. For instance, Clark is the sole

8    representative of the California class, and he claims that he was overcharged on purchases

9    adjudicated by Caremark. Defendants explain that Clark would be atypical of other California

10   class members whose claims were adjudicated by ExpressScripts, Medco, MedImpact, or Optum.

11       The Court agrees. "The test of typicality 'is whether other members have the same or

12   similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

13   and whether other class members have been injured by the same course of conduct.'" *Hanon v.*

14   *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D.

15   279, 282 (C.D. Cal. 1985)). Plaintiffs here are seeking to certify six different state classes to

16   demonstrate that defendants submitted incorrect or false U&C prices to five different PBMs within

17   each state. To illustrate, for instance, the Illinois class would seek to demonstrate that under

18   Illinois' UDAP law, defendants breached their contracts to Caremark, Express Scripts, Medco,

19   MedImpact, and Optum by failing to submit accurate U&C prices to each. However, plaintiffs put

20   forward only two class representatives for Illinois—Washington and Jenks—and both of their

21   claims were adjudicated by only one PBM, Caremark. The evidence with respect to Caremark—

22   discussed in greater depth herein in the context of defendants' summary judgment motion—does

23   not necessarily apply to the other PBMs. Whether defendants failed to honor their agreement with

24   Caremark is not necessarily dispositive of whether they breached their agreement to other PBMs.

25   Each of these agreements was carefully negotiated between highly sophisticated parties, and the

26   nuances among them could induce varying results.

27       Thus, the classes here must necessarily be limited in scope to the PBMs, which adjudicated

28   the class representative's claims. *See O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 412 (C.D.

8

Cal. 2000) ("The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class. Where the premise does not hold true, class treatment is inappropriate." (citations omitted)); *see also In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. 09-MDL-2074-PSG, 2014 WL 6888549, at *4 (C.D. Cal. Sept. 3, 2014) (finding certification not appropriate because "[usual, customary, and reasonable] obligations are governed by its contracts, and the relevant terms of those contracts vary across the proposed classes" even where a standard, industry definition existed); *Westways World Travel, Inc. v. AMR Corp.*, No. 99-CV-386, 2005 WL 6523266, at *9 (C.D. Cal. Feb. 24, 2005) (denying certification where the "sheer number of additional agreements, even though many are form contracts, suggests that individualized issues would predominate"). However, that these limits are necessary does not require denial of plaintiffs' motion for class certification. Rather, to the extent that the proposed classes satisfy the remaining requirements for class certification, the Court narrows each class to the specific PBMs, which adjudicated the claims of the class representatives.

Thus, the proposed classes are so narrowed and limited to the following: (i) California limited only to Caremark; (ii) Arizona to Caremark; (iii) Florida to Optum and Caremark; (iv) Illinois to Caremark; (v) Massachusetts to Express Scripts and MedImpact;[5] and (vi) New York to MedImpact.

### 2. *Lack of Qualifying Transactions*

Defendants have proffered evidence demonstrating that plaintiffs Avis and Samuelson—the named representatives for the Arizona and New York classes, respectively—have no transactions adjudicated by any of the five PBMs at issue for purposes of class certification during the Class Period. Plaintiffs' expert Dr. Hay disclosed the following regarding what plaintiffs considered the relevant purchases for Samuelson and Avis during the Class Period: first, twenty-five purchases by Samuelson from January 19, 2010 to November 14, 2011, bearing Condor Code 7434; second, four purchases by Avis from May 25, 2009 to June 18, 2010, bearing Condor Code

---

[5] Plaintiffs listed Robert Garber as having purchases associated with Medco in their motion for class certification. However, defendants indicate that plaintiffs' expert did not identify any Medco-related purchases with respect to Garber during the Class Period.

15800.  (Dkt. No. 272-6 at 105–108.)  With regard to Samuelson, claims bearing Condor Code 7434 pertained to Excellus as the relevant PBM.  (Dkt. No. 277-8 at 6.)[6]  With regard to Avis, claims bearing the Condor Code 15800 pertained to transactions between CVS and Aetna until January 1, 2011.  (Dkt. No. 283-18 at 5–6; *see also* Dkt. No. 277-8 at 6.)

Plaintiffs' only rebuttal is that defendants' current assertion is inconsistent with their prior discovery responses identifying Caremark and MedImpact contracts as applicable to Avis and Samuelson.  However, those discovery responses were issued prior to this Court's first order denying class certification and plaintiffs' renewed motion narrowing the class definition.  In this context, plaintiffs' own expert identified the relevant transactions.  Defendants' evidence, the accuracy and reliability of which plaintiffs do not dispute, demonstrates that Avis and Samuelson do not have any qualifying transactions under the new class definition.  Thus, the Court finds that neither is typical of the classes, which they seek to represent.  *See McKinnon v. Dollar Thrifty Automotive Grp., Inc.*, No. 12-CV-4457-YGR, 2016 WL 879784, at *9 (N.D. Cal. Mar. 8, 2016) (finding proposed representative atypical because he lacked a qualifying purchase).

Accordingly, the Court **DENIES WITHOUT PREJUDICE** plaintiffs' motion to certify a New York and Arizona class because they lack proper class representatives.

### B.     Predominance and Commonality

Defendants raise four categories of arguments explaining why individual issues predominate rendering class certification untenable.  First, the evidence as to whether a misrepresentation was made to a PBM is not common because five different PBMs administered each class member's prescriptions under plaintiffs' proposed class definition.  Second, whether plaintiffs are third-party beneficiaries of the defendants' contracts with the PBMs varies depending on the state and the contract at issue.  Third, evidence of reliance as to each class member must be considered.  And finally, fourth, evidence of damages differs among each class member.

---

[6]  Plaintiffs cite an article dated September 28, 2010 wherein MedImpact announced that it would be partnering with Excellus to "provide select pharmacy benefit services for Medicare Part D and Part B beginning January 1, 2011," arguing that the article demonstrates that Samuelson made qualifying purchases adjudicated by MedImpact after January 1, 2011.  No evidence demonstrates, however, that Samuelson's claims fell into Excellus' Medicare Part D and Part B pharmacy benefit services.

As an initial matter, the Court finds that defendants' first two arguments are mooted by the Court's decisions herein. With regard to their first argument, the Court has already narrowed the class definition such that each class relates only to the PBMs that adjudicated a named representative's prescriptions. (*See supra.*) With regard to their second argument regarding third-party beneficiary provisions, as discussed below, the Court finds that those concerns are immaterial to plaintiffs' claims. The Court next turns to defendants' remaining arguments.

### 1. Reliance

Defendants contend that reliance and materiality cannot be presumed in this action because, as the transaction data demonstrates, many potential class members knew about HSP pricing as some of them were HSP members. Specifically, the data reflects that 96,800 members of the putative class were enrolled in HSP at some time, of which 69,786 were either enrolled in HSP at the same time that they carried insurance or purchased insurance after having been an HSP member. Thus, defendants contend, the issue of reliance must be determined on a case-by-case basis. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 982 (C.D. Cal. 2015) ("[T]he Ninth Circuit has held that if a misrepresentation is not material to all class members, the issue of reliance varies from consumer to consumer, and no classwide inference arises." (internal quotations omitted)).

Defendants do not persuade. Putting aside the fact that not all of the statutes at issue here require a showing of reliance,[7] the evidence proffered by defendants does not sufficiently

---

[7] Arizona's and California's UDAP statutes require a showing of reliance. *See Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004) ("An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information."); *Cohen v. DIRECTV, Inc.*, 101 Cal. App. 4th 966, 980 (2009) ("[A]ctual reliance must be established for an award of damages under the CLRA."); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1012 (N.D. Cal. 2012) ("California law . . . require[s] a UCL claim to allege actual reliance."). The UDAP statutes in Florida, Illinois, Massachusetts, and New York require a showing of "causation," which, in some cases, is similar to a reliance requirement. *See Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006) ("causation" as a listed element); *Clark v. Experian Info. Sols., Inc.*, 256 F. App'x 818, 821 (7th Cir. 2007) (proximate causation required in Illinois); *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 7 (N.Y. App. Div. 1998) ("[A] plaintiff seeking compensatory damages [under New York's consumer protection statute] must show that the defendant engaged in a material deceptive act or practice that caused actual . . . harm." (internal quotation and citations omitted)); *Kinoo, Inc. v. Bechtel/Parsons Brinckerhoff*, No. 05-CV-0953-BLS, 2009 WL 2449879, at *6 (Mass. Super. Ct. 2009) ("[P]laintiff must prove a causal connection between the

11

demonstrate that potential class members, even those who were members of HSP, knew of the allegedly deceptive practices. The copayment adjudication process from the perspective of the consumer is opaque, as one of defendants' experts concedes: "A pharmacy customer has limited insight into the processes that occur 'behind the scenes' when they have a prescription filled at their local retail pharmacy." (Dkt. No. 313-2 at 4.) Putative class members likely did not understand the relationship between the pharmacy's U&C and what the pharmacy charges them, which may be at times less than or more than the HSP program prices. Thus, that a small percentage of putative class members were also HSP members does not necessarily demonstrate that putative class members were aware of the fraudulent acts alleged here.

### 2. *Damages*

In this regard, defendants argue that there is no common evidence establishing a class member's damages because Dr. Hay's calculation is dependent on their individual insurance plans. Specifically, defendants proffer evidence demonstrating that several named plaintiffs had insurance coverage that provided for caps on individual members' out-of-pocket expenditures, and the transaction data suggests that many other potential class members also had out-of-pocket caps as part of their insurance coverage.

Defendants present a hypothetical situation wherein a patient's out-of-pocket expenses are capped at $100 per annum. If, for instance, the proper U&C for that patient's medication was set at $10, in years when that patient filled that prescription ten or more times, that patient would have suffered no injury even if defendants had charged them more than $10 because the cap would have been reached. Defendants' expert Dr. Barlag observed that 7.7% of the putative class members made at least one purchase where the patient's copayment was $0.00, suggesting that those patients had, and reached, an out-of-pocket cap during the Class Period.

The Court disagrees. The Ninth Circuit has held that "differences in damage calculations" among class members does "not defeat class certification." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015). Rather, plaintiffs need only demonstrate that their

deception and the loss and that the loss was foreseeable as a result of the deception." (internal quotations omitted)).

damages stemmed from the defendants' actions that created the legal liability. *Id.* (citations omitted). Here, assuming that defendants are liable, plaintiffs' damages calculations are tied to the delta between what plaintiffs were charged by defendants and defendants' true U&C price, which plaintiffs allege is the HSP program price for each drug. For the percentage of putative class members whose insurance provided them with out-of-pocket caps, damages can be determined by calculating the difference between those caps and what they would have paid had defendants submitted the correct U&C price. That some of these calculations will involve individualized and fact-specific determinations is insufficient to defeat class certification. *Id.*[8]

### C. Superiority

To make this determination, the Court considers the following four non-exhaustive factors: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d. 1227, 1235 (9th Cir. 1996).

Defendants' arguments focus on the fourth factor outlined above, namely the difficulties likely to be encountered in the management of the class action. Specifically, defendants argue that plaintiffs have failed to demonstrate how a trial could proceed with six classes under seven relevant statutes, on top of each states' jurisprudence on contract interpretation applied to five different PBM-CVS contracts. Moreover, defendants complain that the trial plan reveals inadequate planning and lack of thoughtfulness as to how the case could actually be tried to a jury. For instance, defendants argue, plaintiffs represented that they only intend to offer two to three

---

[8] Plaintiffs also put forth evidence suggesting that prior to 2014, "copays at the doctor or pharmacist did not count toward [patients'] deductible or out-of-pocket maximum." (Dkt. No. 313-4 at 3.) If so, the individualized inquiry would be further minimized.

United States District Court
Northern District of California

1    class representatives as witnesses, yet do not explain how they intend to prove their case as to all

2    claims without presenting more.

3         The Court finds that plaintiffs have sufficiently demonstrated how jury instructions and a

4    verdict form may be structured to account for statewide classes in light of the fact that many of the

5    state-law claims raise common issues.  While further modifications may be necessary, the showing

6    suffices.  Moreover, the Court's limitation of each state class only to the PBMs that adjudicated

7    the named representative's claims and finding that the Arizona and New York classes lack a

8    typical representative further reduces the complexity of any potential trial.

9         While, defendants do not address the other factors courts must consider in evaluating the

10   superiority of a class action, the Court does so here.  Briefly:

11        The first factor—the interest of each member in "individually controlling the prosecution

12   or defense of separate actions"—here weighs in favor of class certification, given that the potential

13   damages suffered by each putative class member are not large.  *See Zinser v. Accufix Research*

14   *Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).  The second factor—the extent and nature of any

15   litigation concerning the controversy already commenced by or against members of the class—

16   also weighs in favor here, given that neither party has indicated that any related actions exist with

17   respect to the putative class members.  And, finally, the third factor—the desirability of

18   concentrating the litigation in this forum—weighs slightly against class certification.  No adequate

19   justification exists for concentrating the litigation in this particular forum given that the potential

20   plaintiffs, witnesses, and evidence are located across the country.  *See Zinser*, 253 F.3d at 1191–92

21   (citing *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 653 (N.D. Cal. 1996)).

22        The Court finds, based on its analysis of the Rule 23(b)(3) factors, that plaintiffs have

23   satisfied the superiority requirement for class certification of the remaining four proposed state

24   classes, as amended herein.

25       **D.**    **Summary**

26        For the foregoing reasons, the Court **GRANTS IN PART** plaintiffs' motion for class

27   certification, and **CERTIFIES** the following state classes:

28

14

**1) California Class:** All CVS customers in California who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**2) Florida Class:** All CVS customers in Florida who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS or Optum; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**3) Illinois Class:** All CVS customers in Illinois who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**4) Massachusetts Class:** All CVS customers in Massachusetts who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered either by Express Scripts or MedImpact; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

The Court **DENIES** plaintiffs' motion to certify a New York and Arizona class because the proposed class representatives fail to satisfy the typicality requirement of Rule 23(a).

## IV. MOTION TO EXCLUDE CERTAIN OPINIONS FROM DR. HAY

Plaintiffs offer Dr. Hay to present the following opinions:  first, CVS customers and transactions associated with the PBMs that adjudicated the named plaintiffs' claims can be identified in CVS's transaction data; second, the transaction data for the named plaintiffs' relevant purchases indicate that plaintiffs meet the class definition; third, CVS charged 6.6 million class members copayments that exceeded CVS's true U&C price; and fourth, the damages for the class are common and uniform, and totals $123,702,100.96 across the classes.  Defendants do not contend that Dr. Hay is unqualified to offer opinions relating to damages.  However, they argue

that two opinions are unreliable, namely his contention that defendant's true U&C price is the HSP program price and Dr. Hay's damages calculation.[9]

### A.    Opinion 1:  HSP Prices Are U&C

Dr. Hay opines that the plaintiffs in the class have all suffered the same harm, namely that defendants charged copayments higher than their true U&C prices, which "should have been based on CVS's HSP prices."  (Dkt. No. 272-6 at ¶ 23.)  Defendants challenge this opinion because Dr. Hay's analysis is premised merely on his conclusion that the HSP price is the most common price observed in defendants' transaction data, despite the lack of any contract, statute, or other relevant publication defining the U&C price as the "most common price."

Plaintiffs disagree and counter that Dr. Hay defines U&C as the "cash price for which a drug is sold," and concludes on that basis that the HSP price is the U&C price.  Plaintiffs contend that Dr. Hay does not, in fact, opine that U&C is defined as the "most common price" charged.

The Court disagrees.  According to Dr. Hay himself, he analyzed "whether and to what extent CVS transacted at the HSP price" and then concluded that CVS "frequently transact[ed] at the HSP prices."  (Dkt. No. 302-8 at 6.)  This is simply another way of stating that the HSP price should be considered the U&C price because it was frequently charged, or, the most common price.  As this Court previously held with respect to striking Dr. Navarro's opinion that the HSP price was the U&C price, where the expert conducted no specific investigation to determine what the PBMs meant relative to the contract provisions, the opinion cannot stand.  (*See* Dkt. No. 316-4 (Hay Dep.) 74:3–76:11.)

Next, plaintiffs attempt to salvage the opinion by arguing that Dr. Hay's analysis demonstrates that the HSP program was not a true membership program:

First, Dr. Hay opines that HSP prices were sometimes charged to non-HSP members, and thus, HSP was not a true membership program.  However, there is no indication that in situations where the HSP-price was charged to a non-HSP member, that price was not submitted to the PBM

---

[9]  Defendants also challenge Dr. Hay's opinions regarding the "1st Percentile methodology."  Plaintiffs represent that Dr. Hay is no longer putting forward those opinions in light of this Court's prior order denying class certification.  (Dkt. No. 302-8 at 7.)

United States District Court
Northern District of California

or TPP as the U&C price. To the contrary, the data suggesting that HSP prices were charged to non-HSP cash members is consistent with defendants' established Minimum Retail Price according to CVS internal policies.[10] The Minimum Retail Price was $10.99 through July 31, 2010 and $11.99 thereafter. (Dkt. No. 283-16 at 13.) Dr. Barlag explains that whenever defendants charged a non-HSP cash customer $9.99 or $11.99, the data demonstrates that defendants "submitted a U&C price equal to, if not lower than, $9.99 or 11.99 for 99.8% of the comparable Third Party prescription purchases." (*Id.* at 22.) Neither plaintiffs nor their experts dispute that analysis.

Second, Dr. Hay opines that the transaction data reveals that 31.68% of HSP members did not pay the membership fee at least once every 365 days, and 8.53% did not ever pay fees, giving further credence to plaintiffs' theory that the HSP program was not a bona fide membership program. However, these figures are misleading. Plaintiffs do not dispute that membership fee payments paid prior to September 29, 2009 are not contained in the prescription purchase data. (*See* Dkt. No. 283-16 at 6; Dkt. No. 303-7 at 11–12.) Based on Dr. Hay's chart in his rebuttal report filed on January 9, 2017, beginning in 2010, the data demonstrates that the vast majority of HSP members paid their membership fees. (Dkt. No. 214-25 at 12 (indicating that no payment data exists for 20.01% of HSP members in 2010, 7.21% in 2011, 6.24% in 2012, 6.23% in 2013, 5.66% in 2014, and 4.78% in 2015).) Dr. Barlag also reported that HSP members sometimes paid their membership fees over the phone or online and such payments were not reflected in the prescription purchase data. (Dkt. No. 283-16 at 8.) Neither Dr. Hay nor plaintiffs address the impact of this fact on their conclusions regarding payment of HSP membership fees. In any event, plaintiffs have not demonstrated at what point failure to collect membership fees renders the program illegitimate for purposes of U&C. For instance, at least one PBM testified that it was the

---

[10] Dr. Barlag describes CVS's Minimum Retail Price as follows: CVS calculates an adjusted working price based, primarily, on the unit cost multiplied by the quantity dispensed. (Dkt. No. 283-16 at 16.) Dr. Barlag then explains that in situations where the adjusted working price for a given dispensed quantity is less than the Minimum Retail Price, the cash customer is charged the Minimum Retail Price as the final retail price. (*Id.*) For instance, if the Minimum Retail Price were $10.00 and the per-unit price of a certain drug were $0.50 cents, a cash customer purchasing less than twenty tablets of that drug would still routinely pay $10.00. (*Id.*)

17

United States District Court
Northern District of California

act of enrolling in a membership program, not paying a fee, that was the relevant action.  (Dkt. No. 316-7 (Express Scripts) at 58:4–14.)

Dr. Hay's opinion that the HSP price should have been reported as the U&C price lacks sufficient foundation to satisfy Federal Rule of Evidence 702.  Accordingly, the Court **GRANTS** defendants' motion to exclude the same.

### B.    Opinion 2:  Damages

Defendants' central concern with Dr. Hay's damages calculation is that it is based on his conclusion that the HSP prices were defendants' true U&C.[11]  Thus, defendants argue, as that conclusion goes, so too does Dr. Hay's damages calculation.  Plaintiffs, on the other hand, counter that attacking the factual bases and inputs into the damages calculation is inappropriate for a *Daubert* motion.  *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) ("The relative weakness or strength of the factual underpinning of the expert's opinion goes to weight and credibility, rather than admissibility."); *see also Internmatch, Inc. v. Nxtbigthing, LLC*, No. 14-CV-5483-JST, 2016 WL 1212626, at *4–5 (N.D. Cal. Mar. 28, 2016).

The Court need not resolve this question at this stage.  Absent a U&C figure to enter into his analysis, Dr. Hay does not, in fact, have a damages figure to present to the Court.  Thus, his opinion on damages is effectively moot.  Defendants do not otherwise challenge Dr. Hay's methodology in this regard, nor do they challenge his qualifications to perform the calculations.

Accordingly, the Court **DENIES** defendants' motion to strike Dr. Hay's damage calculations as moot.

## V.    MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all claims arguing that no evidence exists to satisfy the elements of plaintiffs' claims, namely (i) a misrepresentation of a material fact and (ii)

---

[11] Defendants also briefly argue that Dr. Hay's damages calculation is unreliable for the additional reason that he used the purchase price for 90-day quantities of drugs to analyze prices for 10- and 30-day prescriptions, without sufficient support in the record for doing so.  Plaintiffs respond that for the purposes of their amended motion for class certification, Dr. Hay did not extrapolate prices for 10- and 30-day prescriptions from the 90-day price, but rather only calculated damages on copayments based on the 90-day HSP price.  In light of plaintiffs' clarification, the Court finds that defendants' argument in this regard is moot.

18

reliance or causation. Rather, defendants argue, the evidence produced demonstrates the contrary. The parties have raised certain preliminary matters in arguing the merits of defendants' motion. Specifically: first, whether the parol evidence rule ("PER") applies to bar evidence regarding the meaning of the contracts at issue; and second, whether, in any event, evidence submitted by defendants regarding the meaning of the contracts is competent and admissible. The Court addresses the preliminary matters first, and then proceeds to discuss the merits of defendants' motion for summary judgment.

### A. Preliminary Matters

#### 1. Parol Evidence Rule

Whether the PER bars defendants' evidence regarding the meaning of the contracts depends on state law. While the application of PER varies among the states, the essence of the rule is the same: "The parol evidence rule is a substantive rule of law that prohibits the admission of evidence of prior or contemporaneous oral agreements, or prior written agreements, whose effect is to add to, vary, modify, or contradict the terms of a writing which the parties intend to be a final, complete, and exclusive statement of their agreement." 11 Williston on Contracts § 33:1 (4th ed. 2017).[12] On that basis, plaintiffs contend that evidence demonstrating the PBMs' understanding of certain terms in the agreements is inadmissible because each of the contracts are

---

[12] Federal courts deciding state-law causes of action apply the state's parol evidence rule. *See Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 998–99 (9th Cir. 2001) (stating that the district court's application of the parol evidence rule is an "issue of state law"). Despite some differences within each state as to the application of the PER, the Court is aware of no meaningful differences regarding the basic elements of the PER as set forth herein. *See, e.g.*, *In re Marriage of Shaban*, 88 Cal. App. 4th 398, 404 (2001) ("Parol evidence, of course, may be received to interpret a term of art used within a contract."); *Winston v. Mezzanine Investments, L.P.*, 170 Misc.2d 241, 249 (N.Y. Sup. Ct. 1996) ("Turning to the criteria for contract interpretation, if a contract provision is reasonably susceptible of more than one interpretation, facts and circumstances extrinsic to the agreement can be considered to determine the intention of the parties."); *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms."); *Perlman v. First Nat. Bank of Chicago*, 305 N.E.2d 236, 244 (Ill. App. Ct. Nov. 5, 1973) ("The testimony of witnesses is admissible to explain * * * words or phrases having a local meaning or a special meaning in a particular calling, trade, business or profession. Such evidence does not contradict or change the written instrument." (alteration in original) (quoting *Steidtmann v. Joseph Lay Co.*, 84 N.E. 640, 642 (Ill. 1908))); *see also LaSalle Nat. Bank v. Gen. Mills Rest. Grp., Inc.*, 854 F.2d 1050, 1052 (7th Cir. 1988) (holding that extrinsic evidence is admissible if a judge cannot "make sense of a written contract without" additional evidence).

United States District Court
Northern District of California

1    fully integrated and thus were intended to be a "final, complete, and exclusive statement of" the

2    agreements.

3         Plaintiffs do not persuade.  The evidence defendants have submitted in favor of their

4    interpretation of the contracts between CVS and the BPMs simply do not fall within the ambit of

5    the PER.  The declarations and depositions of the PBM witnesses and CVS representatives about

6    their understanding of the term U&C vis-a-vis the HSP program, along with any documents and

7    emails generated around the time that the HSP program was being established in 2008 and 2009,

8    are not "evidence of prior or contemporaneous oral agreements, or prior written agreements,"

9    introduced to vary the terms of the contracts.  Rather, they have been put forward to explain key

10   terms in the contracts related to what the parties viewed as the "usual" and "customary" price for

11   prescription drugs.  Plaintiffs' argument that the contracts are clear and unambiguous is belied by

12   the contractual language itself.  The term at issue—*i.e.*, "Usual and Customary"—necessarily

13   requires an understanding of what is "usual" and "customary" between the parties and within the

14   industry.  Furthermore, the definitions of "U&C" within each contract introduce further

15   ambiguities.  For instance, under the Caremark contract, the definition states that the U&C price

16   "must include any *applicable* discounts offered to attract customers."  (Dkt. No. 285-2 at 22

17   (emphases supplied); *see also* Medco Pharmacy Services Manual, Dkt. No. 283-9 at 43 (same).)

18   Which discounts are applicable is open to interpretation and thus requires further evidence of the

19   parties' intent and understanding.

20        Thus, under the circumstances present here, the PER does not apply.[13]  Accordingly, the

21   Court finds that the evidence submitted by defendants regarding the meaning of U&C is not barred

22   on this ground.

23             2.    *Admissibility of Defendants' Evidence*

24        Plaintiffs next contend that the declarations and testimony of the PBM witnesses are not

25   admissible because the witnesses (i) did not testify in their capacity as corporate representatives

26

27

28        _____

          [13]  The Court need not address defendants' alternative argument that plaintiffs are
     incompetent to raise PER arguments because they are strangers to the agreements.

and therefore have no authority to bind their respective companies and (ii) lack personal knowledge of the contracts.

Plaintiffs, again, do not persuade. While the majority of the declarants and deponents were not designated as corporate representatives pursuant to Federal Rule of Civil Procedure 30(b)(6), that does not necessarily render their testimony as lacking in foundation.[14] The record put forward by the parties demonstrates otherwise. Each declarant has demonstrated sufficient knowledge of their respective PBM's contractual arrangement with CVS with regard to the HSP program and U&C prices, either through their actual involvement in crafting the contracts at issue or their duties in implementing reimbursement programs between their respective companies and CVS. Specifically:

- John Lavin (Caremark): Mr. Lavin is currently the Senior Vice President ("SVP") of Network Administration for Caremark, and has held that position since 2011. (Dkt. No. 280-32 ("Lavin Decl.") at ¶ 1.) Prior to holding that position, Mr. Lavin worked in various roles within Caremark and its predecessor, PCS Health Systems. (*Id.* at ¶ 2.) In his current capacity as SVP, he is responsible for "managing Caremark's relationship with all of its network pharmacies," including "pharmacy contracting, pharmacy enrollment, network operations, provider-pharmacy audit, pharmacy communications, network development, and other operations responsibilities." (*Id.* at ¶ 4.) Moreover, Mr. Lavin participated in the drafting and negotiation of the agreement between CVS and PCS in 1997, which has been the controlling base agreement between Caremark and CVS since November 2008. (Dkt. No. 276-5 ("Lavin Dep.") at 41:10–42:14; Lavin Decl. ¶ 7.)

- Amber Compton (Express Scripts): Ms. Compton is the current Vice President ("VP") of Retail Strategy & Contracting, which she has held since 2010. (Dkt. No. 280-24 ("Compton Decl.") at ¶¶ 1, 4.) Prior to that role, she held several managerial and administrative roles at Express Scripts dating back to 2001. (*Id.* at ¶ 4.) In her current role, she is responsible for "managing relationships and negotiating provider agreements with pharmacies, ensuring network integrity, and overseeing Express Scripts' retail network." (*Id.* at ¶ 3.) Through this work, Compton avers that she has knowledge of U&C pricing. (*Id.* at ¶ 6.) Ms. Compton further avers that she was aware that CVS was not submitting membership prices as its U&C and that Express Scripts did not object to that practice because it

---

[14] These arguments pertain to the persuasiveness of the declarants' evidence in demonstrating their corporations' understanding and interpretation of the agreements. Moreover, as defendants represented to the Court at oral arguments—a representation which plaintiffs did not contest—plaintiffs had actually designated certain witnesses as Rule 30(b)(6) designees, yet withdrew those designations after they testified in their individual capacities. Thus, the lack of 30(b)(6) evidence exists, in part, due to plaintiffs' strategic decisions in this litigation.

"understood the membership program price did not meet the definition of the U&C, as set forth in the Contract." (*Id.* at ¶ 17.)

- Michael Reichardt (Optum): Mr. Reichardt currently serves as the Senior Director for Network Relations, which he has held since January 2015. (Dkt. No. 280-30 ("Reichardt Decl.") at ¶ 1.) In that role, he is primarily responsible for "negotiating contracts and managing relationships with Optum's network pharmacies, including CVS" along with "managing staff and reviewing the pharmacy manual that applies to network pharmacies." (*Id.*) Mr. Reichardt avers that throughout his career, he has negotiated approximately eight contracts with network pharmacies. (*Id.*) Mr. Reichardt further avers that Optum takes a "consistent position with respect to membership-based generic programs" and he is aware that "CVS did not submit its HSP price as its [U&C] price on claims adjudicated by Optum or its predecessors at any point during the duration of the program." (*Id.* at ¶¶ 5, 12.)

- William Barre (MedImpact): Mr. Barre is currently the VP of Business Development, a role he has held since 2010, and prior to that role Mr. Barre was the VP of Strategic Network Development ("SND"). (Dkt. No. 276-2 ("Barre Dep.") at 11:19–21, 12:7–19.) In his capacity as the VP of SND, Mr. Barre was responsible for negotiating pharmacy contracts for MedImpact, and he estimates that he negotiated over a hundred such agreements. (*Id.* at 11:9–18.) Mr. Barre testifies that he negotiated the network agreement between CVS and MedImpact, which governs the current relationship between the two companies vis-a-vis reimbursements. (*Id.* at 17:10–22:4.)

- Franceen Spadaccino (Medco): Ms. Spadaccino worked at Medco from 1998 through 2013, and served as its Senior Director of Provider Relations and Network Strategy from 2006 through 2013. (Dkt. No. 280-26 ("Spadaccino Decl.") at ¶ 1.) In that capacity, she was responsible for negotiating contracts with network pharmacies, provider relations, and network strategy. (*Id.*) Ms. Spadaccino recalled "discussing membership-based generic programs with a number of [her colleagues" and decided "that pharmacies who charged customers a fee to enroll in a membership-based generic program were not required to submit the program price as U&C" and she believes that she and her colleagues "discussed Medco's position with most of the pharmacies that offered membership-based generic programs." (*Id.* at ¶ 6.) Though not part of her role, Ms. Spadaccino recalls that Medco's team "audited the U&C prices being submitted by pharmacies to ensure that Medco's clients were getting the benefit of discounted pricing." (*Id.* at ¶ 11.)

- William Strein (Medco): Mr. Strein worked for Medco from 1999 through 2012, and served as VP of Provider Relations from 2008 through 2012. (Dkt. No. 280-25 ("Strein Decl.") at ¶ 2.) In that capacity, he was responsible for "negotiating PBM contracts with pharmacies and representation for Medco at state and national professional pharmacy organizations, network pharmacy communications; policy development; dispute resolution and regulatory input at local, state, and national levels as well as indirect support for Audit and Finance on network pharmacy matters." (*Id.* at ¶ 3.) Mr. Strein avers that, upon learning of membership-based programs, he and his colleagues "considered whether membership programs in any way affected the U&C price [their] pharmacies were required to include in each claim" and "determined that Medco's definition of 'usual and customary' in its Pharmacy Services Manual did not encompass membership program prices." (*Id.*

22

at ¶ 9.)  Mr. Strein further avers that he was aware of the HSP program and, based on his understanding of that program, concluded that "CVS was not required to submit the HSP price as its U&C price on Medco claims."  (*Id.* at ¶ 11.)

• Joseph Zavalishin (Aetna):  Mr. Zavalishin is currently the SVP for Network Relations for Optum, but joined Aetna in February 2004 as Head of Planning & Business Strategy.  (Dkt. No. 273-25 ("Zavalishin Decl.") at ¶ 4.)  In October 2006, Mr. Zavalishin became VP of Pharmacy Networks and was responsible for "provider infrastructure, provider relations and contracting, and quality management."  (*Id.*)  Mr. Zavalishin further avers that during his tenure at Aetna, Aetna operated in-house PBM services, and he served as VP of that department.  (*Id.*)  In his capacity as a VP at Aetna, he "negotiated and signed a new national agreement with CVS Pharmacy, Inc.[]—the National Pharmacy Services Agreement (Jan. 15, 2009) between CVS and Aetna," the contract at issue in this litigation.  (*Id.* at ¶ 6.)  Mr. Zavalishin recalls "CVS asking Aetna to modify the proposed language . . . to make clear that prescriptions purchased under CVS's HSP program would be exempt from the claim-submission requirement."  (*Id.* at ¶ 16.)  Aetna "agreed to modify [that section] to exclude HSP purchases from those claims."  (*Id.*)

Such experience and background is sufficient to give each witness enough personal knowledge to provide competent testimony regarding their respective organization's understanding of the contractual relationship with CVS.  While some of the witnesses may not have been personally involved with crafting the contracts at issue, their positions and job duties pertain to managing the relationship between CVS and their respective companies and involve an understanding of how their companies viewed U&C pricing.  Whether that evidence is ultimately persuasive does not pertain to the admissibility of their testimony and declarations.  Accordingly, the Court finds that such evidence is admissible for purposes of the instant summary judgment motion, and hereby **OVERRULES** plaintiffs' objection to the same.

**B.**     **Merits of the Summary Judgment Motion**

Plaintiffs bring claims under the UDAP laws of eleven different states,[15] along with common law claims for fraud, negligent misrepresentation, and unjust enrichment.  While the elements of each claim under the laws of each state differ, each claim shares certain elements.  For the purposes of the instant motion for summary judgment, each of the causes of action raised by

---

[15]  Specifically, plaintiffs bring claims under the laws of the following states:  Arizona, California, Florida, Georgia, Illinois, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Texas.

plaintiffs requires (i) a misrepresentation or omission of a material fact[16] that (ii) caused plaintiffs' injury.[17]  Because the Court finds, for the reasons set forth below, that plaintiffs have failed to raise a triable issue of fact with regard to the first element—that defendants made a misrepresentation or omission of a material fact—the Court need not address any issues relating to reliance or causation.

The Court now turns to its analysis of the first element of plaintiffs' claims.  First, the Court provides a summary of the evidence submitted by both parties regarding the definition of U&C as it relates to the HSP program.  Second, the Court discusses whether a triable issue of material fact exists as to any of plaintiffs' causes of action.

---

[16] Each of the causes of action under the UDAP laws of the eleven states and the common law claims for fraud and negligent misrepresentation require the existence of a misrepresentation or otherwise deceptive or fraudulent action.  *See, e.g.*, *Castle v. Barrett-Jackson Auction Co., LLC*, 276 P.3d 540, 542 (Ariz. App. 2012) (holding that the Arizona Consumer Fraud Act requires a "false promise or misrepresentation"); *Vasic v. PatentHealth, LLC*, 171 F. Supp. 3d 1034, 1043 (S.D. Cal. 2016) (stating that California's Unfair Competition Law requires material misrepresentations); *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47 (Mass. 2009) (common law fraud claim in Massachusetts requires a "false representation of material fact"); *Pasternack v. Lab Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (common law fraud claim in New York requires a "misrepresentation or a material omission of fact"); *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (Pennsylvania negligent misrepresentation claim requires a "misrepresentation of a material fact"); *Li-Conrad v. Curran*, 50 N.E.3d 573, 578 (Ohio App. 2016) (negligent misrepresentation in Ohio requires provision of "false information").  Because plaintiffs' causes of action for unjust enrichment rest on the same allegations of wrongdoing, they also require a showing of a material misrepresentation.  *See, e.g.*, *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117 (2010) ("[T]he trial court properly [dismissed] . . . [plaintiffs'] claims for fraudulent concealment, negligent misrepresentation, and unfair competition.  The [plaintiffs] thus have not demonstrated any basis on which they would be entitled to restitution pursuant to a theory of unjust enrichment." (citations omitted)).

[17] Each cause of action requires a showing that the misrepresentation was the cause of plaintiffs' injury, and, in some cases, requires a showing of reliance.  *See, e.g.*, *Kuehn*, 91 P.3d at 351 (holding that under the Arizona Consumer Fraud Act, an "injury occurs when a consumer relies, even unreasonably, on false or misrepresented information"); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 514 (6th Cir. 2015) (under Illinois' UDAP, plaintiff must demonstrate that plaintiff's injury arises as "a result of the deception"); *Townsend v. Morton*, 36 So. 3d 865, 868 (Fla. App. 2010) (common law fraud claim in Florida requires showing "consequent injury by the party acting in reliance on the representation"); *Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (fraud requires "reasonable reliance thereon by the other person"); *Home Depot U.S.A., Inc. v. Wabash Nat'l Corp.*, 724 S.E.2d 53, 60 (Ga. App. 2012) (Georgia negligent misrepresentation claim requires "reasonable reliance upon [the] false information").

1.    *The Evidence Regarding the Parties' Understanding of the Agreements*

a.    <u>*The Relevant Terms of the Agreements*</u>

The parties have provided evidence relating to CVS's agreements with five PBMs (Caremark, Express Scripts, Optum, Medco, and MedImpact) and one TPP (Aetna) (collectively, the "Six Intermediaries").  At issue in the instant action is whether defendants misrepresented the true U&C price to the PBMs, thereby resulting in higher copayments charged to the consumer at the point-of-sale.  The relationship between each PBM and CVS generally is governed by a master agreement and sometimes supplemented by a pharmacy provider manual.  Below are the definitions of U&C contained either in the relevant agreements or provider manuals between CVS and the Six Intermediaries for which the parties have provided evidence:

- **Caremark/PCS Agreement**:  "Usual and Customary price means the lowest price the Provider would charge to a particular retail customer if such customer were paying cash for an identical prescription on that particular day.  This price must include any applicable discounts offered to attract customers."  (Dkt. No. 285-2 at 22.)

- **MedImpact Agreement**:  "Usual and Customary or U&C means the lowest price Member Pharmacy would charge to a cash paying customer at that location for an identical prescription on that day.  This price must include any applicable discounts, promotions, or other offers to attract customers."  (Dkt. No. 283-12 at 21.)

- **Express Scripts Agreement**:  "'Usual and Customary Retail Price' means the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions on such date."  (Dkt. No. 285-1 at 5.)

- **Medco (2009 Provider Manual):**  "The lowest net price a cash patient or customer would have paid the day the prescription was dispensed, inclusive of all applicable discounts.  These discounts include, but are not limited to, senior citizen discounts, 'loss leaders,' frequent shopper or special customer discounts, competitor's matched price, and other discounts offered to customers, including but not limited to buyer's clubs with nominal membership fees, discount buying cards and programs."  (Dkt. No. 285-3 at 77.)

- **Medco (2009/2010 Provider Manual)**:  "The lowest net cash price a cash patient or customer would have paid the day the prescription was dispensed, inclusive of all applicable discounts."  (Dkt. No. 283-9 at 43.)

- **Optum Agreement**:  "'Usual and Customary' shall mean and refer to the price that the Company Pharmacy would have charged the Member for the Prescription if the Member was a cash customer.  This includes all applicable discounts including, but

25

not limited to Senior citizen discounts, frequent shopper and special customer discounts, or other discounts." (Dkt. No. 285-8 at 14.)

- **Optum Amended Agreement (January 29, 2015)**: "[T]he price that a cash paying customer pays [Optum] for same Drug Products, devices, products and/or supplies and same amount on date of service excluding any coupons or discount card programs." (Reichardt Decl. ¶ 8–9.)

- **Aetna Agreement**: "The cash price less all applicable customer discounts which Pharmacy usually charges customers for providing pharmaceutical services." (Dkt. No. 285-11 at 9.)

The evidence demonstrates that many of these definitions were negotiated and set in place prior to the establishment of defendants' HSP program at issue in this litigation.

### b.    *The Establishment of the HSP Program*

Defendants operated the HSP program from November 9, 2008 through February 1, 2016. (Defendants' Statement of Undisputed Fact ("DSUF") 2.) The following facts relate to the development of the HSP program:

In September 2006, Walmart announced that it would offer all customers 30-day supplies of certain generic drugs for $4, without joining a program or paying a fee. (*Id.* at 35.) Similarly, several other large stores such as Safeway followed suit and announced price reductions for select generic drugs. (*Id.* at 36.) PBMs were aware of these price reductions and considered the new $4 prices charged by these stores as their U&C price. (*Id.* at 37–38.)

Beginning in November 2007, other pharmacies established savings club programs. For instance, Walgreens launched a Prescription Savings Club, which required enrollment and payment of a fee, and in September 2008, Rite Aid launched its Rx Savings program. (*Id.* at 39.) In November 2008, defendants launched their own membership program called Health Savings Pass. (*Id.* at 2.) The HSP program provided discounted pricing on hundreds of generic prescription medications, including some of the most commonly prescribed drugs for cardiovascular, allergy, and diabetes conditions, among others. (TAC ¶ 62.) From November 9, 2008 through 2010, cash paying customers could join the HSP program for a $10 fee, and be entitled to $9.99 prices for a ninety-day supply of an HSP generic. (*Id.*) Beginning in 2011, CVS raised the HSP enrollment fee to $15 a year and the cost of a ninety-day supply of an HSP generic rose to $11.99. (*Id.*)

c.      *The PBM and TPP Testimony Regarding the HSP Program*

The evidence related to the Six Intermediaries demonstrates that each was aware of the HSP program soon after it launched.  (*See, e.g.*, Compton Decl. ¶ 12 (Express Scripts "was aware of CVS having a membership program"); Lavin Decl. ¶ 22 (Caremark learned of HSP "[a]t or within several months of . . . launch"); Zavalishin Decl. ¶¶ 7–8 (Aetna "learned that CVS was launching a generic drug membership program called Health Savings Pass" around the time Aetna was negotiating its contract with CVS late in 2008).)  The following summarizes the evidence in the record related to the understanding and knowledge of the Six Intermediaries with respect to CVS's HSP program:

- **Caremark/PCS**:  Lavin testified that after Walgreens instituted its program in 2007, Caremark worked with its legal team to evaluate that and similar programs under Caremark's contracts.  (Lavin Dep. 105:22–106:25.)  He averred that within several months of the HSP program's launch, he discussed HSP with CVS's then Vice President of Managed Care, and was informed that CVS would not be submitting the HSP program as its U&C.  Lavin further averred that he agreed that the CVS-Caremark agreement did not require HSP prices to be passed through as U&C, and that the term "applicable discounts" did not include the HSP price.  (Lavin Decl. ¶¶ 21–22.)

- **MedImpact**:  Barre testified that MedImpact considered U&C as the "price of that product [] at that store at that given point in time" for "someone that has walked off the street" without a form of prescription benefit.  (Barre Dep. 24:6–27:3.)  Barre further testified that MedImpact distinguished between "active" and "passive" pricing.  Simply put, in an active model, the person had to have undertaken an action to register into the program whereas in a passive model, the person automatically receives the lower price.  (*Id.*)  According to Barre, MedImpact did not consider active pricing models, such as HSP, as an applicable discount for the purposes of its U&C definition.  (*Id.* at 30:16–33:7.)

- **Express Scripts**:  Compton testified that Express Scripts made a business decision that when the "[p]atient had to choose to participate in the program," it was Express Scripts' position that that person "was outside of the usual and customary retail pricing."  (Compton Dep. 19:16–22:4.)  Compton averred that Express Scripts was "aware that CVS was not submitting . . . the membership program prices as U&C price" and "did not object to CVS's approach because Express Scripts understood that the membership program price did not meet the definition of the U&C, as set forth in the contract."  (Compton Decl. ¶¶ 17–18.)

- **MedCo**:  Strein testified that MedCo had a general policy that membership programs were not considered U&C because it "wasn't available to all" but rather only to some "who chose to take additional actions."  (Strein Dep. 91:7–94:22.)  As such, MedCo did not consider HSP prices to constitute U&C because "CVS required HSP members to affirmatively opt into the program."  (Strein Decl. ¶ 11;

*see also* Spadaccino Decl. ¶ 10 (averring the same because a "regular customer paying the retail price (i.e., the cash customer) who did not join the program was not entitled to the same pricing structure").)

- **Optum**: Reichardt avers that the amendment to the agreement in 2015 explicitly excluding discount programs "memorialized both parties' prior understanding that CVS was not required to submit its [HSP] price as its [U&C] price on claims submitted to Optum." (Reichardt Decl. ¶ 10.) Reichardt explained that "Optum did not consider HSP members, who had affirmatively enrolled in a program, to be "cash customers." (*Id.* at ¶ 11.) Reichardt further explained that Optum's general policy was that if a "pharmacy required a customer to enroll in a program in order to access the membership program's prices, then neither Optum nor Prescription Solutions required the pharmacy to submit the program's prices as U&C." (*Id.* at ¶ 12.)

- **Aetna**: Zavalishin averred that on or about December 15, 2008, while he was negotiating Aetna's contract with CVS, he received an email from CVS about the HSP program. He agreed with defendants that under the agreement, defendants did not need to submit the HSP price as U&C. (Zavalishin Decl. ¶¶ 10–13.)

Defendants contend that the evidence described above demonstrates the PBM and TPP understanding of the agreements, and therefore proves that no misrepresentations were made.

### d. *Evidence Purporting to Demonstrate HSP Prices Should Be U&C*

In addition to the contractual language, plaintiffs proffer that the following types of documents demonstrate—or at least create a genuine dispute of material fact—that defendants were aware of and were concerned that its HSP program prices would be considered as U&C:

- **May 9, 2008 Presentation**: An internal presentation discussing "Cash card program offering recommendations," in which defendants recognized that "[m]aking the program 'too attractive' creates higher risk for our 3rd party plan pricing and profitability." (Dkt. No. 306-2 at 5.)

- **August 18, 2008 Presentation**: Slide in the presentation calls for the need to "understand financial implications" because "PBM clients are likely to request access to that level of pricing for their plan participants" and "[c]reation of a CVS retail cash program may put increasing pressure on 3rd party reimbursements from other payers." (Dkt. No. 302-9 at 9.)

- **January 19, 2009 Email**: Emails between CVS executives demonstrating concern over the broad definition of U&C in Medco's 2009 provider manual. (Dkt. No. 302-22 at 2.) Scott Tierney writes the he is "concerned that it is asking for our HSP rates" and indicates that the manual "appears to be fairly recent" and that CVS "should challenge it." (*Id.*)

- **February 2009 Email Chain**: Internal CVS emails asking employees to gather definitions of U&C within PBM and TPP contracts and provider manuals. (Dkt. No. 302-12.)

- **June 25, 2010 Landscape Strategy Document**: Discussing a scenario where state Medicaid programs required HSP pricing, defendants hypothesized that such "would lead to Private payers demanding the same price" leading to HSP becoming U&C. (Dkt. No. 302-24 at 17.)

- **July 2010 Email and Memos**: After Connecticut instructed CVS to report its HSP price as its U&C for Connecticut Medicaid purposes, defendants prepared an internal memorandum to "[i]dentify alternative solutions, whereby the passing of the HSP pricing on CT Medicaid claims would not place CVS at risk with our HSP customers, the state of CT, all other state Medicaid programs, and the commercial sector." (Dkt. No. 306-6 at 5.)

- **December 6, 2012 ScriptSave Business Case**: ScriptSave sought to administer defendants' CVS program and presented defendants with their plan for doing so. In this presentation, ScriptSave indicated that they could minimize "the risk of third party U&C 'discussions,'" indicating that a "ScriptSave program can allow CVS to protect its third party reimbursement levels." (Dkt. N0. 302-21 at 4.) A January 25, 2013 email further explains that ScriptSave has "proven strength and expertise" in their "comprehensive analytical approach throughout the product life cycle, including formulary management and innovation, Usual and Customary pricing strategies to 'protect' loyalty member price from third parties, competitive market intelligence, and compliance with state and federal guidelines—specific to pharmacy savings programs." (Dkt. No. 302-23 at 2.)

In addition to demonstrating defendants' acknowledgement of the risks that PBMs and TPPs will consider their HSP prices as U&C, the documents cited above and other documents refer to the HSP program as a "cash" program, which, plaintiffs argue, further demonstrates that HSP prices should have been submitted as U&C.[18]

### 2. *No Genuine Dispute of Material Fact*

Plaintiffs argue that at least triable issues of fact exist that under the agreements defendants were required to submit their HSP prices as U&C prices. Specifically, plaintiffs argue: (i) that the contracts each define U&C as a cash price; (ii) several documents refer to HSP as a "cash" program; (iii) the contracts require CVS to include all applicable discounts as part of their U&C calculation; and (iv) contemporaneous internal emails demonstrate that defendants acknowledged that HSP could be considered by others as a U&C price.

---

[18] Plaintiffs also argue that a triable issue of material fact exists as to whether the HSP program was a bona fide membership program, based on Dr. Hay's analysis. For the same reasons the Court rejected those arguments in the context of defendants' motion to exclude Dr. Hay's opinions, the Court rejects them here. (*See supra*.)

Plaintiffs' claims of misrepresentation rely on defendants breaching their contract with the PBMs and TPPs by submitting false U&C prices. That analysis turns on whether defendants were required to submit HSP program rates as their U&C prices under each of the relevant agreements. With regard to how PBMs and TPPs viewed defendants' HSP programs in that context, the only evidence that exists in the record is that of the PBM and TPP executives who filed declarations or were deposed on behalf of defendants. Invariably, each averred to their understanding that defendants were not required to submit the HSP program prices as U&C. Plaintiffs have offered no contrary evidence.

The evidence plaintiffs have put forward is not sufficient to create a dispute of material fact as to whether defendants breached their agreements with the PBMs and TPPs. That defendants exhibited concern about how PBMs and TPPs would view the HSP program—while relevant—is ultimately inconsequential in light of evidence demonstrating that the PBMs and TPPs were aware of the HSP program, knew that defendants were not submitting HSP rates as their U&C, and yet did nothing to compel defendants to do so. Rather, that sequence of events provides further support for defendants' position that the PBMs and TPPs legitimately did not view HSP prices as U&C. In some cases, the PBMs even amended the agreement to exclude explicitly membership programs from their definition of U&C. Equally unavailing is plaintiffs' argument that because defendants have referred to the HSP program as a cash program and U&C is the price paid by a cash-paying customer, HSP is therefore U&C. Some references to the HSP program as a "cash script" or "cash discount program" do not contradict the evidence in the record demonstrating the PBMs' and TPP's understanding of their agreements with defendants.

Thus, the Court finds that no genuine issue of material fact exists as to whether defendants misrepresented the U&C price to the PBMs.[19] The Court need not address issues related to

---

[19] Plaintiffs have further argued that whether defendants made misrepresentations to the PBMs is immaterial to their claims because defendants had independent obligations to their customers who are third-party beneficiaries of the CVS-PBM agreements. Specifically, they argue that as third-party beneficiaries to the agreements, they can bring consumer-protection claims arising out of a breach of contract. However, and without resolving whether plaintiffs are actually third-party beneficiaries to the contracts, that claim still requires an underlying breach of contract. And, if a breach did exist, plaintiffs need not be third-party beneficiaries to the agreements to raise the UDAP and common law claims brought here. However, absent a misrepresentation from

reliance or causation here, where plaintiffs have failed to satisfy a necessary element of each of their claims. Accordingly, the Court **GRANTS** summary judgment in favor of defendants.

## VI.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** as follows: The Court **GRANTS IN PART** plaintiffs' motion for class certification, and **CERTIFIES** the following state classes:

**1) California Class:** All CVS customers in California who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS or Optum; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**2) Florida Class:** All CVS customers in Florida who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**3) Illinois Class:** All CVS customers in Illinois who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered by Caremark/PCS; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

**4) Massachusetts Class:** All CVS customers in Massachusetts who, between November 2008 and July 31, 2015 (the "Class Period"), (1) purchased one or more generic prescription drugs that were offered through CVS's Health Savings Pass ("HSP") program at the time of the purchase; (2) were insured for the purchase(s) through a third-party payor plan administered either by Express Scripts or MedImpact; and (3) paid CVS an out-of-pocket payment for the purchase greater than the HSP price for the prescription.

The Court **DENIES WITHOUT PREJUDICE** plaintiffs' motion to certify a New York and Arizona class because the proposed class representatives fail to satisfy the typicality requirement of Rule 23(a).

---

defendants to the PBMs regarding their true U&C price, no such breach of contract exists. Thus, as the Court has previously explained, plaintiffs' claims are inextricably tied to whether defendants made any misrepresentations to the PBMs in the first instance.

The Court **GRANTS IN PART** defendants' motion to strike certain opinions by Dr. Hay and **STRIKES** Dr. Hay's opinion that HSP prices are U&C, but **DENIES** defendants' motion otherwise. The Court **GRANTS** defendants' motion for summary judgment.

Defendants must file a proposed judgment, approved as to form by all parties, within five business days of this Order.

This Order terminates Docket Numbers 271, 274, and 287.

**IT IS SO ORDERED.**

Dated: September 5, 2017

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**